

COMMONWEALTH OF PENNSYLVANIA
## OFFICE OF ATTORNEY GENERAL

KATHLEEN G. KANE
ATTORNEY GENERAL

**January 25, 2016**

**Litigation Section**
**15th Floor, Strawberry Square**
**Harrisburg, PA 17120**
**Phone (717) 787-8106**
**Fax (717) 772-4526**
**kjoel@attorneygeneral.gov**

**BY ECF**

**Honorable Yvette Kane**
**United States District Judge**
**Middle District of Pennsylvania**
**228 Walnut Street**
**Harrisburg, PA 17101**

    Re:    *Benezet Corporation LLC, et al v. Cortés, et al*
           **No. 1:16-cv-0074 (M.D. Pa.)**

Dear Judge Kane:

Plaintiffs, a week before the start-date for the collection of signatures to place Republican and Democratic candidates for President of the United States on the Pennsylvania Republican or Democratic primary ballot, filed an Amended Complaint and a separate motion seeking to prevent Defendants from enforcing provisions of the Pennsylvania's Election Code that, if in effect, may reduce the profit Plaintiffs can make from their professional signature collecting business. Defendants oppose Plaintiffs' motion and, for the benefit of this Court and in advance of Tuesday's hearing, offer this Letter Brief outlining some of the flaws with Plaintiffs' arguments.[1]

---

[1]     Because Plaintiffs' Brief presents no equal protection argument as to the notarization requirement or the requirement that collectors of signatures for candidates seeking to get on the Republican primary ballot for President be duly registered and enrolled as a member of the Pennsylvania Republican party, we need not address those theories here. Moreover, given Plaintiffs' late filings, we reserve the right to present additional arguments based on the facts elicited at Tuesday's hearing. Finally, Defendants reserve the right to present other arguments— either by way of a Rule 12 Motion or a Rule 56 Motion—as this case proceeds.

January 25, 2016
Page 2

## Maxims Relevant To Election Law Challenges

 "Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections" because "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (further quotations omitted). As such, Pennsylvania has "a major role to play in structuring and monitoring the election process, including primaries." *California Democratic Party v. Jones*, 530 U.S. 567, 572 (2000) (citing *Burdick v. White*, 504 U.S. 428, 433 (1992); *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 357-58, 364 (1997) ("[s]tates certainly have an interest in protecting the integrity, fairness, and efficiency of their ballots and election processes as means for electing public officials"); *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986)).

In this regard, the Supreme Court has noted that it is "too plain for argument" that the Commonwealth "may require parties to use the primary format for selecting their nominees." *Jones*, 530 U.S. at 572 (citing *American Party of Tex. v. White*, 415 U.S. 767, 781 (1974)). To prevent burdening ballots with frivolous candidacies, Pennsylvania "may require parties to demonstrate 'a significant modicum of support' before allowing their candidates a place on that ballot." *Id*. at 572 (quoting *Jenness v. Fortson*, 403 U.S. 431, 442 (1971)). To avoid party raiding—a process by which dedicated members of one party formally switch to another party to alter the outcome of that party's primary—Pennsylvania can have closed primaries and impose reasonable restrictions on participation in the primary process. *Id*. at 572 (citing *Rosario v. Rockefeller*, 410 U.S. 752 (1973)). Indeed, the Supreme Court has repeatedly recognized that a state may constitutionally have laws that promote the two-party system. *See Timmons*, 520 U.S. at 366-67 ("[t]he Constitution permits the Minnesota Legislature to decide that political stability is best served through a healthy two-party system").

As it relates to this case, moreover, the fact is that Pennsylvania has a closed primary system for the Republican and Democratic parties. The Supreme Court has made clear that such systems are constitutional and, in fact, further the First Amendment rights—associational and speech—of "citizens to band together in promoting among the electorate candidates who espouse their political views." *Jones*, 530 U.S. at 573; *see also id*. at 573 ("[t]he formation of national political parties was almost concurrent with the formation of the Republic itself"). "Consistent with this tradition, the Court has recognized that the First Amendment protects 'the freedom to join together in furtherance of common political beliefs,' *Tashjian*, supra, at 214-15, which 'necessarily presupposes the freedom to identify the people who constitute the association, and to limit the association to those people only.'" *Jones*, 530 U.S. at 574 (quoting also *Democratic Party of United States v. Wisconsin ex rel. LaFollette*, 450 U.S. 107, 122 (1981)). And, a necessary corollary of the "right to associate is the right not to associate" because "[f]reedom of association would prove an empty guarantee if associations could not limit control over their

January 25, 2016
Page 3

decisions to those who share the interests and persuasions that underlie the association's being."
*Id*. at 574.

"In no area is the political association's right to exclude more important than in the process of selecting its nominee.  That process often determines the party's positions on the most significant public policy issues of the day, and even when those positions are predetermined it is the nominee who becomes the party's ambassador to the general electorate in winning it over to the party's views."  *Id*. at 575.  "Unsurprisingly, [the Court's cases] vigorously affirm the special place the First Amendment reserves for, and the special protection it accords, the process by which a political party 'select[s] a standard bearer who best represents the party's ideologies and preferences.'"  *Id*. at 575.  Indeed, the selection of a party's nominee is "the crucial juncture at which the appeal to common principles may be translated into concerted action, and hence to political power in the community."  *Id*. at 575.

## Plaintiffs' Present Challenges

With these maxims in mind, Plaintiffs—a Texas LLC that collects signatures for profit and its president who styles himself as a professional signature collector—challenge three aspects of Sections 908 and 909 of Pennsylvania's Election Code—*see* 25 P.S. § 2868; 25 P.S. § 2869— and seek to enjoin these three provisions on an emergency basis.  First, Plaintiffs seek to preliminarily enjoin Defendants from enforcing the provision that prohibits qualified electors from signing more than one nomination petition for a putative Republican candidate as they claim that this provision violates the equal protection rights and their rights under the First Amendment.  Second, Plaintiffs want to preliminarily stop Defendants from enforcing the requirement that the circulator affidavit appended to nomination petitions is sworn to before a notary or other person authorized to administer the oath as they claim that this violates their rights under the First Amendment.  And, third, Plaintiffs are trying to halt Defendants from enforcing the part of the Election Code that requires collectors of signatures for a Republican candidate for President to be a qualified elector duly registered and enrolled as a member of the Republican party of Pennsylvania as they believe that this provision violates their First Amendment rights.

Plaintiffs' contentions, however, miss the mark for several reasons.  First, as neither Benezet nor Pool are Republican candidates, or Pennsylvania Republican voters, or members or the Pennsylvania Republican party—instead, they are in business to maximize their profits when collecting signatures for Republican candidates for President—they lack standing to invalidate these provisions and their harm, if any, is limited to making less money than they may want to by complying with the Election Code.  Second, the laws at issue have been on the books for decades and the candidates identified in the Amended Complaint—Senators Cruz and Paul—have been Republican candidates for President for nearly a year.  In short, Plaintiffs created their own urgency by unreasonably waiting until a week before the start of the period for signature collection to seek this emergency preliminary injunctive relief.  Third, Plaintiffs' harm really is

January 25, 2016
Page 4

that they will not be able to maximize their profits—thus, the challenged provisions have not irreparably harmed them (and a remedy at law, seeking damages, would suffice to make them whole for whatever putative harm they claim). And fourth, the provisions challenged do not create any meaningful burden to collectors seeking signatures for Republican candidates for the Presidency and, as such, they are constitutionally valid parts of Pennsylvania's constitutionally permitted closed primary framework.

### Benezet And Pool Lack Standing To Enjoin The Challenged Provisions

Throughout their Brief, Benezet and Pool argue that the challenged provisions somehow impact the rights of Republican candidates or Republican voters. *See, e.g.*, Pl. Br. at 15-16, 18-19, 34-39 (discussing the double-dipping prohibition in terms of the purported impact to Pennsylvania voters). Benezet is a Texas LLC and its business is collecting signatures for Republican candidates. As relevant here, it seeks to send employees into Pennsylvania to collect signatures for Republican candidates for President of the United States. Pool is the president of Benezet and also an employee of Benezet and he seeks to collect signatures—for a fee—in Pennsylvania so that Senator Paul can appear on the Republican primary ballot.

The factual support needed "to establish standing depends considerably upon whether the plaintiff is himself an object of the action….If he is, there is ordinarily little question that the action or inaction has caused him injury." *Lujan v. Defenders of Wildlife,* 504 U.S. 555 at 561–62 (1992). Here the portions of the Election Code challenged by the Plaintiffs directly regulate the manner in which the major political parties nominate their party candidates for the closed primary elections in Pennsylvania. 25 P.S., Ch 14, Art. IX(a) ("[n]omination of Party Candidates at Primaries"); 25 P.S. § 2868 ("[m]anner of signing nomination petitions; time of circulating"); 25 P.S. §2869 ("[p]etition may consist of several sheets; affidavit of circulator"). Yet, Plaintiffs are neither a major political party, a major party candidate, nor a Pennsylvania qualified elector and therefore are not part of the Pennsylvania closed primary election. The Plaintiffs are not the object of the statutes' governance. As such, they cannot establish standing by arguing that the challenged provisions purportedly harm Pennsylvania voters or Republican candidates for President and these alleged "harms" are irrelevant to this case. *See Amato v. Wilentz*, 952 F.2d 742 (3d Cir. 1991) (dismissing claim brought by plaintiffs seeking to litigate the rights of others—"[t]he longstanding basic rule of third party standing is that 'in the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties'") (quoting *Powers v. Ohio*, 499 U.S. 400 (1991)).[2]

Moreover, Benezet employs persons to go to states and—for a fee—collect signatures for candidates. Benezet Decl, ¶ 2. Benezet admits, however, that it has collected signatures for

---

[2]   In fact, it is particularly telling that no Pennsylvania Republican voter, nor any Republican candidate for President, nor the Pennsylvania Republican party has joined this case, nor has any of them independently tried to invalidate these provisions.

January 25, 2016
Page 5

candidates in Pennsylvania before.  *See* Benezet Decl., ¶ 3 (stating that Benezet has collected signatures in various states including Pennsylvania).  Benezet also maintains that the challenged provisions may increase its costs of operation.  *See* Benezet Decl., ¶¶ 4, 6-9 (setting forth the purported additional costs purportedly associated with the challenged provisions).  Pool is employed by Benezet and is paid by Benezet and he makes similar admissions that the challenged provisions will supposedly increase the costs of doing business in Pennsylvania.  Pool Decl., ¶¶ 8, 10, 12-14.  Even assuming the truth of the assertion that less profit may be made, such does not justify standing for the purpose of invalidating Pennsylvania's election laws.[3]

**Plaintiffs Have Unreasonably Delayed And, Thus, Are Not Entitled To The Extraordinary Relief Of A Preliminary Injunction**

"An unreasonable delay in seeking an injunction negates the presumption of irreparable harm."  *FMC Corp v. Control Solutions. Inc.,* 369 F.Supp.2d 539, 582 (E.D.Pa. 2005).  To establish an inexcusable delay, Defendants must show that Plaintiffs sat on their rights and to establish prejudice Defendants must show that the delay has disadvantaged Defendants.  *See In re Mushroom Transp. Co., Inc.,* 382 F.3d 325, 337, 342-43 (3d Cir. 2004).  And, in election challenges, courts have recognized that "any claim against a state elector procedure must be expressed expeditiously."  *Bowes v. Indiana Secretary of State,* 2014 WL 6474097, *3 (S.D. Ind., Nov. 19, 2014) (citing *Fulani v. Hogsett,* 917 F.2d 1028, 1031 (7th Cir. 1990) (citing, in turn, *Williams v. Rhodes,* 393 U.S. 23 (1968))).

---

[3]     Plaintiffs offer a single case that actually analyzed the standing question where the only plaintiff was a collector of signatures; however, that case did not challenge a notarization provision or the one-voter-one-signature rule so, as to those claims it is irrelevant.  *See Daien v. Ysursa*, 711 F. Supp. 2d 1215 (D. Idaho 2010).  In *Daien*, the plaintiff asserted that he was prohibited from collecting signatures in Idaho.  Here, Plaintiffs concede that they can collect signatures—and be paid for it—they merely need to have a Pennsylvania Republican voter sign the Affidavit.  Indeed, Benezet admits that it has collected signatures in Pennsylvania before.  Plaintiffs' other "standing" cases, moreover, included political parties as challengers and no meaningful analysis of the standing issue occurred.  *See, e.g., Nader v. Brewer,* 531 F.3d 1028 (9th Cir. 2008); *Green Party of Pennsylvania v. Aichele,* 89 F. Supp. 3d 723 (E.D. Pa. 2015).  Further, virtually every case cited by Plaintiffs involved challenges to minor-party ballot access laws while this case involves a challenge to provisions relating only to the Democratic Party or the Republican Party.  As such, the underlying question in Plaintiffs' cases was whether prohibiting out-of-state signature collectors somehow unconstitutionally burdened the ability of minor-party candidates to access the general election ballot.  Plaintiffs have raised no such argument here; nor could they given the fact that a Republican or Democratic Presidential candidate only needs 2,000 signatures to appear on the primary ballot—an amount that has been held to be *de minimis*.  *See Trinsey v Mitchell*, 851 F. Supp. 167 (E.D. Pa. 1994).

January 25, 2016
Page 6

Here, Plaintiffs were anything but expeditious. The Pennsylvania Election Code and the specific sections challenged have existed in some form since 1937. Additionally, the field of Republican candidates has been known for months. In fact, Senator Cruz was the first to announce his candidacy in March of 2015 and Senator Paul has been a candidate since April of 2015. Therefore, the knowledge that these candidates would want to qualify for the Pennsylvania primary election has long been established. Notably, moreover, Plaintiffs offer nothing in their Amended Complaint or Declarations to suggest that these campaigns only recently contacted them (or refused to do business with them) or that any other Republican candidate has recently contacted them to collect signatures in Pennsylvania. Plaintiffs only sought the extraordinary relief of a preliminary injunction seven days before the first day of the nomination petition period. It is Plaintiffs' own delay that has caused the current urgency and it prevents the extraordinary relief they seek.

Furthermore, Defendants are prejudiced by Plaintiffs' delay. The nomination petitions have already been posted to the Department of State's website and hundreds of circulators and candidates have already downloaded the forms in anticipation of the nearing January 26, 2016 start date for collection of signatures. The requested relief would require that the Defendants expend time and money to revamp the current petitions, reissue them, and somehow notify signature collectors and candidates of the changes. Additionally, the requested relief would cause undue confusion and expense to the Pennsylvania electorate who have already prepared their nomination petitions and possibly began producing copies of them in preparation for tomorrow's start date.

Plaintiffs' delay until less than a week before the nomination petition period begins is unreasonable and it materially prejudices the Defendants. Accordingly, Plaintiffs' motion for injunctive relief must be denied. *See also Perry v. Judd*, 840 F. Supp. 2d 945 (E.D. Va.), *aff'd*, 471 Fed. Appx. 219 (4th Cir. 2012) (rejecting challenge to out-of-state collector prohibition by Presidential candidate Rick Perry on the basis of laches and noting that then-Governor Perry's "cognizable injury occurred no later than … the day on which he declared his candidacy" and, at that point, Virginia's "residency requirement prevented him from using non-resident petition circulators").

### Plaintiffs' Harm, If Any, Is Monetary And Not Irreparable

As discussed above, Plaintiffs concede that the harm, if any, is monetary. To that end, Benezet believes that its business will be less profitable if it is compelled to have the circulator's affidavit appended to nomination petitions notarized, or if it cannot have Pennsylvania Republican voters double-dip or triple-dip or quadruple-dip (by signing nomination petitions for multiple candidates), or if it must have a Pennsylvania Republican voter accompany the professional collectors to sign the appropriate affidavit. Pool's admissions confirm that the harm is a possible loss of profit. To the extent that Plaintiffs can establish, at trial, that they lost revenue because of these laws, or to the extent that Plaintiffs can demonstrate, at trial, that they were denied specific

January 25, 2016
Page 7

contracts solely because of these laws, then Plaintiffs may be entitled to recover monetary damages in this § 1983 suit. Because Plaintiffs have the ability to recoup their alleged monetary damages—should they properly further amend their Complaint—these provisions do not irreparably harm them and they are not entitled to preliminary injunctive relief. *See Continental Group, Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351, 359 (3d Cir. 1980) (movant has the burden of proving a "clear showing of immediate irreparable injury"); *Glasco v. Hills*, 558 F.2d 179, 181 (3d Cir. 1977) (the "requisite feared injury or harm must be irreparable not merely serious or substantial" and "must be of a peculiar nature, so that compensation in money cannot atone for it").[4]

This result is not changed by the fact that Plaintiffs have asserted First Amendment claims. First, all election laws impact, to some extent, a person's or a party's or a candidate's First Amendment rights of association and speech; however, it cannot be that all such laws necessarily irreparably harm these rights and the Supreme Court's sliding-scale approach to analyzing such challenges—looking first at the actual burden to the rights of the challenger—reflects this point. Second, Benezet admitted that it has professionally collected signatures in Pennsylvania in the past. Further, Plaintiffs concede that they are able to send non-Pennsylvania registered Republicans into Pennsylvania so long as a Pennsylvania Republican voter accompanies them. Similarly, having the nomination petitions notarized does not impact the ability of Plaintiffs to try to convince voters to support the candidate who hired them to collect signatures and requiring Pennsylvania Republican voters to only sign one nomination petition does not adversely affect Plaintiffs' ability to interact with prospective signors. Thus, there is no significant burden—let alone a complete bar—to their purported First Amendment activities.[5]

---

[4]     Of course, as currently pled, Plaintiffs cannot recover money damages against the named Defendants because they have only been sued in their official capacities and such claims are barred not only by the Eleventh Amendment but also because the individuals, when sued in their official capacities, are not "persons" for purposes of 42 U.S.C. § 1983.

[5]     In fact, since Pennsylvania Republicans cannot double or triple dip—in terms of signing nomination petitions—Plaintiffs will likely be forced to interact with more citizens of the Commonwealth—Republican and Democratic alike—and while these persons may not be legally able to sign a petition for Senator Paul, Plaintiffs could still advocate what they believe to be the benefits to Pennsylvania and the United States of "President Paul" and they will need to do so to more people. Moreover, having a Pennsylvania Republican voter with the paid signature collectors can further the political speech that Plaintiffs believe will be curtailed because, for example, there can be two voices for Senator Paul instead of one. There are doubtless other benefits to using a buddy system—more accurate navigation between homes of potential signers, easier juggling of petitions, campaign literature and other materials, helping teach the Pennsylvania resident to be a better and more efficient circulator, etc.—and to say it has all disadvantages and no advantages is clearly wrong.

January 25, 2016
Page 8

## A Preliminary Injunction Would Affect The First Amendment Rights Of Non-Parties

Pennsylvania has a closed primary process.  To that end, only Pennsylvania registered Republican voters are legally permitted to sign nomination petitions, only Pennsylvania registered Republican voters are legally permitted to sign the affidavit that accompanies the nomination petitions, and only Pennsylvania registered Republicans can vote in the Republican primary.  As discussed above, the primary process involves the two major parties—Republican and Democratic.  The Pennsylvania Republican Party—like the Pennsylvania Democratic Party—has First Amendment rights as it relates to who can participate in their respective primaries.  Plaintiffs' motion, if granted, would mean that non-Pennsylvanians could collect signatures for the Republican and Democratic primary for President and, in fact, that non-party members could collect signatures for the other party.  This impact on the First Amendment rights of non-present third-parties would be inappropriate and, thus, Plaintiffs' requested relief should not issue.

## Plaintiffs Cannot Demonstrate A Likelihood Of Success On The Merits

The Third Circuit has made clear that the sliding-scale test of *Anderson v. Celebrezze*, 460 U.S. 780 (1983) is the proper test for analyzing equal protection challenges and First Amendment challenges to election laws.  *Rogers v. Corbett*, 468 F.3d 188, 193-94 (3d Cir. 2006).  Thus, this Court must assess the burden that Plaintiffs demonstrate and then must weigh that burden against the Commonwealth's interests and the challenged provision is only unconstitutional if the burden outweighs the interests.  *Id*. at 194.[6]

The goal of Benezet and Pool is to collect 2,000 signatures for a Republican Presidential candidate and, since they are paid on a fee/signature basis, the more signatures they get the more they get paid.  There are nearly 3,000,000 registered Republican voters in Pennsylvania and this means that, to gain access to the primary ballot, any given candidate needs only show support of 0.067% of his/her party's voters in the Commonwealth and there is no evidence that any person seeking to gain access to the Republican/Democratic primary ballot has ever not met this number.  This is hardly a high threshold and, in fact, it has been held to be a *de minimis* burden.  *See Trinsey*, 851 F. Supp. at 169-70 (collecting cases).  The business of Benezet and Pool is getting paid for getting these signatures.  Given the *de minimis* number of signatures needed, the burden on Plaintiffs in obtaining these signatures is also *de minimis*.  Having a Pennsylvania Republican voter accompany Benezet employees—including Pool—is not a significant burden to

---

[6]     During the conference call on January 22, 2016, Plaintiffs' counsel argued that this was not a ballot access case.  Defendants do not really understand this position since virtually all of the cases cited in Plaintiffs' 42-page Brief involve challenges by minor parties to ballot access provisions.

January 25, 2016
Page 9

the collection of 2,000 Republican signatures.  Significantly, Benezet admitted that it has collected signatures in Pennsylvania before.  No facts have been offered to suggest that Plaintiffs have been unable to recruit a Pennsylvania Republican voter to accompany Pool or other Benezet employees, or that doing so will cost so much as to make his signature collection a money-losing proposition, or that Benezet cannot build these costs into the rate/signature he gets from clients. Similarly, there are no facts presented to demonstrate that the notarization requirement— estimated by Plaintiffs to be less than $300 for the 2,000 signatures—will prevent Plaintiffs from advocating political speech or cause Plaintiffs to lose so much money on their signature collection efforts so as to prohibit them from engaging in the effort.  And, there are no facts to prove that prohibiting double-dipping of signatures will prevent Plaintiffs from engaging in political speech or ceasing their efforts altogether because they will lose money doing so.

Since these provisions impose a *de minimis* economic burden on Plaintiffs, Pennsylvania's important regulatory interests are sufficient to justify them.  As discussed above, Pennsylvania has a significant interest in requiring candidates to show a significant modicum of support. Pennsylvania is also constitutionally permitted to have a closed primary system and the justifications for such a system include the prevention of party raiding/party hijacking and allowing the Pennsylvania Republican party (or the Pennsylvania Democratic party) to have a significant say in the candidates who appear on the Pennsylvania Republican primary ballot (or the Pennsylvania Democratic primary ballot). *See Nader v. Schaffer*, 417 F. Supp. 837, 845 (D. Conn.) (Connecticut was constitutionally allowed to "legislat[e] to protect the party from intrusion by those with adverse political principles" in order to safeguard the constitutional rights of party members during the candidate selection process), *aff'd*, 429 U.S. 989 (1976); *Balsam v. Secretary of New Jersey*, 607 Fed.Appx. 117, 182-83 (3d Cir. 2015) ("in order to protect party members from intrusion by those with adverse political principles, and to preserve the integrity of the electoral process, a state legitimately may condition one's participation in a party's nominating process on some showing of loyalty to that party, including party membership").  Further, these provisions can assist in preventing fraud and ballot crowding and ballot confusion.  Additionally, objections to nominating petitions must be filed within seven days of the end the collection period and, statutorily, Commonwealth Court is required to begin hearings within three days of that.  Moreover, the first round of absentee ballots must be mailed on March 7, 2016.  Given this expedited process, having the person who swears to the nomination petition be a Pennsylvania resident will better allow this process to conclude in the most expeditious fashion.[7]  These provisions also allow the Pennsylvania Republican Party or the Pennsylvania Democratic Party to pick the candidate that it believes best represents the interests of Pennsylvanians.  Any of these reasons is sufficient to overcome the slight—or non-existent— burden on Plaintiffs.  *See also Davis v. Johnson*, 26 F. Supp. 3d 665 (E.D. Mich. 2014) (rejecting constitutional challenge to the prohibition of using unregistered persons to collect signatures for

---

[7]     Other primaries follow Pennsylvania and, as a professional signature collector, it certainly is possible that Benezet's employees—including Pool—will be onto other states during the objection period.

January 25, 2016
Page 10

inclusion on a ballot and noting that the non-registered persons still have the ability to speak on the candidate's behalf—they just cannot collect signatures).

**Green Party Case**

Some final points must be made since Plaintiffs try to pigeon-hole this case into the *Green Party* decision.  First, *Green Party* granted summary judgment in favor of the Commonwealth on the facial challenges to the non-resident collector provision and the notarization fee provision.  89 F. Supp. 3d at 742, 745.  Second, *Green Party*, like most of the cases on which Plaintiffs rely, were challenges brought by minor political parties.  This distinction is dispositive because, as it related to the challenges, the Court found that, in the context of those minor parties' access to the ballot, such restrictions would make it unduly burdensome for a candidate to get on the ballot because fewer collectors would be available to gather the far more signatures that are needed to achieve ballot access.  *See, e.g., Green Party*, 89 F. Supp. 3d at 734, 740 (the minor party gubernatorial candidate needs 16,639 signatures whereas only 2,000 signatures are needed for major-party candidates); 89 F. Supp. 3d at 743 (in reference to the notarization fee, crediting the minor party's evidence that they were "near-indigent political entities").  Third, as for the double-dipping restriction, the *Green Party* Court rejected the First Amendment challenge and concluded that the Commonwealth prohibition on double-dipping did not impermissibly "burden the Green Party plaintiffs' First Amendment association and speech rights."  89 F. Supp. 3d at 748-49.  While the Court did invalidate that provision, it did so only on equal protection grounds because it found that major party members could sign nomination petitions for one candidate but vote for another in the primary but minor party members could not.  That concern is not at issue here and, without doubt, there are material differences between major political parties and minor political parties that justify differential treatment.

**Conclusion**

A preliminary injunction is an "extraordinary and drastic remedy" and it should not be granted "unless the movant, by a clear showing, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *see also American Telephone & Telegraph Co. v. Winback and Conserve Program, Inc.,* 42 F.3d 1421 (3d Cir.1994) (preliminary injunctive relief "should be granted only in limited circumstances") (quoting *Frank's GMC Truck Center, Inc. v. General Motor Corp.,* 847 F.2d 100, 102 (3d Cir.1988)), *cert. denied,* 514 U.S. 1103 (1995).  This extraordinary relief may only be granted where the moving party demonstrates that:  (1) she has a reasonable probability of success on the merits; (2) she will be irreparably injured by denial of the relief; (3) the granting of a preliminary injunction will not result in even greater harm to the non-moving party; and (4) granting the relief is in the public interest.  *McTernan v. City of York*, 486 F. Supp. 2d 466 (M.D. Pa. May 21, 2007).  An injunction may properly be issued only where the moving party produces evidence sufficient to convince the Court that all four factors favor preliminary relief.  *Merchants & Evans, Inc. v. Roosevelt Bldg. Products Co.*, 963 F.3d

January 25, 2016
Page 11

628, 632-33 (3d Cir.1992).  "[U]pon an application for a preliminary injunction to doubt is to deny."  *Madison Square Garden Corp. v. Braddock*, 90 F.2d 924, 927 (3d Cir. 1937).

Because Plaintiffs have not satisfied their burden, and because they lack standing and have unreasonably delayed in seeking this drastic remedy, Defendants respectfully request that this Court deny Plaintiffs' Motion for Temporary Restraining Order/Preliminary Injunction.

                            Sincerely,


                            /s/ *Kenneth L. Joel*
                            Kenneth L. Joel
                            Chief Deputy Attorney General


KLJ

CC:  Paul A. Rossi, by ECF