**EXHIBIT 2, Part 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT

OF PENNSYLVANIA

* * * * * * * *

BENEZET CONSULTING,      *

LLC and TRENTON POOL,    *

    Plaintiffs           *   Case No.

    vs.                  *   1:16-CV-0074

PEDRO A. CORTES and      *

JONATHAN MARKS,          *

    Defendants            *

* * * * * * * *


DEPOSITION OF

TRENTON POOL

September 27, 2016



Any reproduction of this transcript is prohibited

without authorization by the certifying agency.

Page 2

```
 1                         DEPOSITION
 2                            OF
 3       TRENTON POOL, taken on behalf of the Defendants
 4       herein, pursuant to the Rules of Civil Procedure,
 5       taken before me, the undersigned, Cynthia Piro
 6       Simpson, a Court Reporter and Notary Public in and for
 7       the Commonwealth of Pennsylvania, at the Offices of
 8       Attorney General, Strawberry Square, Fifteenth Floor,
 9       Harrisburg, Pennsylvania, on Tuesday, September 27,
10       2016 beginning at 11:00 a.m.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                        I N D E X
 2
 3    DISCUSSION AMONG PARTIES                      7 -   8
 4    WITNESS: TRENTON POOL
 5    EXAMINATION
 6       By Attorney Joel                          8 - 185
 7    DISCUSSION AMONG PARTIES                    185 - 186
 8    CERTIFICATE                                      187
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                  A P P E A R A N C E S
 2
 3       PAUL ANTHONY ROSSI, ESQUIRE
 4       873 East Baltimore Pike
 5       Suite 705
 6       Kennett Square, PA  19348
 7          COUNSEL FOR PLAINTIFFS
 8
 9       NICOLE J. RADZIEWICZ, ESQUIRE
10       KENNETH L. JOEL, ESQUIRE
11       Chief Deputy Attorney General
12       Strawberry Square, Fifteenth Floor
13       Harrisburg, PA  17120
14          COUNSEL FOR DEFENDANTS
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1                      EXHIBIT PAGE
 2
 3                                          PAGE
 4    NUMBER      DESCRIPTION            IDENTIFIED
 5    Exhibit D-4  Deposition Notice           8
 6    Exhibit D-5  Allegheny County Opinion   60
 7    Exhibit D-6  Nominating Petition        75
 8    Exhibit D-7  Cruz Campaign Agreement    85
 9    Exhibit D-8  List of Rand Paul Agreement 92
10    Exhibit D-9  Contract                   94
11    Exhibit D-10 Cruz for President         94
12    Exhibit D-11 Agreement/Contract         94
13    Exhibit D-12 Agreement/Contract        110
14    Exhibit D-13 Set of Interrogatories    140
15    Exhibit D-14 Emails                    172
16    Exhibit D-15 Objections & Responses    175
17    Exhibit D-16 Craigslist Ad             176
18
19
20
21
22
23
24
25
```

2 (Pages 2 to 5)

Sargent's Court Reporting Services, Inc.
(814)-536-8909

Page 6

OBJECTION PAGE

ATTORNEY                    PAGE

NONE MADE

---

Page 8

1    ATTORNEY JOEL:
2    Great. I'm going to mark that as
3    Defendant's 4 is what I think we're up to.
4    (Defendant's Exhibit 4 marked for
5    identification.)
6    CELL PHONE RINGS
7    OFF RECORD DISCUSSION
8    EXAMINATION
9    BY ATTORNEY JOEL:
10   **Q. Mr. Pool, I'm showing you what has been marked as**
11   **Defendant's Exhibit 4. Take a minute and take a look**
12   **at it. I've got just a few preliminary questions on**
13   **it.**
14   A. Yes.
15   **Q. My first question's going to be have you seen it**
16   **before? Have you seen Defendant's Exhibit 4 before?**
17   A. Yeah, I mean, this is what we filed to bring the
18   action against the State; correct?
19   **Q. No.**
20   ATTORNEY ROSSI:
21   No. The Deposition Notice that was sent
22   to you.
23   A. Oh, no, I haven't seen it.
24   BY ATTORNEY JOEL:
25   **Q. Okay.**

---

Page 7

1    PROCEEDINGS
2    ----------------------------------------
3    TRENTON POOL, HAVING FIRST BEEN DULY SWORN, TESTIFIED
4    AS FOLLOWS:
5    ----------------------------------------
6    ATTORNEY JOEL:
7    So we just had a discussion amongst
8    Counsel and just so that everything is clear, Mr. ---
9    well, today's deposition is noticed as a 30(b)(6)
10   deposition for Benezet Consulting, LLC. I will mark
11   in a second the Deposition Notice, but Mr. Pool is
12   here, I'm assuming, to testify on behalf of Benezet
13   for all topics in the Notice of Deposition?
14   ATTORNEY ROSSI:
15   Yes. Correct.
16   ATTORNEY JOEL:
17   Mr. Pool was also noticed individually,
18   because he's an individual Plaintiff, to be deposed
19   tomorrow. What we've agreed to do is, do one
20   deposition for both purposes so that any answer Mr.
21   Pool gives will be deemed to be an admission on behalf
22   of Benezet Consulting and on behalf of himself
23   individually as a Plaintiff. Is that agreeable?
24   ATTORNEY ROSSI:
25   Counsel agrees.

---

Page 9

1    A. He told me I have a deposition.
2    **Q. If you would look on --- to Attachment A, I think**
3    **it is, probably on the third page. Take a minute,**
4    **read those, and my question is going to be, and we've**
5    **already confirmed this but I just want to make sure**
6    **that it's on the record through you, that you are**
7    **here, prepared and ready to provide testimony on**
8    **behalf of Benezet that will bind Benezet on all of**
9    **those issues?**
10   A. Yes. I can testify.
11   **Q. Please state your full name.**
12   A. Trenton Don Pool.
13   **Q. And where do you live?**
14   A. I live in Dripping Springs, Texas.
15   **Q. What's the address?**
16   A. 3800 Creek Road.
17   **Q. What's the address for Benezet Consulting?**
18   A. The same.
19   **Q. And it's 3800 Creek Road, Dripping Springs?**
20   A. Yes, sir.
21   **Q. What's the zip code there?**
22   A. 78620.
23   **Q. Have you ever been deposed before?**
24   A. I have.
25   **Q. How many times?**

Sargent's Court Reporting Services, Inc.
(814)-536-8909

Page 10

1   A. Twice.
2   **Q. Were either of those times in connection with**
3   **your work as a signature collector?**
4   A. Once, yeah.
5   **Q. When was that deposition?**
6   A. That deposition was --- I don't recall the exact
7   date, but it was in 2015.
8   **Q. Why were you being deposed?**
9   A. Signature gathering for Houston Equal Rights
10   Ordinance.
11   **Q. Was Benezet hired to gather signatures for this**
12   **Houston Equal Rights Ordinance?**
13   A. I was, as an individual.
14   **Q. Did you gather signatures for that ordinance?**
15   A. I did.
16   **Q. And then what happened? Did somebody object?**
17   **Did somebody challenge the signatures? How was it**
18   **that it ended up in court with you being deposed?**
19   A. It was a circus, but basically the mayor did not
20   want to give the ballot access, so she fought tooth
21   and nail and I ended up being the collateral damage.
22   She wanted to depose all the pastors and I got deposed
23   with them.
24   **Q. Was the nature of your deposition trying to**
25   **challenge the signatures or the process by which you**

Page 11

1   gathered the signatures to invalidate them, what
2   was ---?
3   A. The nature of my living. I think it was just to
4   defend, yeah, the authenticity of the signatures.
5   **Q. Okay.**
6   A. They had a million questions. I mean, I don't
7   know what their agenda was, but I know that I
8   testified on, you know, mainly that.
9   **Q. And it was a deposition?**
10   A. It was a deposition.
11   **Q. And did the deposition actually take place in**
12   **Texas?**
13   A. It did.
14   **Q. So you personally attended someplace in or around**
15   **Houston?**
16   A. It was in Fulbright & Jaworski's office in
17   downtown Austin.
18   **Q. In Austin? Okay. Thank you for that. The**
19   **reason why I asked you if you'd ever been deposed is**
20   **I'd like to set some ground rules.**
21   A. Sure.
22   **Q. You probably have heard some of them, you**
23   **probably know them, but I just want to get them out**
24   **there.**
25   **First of all, can you make sure to answer**

Page 12

1   verbally? Yes, no, whatever explanation you want to
2   give is fine as long as it's the truth. Please stay
3   away from nonverbal communication, shrugs, nods,
4   uh-huhs, uh-uhs. A, because it's hard for our court
5   reporter to take it down and B, because when we read
6   this in the future we won't know what your inflection
7   was, so we won't know what your answer was. Is that
8   okay?
9   A. Understood, yes.
10   **Q. At any point if you don't hear me, you don't hear**
11   **a question, just ask me to repeat it and I'll be happy**
12   **to do so. Is that okay?**
13   A. Yep.
14   **Q. If at any point you don't understand a question,**
15   **tell me what's confusing, ask me to rephrase it. I**
16   **want to make sure that you're understanding what I'm**
17   **asking, okay?**
18   A. No problem.
19   **Q. With that, can we be agreed then that if you do**
20   **answer a question, you've heard me, understood me and**
21   **answered truthfully to the best of your knowledge?**
22   A. Sure.
23   **Q. If at any point you'd like to take a break,**
24   **that's fine as well. The only thing I ask is, answer**
25   **whatever question is on the table, then we take**

Page 13

1   whatever break you want. Okay?
2   A. Yep.
3   **Q. I'm going to talk about Benezet. When was**
4   **Benezet formed?**
5   A. 2013.
6   **Q. And it is an LLC?**
7   A. It is.
8   **Q. Has it been an LLC throughout its existence?**
9   A. It has.
10   **Q. Are there shareholders of Benezet ---?**
11   A. Actually, 2014, sorry.
12   **Q. Okay. Are there shareholders of Benezet?**
13   A. I mean, I am.
14   **Q. So you, Trenton Pool, are the only shareholder of**
15   **Benezet?**
16   A. Yes, sir.
17   **Q. What is the nature of work that Benezet does?**
18   A. We do political consulting, but mainly focus on a
19   very niche part of consulting, political consulting,
20   which is ballot access. Signature gathering. That's
21   our primary focus.
22   **Q. And has Benezet been continuously involved in**
23   **that focus of ballot access signature gathering from**
24   **2014 to the present?**
25   A. No. We've done other stuff.

4 (Pages 10 to 13)

Page 14

1  Q. What other stuff has Benezet done?
2  A. I was a consultant and campaign manager for Don
3  Zimmerman, Austin City Councilor. He got elected in
4  2015. Benezet --- this is me as Trent Pool, I mean,
5  it's so confusing because no one really knew my
6  company until this year, so I didn't really ever use
7  it, I just had it. But I would say, I mean that is
8  something I've done.
9  Q. Okay.
10 A. Can I ask him a question?
11 Q. Sure.
12 A. How do I answer this stuff that's like ---
13 because it's kind of jumbled as to what was done by
14 Trent as an individual versus Trent ---?
15 ATTORNEY ROSSI:
16 Well, just clearly state when you were
17 doing something as ---
18 A. Benezet?
19 ATTORNEY ROSSI:
20 --- as Benezet, you state as Benezet.
21 A. Okay.
22 ATTORNEY ROSSI:
23 And that if after the formation ---
24 anything before the formation of Benezet you did on
25 your own. I think opposing Counsel will understand

Page 15

1  that and it will be clear in the record. Once Benezet
2  Consulting was formed, if you did anything on your
3  own, my recommendation is to specifically denote that
4  you're doing this on your own and not through Benezet.
5  I would assume, and ask Counsel that, from the point
6  Benezet was formed, anything after would be assumed to
7  be Benezet unless he specifically says ---
8  ATTORNEY JOEL:
9  That's fine.
10 ATTORNEY ROSSI:
11 --- I was doing it on my own. Is
12 that ---?
13 ATTORNEY JOEL:
14 That's fine.
15 A. I mean, my client ---.
16 ATTORNEY ROSSI:
17 That way, to keep the record straight.
18 A. Tom didn't even know I had a company, he was just
19 like paying me whatever he could, you know? But we
20 got him elected, and then I ended up working for him
21 at the City Hall, and then before then I had done the
22 Equal Rights Ordinance, so, that was a --- so all that
23 stuff was done under my name, but, I mean, yeah. I
24 still think that kind of helps answer your question.
25 BY ATTORNEY JOEL:

Page 16

1  Q. So getting back, what I was interested in, has
2  Benezet been involved in this ballot access signature-
3  gathering niche from its formation of 2014 through the
4  present?
5  A. Yes, it has.
6  Q. So first I want to talk about what Benezet has
7  done. Campaigns it's worked on, people it's used,
8  that sort of stuff. Then, as I understand it from our
9  previous meeting at the PI hearing, you probably did
10 some of this work before forming Benezet as an
11 individual and I want to talk about that also. Okay?
12 So for now, let's talk about Benezet and then we'll
13 circle back, okay?
14 A. All right.
15 Q. So if Benezet was formed in 2014, what elections,
16 campaigns, candidates, parties, referenda has it
17 worked on from that point to the present?
18 A. I would say ---.
19 Q. And by that I'm wanting to know, and if you don't
20 give me all this, we'll follow up, that's fine, but
21 the type of stuff I'm interested in is who the
22 candidate was, what the party was, what the initiative
23 was, what year it was, what election cycle it was
24 before, what state it was in, those sorts of things.
25 Okay?

Page 17

1  A. All right. And then, again, I have, there's two
2  different entities. One's me as an individual, one's
3  Benezet. I had Benezet formed and I was still doing
4  this stuff, so people weren't writing checks under
5  Benezet. They weren't even, you know, I wasn't even
6  really using the name. No one even knew I had it. No
7  website, it just was a formed LLC. So for those
8  things, I mean, should I omit them?
9  Q. Let's talk about the ones that Benezet was
10 formally involved in.
11 A. Okay, so ---.
12 Q. Then, if there are additional ones during this
13 period that Benezet was not involved in but you were
14 involved in, we'll talk about those, and then we can
15 do the things that occurred pre-Benezet. Okay?
16 A. So I would say that the stuff Benezet's done is
17 mainly this stuff this year. Ballot access for Ted
18 Cruz, Rand Paul, working under Mike Arno and then
19 working direct for the Cruz campaign in various
20 states. Also I put you all's former senator, Rick
21 Santorum on the ballot in Indiana, where I got half of
22 his signatures. What else did we do? This is all for
23 2016. We did a citywide petition in Pittsburgh. We
24 did a Rocky De La Fuente for president, all of his
25 ballot access or most of his. I think we put him on

Page 18

1  about 17 states this summer.  And I think that's
2  pretty much it.
3  **Q. Great.  I appreciate that.  I've got some follow**
4  **up to make sure that I have the full information.  So**
5  **what states did you collect signatures for --- did**
6  **Benazet collect signatures for, for Senator Cruz?**
7  A. We did Illinois, Indiana, Vermont, Rhode Island,
8  Delaware, I've got to check that, I think we did
9  Delaware, but it was --- it doesn't matter.  Okay.
10  Pennsylvania. I think that's --- yeah.
11  **Q. For Senator Rand Paul, what states did you ---**
12  **did Benazet collect signatures in?**
13  A. We helped in Illinois and then we did all of
14  Indiana.  And then that was it.  He dropped out.
15  **Q. For former Senator Santorum, what states did**
16  **you ---?**
17  A. Just Indiana.  Just Indiana.  And we actually
18  collected for Rocky De La Fuente as a Democrat in
19  Indiana, too.
20  **Q. So for Rocky De La Fuente, where did you collect**
21  **for him?**
22  A. Wisconsin, Indiana, Pennsylvania, and also I
23  think we did some Illinois.  As a Democrat.
24  **Q. So for Rocky De La Fuente, Wisconsin, Indiana,**
25  **Pennsylvania and Illinois was for him to get on the**

Page 19

1  **Democratic primary in those states?**
2  A. Yes, sir.
3  **Q. Have you done other work for Rocky De La Fuente**
4  **to get him on as a third party or an Independent**
5  **candidate?**
6  A. Yeah.
7  **Q. Where have you done that work?**
8  A. Oh, man.  Pennsylvania, Ohio, South Dakota, North
9  Dakota, Wyoming, Montana, Washington ---.
10  **Q. Washington State or the District of Columbia?**
11  A. State.  New Mexico, where else did we do?
12  Minnesota, --- no, that was --- Wisconsin, Virginia,
13  Alabama, Mississippi.  I think that's it.
14  **Q. And this is all ---?**
15  A. Oh, Massachusetts, Connecticut, New Hampshire,
16  Rhode Island.  We'll go with that.  New York.
17  ATTORNEY ROSSI:
18  Did you do any in Georgia?
19  A. Very few, but yeah, we did some in Georgia.
20  ATTORNEY ROSSI:
21  Sorry, I didn't mean to ---.
22  ATTORNEY JOEL:
23  No, that's fine.  Thank you for
24  prompting him so we have a complete list.
25  A. Paul's been helping us there, so.

Page 20

1  ATTORNEY JOEL:
2  I'm sorry, what?
3  A. I'm sorry, nevermind.
4  BY ATTORNEY JOEL:
5  **Q. And this is all for the 2016 presidential**
6  **campaign?**
7  A. Yeah.  For his Independent.
8  **Q. So did Benazet do --- as Benazet, do any**
9  **signature collecting for any elections in 2015, in**
10  **that cycle?**
11  A. No.
12  **Q. And how about in the 2014 cycle?**
13  A. No.
14  **Q. Did Benazet have a contract with the Cruz**
15  **campaign for any of the states for which Benazet**
16  **collected signatures?**
17  A. Yes.
18  **Q. For all of them?  For some of them?**
19  A. Some of them.
20  **Q. Which ones did you have contracts for?**
21  A. I was direct with the Cruz campaign in
22  Pennsylvania, Vermont, Rhode Island and I believe
23  Delaware, but I'll have to double check Delaware.  And
24  you all should have the contract that I had with them.
25  It's in the Discovery somewhere.

Page 21

1  **Q. And then how about Indiana and Illinois?**
2  A. Indiana and Illinois I was a subcontractor.  It
3  was a weird arrangement but I had basically been hired
4  by both the person they had contracted and the Cruz
5  campaign directly almost virtually the same time.
6  They both called me.
7  **Q. What was the other contractor who used to**
8  **contractor with ---?**
9  A. Michael Arno.  Michael Arno.  He runs Arno
10  Petition Consultants, one of the biggest ---.
11  **Q. Where is he out of?**
12  A. California, but I think they're moving to D.C.
13  **Q. For Senator Paul in Illinois and Indiana ---?**
14  A. Both subcontracted through Michael Arno.  Sorry,
15  if I should wait 'til the end, sir.
16  **Q. That was one of my rules and I forgot to mention**
17  **it.  Yeah, try hard, because it'll be easier for our**
18  **court reporter.**
19  A. Yes, sir.
20  **Q. So both Illinois and Indiana for Senator Paul**
21  **were as a subcontractor for Arno?**
22  A. That's correct.
23  **Q. Benazet subcontracted with ---?**
24  A. Benazet was subcontracted.  And I believe that
25  contract is in the Discovery as well.

6 (Pages 18 to 21)

Page 22

1    Q. How about for Rick Santorum?
2    A. That was direct through their campaign, through
3    Jessica Colon, who is their campaign assistant. Now,
4    I didn't put in there that I was contracted to do
5    Trump. We did very few Trump signatures. My guys
6    love doing them. I think that we got him, you know,
7    500 or 1,000 in Indiana. Pennsylvania I got
8    contracted as soon as our first hearing was over and
9    they pulled the contract from me almost within a day
10   of doing --- I did exactly what you said, I reached
11   out to the local Alleghany County party, asked for
12   local Republicans to walk with me. She got mad, said
13   that we don't trust --- you know, basically don't
14   trust the local Republicans. You know how campaigns
15   are, and they pulled the contract from me. So I ended
16   up not making the money that I should've, but that is
17   one contract I had taken from me. That's the only
18   contract that was pulled.
19   Q. So did you collect any signatures for Donald
20   Trump in Pennsylvania?
21   A. No, I did not.
22   Q. How about in Indiana?
23   A. Yes, we did. I didn't personally, but my people
24   did.
25   Q. Benezet did?

Page 23

1    A. Yes, some of them.
2    Q. And was that through a contract between the Trump
3    campaign and Benezet or was that a subcontractor
4    relationship?
5    A. We were subcontracted by his primary.
6    Q. And who was that?
7    A. Edee Baggette.
8    ATTORNEY RADZIEWICZ:
9    Edee what?
10   A. Edee Baggett, E-D-E-E B-A-G-G-E-T-T-E. She runs
11   National Ballot Access, I believe is the company.
12   BY ATTORNEY JOEL:
13   Q. For Mr. De La Fuente as a Democrat, did you
14   contract directly with the De La Fuente party, ---
15   A. Yes.
16   Q. --- or campaign, or with somebody ---?
17   A. No, no. As a Democrat we were contracted through
18   his --- we were subcontracted.
19   Q. You're subcontracted?
20   A. Yeah. As a Democrat, we were subcontracted.
21   Q. And who was the contractor?
22   A. His name is Shawn Wilmoth and he runs Signature
23   Masters, LLC.
24   Q. So this Signature Masters had the contract with
25   Rocky's campaign and then Signature subcontracted with

Page 24

1    Benezet to gather some of the signatures?
2    A. Exactly.
3    Q. How about with Rocky as an Independent?
4    A. As an Independent, I'm contracted directly with
5    Rocky.
6    Q. Benezet?
7    A. Benezet.
8    Q. And going back to Senator Cruz, I'm not sure if I
9    asked this and I probably know the answer but just to
10   make sure, did Benezet actually collect signatures for
11   Senator Cruz in Illinois, Indiana, Vermont, Rhode
12   Island, Delaware and Pennsylvania?
13   A. Yes. Of course.
14   Q. And did Benezet actually collect signatures for
15   Senator Paul in Illinois and Indiana?
16   A. Yep.
17   Q. And did Benezet actually collect signatures for
18   Senator Santorum in Indiana?
19   A. Yep.
20   Q. And did Benezet actually collect signatures for
21   Donald Trump in Indiana?
22   A. Yep.
23   Q. And did Benezet actually collect signatures for
24   Rocky De La Fuente as a Democrat in Wisconsin,
25   Indiana, Pennsylvania and Illinois?

Page 25

1    A. Yes.
2    Q. And did Benezet actually collect signatures for
3    Rocky De La Fuente as an Independent candidate in
4    Massachusetts, Connecticut, New Hampshire, Rhode
5    Island, New York, Georgia, Pennsylvania, Ohio, South
6    Dakota, North Dakota, Wyoming, Montana, Washington,
7    New Mexico, Wisconsin, Virginia, Alabama and
8    Mississippi?
9    A. Yes. Alaska too. Sorry.
10   Q. So in addition to those states I just read, Rocky
11   De La Fuente as an Independent, Benezet collected
12   signatures for Mr. De La Fuente to be on the general
13   election ballot in Alaska?
14   A. Alaska and California as well, I'm sorry.
15   Q. That's fine. Thank you. Now, does Benezet have
16   any employees?
17   A. No. Well, I have a part-time employee right now.
18   Q. Okay. Who's that?
19   A. I don't know. Her name is Carly Rose Jackson.
20   She does like scheduling of events. and that's it.
21   Q. Benezet does not have any employees who are
22   signature gatherers, though?
23   A. Uh-uh (no).
24   Q. Can you say yes or no?
25   A. No.

Page 26

1   Q. Am I correct that Benezet uses various
2   individuals out in the field to collect signatures?
3   A. Yes.
4   Q. Is that a contractor-type relationship?
5   A. Yes.
6   Q. Who has Benezet used for any or all of the
7   campaigns? I'm not sure which way is easier for you
8   to list. If you want to go state by state we can. If
9   there's an easier way to do it, we can do that, too.
10  A. This is going to be tough, but ---. Most of them
11  I think I've given to you guys already. But yeah, we
12  can go state by state. So Cruz, the stuff from
13  January, pretty easy. Jake Witmer ---.
14  Q. All right, so, hold on. So is this for Cruz or
15  is this January? I just want to make sure that I'm
16  taking accurate notes.
17  A. Well, there's two different periods, right?
18  Q. Okay.
19  A. So the stuff in January is going to be all of the
20  primary stuff, okay? Anyone who was running in the
21  primary, the people that were working for me we're
22  circulating for.
23  Q. Correct.
24  A. And then the stuff now, I mean, I probably
25  couldn't even --- I'd have to come back and amend the

Page 27

1   record for the stuff now because I don't even know ---
2   I have to go through my records, okay?
3   Q. So let's talk about ---.
4   A. About 50 guys. Fifty (50) or so guys.
5   Q. So let's set it up like this. The work for Cruz
6   in all of those states was Cruz as a Republican, so it
7   was to get him on primary ballots?
8   A. Yeah.
9   Q. And work for Paul was as Paul as a Republican to
10  get him on primary ballots?
11  A. Yep.
12  Q. The work for Santorum was Santorum as a
13  Republican to get him on the primary ballot?
14  A. Yep.
15  Q. The work for Trump was as a Republican to get him
16  on the primary ballot?
17  A. Yeah.
18  Q. The work for Rocky as a Democrat was to get him
19  on a primary ballot?
20  A. Sure.
21  Q. In all of the states that you've listed that you
22  collected for?
23  A. Yeah. So these are going to be the guys that
24  worked on the primary ballot.
25  Q. That's fine.

Page 28

1   A. So Jacob Witmer is number one. Andy Jacobs is
2   number two. Robert Lynch is number three. Milton
3   Lukens is number four. William Wright is number five.
4   Q. How do you spell Wright? W-R ---?
5   A. W-R-I-G-H-T. Who else did we have? Mark Gailey
6   is number six. Nicholas --- I know there's more.
7   Nicholas Sumbles, me, you know. There's about ten.
8   How many do I have?
9   Q. You have eight right now.
10  A. Okay.
11  ATTORNEY ROSSI:
12  What about the husband and wife team in
13  Pennsylvania?
14  A. Husband and wife team? Oh. Edward Mason and
15  Denise Mason. That's a good point. Michael
16  Alexander. Brian Lyra.
17  ATTORNEY ROSSI:
18  Lynch.
19  A. Oh, yeah, Robert Lynch, I already said that. A
20  guy named Gerald Bundy. Gerald Bundy.
21  BY ATTORNEY JOEL:
22  Q. Gerald? Gerald?
23  A. Gerald Bundy, B-U-N-D-Y. And, yeah. I think
24  that's a good --- and later I can come back and put in
25  there.

Page 29

1   Q. If something comes to you that's fine. We're
2   going to continue this tomorrow so if it comes to you
3   we can update tomorrow, that's fine.
4   A. Okay.
5   Q. We spoke with Mr. Witmer yesterday.
6   A. Yep.
7   Q. While we're talking about him, he said that there
8   was some dispute between him and Benezet over money
9   owed. What can you tell me about that?
10  A. Oh. He says that I owe him $900 from Georgia
11  which is not true.
12  Q. Why is it not true? What do you understand his
13  point of view to be and what's your point of view on
14  it?
15  A. I sent him, basically, an e-mail which is in the
16  Discovery showing the times that I put cash into his
17  account, okay? He hasn't invoiced me correctly, okay?
18  So I'm going off of the signatures that I wrote down
19  that he collected for Pennsylvania as a Democrat. We
20  all lost basically --- all of the Rocky De La Fuente
21  stuff, who was the primary client in Pennsylvania, I
22  ended up losing money on, because I went out of
23  pocket, I paid witnesses, I even went out and paid ---
24  I settled with every petitioner who worked for me. I
25  lost a lot of money because the guy, Shawn Wilmoth,

8 (Pages 26 to 29)

Page 30

1  ripped off Benezet for about $30 grand, okay? $22,500
2  actually.  He refused to pay me, okay?
3  **Q. And that was ---?**
4  A. That was for Rocky De La Fuente as a Democrat in
5  Pennsylvania.
6  **Q. And that was subcontract work?**
7  A. I was subcontracted through him.
8  **Q. And why didn't he pay you?**
9  A. Because he's a scumbag.  And so that's actually
10  why I'm working for Rocky now.  I contacted him and
11  told him what had happened.  He was shocked and he
12  asked me to start working for him now.  So Jacob and
13  me went to Georgia to go and help the green party
14  there.  And when we got there, there was a lot of
15  issues.  But one of them was they were using the wrong
16  size paper, subcontractor fault.  And then the other
17  one was, there was a discrepancy on separation by
18  counties, okay?  We basically ended up doing a lot of
19  work in two days and not really having any legitimate
20  right to bill for it.  And Jake, being the stubborn
21  individual I know him to be, demanded that I paid him
22  $1,000 immediately.  I went through the books and had
23  my fiancee go through the books before we got back
24  from Georgia, because we had done a job in New Mexico
25  --- oh, I forgot to put that down there.  We did

Page 31

1  Better for America in New Mexico and Arkansas.
2  BRIEF INTERRUPTION
3  A. Arkansas.  That's under Michael Arno.
4  BY ATTORNEY JOEL:
5  **Q. All right.  So Better for America in New**
6  **Mexico ---**
7  A. Yeah.
8  **Q. --- and Arkansas?**
9  A. Yeah.
10  **Q. That was a subcontractor?**
11  A. Through Michael Arno.  That was this summer.  As
12  an Independent party.
13  **Q. And that was to get that party ---**
14  A. On the ballot.
15  **Q. --- on the ballot?**
16  A. Yeah.  So me and Jake had flown down to New
17  Mexico, we'd done a lot of work, and on the plane ride
18  there I gave Jake a check to settle with him on the
19  Rocky campaign of the money he was still owed.
20  Because I felt bad, you know?  These guys lost money,
21  I'm making money, it's time to pay them back.  Jake, I
22  believe, was still owed money.  He says that he was
23  owed $2,000, so I wrote him a check on the plane for
24  $1,500.  When I gave Carol this information, my
25  fiancée, she said, that's not correct.  Immediately,

Page 32

1  she told me that.  And I said, well, show me what's
2  wrong, we'll figure it out.  It took until after we
3  got back from Georgia, which was a week or so later,
4  she said, look, you know, you got to look at this.  We
5  have actually paid Jake.  We owed him $450 at the time
6  that I wrote him that $1,500 check.  For all of his
7  work in Pennsylvania from January.  We were making
8  cash deposits into his account as well as check
9  deposits all to his Chase bank.  And obviously he
10  didn't know that.  We sent him proof of that, you
11  know, and that's what it is.  So he's saying I owe him
12  money.  He, actually, technically owes us a little bit
13  of money.  And on top of that he screwed me over this
14  summer, so I'm not too happy with him.
15  **Q. How'd he screw you over this summer?**
16  A. He took a contract that I had with Rocky and
17  offered, like, bottom-of-the-barrel price to get it
18  done in North Dakota and then he just stopped
19  answering his phone, so I had to send people in there
20  and get it done anyway, and I probably lost $3 or $4
21  --- it's not a big deal, because I'm fine, but, I
22  probably lost $9 or $10 grand.
23  **Q. Who, and if you can't remember them all, that's**
24  **fine, for the general election ballot, that's the work**
25  **you're doing for Rocky now?**

Page 33

1  A. Yes, sir.
2  **Q. And who were the folks that Benezet engaged to be**
3  **out in the field collecting those signatures?**
4  A. There's so many I couldn't name them now, but
5  mainly, most of the people on that list, with the
6  exception of --- well, no, he worked too.  I was going
7  to say Jake.  Robert Lynch worked --- they've all
8  worked for me this summer.  Except for Mark Gailey.
9  He's out of the signature-gathering business.  And
10  then there's a bunch of new people, there's probably
11  close to about 30 or 40 people.  Tim Hale (phonetic)
12  comes to mind.  Mildred Almeida, Paulie Frankel ---.
13  **Q. Do you know how to spell Almeida?**
14  A. No.  A-L-M-E-I-D-A, I think is the way you do it,
15  but ---.
16  **Q. Okay, Paulie ---?**
17  A. Paulie Frankel, yeah.  I'm going to have to come
18  with y'all with the list.  Is that okay?
19  **Q. Yeah, that's fine.  That's fine.**
20  A. There's about 30 guys yet.
21  **Q. We've got three right now.  If you can look at**
22  **anything, either over a break ---.**
23  A. I can go through my texts, probably is what I'll
24  do.
25  **Q. That's fine.  That's fine.  And after the break**

Page 34

1    we can update that or tomorrow morning we can update
2    that.
3    A. Sure. That'll be --- so we don't waste too much
4    time.
5    Q. That's fine. I appreciate it. So the next thing
6    I want to know is, I know some of the people but I
7    don't know all of them. Witmer, I understand, is a
8    resident of Alaska. Jacobs is a resident of
9    Pennsylvania; correct?
10   A. He is. yeah.
11   Q. You laugh about Witmer. He's here, there and
12   everywhere?
13   A. I don't know. Resident of Alaska, that sounds
14   --- I don't know. Whatever. I guess, yeah. I don't
15   know where he --- if that's what's listing, that's
16   what he's listing, man.
17   Q. Why? Where do you think he's from?
18   A. I mean. I haven't known him to be in Alaska since
19   we were in Alaska in like 2006, so if he's been there
20   since then, that's news to my ears, I mean, whatever.
21   Q. Where do you think he is?
22   A. He's in Illinois.
23   Q. Jacobs is in Pennsylvania; correct?
24   A. Jacobs is in Pennsylvania.
25   Q. How about Lynch?

Page 35

1    A. Lynch is Virginia.
2    Q. Lukens?
3    A. Lukens is Virginia or Kentucky or Florida.
4    Wherever he happens to be. But mainly Kentucky.
5    Yeah, Kentucky's his home. That's where I send his
6    checks.
7    Q. William Wright?
8    A. South Dakota.
9    Q. Mark Gailey?
10   A. Kentucky.
11   Q. Who is now out of the business?
12   A. Out of the business.
13   Q. Nick Sumbles?
14   A. Maryland.
15   Q. You are Texas.
16   A. Uh-huh (yes).
17   Q. Ed Mason?
18   A. Pennsylvania.
19   Q. Denise Mason?
20   A. Pennsylvania.
21   Q. Michael Al --- Alex?
22   A. Alexander?
23   Q. Alexander.
24   A. Yeah, he's from Boston.
25   Q. Massachusetts?

Page 36

1    A. Massachusetts somewhere.
2    Q. Brian Lyra is Massachusetts?
3    A. Massachusetts as well, yes.
4    Q. Gerald Bundy?
5    A. Pennsylvania.
6    Q. How about Tim Hale?
7    A. I think Ohio.
8    Q. Mildred Almeida?
9    A. Florida.
10   Q. Paulie Frankel?
11   A. Alabama.
12   Q. Now, when Benezet engages any of these people to
13   go out and collect signatures, is there a written
14   contract? Is it just oral, calling them and saying I
15   need you here? How does that work?
16   A. It's a combination. So people that I've used
17   before and have pretty much --- in the perfect
18   world, yes, we give them a written contract, but a lot
19   of these drives we did this summer were six or seven-
20   day drives, so it's hard to get all that paperwork
21   processed. But, with that said, there is a lot of
22   contracts from this summer with individuals.
23   Q. How does Benezet get paid, whether it's from the
24   campaign or through a subcontract? Is it a per
25   signature, is it a flat rate that Benezet gets? How

Page 37

1    does that ---?
2    A. All of the above. I bill different ways.
3    Q. So for the work you did in Pennsylvania for Cruz,
4    was that --- that Benezet did in Pennsylvania for
5    Cruz, ---
6    A. Sure.
7    Q. --- was that per signature or was that a flat
8    rate?
9    A. We did per signature. The client preferred that
10   methodology of pricing.
11   Q. How about for Rocky as a Democrat in
12   Pennsylvania?
13   A. That was per signature plus I had an allocated
14   amount per hour for a witness, okay? I had also some
15   expense money, so it was a combination. Expense money
16   plus per-signature cost plus they assumed that I was
17   going to have to spend money on witnesses. But I
18   didn't get paid, so I mean ---.
19   Q. And then how about Rocky as an Independent in
20   Pennsylvania, was that per signature?
21   A. That is, yeah. Plus expense money. And those
22   contracts you should all have copies of.
23   Q. But other of your contracts, some of them you get
24   flat rates?
25   A. No, it depends. I mean, I've told clients, I

Page 38

1  won't go over this price, so I assume that that's a
2  flat rate.
3  **Q. Are the majority of the contracts that Benezet**
4  **gets, then, is it paid based on the signatures you**
5  **collect?**
6  A. Yeah.  Yeah, the majority of them.
7  **Q. So if you collect more signatures, Benezet makes**
8  **more money?**
9  A. Generally.
10 **Q. And I'd like to understand sort of when that**
11 **payment is made.  Because as I understand the process,**
12 **you can collect signatures in any number of states,**
13 **submit them, somewhere along the way there's the**
14 **ability for somebody to complain about them, challenge**
15 **them, object to them.  That, I don't think, is unique**
16 **to Pennsylvania.**
17 A. No, it's not.
18 **Q. The process may be different here, but I would**
19 **suspect that there is an ability for folks to**
20 **challenge or complain in Virginia, in North Dakota ---**
21 A. All over, yeah.
22 **Q. --- in Alaska.  Do you get paid when you submit**
23 **the signatures or do you get paid after some period of**
24 **time where we can figure out what the valid signatures**
25 **really are?**

Page 39

1  A. No.  My contract is clear that I get paid on the
2  work produced, okay?  So there is no indemnification
3  clauses or anything like that, or anything that's
4  guaranteed my work.  Now, that's for Rocky.  It
5  depends.  The Cruz campaign, I bill them per valid
6  signature.  Valid signature for Pennsylvania was what
7  the laws say a valid signature are.  You know what
8  they are.  I know what they are.  So those were door-
9  to-door gathered signatures.  We did everything in
10 front of the voters, or made sure --- and if they
11 weren't door-to-door gathered we'd go and validate
12 them, and then I would just bill them for the valid
13 signatures, so it all kind of is variable, but it's
14 mainly done --- and they --- yeah.
15 **Q. Then how do you pay your folks?  The Jacob**
16 **Witmers of the world, the Andy Jacobs of the world,**
17 **the Robert Lynches of the world?  Would you pay them**
18 **--- that was a bad question.  Do you pay them per**
19 **signature or do you pay them an hourly rate or do you**
20 **pay them a flat fee?**
21 A. No, they're paid per signature.
22 **Q. So let's take, as an example, just to make sure**
23 **that I understand it, let's say you're collecting**
24 **signatures in Pennsylvania for Senator Cruz, okay?**
25 **You had a contract with the Cruz campaign; correct?**

Page 40

1  A. Uh-huh (yes).
2  **Q. You have to say yes or no, for ---.**
3  A. Yes, sir.
4  **Q. Do you remember what the price per signature**
5  **Benezet was getting on that?**
6  A. I think it was $6.  $6 or $7.
7  **Q. And was there anything built in there additional**
8  **for witnesses or for ---**
9  A. No.  No.
10 **Q. --- expenses?**
11 A. Nope.  I was pretty fair with them, I just
12 charged them $7 a signature.
13 **Q. But I'm assuming that the $7 you quoted them and**
14 **charged them at least built in your overhead,**
15 **meaning ---**
16 A. Yeah.
17 **Q. --- expenses, witness fee if there was one,**
18 **notarization fee, all that sort of stuff?**
19 A. Sure.
20 **Q. I mean, you certainly ---?**
21 A. We did have a --- I think there was a couple
22 grand allcoated for notarization.  That's what it was.
23 It was like $2 grand for notarizations and $6.50 a
24 signature, we'll say.
25 **Q. You certainly didn't quote them a signature rate**

Page 41

1  **that you knew going in was going to lose you money?**
2  A. No.
3  **Q. You're in this to make money?**
4  A. Yes.  However, I am a supporter of Senator Cruz.
5  **Q. I understand that.**
6  A. So we're trying to do it as cheap as possible,
7  plus we worked for him in a few states and made pretty
8  good money.  I will say, though, that in Cruz's case,
9  I only took on the districts that I could actually do.
10 Like, I didn't go and try to start sourcing witnesses
11 from all of the states, so I only did a handful of the
12 districts, I didn't do the whole state for him.
13 **Q. So if you were charging Cruz campaign $6.50 a**
14 **signature, how much did Benezet then pay to whoever**
15 **collected for you?  Jake Witmer or Andy Jacobs or**
16 **Robert Lynch, whoever was collecting for you in**
17 **Pennsylvania?**
18 A. That's private.  It's all --- I don't think we'll
19 mention ---.
20 ATTORNEY ROSSI:
21 There's a confidentiality agreement
22 here.
23 A. Yeah, so these guys are getting $3.50 a
24 signature.
25 BY ATTORNEY JOEL:

Page 42

1  Q. And you told me who worked for you in the primary
2  and in the general, at least as far as you could
3  remember for the general.  Who worked for Benezet
4  collecting signatures for any of the Pennsylvania work
5  that Benezet did?  Whether that was Cruz, I guess
6  Rocky as a D, Rocky as an Independent, or the Open
7  Pittsburgh thing?
8  A. Who?
9  Q. Yeah.
10  A. Who was working?
11  Q. Yeah.
12  A. Well, I've given you a long list and we're going
13  to go back and amend it later.
14  Q. That's fine.  Well, here's what I'm trying to
15  figure out.  Did Witmer collect for you in
16  Pennsylvania or did Jacobs or did Lynch or did all of
17  them, or did some of them?
18  A. All of them.  All of them collected in
19  Pennsylvania at some point or another.  Some of them
20  collected all the drives, some of them only did one,
21  some of them, you know ---.
22  Q. So these people that you listed for the primary
23  and the general, and those who carried over from the
24  primary to the general, those who did both, it's your
25  testimony that all of those people, at least at some

Page 43

1  level, were in the Commonwealth of Pennsylvania
2  collecting signatures?
3  A. Yeah.  And like I said, there's probably closer
4  --- for the Open PGH stuff, I mean there's like 30, 40
5  guys.
6  Q. Let's talk about that since you brought it up.
7  You know what Open Pittsburgh is?
8  A. Sure.
9  Q. How did you become aware of their desire to ---
10  strike that.
11  Did Benezet contract with Open Pittsburgh to
12  collect the signatures?  Was it Trenton Pool, or ---?
13  A. It was Benezet.
14  Q. And was that directly with Open Pittsburgh?
15  A. Yes.
16  Q. When did you first become aware of that
17  opportunity?
18  A. They contacted me.  They saw one of our
19  petitioners in Allegheny County.  He gave them my
20  card.  They contacted me to do the drive in July.
21  Early July or late June.
22  Q. Was there a formal written contract between
23  Benezet and Open Pittsburgh?
24  A. No, we really didn't have it.
25  Q. What did you quote --- what was the price that

Page 44

1  Benezet charged?  Was it a per signature or was it a
2  flat rate?
3  A. I was going to charge them originally like, I
4  think, $8 a signature.  And then that was because of
5  the requirement they have.  The city charter, as you
6  know, requires you to follow the nominating petition
7  laws.  And so that would have to cover witnesses, the
8  whole enchilada, as we did in the primary.  And it was
9  going to slow us down tremendously so I really
10  honestly didn't even --- I would do it to help them
11  because I believed in their cause and mission but I
12  just didn't really --- we couldn't really afford ---
13  we didn't have the manpower, so to speak, at the time,
14  so I made it a high price.  He didn't like that price.
15  They didn't have the budget, so I recommended that
16  they look into the legality of that law, the
17  constitutionality of that requirement, as I did.  And
18  they actually ended up taking that out, and I believe
19  they contracted the best advocate in Pennsylvania over
20  here, and so they --- I guess they got it struck and
21  then they called me up and asked if we'd help come
22  back in.  We had like three or four days.  And we had
23  conveniently just finished the State of Ohio, so I
24  took everyone from Ohio and came into Pennsylvania and
25  just basically handled it in like four days.

Page 45

1  Q. How much did you charge them per signature when
2  you came in on that three to four days?
3  A. I think I asked them for $4 a signature.
4  Q. How many people did you put into Pennsylvania to
5  collect the signatures --- I'm sorry, did Benezet put
6  in?
7  A. I'd have to go look, to see the records, but
8  probably 25.  Around there.
9  Q. Can you remember the names of any of them?
10  A. A lot of them are on that list I started over
11  there, the four or five guys.  Ed Mason was there,
12  Gerald Bundy was there.
13  Q. I'm sorry, ---?
14  A. So the list that you have, mainly most of those
15  people were there.
16  Q. Let me interrupt you for a sec.  Witmer said he
17  wasn't there.
18  A. He didn't come.  We were fighting at that point.
19  BRIEF INTERRUPTION
20  A. We were fighting at that point.
21  BY ATTORNEY JOEL:
22  Q. So was Andy Jacobs there?
23  A. No, Andy actually didn't come in.  He didn't come
24  in at all.
25  Q. How about Robert Lynch?

Sargent's Court Reporting Services, Inc.
(814)-536-8909

Page 46

1  A. Nope.
2  Q. Milton Lukens?
3  A. No.
4  Q. William Wright?
5  A. No, they didn't come in.  Michael Jennings was
6  there.
7  Q. How about Mark Gailey?
8  A. No.
9  Q. Nick Sumbles?
10  A. No.
11  Q. Were you there?
12  A. I was.
13  Q. So we have one.  Ed Mason?
14  A. He was there.  Denise was there.
15  Q. Michael Alexander?
16  A. He didn't come in.
17  Q. Brian Lyra?
18  A. He didn't come in, either.
19  Q. Gerald Bundy?
20  A. He was there.
21  Q. Tim Hale?
22  A. He was there.
23  Q. Mildred Almeida?
24  A. She was there.
25  Q. And Paulie Frankel?

Page 47

1  A. He wasn't there.  Let me give you some more
2  names.
3  Q. Sure, that'd be great.
4  A. All right.  A lady named Elizabeth Hastings.  She
5  had about four people underneath --- five people
6  underneath her and she took an override off of --- I'd
7  have to go look for their names.  Kathy Adams and a
8  couple other people.  A guy named, oh man, I mean,
9  yeah, I'll get these lists for you.  There's about 25
10  people.
11  Q. Where's Elizabeth Hastings from?
12  A. Cleveland.
13  Q. So Ohio?
14  A. Yeah.
15  Q. And how about Kathy Adams?
16  A. Cleveland.  There's about six guys from
17  Cleveland.  And then there was a guy named Joe Jackson
18  came in, a guy named, oh man, what's his name up
19  there?  Yeah, we'll come back to this.
20  Q. Where's Joe Jackson from?
21  A. Ohio.  Columbus.
22  Q. Going back to the Cruz work that you did in
23  Pennsylvania, can you give me any estimate or figure
24  as to how many signatures Benezet actually got for
25  Senator Cruz in Pennsylvania?

Page 48

1  A. I can do math real quick, but, like, 300 per CD
2  times four, and we ended up doing I think like three,
3  so that'd be like 1,200.  I think it was like around
4  4,000.
5  Q. Around 4,000 signatures?
6  A. Yeah.  Sounds about right.
7  Q. How about Rocky as a Democrat in Pennsylvania?
8  A. Closer to 5,000.
9  Q. And how about Rocky as an Independent in
10  Pennsylvania?
11  A. Rocky as an Independent, that's closer to 11,000.
12  Well, I mean, we probably submitted 12,000 or so.
13  I'll bill him for 11,000 though.  Something like that.
14  Q. And with the Cruz work, am I correct that those
15  signatures were witnessed by a Pennsylvania resident?
16  A. Witnessed by a --- oh, yeah.
17  Q. The affidavit was signed by a Pennsylvania
18  resident?
19  A. Yeah, any of the work done in that time was --- I
20  mean, you have to be an in-state circulator.
21  Q. So just to make sure we're clear, the signatures
22  for Cruz, the affidavit of circulation was signed by a
23  Pennsylvania resident; correct?
24  A. Yeah.
25  Q. They were all ---?

Page 49

1  A. They should have been, yeah.
2  Q. They were all notarized; correct?
3  A. They were all notarized.
4  Q. And did you do anything to ensure that you didn't
5  have people signing more than one petition?
6  A. More than one petition, what do you mean?
7  Q. Well, you understand that part of your challenge
8  here is that I, for example, can't sign a petition for
9  Bernie Sanders and Hillary Clinton?
10  A. Correct, yeah.
11  Q. I have to pick one.
12  A. Yeah.
13  Q. So did you do anything to ensure that you didn't
14  have people who were ---
15  A. Yes.
16  Q. --- singing multiple petitions?
17  A. I mean, every one of my guys is trained with the
18  best business practices.  I went over and showed them
19  exactly what the law is, told them and made it crystal
20  clear, explained to them all why they're walking
21  around with a registered voter, okay, and the
22  registered voter also carried petition boards at all
23  times.  They weren't just partaking in the witnessing
24  process, I wanted them to actually carry the boards
25  and make sure that they're gathering signatures as

Page 50

1   much as they can, too.
2   Q. And you did that for all of your Pennsylvania
3   work?
4   A. Every single thing. And so the other thing we
5   did was we explained it. Some of the guys, they're a
6   little bit slow witted, so they didn't really --- it
7   may not've registered, but I did explain about the ---
8   why we're qualifying voters. When the qualification
9   process --- the first question out of our mouth is,
10  hi, are you a Pennsylvania resident? If they say yes,
11  okay, great, are you in this county? Because it's
12  separated by county. If they say, sure, say, you mind
13  helping out with a quick signature --- well, sorry, go
14  back. We'd ask them if they're a registered
15  Republican in the event that we're not going door to
16  door. So, if we're not going door to door, we don't
17  know that they're a Republican, we'd ask them, are you
18  a registered voter? Are you Republican or Democrat?
19  And then if they say they're Republican then we say,
20  great, have you had any chance to sign any nomination
21  petitions for any candidates? And if they say yes, we
22  ask them who, if they remember. If they don't
23  remember, sometimes I'm sure the guys take their
24  signature. I don't know. I wasn't there, but yeah,
25  to answer your question, basically, we ask in the

Page 51

1   questions leading up to getting the signature, you
2   always make sure. And that's --- I mean, everyone
3   does that.
4   Q. And that was your practice? That's how you
5   instructed your folks who were working in Pennsylvania
6   for you?
7   A. Of course. Except Rocky, too. When they did
8   Rocky we'd make sure that no one signed that signed
9   for Hillary or Bernie.
10  Q. And in addition to making sure about that for
11  Rocky as a Democrat in Pennsylvania, those signatures
12  you collected, the affidavit of circulation was signed
13  by a Pennsylvania resident; correct?
14  A. Affidavit?
15  Q. The witness.
16  A. The witness?
17  Q. Pennsylvania resident.
18  A. Yeah. Yeah.
19  Q. And they were all notarized; correct?
20  A. To the best of my knowledge, I mean I think I
21  looked at every one. I can't really remember.
22  Q. But to the best of your knowledge they were
23  notarized?
24  A. Oh, yeah. Yeah. I mean, I paid a lot of notary
25  fees. Thousands of dollars.

Page 52

1   Q. And Rocky as an Independent, were witnesses
2   involved in those signature collections?
3   A. No, we didn't have to. That was the Achilles
4   (phonetic) versus --- the 2015 ruling. Achilles
5   (changes pronunciation)?
6   ATTORNEY ROSSI:
7   I think it's pronounced Achilles.
8   A. Achilles? Achilles? The case that I cited in
9   the original hearing when I testified. This all stems
10  from that case law that developed. That's why we're
11  here.
12  BY ATTORNEY JOEL:
13  Q. And so the Rocky signatures, there was no witness
14  associated with those?
15  A. No, you didn't need to.
16  Q. How about a notarization?
17  A. You don't need to do that, either.
18  Q. And how about the signing more than one?
19  A. You can sign for as many Independents as you
20  want. Now, can they sign for a major party candidate
21  and an Independent? I'd have to re-read the case. Do
22  you know the answer to that?
23  ATTORNEY ROSSI:
24  Yes.
25  A. You can --- they can?

Page 53

1   ATTORNEY JOEL:
2   He probably does? Okay.
3   ATTORNEY ROSSI:
4   I mean --- I don't know if you want to
5   go off the record or not but the case was cited on
6   equal protection grounds with respect to the multiple
7   signature issue. So the problem was that signing for
8   a Republican candidate --- if you're Republican you
9   can sign for more than one --- you can essentially get
10  more than one candidate onto the ballot. So
11  Republicans who sign for Ted Cruz could then sign for
12  a nominee --- in fact, that was always the case under
13  the statute.
14  A. Okay. That makes sense.
15  ATTORNEY ROSSI:
16  People who challenge petition papers
17  would often try to say, well, if you signed for a
18  Republican in the spring you can't sign a nomination
19  here, but based on the statute, you always could. It
20  was always, could you sign for more than one?
21  A. More than one --- okay, that answered the
22  question. So that was my question. Sorry.
23  BY ATTORNEY JOEL:
24  Q. And when you went to Rocky as an Independent, am
25  I correct that those signatures can be from any

14 (Pages 50 to 53)

Page 54

1 registered voter in the Commonwealth?
2 A. That's correct.
3 Q. It's not broken down by congressional district or
4 county or anything like that?
5 A. No, we have to separate by county.
6 Q. Oh, you do?
7 A. Well, there's no distribution requirement, but
8 you still need to separate the paper by county. Now,
9 if we didn't need to do that, I wish I would've known,
10 because we definitely did.
11 Q. So the Rocky as an Independent, can anybody in
12 Pennsylvania sign those? Like, Democrat, Republican,
13 Independent, Green, Constitution?
14 A. That's correct.
15 Q. Whereas Cruz, only Republicans could sign for
16 him, Rocky as a D, only Democrats could sign for him?
17 A. That's correct.
18 Q. And you mentioned that for Cruz at least, you
19 only went in certain areas. I'm presuming those are
20 areas which you had witnesses available?
21 A. That's correct, yeah.
22 Q. And did you do the same for Rocky as a Democrat?
23 A. No. Rocky as a Democrat, I was basically --- I
24 thought we would just be helping the campaign
25 originally, like we had been. Rocky was never our

Page 55

1 primary client. Shawn Wilmoth basically made me a
2 pretty compelling offer, I accepted it and I did
3 something that I really never had much experience
4 doing before, which was hitting all the different
5 forums and stuff and finding registered Democratic
6 voters to be paid hourly to help our guys.
7 Q. You mentioned going door to door. It was sort of
8 in the context, I think, about talking about Cruz
9 and/or Rocky. Do I understand what you're getting at
10 is, you can get a map, you can get a database,
11 something that says, this house is a Democratic house
12 or it has Democratic voters in it, this house has
13 Republican voters in it?
14 A. Yeah. Any person can go get that file.
15 Q. So with the ability therefore to canvass and
16 collect for Cruz, am I correct that you got that
17 information?
18 A. I did.
19 Q. So you knew which houses to target?
20 A. Yes.
21 Q. When you were doing the door-to-door aspect of
22 it?
23 A. Yeah. Yeah. I mean, we have ways of checking
24 now. Yeah.
25 Q. And the same with Rocky as a Democrat?

Page 56

1 A. No. Rocky as a Democrat, you have a lot more
2 registered Democrats in the state --- in the big
3 cities, so we didn't really need to do that, but we
4 just went for above and beyond the target number. We
5 asked everyone, are you a registered voter, are you a
6 registered Democratic voter, and we basically got them
7 on the street corners, in Allegheny County
8 predominantly. Near the campuses.
9 Q. You said that Shawn made you a compelling offer.
10 What was that compelling offer?
11 A. Well, he told me, basically, he was going to pay
12 me money, and he would train me how to go and procure
13 witness assets to help. I've never really gone onto
14 Craigslist and started putting up ads and all that,
15 and he taught me how to do it. And he's good at it,
16 so the compelling offer was to educate me in the
17 process.
18 Q. Where's his business located?
19 A. Michigan?
20 ATTORNEY ROSSI:
21 Yeah, Michigan.
22 BY ATTORNEY JOEL:
23 Q. Does he do stuff nationwide?
24 A. I don't think so, anymore. But he did, yeah.
25 Q. You talked about the training that you gave to

Page 57

1 your collectors. What kind of training did you get
2 when you entered into this business?
3 A. What kind of training did I get?
4 Q. Yeah.
5 A. I mean, y'all met Jake the other day. He was the
6 first person I ever gathered a signature with, so he
7 pretty much trained me and he's pretty fluid. A
8 pretty thorough guy. But, it's like, do you want me
9 to tell you how I was trained?
10 Q. Sure. Sure.
11 A. The first question is always make sure the
12 person's a registered voter. Greet them, say hello.
13 They say, pardon me sir, or ma'am, are you a
14 registered voter here, in the city you're in and once
15 you qualify them and make sure that they're a
16 registered voter, then you ask them for the --- you
17 pitch them on what you're doing and getting the
18 signature for, and then you basically try to convince
19 them to help qualify the issue or candidate cause to
20 get it on the ballot.
21 Q. And is that the similar training that you
22 instilled on folks who Benezet hired?
23 A. Yes.
24 Q. The asking if they're a registered voter in the
25 municipality ---?

Page 58

1  A. We didn't train many petitioners. We trained
2  witnesses at this time. We did end up training
3  petitioners later. And that file. I actually have
4  like a two-page document for training. It's in the
5  discovery I'll give you guys today or tomorrow.
6  **Q. Now, in the Open Pittsburgh, was there any**
7  **guarantee that Benezet provided to Open Pittsburgh on**
8  **validity of signatures or anything like that?**
9  A. No, there wasn't. Now, well, there was a
10  guarantee that --- there was. Okay, sorry. So they
11  had a very finite budget so we had said $4 a signature
12  plus a 70 percent validity agreement. Now, validity
13  agreement, in the eyes of any contracted petition
14  company, is basically a signature that's accepted or
15  not accepted by the authority, okay? By the entity.
16  Every signature was accepted by Pittsburgh. So
17  therefore, we had 100 percent validity. And therefore
18  my bill should be paid in full.
19  **Q. So when you're talking about validity rate, at**
20  **least as it relates to Open Pittsburgh, it is if the**
21  **election board of the official receives and accepts**
22  **them?**
23  A. Yes.
24  **Q. Even if there's a challenge down the road that**
25  **nixes them all, but if they receive and accept them,**

Page 59

1  **that's good? At least as it related to Open**
2  **Pittsburgh?**
3  A. No. If there's a challenge down the road, so
4  what we'd be able to do would be go and validate every
5  signature. We'd know what the validity rate was and
6  be paid on that percentage, okay? And then, after the
7  challenge process is done, then he would release the
8  remaining money or not.
9  **Q. Are you aware that in the Open Pittsburgh case,**
10  **challenges were filed to the signatures that Benezet**
11  **collected?**
12  A. I've heard this. I've really not paid much
13  attention.
14  **Q. Are you aware that the judge out in Allegheny**
15  **County struck a lot of those signatures?**
16  A. I didn't know that. That Benezet collected?
17  ATTORNEY ROSSI:
18  I'm sorry, what?
19  A. That Benezet collected? Our signatures got
20  challenged?
21  ATTORNEY ROSSI:
22  I'm not the attorney in that case.
23  Although I am now, as of one o'clock, so I'm not --- I
24  have not been following. I thought the challenge ---.
25  A. I had no clue. Sorry, Mr. Joel.

Page 60

1  ATTORNEY JOEL:
2  That's okay.
3  ATTORNEY ROSSI:
4  I thought that the challenge actually
5  was also ---.
6  A. Completed, yeah.
7  ATTORNEY ROSSI:
8  The 30-page question that they submitted
9  to Pittsburgh. I mean, the litigation that struck the
10  --- and it's on appeal with the Commonwealth Court,
11  but it was involved --- I don't --- there wasn't
12  actually any individual signature-by-signature
13  challenge to the signatures.
14  ATTORNEY JOEL:
15  Why don't you mark that one next?
16  A. All right, we'll see what he's got.
17  ATTORNEY JOEL:
18  I'll show you what's been marked as
19  Defendant's 5. Take as much time as you'd like to
20  read it.
21  (Defendant's Exhibit 5 marked for
22  identification.)
23  A. Yeah, that's fine.
24  BY ATTORNEY JOEL:
25  **Q. I'll tell you it's an Opinion from Allegheny**

Page 61

1  **County Court of Common Pleas, City of Pittsburgh is**
2  **the Petitioner, openpittsburgh.org was one of the**
3  **Respondents and it was a challenge and an objection to**
4  **the signatures submitted for the Open Pittsburgh**
5  **ballot initiative.**
6  A. So they did two filings; correct? Can I ask a
7  question here?
8  **Q. Sure.**
9  A. Yeah, they filed their original signatures by the
10  due date --- original due date. Then when the
11  injunction was issued and they got the relief, they
12  had another due date, which was a week from ---.
13  **Q. Correct.**
14  A. And so is this for the cumulative signatures
15  turned in challenge?
16  **Q. Yes.**
17  A. Or is the --- okay. That was ---.
18  **Q. It's for the whole kit and caboodle.**
19  A. Okay, got it.
20  **Q. So the judge writes, I'll read upside down.**
21  A. Yeah.
22  **Q. On August 9 and 15, 2016, openpittsburgh.org**
23  **submitted a total of 12,315 signatures to the election**
24  **division. However, 3,792 of those signatures must be**
25  **stricken primarily because the petition paper was not**

Page 62

```
 1    submitted with a valid notarized affidavit as
 2    required.  Additionally, another 8,454 signatures must
 3    be stricken because they were gathered by out-of-state
 4    circulators prior to the extended submission deadline
 5    of August 15th, 2016.  Furthermore there is no
 6    verification that the out-of-state circulators were
 7    adult U.S. Citizens.  Finally, they were not notarized
 8    or sworn.  That leaves Open Pittsburgh with less than
 9    7,582 required signatures necessary to place the
10    question on the ballot.  Judge Hornak made those
11    additional requirements a condition for the extension
12    of the filing deadline and the failure to comply with
13    those requirements is a fatal defect and cannot be
14    cured by amendment.  First of all, did I read that
15    correctly?
16    A. Yeah, you read that correctly.
17    Q. Were you aware of that?
18    A. I've heard this, I mean, I disagree.  I know we
19    notarized --- you know, everything was done with a
20    notarization that we turned in.  So the signatures
21    that I collected were probably 6,000 of those?  Half,
22    maybe?  And we notarized every single one.  And we
23    stapled a --- we took the bottom of your nomination
24    paper form, and this was done by David.  I tried to
25    read the opinion but couldn't find it, so I didn't
```

Page 63

```
 1    have any way of consulting on it, but I just basically
 2    did what he told me.  We took the bottom of the
 3    nominating paper ---.
 4    Q. Who's David?  Tessator?
 5    A. David Tessatori or Tessator.
 6    Q. And he's the head guy over in Pittsburgh?
 7    A. The proponent.  Yeah, I call him the proponent.
 8    So he took the nomination paper form and we stapled
 9    that to the back of every --- so we basically took
10    y'all's jurat from the bottom --- or it's not a jurat
11    anymore because there's no notarization requirement.
12    But we took the nominating paper affidavit or
13    statement of circulator, and we stapled that now to
14    the back of every page of the Open PGH petition.  So
15    we executed it normally, signed it with the notary
16    normally, did the normal notarization and we struck
17    anything that said they had to be an in-state
18    circulator because that wasn't required by the judge's
19    opinion.  Then we stapled the out of state --- the
20    nominating paper thing and then filled that out as
21    well, each petitioner did that.  So basically, I mean,
22    if that's the case, there's no thing that declared
23    that they're an in-state U.S. Citizen in the
24    nominating paper petition that y'all use in the State,
25    then by this judge's logic, that petition's flawed,
```

Page 64

```
 1    too, right?  Wouldn't that be a true statement?
 2    ATTORNEY ROSSI:
 3    Could we go off record?  Can we just
 4        have a discussion about this, because I think what I
 5        understand happened may actually inform everybody, but
 6        I don't want to be --- I don't want to testify.
 7        A. I don't even know, yeah.
 8    ATTORNEY ROSSI:
 9    Is that okay?
10    ATTORNEY JOEL:
11    Yeah, it's fine.
12    A. I have no clue what's going on with this but I
13    think that's what's happening.
14    OFF RECORD DISCUSSION
15    BY ATTORNEY JOEL:
16    Q. Really, all I was looking for was, are you aware
17    that a judge has, in his own language, stricken the
18    overwhelming majority of signatures that you gathered?
19    A. I was not, but I am now.
20    Q. That's all I wanted to confirm.
21    A. Sorry.
22    Q. Thank you.
23    A. Oh, man.
24    Q. Benezet is a Texas Limited Liability Corporation?
25    A. Yes, sir.
```

Page 65

```
 1    Q. Now, you listed a number of people who worked the
 2    primaries for Benezet and then others in addition who
 3    worked the general election for Benezet in various
 4    states and things like that where these people worked.
 5    My question, let me ask it sort of broadly and if we
 6    need to drill down we can, but do the signature
 7    collectors that Benezet engages, do they go from job
 8    to job to job, state to state to state?  Is that their
 9    business?  Is that what they do, or ---?
10    A. Yes.
11    Q. And if we go back to Cruz, Illinois, Indiana,
12    Vermont, Rhode Island, Delaware, Pennsylvania, can you
13    tell me what the chronology was of those collection
14    efforts?
15    A. Illinois, then Indiana, then Pennsylvania and
16    Rhode Island simultaneously, with maybe Delaware.
17    Q. Simultaneously with Delaware?
18    A. Oh.  Yeah, and then Vermont was done at the same
19    time as Indiana and part of Illinois.
20    Q. So recognizing that people can't be in two places
21    at once, you'd agree with that?
22    A. Yes.
23    Q. The folks who you listed for the primary, you had
24    some of them in Delaware, while others were in
25    Pennsylvania, while others were in Rhode Island?
```

Sargent's Court Reporting Services, Inc.
(814)-536-8909

Page 66

```
 1    A. No.  No.  I began to start like Rhode Island.  A
 2    friend of mine's a petition-gatherer in Massachusetts,
 3    Alex Arsenal (phonetic).  He's still contracted with
 4    us now under Rocky Independent.  I just hired his
 5    company and let him do it.  Michael Alexander, who you
 6    spoke to this weekend works with him.
 7    Q. Oh, okay.
 8    A. He knew.  Michael Alexander was technically
 9    working for me, too.  But, you know, in Rhode Island
10    he probably worked directly under Alex Arsenal so.
11    Q. Okay.
12    A. I would just subcontract out the job to answer
13    your question.
14    Q. I didn't ask that and that's helpful actually.
15    So for the Cruz work, you said that you had a contract
16    directly with the campaign.  Did you further
17    subcontract out that work to other businesses?
18    A. Only one time.  And I did it to Alex Arsenal for
19    Rhode Island ---
20    Q. Okay.
21    A. --- and possibly Delaware.  I've got to go look.
22    I can't remember if we did Delaware or not.
23    Q. How about Senator Paul?  Did you subcontract any
24    of that?  Oh, no.  That was one that you were
25    subcontracted?
```

Page 67

```
 1    A. I was subcontractor.
 2    Q. Rocky as a Democrat, did you subcontract that to
 3    anybody?
 4    A. No.  No.
 5    Q. Okay.
 6    A. No.  I always did it.  I did it.
 7    Q. You were subcontracted by that Shawn guy?
 8    A. Shawn Wilmoth.
 9    Q. Okay.  Okay.  So ---.
10    A. And the same thing with Santorum and all that.
11    Q. Santorum you didn't subcontract out?
12    A. No.
13    Q. Benezet did that work?
14    A. Yeah.  Yeah.
15    Q. And how about the Rocky is an Independent, did
16    you subcontract any of that out?
17    A. I did in a couple states.  We always had people
18    that we would send in to help.  So I mean, you know,
19    it wasn't like a complete sub-out.  I've got
20    petitioners I'm going to pay for most of the states we
21    did.
22    Q. Okay.
23    A. Out of my own billings.
24    Q. So getting back to Cruz and the chronology, did
25    the folks that you put on the ground in Illinois then
```

Page 68

```
 1    move to Indiana to do the work?
 2    A. Yes.
 3    Q. And then they moved or some of them moved to
 4    Indiana.  Some of them moved to Vermont?
 5    A. No.  I sent in like four people to Vermont.  One
 6    originally and then after he had left, two more came.
 7    Q. So you had people in Illinois and then some of
 8    them you moved to Vermont, and some of them you moved
 9    to Indiana, and they went right to those next states?
10    A. Everyone from Illinois went to Indiana.  And then
11    I brought in people from the Northeast who were
12    already there to go into Vermont.
13    Q. Oh, okay.
14    A. Yeah.  Vermont.
15    Q. And then from Indiana, did they move directly on
16    to Delaware, Pennsylvania and Rhode Island?
17    A. No, they went to --- from Indiana, we went
18    straight to Pennsylvania.
19    Q. Okay.
20    A. The timelines are almost I mean identical.  And I
21    testified this in Court, you know, I think
22    Pennsylvania starts the 26th of January and ends the
23    15th or something of February.  Well, Indiana ends the
24    26th of January.  So it's like it's almost staggered
25    perfectly.
```

Page 69

```
 1    Q. And how about Senator Paul?  You went Illinois
 2    and then directly into Indiana?
 3    A. Right.
 4    Q. Your workers did?
 5    A. Yes.  Yes.  And when I say Senator Paul, Senator
 6    Paul and Cruz, we can circulate for more than one
 7    candidate in those states.
 8    Q. Okay.
 9    A. So you can basically just stack the petition and
10    do them all together.  So they're basically a function
11    of each other.
12    Q. Okay.
13    A. And we did have those.
14    Q. So in those states, do you have like two
15    clipboards; one for Paul, one for ---?
16    A. No, we just stack the petitions.
17    Q. And Rocky is a Democrat, what was the order of
18    those states?
19    A. He's a little different.  We didn't get him until
20    Indiana.  We qualified a couple congressional
21    districts for him.  He was a secondary or tertiary
22    client.  We really didn't care --- not that we didn't
23    care.  We wanted to do a good job.  But we weren't
24    contracted to do a whole congressional.  We were just
25    basically doing cleanup is what we call it.
```

Sargent's Court Reporting Services, Inc.
(814)-536-8909

Page 70

1  Q. Okay.
2  A. You know, a few hundred signatures here, there or
3  the other. And they liked us so much that they sent
4  us to Wisconsin as soon as we were done. So we filed
5  everything like the 15th of January. And then we went
6  to Wisconsin for a couple of days, got that done. And
7  then after Wisconsin, everyone kind of came into
8  Pennsylvania. I told them to take a couple days off.
9  And he was --- yeah, we started Pennsylvania.
10 Q. And then where did Illinois fall in that?
11 A. Illinois, I believe Michael Jennings or a couple
12 of those guys collected some signatures for them. I'm
13 not 100 percent. I'd have to go check.
14 Q. Okay.
15 A. If we did Illinois, it was during that --- it
16 would've been before.
17 Q. And then how about Rocky is an Independent? Can
18 you chronologize those, or were some of them going on
19 at the same time, or when did those periods start for
20 Independent? Anything like that?
21 A. I can give you a whole list, but off the top of
22 my head it would be almost impossible. I basically
23 began with Pennsylvania. That was the first state I
24 went to.
25 Q. Okay.

Page 71

1  A. Because it was the hardest requirement. I mean
2  we were looking at 30,000 signatures originally.
3  ATTORNEY ROSSI:
4  If I may interject? My personal
5  experience with Rocky is he's a bit chaotic in his
6  planning processes. It's like ---
7  A. Yes.
8  ATTORNEY ROSSI:
9  --- I think sort of the natural flow
10 that other candidates would use signatures, Rocky just
11 calls on the phone. I need people. You know, he does
12 the same thing for lawsuits quite frankly. So the
13 planning process is a bit chaotic for Rocky. So it's
14 going to be more difficult to, I think provide a
15 chronologic order for you with respect to Rocky.
16 BY ATTORNEY JOEL:
17 Q. Well, with that explanation, is that an accurate
18 explanation of your dealings with Rocky De La Fuente?
19 A. I think that he's --- yeah. I think that there's
20 a little bit of --- there's always a method to his
21 madness. But I think we have less structure and less
22 planning. We definitely agree with that ---
23 Q. Okay.
24 A. --- assessment.
25 Q. So in terms of the going out and collecting

Page 72

1  signatures, your folks may be, the folks working for
2  Benezet may be in Pennsylvania collecting and you may
3  get a call from the campaign say we need to get to
4  South Dakota, and then they just run over to South
5  Dakota. Is that the way it works?
6  A. Yes, that's how it's worked. Yeah.
7  Q. And that's been your experience with Rocky as an
8  Independent this campaign cycle?
9  A. Yes, sir.
10 Q. And is that the same for all those states? I
11 mean, we could plug in any two states they would
12 be ---?
13 A. What we can do is I can take --- I'm sorry.
14 Q. Let me ask you generally then if you've got a
15 better explanation. I mean I really don't want to try
16 to come up with every permutation that people were
17 here and then went there.
18 A. Yeah.
19 Q. Because we'll be here until the end of time.
20 A. Yeah.
21 Q. What I'd like to do is just get some sense was
22 that consistent --- was that a consistent approach by
23 Rocky De La Fuente as an Independent candidate in
24 Benezet's dealings with him? Namely you would have
25 --- Benezet would have folks collecting in any of the

Page 73

1  states that you listed. But then they may be
2  redeployed to another state on a moment's notice
3  depending on what was needed?
4  A. That's true, yeah.
5  Q. Okay. That's accurate?
6  A. That's very accurate.
7  Q. Okay.
8  A. And the way to get that list of states where we
9  deploy to, we basically will just go and grab the
10 timeline, the filing date requirements and I can say
11 --- I can amend the record, you know, once the
12 depositions are produced and say we did this.
13 Q. Why don't we do that either the break or this
14 evening, since we're going to be back here tomorrow
15 finishing up? Why don't we ---?
16 A. Produce that timeline.
17 Q. Yeah, look at that because I am interested in
18 knowing out of the many states that were Independents,
19 where those timelines fell, when they began, ---
20 A. Write that down to remind me.
21 Q. --- when they ended ---
22 ATTORNEY ROSSI:
23 Yeah. I will.
24 BY ATTORNEY JOEL:
25 Q. --- and how Benezet deployed its resources on

Sargent's Court Reporting Services, Inc.
(814)-536-8909

Page 74

1  behalf of Rocky De La Fuente during that ---
2  A. Sure.
3  Q. --- time frame.
4  A. Not a problem.
5  Q. Now, did you personally collect signatures for
6  Senator Cruz in any of those states?
7  A. Yeah. Yeah.
8  Q. I can't remember if you listed yourself as a
9  person? Oh, you did.
10 A. Yes.
11 Q. So I don't have to ask that.
12 A. Yeah, I enjoy collecting signatures ---
13 Q. Okay.
14 A. --- for my senator. It's a personal privilege, a
15 way of respecting him. I wish that he was in the
16 debate last night.
17 Q. And you collected --- did you collect for Senator
18 Cruz in all of those states that you listed?
19 A. Yeah, I did.
20 Q. Did you collect for Senator Paul in the two
21 states that you listed?
22 A. I did.
23 Q. Did you collect for Rick Santorum in Indiana?
24 A. I did.
25 Q. Did you collect for Trump in Indiana?

Page 75

1  A. I did not.
2  Q. Did you collect for Rocky is a Democrat in the
3  four states you listed?
4  A. I did not. Yes. Yes. Yes, I did in every one.
5  Q. And did you collect for Rocky is an Independent
6  in the number of states you listed there?
7  A. I believe. I mean I definitely collected a lot
8  of signatures. I don't know if I actually was on
9  record as collecting any. So when I would train
10 someone, I would go collect their first like 20
11 signatures with them.
12 Q. Uh-huh (yes).
13 A. Teach them how to do it. And I always gave each
14 person I trained a lot of --- I wanted them to make
15 money. So I was trying to help them as much as
16 possible. So I probably collected, you know, 1,000
17 signatures. But I don't know if I actually was on
18 record as collecting any. I'd have to go look
19 through. I'm sure I notarized a page or two. But
20 yes, I did collect signatures.
21 ATTORNEY JOEL:
22 Mark that one next, please.
23 (Defendant's Exhibit 6 marked for
24 identification.)
25 BY ATTORNEY JOEL:

Page 76

1  Q. Mr. Pool, I'm going to show you what's about to
2  be marked as it looks like Defendant's 6. Thanks.
3  If you take a look at it. I've just got a couple of
4  basic questions about it.
5  A. Okay.
6  Q. Am I correct that this is a nominating petition
7  for Rocky De La Fuente as a Democrat in the
8  Commonwealth of Pennsylvania?
9  A. Yes, sir.
10 Q. So those signatures that are below there are
11 registered voters in the Commonwealth who signed this
12 petition?
13 A. To the best of my knowledge.
14 Q. And it looks like it was notarized and the
15 Affidavit signed by somebody in Pennsylvania?
16 A. Carterstown, yep. Yeah, a Pennsylvania address.
17 Q. Okay.
18 A. And it was notarized in Allegheny County.
19 Q. And this was some stuff that you produced. So am
20 I accurate, this is some of the work that Benezet did?
21 A. Yeah. This is --- any signature gathered for
22 Rocky is a Democrat was done by our company.
23 Q. Nobody else collected for Rocky as a Democrat in
24 the Commonwealth?
25 A. No.

Page 77

1  Q. Okay.
2  A. I would have gotten it if it was a volunteer or
3  something, you know.
4  Q. Okay.
5  A. Yeah.
6  Q. Let me see that for a second. Do you know
7  whether or not --- do you collect any --- this looks
8  like it's for Rocky De La Fuente. My question is did
9  you collect any signatures for Rocky De La Fuente's
10 delegates?
11 A. No, he didn't want any.
12 Q. He didn't want any?
13 A. No. I thought it was kind of weird, but I didn't
14 say anything. I told him what the purpose of the
15 delegates were and he --- it's hard finding them I
16 mean, it requires a lot of campaign resources and
17 outreach and stuff.
18 Q. So if we talk about --- we'll talk about this
19 election cycle and your signature collections. You,
20 Trenton Pool.
21 A. Okay.
22 Q. For Cruz, you talk about the progression of
23 states. Did you follow that same progression? Did
24 you go from Illinois to Indiana to, what was next,
25 Pennsylvania?

Page 78

1    A. Yes, I did. I had to go and like, you know, do
2    some farming in Vermont. And I never went to Rhode
3    Island, but I did have to take a trip to Vermont once
4    or twice. And then I had to go and, you know, go back
5    to Illinois a couple times. We had people in Illinois
6    that were in Indiana that had people in Indiana
7    simultaneously for some period of time.
8    Q. Okay.
9    A. I did a little bit more traveling than gathering.
10   Q. Okay.
11   A. But I was in that same time.
12   Q. And when you were doing the traveling, let's talk
13   about the Cruz campaign first. Through all those
14   states, did you collect signatures or did you manage
15   or whatever it was you were doing at different
16   locations throughout the various states?
17   A. Yeah. I collected signatures in every state I
18   listed.
19   Q. Okay.
20   A. Except for Rhode Island or Delaware.
21   Q. And then within the states or within Illinois,
22   did you collect signatures in different locations
23   within Illinois?
24   A. Uh-huh (yes). Sure.
25   Q. And for Indiana, did you collect signatures in

Page 79

1    different locations in Indiana?
2    A. Of course.
3    Q. And in Vermont, did you collect signatures in
4    different locations in Vermont?
5    A. Not different. I was in pretty much one area.
6    Q. Okay.
7    A. But I did collect signatures.
8    Q. Delaware, did you go to different locations?
9    A. I didn't go to Delaware or Rhode Island.
10   Q. Pennsylvania, you went to different locations?
11   A. Yes.
12   Q. Did you stay in different hotels at these
13   different locations or did you come back to one hotel?
14   A. In Pennsylvania, I stayed in a few cities. I
15   think Harrisburg, Philly and Allegheny.
16   Q. How about in Illinois? Did you stay in different
17   cities?
18   A. Yeah, it was chaotic there. We didn't have the
19   whole state. So it was like, you know, we'd go to one
20   congressional --- it's all done by congressional
21   district there. Kind of like how you guys do it here
22   for the presidential delegates. And we would
23   basically jump to wherever there weren't a bunch of
24   petitioners because everyone just kind of hit the
25   street. My company wasn't the only one doing

Page 80

1    Illinois.
2    Q. And how about in Indiana? Did you stay in
3    different locations?
4    A. Indiana, we had people in every congressional
5    district working simultaneously. And I personally
6    jumped around quite a bit. So yeah.
7    Q. Did the people that Benezet had working in
8    Illinois, did they move around to different locations
9    to collect signatures?
10   A. All the time, yeah.
11   Q. Did they stay in different locations depending on
12   where they were collecting signatures?
13   A. Yes.
14   Q. How about in Indiana? Did they move around to
15   different locations?
16   A. Not generally. We try to keep them all to one
17   area. So I'd give each person a congressional
18   district.
19   Q. Okay.
20   A. Let them get all the money and they make enough
21   money. And, you know, also they get to know the area.
22   It's really chaotic because you're switching up the
23   petition. And Indiana actually doesn't matter but.
24   Well, yeah, you'd have to have --- it's done by
25   congressional district there, too or county there.

Page 81

1    And the counties are part of a congressional district.
2    Meaning you qualify when you get 500 valid signatures
3    in each congressional district. So when they start
4    jumping out of that congressional district, we have to
5    make them do petitions and all that and it gets pretty
6    chaotic. So we keep them in one area to answer your
7    question.
8    Q. How about in Pennsylvania? Did the people you
9    had on the ground in Pennsylvania, did they collect in
10   different locations?
11   A. Not generally.
12   Q. Okay.
13   A. They all try to qualify one district.
14   Q. Okay.
15   A. But we did have some jumping around.
16   Q. And you jumped around?
17   A. I did. I was jumping around, yeah.
18   Q. Rand Paul in Illinois, would it be the same as
19   Cruz in Illinois?
20   A. Yes.
21   Q. We're jumping around?
22   A. Yes.
23   Q. Staying in different locations?
24   A. Yes.
25   Q. Rand Paul in Indiana would be the same as Cruz in

21 (Pages 78 to 81)

Page 82

1    Indiana?  It pretty much stayed to a congressional
2    district?
3    A. Yes.
4    Q. But you jumped around?
5    A. We all --- well, yes.  Yes.
6    Q. All right.  Did others jump around, too?
7    A. Yes.  Andy Jacobs probably the most because he
8    did a lot of events.  But generally not many others
9    than Andy.
10   Q. Okay.
11   A. He did a lot of the gun shows and stuff so people
12   --- he did a lot of gun shows and stuff where people
13   come from all over the state.  And so his signature
14   collection will show that he jumped around.  And he
15   did jump around a lot.
16   Q. Rocky in Wisconsin as a Democrat, I can't
17   remember if I asked you this.  But did you collect
18   signatures there?
19   A. I did not go.
20   Q. Did the people that you deployed there, did they
21   jump around in different parts of the state?
22   A. They worked one congressional district.  I don't
23   know the name, but it's the city of like Wausauwee or
24   something.  Some type of W.
25   Q. Okay.

Page 83

1    A. Northern city.  It's like Wausau.
2    Q. How about Rocky as a Democrat in Indiana?  Did
3    you collect for him there?
4    A. Yeah.
5    Q. And did you jump around?
6    A. Yeah.  I collected in probably five or six of the
7    districts.
8    Q. Did you stay in different locations with that
9    jumping around?
10   A. Yeah.
11   Q. How about the other folks who you deployed?  Did
12   they jump around for Rocky as a Democrat?
13   A. Yeah.
14   Q. And did they stay in different locations?
15   A. Yes.
16   Q. In Pennsylvania, Rocky as a Democrat, did you
17   collect signatures?
18   A. I believe I did.
19   Q. And did you jump around to different parts of the
20   Commonwealth to do that?
21   A. No.  We pretty much stayed in Allegheny for
22   Rocky.
23   Q. And the other folks you deployed also pretty much
24   stayed in Allegheny for Rocky?
25   A. Yeah.  I think that's where most of the

Page 84

1    signatures came from for Rocky.
2    Q. Did you jump around hotels within Allegheny
3    County or did you stay in the same hotel?
4    A. No, I stayed.  I had a house.  I stayed at a
5    house.
6    Q. How about the other folks who you deployed?
7    A. Some of them stayed with me.  But I tried to get
8    as many of them out of the house as possible.  So we
9    put them in hotels.  I'm sure you all see why.
10   Q. How about Rocky as a Democrat in Illinois?  Did
11   you collect signatures for him there?
12   A. I didn't.  I think Michael Jennings did, but I'd
13   have to go and ask him.  And I think William Wright
14   might have.  There's two people that I left in
15   Illinois because they were doing such a good job.
16   Q. Okay.
17   A. And I think that they ended up picking up the
18   petition because they needed some signatures.  And I
19   can't remember how it went down, but I remember being
20   asked.
21   Q. Do you know whether or not those folks or whoever
22   else you deployed in Illinois for Rocky as a Democrat,
23   did they jump around to different parts of the state?
24   A. If there were any, I'm sure they jumped around.
25   Q. And did they stay in different hotels when they

Page 85

1    were jumping around?
2    A. Always in different hotels, yeah.
3    Q. And for Rocky as an Independent in all of the
4    states that you've listed, did you collect signatures
5    personally?
6    A. Yes.
7    Q. And did you jump around in those states to
8    different locations?
9    A. I did to the best of my knowledge.
10   Q. And did you stay in different hotels when you
11   were jumping around?
12   A. Yeah.  Yeah.
13   Q. And how about the other folks who Benezet
14   deployed to those states for Rocky as an Independent?
15   Did they jump around those states to collect
16   signatures?
17   A. Yeah.
18   Q. And did they stay in different hotels when they
19   were jumping around?
20   A. Yes.
21   OFF RECORD DISCUSSION
22   ATTORNEY JOEL:
23   I'll mark that one next.
24   (Defendant's Exhibit 7 marked for
25   identification.)

22 (Pages 82 to 85)

Page 86

BY ATTORNEY JOEL:

Q. Mr. Pool, I'm showing you what's been marked as Defendant's 7. Can take a look at that and when you're ready, let me know.

A. Yes, I'm ready.

Q. Can you identify it for me?

A. This is the agreement between us and Cruz campaign.

Q. Is that your standard contract that Benezet created and ---

A. Yeah.

Q. --- contracted with the Cruz campaign?

A. Yeah. This is a pretty typical contract. This one has a lot of amendments, I believe. What amendment did we give to them? Do you know? Oh, okay. I thought we were on like amendment U with them. It doesn't matter. Yeah, this is a typical contract.

Q. And did you use the same form contract for --- strike that.

How does it work? Is there one contract with Cruz and then for every state there's an amendment that talks about that state what you're going to get, how much you're going to get paid?

A. My fiancée does it. She's a contract lawyer.

Page 87

Man, I don't know what she's doing but it seemed pretty cool. I like that amendment process. Yeah. I thought it was pretty cool. I mean, that's a professional way of doing it. So in a perfect world, that's how I would do all these clients. Rocky didn't happen that way.

Q. Am I correct that 2016 was the first time that Benezet operated in terms of working a presidential campaign?

A. Yeah.

Q. And I may have asked this, but if not --- if so, I apologize. If not, let me ask it now. The campaigns you've talked about, the collections you've talked about, that's all that Benezet has done?

A. Yeah.

Q. There haven't been any municipal elections, gubernatorial elections, things like that that you've done?

A. No, I've done some municipal elections.

Q. Benezet?

A. Under Benezet, yeah.

Q. Talk about those.

A. City councilors in Kyle, gotten two elected. I've done a --- we took fluoride out of the water in San Marcus.

Page 88

Q. Kyle is in Texas?

A. Kyle, Texas. It's a city.

Q. Damon Fogley and a guy named Travis Mitchell. And then we did a --- we fought a $20 million animal shelter in Pflugerville, Texas. Won that one. And we've done about three or four other things, you know, small things here and there.

Q. Okay.

A. Bonds and stuff like that.

Q. I'm sorry?

A. Bonds and stuff like that. And then we also have done a --- I don't consider Don Zimmerman as part of Benezet. He never wrote Benezet a check. He didn't even know the name of my company until after we were elected. But what else did we do? We helped defeat --- I can come back and give you a list of that stuff, too.

Q. Has all of that --- strike that. Has the only work that Benezet has done out of state been in the 2016 presidential arena?

A. Yes.

Q. So Benezet hasn't done work for a gubernatorial race in Missouri, for example?

A. No.

Q. Or Senate race in California?

Page 89

A. No.

Q. Or a ballot initiative in Oregon?

A. No. Not Benezet.

Q. And again, we will talk about what you've done pre ---.

A. Yeah.

Q. But right now, I'm just focused on Benezet.

A. Yeah. We did a congressional candidate CD21 to Todd Phelps cycle.

Q. And where was that?

A. CD21 is like San Antonio up to Austin over to Fredericksburg.

Q. So Texas again?

A. Texas.

Q. Okay.

A. And then, you know, I think that's pretty much it.

Q. Let's talk about Pennsylvania. When you're collecting signatures for Cruz in Pennsylvania, for example, did you work with any of the Cruz --- folks who wanted to be delegates for Cruz?

A. Yeah, we did. We're in contact with the campaign.

Q. Is that where you got your witnesses from?

A. Sometimes, yeah. It depends. I mean we had ---

Sargent's Court Reporting Services, Inc.
(814)-536-8909

Page 90

1   well, yeah. Sometimes.
2   **Q. Why did it depend?**
3   A. It just depended on, you know, where we were.
4   They wanted five congressional district delegates
5   originally. And I had enough people to do that. We
6   had some manpower that were in state. And I'd sourced
7   enough people at that point for the Rocky De La
8   Fuente. They came a week after Rocky. So Rocky
9   contracted this within a day or two of the lawsuit.
10  It was like the 27th, 28th, 29th of January.
11  **Q. Okay.**
12  A. And then we got contracted by the Cruz campaign
13  almost a week after that. So the clock was ticking.
14  You know, I couldn't do the whole state. And also I
15  sourced some Republican people that wanted to work for
16  Rocky. There were outsourced Republicans. So we used
17  some of those people and we tried to get the five
18  districts they wanted. And then we had a couple, I
19  think like one of the districts we had one witness who
20  was ready. He was already going door to door and
21  getting everything. So all we needed was manpower and
22  circulators to help him.
23  **Q. Were you able to get the delegates signed up?**
24  A. Most of them.
25  **Q. For all five districts?**

Page 91

1   A. No, not all of them.
2   **Q. How many of them?**
3   A. Whatever Bucks County is, we definitely could not
4   get that done. Our witness there was probably
5   mentally insane. I'm not sure what her problem was,
6   but Michael Alexander who you spoke to I'm sure he
7   could tell you what exactly happened. I mean, she was
8   talking to herself at the door with the ---.
9   **Q. Where did you find her as a witness?**
10  A. On Craigslist. And then Andy Jacobs and the
11  Masons and a few other people, they basically got the
12  rest of the stuff done. We did three districts to
13  answer your question.
14  **Q. Okay.**
15  A. Three districts.
16  **Q. What happened in the fifth district? You got**
17  **three. You got the Bucks County district. What**
18  **happened to the fifth one?**
19  A. The Bucks County one. Oh, okay. So the other
20  one was, I think we just, I just told the campaign at
21  that point, after we had the issues with the witnesses
22  and there was an issue with just mobilizing people and
23  getting them to move around, the delegates, Vonne
24  Andring who I think he should have stuff between me
25  and her. She was her campaign person. She provided

Page 92

1   me a list of people's names. I had a list of --- the
2   Rand Paul campaign like reached out to me after that
3   lawsuit. There was like an article written. Some guy
4   gave me a list of every Rand Paul delegate and helper.
5   So I utilized that, tried to find Cruz people. We
6   were told basically to go fly a kite. We exhausted
7   every opportunity we could to go and get witnesses.
8   And unfortunately, we were falling short. And no one
9   wanted to move around. You know, no one has the time
10  and --- the time necessary to go and just travel
11  around with other petitioners to go get signatures.
12  So I told the Cruz campaign I can only do two
13  districts and we ended up getting them in three.
14  **Q. Okay.**
15  A. So we dropped one of them. I don't know which
16  one it was.
17  **Q. Okay.**
18  A. It's probably on here though.
19  ATTORNEY JOEL:
20  Mark that one next.
21  (Defendant's Exhibit 8 marked for
22  identification.)
23  BY ATTORNEY JOEL:
24  **Q. I'm showing you what's been marked as Defendant's**
25  **8. Is that what you were talking about? The list**

Page 93

1   of ---
2   A. Yes.
3   **Q. --- Rand Paul ---**
4   A. Yeah, this one.
5   **Q. --- delegates ---**
6   A. Yes.
7   **Q. --- that might be able to help out as witnesses**
8   **for Cruz?**
9   A. Yeah, we did. I e-mailed all these guys and I
10  got the worst e-mail responses back. It's pretty
11  hysterical. Probably not appropriate for Court.
12  **Q. Okay.**
13  A. But yes, this is what I was talking about.
14  **Q. All right.**
15  ATTORNEY JOEL:
16  Why don't we take a break? It's about
17  ten of. Give you a chance to get your head together
18  for the next thing.
19  SHORT BREAK TAKEN
20  BY ATTORNEY JOEL:
21  **Q. Mr. Pool, one question that came to me over the**
22  **lunch break was in Pennsylvania when you're getting**
23  **the notarization requirement, that's done, the**
24  **signature occurs of the Pennsylvania resident and the**
25  **notarization happens both after all the signatures**

24 (Pages 90 to 93)

Page 94

1  collected on that piece of paper; correct?
2  A. Oh, yeah. Of course. Of course. Now, if
3  there's a typo or a dating error, it does happen. I
4  would say, you know, when I get a notarized piece of
5  paper, it's going basically in a folder that no one's
6  ever going to get back from me.
7  Q. Okay.
8  A. And I do a pretty thorough job of checking it,
9  but stuff does happen.
10  **Q. But that's the intent, is that the signature and**
11  **the notarization happens after you've collected all**
12  **your signatures?**
13  A. A hundred percent, yeah. We would not do
14  anything else or allow anything else to happen.
15  Q. Okay.
16  ATTORNEY JOEL:
17  There's three of them there.
18  (Defendant's Exhibits 9, 10 and 11
19  marked for identification.)
20  BY ATTORNEY JOEL:
21  **Q. I'm showing you what's been marked as Defendant's**
22  **9, 10 and 11. Take a minute. Take a look at them.**
23  **And when you're ready, let me know. Ten may be a**
24  **duplicate.**
25  A. Yeah, I think this is 10. I think that this is

Page 95

1  the same multi-one.
2  **Q. Is that the same one for Cruz for President?**
3  A. Yeah. I mean, I haven't gone through every word,
4  but it should be.
5  **Q. All right. Then take a look at 9. What's that?**
6  A. Nine is the contract I had with --- this is the
7  contract between me, Shawn Wilmoth for the Rocky De La
8  Fuente campaign.
9  **Q. That was Rocky as a Democrat?**
10  A. Rocky as a Democrat in the State of Pennsylvania.
11  **Q. Okay. And what is 11?**
12  A. It does say qualify Rocky De La Fuente for the
13  2016 Republican Primary ballot. Obviously that's
14  incorrect. But yes.
15  ATTORNEY ROSSI:
16  He's ambitious, he's not that ambitious.
17  A. Yeah. Yeah, I don't think he would fly there.
18  This is the agreement between me and client. This is
19  just a standard contract.
20  BY ATTORNEY JOEL:
21  **Q. Okay. So Defendant's 11 is just a template**
22  **contract?**
23  A. Yeah. Yeah.
24  **Q. And I ask because it looks like the last page,**
25  **there's something in there.**

Page 96

1  A. Oh, yeah. So this is actually a contract that I
2  was sending to Rocky for the Ohio. Originally me and
3  Rocky, for when he was running as an Independent, I
4  called about the money issue that I was still owed
5  from this contract, Shawn Wilmont's contract. And I
6  contacted him after the Libertarian National
7  Convention. And he called me that night and he
8  contracted me immediately to do Ohio. So this was the
9  first.
10  Q. Okay.
11  A. This would be the first contract we executed and
12  then after that there was another amendment with a
13  bunch of states.
14  Q. Okay. Okay.
15  A. Does that make sense?
16  **Q. Yeah. So 11 was the contract between Benezet and**
17  **Rocky De La Fuente to collect signatures for him as an**
18  **Independent in Ohio to get on the general election**
19  **ballot?**
20  A. Yeah. And it makes sense that there's no line
21  there or his signature because we actually were
22  missing that. And I asked him. He sent it to me and
23  I didn't print it. I think it was a text message.
24  Anyway, I couldn't find it forever and we couldn't
25  make the actual amendment until we had the original

Page 97

1  thing that he'd executed. So we gave you the blank
2  one just ---
3  Q. Okay.
4  A. --- because that's all we had.
5  **Q. That's fine.**
6  A. And I do have one thing to add to the record ---
7  **Q. Sure.**
8  A. --- from the prior thing. I worked for the
9  Libertarian party this summer.
10  Q. Okay.
11  A. And I also worked for the Green party this
12  summer.
13  Q. Okay.
14  A. And I put them on a few different states each.
15  So that's something that needed to be amended.
16  **Q. Let's talk about that then. So did Benezet, was**
17  **it Benezet that had that work?**
18  A. Yes, sir. Benezet did it.
19  **Q. So Benezet had a contract with the Libertarian**
20  **party to collect signatures to get Libertarian**
21  **candidates or Libertarian party on ballots?**
22  A. Libertarian candidate, Libertarian --- well, the
23  Libertarian party in some states like Pennsylvania.
24  And then Libertarian candidates in other states like
25  Ohio.

Sargent's Court Reporting Services, Inc.
(814)-536-8909

Page 98

1  Q. Okay. So what ---.
2  A. And I only did three states. So if you want me
3  to answer that really quickly, I can.
4  Q. Yeah, let's go into that. So what states did
5  Benezet collect signatures for for the Libertarians?
6  A. Libertarian party we did the party petition of
7  Illinois and Pennsylvania. And we only did, we did a
8  small portion of the contract. So I was the
9  subcontractor. I was contracted by a subcontractor.
10  Q. So there was a contractor who subcontracted to
11  somebody else, who subcontracted to Benezet ---
12  A. That's correct.
13  Q. --- to get some signatures?
14  A. That's my belief, yes.
15  Q. All right. And that was to get the Libertarian
16  party on the general election ballot in Illinois and
17  Pennsylvania?
18  A. Yes, sir.
19  Q. Okay.
20  A. No, that was for Illinois. For Pennsylvania, I
21  was directly through the Libertarian National
22  Committee.
23  Q. Okay.
24  A. LNC. And then for Ohio, I was direct through the
25  LNC as well. And I had an exclusive for 5,000

Page 99

1  signatures. And they were going to get the other
2  5,000 from volunteers. And that was for the
3  Independent presidential petition for the Libertarian
4  candidates.
5  Q. Okay.
6  A. Because they were running as Independents, not as
7  the party.
8  Q. All right. And did you collect for any
9  candidates as well, or just for the party?
10  A. Just for the --- we collected for Gary Johnson
11  and for William Weld. The Independent presidential
12  candidates --- we put them on as an Independent in
13  Ohio if that makes any sense.
14  Q. Okay.
15  A. Because the party petition requirement is so much
16  more it makes a lot of cost. It makes cost-effective
17  strategies to go after the Independent status. So you
18  know how many candidates. Does that make sense?
19  Q. Uh-huh (yes).
20  A. So it's 5,000 signatures versus 35,000.
21  Q. And how about the Green party? Where did you
22  collect? Where did Benezet have contracts to collect
23  for the Green party?
24  A. In Pennsylvania, Virginia, Georgia and that's it.
25  Q. And how many people did Benezet deploy for the

Page 100

1  Libertarian signature gathering effort?
2  A. I subcontracted like two or three big
3  coordinators in Ohio. They were working on some
4  state-wide initiative orders. So I just, you know,
5  basically threw it to them. Saw how many signatures
6  they got. And I think they probably had, I think we
7  had about 20 circulators total for the Libertarian
8  party of Ohio. For Illinois, it was a little
9  different set up. I was basically given a 12,500
10  signature contract. I flew in or I drove in from Ohio
11  and found two pretty solid guys. Put them to work and
12  we ended up getting about 9,000 or 10,000 of the
13  signatures. The lady who contracted me got another
14  2,000. And then for Pennsylvania, I turned in about
15  1,500 signatures. And that was all done through a
16  hand full of people that I had working for Rocky and
17  other stuff.
18  Q. So I just want to make sure I understand. So
19  Illinois, you subcontracted it to somebody else?
20  A. To two individuals.
21  Q. Okay.
22  A. But I was like managing them and overseeing the
23  whole production so.
24  Q. What two individuals were those?
25  A. Rod McCulloch and Jon Zahm and their companies.

Page 101

1  I think one's Victory Research and the other one's
2  Goliath Slayer Communication.
3  Q. And then the Pennsylvania Libertarian, who did
4  you use to collect those signatures?
5  A. That was my company. I used a handful of guys.
6  And I'm going to get you that list tonight.
7  Q. And then for Ohio, did I hear you right that you
8  subcontracted that work out to somebody?
9  A. I did. I did. And when I subcontract, I do a
10  very particular way. Like I'm sourcing people, too.
11  So I'll put up ads or whatever and find petitioners
12  and I send them to my guys. So they'll make the deals
13  off. But I'm helping them get the job done. And my
14  intent was to always go and do the whole State of Ohio
15  myself personally. But it was at that time that I got
16  contracted by Rocky. And it just made the most sense.
17  So I guess I'm saying that defensively in case anyone
18  like reads this deposition. But we did subcontract it
19  out. And we subcontracted Brian Meader (phonetic)
20  who, I can't remember his company. It's a real weird
21  name. It's like Jack Services Sunset Services, LLC.
22  And that's in my discovery today. And then also
23  another person named --- he didn't do much work. I
24  can't remember his name.
25  Q. Okay.

26 (Pages 98 to 101)

Page 102

1 A. I'll find it.
2 Q. And were you able to collect signatures in
3 Pennsylvania?
4 A. Me personally I did not.
5 Q. Okay.
6 A. I didn't sign off on any affidavits.
7 Q. But the people who you sent out, were they able
8 to collect?
9 A. Oh, yeah.
10 Q. Okay.
11 A. Yeah. We got 1,500 signatures ---
12 Q. Okay.
13 A. --- for the LP and about 4,500 for the Green
14 party.
15 Q. And for the --- staying on the Libertarian party,
16 that was this, it was 2016 ---
17 A. Yes, sir.
18 Q. --- that that happened?
19 A. Yeah.
20 Q. And was there an in-state witness requirement on
21 that collection?
22 A. There wasn't.
23 Q. Was there a notarization requirement on that
24 collection?
25 A. There wasn't.

Page 103

1 Q. Was there a can't sign two permit on that?
2 A. There was not.
3 Q. For the Green party, you said you went to
4 Pennsylvania, Virginia and Georgia. Pennsylvania, did
5 Benezet do that work itself?
6 A. Yes.
7 Q. Who did you deploy there to do that?
8 A. I'm going to give you that list tomorrow.
9 Q. And were those signatures --- did you have the
10 in-state requirement for those signatures?
11 A. Yes. No. No, we did not.
12 Q. Okay.
13 A. No.
14 Q. With the notarization?
15 A. No. We did not have that requirement either.
16 Q. And how about the requirement of two people not
17 being able to sign? Or one person not being able to
18 sign two or more petitions?
19 A. We did not.
20 Q. Virginia, did Benezet do that or did you
21 subcontract?
22 A. Bob Lynch has worked with me a lot. He said he
23 wanted to do it. And it was an Election Day only type
24 of deal. And I subcontracted out technically to allow
25 him to do the whole thing. I think he got 300

Page 104

1 signatures. They wanted 1,000. They were pretty non-
2 plussed with his output. So they ended up basically
3 pulling it and giving it to someone else.
4 Q. How about Georgia? Did you subcontract out or
5 was that Benezet?
6 A. I did subcontract it out, but I did do the work,
7 too. So I subcontracted it to Derrick Lee who had
8 worked with me a lot or worked with Rocky a lot, the
9 cycles. So he was doing Rocky there.
10 Q. Now, when you were collecting for Cruz in
11 Pennsylvania, were you collecting signatures for Cruz
12 and also his delegates? Delegates only? Cruz only?
13 How was that?
14 A. No, the plan was a delegate strategy plan. He
15 wanted to have his delegates on the ballot. So we
16 tried to get them as, you know, the District seemed to
17 want its delegates in there.
18 Q. And the 4,000 signatures you testified about
19 getting, were those for his delegates?
20 A. Oh, yeah. I mean like it's split up, you know.
21 We probably got 1,500 for Cruz and then, you know,
22 2,500 for the delegates.
23 Q. And were you successful in getting these
24 delegates done?
25 A. Yeah, we got some. I think we got about ten on

Page 105

1 there. Between five and ten that my people helped
2 personally fill.
3 Q. Yesterday there was some --- I forget which
4 witness it was frankly. There was some testimony
5 about somebody witnessing. Kemit or something like
6 that.
7 A. Kemit, yes.
8 Q. Kemit. Can you spell that for me?
9 A. It's K-E-M-I-T. Like Kermit without the R.
10 Q. Is that his first name or last name?
11 A. That's his first name.
12 Q. What's the last name?
13 A. His last name is Wilson, I believe.
14 Q. Okay.
15 A. I'll double check that. I think it's in my phone
16 but ---.
17 Q. Am I correct that he was a witness for the Rocky
18 Democratic collection effort?
19 A. He was. Yes, sir; that's correct.
20 Q. How did you find him?
21 A. We found him --- we sourced him through I believe
22 it was Gerald Bundy; he's a friend of Gerald Bundy or,
23 you know, that's exactly how we found him.
24 Q. And was Bundy, was he from Pennsylvania also, if
25 I remember right?

Page 106

1   A. Yes, he's from Philly.
2   Q. Now, there was some discussion --- well, now let
3   me ask you this. Did you have a written contract with
4   Mr. Wilson to be a witness?
5   A. No, I did not.
6   Q. Did you have any paperwork back and forth with
7   him setting up the relationship with him?
8   A. I had a contract, a verbal contract with Gerald
9   who worked for me, you know, a lot. And Gerald's the
10  one who sourced Kemit. And he told Kemit exactly what
11  me and Gerald had agreed to for all witnesses in this
12  state.
13  Q. Okay. What was that?
14  A. $10 per hour. And it's written in our contract.
15  I'm getting into my cost that I billed the campaign.
16  Q. I'm sorry, say that again?
17  A. I'm giving them literally the cost that was
18  billed to the campaign.
19  Q. Okay.
20  A. So Rocky's campaign is paying me $10 an hour.
21  I'm giving it directly to the witness who's following
22  around my people and helping.
23  Q. Okay.
24  A. Okay.
25  Q. And it sounds like there was a dispute over

Page 107

1   payment with Mr. Wilson. What's your understanding of
2   that?
3   A. Well, I was there so I understand it to be the
4   guy basically tried to change the deal after the fact
5   and refused to notarize the signatures we needed to
6   get him on the ballot. I mean, you're talking about
7   700 signatures or so. Basically we wouldn't have
8   qualified Rocky if there was a challenge or anything
9   without paying this guy the extra money he asked for.
10  Q. So why did he think he was deserving of more
11  money?
12  A. It happens a lot. Just people get greedy and
13  they realize how important their role is in the
14  process. And they start asking for more.
15  Q. What was his basis for saying it? Did he say he
16  worked more hours? I mean, if there's an hourly rate,
17  how did he come up with that I'm owed this?
18  A. He just said that that's what he thinks it's
19  worth.
20  Q. Did you ever consider paying any of your
21  witnesses a per signature fee?
22  A. I wanted to actually. I didn't. And I told
23  Shawn that. I said I think that, you know, if we
24  charged $1 per signature rate, it'll come out to be,
25  you know, probably the same price. And it actually

Page 108

1   ended up being less the way Shawn proposed it; the $10
2   per hour. You know, I want to make sure that they're
3   all there also. I could see people saying yeah, I'll
4   just go get them and I'll sign off on them. I don't
5   want anything like that to happen. So I think the per
6   hour thing maybe is better. You know, these guys are
7   all independent contractors. They're just going to do
8   what they do anyway. But I wanted to make sure that
9   the plan was in place to make sure the best business
10  practices were followed.
11  Q. Okay.
12  A. And I thought that the hourly rate, after talking
13  to Shawn, might have been the smarter strategy.
14  Q. And why is that?
15  A. For those reasons; making sure the person
16  actually shows up to the job and not trying to pull
17  some, you know, shoddy --- I don't know, doing
18  something that's not correct.
19  Q. So were you actually there on the collecting with
20  Mr. Wilson?
21  A. No, I was not there.
22  Q. Okay.
23  A. I was there at the turn in to get his stuff
24  notarized.
25  Q. Oh, okay.

Page 109

1   A. To write him his check.
2   Q. Did you end up resolving that with him?
3   A. I did.
4   Q. What did you end up giving him?
5   A. I gave him a few hundred dollars extra. We
6   settled about half.
7   Q. Okay.
8   A. By the end of it, he probably got $300 or $400
9   extra.
10  Q. Since Benezet has been up and running in 2014,
11  has it been profitable?
12  A. In 2014, no. But it has been this year.
13  Q. So 2016 you'll be profitable?
14  A. Yeah, I'll be profitable this year.
15  Q. 2015, you didn't do any work?
16  A. Didn't do any work under Benezet.
17  Q. And 2014, you just started out?
18  A. Yeah. We're baby.
19  Q. Okay.
20  ATTORNEY JOEL:
21  Can you mark that one, please? Okay.
22  I'm not sure if that's supposed to go with something
23  else or what. That's the way it came to us sort of
24  after another e-mail.
25  (Defendant's Exhibit 12 marked for

Page 110

1  identification.)
2  BY ATTORNEY JOEL:
3  Q. So can you just tell me what that is?
4  A. This is the amendment for Rocky De La Fuente's
5  contract. I think number ten in there. This would be
6  the amendment for number ten.
7  Q. So if it's not number ten, whatever the contract
8  we just looked at for Rocky De La Fuente, this is the
9  amendment?
10 A. Sure. Yeah.
11 Q. That added all those states?
12 A. Yeah. And I believe the contract was for Ohio.
13 So then we said okay, well this is now going to amend
14 the Ohio agreement and then add all these other
15 states.
16 Q. Okay.
17 A. And then this was, after this everything became a
18 verbal basically because we were just moving too
19 crazy.
20 Q. And was this for him as an Independent?
21 A. Yeah.
22 Q. Correct? Okay. What do you mean when you say
23 you're moving too crazy?
24 A. Well, I mean like we're just, you know, I didn't
25 have time to go and sit with my contract lawyer and go

Page 111

1  and like read the by stuff and then get his signature
2  because, you know, by this time we're halfway through
3  the cycle. Deadlines are looming. You know, we're
4  just, we're literally just become a nomadic band of
5  petition gatherers and throw them into the next state.
6  Make sure we see what we can get on the ballot.
7  Q. This nomadic existence that you and your people
8  had, did that --- when did it start?
9  A. It started basically after Pennsylvania.
10 Q. So after the Pennsylvania Democratic deadline?
11 A. No, after the Pennsylvania Independent deadline
12 we became pretty chaotically moving about trying to
13 get stuff done.
14 Q. Okay. And was that August?
15 A. Yeah. I think it was August 1st deadline.
16 Q. August 1st. Okay. So from August 1st through
17 when were you and your folks nomadic?
18 A. Pretty much until about two weeks ago.
19 Q. And describe what you mean by nomadic?
20 A. We're just like, you know, I went from
21 Pennsylvania into Ohio. We had eight days to get it
22 done. Then we got contracted. We got the
23 Constitution party. Actually, they contracted us
24 there, too. I didn't tell you that. That's another
25 amendment. Darrell Castle. You know, so we had eight

Page 112

1  days to go get the 10,000 signatures or so we needed.
2  And, you know, get it done. And then after that we're
3  like okay, great. And then we get called to come to
4  Pittsburgh. So we all move to Pittsburgh. Okay,
5  great. Go get that done. You know, what else do got?
6  Alabama, Virginia, Kentucky, you know, Georgia. Some
7  of the people came in from working for Alex in
8  Connecticut and Massachusetts. So people just kind of
9  running all over.
10 Q. Okay.
11 A. That's what I meant.
12 Q. And after the primary in Pennsylvania, did you
13 guys continue collecting signatures in other
14 locations?
15 A. After the primary in Pennsylvania we're pretty
16 much done. After the primary date or after the
17 Pennsylvania primary collection window?
18 Q. After the collection window.
19 A. After the collection window, I think we still did
20 a couple things but I can't recall.
21 Q. Okay.
22 A. I don't know what we --- I think actually we were
23 done. We're done. I remember we're done.
24 Q. Is that because there was --- I mean, were there
25 other ---.

Page 113

1  A. There's no ---.
2  Q. Were there other drives to do?
3  A. After that, the only thing really left is Rhode
4  Island delegates. And the Rhode Island delegates need
5  like 1,000 signatures between the two congressional
6  districts. It's pretty easy. At that point everyone
7  --- all the Republican Party people are helping anyone
8  but Trump. So they need to spend money on this.
9  Q. And how about for the Independents? When do
10 those start up?
11 A. The Independents start up ---.
12 Q. What was the earliest startup date?
13 A. Actually, some of them started right around then.
14 Q. Oh, okay.
15 A. So I could have actually theoretically began
16 circulating at the same time. I could have started
17 circulating for the Libertarians probably at the same
18 time that we had turned in for Ted Cruz. I believe
19 that I could have gone straight into doing that.
20 Q. Okay.
21 A. I'll look at the timeline and see.
22 Q. If you had a contract?
23 A. Yeah, if I had a contract. Yeah.
24 Q. So there's work to be done in various states for
25 other, for Libertarians, Greens, Constitution, ballot

Page 114

1   initiatives.
2   A. There's work, yeah.  It's just fighting over,
3   figuring out who's going to hire you do to it.
4   Q. Okay.
5   A. Yeah.  And, you know, it's human inertia, too.  A
6   lot of these guys don't even look at getting it done
7   until the last two weeks.  So try getting a contract
8   from a Libertarian until they need it.  It's kind of
9   hard.
10  Q. When you're going to all of these states, the
11  cycle 2016, are you driving to them?  Are you flying
12  to them?  What's your mode of transportation?
13  A. We do all of it.  You know, fly, drive, train.
14  Pretty much however we have to get there.  No boats.
15  But, you know, I'm sure it's not out of the question.
16  Q. Now, from 2014 through 2016, let's take that
17  chunk of time.  Not Benezet-related work or Benezet
18  contracted work, but Trenton Pool individual work.
19  A. Okay.
20  Q. What did you do?
21  A. We put some candidates on the ballot for Supreme
22  Court of Texas.  Probably the first thing we did.
23  Q. And when was that?
24  A. 2014.  Early 2014.  Actually, we might have
25  already filed them.  That was probably 2013.

Page 115

1   Q. And that was?
2   A. So you didn't ask that.  I won't, I'll say we
3   didn't do them.  But I was working on my dad's
4   campaign.
5   Q. Okay.
6   A. He was running for Supreme Court.  That was
7   probably the first thing we did in 2014.
8   Q. Okay.
9   A. Then after that it was I left my dad's campaign
10  to go and I raised about $30,000 to go and take out a
11  congressman, take down a congressman from getting re-
12  elected.  Helped stop a congressman from being re-
13  elected.
14  Q. Okay.
15  A. That would be a more appropriate way.
16  Q. How did you do that?
17  A. We basically put together like a campaign
18  strategy, executed a campaign plan.  You know, like
19  general political consulting stuff.
20  Q. Okay.
21  A. Signs, you know, mailers, phone calls.
22  Q. With regard to the Supreme Court, were you out
23  collecting signatures for that?
24  A. I did collect signatures for my dad and two other
25  candidates.

Page 116

1   Q. And two other candidates.  Were you paid for
2   that?
3   A. I was paid.  Dad didn't pay me.  He was supposed
4   to.  I got paid by, you know, I probably made like
5   $5,000 or so.  $10,000.  I can't remember the total.
6   I was supposed to make more, but the donors' checks
7   didn't matriculate as we were planning.  So a lot of
8   the money didn't come.  We were all kind of just
9   sitting there twiddling our thumbs like, what do we
10  do?
11  Q. So that might have been 2013 or '14.  But that
12  was something you, Trenton Pool, did outside of
13  Benezet?
14  A. Yeah.  Yeah.
15  Q. Okay.
16  A. Yeah.
17  Q. Did you bring anybody in to help you out or did
18  you just do that yourself?
19  A. Jake Witmer came down to help with signature
20  gathering.  He also helped run dad's campaign.  He
21  lived with my parents for like six months.
22  Q. Was that six months in 2013 or '14?
23  A. Probably a month or so in '13.  And then four
24  months or so, five months in '14.
25  Q. Okay.

Page 117

1   A. 'Til the primary, whatever the date was.  It may
2   have been four or five months.  I can't remember.
3   Q. So you collected signatures for your father's
4   campaign for Supreme Court and two other candidates.
5   A. And then there was probably a handful of others
6   that we picked up along the way, you know.  So a guy
7   would say hey, I need signatures, too.  I see you guys
8   are collecting.  Will you go get me 100?  We'll go get
9   them 100 signatures.
10  Q. And this is for that same Supreme Court race?
11  A. No, they're running for like District Judge.
12  Q. Okay.
13  A. They're running for, you know, dog catcher.
14  Whatever it was.
15  Q. Okay.
16  A. So there's probably about six or seven other guys
17  and I don't know their names, all of them.
18  Q. Okay.  Was that in 2014?
19  A. That was 2014.
20  Q. But all those efforts were in Texas that you did?
21  A. All of them in Texas, yeah.
22  Q. How about any others in 2014 that Trenton Pool
23  did in terms of collecting signatures?
24  A. Just collecting signatures.  There wasn't
25  anything else.

Sargent's Court Reporting Services, Inc.
(814)-536-8909

Page 118

1  Q. Okay. How about in 2015? Anything that Trenton
2  Pool did to collect signatures in 2015?
3  A. Actually, sorry. 2014 was the Equal Rights
4  Ordinance. So we ended up doing that in like July.
5  Q. Okay. That was in Texas also?
6  A. Yes.
7  Q. Okay.
8  A. In Houston.
9  Q. Okay. Anything else in 2014?
10 A. I think that's it.
11 Q. All right. How about 2015?
12 A. 2015, the very end about I think like the late,
13 late, late, late, it was probably like right at the
14 --- it was November, December. I can't remember. I
15 got to go look at the timeline. But I consider that
16 all in this fiscal year because we really didn't do
17 billing or any of that. It was like we got contracted
18 technically in that year. But all the work was done
19 in the '16 cycle.
20 Q. So in 2015, I just want to make sure I
21 understand, Trenton Pool didn't collect signatures in
22 2015?
23 A. That's correct.
24 Q. In 2016, has Trenton Pool collected signatures
25 other than for your work with Benezet?

Page 119

1  A. No, I was doing this under the Benezet name
2  there. We also did an Uber lift. We helped recall a
3  city councilor as an advisory role to source
4  petitioners. I forgot to mention that, too. That's
5  one thing we did in 2016 while we were doing all this
6  other stuff.
7  Q. Did that involve signature collecting?
8  A. Yeah, it did.
9  Q. Okay. Where was that?
10 A. That was in Austin. It was a recall of Ann
11 Kitchen. We sourced about 10 or 20 of the petitioners
12 that they used to gather the 5,600, 6,000 signatures
13 in the District.
14 Q. Was that Benezet?
15 A. That was probably, I can't remember. I think
16 they wrote the check to Benezet. But it could have
17 been my name on it. So I would just say either one.
18 Q. Okay.
19 A. You can say it's under me. That's fine.
20 Q. So anything else in 2016 where Trenton Pool was
21 out collecting signatures other than for Benezet?
22 A. No, that's pretty much it.
23 Q. So now let's go back before the formation of
24 Benezet in 2014. When did you first begin doing work
25 as a signature collector?

Page 120

1  A. I started a long time ago with Jake. We were in
2  Oregon.
3  Q. Can you give me a year?
4  A. I think it was 2006. I don't really recall. I
5  believe it was whatever --- it must have been 2006
6  because that was the Libertarian National Convention
7  of Oregon where we were.
8  Q. And what did you do in 2006 as it related to
9  collecting signatures?
10 A. We worked for a petition company called Americans
11 for Limited Government. It was run by, you know, some
12 co-financed organization. I didn't know anything
13 about gathering signatures other than it was kind of
14 an interesting thing to me. And Jake was already
15 there doing it. And I was supposed to meet up with
16 this guy Jake because he was going to pay half of gas
17 to drive from Oregon to Alaska where we both needed to
18 go. So he asked me if I wanted to work. I remember
19 we made, I made like $3,000 or $4,000 in a few days.
20 So I thought it was pretty cool.
21 Q. Okay.
22 A. I was in college.
23 Q. I never asked you about your educational
24 background. Tell me about that.
25 A. I went to school growing up in high school and

Page 121

1  then went to Baylor for a semester. Didn't like it.
2  So I transferred to Alaska. They had given me part of
3  the --- they have like a private fund dividend that
4  they give people that go to all the schools. And so
5  it was super cheap and I had made like a 1,400 SAT,
6  1,300-something SAT. So they gave me a scholarship to
7  Baylor. And then I went to Alaska and they gave me a
8  good deal. And then I transferred to SMU because I
9  mean there's not much money in being a park ranger,
10 you know.
11 Q. What was your degree in?
12 A. My degree was in business and geology. A little
13 bit different.
14 Q. And when did you get your degree?
15 A. I got my degree in 2010.
16 Q. So 2006 was your first signature gathering for
17 money?
18 A. Yeah. That was the first time I ever did it.
19 Q. And that was for Americans for Limited Government
20 in Oregon?
21 A. Yes.
22 Q. What time of year was that?
23 A. It was in the summer, early summer.
24 Q. Did you do any other signature collecting in
25 2006?

Sargent's Court Reporting Services, Inc.
(814)-536-8909

Page 122

1  A. I might have. We had a --- when we got to Alaska
2  we started fighting a smoking ban. And it was
3  actually the first time I'd ever seen a petition drive
4  come from conception. And it left, you know, a
5  lasting impact on me. We raised about $30,000 from a
6  bingo hall owner who installed all these smoke
7  extractors in his store. I believe I collected some
8  of the signatures before I left. I had to go back to
9  school at SMU. So we ended up actually referrending
10 successfully and putting it back to the voters to make
11 a question on the ballot. We ended up losing, but it
12 was still an interesting experience.
13 Q. Any other signature collecting efforts in 2006?
14 A. No, that would be it.
15 Q. And both of those, were you paid for those?
16 A. I don't think I took any money for the second
17 one. But the first one, yes.
18 Q. How about in 2007? What signature collecting
19 activities did you ---?
20 A. I don't know. I don't know what year it was.
21 Between 2006 and the time I graduated and we started
22 Benezet or started working as petition gatherer.
23 There wasn't many times I can like --- I know that
24 there were places that I was and I went in-between
25 summer breaks. But I don't know what years they were.

Page 123

1  Q. So would it be fair to say that from 2007, 2010
2  it was sporadic?
3  A. Sporadic, yeah.
4  Q. Okay.
5  A. If Jake testified, he probably --- because I was
6  working with either him or Andy Jacobs. And you'll be
7  probably both of them. If you haven't met Andy, he's
8  probably on the list.
9  Q. Were those efforts, the sporadic efforts between
10 2007 and '10, were they --- were you paid for all of
11 them? Were you paid for some of them?
12 A. I think Jake is the only one who didn't pay us.
13 I think Jake was the only one that didn't pay us. He
14 had an issue with --- didn't pay us. He didn't pay
15 us, yeah. But he had an issue with one of the clients
16 and like one of the --- the Proponent didn't pay him
17 or something. So we ended up all getting stiffed.
18 But we got paid as much as we could get paid, yes.
19 Q. Were any of those signature sporadic gatherings
20 volunteer? And by volunteer I don't mean where you
21 didn't get paid because you got stiffed. I mean
22 volunteer like you wanted to do it ---
23 A. Yeah.
24 Q. --- even if you weren't expecting to get paid.
25 A. I think we gathered some signatures. I don't

Page 124

1  remember. Probably not.
2  Q. Okay. So in 2010, you graduated from college.
3  A. Uh-huh (yes).
4  Q. Yes?
5  A. Yes.
6  Q. Okay. Thank you. And is that when you decided
7  you wanted to be a professional signature gatherer?
8  A. Not really. Just kind of, you know, the economy
9  was tanked. And I, you know, needed to do something.
10 And it was something I seemed to be pretty good at.
11 So I just kind of hit the pavement and started doing
12 it.
13 Q. Okay.
14 A. Make some money.
15 Q. So in 2010, what issues or candidates or parties
16 did you collect signatures for?
17 A. I'm not sure if I did anything immediately in
18 2010. I was pretty proactive about looking for work
19 in the geology field.
20 Q. Okay.
21 A. And I had been hired by a couple different people
22 to do some stuff. My dad's and oil and gas driller so
23 he had me working with him a lot.
24 Q. Okay.
25 A. But I know that between then and 2012, I started

Page 125

1  working. I did some work for Andy Jacobs, I believe
2  and Jake Witmer.
3  Q. So let's take it. I'm trying to do this
4  chronologically so I can get a clean record and know
5  what's what. So in 2011, did you collect any
6  signatures?
7  A. I wouldn't be able to recall, yeah.
8  Q. Okay.
9  A. I have no clue.
10 Q. How about in 2012?
11 A. 2012, yes.
12 Q. So 2010, you're not sure. 2011, you're not sure.
13 A. 2011 I am sure actually. I do know an example.
14 Q. Okay.
15 A. My dad ran for Supreme Court at that time, too.
16 So he's a perennial candidate they like to call him.
17 Q. Okay.
18 A. And he did ask us to collect the signatures. And
19 Jake helped us in that.
20 Q. Were you paid for that?
21 A. I was paid a little bit, yeah.
22 Q. And that was within Texas I'm assuming?
23 A. Yeah. Yeah.
24 Q. Okay.
25 A. And then we also in 2012, we went, I left dad's

1 campaign to do possible work for Ron Paul. And the
2 work was supposed to be in Indiana but I couldn't make
3 Indiana. I came at the end of the Pennsylvania drive.
4 And I got to do some --- I started off volunteering
5 because I didn't know who to talk to. But Andy hired
6 me to do District --- one of the Districts in
7 Pennsylvania.
8 Q. So let's talk about 2012. So you collected
9 signatures for Ron Paul.
10 A. Yes.
11 Q. Did you collect any other signatures for other
12 candidates, issues, parties, anything like that in
13 2012?
14 A. No, not really.
15 Q. So where did you collect signatures for Ron Paul?
16 A. I collected predominantly, I mean I collected a
17 couple hundred for him in the Allegheny County area.
18 Q. Of Pennsylvania?
19 A. Yeah.
20 Q. And what did you say about Indiana? You tried to
21 get there, but it didn't work out?
22 A. Yeah. Dad's campaign was kind of like having
23 issues. And Jake was supposed to get set up there.
24 And so Jake was --- actually, Jake didn't come down in
25 2012. He came in and then left. And he went and

1 gathered signatures. I actually went up and met Jake
2 and collected in Illinois, too. I remember that. I
3 stayed with him and we did some Libertarian Party work
4 as well.
5 Q. And was that in 2012?
6 A. Yeah. And then I was supposed to go to Indiana
7 after Illinois. I can't remember what happened.
8 Something fell through. It's all kind of --- I'd have
9 to look at the timeline about all this stuff, man.
10 Q. Okay.
11 A. It's a pretty long time ago.
12 Q. But in any event, you did go to Pennsylvania and
13 collect signatures?
14 A. I went to Pennsylvania, yeah.
15 Q. Okay. And ---.
16 A. Very small amount. I don't remember what it was.
17 Q. Were you paid for those or no?
18 A. I was a little bit. Andy probably knows exactly
19 what I was paid. I'm not exactly sure.
20 Q. And you were hired by Andy Jacobs to collect
21 those signatures?
22 A. Yeah, I was.
23 Q. I'm assuming you had a witness with you?
24 A. Yeah, we did.
25 Q. Do you know how you got teamed up with that

1 witness?
2 A. We got teamed up --- I basically met the
3 delegates and then I worked with them directly.
4 Q. Okay.
5 A. But I mean, again, I probably got that like the
6 last week of the drive. I remember waiting around
7 trying to figure out who to talk to.
8 Q. And I'm assuming that those signatures were all
9 notarized?
10 A. They were, yeah. Everything was done notarized.
11 Q. So you had a Pennsylvania witness; right?
12 A. Uh-huh (yes). Yes.
13 Q. Yes? All right.
14 A. Yes.
15 Q. And you had notary?
16 A. Yes.
17 Q. And you asked the questions to make sure you
18 weren't getting somebody who had already signed
19 somebody else's petition?
20 A. Yes.
21 Q. Where else did you collect in 2012, if anywhere?
22 A. I'm sure there was more places. But I can't
23 remember. I believe the Libertarian stuff was before,
24 but I'm thinking now it probably was after that. And
25 I think we went to North Dakota in 2012. But it could

1 have been 2013. It makes sense though because the
2 presidential cycle that we would have done North
3 Dakota in 2012. So we went to North Dakota sometime
4 in the summer.
5 Q. And was that working for Andy Jacobs again?
6 A. Andy Jacobs, yes.
7 Q. And were you paid for those signatures?
8 A. For Andy's? Oh yeah.
9 Q. For the ones you collected in North Dakota and
10 Pennsylvania, were you paid per signature?
11 A. Per signature? For the Paul stuff, yes. And for
12 North Dakota, yes. The Paul stuff was actually ---
13 they did that kind of that hybrid where they give you
14 your expenses. But I didn't have any. So I was like,
15 I didn't have that many. I had notarization expenses.
16 That was it.
17 Q. Okay.
18 A. Plus your signature costs. And then North Dakota
19 it was just signature, no expenses.
20 Q. Okay.
21 A. Actually, no. I think I did get expenses there,
22 too. I've got to look, man. I don't know how it all
23 worked out.
24 Q. Okay.
25 A. But it was a signature pay. That's how we

Page 130

1  reimbursed.
2  **Q. With the Benezet work for this year that Benezet**
3  **has done in Pennsylvania, did the notary --- I'm**
4  **sorry.  Did the witness fee get passed on to whoever**
5  **the client was?**
6  A. No, not for Cruz.
7  **Q. Not for Cruz?**
8  A. For Rocky, it's in the contract that we ---
9  **Q. Okay.**
10  A. --- would pass that on.
11  **Q. So for the Rocky witness fee, when Rocky was**
12  **running as a Democrat in Pennsylvania, that $10 an**
13  **hour was passed through to the Rocky campaign?**
14  A. It was passed to subcontractor.
15  **Q. Oh.  Passed through to ---**
16  A. His contractor.
17  **Q. --- Shawn?**
18  A. Yeah.  Yeah.
19  **Q. Okay.**
20  A. A deal, yeah.
21  **Q. And for the Cruz, did you quote a price that**
22  **would incorporate what that was going to cost you?**
23  **That witness fee?**
24  A. Yeah.  I mean I did some arithmetic and figured,
25  you know, I had a pretty good idea what it would be

Page 131

1  considering the other stuff.  But when I did Cruz's
2  --- like I told you before, when I did the Cruz bid, I
3  was, I assumed that I was only going to do the
4  districts that I had the people to do.  So I was going
5  to use people.  I wasn't going to go source witnesses
6  and everyone was circulated was going to be the
7  witness.  Now, that didn't actually work out that way.
8  But that's pretty much what we had anticipated.  So
9  the $7, $6.50 that I quoted him should have been able
10  to absorb some of it.  But it's probably not, you
11  know, I'm probably lower than what anyone else would
12  have charged them.
13  **Q. And did I understand you correctly that when you**
14  **bid the Cruz work, you were, it was your thought that**
15  **you were going to do a limited amount of districts,**
16  **ones where you already had witnesses online to help?**
17  A. Exactly.
18  **Q. Okay.  That was the plan?**
19  A. That was the plan, yeah.
20  **Q. Okay.**
21  A. Yeah.
22  **Q. And that didn't work?**
23  A. No, we had to move some of the guys around.  So
24  we took like, you know, once someone moved, they'd
25  finished the district, we had to move them somewhere

Page 132

1  else to help go clean up.  But yeah, I mean we were
2  able to get about three of the five we had originally
3  contracted for.  And as I mentioned before, part of
4  that was because the witness and district date who,
5  you know, she spoke well and seemed really awesome and
6  nice. she ended up being however you want to say it.
7  I think pretty crazy.
8  **Q. Getting back to 2012 when you were doing it just**
9  **on your own or working for Andy Jacobs or somebody**
10  **else, you mentioned Pennsylvania and you mentioned**
11  **North Dakota.  Any place else you collected signatures**
12  **for?**
13  A. Not that I remember.
14  **Q. And the collection in Pennsylvania was for Ron**
15  **Paul to get on the Republican primary ballot for**
16  **President, I assume?**
17  A. Yeah, that is true.
18  **Q. And the work you did in North Dakota for the**
19  **Libertarian party, was that to get them on the general**
20  **election ballot ---**
21  A. Yeah.
22  **Q. --- for President?**
23  A. Yes, it was.  And we also did the Constitution
24  Party there.  And a third party, it was kind of odd at
25  the time.  It was brand-new.  It was called Americans

Page 133

1  Elect.  And that was all for Mike Arno.
2  **Q. And both of those, the Constitution party and**
3  **that American Select or Elect?**
4  A. Elect.
5  **Q. Elect?**
6  A. Yeah.
7  **Q. American Elect party, was that also to get that**
8  **party on the general election ballot for president?**
9  A. Yes, sir.
10  **Q. Did you do any work in 2012 signature gathering**
11  **that wasn't associated with a presidential bid?**
12  A. I don't believe so.
13  **Q. So we talked about Pennsylvania and North Dakota.**
14  **Any other states did you go to in 2012 to collect**
15  **signatures?**
16  A. I don't think so.
17  **Q. How about 2013?  Trenton Pool as an individual?**
18  A. Just the stuff for the Supreme Court candidates.
19  **Q. And is that what you talked about before that may**
20  **have bled ---**
21  A. Yes.
22  **Q. --- into 2014?**
23  A. Yes.  Well, the signatures are due in December of
24  that month.  But the primary's not until a few months
25  later.  So we roll into the campaign.

Page 134

1   Q. Okay.
2   A. So we're still helping and doing stuff.
3   Q. And that Supreme Court candidate, that was your
4   father's?
5   A. Yes. But I was helping two others, I mean I did
6   their signature gathering. I made it pretty clear I
7   wasn't going to help dad's campaign. I didn't think
8   it was appropriate. And, you know, it's hard to get
9   along with your dad. You know, seeing him getting
10  torn up. It kind of feels, you know, you just want to
11  stay away from it. So Jake did most of that.
12  Q. Okay.
13  A. I went and helped Robert Talton mainly. He's a
14  friend of mine. He was running for Supreme Court. So
15  I kind of, you know, I was his little helper. And
16  then they're doing, you know, I think we helped a few
17  other people. I can't remember who. I don't know.
18  Q. Was that all in Texas though, that work in 2013?
19  A. Yeah.
20  Q. Did you do any other signature collection other
21  than for that Supreme Court work in Texas in 2013?
22  A. No.
23  Q. And 2014 we already talked about. Do you do, for
24  any of the folks who you subcontract with --- strike
25  that. That's a bad one.

Page 135

1   For any of the individuals who you contract with,
2   that Benezet contracts with to go out and collect the
3   signatures, whether it's Witmer or Jacobs or any of
4   those folks, do you do any sort of a background check
5   on them?
6   A. No.
7   Q. Okay.
8   A. I mean, no.
9   Q. Your complement of signature gatherers that
10  Benezet uses, how did you find them all?
11  A. We find them from all over.
12  Q. Explain that to me.
13  A. It's word of mouth. People being sourced by
14  other, you know, signature gathering companies,
15  friends of friends, you know, people who have done it
16  before. There's really not like that big of a barrier
17  of entries. So anyone can become one in a sense. So
18  we can also train them, which we did over the summer.
19  We've trained a lot of people. And, you know, try to
20  give everyone a chance.
21  Q. I noticed that a few of your folks at least are
22  from Pennsylvania.
23  A. Uh-huh (yes).
24  Q. Jacobs, Mason, Mason and Bundy.
25  A. Uh-huh (yes).

Page 136

1   Q. You have to say yes or no, please.
2   A. Yes, sir. They are.
3   Q. Did you ever --- did you or Benezet ever ask them
4   to try to find more witnesses in Pennsylvania?
5   A. I think we did. I mean that's how I got a hold
6   of Kemit was through Gerald Bundy.
7   Q. Okay.
8   A. So I told him what the deal, what the offer was
9   and he sourced Kemit. And he, you know, I don't think
10  he found any. I don't know what he did. I didn't
11  think he --- they didn't do anything.
12  Q. How many people ---?
13  ATTORNEY ROSSI:
14  Can you speak up for the ---?
15  A. Yeah. Ed and Denise, they didn't do any --- I
16  didn't ask him to help source them out.
17  BY ATTORNEY JOEL:
18  Q. You didn't ask him to do what?
19  A. I didn't ask him to help source anyone.
20  Q. And by that you mean to help find witnesses?
21  A. To help find, yeah, more registered ---
22  Q. Okay.
23  A. --- Republican or Democratic voters.
24  Q. Is Jacobs a registered voter?
25  A. I believe so.

Page 137

1   Q. Republican or Democrat?
2   A. I'm not sure.
3   Q. How about Mason, Ed?
4   A. He's a diehard Republican.
5   Q. Okay. How about Denise Mason?
6   A. A Republican.
7   Q. And how about Gerald Bundy? Democrat, I'm
8   assuming?
9   A. I don't know. I think he is.
10  Q. Let me ask you this. Jacobs is a Pennsylvania
11  resident; correct?
12  A. I believe so.
13  Q. So Jacobs could have signed the affidavit. Why
14  did Jacobs need a witness?
15  A. Jacobs need a witness?
16  Q. Or did he?
17  A. I don't know if he did. Where did he work? Did
18  he work in --- I think he did sign the affidavit.
19  Q. Okay.
20  A. Yeah.
21  Q. And what about Mason? The Mason's? Did they
22  work for you in Pennsylvania?
23  A. Yeah.
24  Q. I thought they did.
25  A. They did.

Page 138

1   Q. So they didn't need a witness?
2   A. They signed the affidavit, too.
3   Q. And how about Mr. Bundy?
4   A. Bundy, I don't know what he, if he worked for me
5   or not at that time. I've got to go and figure it
6   out. He might have gone to Delaware and did Delaware
7   or something. He lives in Delaware, too. So we have
8   --- I don't know. I'd have to go see what he did.
9   Q. Okay.
10  A. Or ask him. But I don't know. I don't recall
11  him. Actually no, he did. He collected signatures
12  for Rocky.
13  Q. Okay.
14  A. Yeah, he did.
15  Q. So why did he need a witness or did he?
16  A. I think he signed off on his declaration.
17  Q. Okay.
18  A. I'm not sure though. I'd have to go look. I
19  can't remember how it went down. The people from the
20  state didn't need witnesses.
21  Q. Okay.
22  A. And I made sure. We basically went and looked
23  everyone up who was planning on being a petition
24  circulator or a witness. And we took --- we typed in
25  their date of birth, county and their name to make

Page 139

1   sure. So we didn't do background checks, but we did
2   look up to see if they were actually voting or not.
3   Q. Okay.
4   A. And if they were, then they were allowed to be a
5   witness or sign up on their own decs as a petitioner.
6   Q. Right. They wouldn't have need a witness then.
7   A. Yeah. Yeah.
8   Q. They could have just signed their own
9   declaration.
10  A. That would have saved money and time and a lot of
11  energy.
12  Q. Have you begun any responding to proposals,
13  request for proposals, bid work, anything like that
14  for next year's election cycle, 2017?
15  A. I haven't. I haven't.
16  Q. And let me break it up. You as Trenton Pool?
17  A. Yeah.
18  Q. How about Benezet?
19  A. Neither one.
20  Q. All right.
21  A. I'm exhausted man. Go find a nice beach
22  somewhere. I think that's my next priority.
23  Q. As it relates to the Cruz efforts in Pennsylvania
24  --- strike that. Never mind.
25  ATTORNEY JOEL:

Page 140

1   Mark that one next. Thank you.
2   Thirteen.
3   (Defendant's Exhibit 13 marked for
4   identification.)
5   BY ATTORNEY JOEL:
6   Q. Mr. Pool, I'm showing you what's been marked as
7   Defendant's 13. Take a look at it. Let me know when
8   you're ready.
9   A. I'm ready.
10  Q. Can you turn towards the back of it? There
11  should be something called a verification.
12  A. Where is that? Do you want to show me? What's
13  the last?
14  Q. It might be the second to last page.
15  A. Okay. Is this it there?
16  Q. There it is.
17  A. Okay.
18  Q. Is that your signature?
19  A. Yes, it is.
20  Q. Okay.
21  A. Yeah.
22  Q. Mind if I look at it?
23  A. Yes. I remember we signed these whenever you met
24  with me ---
25  ATTORNEY ROSSI:

Page 141

1   Yeah.
2   A. --- to talk.
3   ATTORNEY ROSSI:
4   I don't even remember when we did it.
5   A. We did it at the Crompaws in Harrisburg.
6   ATTORNEY ROSSI:
7   Oh, yeah. I came up to you.
8   A. Yeah, you came up and saw me.
9   BY ATTORNEY JOEL:
10  Q. Let me ask you this before we get to this
11  document. Any of the times that you've been in
12  Pennsylvania collecting signatures, ---
13  A. Uh-huh (yes).
14  Q. --- have you ever been stopped, told to stop,
15  anything like that, by anybody associated with the
16  Commonwealth of Pennsylvania?
17  A. Stop gathering signatures?
18  Q. Yeah, stop gatherings signatures. Stop talking
19  to people about candidates. Stop advocating on behalf
20  of whatever candidate you're advocating for, anything
21  like that?
22  A. No.
23  Q. Okay.
24  A. Why?
25  Q. I'm just asking.

36 (Pages 138 to 141)

Page 142

1   A. Oh, okay. I don't believe so.
2   Q. What about any of the people who you have
3   deployed to Pennsylvania? To your knowledge have any
4   of them ever been stopped, arrested, told to stop
5   gathering signatures, told that they're not allowed to
6   speak about their political views, candidates,
7   anything like that?
8   A. So can you just clarify what you mean by asked to
9   stop? Like by an officer of the law?
10  Q. Yeah.
11  A. Okay.
12  Q. Yeah.
13  A. I'm sure, yeah. I mean I haven't personally, but
14  I've had incidents all over the country where people
15  have been asked to stop.
16  Q. I'm asking in Pennsylvania.
17  A. I got asked to stop by a lot of people that
18  weren't officers of the law.
19  Q. No. All right.
20  A. So I mean it's like ---.
21  Q. To your knowledge, the time that you've been in
22  Pennsylvania collecting signatures, ---
23  A. Uh-huh (yes).
24  Q. --- has any Pennsylvania law enforcement officer
25  prohibited you from interacting with the people who

Page 143

1   you're trying to convince to sign petitions?
2   A. Me, no. Independent contractors, I would have to
3   go back and ask.
4   Q. Okay. To your knowledge has that happened ---
5   A. I believe ---.
6   Q. --- as you're sitting here today?
7   A. I believe to Michael Jennings it happened
8   somewhere.
9   Q. In Pennsylvania or elsewhere?
10  A. In Pennsylvania, yeah.
11  Q. Okay. What do you know about that?
12  A. I don't know much. I'd have to go look at my
13  notes and see what happened. But people get asked to
14  stop all the time. Were they on private property?
15  Possibly. I don't know how it happened.
16  Q. And just to be clear, I want to make sure.
17  Stopped by like a Pennsylvania State Police Officer?
18  A. Yes, it's possible.
19  Q. Do you know that for a fact or are you saying
20  maybe?
21  A. I don't know about Michael, but I'm sure it's
22  possible, yeah.
23  Q. Okay.
24  A. People have been asked to stop.
25  Q. All right. Well, I'll ask Michael when we meet

Page 144

1   with him. That's fine.
2   A. Jake, could've happened to him, I don't know who
3   was asked to stop what, you know. So I mean I'd have
4   to go and ask every single person.
5   Q. Okay.
6   A. And when I say that, just to clarify, you know,
7   signatures are gathered from all different aspects.
8   You can go, some people gather them on private
9   property. Some people gather them at public events.
10  Some people go door-to-door. So there's a whole walk
11  of different modes of modalities of getting these
12  things onto the paper.
13  Q. Okay.
14  A. And so if they've been --- if they're at a
15  private, you know, Walmart for instance getting
16  signatures, odds are they probably got asked to stop.
17  Q. Okay.
18  A. You know?
19  Q. All right.
20  A. Does that make sense?
21  Q. Yeah. No, I understand what you're saying.
22  A. Okay.
23  Q. And that does help clarify what you said.
24  A. Okay.
25  Q. Thank you.

Page 145

1   A. Okay.
2   Q. You understand the nature of this lawsuit to be
3   challenging the restriction, the necessity to have an
4   in-state witness with you; correct?
5   A. Yes.
6   Q. The notarization requirement; correct?
7   A. The notarization requirement, yes.
8   Q. And the fact that a voter in Pennsylvania can
9   only sign one petition?
10  A. Yes.
11  Q. Do any of those provisions stop you from coming
12  in to Pennsylvania and campaigning or advocating on
13  behalf of any candidate of your choice?
14  A. Campaigning or advocating can be defined as
15  petitioning, too. I mean so under that question I
16  would say yes. If I can't do everything that needs to
17  be done to make sure that candidate is most successful
18  and petitioning's included then, yeah. I would say
19  yes.
20  Q. Okay.
21  A. Without spending money out of my own pocket and
22  without being harmed by not being able to practice my
23  personal right to petition the government.
24  Q. So is it your belief that the provisions you've
25  challenged ban you from coming into Pennsylvania and

Page 146

1  handing out leaflets for a candidate?
2  A. They don't ban me from that, no.
3  Q. Do they ban you from coming in to Pennsylvania
4  and talking to people on the street about the
5  candidate of your choice?
6  A. No, they do not.
7  Q. Do they ban you from coming in to Pennsylvania
8  and carrying signs around with the candidate of your
9  choice?
10  A. No, they don't.
11  Q. For the issue of your choice, or the ballot
12  initiative of your choice, anything like that?
13  A. No.
14  Q. All right. Let's look at this a little bit. I'm
15  going to pass this back and forth because this is the
16  only copy I have.
17  A. No problem.
18  Q. Ron Yoachum. Yoachum?
19  A. Ron Yoachum.
20  Q. And I'm just a little bit confused when you say
21  circulated and/or witnesses. Was he a circulator for
22  you in Pennsylvania?
23  A. Yeah, I believe he actually was. He collected a
24  few signatures.
25  Q. Okay.

Page 147

1  A. Maybe ten.
2  Q. For who?
3  A. Twenty (20). He was working Cruz. He was a
4  Republican.
5  Q. So since he's a Pennsylvania resident, he
6  wouldn't have needed a separate witness ---
7  A. He would not.
8  Q. --- to collect?
9  A. He would not. Well, he could have, but I didn't
10  --- he was doing is own little thing. I gave him the
11  walk list. I believe that's the guy I gave a walk
12  list to, gave him an account. And he was just going
13  door-to-door and doing it that way. And I tried to
14  pair him up with someone probably and he probably told
15  me to go fly a kite to be honest. I can't remember.
16  Some of these guys don't want to work with anyone and
17  it's hard to ---.
18  Q. I mean, he didn't need anybody to collect in
19  Pennsylvania because he could sign the affidavit?
20  A. I believe that Ron Yoachum is a registered
21  Republican.
22  Q. Okay. Rick Churra?
23  A. Rich Churra is a registered Republican, too.
24  Q. And was he a circulator for you?
25  A. He was a circulator and witness.

Page 148

1  Q. Okay.
2  A. And a delegate.
3  Q. Delegate for Cruz?
4  A. For Cruz.
5  Q. So he circulated signature petitions on behalf of
6  Benezet?
7  A. Originally for himself. So he was one of those
8  guys that the campaign said hey, this guy's already
9  doing work. Go get him.
10  Q. Okay.
11  A. And so I said okay. And we were originally going
12  to use him to travel to other districts. But none of
13  the other delegates in that district could spin. He
14  was a full-time, he basically gave up his job for a
15  month to go and do this. So he was actually probably
16  one of the better, he was our best asset provided to
17  us by the Cruz campaign.
18  Q. And did you find him by contacting the Cruz
19  campaign?
20  A. Yeah. I mean we were in communication daily.
21  Q. Okay.
22  A. Vonne Andring who I believe might be in this
23  list, too.
24  Q. Yeah.
25  A. If she's not, she's in the discovery I'll send

Page 149

1  you with all the email. But she gave us him and a
2  couple other people.
3  Q. And did you contact them for --- did you contact
4  the Cruz campaign to try to get registered Republicans
5  who might help with this witness or collect or do
6  anything like that?
7  A. Exactly. We wanted help getting signatures or
8  volunteers. Originally when I talked to the Cruz
9  campaign about all this stuff, you know, back when we
10  were in Indiana, I told them how difficult
11  Pennsylvania was. And I said, you know, you guys are
12  going to need help there. It's not an easy state.
13  It's the most difficult state. It really is. And I
14  said if y'all want delegates, you know, you guys are
15  going to. He said no, no. We've got $20,000 and 200
16  volunteers. He's like you guys are going to get blown
17  away. And I said I'll bet you $500 you call me within
18  a week. And he did.
19  Q. Okay.
20  A. So that's when we --- and then we had two weeks
21  to do it instead of three. So we just kind of
22  scrambled and hit our heads against the wall. And
23  figured out who could spend this amount of time, who
24  could get paid for their activism, and who was able to
25  go out and help us. And they provided probably two or

Page 150

```
1   three people that actually ---.  I think most of the
2   people were pretty autonomous, getting their stuff
3   done themselves like Rick.  But obviously we weren't
4   able to get them on in every district.  And it's kind
5   of sucky so.
6   Q. Do you remember the names of the other people
7   that the Cruz campaign put you in touch with to help
8   you out?
9   A. I have a list and the contract that I have, you
10  know, whatever the delegates were for those districts,
11  I can pull them out.
12  Q. Okay.
13  A. And there's probably an email between me and
14  Vonne basically listing each one.
15  Q. Okay.  Andy Maul.
16  A. Uh-huh (yes).
17  Q. We haven't talked about him.  Did he actually
18  circulate for you in Pennsylvania?
19  A. He circulated.  Actually me and him went out
20  together and circulated initially.  And then he ended
21  up working with --- I don't know who he worked with.
22  Andy's in pretty bad shape right now.  So he
23  originally was going to do the whole --- I was going
24  to do District 14 with Andy.  And he ended up, I'm not
25  sure what happened, but he couldn't go door-to-door.
```

Page 151

```
1   I mean that was pretty evident.  He's gained about 200
2   pounds.  He's got asthma.  So I told the Cruz campaign
3   we weren't going to be able to get him on the ballot.
4   And we ended up actually getting him on the ballot.
5   And then he got kicked off.
6   Q. Cruz got kicked off the ballot?
7   A. No, Andy did.  Andy was a delegate.
8   Q. Oh, he was the delegate.  Okay.
9   A. Yeah.  Yeah.
10  Q. So is he somebody that the Cruz campaign put you
11  in touch with?
12  A. I put them in touch with him.  I knew Andy from a
13  personal.  He actually was a Ron Paul guy.
14  Q. Okay.
15  A. Ron Paul then Rand Paul.  But then Rand got
16  kicked out so he became a Cruz guy.
17  Q. Okay.  And he's a Pennsylvania ---
18  A. He's a Pennsylvania.
19  Q. --- resident?
20  A. Yes.
21  Q. And Republican?
22  A. He's a diehard Republican.
23  Q. Okay.
24  A. Yeah.  Probably one of the only ones in Allegheny
25  County.
```

Page 152

```
1   Q. Number 12 mentioned a Jim Edwards.  We haven't
2   talked about him yet.  Was he a circulator?
3   A. Jim Edwards was a doctor of something in Penn
4   State.  And him and Rick I believe are buddies.  He
5   might have actually --- Jim came from Ron Yoachum.
6   And that guy said that this guy could help us gather
7   signatures.  So I put him and Rick together.  And he
8   gathered signatures or he helped Rick gather
9   signatures.  I'm not really exactly sure what happened
10  there.
11  Q. And by Rick you mean?
12  A. Rick Churra.
13  Q. Rick Churra?
14  A. Yeah, they're all from Penn State area.
15  Q. Okay.
16  A. Yeah.
17  Q. So you put Jim Edwards, the Pennsylvania guy,
18  together with Rick Churra, Pennsylvania guy?
19  A. Rick Churra.  And then actually Jake Witmer ended
20  up --- I ended up taking him off of Rocky and putting
21  him up there to help Rick.  So him, Jake and Jim were
22  kind of a team.
23  Q. Okay.
24  A. And then Jake got mad at Rick --- Rick got mad at
25  Jake.  So I had to basically fire Jake because he was
```

Page 153

```
1   getting --- he did get asked to leave a parking --- he
2   got asked to leave a Walmart with Rick, the delegate.
3   And that pissed off Rick.  So the campaign told me
4   that they were going to have to come to some other
5   arrangement.  So I ended up sending Andy Jacobs to go
6   help Rick.  And that's exactly how that went down that
7   I remember.
8   Q. Okay.
9   A. So they probably got half the district done
10  together.  And then Andy went and helped Rick and then
11  Jim finished it.  Pretty much everyone on that list
12  though, if I can go through it, I can probably name a
13  lot more people for you guys for the list.
14  Q. Okay.
15  A. That that actually is a complete.  That's the one
16  I gave you.
17  ATTORNEY ROSSI:
18      Yeah.  And I will give you that.  I can
19  copy that off my computer tonight.
20      A. Give it to me tomorrow.
21  ATTORNEY ROSSI:
22      Or email it to you.
23      A. That would be perfect.  Yeah.  Because that'll
24  help me, yeah, for the Pennsylvania stuff.  Because
25  all those guys are in the state helping us.  And, you
```

Page 154

1    know, there's probably 50 names.
2    ATTORNEY ROSSI:
3    You can take care of that after you get
4       the download then; right?
5    A. Sure. Yeah, that's right.
6    BY ATTORNEY JOEL:
7    **Q. Have you had any discussions with Carol Love**
8    **about this case?**
9    A. No, not really. I know that she was one of the
10   witnesses. She was going to be a signature. She was
11   a Proponent of signing for multiple, multiple
12   signatures.
13   **Q. Okay.**
14   A. Or candidates, sorry. Republican candidates. As
15   are many voters, you know. A lot of people ask why
16   they can only sign for one. And they get kind of mad.
17   **Q. Number 17, Justin Freyermuth; his involvement?**
18   A. He was a Democrat witness.
19   ATTORNEY ROSSI:
20   Sorry, what's that name?
21   A. Justin Freyermuth was a Democrat witness
22   circulator for Rocky.
23   BY ATTORNEY JOEL:
24   **Q. Was he one who you contracted via Benezet or is**
25   **he just one of these local witnesses that you found to**

Page 155

1    **go along?**
2    A. What you mean contracted? I mean they were all
3    technically contracted via Benezet; right?
4    **Q. Okay.**
5    A. If they're working for us and getting paid by us.
6    **Q. Okay.**
7    A. Yeah. So this guy ---.
8    **Q. Oh, that's true. So even all your Pennsylvania**
9    **witnesses were working for Benezet?**
10   A. Technically, yeah.
11   **Q. Okay.**
12   A. Yeah. So they're all independent contractors.
13   But they're all working for Benezet or getting a
14   paycheck from Benezet at this time, in 2016.
15   **Q. For whatever effort they provide?**
16   A. For whatever, yeah.
17   **Q. And for Rocky, it was $10 an hour that was passed**
18   **through to the Rocky campaign?**
19   A. For Rocky, yeah. Some of them got paid cash like
20   Kemit and Justin probably got some cash, too. But
21   they were all getting paid. Now, some of them
22   actually ended up liking the signature gathering
23   portion, too. Like Justin ended up, he was one of our
24   best witnesses or most reliable. I wouldn't say best.
25   But he actually liked collecting the signatures. So

Page 156

1    he would go and he would be holding the boards getting
2    signatures. And when Bob or whoever is working with
3    him can't get them all, you know, because they're
4    spilling over and everything, he would start gathering
5    them, too. And he would end up --- so I'd pay him
6    per signature on his signatures.
7    **Q. So some of your --- how many others in addition**
8    **to Freyermuth, did that?**
9    A. Pretty much all of them. All of them.
10   **Q. Okay.**
11   A. I would say the majority of the people that are
12   witnessing. Kemit didn't do it. I don't know why.
13   Maybe Michael just didn't tell him to do it. But they
14   guys that were working for me, you know. They see how
15   easy and how good it is. And they all kind of say
16   well, you know, I can do that, too. Why don't we make
17   a little extra money?
18   **Q. Okay. So the witnesses were not only witnessing**
19   **the folks, well, Andy Jacobs is from Pennsylvania, but**
20   **the Jake Witmers of the world, but were also**
21   **collecting their own signatures is what you're saying?**
22   A. Yeah.
23   **Q. Okay.**
24   A. I mean they're carrier circulators. That's what
25   they are.

Page 157

1    **Q. What's that mean?**
2    A. They're circulating, carrying the petition and
3    witnessing the circulation effort. So they're there
4    basically --- they're not there to take away
5    signatures from a primary like professional
6    circulator. But they're there to make sure that, you
7    know, they're aided in every way. Like if you're at a
8    busy location, it's impossible to stop them all. You
9    can't catch them all, right. So you've got to like,
10   you know ---. And so these guys are there to help and
11   make sure, in the most beneficent way possible, that
12   these guys succeed, and we get our clients on the
13   ballot, and make sure that we do it all legally and
14   lawfully. And Justin Freyermuth was one of the better
15   ones. He would come home. Him and Jake went to that
16   library in downtown Pittsburgh. And I think they got
17   like, I'm thinking like 200-something signatures a
18   day.
19   **Q. Okay.**
20   A. And Justin was getting about 50. So that's
21   pretty good.
22   **Q. So the witnesses would catch the overflow?**
23   A. Overflow, yeah.
24   **Q. So if they weren't there to collect those**
25   **signatures, those signatures would be gone. They**

Sargent's Court Reporting Services, Inc.
(814)-536-8909

Page 158

1   wouldn't be recorded arguably.  And they wouldn't get
2   paid for them and you've got fewer signatures to try
3   to get your folks on the ballot?
4   A. Yeah.  I think we have like Justin, you know, he
5   was obviously offered to be a complete ---.  You know,
6   I was like hey, it doesn't make sense.  Why don't you
7   just go get your own signatures?  These guys, they
8   don't really like that.  A lot of them don't like
9   asking the questions.  So yeah, I mean technically
10  they're doing --- you know, they're helping out the
11  petitioner as best as possible.
12  Q. And part of that is signing the affidavit.  And
13  part of it is also catching whatever overflow may come
14  so you get some more signatures?
15  A. Their primary role is to witness.
16  Q. Right.  But they'd also catch overflow.  You said
17  Justin was good at it and he'd get signatures.
18  A. Yeah, he would help us get signatures.  They do,
19  you know.
20  Q. And you said that your other witnesses did the
21  same?
22  A. Some of them, yeah.
23  Q. Maybe we can keep going because maybe you can
24  identify.  So William Trautman, was he another witness
25  who carried a board?

Page 159

1   A. I believe so.  I don't recall him.  He was
2   probably very --- I don't know how many signatures he
3   gathered.  I remember the guys that did a lot of the
4   work.
5   Q. Okay.
6   A. And that's pretty much it.
7   Q. But Trautman might have got a few signatures for
8   you?
9   A. I can't speak to that.  I don't know.
10  Q. Okay.
11  A. I don't know.
12  Q. How about Charles ---
13  A. McConville?
14  Q. McConville?
15  A. I can't say to him either.  The only reason I
16  remember Justin is because he stuck out to me.
17  Q. Okay.  How about Ashley Warner?
18  A. She didn't work at all.
19  Q. Okay.  Jovan Brown?
20  A. He didn't work much at all.
21  Q. These folks that we're talking about now, this
22  Justin, William, Charles, Ashley, Jovan, they were all
23  witnesses.  But they'd also carry a board and, ---
24  A. Yeah.
25  Q. --- at least Justin got you signatures and maybe

Page 160

1   some of the other ones did, too?
2   A. It's possible, yeah.
3   Q. Okay.  How about Lauren Green?  Another witness?
4   A. Some of them, when I say carry, so some of them
5   would actually go and go after they were off the clock
6   would go and get some more signatures.
7   Q. Oh, okay.
8   A. Yeah.  So that's how it would work, too.  Like it
9   was just kind of, you know, just making sure we get as
10  many --- we're getting the job done.
11  Q. I mean that's the goal, is to get as many
12  signatures as possible?
13  A. Yeah, as long as we're complying and making sure
14  everything's done lawfully.
15  Q. Understood.
16  A. Yeah.
17  Q. But if everything's complied with, you want to
18  get as many signatures as possible?
19  A. Exactly.  As many signatures as we need, yeah.  I
20  mean I couldn't --- I don't need 10,000 signatures for
21  Rocky's presidential.  I need 3,000 plus.  So yeah.  I
22  do also, you know, like want to make sure that the
23  guys who work with me the most get as much work as
24  they can.  I don't want to give them all, you know,
25  $20 if I can give one or two guys a couple thousand

Page 161

1   out of the work.  So the workload, we do a division of
2   labor.  And that makes sense.
3   Q. Okay.  We talked about Lauren Green.
4   A. Lauren was a Republican actually.
5   Q. Oh, okay.
6   A. Yeah.  And he was a ---.
7   Q. Oh, okay.
8   A. He was a Republican witness.
9   Q. So worked on the Cruz effort?
10  A. That's correct; yes.
11  Q. And carried a petition also like the other ones?
12  A. To the best of my knowledge, they all carried
13  them.
14  Q. Okay.
15  A. Everyone who worked.
16  Q. Here's what we're going to do next.  We are going
17  --- you said you wanted to talk a look at all the
18  names there.  See if any of them help you remember.
19  So why don't you take as much time as you need, a few
20  minutes.  I think we've covered most of them already.
21  But if there are any names in there that help you with
22  folks, especially on the Rocky Independent gathering.
23  Because I think that's where we're lacking names.
24  A. Okay.
25  Q. So why don't you take a couple minutes and do

Page 162

1   that. And then we'll have some more questions about
2   that document.
3   A. Vonne, I asked her to help source people. She
4   didn't have anyone. Edee, she didn't send me anyone.
5   Ron ---.
6   ATTORNEY ROSSI:
7   Edee who?
8   A. Edee Baggett.
9   BY ATTORNEY JOEL:
10  Q. Vonne was ---.
11  A. This is for Rocky.
12  Q. Vonne was associated with the Cruz campaign?
13  A. Sure. Sure. Sure. Sure.
14  Q. Okay.
15  A. But we had the Libertarian candidates needed
16  help. So I asked them if they wanted to send --- if
17  she knew anyone was interested in circulating with
18  Gary Johnson or, you know, a lot of Cruz people aren't
19  supporting Trump now. So it made sense. Said hey,
20  we're doing Gary Johnson. Do you know anyone who's
21  interested? That kind of thing.
22  Q. Okay.
23  A. Just kind of networking with people and seeing
24  who they know.
25  Q. Okay.

Page 163

1   A. So she didn't do any work there. Edee didn't do
2   any work. Well, Edee was working in other states.
3   Ron, he didn't do anything. Ed Mason helped us. He
4   worked pretty much for me in about four or five states
5   this summer.
6   Q. Okay.
7   A. He's a hardworking guy.
8   Q. For the Rocky as Independent?
9   A. He worked for Rocky as an Independent and he
10  worked in other states as well.
11  Q. What do you mean by that?
12  A. He went to other states for me as well. I mean I
13  gave you a list of states.
14  Q. Oh. Oh. Oh. Oh. Oh. Okay. So my mistake.
15  He worked for you collecting signatures for Rocky as
16  an Independent in a number of states this summer?
17  A. Exactly.
18  Q. Perfect. Go ahead.
19  A. He also worked on Open PGH, too. Him and Denise
20  did.
21  Q. Him and?
22  A. Him and Denise both worked on the Open PGH ---
23  Q. Okay.
24  A. --- petition.
25  ATTORNEY ROSSI:

Page 164

1   That's Open Pittsburgh.
2   A. Open Pittsburgh. Rick didn't do much. He did
3   help me. He gave me a couple people's names. One of
4   them got in a really bad accident. It was horrible.
5   I think she almost died and it's kind of sad. So we
6   stopped using her. Not by choice. She was actually
7   pretty decent, Shirley Thompson or something. But
8   yeah. Andy, I don't even know where he's at. Milton
9   didn't help much but he did work in a couple states.
10  BY ATTORNEY JOEL:
11  Q. For Rocky as an Independent this summer?
12  A. Yeah, but not in Pennsylvania. He was mainly
13  doing his own thing. Andy helped for Rocky here in
14  Pennsylvania. Michael Alexander, he's been doing a
15  lot of the northeast stuff with Alex Arsenal, who's my
16  partner up there. So all those northeast states I
17  mentioned earlier, those were all under Alex who's
18  subcontracted under me.
19  Q. Okay.
20  A. Brian Lyra, no. Jim Edwards, no. Mike Jennings,
21  yes. Jake Witmer, some, yes. Lowman Henry, I don't
22  remember who he was. Oh, I know Lowman, yes. I know
23  who he was. Lowman didn't work with us. I actually
24  should have probably called him. Justin, he didn't
25  want to, man. I wish. William, I didn't even call

Page 165

1   him. I think we had an argument or a falling out or
2   something. Charles, he didn't want any part of it.
3   Ashley, no. Jovan Brown, no. Lauren Green, no.
4   Actually, Jovan ---.
5   Q. And when you're saying no, those are people who
6   did not help on the Rocky campaign?
7   A. No. We basically sourced a lot of new people.
8   That's how we did it. I listed most of them. I think
9   that was it. So I'll go through the --- I have a list
10  and I have W-9s and all that I can go through. I
11  think you all have copies of everything that I'm going
12  to give you all tonight.
13  Q. Okay. So let me show you this in response to
14  number 15 and ask about elections you've tried to
15  collect for. Some of these we've talked about. It
16  looks like this is an answer for you individually.
17  A. Okay.
18  Q. I think we've talked about some of them, but why
19  don't you look down that list. If they're ones that
20  we haven't talked --- read them through and we'll see
21  if we need to talk about any of the other ones.
22  A. Yeah, I think I just kind of construed this. We
23  were talking on the phone. A lot of this stuff isn't
24  completely accurate. I probably should have done a
25  better job before I filed this. I'd say they had one

Sargent's Court Reporting Services, Inc.
(814)-536-8909

Page 166

1  through --- I'd say one through four aren't true.
2  Well, Ron Paul is. I did do some Ron Paul. I'd say
3  two, three, four need to be expurgated or redacted or
4  whatever you want to say. And then five is good. Six
5  is true. And I think the date we actually established
6  today was 2006 instead of 2008.
7  Q. Okay.
8  A. Are you looking at my work? Is that what you're
9  asking?
10  Q. Yeah. Yeah.
11  A. Okay. So some of that stuff is accurate. Some
12  of it's inaccurate.
13  Q. Okay. So let's just go through it. Maybe it'll
14  be cleaner this way.
15  A. Okay.
16  Q. Ron Paul ---
17  A. I helped him out.
18  Q. --- in Pennsylvania in 2012, we already talked
19  about that.
20  A. Yeah. Yeah. We did some.
21  Q. Gary Johnson 2012, you didn't do any work for
22  that?
23  A. Well, it says Pennsylvania. But I did. I mean I
24  did Illinois and I didn't collect in Pennsylvania.
25  But we did do Gary Johnson in North Dakota as we

Page 167

1  talked about earlier.
2  Q. Okay.
3  A. So I think this state's just confusing.
4  Q. Okay. Number three, Gary Johnson and Jill Stein
5  in Alaska.
6  A. Uh-huh (yes).
7  Q. Did you do that?
8  A. I did not.
9  Q. Okay. Number four, new party nomination
10  petitions for Americans Elect, Alaska 2012. Did you
11  do that?
12  A. We didn't do that. We did just Americans Elect
13  in North Dakota.
14  Q. Which is number five?
15  A. That's right.
16  Q. Okay. Number six, new party nomination petitions
17  for Americans for Limited Government in Oregon 2008.
18  Did you do that?
19  A. We did do that.
20  Q. Okay. I think we talked about that.
21  A. Well, it's 2006.
22  Q. Okay.
23  A. Yeah, probably. I think it was 2006. I'd have
24  to go look at the date, man. I mean my timeline's a
25  little bit off.

Page 168

1  Q. But that's the one we talked about earlier?
2  A. Yeah, that's the one we talked about earlier.
3  Q. Okay. Casino Gaming Referendum in Arkansas?
4  A. It might have been 2012. I'd have to look at the
5  date. But those were Jake. It's out of his
6  testimony. Whatever dates he says.
7  Q. And this is one ---.
8  A. That was working for Jake.
9  Q. Okay. That was not with Benezet. That was
10  working for yourself?
11  A. Yes.
12  Q. Or ---.
13  A. Benezet wasn't even formed at the time.
14  Q. Okay. Not working for yourself, but working for
15  Jake, or Andy Jacobs, ---
16  A. Yeah.
17  Q. --- or somebody like that?
18  A. Sure.
19  Q. How about number eight, medical marijuana
20  referendum petitions in Arkansas?
21  A. Yeah. I just don't know the date.
22  Q. Okay. But that's you personally?
23  A. Uh-huh (yes).
24  Q. And then we have a series, Benezet Consulting for
25  the following, talked about Ted Cruz?

Page 169

1  A. Uh-huh (yes).
2  Q. Talked about Rocky De La Fuente?
3  A. Uh-huh (yes). We did Rand in Indiana and
4  Illinois. We talked about that earlier.
5  Q. Okay. But not Vermont or Rhode Island?
6  A. Not Vermont or Rhode Island. Rocky we did in ---
7  is this the general election? I've given you a long
8  list of those states.
9  Q. Yeah.
10  A. I couldn't rename them all.
11  Q. That's the general election.
12  A. Yes. There's about 17, I think is what my last
13  count was.
14  Q. This number two Rocky; Pennsylvania, Indiana,
15  Wisconsin, Connecticut. I thought it was Illinois and
16  not Connecticut.
17  A. It was.
18  Q. Okay.
19  A. That's correct. So a lot of this needs to be
20  probably changed.
21  Q. Four we talked about. Did you do Jill Stein in
22  Virginia in 2016?
23  A. Yes, we talked about that. Yeah. We were
24  supposed to do Jill Stein. Bob Lynch did 350
25  signatures.

Page 170

1    Q. Okay.
2    A. He submitted them. And they got mad because it
3    wasn't 1,000. And we just kind of, you know, we were
4    so busy with other states. We just, you know, didn't.
5    Okay.
6    Q. Okay. We talked about Rick Santorum.
7    A. Yeah.
8    Q. Carly Fiorina?
9    A. That's true, yeah. We did collect for her a
10   little bit. I forgot about that.
11   Q. Okay.
12   A. And Ben Carson. Both of those two.
13   Q. In Indiana for the primary?
14   A. Yeah, probably 1,000 signatures each.
15   Q. Okay. Donald Trump, we talked about him.
16   A. Uh-huh (yes).
17   Q. Texas Supreme Court candidates?
18   A. Yes.
19   Q. That's who we talked about. Okay. And you put
20   this under the Benezet one. Benezet did some of that?
21   A. No, that's --- really Benezet didn't get anything
22   off of, anything until 2016 ---
23   Q. Okay.
24   A. --- is where Benezet is.
25   Q. Okay.

Page 171

1    A. So even the late 2015 stuff's going to be in this
2    fiscal year. So it's going to be pretty much be
3    everything after. Joe Pool, all that stuff, that was
4    all Trent.
5    Q. Okay. Alicia Franklin?
6    A. Trent. HERO is under Trent.
7    Q. What was a Houston Equal Rights Ordinance?
8    A. Yeah. I forgot about Leonila. She had gotten
9    kicked off the ballot. We went back in and put her
10   back on in the case that they gave a secure period.
11   They didn't. It was a pretty interesting case, but
12   y'all probably don't care in Pennsylvania.
13   Q. So that's Leonila Salazar that was --- and that
14   was Trent also?
15   A. That was Trent.
16   Q. Okay. Ann Kitchen, Austin City Council?
17   A. Yeah, we did do that. That's the city council
18   recall petition I told you about that we are advising
19   on.
20   Q. Okay. Gary Johnson, Ohio, General Election?
21   A. We talked about that.
22   Q. Okay. And Stop the Lone Star Rail Initiative,
23   City of Kyle, Texas in 2016?
24   A. We actually didn't have to file that. We got
25   about half-way there. And we did it the old-fashioned

Page 172

1    way, lobbying. We just went and talked to all the
2    legislators. And they killed it organically so. And
3    if you want I can write that up, too. I mean I'm sure
4    that's probably pretty confusing. I can fix that.
5    ATTORNEY JOEL:
6    Mark that one next, please. Fourteen.
7    (Defendant's Exhibit 14 marked for
8    identification.)
9    BY ATTORNEY JOEL:
10   Q. Okay. Mr. Pool, I'm showing you what's been
11   marked as Defendant's 14. It looks like a bunch of
12   emails between you and some other folks listing some
13   people I think to help out in Pennsylvania. Can you
14   just tell me what that all is about?
15   A. Yes. Okay. This is to Michael Alexander. And
16   these are the delegates for that County that he was
17   supposed to go and get done for the Cruz campaign.
18   And I must have given him, these are the files, their
19   names, and the emails. And basically getting him
20   going.
21   Q. So you gave him three possible witnesses?
22   A. No. No, those are the delegates.
23   Q. Oh, okay.
24   A. Yeah.
25   Q. So is that who he was collecting for or are those

Page 173

1    delegates that were going to help him out with the
2    collection?
3    A. Well, both. So the delegates were given to us.
4    So people signed up with the Cruz campaign. My
5    understanding, and this is, you know, this may be off.
6    But I believe the process was they source people that
7    were interested in being a Cruz delegate. They
8    contacted the campaign. The campaign, you know,
9    either they responded to a mail order or something.
10   Then the campaign calls them and lets them know what
11   the process is. They sign up and then they're asked a
12   series of questions like how much time can you devote
13   to this. If they're told that they can devote full
14   time, like a Rick Churra, then I was let know and
15   apprised of that individual. If they were told that
16   they can only do very limited work, but they would
17   help in the gathering, then like these three in Bucks
18   County I would say okay, well then I need to find a
19   witness circulator team to go in there. And that's
20   what we did. So we sourced a lady named Amy Strauss.
21   And Michael went in there with Brian Lyra. And they
22   went door-to-door in Bucks County collecting
23   signatures. And it was for those three. Those are
24   three delegates.
25   Q. Okay. So those are the three they were

Page 174

1  collecting signatures for?
2  A. Those were ---.
3  **Q. On behalf of?**
4  A. Yes.  There's probably some --- I know one
5  delegate from that district did end up getting
6  entered.  I think it was Evangelou.  And she was
7  actually pretty excited because we only ended up
8  getting 25 signatures or so for her before I had to
9  pull the plug.  And that's exactly the number she
10 needed.  So it was just, you know, I guess someone's
11 looking out for us.  Because she came to the turn-in
12 the final day and she said I need 25 signatures more.
13 And I pulled them out and I said this is yours.  So it
14 was kind of funny.  At least I didn't throw them away.
15 **Q. How about this last page talking about CD14,**
16 **Richard Finn?  What's that one about?**
17 A. So these are the two for congressional district
18 14, Richard Finn, Andy Maul, and then they had some
19 other person who came in late and then they pulled
20 him.  Actually, Ron Yoachum wanted to be a delegate,
21 too.  He asked me, but at the time we had like a week
22 left.  And I said, you know, we're getting like 40 a
23 day, 50 a day, 30 a day or something.  It was really
24 slow moving.  And, you know, I couldn't --- it was not
25 going to happen basically.  So we have two delegates

Page 175

1  there.
2  ATTORNEY JOEL:
3  All right.  Can we take a couple minute
4  break?
5  ATTORNEY ROSSI:
6  No problem.
7  SHORT BREAK TAKEN
8  (Defendant's Exhibit 15 marked for
9  identification.)
10 BY ATTORNEY JOEL:
11 **Q. Mr. Pool, marked and put in front of you**
12 **Defendant's 15.  Can you take a look at that?  My**
13 **suspicion is it's identical to the Interrogatories**
14 **that you verified on behalf of Benezet.  But could you**
15 **confirm that for me and confirm that it is your**
16 **signature at the very end?**
17 A. I believe it's the same.  I don't see anything.
18 It's the same, pretty much the same names that were
19 involved in the challenge.  There's some, obviously
20 stuff that needs to be changed on page 18 that we
21 talked about on the other one.  And then there's
22 probably some stuff on page 19 as well that we talked
23 about on the other one.  And then Paul's signature and
24 my signature.
25 **Q. Okay.**

Page 176

1  OFF RECORD DISCUSSION
2  BY ATTORNEY JOEL:
3  **Q. Mr. Pool, Defendant's 15, you identified that**
4  **that is your signature again; correct?**
5  A. Yes, that's my signature.
6  **Q. And whatever discussions or changes or**
7  **information you provided with regards to the**
8  **Interrogatories that were signed on behalf of Benezet**
9  **also apply to this; correct?**
10 A. Yes, sir.
11 **Q. I'm showing you what's been marked as Defendant's**
12 **16.**
13 **(Defendant's Exhibit 16 marked for**
14 **identification.)**
15 BY ATTORNEY JOEL:
16 **Q. Can you tell me what that is, please?**
17 A. This is the ad for --- this is an ad that we
18 posted on Craigslist.
19 **Q. Is that to get witnesses for the Rocky signature**
20 **collection?**
21 A. Yeah.  No, it's not.  This is for the
22 Republicans.
23 **Q. Oh, okay.  So that's for Cruz?**
24 A. Yeah.
25 **Q. Okay.**

Page 177

1  A. Yeah.  This is probably after we ended up losing
2  what's her name?  The witness who was speaking to
3  herself and was crazy, making voters not want to sign
4  the petitions at the door.
5  **Q. I don't know what the right word is but how many**
6  **hits or responses did you get to your ads for**
7  **witnesses in Pennsylvania?**
8  A. Not many.  Not many.
9  **Q. Can you estimate?**
10 A. Make an estimate?  Probably, you know, I would
11 say per ad placement, we'd probably get one email a
12 day and we'd put it up pretty much in every major city
13 every day.  So we'd probably get one person out of all
14 four markets to say yeah, I'm interested.  And then
15 when I'd touch base with them, they'd say, you know,
16 they wouldn't answer.  They'd flake out.
17 **Q. Okay.  What other efforts did you make to find**
18 **witnesses for Pennsylvania?**
19 A. I should have sent you guys something in
20 discovery, but I made like a flyer.  We put it in all
21 the shops in Allegheny County.  Bulletin boards,
22 especially like the same thing, same type script, more
23 generalized for both parties on the field.  Do you
24 have a copy of that?  Have y'all seen that?  It's in
25 discovery that I'll send you all tonight or get you

Page 178

1  all for tomorrow. And I had like the bottom serrated
2  so they could like rip off my number. You haven't
3  seen it? Do you have it?
4  ATTORNEY ROSSI:
5  I don't know how to print this out
6  though.
7  A. Okay.
8  ATTORNEY ROSSI:
9  Let me see if I have it.
10  A. Yeah. Well, we can get it to y'all. I did
11  things like that. Networking was the best, you know.
12  Asking people who are already on board to go and ask
13  other people because people don't believe that they're
14  going to get --- I mean, everyone thinks you're a
15  Nigerian prince, something crazy. So it's kind of
16  hard to convince people you're legitimate.
17  BY ATTORNEY JOEL:
18  **Q. Did you use your Pennsylvania collectors as a**
19  **source of trying to get more witnesses?**
20  A. Yeah, sure. We asked everyone.
21  **Q. Okay.**
22  A. I mean I was pretty thorough in pretty much
23  taking any lead I had.
24  **Q. And you got with the campaigns, at least the Cruz**
25  **campaign?**

Page 179

1  A. Yeah, Cruz campaign was a lot more helpful than
2  Rocky's. Rocky, I didn't even talk to Rocky until,
3  you know, this June. So I didn't really know him.
4  And we pretty much realized from the get, when we
5  signed the contract that there wasn't going to be any
6  campaign resource help. But yeah.
7  **Q. All right. I am almost at a good stopping point.**
8  **Why don't we go back and try to figure out what your**
9  **homework is for tonight?**
10  A. Can I write this down, Paul, or do you want to
11  write it down?
12  ATTORNEY ROSSI:
13  You write it down.
14  A. Okay.
15  BY ATTORNEY JOEL:
16  **Q. I've been taking some notes along the way, but**
17  **let's just have a ---.**
18  ATTORNEY ROSSI:
19  First of all, first of all, the getting
20  the download tonight. He's going to use my computer,
21  which is faster than the hotel's computer ---
22  ATTORNEY JOEL:
23  Okay.
24  ATTORNEY ROSSI:
25  --- to do the downloads. If that fails,

Page 180

1  I'm going to ask your girlfriend to maybe break down.
2  Is that possible?
3  A. Oh, yeah. Yes.
4  ATTORNEY ROSSI:
5  Get it in smaller amounts?
6  A. Right now it's 633 megabytes. So there's a lot
7  of stuff for you.
8  ATTORNEY ROSSI:
9  I think as I explained to you, they want
10  all the invoices that you have with contracts.
11  A. I mean anything that I have regarding any of this
12  stuff should be, it will be in.
13  ATTORNEY ROSSI:
14  We're intending to give you is --- we're
15  downloading it on to flash drives.
16  ATTORNEY JOEL:
17  Okay.
18  A. I'll give you guys one of these tomorrow and then
19  I'll make paper copies. Y'all have them pre-print in
20  here, I'm sure.
21  ATTORNEY ROSSI:
22  And if there's any follow-up,
23  communicate any documents that aren't opening up and I
24  will try to get, I will get the hard copy for you that
25  way. So that's the first thing --- from my

Page 181

1  standpoint, that's the most important thing from my
2  standpoint ---
3  A. Got it.
4  ATTORNEY ROSSI:
5  --- to be accomplished.
6  BY ATTORNEY JOEL:
7  **Q. The other thing that I had down was the list of**
8  **people who worked for you for Benezet on the general**
9  **election. I guess it would be probably the general**
10  **election Rocky.**
11  A. Okay.
12  **Q. Isn't it, who had that?**
13  A. Yeah. And that'll cover --- and do you want
14  every state?
15  **Q. Uh-huh (yes).**
16  A. Broken down by state?
17  **Q. What I want is you gave me a list of the states**
18  **that you worked.**
19  A. Yeah.
20  **Q. So what I want is all the people who worked in**
21  **those. And I'll probably drill down and try to figure**
22  **out who worked where.**
23  A. Yeah.
24  **Q. So think of that.**
25  A. That might be pretty hard.

Page 182

1   Q. And when they worked, and did they move all
2   around? Were they chaotic? Were they nomadic? Along
3   those lines, when did the collection --- after your
4   primary work in Pennsylvania, where did you go next or
5   when did you start, when did you end?
6   A. Okay.
7   Q. I think you testified that there was other work
8   that would have been available in other states. You
9   didn't necessarily have those contracts. But if you
10  have any information on what other states were still
11  out there after the Pennsylvania primary to do work
12  in.
13  A. For the primary? Okay.
14  Q. For 2016.
15  A. Yeah.
16  Q. Whether it's later primaries or whether it's
17  general election ---
18  A. Oh, okay.
19  Q. --- independently.
20  A. So me answering the timeline of work would answer
21  that question though; correct?
22  Q. I think so, yeah.
23  A. Okay. Okay.
24  Q. You testified about doing the Libertarian party
25  and the Green party this past summer, but I think

Page 183

1   there's more information to be gleaned there about who
2   worked which one and what time frame that was.
3   A. Who worked which one and what time frame?
4   Q. Yeah. And then some of these subcontracted out.
5   But for the ones that were Benezet, who actually
6   worked for Benezet?
7   A. And when I answer who worked on the Rocky 2016
8   stuff --- well, actually, okay. Got it. Let me pull
9   it up. Libertarian party, PA petition. I actually
10  have their, I have a file with their validity report I
11  sent to you.
12  Q. Okay.
13  A. I can pull that and that'll be every person.
14  ATTORNEY ROSSI:
15  Into the record?
16  A. Yeah, because you remember I put that in the
17  email CC ---.
18  ATTORNEY ROSSI:
19  Oh, okay. That didn't register as ---.
20  A. Something they would need, yeah.
21  ATTORNEY ROSSI:
22  That didn't get --- that wasn't part of
23  my collection.
24  A. I didn't even think about the PA stuff. It was
25  such a --- I only did like 1,500 signatures. So it

Page 184

1   was like a very small amount of work. But still work
2   that I did.
3   BY ATTORNEY JOEL:
4   Q. So who did the Libertarian and Greens.
5   A. Okay.
6   Q. At least for the --- as I understood it, a couple
7   of those states for each one you subcontracted to to
8   get somebody else to do it. But I thought you said
9   that some of the Libertarian and Green that you did
10  this year was actually done by Benezet. So who are
11  the people that Benezet hired to do that.
12  A. Got it.
13  Q. Was it Andy Jacobs? Was it Witmer? Was it Lyra?
14  You know. The general election for Rocky, who did
15  that, the sequence of states. I think that's what I
16  have for homework. I'm going to go through the
17  amended complaint with you tomorrow and I have a few
18  questions about that. But I think that's what I have
19  sort of for homework.
20  A. All right. Cool. I can get all this stuff done
21  pretty ---
22  Q. Okay. That would be great.
23  A. --- quickly.
24  Q. That would be great. And I appreciate your
25  willingness to stay at least part. Hopefully we can

Page 185

1   get you out of here early tomorrow.
2   A. All right. Yeah.
3   ATTORNEY ROSSI:
4   Well, he spoke all --- he spoke to the
5   hotel monitoring as well.
6   ATTORNEY JOEL:
7   Oh, okay. Okay.
8   A. I can stay Thursday.
9   ATTORNEY ROSSI:
10  I can imagine 100 million questions you
11  could possible ask him in such a sort of a hydra of a
12  case. Especially the things that they do. So ---
13  ATTORNEY JOEL:
14  Yeah.
15  ATTORNEY ROSSI:
16  --- I assumed it's going to take us a
17  while.
18  ATTORNEY JOEL:
19  Hopefully we'll be done early.
20  A. That's fine.
21  ATTORNEY JOEL:
22  But if it's not, we've got the day and
23  we'll be ---.
24  A. I'm thinking like, you know, 10:00 we'll be done
25  with. I'm overly optimistic.

Page 186

1  ATTORNEY JOEL:
2  And then that will result in me having
3    more questions, I'm sure.
4  ATTORNEY ROSSI:
5  Oh, you will.
6  ATTORNEY JOEL:
7  So let's suspend for the day and we'll
8    pick up tomorrow morning.  Is nine o'clock okay for
9    you guys?
10  ATTORNEY ROSSI:
11  Absolutely.
12  ATTORNEY JOEL:
13  Will that work?
14  ATTORNEY ROSSI:
15  That's fine.
16  ATTORNEY JOEL:
17  You'll be in town?  Okay.
18  ATTORNEY ROSSI:
19  We're in town.
20  ATTORNEY JOEL:
21  Okay.
22         * * * * * * * *
23         DEPOSITION CONCLUDED AT 4:30 P.M.
24         * * * * * * * *
25

Page 187

1     COMMONWEALTH OF PENNSYLVANIA  )
2     COUNTY OF CAMBRIA          )
3            CERTIFICATE
4  I, Cynthia Piro Simpson, a Notary Public in and
5    for the Commonwealth of Pennsylvania, do hereby
6    certify:
7  That the foregoing proceedings, deposition of
8    Trenton Pool was reported by me on 9/27/16 and that I,
9    Cynthia Piro Simpson, read this transcript, and that I
10   attest that this transcript is a true and accurate
11   record of the proceeding.
12  That the witness was first duly sworn to testify
13   to the truth, the whole truth, and nothing but the
14   truth and that the foregoing deposition was taken at
15   the time and place stated herein.
16  I further certify that I am not a relative,
17   employee or attorney of any of the parties, nor a
18   relative or employee of counsel, and that I am in no
19   way interested directly or indirectly in this action.
20
21
22
23  Cynthia Piro Simpson
24
25  Cynthia Piro Simpson

Sargent's Court Reporting Services, Inc.
(814)-536-8909

**A**

ability
  38:14,19
  55:15
able 59:4
  90:23 93:7
  102:2,7
  103:17,17
  125:7
  131:9
  132:2
  145:22
  149:24
  150:4
  151:3
Absolutely
  186:11
absorb
  131:10
accept 58:25
accepted
  55:2 58:14
  58:15,16
accepts
  58:21
access 10:20
  13:20,23
  16:2 17:17
  17:25
  23:11
accident
  164:4
accompli...
  181:5
account
  29:17 32:8
  147:12
accurate
  26:16
  71:17 73:5
  73:6 76:20
  165:24
  166:11
  187:10
Achilles
  52:3,4,7,8
  52:8
action 8:18
  187:19
activism

activities
  122:19
actual 96:25
ad 5:17
  176:17,17
  177:11
Adams 47:7
  47:15
add 97:6
  110:14
added 110:11
addition
  25:10
  51:10 65:2
  156:7
additional
  17:12 40:7
  62:11
Addition...
  62:2
address 9:15
  9:17 76:16
admission
  7:21
ads 56:14
  101:11
  177:6
adult 62:7
advising
  171:18
advisory
  119:3
advocate
  44:19
advocating
  141:19,20
  145:12,14
affidavit
  48:17,22
  51:12,14
  62:1 63:12
  76:15
  137:13,18
  138:2
  147:19
  158:12
affidavits
  102:6
afford 44:12

agency 1:23
agenda 11:7
ago 111:18
  120:1
  127:11
agree 65:21
  71:22
agreeable
  7:23
agreed 7:19
  12:19
  106:11
agreement
  5:8,9
  41:21
  58:12,13
  86:7 95:18
  110:14
Agreemen...
  5:12,13
agrees 7:25
ahead 163:18
aided 157:7
Al 35:21
Alabama
  19:13 25:7
  36:11
  112:6
Alaska 25:9
  25:13,14
  34:8,13,18
  34:19
  38:22
  120:17
  121:2,7
  122:1
  167:5,10
Alex 35:21
  66:3,10,18
  112:7
  164:15,17
Alexander
  28:16
  35:22,23
  46:15 66:5
  66:8 91:6
  164:14
  172:15
Alicia 171:5
allcoated

40:22
Allegheny
  5:6 22:11
  43:19 56:7
  59:14
  60:25
  76:18
  79:15
  83:21,24
  84:2
  126:17
  151:24
  177:21
allocated
  37:13
allow 94:14
  103:24
allowed
  139:4
  142:5
all's 17:20
Almeida
  33:12,13
  36:8 46:23
ambitious
  95:16,16
amend 26:25
  42:13
  73:11
  110:13
amended
  97:15
  184:17
amendment
  62:14
  86:15,16
  86:22 87:2
  96:12,25
  110:4,6,9
  111:25
amendments
  86:14
America 31:1
  31:5
American
  133:3,7
Americans
  120:10
  121:19
  132:25

167:10,12
  167:17
amount 37:14
  127:16
  131:15
  149:23
  184:1
amounts
  180:5
Amy 173:20
Andring
  91:24
  148:22
Andy 28:1
  39:16
  41:15
  45:22,23
  82:7,9
  91:10
  123:6,7
  125:1
  126:5
  127:18,20
  129:5,6
  132:9
  150:15,24
  151:7,7,12
  153:5,10
  156:19
  164:8,13
  168:15
  174:18
  184:13
Andy's 129:8
  150:22
and/or 55:9
  146:21
anIindep...
  25:3
animal 88:4
Ann 119:10
  171:16
answer 7:20
  11:25 12:7
  12:20,24
  14:12
  15:24 24:9
  50:25
  52:22
  66:12 81:6

91:13 98:3
165:16
177:16
182:20
183:7
**answered**
12:21
53:21
**answering**
32:19
182:20
**ANTHONY** 3:3
**anticipated**
131:8
**Antonio**
89:11
**anybody**
54:11 67:3
116:17
141:15
147:18
**anymore**
56:24
63:11
**anyway** 32:20
96:24
108:8
**apologize**
87:12
**appeal** 60:10
**apply** 176:9
**appreciate**
18:3 34:5
184:24
**apprised**
173:15
**approach**
72:22
**appropriate**
93:11
115:15
134:8
**area** 79:5
80:17,21
81:6
126:17
152:14
**areas** 54:19
54:20
**arena** 88:20

**arguably**
158:1
**argument**
165:1
**arithmetic**
130:24
**Arkansas**
31:1,3,8
168:3,20
**Arno** 17:18
21:9,9,9
21:14,21
31:3,11
133:1
**arrangement**
21:3 153:5
**arrested**
142:4
**Arsenal** 66:3
66:10,18
164:15
**article** 92:3
**Ashley**
159:17,22
165:3
**asked** 11:19
22:11 24:9
30:12
44:21 45:3
56:5 82:17
84:20
87:11
96:22
107:9
120:18,23
128:17
142:8,15
142:17
143:13,24
144:3,16
153:1,2
162:3,16
173:11
174:21
178:20
**asking** 12:17
57:24
107:14
141:25
142:16

158:9
166:9
178:12
**aspect** 55:21
**aspects**
144:7
**assessment**
71:24
**asset** 148:16
**assets** 56:13
**assistant**
22:3
**associated**
52:14
133:11
141:15
162:12
**assume** 15:5
38:1
132:16
**assumed** 15:6
37:16
131:3
185:16
**assuming**
7:12 40:13
125:22
127:23
128:8
137:8
**asthma** 151:2
**Attachment**
9:2
**attended**
11:14
**attention**
59:13
**attest**
187:10
**attorney** 2:8
3:11 4:6
6:3 7:6,14
7:16,24
8:1,9,20
8:24 14:15
14:19,22
15:8,10,13
15:16,25
19:17,20
19:22 20:1

20:4 23:8
23:12
28:11,17
28:21 31:4
41:20,25
45:21 52:6
52:12,23
53:1,3,15
53:23
56:20,22
59:17,21
59:22 60:1
60:3,7,14
60:17,24
64:2,8,10
64:15 71:3
71:8,16
73:22,24
75:21,25
85:22 86:1
92:19,23
93:15,20
94:16,20
95:15,20
109:20
110:2
136:13,17
139:25
140:5,25
141:3,6,9
153:17,21
154:2,6,19
154:23
162:6,9
163:25
164:10
172:5,9
175:2,5,10
176:2,15
178:4,8,17
179:12,15
179:18,22
179:24
180:4,8,13
180:16,21
181:4,6
183:14,18
183:21
184:3
185:3,6,9

185:13,15
185:18,21
186:1,4,6
186:10,12
186:14,16
186:18,20
187:17
**August** 61:22
62:5
111:14,15
111:16,16
**Austin** 11:17
11:18 14:3
89:11
119:10
171:16
**authenti...**
11:4
**authority**
58:15
**authoriz...**
1:23
**autonomous**
150:2
**available**
54:20
182:8
**aware** 43:9
43:16 59:9
59:14
62:17
64:16
**awesome**
132:5
**A-L-M-E-...**
33:14
**a.m** 2:10

**B**

**B** 12:5
**baby** 109:18
**back** 16:1,13
24:8 26:25
28:24
30:23
31:21 32:3
42:13
44:22
47:19,22
50:14 63:9

63:14
65:11
67:24
73:14 78:4
79:13
88:16
93:10 94:6
106:6
119:23
122:8,10
132:8
140:10
143:3
146:15
149:9
171:9,10
179:8
**background**
120:24
135:4
139:1
**bad** 31:20
39:18
134:25
150:22
164:4
**Baggett**
23:10
162:8
**Baggette**
23:7
**ballot** 10:20
13:20,23
16:2 17:17
17:21,25
23:11
25:13
27:13,16
27:19,24
31:14,15
32:24
53:10
57:20 61:5
62:10 89:2
95:13
96:19
98:16
104:15
107:6
111:6

113:25
114:21
122:11
132:15,20
133:8
146:11
151:3,4,6
157:13
158:3
171:9
**ballots** 27:7
27:10
97:21
**Baltimore**
3:4
**ban** 122:2
145:25
146:2,3,7
**band** 111:4
**bank** 32:9
**barrier**
135:16
**base** 177:15
**based** 38:4
53:19
**basic** 76:4
**basically**
10:19 21:3
22:13
29:15,20
30:18
44:25
50:25
54:23 55:1
56:6,11
57:18
58:14 63:1
63:9,21
69:9,10,25
70:22 73:9
79:23
91:11 92:6
94:5 100:5
100:9
104:2
107:4,7
110:18
111:9
115:17
128:2

138:22
148:14
150:14
152:25
157:4
165:7
172:19
174:25
**basis** 107:15
**Baylor** 121:1
121:7
**beach** 139:21
**began** 66:1
70:23
73:19
113:15
**beginning**
2:10
**begun** 139:12
**behalf** 2:3
7:12,21,22
9:8 74:1
141:19
145:13
148:5
174:3
175:14
176:8
**belief** 98:14
145:24
**believe**
20:22
21:24
23:11
31:22
44:18
70:11 75:7
83:18
86:14
105:13,21
110:12
113:18
120:5
122:7
125:1
128:23
133:12
136:25
137:12
142:1

143:5,7
146:23
147:11,20
148:22
152:4
159:1
173:6
175:17
178:13
**believed**
44:11
**Ben** 170:12
**Benazet** 18:6
**beneficent**
157:11
**Benezet** 1:5
7:10,12,22
9:8,8,17
10:11 13:3
13:4,10,12
13:15,17
13:22 14:1
14:4,18,20
14:20,24
15:1,4,6,7
16:2,6,10
16:12,15
17:3,3,5,9
17:13
18:12 20:8
20:8,14,15
21:23,24
22:25 23:3
24:1,6,7
24:10,14
24:17,20
24:23 25:2
25:11,15
25:21 26:1
26:6 29:8
30:1 33:2
36:12,23
36:25 37:4
38:3,7
40:5 41:14
42:3,5
43:11,13
43:23 44:1
45:5 47:24
57:22 58:7

59:10,16
59:19
64:24 65:2
65:3,7
67:13 72:2
72:25
73:25
76:20 80:7
85:13 86:9
87:8,14,20
87:21
88:13,13
88:19,22
89:3,7
96:16
97:16,17
97:18,19
98:5,11
99:22,25
103:5,20
104:5
109:10,16
114:17
116:13
118:25
119:1,14
119:16,21
119:24
122:22
130:2,2
135:2,10
136:3
139:18
148:6
154:24
155:3,9,13
155:14
168:9,13
168:24
170:20,20
170:21,24
175:14
176:8
181:8
183:5,6
184:10,11
**Benezet's**
17:16
72:24
**Benezet-...**

114:17
**Bernie** 49:9
51:9
**best** 12:21
44:19
49:18
51:20,22
76:13 85:9
108:9
148:16
155:24,24
158:11
161:12
178:11
**bet** 149:17
**better** 31:1
31:5 72:15
108:6
148:16
157:14
165:25
**beyond** 56:4
**bid** 131:2,14
133:11
139:13
**big** 32:21
56:2 100:2
135:16
**biggest**
21:10
**bill** 30:20
37:2 39:5
39:12
48:13
58:18
**billed**
106:15,18
**billing**
118:17
**billings**
67:23
**bind** 9:8
**bingo** 122:6
**birth** 138:25
**bit** 32:12
50:6 71:5
71:13,20
78:9 80:6
121:13
125:21

127:18
146:14,20
167:25
170:10
**blank** 97:1
**bled** 133:20
**blown** 149:16
**board** 58:21
158:25
159:23
178:12
**boards** 49:22
49:24
156:1
177:21
**boats** 114:14
**Bob** 103:22
156:2
169:24
**Bonds** 88:9
88:11
**books** 30:22
30:23
**Boston** 35:24
**bottom** 62:23
63:2,10
178:1
**bottom-o...**
32:17
**brand-new**
132:25
**break** 12:23
13:1 33:22
33:25
73:13
93:16,19
93:22
139:16
175:4,7
180:1
**breaks**
122:25
**Brian** 28:16
36:2 46:17
101:19
164:20
173:21
**BRIEF** 31:2
45:19
**bring** 8:17

116:17
**broadly** 65:5
**broken** 54:3
181:16
**brought** 43:6
68:11
**Brown** 159:19
165:3
**Bucks** 91:3
91:17,19
173:17,22
**buddies**
152:4
**budget** 44:15
58:11
**built** 40:7
40:14
**Bulletin**
177:21
**bunch** 33:10
79:23
96:13
172:11
**Bundy** 28:20
28:20,23
36:4 45:12
46:19
105:22,22
105:24
135:24
136:6
137:7
138:3,4
**business**
33:9 35:11
35:12
49:18
56:18 57:2
65:9 108:9
121:12
**businesses**
66:17
**busy** 157:8
170:4
**B-A-G-G-...**
23:10
**B-U-N-D-Y**
28:23

**C**

**C** 3:1 7:1
**caboodle**
61:18
**California**
21:12
25:14
88:25
**call** 63:7
69:25 72:3
125:16
149:17
164:25
**called** 21:6
44:21 96:4
96:7 112:3
120:10
132:25
140:11
164:24
**calling**
36:14
**calls** 71:11
115:21
173:10
**CAMBRIA**
187:2
**campaign** 5:8
14:2 17:19
20:6,15,21
21:5 22:2
22:3 23:3
23:16,25
31:19
36:24 39:5
39:25
41:13
54:24
66:16 72:3
72:8 77:16
78:13 86:8
86:12 87:9
89:23
90:12
91:20,25
92:2,12
95:8
106:15,18
106:20
115:4,9,17
115:18

116:20
117:4
126:1,22
130:13
133:25
134:7
148:8,17
148:19
149:4,9
150:7
151:2,10
153:3
155:18
162:12
165:6
172:17
173:4,8,8
173:10
178:25
179:1,6
**campaigning**
145:12,14
**campaigns**
16:7,16
22:14 26:7
87:13
178:24
**campuses**
56:8
**candidate**
16:22 19:5
25:3 52:20
53:8,10
57:19 69:7
72:23 89:8
97:22
125:16
134:3
141:20
145:13,17
146:1,5,8
**candidates**
16:16
50:21
71:10
97:21,24
99:4,9,12
99:18
114:21
115:25

117:4
124:15
126:12
133:18
141:19
142:6
154:14,14
162:15
170:17
**canvass**
55:15
**card** 43:20
**care** 69:22
69:23
154:3
171:12
**Carly** 25:19
170:8
**Carol** 31:24
154:7
**carried**
42:23
49:22
158:25
161:11,12
**carrier**
156:24
**carry** 49:24
159:23
160:4
**carrying**
146:8
157:2
**Carson**
170:12
**Carterstown**
76:16
**case** 1:7
41:8 52:8
52:10,21
53:5,12
59:9,22
63:22
101:17
154:8
171:10,11
185:12
**cash** 29:16
32:8
155:19,20

**Casino** 168:3
**Castle**
111:25
**catch** 157:9
157:22
158:16
**catcher**
117:13
**catching**
158:13
**cause** 44:11
57:19
**CC** 183:17
**CD** 48:1
**CD14** 174:15
**CD21** 89:8,11
**CELL** 8:6
**certain**
54:19
**certainly**
40:20,25
**CERTIFICATE**
4:8 187:3
**certify**
187:6,16
**certifying**
1:23
**challenge**
10:17,25
38:14,20
49:7 53:16
58:24 59:3
59:7,24
60:4,13
61:3,15
107:8
175:19
**challenged**
59:20
145:25
**challenges**
59:10
**challenging**
145:3
**chance** 50:20
93:17
135:20
**change** 107:4
**changed**
169:20

175:20
**changes** 52:5
176:6
**chaotic** 71:5
71:13
79:18
80:22 81:6
182:2
**chaotically**
111:12
**charge** 44:3
45:1
**charged**
40:12,14
44:1
107:24
131:12
**charging**
41:13
**Charles**
159:12,22
165:2
**charter** 44:5
**Chase** 32:9
**cheap** 41:6
121:5
**check** 18:8
20:23
31:18,23
32:6,8
70:13
88:13
105:15
109:1
119:16
135:4
**checking**
55:23 94:8
**checks** 17:4
35:6 116:6
139:1
**Chief** 3:11
**choice**
145:13
146:5,9,11
146:12
164:6
**chronologic**
71:15
**chronolo...**

125:4
**chronolo...**
70:18
**chronology**
65:13
67:24
**chunk** 114:17
**Churra**
147:22,23
152:12,13
152:18,19
173:14
**circle** 16:13
**circulate**
69:6
150:18
**circulated**
131:6
146:21
148:5
150:19,20
**circulating**
26:22
113:16,17
157:2
162:17
**circulation**
48:22
51:12
157:3
**circulator**
48:20
63:13,18
138:24
146:21
147:24,25
152:2
154:22
157:6
173:19
**circulators**
62:4,6
90:22
100:7
156:24
**circus** 10:19
**cited** 52:8
53:5
**cities** 56:3
79:14,17

**Citizen**
63:23
**Citizens**
62:7
**city** 14:3
15:21 44:5
57:14 61:1
82:23 83:1
87:23 88:2
119:3
171:16,17
171:23
177:12
**citywide**
17:23
**Civil** 2:4
**clarify**
142:8
144:6,23
**clauses** 39:3
**clean** 125:4
132:1
**cleaner**
166:14
**cleanup**
69:25
**clear** 7:8
15:1 39:1
48:21
49:20
134:6
143:16
**clearly**
14:16
**Cleveland**
47:12,16
47:17
**client** 15:15
29:21 37:9
55:1 69:22
95:18
130:5
**clients**
37:25 87:5
123:15
157:12
**Clinton** 49:9
**clipboards**
69:15
**clock** 90:13

160:5
**close** 33:11
**closer** 43:3
48:8,11
**clue** 59:25
64:12
125:9
**code** 9:21
**collateral**
10:21
**collect** 18:5
18:6,12,20
22:19
24:10,14
24:17,20
24:23 25:2
26:2 36:13
38:5,7,12
42:15
43:12 45:5
55:16 74:5
74:17,20
74:23,25
75:2,5,10
75:20 77:7
77:9 78:14
78:22,25
79:3,7
80:9 81:9
82:17 83:3
83:17
84:11 85:4
85:15
96:17
97:20 98:5
99:8,22,22
101:4
102:2,8
115:24
118:2,21
124:16
125:5,18
126:11,15
127:13,20
128:21
133:14
135:2
147:8,18
149:5
157:24

165:15
166:24
170:9
**collected**
18:18
20:16
25:11
27:22
29:19
41:15
42:18,20
51:12
59:11,16
59:19
62:21
70:12
74:17 75:7
75:16
76:23
78:17 83:6
94:1,11
99:10
117:3
118:24
122:7
126:8,16
126:16
127:2
129:9
132:11
138:11
146:23
**collecting**
20:9 33:3
39:23
41:16 42:4
43:2 71:25
72:2,25
74:12 75:9
75:18
80:12
89:19
104:10,11
108:19
112:13
115:23
117:8,23
117:24
119:7,21
120:9

121:24
122:13,18
141:12
142:22
155:25
156:21
163:15
172:25
173:22
174:1
**collection**
65:13
82:14
102:21,24
105:18
112:17,18
112:19
132:14
134:20
173:2
176:20
182:3
183:23
**collections**
52:2 77:19
87:13
**collector**
10:3
119:25
**collectors**
57:1 65:7
178:18
**college**
120:22
124:2
**Colon** 22:3
**Columbia**
19:10
**Columbus**
47:21
**combination**
36:16
37:15
**come** 26:25
28:24
33:17
44:21
45:18,23
45:23 46:5
46:16,18

47:19
72:16
79:13
82:13
88:16
107:17,24
112:3
116:8
122:4
126:24
153:4
157:15
158:13
**comes** 29:1,2
33:12
**coming**
145:11,25
146:3,7
**Committee**
98:22
**Common** 61:1
**Commonwe...**
2:7 43:1
54:1 60:10
76:8,11,24
83:20
141:16
187:1,5
**communicate**
180:23
**communic...**
12:3 101:2
148:20
**companies**
100:25
135:14
**company** 14:6
15:18
23:11
58:14 66:5
76:22
79:25
88:14
101:5,20
120:10
**compelling**
55:2 56:9
56:10,16
**complain**
38:14,20

**complaint**
184:17
**complement**
135:9
**complete**
19:24
67:19
153:15
158:5
**Completed**
60:6
**completely**
165:24
**complied**
160:17
**comply** 62:12
**complying**
160:13
**computer**
153:19
179:20,21
**conception**
122:4
**CONCLUDED**
186:23
**condition**
62:11
**confiden...**
41:21
**confirm**
64:20
175:15,15
**confirmed**
9:5
**confused**
146:20
**confusing**
12:15 14:5
167:3
172:4
**congress...**
54:3 69:20
69:24
79:20,20
80:4,17,25
81:1,3,4
82:1,22
89:8 90:4
113:5
174:17

congressman
115:11,11
115:12
Connecticut
19:15 25:4
112:8
169:15,16
connection
10:2
consider
88:12
107:20
118:15
considering
131:1
consistent
72:22,22
Constitu...
54:13
111:23
113:25
132:23
133:2
constitu...
44:17
construed
165:22
consultant
14:2
Consultants
21:10
consulting
1:5 7:10
7:22 9:17
13:18,19
13:19 15:2
63:1
115:19
168:24
contact
89:22
149:3,3
contacted
30:10
43:18,20
96:6 173:8
contacting
148:18
context 55:8
continue

29:2
112:13
continuo...
13:22
contract
5:10 20:14
20:24
21:25 22:9
22:15,17
22:18 23:2
23:14,24
32:16
36:14,18
39:1,25
43:11,22
66:15 86:9
86:13,18
86:19,21
86:25 95:6
95:7,19,22
96:1,5,5
96:11,16
97:19 98:8
100:10
106:3,8,8
106:14
110:5,7,12
110:25
113:22,23
114:7
130:8
135:1
150:9
179:5
contracted
21:4 22:4
22:8 23:17
24:4 44:19
58:13 66:3
69:24
86:12 90:9
90:12 96:8
98:9
100:13
101:16
111:22,23
114:18
118:17
132:3
154:24

155:2,3
contractor
21:7,8
23:21
98:10
130:16
contractors
108:7
143:2
155:12
contract...
26:4
contracts
20:20
36:22
37:22,23
38:3 99:22
135:2
180:10
182:9
convenie...
44:23
Convention
96:7 120:6
convince
57:18
143:1
178:16
cool 87:2,3
120:20
184:20
coordina...
100:3
copies 37:22
165:11
180:19
copy 146:16
153:19
177:24
180:24
corners 56:7
Corporation
64:24
correct 7:15
8:18 21:22
26:1,23
31:25 34:9
34:23
39:25
48:14,23

49:2,10
51:13,19
53:25 54:2
54:14,17
54:21
55:16 61:6
61:13 76:6
87:7 94:1
98:12
105:17,19
108:18
110:22
118:23
137:11
145:4,6
161:10
169:19
176:4,9
182:21
correctly
29:17
62:15,16
131:13
CORTES 1:9
cost 37:16
99:16
106:15,17
130:22
costs 129:18
cost-eff...
99:16
could've
144:2
council
171:16,17
councilor
14:3 119:3
councilors
87:23
counsel 3:7
3:14 7:8
7:25 14:25
15:5
187:18
count 169:13
counties
30:18 81:1
country
142:14
county 5:6

22:11
43:19
50:11,12
54:4,5,8
56:7 59:15
61:1 76:18
80:25 84:3
91:3,17,19
126:17
138:25
151:25
172:16
173:18,22
177:21
187:2
couple 40:21
47:8 67:17
69:20 70:6
70:8,11
76:3 78:5
90:18
112:20
124:21
126:17
149:2
160:25
161:25
164:3,9
175:3
184:6
course 24:13
51:7 79:2
94:2,2
court 1:1
2:6 10:18
12:4 21:18
60:10 61:1
68:21
93:11
114:22
115:6,22
117:4,10
125:15
133:18
134:3,14
134:21
170:17
cover 44:7
181:13
covered

161:20
co-financed
120:12
Craigslist
5:17 56:14
91:10
176:18
crazy 110:19
110:23
132:7
177:3
178:15
created
86:10
Creek 9:16
9:19
Crompaws
141:5
Cruz 5:8,11
17:18,19
18:6 20:14
20:21 21:4
24:8,11
26:12,14
27:5,6
37:3,5
39:5,24,25
41:4,13
42:5 47:22
47:25
48:14,22
53:11
54:15,18
55:8,16
65:11
66:15
67:24 69:6
74:6,18
77:22
78:13
81:19,25
86:7,12,22
89:19,20
89:21
90:12 92:5
92:12 93:8
95:2
104:10,11
104:12,21
113:18

130:6,7,21
131:2,14
139:23
147:3
148:3,4,17
148:18
149:4,8
150:7
151:2,6,10
151:16
161:9
162:12,18
168:25
172:17
173:4,7
176:23
178:24
179:1
Cruz's 41:8
131:1
crystal
49:19
cumulative
61:14
cured 62:14
cycle 16:23
20:10,12
72:8 77:19
89:9 111:3
114:11
118:19
129:2
139:14
cycles 104:9
Cynthia 2:5
187:4,9,23

— D —
D 4:1 7:1
42:6 54:16
dad 115:24
116:3
125:15
134:9
dad's 115:3
115:9
116:20
124:22
125:25
126:22

134:7
daily 148:20
Dakota 19:8
19:9 25:6
25:6 32:18
35:8 38:20
72:4,5
128:25
129:3,3,9
129:12,18
132:11,18
133:13
166:25
167:13
damage 10:21
Damon 88:3
Darrell
111:25
database
55:10
date 10:7
61:10,10
61:12
73:10
112:16
113:12
117:1
132:4
138:25
166:5
167:24
168:5,21
dates 168:6
dating 94:3
David 62:24
63:4,5
day 22:9
36:20 57:5
90:9
103:23
157:18
174:12,23
174:23,23
177:12,13
185:22
186:7
days 30:19
44:22,25
45:2 70:6
70:8

111:21
112:1
120:19
De 17:24
18:18,20
18:24 19:3
23:13,14
24:24 25:3
25:11,12
29:20 30:4
71:18
72:23 74:1
76:7 77:8
77:9 90:7
95:7,12
96:17
110:4,8
169:2
deadline
62:4,12
111:10,11
111:15
Deadlines
111:3
deal 32:21
103:24
107:4
121:8
130:20
136:8
dealings
71:18
72:24
deals 101:12
debate 74:16
December
118:14
133:23
decent 164:7
decided
124:6
declaration
138:16
139:9
declared
63:22
decs 139:5
deemed 7:21
defeat 88:15
defect 62:13

defend 11:4
Defendants
1:11 2:3
3:14
Defendant's
8:3,4,11
8:16 60:19
60:21
75:23 76:2
85:24 86:3
92:21,24
94:18,21
95:21
109:25
140:3,7
172:7,11
175:8,12
176:3,11
176:13
defensively
101:17
defined
145:14
definitely
54:10
71:22 75:7
91:3
degree
121:11,12
121:14,15
Delaware
18:8,9
20:23,23
24:12
65:12,16
65:17,24
66:21,22
68:16
78:20 79:8
79:9 138:6
138:6,7
delegate
92:4
104:14
148:2,3
151:7,8
153:2
173:7
174:5,20
delegates

79:22
89:21 90:4
90:23
91:23 93:5
104:12,12
104:15,17
104:19,22
104:24
113:4,4
128:3
148:13
149:14
150:10
172:16,22
173:1,3,24
174:25
**demanded**
30:21
**Democrat**
18:18,23
23:13,17
23:20
24:24
27:18
29:19 30:4
37:11 48:7
50:18
51:11
54:12,22
54:23
55:25 56:1
67:2 69:17
75:2 76:7
76:22,23
82:16 83:2
83:12,16
84:10,22
95:9,10
130:12
137:1,7
154:18,21
**Democratic**
19:1 55:5
55:11,12
56:6
105:18
111:10
136:23
**Democrats**
54:16 56:2

**Denise** 28:15
35:19
46:14
136:15
137:5
163:19,22
**denote** 15:3
**depend** 90:2
**depended**
90:3
**depending**
73:3 80:11
**depends**
37:25 39:5
89:25
**deploy** 73:9
99:25
103:7
**deployed**
73:25
82:20
83:11,23
84:6,22
85:14
142:3
**depose** 10:22
**deposed** 7:18
9:23 10:8
10:18,22
11:19
**deposition**
1:14 2:1
5:5 7:9,10
7:11,13,20
8:21 9:1
10:5,6,24
11:9,10,11
101:18
186:23
187:7,14
**depositions**
73:12
**deposits**
32:8,9
**Deputy** 3:11
**Derrick**
104:7
**describe**
111:19
**DESCRIPTION**

5:4
**deserving**
107:10
**desire** 43:9
**developed**
52:10
**devote**
173:12,13
**died** 164:5
**diehard**
137:4
151:22
**different**
17:2 26:17
37:2 38:18
55:4 69:19
78:15,22
79:1,4,5,8
79:10,12
79:13,16
80:3,8,11
80:15
81:10,23
82:21 83:8
83:14,19
84:23,25
85:2,8,10
85:18
97:14
100:9
121:13
124:21
144:7,11
**difficult**
71:14
149:10,13
**direct** 17:19
20:21 22:2
98:24
**directly**
21:5 23:14
24:4 43:14
66:10,16
68:15 69:2
98:21
106:21
128:3
187:19
**disagree**
62:18

**discovery**
20:25
21:25
29:16 58:5
101:22
148:25
177:20,25
**discrepancy**
30:17
**discussion**
4:3,7 7:7
8:7 64:4
64:14
85:21
106:2
176:1
**discussions**
154:7
176:6
**dispute** 29:8
106:25
**distribu...**
54:7
**district** 1:1
1:2 19:10
54:3 79:21
80:5,18,25
81:1,3,4
81:13 82:2
82:22 90:4
91:16,17
104:16
117:11
119:13
126:6
131:25
132:4
148:13
150:4,24
153:9
174:5,17
**districts**
41:9,12
69:21 83:7
90:18,19
90:25
91:12,15
92:13
113:6
126:6

131:4,15
148:12
150:10
**dividend**
121:3
**division**
61:24
161:1
**doctor** 152:3
**document**
58:4
141:11
162:2
**documents**
180:23
**dog** 117:13
**doing** 14:17
15:4,11
17:3 22:6
22:10
30:18
32:25 48:2
55:4,21
57:17
69:25
78:12,15
79:25
84:15 87:1
87:4 104:9
108:17
113:19
118:4
119:1,5,24
120:15
124:11
132:8
134:2,16
147:10,13
148:9
158:10
162:20
164:13,14
182:24
**dollars**
51:25
109:5
**Don** 9:12
14:2 88:12
**Donald** 22:19
24:21

170:15
donors 116:6
door 39:8
  50:15,16
  50:16,16
  55:7,7
  90:20,20
  91:8  177:4
door-to-...
  39:11
  55:21
  144:10
  147:13
  150:25
  173:22
double 20:23
  105:15
download
  154:4
  179:20
downloading
  180:15
downloads
  179:25
downtown
  11:17
  157:16
drill 65:6
  181:21
driller
  124:22
Dripping
  9:14,19
drive 43:20
  114:13
  120:17
  122:3
  126:3
  128:6
drives 36:19
  36:20
  42:20
  113:2
  180:15
driving
  114:11
dropped
  18:14
  92:15
drove 100:10

due 61:10,10
  61:12
  133:23
duly 7:3
  187:12
duplicate
  94:24
D-10 5:11
D-11 5:12
D-12 5:13
D-13 5:14
D-14 5:15
D-15 5:16
D-16 5:17
D-4 5:5
D-5 5:6
D-6 5:7
D-7 5:8
D-8 5:9
D-9 5:10
D.C 21:12

_____ E _____
E 3:1,1  4:1
  7:1,1
earlier
  164:17
  167:1
  168:1,2
  169:4
earliest
  113:12
early 43:21
  114:24
  121:23
  185:1,19
ears 34:20
easier 21:17
  26:7,9
East 3:4
easy 26:13
  113:6
  149:12
  156:15
economy
  124:8
Ed 35:17
  45:11
  46:13
  136:15

137:3
  163:3
Edee 23:7,9
  23:10
  162:4,7,8
  163:1,2
educate
  56:16
educational
  120:23
Edward 28:14
Edwards
  152:1,3,17
  164:20
effort 100:1
  105:18
  155:15
  157:3
  161:9
efforts
  65:14
  117:20
  122:13
  123:9,9
  139:23
  177:17
eight 28:9
  111:21,25
  168:19
either 10:2
  33:22
  46:18
  52:17
  73:13
  103:15
  119:17
  123:6
  159:15
  173:9
Elect 133:1
  133:3,4,5
  133:7
  167:10,12
elected 14:3
  15:20
  87:23
  88:15
  115:12,13
election
  16:23

25:13
  32:24
  58:21
  61:23  65:3
  77:19
  96:18
  98:16
  103:23
  132:20
  133:8
  139:14
  169:7,11
  171:20
  181:9,10
  182:17
  184:14
elections
  16:15  20:9
  87:16,17
  87:19
  165:14
Elizabeth
  47:4,11
else's
  128:19
email 149:1
  150:13
  153:22
  177:11
  183:17
emails 5:15
  172:12,19
employee
  25:17
  187:17,18
employees
  25:16,21
enchilada
  44:8
ended 10:18
  10:21
  15:20
  22:15
  29:22
  30:18
  44:18  48:2
  73:21
  84:17
  92:13
  100:12

104:2
  108:1
  118:4
  122:9,11
  123:17
  132:6
  150:20,24
  151:4
  152:19,20
  153:5
  155:22,23
  174:7
  177:1
ends 68:22
  68:23
energy
  139:11
enforcement
  142:24
engaged 33:2
engages
  36:12  65:7
enjoy 74:12
ensure 49:4
  49:13
entered 57:2
  174:6
entities
  17:2
entity 58:15
entries
  135:17
equal 10:9
  10:12
  15:22  53:6
  118:3
  171:7
error 94:3
especially
  161:22
  177:22
  185:12
ESQUIRE 3:3
  3:9,10
essentially
  53:9
established
  166:5
estimate
  47:23

177:9,10
Evangelou
  174:6
evening
  73:14
event 50:15
  127:12
events 25:20
  82:8 144:9
everybody
  64:5
everythi...
  160:14,17
evident
  151:1
exact 10:6
exactly
  22:10 24:2
  49:19 91:7
  105:23
  106:10
  127:18,19
  131:17
  149:7
  152:9
  153:6
  160:19
  163:17
  174:9
EXAMINATION
  4:5 8:8
example
  39:22 49:8
  88:23
  89:20
  125:13
exception
  33:6
excited
  174:7
exclusive
  98:25
executed
  63:15
  96:11 97:1
  115:18
exhausted
  92:6
  139:21
Exhibit 5:1

5:5,6,7,8
5:9,10,11
5:12,13,14
5:15,16,17
8:4,11,16
60:21
75:23
85:24
92:21
109:25
140:3
172:7
175:8
176:13
Exhibits
  94:18
existence
  13:8 111:7
expecting
  123:24
expense
  37:15,15
  37:21
expenses
  40:10,17
  129:14,15
  129:19,21
experience
  55:3 71:5
  72:7
  122:12
explain 50:7
  135:12
explained
  49:20 50:5
  180:9
explanation
  12:1 71:17
  71:18
  72:15
expurgated
  166:3
extended
  62:4
extension
  62:11
extra 107:9
  109:5,9
  156:17
extractors

122:7
eyes 58:13
E-D-E-E
  23:10
e-mail 29:15
  93:10
  109:24
e-mailed
  93:9

_____ F _____
fact 53:12
  107:4
  143:19
  145:8
fails 179:25
failure
  62:12
fair 40:11
  123:1
fall 70:10
falling 92:8
  165:1
far 42:2
farming 78:2
faster
  179:21
fatal 62:13
father 134:4
father's
  117:3
fault 30:16
February
  68:23
fee 39:20
  40:17,18
  107:21
  130:4,11
  130:23
feels 134:10
fees 51:25
fell 73:19
  127:8
felt 31:20
fewer 158:2
fiancee
  30:23
fiancée
  31:25
  86:25

field 26:2
  33:3
  124:19
  177:23
Fifteenth
  2:8 3:12
fifth 91:16
  91:18
Fifty 27:4
fighting
  45:18,20
  114:2
  122:2
figure 32:2
  38:24
  42:15
  47:23
  128:7
  138:5
  179:8
  181:21
figured
  130:24
  149:23
figuring
  114:3
file 55:14
  58:3
  171:24
  183:10
filed 8:17
  59:10 61:9
  70:4
  114:25
  165:25
files 172:18
filing 62:12
  73:10
filings 61:6
fill 105:2
filled 63:20
final 174:12
Finally 62:7
find 62:25
  91:9 92:5
  96:24
  101:11
  102:1
  105:20
  135:10,11

136:4,20
136:21
139:21
148:18
173:18
177:17
finding 55:5
  77:15
fine 12:2,24
  15:9,14
  16:20
  19:23
  25:15
  27:25 29:1
  29:3 32:21
  32:24
  33:19,19
  33:25,25
  34:5 42:14
  60:23
  64:11 97:5
  119:19
  144:1
  185:20
  186:15
finished
  44:23
  131:25
  153:11
finishing
  73:15
finite 58:11
Finn 174:16
  174:18
Fiorina
  170:8
fire 152:25
first 7:3
  8:15 11:25
  16:6 22:8
  43:16 50:9
  57:6,11
  62:14
  70:23
  75:10
  78:13 87:7
  96:9,11
  105:10,11
  114:22
  115:7

| | | | | |
|---|---|---|---|---|
| 119:24 | **folks** 33:2 | **formed** 13:4 | **friend** 66:2 | **Gary** 99:10 |
| 121:16,18 | 38:19 | 15:2,6 | 105:22 | 162:18,20 |
| 122:3,17 | 39:15 51:5 | 16:15 17:3 | 134:14 | 166:21,25 |
| 179:19,19 | 57:22 | 17:7 | **friends** | 167:4 |
| 180:25 | 65:23 | 168:13 | 135:15,15 | 171:20 |
| 187:12 | 67:25 72:1 | **former** 17:20 | **front** 39:10 | **gas** 120:16 |
| **fiscal** | 72:1,25 | 18:15 | 175:11 | 124:22 |
| 118:16 | 83:11,23 | **forming** | **Fuente** 17:24 | **gather** 10:11 |
| 171:2 | 84:6,21 | 16:10 | 18:18,20 | 10:14 24:1 |
| **five** 28:3 | 85:13 | **forth** 106:6 | 18:24 19:3 | 119:12 |
| 45:11 47:5 | 89:20 | 146:15 | 23:13,14 | 144:8,9 |
| 83:6 90:4 | 111:17 | **forums** 55:5 | 24:24 25:3 | 152:6,8 |
| 90:17,25 | 134:24 | **fought** 10:20 | 25:11,12 | **gathered** |
| 105:1 | 135:4,21 | 88:4 | 29:20 30:4 | 11:1 39:9 |
| 116:24 | 156:19 | **found** 100:11 | 71:18 | 39:11 57:6 |
| 117:2 | 158:3 | 105:21,23 | 72:23 74:1 | 62:3 64:18 |
| 132:2 | 159:21 | 136:10 | 76:7 77:8 | 76:21 |
| 163:4 | 161:22 | 154:25 | 90:8 95:8 | 123:25 |
| 166:4 | 172:12 | **four** 28:3 | 95:12 | 127:1 |
| 167:14 | **follow** 16:20 | 44:22,25 | 96:17 | 144:7 |
| **fix** 172:4 | 18:3 44:6 | 45:2,11 | 110:8 | 152:8 |
| **flake** 177:16 | 77:23 | 47:5 48:2 | 169:2 | 159:3 |
| **flash** 180:15 | **followed** | 68:5 75:3 | **Fuente's** | **gatherer** |
| **flat** 36:25 | 108:10 | 88:6 | 77:9 110:4 | 122:22 |
| 37:7,24 | **following** | 116:23 | **Fulbright** | 124:7 |
| 38:2 39:20 | 59:24 | 117:2 | 11:16 | **gatherers** |
| 44:2 | 106:21 | 163:4 | **full** 9:11 | 25:22 |
| **flawed** 63:25 | 168:25 | 166:1,3 | 18:4 58:18 | 111:5 |
| **flew** 100:10 | **FOLLOWS** 7:4 | 167:9 | 100:16 | 135:9 |
| **Floor** 2:8 | **follow-up** | 169:21 | 173:13 | **gathering** |
| 3:12 | 180:22 | 177:14 | **full-time** | 10:9 13:20 |
| **Florida** 35:3 | **foregoing** | **Fourteen** | 148:14 | 13:23 16:3 |
| 36:9 | 187:7,14 | 172:6 | **function** | 49:25 78:9 |
| **flow** 71:9 | **forever** | **frame** 74:3 | 69:10 | 100:1 |
| **flown** 31:16 | 96:24 | 183:2,3 | **fund** 121:3 | 116:20 |
| **fluid** 57:7 | **forget** 105:3 | **Frankel** | **funny** 174:14 | 120:13 |
| **fluoride** | **forgot** 21:16 | 33:12,17 | **further** | 121:16 |
| 87:24 | 30:25 | 36:10 | 66:16 | 133:10 |
| **fly** 92:6 | 119:4 | 46:25 | 187:16 | 134:6 |
| 95:17 | 170:10 | **Franklin** | **Furthermore** | 135:14 |
| 114:13 | 171:8 | 171:5 | 62:5 | 141:17 |
| 147:15 | **form** 62:24 | **frankly** | **future** 12:6 | 142:5 |
| **flyer** 177:20 | 63:8 86:19 | 71:12 | | 155:22 |
| **flying** | **formal** 43:22 | 105:4 | **G** | 156:4 |
| 114:11 | **formally** | **Frederic...** | **G** 7:1 | 161:22 |
| **focus** 13:18 | 17:10 | 89:12 | **Gailey** 28:5 | 173:17 |
| 13:21,23 | **formation** | **Freyermuth** | 33:8 35:9 | **gatherings** |
| **focused** 89:7 | 14:23,24 | 154:17,21 | 46:7 | 123:19 |
| **Fogley** 88:3 | 16:3 | 156:8 | **gained** 151:1 | 141:18 |
| **folder** 94:5 | 119:23 | 157:14 | **Gaming** 168:3 | **general** 2:8 |

3:11 25:12
32:24 42:2
42:3,23,24
65:3 96:18
98:16
115:19
132:19
133:8
169:7,11
171:20
181:8,9
182:17
184:14
**generalized**
177:23
**generally**
38:9 72:14
80:16
81:11 82:8
**geology**
121:12
124:19
**Georgia**
19:18,19
25:5 29:10
30:13,24
32:3 99:24
103:4
104:4
112:6
**Gerald** 28:20
28:20,22
28:22,23
36:4 45:12
46:19
105:22,22
106:8,11
136:6
137:7
**Gerald's**
106:9
**getting** 16:1
40:5 41:23
51:1 55:9
57:17
67:24
90:21
91:23
92:13
93:22

100:12
104:19,23
106:15
114:6,7
115:11
123:17
128:18
132:8
134:9
144:11,15
149:7
150:2
151:4
153:1
155:5,13
155:21
156:1
157:20
160:10
172:19
174:5,8,22
179:19
**girlfriend**
180:1
**give** 10:20
12:2 16:20
36:18 47:1
47:23 58:5
70:21
80:17
86:15
88:16
93:17
103:8
120:3
121:4
129:13
135:20
153:18,20
160:24,25
165:12
180:14,18
**given** 26:11
42:12
100:9
121:2
169:7
172:18
173:3
**gives** 7:21

**giving** 104:3
106:17,21
109:4
**gleaned**
183:1
**go** 19:16
26:8,12
27:2 30:13
30:23
33:23
36:13 38:1
39:11
41:10
42:13 45:7
47:7 50:13
53:5 55:14
56:12 59:4
64:3 65:7
65:11
66:21
68:12
70:13 73:9
75:10,18
77:24 78:1
78:4,4
79:8,9,19
82:19
84:13 92:6
92:7,10,11
98:4 99:17
101:14
108:4
109:22
110:25,25
112:1,5
115:10,10
117:8,8
118:15
119:23
120:18
121:4
122:8
127:6,12
131:5
132:1
133:14
135:2
138:5,8,18
139:21
143:3,12

144:4,8,10
147:15
148:9,15
149:25
150:25
153:5,12
155:1
156:1
158:7
160:5,6
163:18
165:9,10
166:13
167:24
172:17
173:19
178:12
179:8
182:4
184:16
**goal** 160:11
**going** 8:2,15
9:4 13:3
24:8 26:10
26:19
27:23 29:2
29:18 33:6
33:17
37:17 41:1
41:1 42:12
44:3,9
47:22
50:15,16
55:7 56:11
64:12
67:20
70:18
71:14,25
73:14 76:1
86:23,24
90:20 94:5
94:6 99:1
101:6
103:8
108:7
110:13
114:3,10
120:16
130:22
131:3,4,5

131:6,15
134:7
146:15
147:12
148:11
149:12,15
149:16
150:23,23
151:3
153:4
154:10
158:23
161:16,16
165:11
171:1,2
172:20
173:1
174:25
178:14
179:5,20
180:1
184:16
185:16
**Goliath**
101:2
**good** 28:15
28:24 41:8
56:15 59:1
69:23
84:15
121:8
124:10
130:25
156:15
157:21
158:17
166:4
179:7
**gotten** 77:2
87:23
171:8
**government**
120:11
121:19
145:23
167:17
**grab** 73:9
**graduated**
122:21
124:2

grand 30:1
  32:22
  40:22,23
great 8:2
  18:3 47:3
  50:11,20
  112:3,5
  184:22,24
greedy
  107:12
green 30:13
  54:13
  97:11
  99:21,23
  102:13
  103:3
  160:3
  161:3
  165:3
  182:25
  184:9
Greens
  113:25
  184:4
Greet 57:12
ground 11:20
  67:25 81:9
grounds 53:6
growing
  120:25
guarantee
  58:7,10
guaranteed
  39:4
gubernat...
  87:17
  88:22
guess 34:14
  42:5 44:20
  101:17
  174:10
  181:9
gun 82:11,12
guy 28:20
  29:25 47:8
  47:17,18
  57:8 63:6
  67:7 88:3
  92:3 107:4
  107:9

117:6
120:16
147:11
151:13,16
152:6,6,17
152:18
155:7
163:7
guys 22:5
  26:11 27:4
  27:4,23
  31:20
  33:20
  41:23 43:5
  45:11
  47:16
  49:17 50:5
  50:23 55:6
  58:5 70:12
  79:21 93:9
  100:11
  101:5,12
  108:6
  112:13
  114:6
  117:7,16
  131:23
  147:16
  148:8
  149:11,14
  149:16
  153:13,25
  156:14
  157:10,12
  158:7
  159:3
  160:23,25
  177:19
  180:18
  186:9
guy's 148:8

**H**

Hale 33:11
  36:6 46:21
half 17:21
  62:21
  109:6
  120:16
  153:9

halfway
  111:2
half-way
  171:25
hall 15:21
  122:6
Hampshire
  19:15 25:4
hand 100:16
handful
  41:11
  101:5
  117:5
handing
  146:1
handled
  44:25
happen 87:6
  94:3,9,14
  108:5
  174:25
happened
  10:16
  30:11 64:5
  91:7,16,18
  102:18
  127:7
  143:4,7,13
  143:15
  144:2
  150:25
  152:9
happening
  64:13
happens 35:4
  93:25
  94:11
  107:12
happy 12:11
  32:14
hard 12:4
  21:17
  36:20
  77:15
  114:9
  134:8
  147:17
  178:16
  180:24
  181:25

hardest 71:1
hardworking
  163:7
harmed
  145:22
Harrisburg
  2:9 3:13
  79:15
  141:5
Hastings
  47:4,11
head 63:6
  70:22
  93:17
heads 149:22
hear 12:10
  12:10
  101:7
heard 11:22
  12:20
  59:12
  62:18
hearing 16:9
  22:8 52:9
hello 57:12
help 30:13
  44:10,21
  55:6 56:13
  57:19
  67:18
  75:15
  90:22 93:7
  116:17,19
  131:16
  132:1
  134:7
  136:16,19
  136:20,21
  144:23
  149:5,7,12
  149:25
  150:7
  152:6,21
  153:6,24
  157:10
  158:18
  161:18,21
  162:3,16
  164:3,9
  165:6

172:13
173:1,17
179:6
helped 18:13
  88:15
  105:1
  115:12
  116:20
  119:2
  125:19
  134:13,16
  152:8
  153:10
  163:3
  164:13
  166:17
helper 92:4
  134:15
helpful
  66:14
  179:1
helping
  19:25
  50:13
  54:24
  101:13
  106:22
  113:7
  134:2,5
  153:25
  158:10
helps 15:24
Henry 164:21
HERO 171:6
hey 117:7
  148:8
  158:6
  162:19
hi 50:10
high 44:14
  120:25
Hillary 49:9
  51:9
hire 114:3
hired 10:11
  21:3 57:22
  66:4
  124:21
  126:5
  127:20

184:11
**hit** 79:24
124:11
149:22
**hits** 177:6
**hitting** 55:4
**hold** 26:14
136:5
**holding**
156:1
**home** 35:5
157:15
**homework**
179:9
184:16,19
**honest**
147:15
**honestly**
44:10
**Hopefully**
184:25
185:19
**Hornak** 62:10
**horrible**
164:4
**hotel** 79:13
84:3 185:5
**hotels** 79:12
84:2,9,25
85:2,10,18
**hotel's**
179:21
**hour** 37:14
106:14,20
108:2,6
130:13
155:17
**hourly** 39:19
55:6
107:16
108:12
**hours** 107:16
**house** 55:11
55:11,12
84:4,5,8
**houses** 55:19
**Houston** 10:9
10:12
11:15
118:8

171:7
**How'd** 32:15
**human** 114:5
**hundred** 70:2
94:13
109:5
126:17
**husband**
28:12,14
**hybrid**
129:13
**hydra** 185:11
**hysterical**
93:11

------
**I**
**idea** 130:25
**identical**
68:20
175:13
**identifi...**
8:5 60:22
75:24
85:25
92:22
94:19
110:1
140:4
172:8
175:9
176:14
**identified**
5:4 176:3
**identify**
86:6
158:24
**Illinois**
18:7,13,23
18:25 21:1
21:2,13,20
24:11,15
24:25
34:22
65:11,15
65:19
67:25 68:7
68:10 69:1
70:10,11
70:15
77:24 78:5

78:5,21,23
79:16 80:1
80:8 81:18
81:19
84:10,15
84:22 98:7
98:16,20
100:8,19
127:2,7
166:24
169:4,15
**imagine**
185:10
**immediately**
30:22
31:25 96:8
124:17
**impact** 122:5
**important**
107:13
181:1
**impossible**
70:22
157:8
**inaccurate**
166:12
**incidents**
142:14
**included**
145:18
**incorporate**
130:22
**incorrect**
95:14
**indemnif...**
39:2
**independent**
19:4 20:7
24:3,4
25:11
31:12
37:19 42:6
48:9,11
52:1,21
53:24
54:11,13
66:4 67:15
70:17,20
72:8,23
75:5 85:3

85:14 96:3
96:18 99:3
99:11,12
99:17
108:7
110:20
111:11
143:2
155:12
161:22
163:8,9,16
164:11
**independ...**
182:19
**Independ...**
52:19
73:18 99:6
113:9,11
**Indiana**
17:21 18:7
18:14,17
18:17,19
18:22,24
21:1,2,13
21:20 22:7
22:22
24:11,15
24:18,21
24:25
65:11,15
65:19 68:1
68:4,9,10
68:15,17
68:23 69:2
69:20
74:23,25
77:24 78:6
78:6,25
79:1 80:2
80:4,14,23
81:25 82:1
83:2 126:2
126:3,20
127:6
149:10
169:3,14
170:13
**indirectly**
187:19
**individual**

7:18 10:13
14:14
16:11 17:2
30:21
60:12
114:18
133:17
173:15
**individu...**
7:17,23
165:16
**individuals**
26:2 36:22
100:20,24
135:1
**inertia**
114:5
**inflection**
12:6
**inform** 64:5
**information**
18:4 31:24
55:17
176:7
182:10
183:1
**initially**
150:20
**initiative**
16:22 61:5
89:2 100:4
146:12
171:22
**initiatives**
114:1
**injunction**
61:11
**insane** 91:5
**installed**
122:6
**instance**
144:15
**instilled**
57:22
**instructed**
51:5
**intending**
180:14
**intent** 94:10
101:14

interacting
142:25
interested
16:1,21
73:17
162:17,21
173:7
177:14
187:19
interesting
120:14
122:12
171:11
interject
71:4
Interrog...
5:14
175:13
176:8
interrupt
45:16
INTERRUP...
31:2 45:19
invalidate
11:1
invoiced
29:17
invoices
180:10
involve
119:7
involved
13:22 16:2
17:10,13
17:14 52:2
60:11
175:19
involvement
154:17
in-between
122:24
in-state
48:20
63:17,23
102:20
103:10
145:4
Island 18:7
19:16
20:22

24:12 25:5
65:12,16
65:25 66:1
66:9,19
68:16 78:3
78:20 79:9
113:4,4
169:5,6
issue 53:7
57:19
91:22 96:4
123:14,15
146:11
issued 61:11
issues 9:9
30:15
91:21
124:15
126:12,23
it'll 21:17
107:24
166:13

_____ J _____

J 3:9
Jack 101:21
Jackson
25:19
47:17,20
Jacob 28:1
30:12
39:15
Jacobs 28:1
34:8,23,24
39:16
41:15
42:16
45:22 82:7
91:10
123:6
125:1
127:20
129:5,6
132:9
135:3,24
136:24
137:10,13
137:14,15
153:5
156:19

168:15
184:13
Jake 26:13
30:20
31:16,18
31:21 32:5
33:7 41:15
57:5
116:19
120:1,14
120:16
123:5,12
123:13
125:2,19
126:23,24
126:24
127:1
134:11
144:2
152:19,21
152:24,25
152:25
156:20
157:15
164:21
168:5,8,15
January
26:13,15
26:19 32:7
68:22,24
70:5 90:10
Jaworski's
11:16
Jennings
46:5 70:11
84:12
143:7
164:20
Jessica 22:3
Jill 167:4
169:21,24
Jim 152:1,3
152:5,17
152:21
153:11
164:20
job 30:24
65:7,8,8
66:12
69:23

84:15 94:8
101:13
108:16
148:14
160:10
165:25
Joe 47:17,20
171:3
Joel 3:10
4:6 7:6,16
8:1,9,24
15:8,13,25
19:22 20:1
20:4 23:12
28:21 31:4
41:25
45:21
52:12 53:1
53:23
56:22
59:25 60:1
60:14,17
60:24
64:10,15
71:16
73:24
75:21,25
85:22 86:1
92:19,23
93:15,20
94:16,20
95:20
109:20
110:2
136:17
139:25
140:5
141:9
154:6,23
162:9
164:10
172:5,9
175:2,10
176:2,15
178:17
179:15,22
180:16
181:6
184:3
185:6,13

185:18,21
186:1,6,12
186:16,20
Johnson
99:10
162:18,20
166:21,25
167:4
171:20
Jon 100:25
JONATHAN
1:10
Jovan 159:19
159:22
165:3,4
judge 59:14
61:20
62:10
64:17
117:11
judge's
63:18,25
July 43:20
43:21
118:4
jumbled
14:13
jump 79:23
82:6,15,21
83:5,12,19
84:2,23
85:7,15
jumped 80:6
81:16 82:4
82:14
84:24
jumping 81:4
81:15,17
81:21 83:9
85:1,11,19
June 43:21
179:3
jurat 63:10
63:10
Justin
154:17,21
155:20,23
157:14,20
158:4,17
159:16,22

159:25
164:24

**K**

**Kathy** 47:7
47:15
**keep** 15:17
80:16 81:6
158:23
**Kemit** 105:5
105:7,8
106:10,10
136:6,9
155:20
156:12
**KENNETH** 3:10
**Kennett** 3:6
**Kentucky**
35:3,4,10
112:6
**Kentucky's**
35:5
**Kermit** 105:9
**kicked** 151:5
151:6,16
171:9
**killed** 172:2
**kind** 14:13
15:24
39:13 57:1
57:3 70:7
77:13
79:21,24
112:8
114:8
116:8
120:13
124:8,11
126:22
127:8
129:13
132:24
134:10,15
149:21
150:4
152:22
154:16
156:15
160:9
162:21,23

164:5
165:22
170:3
174:14
178:15
**kit** 61:18
**Kitchen**
119:11
171:16
**kite** 92:6
147:15
**knew** 14:5
17:6 41:1
55:19 66:8
151:12
162:17
**know** 11:7,7
11:8,23
12:6,7
15:18,19
16:19 17:5
22:6,13,14
24:9 25:19
27:1 28:6
28:7 30:21
31:20 32:4
32:10,11
33:13 34:6
34:6,7,13
34:14,15
39:7,8
42:21 43:7
44:6 50:17
50:24
52:22 53:4
59:5,16
62:18,19
64:7 66:9
67:18
68:21 70:2
71:11
73:11 75:8
75:16,17
77:3,6
78:1,4
79:19
80:21,21
82:23
84:21 86:4
86:15 87:1

88:6,14
89:16 90:3
90:14 92:9
92:15 94:4
94:23
99:18
100:4
104:16,20
104:21
105:23
106:9
107:23,25
108:2,6,17
108:17
110:24
111:2,3,20
111:25
112:2,5,6
112:22
114:5,13
114:15
115:18,21
116:4
117:6,13
117:17
120:11,12
121:10
122:4,20
122:20,23
122:25
124:8,9,25
125:4,13
126:5
127:25
129:22
130:25
131:11,24
132:5
134:8,9,10
134:15,16
134:17
135:14,15
135:19
136:9,10
137:9,17
138:4,8,10
140:7
143:11,12
143:15,19
143:21

144:2,3,6
144:15,18
149:9,11
149:14
150:10,21
154:1,9,15
156:3,12
156:14,16
157:7,10
158:4,5,10
158:19
159:2,9,11
160:9,22
160:24
162:18,20
162:24
164:8,22
164:22
168:21
170:3,4
173:5,8,10
173:14
174:4,10
174:22,24
177:5,10
177:15
178:5,11
179:3,3
184:14
185:24
**knowing**
73:18
**knowledge**
12:21
51:20,22
76:13 85:9
142:3,21
143:4
161:12
**known** 34:18
54:9
**knows** 127:18
**Kyle** 87:23
88:1,2
171:23
**K-E-M-I-T**
105:9

**L**

**L** 3:10

**La** 17:24
18:18,20
18:24 19:3
23:13,14
24:24 25:3
25:11,12
29:20 30:4
71:18
72:23 74:1
76:7 77:8
77:9 90:7
95:7,12
96:17
110:4,8
169:2
**labor** 161:2
**lacking**
161:23
**lady** 47:4
100:13
173:20
**language**
64:17
**lasting**
122:5
**late** 43:21
118:12,13
118:13,13
171:1
174:19
**laugh** 34:11
**Lauren** 160:3
161:3,4
165:3
**law** 44:16
49:19
52:10
142:9,18
142:24
**lawfully**
157:14
160:14
**laws** 39:7
44:7
**lawsuit** 90:9
92:3 145:2
**lawsuits**
71:12
**lawyer** 86:25
110:25

| | | | | |
|---|---|---|---|---|
| **lead** 178:23 | 97:24 98:6 | 165:9,19 | 157:8 | 174:11 |
| **leading** 51:1 | 98:15,21 | 169:8 | **locations** | **looks** 76:2 |
| **leaflets** | 99:3 100:1 | 181:7,17 | 78:16,22 | .76:14 77:7 |
| 146:1 | 100:7 | **listed** 27:21 | 79:1,4,8 | 95:24 |
| **leave** 153:1 | 101:3 | 42:22 65:1 | 79:10,13 | 165:16 |
| 153:2 | 102:15 | 65:23 73:1 | 80:3,8,11 | 172:11 |
| **leaves** 62:8 | 114:8 | 74:8,18,21 | 80:15 | **looming** |
| **Lee** 104:7 | 120:6 | 75:3,6 | 81:10,23 | 111:3 |
| **left** 68:6 | 127:3 | 78:18 85:4 | 83:8,14 | **lose** 41:1 |
| 84:14 | 128:23 | 165:8 | 85:8 | **losing** 29:22 |
| 113:3 | 132:19 | **listing** | 112:14 | 122:11 |
| 115:9 | 162:15 | 34:15,16 | **logic** 63:25 | 177:1 |
| 122:4,8 | 182:24 | 150:14 | **Lone** 171:22 | **lost** 29:20 |
| 125:25 | 183:9 | 172:12 | **long** 12:2 | 29:25 |
| 126:25 | 184:4,9 | **lists** 47:9 | 42:12 | 31:20 |
| 174:22 | **Libertar...** | **literally** | 120:1 | 32:20,22 |
| **legality** | 98:5 | 106:17 | 127:11 | **lot** 29:25 |
| 44:16 | 113:17,25 | 111:4 | 160:13 | 30:14,18 |
| **legally** | **library** | **litigation** | 169:7 | 31:17 |
| 157:13 | 157:16 | 60:9 | **look** 8:11 | 36:18,21 |
| **legislators** | **lift** 119:2 | **little** 32:12 | 9:2 32:4,4 | 45:10 |
| 172:2 | **liked** 70:3 | 50:6 69:19 | 33:21 | 51:24 56:1 |
| **legitimate** | 155:25 | 71:20 78:9 | 44:16 45:7 | 59:15 75:7 |
| 30:19 | **liking** | 100:8 | 47:7 66:21 | 75:14 |
| 178:16 | 155:22 | 121:12 | 73:17 | 77:16 82:8 |
| **Leonila** | **limited** | 125:21 | 75:18 76:3 | 82:11,12 |
| 171:8,13 | 64:24 | 127:18 | 86:3 94:22 | 82:15 |
| **let's** 16:12 | 120:11 | 134:15 | 95:5 | 86:14 |
| 17:9 27:3 | 121:19 | 146:14,20 | 113:21 | 99:16 |
| 27:5 39:22 | 131:15 | 147:10 | 114:6 | 103:22 |
| 39:23 43:6 | 167:17 | 156:17 | 118:15 | 104:8,8 |
| 78:12 | 173:16 | 167:25 | 127:9 | 106:9 |
| 89:18 | **line** 96:20 | 170:10 | 129:22 | 107:12 |
| 97:16 98:4 | **lines** 182:3 | **live** 9:13,14 | 138:18 | 114:6 |
| 114:16 | **list** 5:9 | **lived** 116:21 | 139:2 | 116:7 |
| 119:23 | 19:24 26:8 | **lives** 138:7 | 140:7,22 | 124:23 |
| 125:3 | 33:5,18 | **living** 11:3 | 143:12 | 135:19 |
| 126:8 | 42:12 | **LLC** 1:6 7:10 | 146:14 | 139:10 |
| 146:14 | 45:10,14 | 13:6,8 | 161:17 | 142:17 |
| 166:13 | 70:21 73:8 | 17:7 23:23 | 165:19 | 153:13 |
| 179:17 | 88:16 92:1 | 101:21 | 167:24 | 154:15 |
| 186:7 | 92:1,4,25 | **LNC** 98:24,25 | 168:4 | 158:8 |
| **level** 43:1 | 101:6 | **lobbying** | 175:12 | 159:3 |
| **Liability** | 103:8 | 172:1 | **looked** 51:21 | 162:18 |
| 64:24 | 123:8 | **local** 22:11 | 110:8 | 164:15 |
| **Libertarian** | 147:11,12 | 22:12,14 | 138:22 | 165:7,23 |
| 96:6 97:9 | 148:23 | 154:25 | **looking** | 169:19 |
| 97:19,20 | 150:9 | **located** | 64:16 71:2 | 179:1 |
| 97:21,22 | 153:11,13 | 56:18 | 124:18 | 180:6 |
| 97:22,23 | 163:13 | **location** | 166:8 | **love** 22:6 |

154:7
lower 131:11
Lowman
  164:21,22
  164:23
LP 102:13
Lukens 28:3
  35:2,3
  46:2
lunch 93:22
Lynch 28:2
  28:18,19
  33:7 34:25
  35:1 41:16
  42:16
  45:25
  103:22
  169:24
Lynches
  39:17
Lyra 28:16
  36:2 46:17
  164:20
  173:21
  184:13

_____ M _____
mad 22:12
  152:24,24
  154:16
  170:2
madness
  71:21
mail 173:9
mailers
  115:21
major 52:20
  177:12
majority
  38:3,6
  64:18
  156:11
making 22:16
  31:21 32:7
  51:10
  108:15
  160:9,13
  177:3
man 19:8
  34:16 47:8

47:18
64:23 87:1
127:9
129:22
139:21
164:25
167:24
manage 78:14
manager 14:2
managing
  100:22
manpower
  44:13 90:6
  90:21
map 55:10
Marcus 87:25
marijuana
  168:19
mark 7:10
  8:2 28:5
  33:8 35:9
  46:7 60:15
  75:22
  85:23
  92:20
  109:21
  140:1
  172:6
marked 8:4
  8:10 60:18
  60:21
  75:23 76:2
  85:24 86:2
  92:21,24
  94:19,21
  109:25
  140:3,6
  172:7,11
  175:8,11
  176:11,13
markets
  177:14
MARKS 1:10
Maryland
  35:14
Mason 28:14
  28:15
  35:17,19
  45:11
  46:13

135:24,24
137:3,5,21
163:3
Masons 91:11
Mason's
  137:21
Massachu...
  19:15 25:4
  35:25 36:1
  36:2,3
  66:2 112:8
Masters
  23:23,24
math 48:1
matriculate
  116:7
matter 18:9
  80:23
  86:17
Maul 150:15
  174:18
mayor 10:19
ma'am 57:13
McConville
  159:13,14
McCulloch
  100:25
Meader
  101:19
mean 8:17
  11:6 13:13
  14:4,7
  15:15,23
  17:8 19:21
  26:24
  34:18,20
  37:18,25
  40:20 43:4
  47:8 48:12
  48:20 49:6
  49:17 51:2
  51:20,24
  53:4 55:23
  57:5 60:9
  62:18
  63:21
  67:18
  68:20 71:1
  72:11,15
  75:7 77:16

87:3 89:25
91:7 95:3
104:20
107:6,16
110:22,24
111:19
112:24
121:9
123:20,21
126:16
128:5
130:24
132:1
134:5
135:8
136:5,20
142:8,13
142:20
144:3
145:15
147:18
148:20
151:1
152:11
155:2,2
156:24
157:1
158:9
160:11,20
163:11,12
166:23
167:24
172:3
178:14,22
180:11
meaning
  40:15 81:2
meant 112:11
medical
  168:19
meet 120:15
  143:25
meeting 16:9
megabytes
  180:6
mentally
  91:5
mention
  21:16
  41:19

119:4
mentioned
  54:18 55:7
  132:3,10
  132:10
  152:1
  164:17
message
  96:23
met 57:5
  123:7
  127:1
  128:2
  140:23
method 71:20
methodology
  37:10
Mexico 19:11
  25:7 30:24
  31:1,6,17
Michael 21:9
  21:9,14
  28:15 31:3
  31:11
  35:21 46:5
  46:15 66:5
  66:8 70:11
  84:12 91:6
  143:7,21
  143:25
  156:13
  164:14
  172:15
  173:21
Michigan
  56:19,21
MIDDLE 1:2
Mike 17:18
  133:1
  164:20
Mildred
  33:12 36:8
  46:23
million 11:6
  88:4
  185:10
Milton 28:2
  46:2 164:8
mind 33:12
  50:12

139:24
140:22
**mine** 134:14
**mine's** 66:2
**Minnesota**
19:12
**minute** 8:11
9:3 94:22
175:3
**minutes**
161:20,25
**missing**
96:22
**mission**
44:11
**Mississippi**
19:13 25:8
**Missouri**
88:23
**mistake**
163:14
**Mitchell**
88:3
**mobilizing**
91:22
**modalities**
144:11
**mode** 114:12
**modes** 144:11
**moment's**
73:2
**money** 22:16
29:8,22,25
31:19,20
31:21,22
32:12,13
37:15,15
37:17,21
38:8 41:1
41:3,8
56:12 59:8
75:15
80:20,21
96:4 107:9
107:11
113:8
116:8
121:9,17
122:16
124:14

139:10
145:21
156:17
**monitoring**
185:5
**Montana** 19:9
25:6
**month** 116:23
133:24
148:15
**months**
116:21,22
116:24,24
117:2
133:24
**morning** 34:1
186:8
**mouth** 50:9
135:13
**move** 68:1,15
80:8,14
91:23 92:9
112:4
131:23,25
182:1
**moved** 68:3,3
68:4,8,8
131:24
**moving** 21:12
110:18,23
111:12
174:24
**multiple**
49:16 53:6
154:11,11
**multi-one**
95:1
**municipal**
87:16,19
**municipa...**
57:25

**N**

**N** 3:1 4:1
7:1
**nail** 10:21
**name** 9:11
15:23 17:6
23:22
25:19 33:4

47:18
82:23
88:14
101:21,24
105:10,10
105:11,12
105:13
119:1,17
138:25
153:12
154:20
177:2
**named** 28:20
47:4,8,17
47:18 88:3
101:23
173:20
**names** 45:9
47:2,7
92:1
117:17
150:6
154:1
161:18,21
161:23
164:3
172:19
175:18
**National**
23:11 96:6
98:21
120:6
**nationwide**
56:23
**natural** 71:9
178:11
**nature** 10:24
11:3 13:17
145:2
**Near** 56:8
**necessarily**
182:9
**necessary**
62:9 92:10
**necessity**
145:3
**need** 36:15
52:15,17
54:8,9
56:3 65:6
71:11 72:3

113:4,8
114:8
117:7
137:14,15
138:1,15
138:20
139:6
147:18
149:12
160:19,20
160:21
161:19
165:21
166:3
173:18
174:12
183:20
**needed** 73:3
84:18
90:21
97:15
107:5
112:1
120:17
124:9
147:6
162:15
174:10
**needs** 145:16
169:19
175:20
**Neither**
139:19
**networking**
162:23
178:11
**never** 54:25
55:3 56:13
78:2 88:13
120:23
139:24
**nevermind**
20:3
**new** 19:11,15
19:16 25:4
25:5,7
30:24 31:1
31:5,16
33:10
165:7

167:9,16
**news** 34:20
**nice** 132:6
139:21
**niche** 13:19
16:3
**Nicholas**
28:6,7
**Nick** 35:13
46:9
**NICOLE** 3:9
**Nigerian**
178:15
**night** 74:16
96:7
**nine** 95:6
186:8
**nixes** 58:25
**nods** 12:3
**nomadic**
111:4,7,17
111:19
182:2
**nominating**
5:7 44:6
63:3,12,20
63:24 76:6
**nomination**
50:20
53:18
62:23 63:8
167:9,16
**nominee**
53:12
**non** 104:1
**nonverbal**
12:3
**Nope** 40:11
46:1
**normal** 63:16
**normally**
63:15,16
**North** 19:8
25:6 32:18
38:20
128:25
129:2,3,9
129:12,18
132:11,18
133:13

| | | | | |
|---|---|---|---|---|
| 166:25 | **number** 5:4 | **oh** 8:23  19:8 | **oil** 124:22 | 98:1,19,23 |
| 167:13 | 28:1,2,2,3 | 19:15 | **okay** 8:25 | 99:5,14 |
| **northeast** | 28:3,6 | 28:14,19 | 11:5,18 | 100:21 |
| 68:11 | 38:12  56:4 | 29:10 | 12:8,12,17 | 101:25 |
| 164:15,16 | 65:1  75:6 | 30:25  47:8 | 13:1,12 | 102:5,10 |
| **Northern** | 110:5,6,7 | 47:18 | 14:9,21 | 102:12 |
| 83:1 | 152:1 | 48:16 | 16:11,13 | 103:12 |
| **notariza...** | 154:17 | 51:24  54:6 | 16:25 | 105:14 |
| 40:18,22 | 163:16 | 64:23 | 17:11,15 | 106:13,19 |
| 52:16 | 165:14 | 65:18  66:7 | 18:9  25:18 | 106:23,24 |
| 62:20 | 167:4,9,14 | 66:24 | 26:18,20 | 108:11,22 |
| 63:11,16 | 167:16 | 68:13  74:9 | 27:2  28:10 | 108:25 |
| 93:23,25 | 168:19 | 86:15 | 29:4,17,17 | 109:7,19 |
| 94:11 | 169:14 | 91:19  94:2 | 30:1,2,18 | 109:21 |
| 102:23 | 174:9 | 96:1  102:9 | 33:16,18 | 110:13,16 |
| 103:14 | 178:2 | 104:20 | 37:14  39:2 | 110:22 |
| 129:15 | | 108:25 | 39:24 | 111:14,16 |
| 145:6,7 | **O** | 113:14 | 49:21 | 112:3,4,10 |
| **notariza...** | **o** 7:1 | 129:8 | 50:11  53:2 | 112:21 |
| 40:23 | **object** 10:16 | 130:15 | 53:14,21 | 113:14,20 |
| **notarize** | 38:15 | 141:7 | 58:10,15 | 114:4,19 |
| 107:5 | **objection** | 142:1 | 59:6  60:2 | 115:5,8,14 |
| **notarized** | 6:1  61:3 | 151:8 | 61:17,19 | 115:20 |
| 49:2,3 | **Objections** | 155:8 | 64:9  66:7 | 116:15,25 |
| 51:19,23 | 5:16 | 160:7 | 66:11,20 | 117:12,15 |
| 62:1,7,19 | **obviously** | 161:5,7 | 67:5,9,9 | 117:18 |
| 62:22 | 32:9  95:13 | 163:14,14 | 67:22 | 118:1,5,7 |
| 75:19 | 150:3 | 163:14,14 | 68:13,19 | 118:9 |
| 76:14,18 | 158:5 | 163:14 | 69:8,12 | 119:9,18 |
| 94:4 | 175:19 | 164:22 | 70:1,14,25 | 120:21 |
| 108:24 | **occurred** | 172:23 | 71:23  73:5 | 123:4 |
| 128:9,10 | 17:15 | 176:23 | 73:7  74:13 | 124:2,6,13 |
| **notary** 2:6 | **occurs** 93:24 | 180:3 | 76:5,17 | 124:20,24 |
| 51:24 | **odd** 132:24 | 182:18 | 77:1,4,21 | 125:8,14 |
| 63:15 | **odds** 144:16 | 183:19 | 78:8,10,19 | 125:17,24 |
| 128:15 | **offer** 55:2 | 185:7 | 79:6  80:19 | 127:10,15 |
| 130:3 | 56:9,10,16 | 186:5 | 81:12,14 | 128:4 |
| 187:4 | 136:8 | **Ohio** 19:8 | 82:10,25 | 129:17,20 |
| **notes** 26:16 | **offered** | 25:5  36:7 | 84:16 | 129:24 |
| 143:13 | 32:17 | 44:23,24 | 86:16  88:8 | 130:9,19 |
| 179:16 | 158:5 | 47:13,21 | 89:15 | 131:18,20 |
| **notice** 5:5 | **office** 11:16 | 96:2,8,18 | 90:11 | 134:1,12 |
| 7:11,13 | **officer** | 97:25 | 91:14,19 | 135:7 |
| 8:21  73:2 | 142:9,24 | 98:24 | 92:14,17 | 136:7,22 |
| **noticed** 7:9 | 143:17 | 99:13 | 93:12  94:7 | 137:5,19 |
| 7:17 | **officers** | 100:3,8,10 | 94:15 | 138:9,13 |
| 135:21 | 142:18 | 101:7,14 | 95:11,21 | 138:17,21 |
| **not've** 50:7 | **Offices** 2:7 | 110:12,14 | 96:10,14 | 139:3 |
| **November** | **official** | 111:21 | 96:14  97:3 | 140:15,17 |
| 118:14 | 58:21 | 171:20 | 97:10,13 | 140:20 |

141:23
142:1,11
143:4,11
143:23
144:5,13
144:17,22
144:24
145:1,20
146:25
147:22
148:1,10
148:11,21
149:19
150:12,15
151:8,14
151:17,23
152:15,23
153:8,14
154:13
155:4,6,11
156:10,18
156:23
157:19
159:5,10
159:17,19
160:3,7
161:3,5,7
161:14,24
162:14,22
162:25
163:6,14
163:23
164:19
165:13,17
166:7,11
166:13,15
167:2,4,9
167:16,20
167:22
168:3,9,14
168:22
169:5,18
170:1,5,6
170:11,15
170:19,23
170:25
171:5,16
171:20,22
172:10,15
172:23

173:18,25
175:25
176:23,25
177:17
178:7,21
179:14,23
180:17
181:11
182:6,13
182:18,21
182:23
183:8,12
183:19
184:5,22
185:7,7
186:8,17
186:21
old-fash...
171:25
omit 17:8
once 10:4
15:1 57:14
65:21
73:11 78:3
131:24
ones 17:9,12
20:20
129:9
131:16
151:24
157:15
160:1
161:11
165:19,21
183:5
one's 17:2,2
94:5 101:1
101:1
online
131:16
Open 42:6
43:4,7,11
43:14,23
58:6,7,20
59:1,9
61:4 62:8
63:14
163:19,22
164:1,2
opening

180:23
openpitt...
61:2,22
operated
87:8
opinion 5:6
60:25
62:25
63:19
opportunity
43:17 92:7
opposing
14:25
optimistic
185:25
oral 36:14
order 69:17
71:15
173:9
orders 100:4
ordinance
10:10,12
10:14
15:22
118:4
171:7
Oregon 89:2
120:2,7,17
121:20
167:17
organically
172:2
organiza...
120:12
original
52:9 61:9
61:10
96:25
originally
44:3 54:25
68:6 71:2
90:5 96:2
132:2
148:7,11
149:8
150:23
output 104:2
outreach
77:17
outside

116:12
outsourced
90:16
out-of-s...
62:3,6
overflow
157:22,23
158:13,16
overhead
40:14
overly
185:25
override
47:6
overseeing
100:22
overwhel...
64:18
owe 29:10
32:11
owed 29:9
31:19,22
31:23 32:5
96:4
107:17
owes 32:12
owner 122:6
o'clock
59:23
186:8
─────────
P
P 3:1,1 7:1
PA 3:6,13
183:9,24
page 5:1,3
6:1,3 9:3
63:14
75:19
95:24
140:14
174:15
175:20,22
paid 29:23
29:23
30:21 32:5
36:23
37:18 38:4
38:22,23
39:1,21

51:24 55:6
58:18 59:6
59:12
86:24
116:1,3,4
122:15
123:10,11
123:18,18
123:21,24
125:20,21
127:17,19
129:7,10
149:24
155:5,19
155:21
158:2
pair 147:14
paper 30:16
54:8 61:25
62:24 63:3
63:8,12,20
63:24 94:1
94:5
144:12
180:19
papers 53:16
paperwork
36:20
106:6
pardon 57:13
parents
116:21
park 121:9
parking
153:1
part 13:19
49:7 65:19
81:1 88:12
121:2
132:3
158:12,13
165:2
183:22
184:25
partaking
49:23
particular
101:10
parties 4:3
4:7 16:16

124:15
126:12
177:23
187:17
**partner**
164:16
**parts** 82:21
83:19
84:23
**party** 16:22
19:4 22:11
23:14
30:13
31:12,13
52:20 97:9
97:11,20
97:21,23
98:6,6,16
99:7,9,15
99:21,23
100:8
102:14,15
103:3
111:23
113:7
127:3
132:19,24
132:24
133:2,7,8
167:9,16
182:24,25
183:9
**part-time**
25:17
**pass** 130:10
146:15
**passed** 130:4
130:13,14
130:15
155:17
**pastors**
10:22
**Paul** 3:3 5:9
17:18
18:11
21:13,20
24:15 27:9
27:9 66:23
69:1,5,6
69:15

74:20
81:18,25
92:2,4
93:3 126:1
126:9,15
129:11,12
132:15
151:13,15
151:15
166:2,2,16
179:10
**Paulie** 33:12
33:16,17
36:10
46:25
**Paul's** 19:25
175:23
**pavement**
124:11
**pay** 30:2,8
31:21
39:15,17
39:18,19
39:20
41:14
56:11
67:20
116:3
120:16
123:12,13
123:14,14
123:16
129:25
156:5
**paycheck**
155:14
**paying** 15:19
106:20
107:9,20
**payment**
38:11
107:1
**PEDRO** 1:9
**Penn** 152:3
152:14
**Pennsylv...**
1:3 2:7,9
18:10,22
18:25 19:8
20:22 22:7

22:20
24:12,25
25:5 28:13
29:19,21
30:5 32:7
34:9,23,24
35:18,20
36:5 37:3
37:4,12,20
38:16 39:6
39:24
41:17 42:4
42:16,19
43:1 44:19
44:24 45:4
47:23,25
48:7,10,15
48:17,23
50:2,10
51:5,11,13
51:17
54:12
65:12,15
65:25
68:16,18
68:22 70:8
70:9,23
72:2 76:8
76:15,16
77:25
79:10,14
81:8,9
83:16
89:18,19
93:22,24
95:10
97:23 98:7
98:17,20
99:24
100:14
101:3
102:3
103:4,4
104:11
105:24
111:9,10
111:11,21
112:12,15
112:17
126:3,7,18

127:12,14
128:11
129:10
130:3,12
132:10,14
133:13
135:22
136:4
137:10,22
139:23
141:12,16
142:3,16
142:22,24
143:9,10
143:17
145:8,12
145:25
146:3,7,22
147:5,19
149:11
150:18
151:17,18
152:17,18
153:24
155:8
156:19
164:12,14
166:18,23
166:24
169:14
171:12
172:13
177:7,18
178:18
182:4,11
187:1,5
**people** 16:7
17:4 22:23
26:21
32:19 33:5
33:10,11
34:6 36:12
36:16
42:22,25
45:4,15
47:5,5,8
47:10 49:5
49:14
53:16 65:1
65:4,20

67:17 68:5
68:7,11
71:11
72:16 78:5
78:6 80:4
80:7 81:8
82:11,12
82:20
84:14 90:5
90:7,15,17
91:11,22
92:5 99:25
100:16
101:10
102:7
103:16
105:1
106:22
107:12
108:3
111:7
112:7,8
113:7
121:4
124:21
131:4,5
134:17
135:13,15
135:19
136:12
138:19
141:19
142:2,14
142:17,25
143:13,24
144:8,9,10
146:4
149:2
150:1,2,6
153:13
154:15
156:11
162:3,18
162:23
165:5,7
172:13
173:4,6
178:12,13
178:13,16
181:8,20

people's 92:1 164:3
percent 58:12,17 70:13 94:13
percentage 59:6
perennial 125:16
perfect 36:17 87:4 153:23 163:18
perfectly 68:25
period 17:13 38:23 78:7 171:10
periods 26:17 70:19
permit 103:1
permutation 72:16
person 21:4 55:14 57:6 74:9 75:14 80:17 91:25 101:23 103:17 108:15 144:4 174:19 177:13 183:13
personal 71:4 74:14 145:23 151:13
personally 11:14 22:23 74:13 80:5 85:5 101:15 102:4 105:2 142:13

184:11

person's 57:12
per-sign... 37:16
petition 5:7 17:23 21:10 44:6 49:5,6,8 49:22 53:16 58:13 61:25 63:14,24 69:9 76:6 76:12 80:23 84:18 98:6 99:3,15 111:5 120:10 122:3,22 128:19 138:23 145:9,23 157:2 161:11 163:24 171:18 183:9
petitioner 29:24 61:2 63:21 139:5 158:11
petitioners 43:19 58:1 58:3 67:20 79:24 92:11 101:11 119:4,11
petitioning 145:15
petition... 145:18
petitions 49:16 50:21 69:16 81:5

168:22

103:18
143:1
148:5
167:10,16
168:20
177:4
petition's 63:25
petition... 66:2
Pflugerv... 88:5
PGH 43:4 63:14 163:19,22
Phelps 89:9
Philly 79:15 106:1
phone 8:6 32:19 71:11 105:15 115:21 165:23
phonetic 33:11 52:4 66:3 101:19
PI 16:9 186:8
pick 49:11 186:8
picked 117:6
picking 84:17
piece 94:1,4
Pike 3:4
Piro 2:5 187:4,9,23
pissed 153:3
pitch 57:17
Pittsburgh 17:23 42:7 43:7,11,14 43:23 58:6 58:7,16,20 59:2,9 60:9 61:1 61:4 62:8 63:6 112:4 112:4

157:16
164:1,2
place 11:11 62:9 108:9 132:11 187:15
placement 177:11
places 65:20 122:24 128:22
Plaintiff 7:18,23
Plaintiffs 1:7 3:7
plan 104:14 104:14 108:9 115:18 131:18,19
plane 31:17 31:23
planning 71:6,13,22 116:7 138:23
Pleas 61:1
please 9:11 12:2 75:22 109:21 136:1 172:6 176:16
plug 72:11 174:9
plus 37:13 37:16,16 37:21 41:7 58:12 129:18 160:21
plussed 104:2
pocket 29:23 145:21
point 12:10 12:14,23 15:5 16:17 28:15 29:13,13

42:19
45:18,20
90:7 91:21
113:6
179:7
Police 143:17
political 13:18,19 115:19 142:6
Pool 1:6,15 2:3 4:4 7:3,11,17 7:21 8:10 9:12 13:14 14:4 43:12 76:1 77:20 86:2 93:21 114:18 116:12 117:22 118:2,21 118:24 119:20 133:17 139:16 140:6 171:3 172:10 175:11 176:3 187:8
portion 98:8 155:23
possible 41:6 75:16 84:8 126:1 143:18,22 157:11 158:11 160:2,12 160:18 172:21 180:2 185:11
possibly 66:21 143:15
posted

176:18
**pounds** 151:2
**practice**
  51:4
  145:22
**practices**
  49:18
  108:10
**pre** 89:5
**predomin...**
  56:8
  126:16
**preferred**
  37:9
**preliminary**
  8:12
**prepared** 9:7
**present**
  13:24  16:4
  16:17
**president**
  5:11  17:24
  95:2
  132:16,22
  133:8
**presiden...**
  20:5  79:22
  87:8  88:20
  99:3,11
  129:2
  133:11
  160:21
**presuming**
  54:19
**pretty** 18:2
  26:13
  36:17
  40:11  41:7
  55:2  57:7
  57:7,8
  79:5  81:5
  82:1  83:21
  83:23
  86:13  87:2
  87:3  89:16
  93:10  94:8
  100:11
  104:1
  111:12,18
  112:15

113:6
114:14
119:22
120:20
124:10,18
127:11
130:25
131:8
132:7
134:6
150:2,22
151:1
153:11
156:9
157:21
159:6
163:4
164:7
171:2,11
172:4
174:7
175:18
177:12
178:22,22
179:4
181:25
184:21
**previous**
  16:9
**pre-Benezet**
  17:15
**pre-print**
  180:19
**price** 32:17
  38:1  40:4
  43:25
  44:14,14
  107:25
  130:21
**pricing**
  37:10
**primaries**
  65:2
  182:16
**primarily**
  61:25
**primary**
  13:21  19:1
  23:5  26:20
  26:21  27:7

27:10,13
27:16,19
27:24
29:21  42:1
42:22,24
44:8  55:1
65:23
95:13
112:12,15
112:16,17
117:1
132:15
157:5
158:15
170:13
182:4,11
182:13
**primary's**
  133:24
**prince**
  178:15
**print** 96:23
  178:5
**prior** 62:4
  97:8
**priority**
  139:22
**private**
  41:18
  121:3
  143:14
  144:8,15
**privilege**
  74:14
**proactive**
  124:18
**probably** 9:3
  11:22,23
  16:9  24:9
  26:24
  32:20,22
  33:10,23
  43:3  45:8
  48:12  53:2
  62:21
  66:10
  75:16  82:7
  83:6  91:4
  92:18
  93:11

100:6
104:21
107:25
109:8
113:17
114:22,25
115:7
116:4,23
117:5,16
118:13
119:15
123:5,7,8
124:1
127:18
128:5,24
131:10,11
144:16
147:14,14
148:15
149:25
150:13
151:24
153:9,12
154:1
155:20
159:2
164:24
165:24
167:23
169:20
170:14
171:12
172:4
174:4
175:22
177:1,10
177:11,13
181:9,21
**problem**
  12:18  53:7
  74:4  91:5
  146:17
  175:6
**Procedure**
  2:4
**proceeding**
  187:11
**proceedings**
  187:7
**process**

10:25
38:11,18
49:24  50:9
56:17  59:7
71:13  87:2
107:14
173:6,11
**processed**
  36:21
**processes**
  71:6
**procure**
  56:12
**Produce**
  73:16
**produced**
  39:2  73:12
  76:19
**production**
  100:23
**professi...**
  87:4  124:7
  157:5
**profitable**
  109:11,13
  109:14
**progression**
  77:22,23
**prohibited**
  1:22
  142:25
**prompting**
  19:24
**pronounced**
  52:7
**pronunci...**
  52:5
**proof** 32:10
**property**
  143:14
  144:9
**proponent**
  63:7,7
  123:16
  154:11
**proposals**
  139:12,13
**proposed**
  108:1
**protection**

53:6
**provide** 9:7
71:14
155:15
**provided**
58:7 91:25
148:16
149:25
176:7
**provisions**
145:11,24
**public** 2:6
144:9
187:4
**pull** 108:16
150:11
174:9
183:8,13
**pulled** 22:9
22:15,18
174:13,19
**pulling**
104:3
**purpose**
77:14
**purposes**
7:20
**pursuant** 2:4
**put** 17:20,25
22:4 28:24
29:16
30:25 45:4
45:5 67:25
84:9 97:14
99:12
100:11
101:11
114:21
115:17
150:7
151:10,12
152:7,17
170:19
171:9
175:11
177:12,20
183:16
**putting**
56:14
122:10

152:20
**P.M** 186:23

**Q**
**qualific...**
50:8
**qualified**
69:20
107:8
**qualify**
57:15,19
81:2,13
95:12
**qualifying**
50:8
**question** 9:4
12:11,14
12:20,25
14:10
15:24
39:18 50:9
50:25
53:22,22
57:11 60:8
61:7 62:10
65:5 66:13
77:8 81:7
91:13
93:21
114:15
122:11
145:15
182:21
**questions**
8:12 11:6
51:1 76:4
128:17
158:9
162:1
173:12
184:18
185:10
186:3
**question's**
8:15
**quick** 48:1
50:13
**quickly** 98:3
184:23
**quite** 71:12

80:6
**quote** 40:25
43:25
130:21
**quoted** 40:13
131:9

**R**
**R** 3:1 7:1
105:9
**race** 88:23
88:25
117:10
**RADZIEWICZ**
3:9 23:8
**Rail** 171:22
**raised**
115:10
122:5
**ran** 125:15
**Rand** 5:9
17:18
18:11
81:18,25
92:2,4
93:3
151:15,15
169:3
**ranger** 121:9
**rate** 36:25
37:8 38:2
39:19
40:25 44:2
58:19 59:5
107:16,24
108:12
**rates** 37:24
**reached**
22:10 92:2
**read** 9:4
12:5 25:10
60:20
61:20
62:14,16
62:25
111:1
165:20
187:9
**reads** 101:18
**ready** 9:7

86:4,5
90:20
94:23
140:8,9
**real** 48:1
101:20
**realize**
107:13
**realized**
179:4
**really** 14:5
14:6 17:6
30:19
38:25
43:24 44:9
44:12,12
50:6 51:21
55:3 56:3
56:13
59:12
64:16
69:22
72:15
80:22 98:3
113:3
118:16
120:4
124:8
126:14
132:5
135:16
149:13
152:9
154:9
158:8
164:4
170:21
174:23
179:3
**reason** 11:19
159:15
**reasons**
108:15
**recall** 10:6
112:20
119:2,10
120:4
125:7
138:10
159:1

171:18
**receive**
58:25
**receives**
58:21
**recognizing**
65:20
**recommen...**
15:3
**recommended**
44:15
**record** 8:7
9:6 15:1
15:17 27:1
53:5 64:3
64:14
73:11 75:9
75:18
85:21 97:6
125:4
176:1
183:15
187:11
**recorded**
158:1
**records** 27:2
45:7
**redacted**
166:3
**redeployed**
73:2
**referenda**
16:16
**referendum**
168:3,20
**referren...**
122:9
**refused** 30:2
107:5
**regard**
115:22
**regarding**
180:11
**regards**
176:7
**register**
183:19
**registered**
49:21,22
50:7,14,18

56:2,5,6
57:12,14
57:16,24
76:11
136:21,24
147:20,23
149:4
**reimbursed**
130:1
**related** 59:1
120:8
**relates**
58:20
139:23
**relation...**
23:4 26:4
106:7
**relative**
187:16,18
**release** 59:7
**reliable**
155:24
**relief** 61:11
**remaining**
59:8
**remember**
32:23 40:4
42:3 45:9
50:22,23
51:21
66:22 74:8
82:17
84:19,19
101:20,24
105:25
112:23
116:5
117:2
118:14
119:15
120:18
124:1
127:2,7,16
128:6,23
132:13
134:17
138:19
140:23
141:4
147:15

150:6
153:7
159:3,16
161:18
164:22
183:16
**remind** 73:20
**rename**
169:10
**repeat** 12:11
**rephrase**
12:15
**report**
183:10
**reported**
187:8
**reporter** 2:6
12:5 21:18
**reproduc...**
1:22
**Republican**
27:6,9,13
27:15
50:15,17
50:18,19
53:8,8,18
54:12
55:13
90:15
95:13
113:7
132:15
136:23
137:1,4,6
147:4,21
147:23
151:21,22
154:14
161:4,8
**Republicans**
22:12,14
53:11
54:15
90:16
149:4
176:22
**request**
139:13
**required**
62:2,9

63:18
**requirement**
44:5,17
54:7 63:11
71:1 93:23
99:15
102:20,23
103:10,15
103:16
145:6,7
**requirem...**
62:11,13
73:10
**requires**
44:6 77:16
169:5,6
**Research**
101:1
**resident**
34:8,8,13
48:15,18
48:23
50:10
51:13,17
93:24
137:11
147:5
151:19
**resolving**
109:2
**resource**
179:6
**resources**
73:25
77:16
**respect** 53:6
71:15
**respecting**
74:15
**responded**
173:9
**Respondents**
61:3
**responding**
139:12
**response**
165:13
**responses**
5:16 93:10
177:6
**rest** 91:12

**restriction**
145:3
**result** 186:2
**re-read**
52:21
**Rhode** 18:7
19:16
20:22
24:11 25:4
65:12,16
65:25 66:1
66:9,19
68:16 78:2
78:20 79:9
113:3,4
169:5,6
**Rich** 147:23
**Richard**
174:16,18
**Rick** 17:20
22:1 74:23
147:22
150:3
152:4,7,8
152:11,12
152:13,18
152:19,21
152:24,24
153:2,3,6
153:10
164:2
170:6
173:14
**ride** 31:17
**right** 16:14
17:1 25:17
26:14,17
28:9 30:20
31:5 33:21
47:4 48:6
60:16 64:1
68:9 69:3
82:6 89:7
93:14 95:5
98:15 99:8
101:7
105:25
113:13
118:11,13
128:11,13

139:6,20
142:19
143:25
144:19
145:23
146:14
150:22
154:4,5
155:3
157:9
158:16
167:15
175:3
177:5
179:7
180:6
184:20
185:2
**Rights** 10:9
10:12
15:22
118:3
171:7
**RINGS** 8:6
**rip** 178:2
**ripped** 30:1
**road** 9:16,19
58:24 59:3
**Robert** 28:2
28:19 33:7
39:17
41:16
45:25
134:13
**Rocky** 17:24
18:18,20
18:24 19:3
24:3,5,24
25:3,10
27:18
29:20 30:4
30:10
31:19
32:16,25
37:11,19
39:4 42:6
42:6 48:7
48:9,11
51:7,8,11
52:1,13

53:24
54:11,16
54:22,23
54:25 55:9
55:25 56:1
66:4 67:2
67:15
69:17
70:17 71:5
71:10,13
71:15,18
72:7,23
74:1 75:2
75:5 76:7
76:22,23
77:8,9
82:16 83:2
83:12,16
83:22,24
84:1,10,22
85:3,14
87:5 90:7
90:8,8,16
95:7,9,10
95:12 96:2
96:3,17
100:16
101:16
104:8,9
105:17
107:8
110:4,8
130:8,11
130:11,13
138:12
152:20
154:22
155:17,18
155:19
161:22
162:11
163:8,9,15
164:11,13
165:6
169:2,6,14
176:19
179:2,2
181:10
183:7
184:14

**Rocky's**
23:25
106:20
160:21
179:2
**Rod** 100:25
**role** 107:13
119:3
158:15
**roll** 133:25
**Ron** 126:1,9
126:15
132:14
146:18,19
147:20
151:13,15
152:5
162:5
163:3
166:2,2,16
174:20
**Rose** 25:19
**ROSSI** 3:3
7:14,24
8:20 14:15
14:19,22
15:10,16
19:17,20
28:11,17
41:20 52:6
52:23 53:3
53:15
56:20
59:17,21
60:3,7
64:2,8
71:3,8
73:22
95:15
136:13
140:25
141:3,6
153:17,21
154:2,19
162:6
163:25
175:5
178:4,8
179:12,18
179:24

180:4,8,13
180:21
181:4
183:14,18
183:21
185:3,9,15
186:4,10
186:14,18
**rules** 2:4
11:20
21:16
**ruling** 52:4
**run** 72:4
116:20
120:11
**running**
26:20 96:3
99:6
109:10
112:9
115:6
117:11,13
130:12
134:14
**runs** 21:9
23:10,22

——— S ———
**S** 3:1 7:1
**sad** 164:5
**Salazar**
171:13
**San** 87:25
89:11
**Sanders** 49:9
**Santorum**
17:21
18:15 22:1
24:18
27:12,12
67:10,11
74:23
170:6
**SAT** 121:5,6
**saved** 139:10
**saw** 43:18
100:5
141:8
**saying** 32:11
36:14

101:17
107:15
108:3
143:19
144:21
156:21
165:5
**says** 15:7
29:10
31:22
55:11
166:23
168:6
**scheduling**
25:20
**scholarship**
121:6
**school**
120:25,25
122:9
**schools**
121:4
**scrambled**
149:22
**screw** 32:15
**screwed**
32:13
**script**
177:22
**scumbag** 30:9
**sec** 45:16
**second** 7:11
77:6
122:16
140:14
**secondary**
69:21
**secure**
171:10
**see** 45:7
60:16 77:6
84:9 108:3
111:6
113:21
117:7
138:8
139:2
143:13
156:14
161:18

165:20
175:17
178:9
**seeing** 134:9
162:23
**seen** 8:15,16
8:23 122:3
177:24
178:3
**Select** 133:3
**semester**
121:1
**Senate** 88:25
**senator**
17:20 18:6
18:11,15
21:13,20
24:8,11,15
24:18
39:24 41:4
47:25
66:23 69:1
69:5,5
74:6,14,17
74:20
**send** 32:19
35:5 67:18
101:12
148:25
162:4,16
177:25
**sending** 96:2
153:5
**sense** 53:14
72:21
96:15,20
99:13,18
101:16
129:1
135:17
144:20
158:6
161:2
162:19
**sent** 8:21
29:15
32:10 68:5
70:3 96:22
102:7
177:19

| | | | | |
|---|---|---|---|---|
| 183:11 | 108:17 | 36:25 37:7 | 20:16 22:5 | 101:4 |
| **separate** | **shops** 177:21 | 37:9,13,20 | 22:19 24:1 | 102:2,11 |
| 54:5,8 | **short** 92:8 | 39:6,6,7 | 24:10,14 | 103:9,10 |
| 147:6 | 93:19 | 39:19,21 | 24:17,20 | 104:1,11 |
| **separated** | 175:7 | 40:4,12,24 | 24:23 25:2 | 104:18 |
| 50:12 | **should've** | 40:25 | 25:12 26:2 | 107:5,7 |
| **separation** | 22:16 | 41:14,24 | 29:18 33:3 | 112:1,13 |
| 30:17 | **show** 32:1 | 44:1,4 | 36:13 38:4 | 113:5 |
| **September** | 60:18 76:1 | 45:1,3 | 38:7,12,23 | 115:23,24 |
| 1:16 2:9 | 82:14 | 50:13,24 | 38:24 39:9 | 117:3,7,9 |
| **sequence** | 140:12 | 51:1 52:2 | 39:13,24 | 117:23,24 |
| 184:15 | 165:13 | 53:7 57:6 | 42:4 43:2 | 118:2,21 |
| **series** | **showed** 49:18 | 57:18 | 43:12 45:5 | 118:24 |
| 168:24 | **showing** 8:10 | 58:11,14 | 47:24 48:5 | 119:12,21 |
| 173:12 | 29:16 86:2 | 58:16 59:5 | 48:15,21 | 120:9,13 |
| **serrated** | 92:24 | 65:6 76:21 | 49:25 | 122:8 |
| 178:1 | 94:21 | 77:19 | 51:11 | 123:25 |
| **Services** | 140:6 | 82:13 | 52:13 | 124:16 |
| 101:21,21 | 172:10 | 93:24 | 53:25 58:8 | 125:6,18 |
| **set** 5:14 | 176:11 | 94:10 | 59:10,15 | 126:9,11 |
| 11:20 27:5 | **shows** 82:11 | 96:21 | 59:19 | 126:15 |
| 100:9 | 82:12 | 100:1,10 | 60:13 61:4 | 127:1,13 |
| 126:23 | 108:16 | 107:21,24 | 61:9,14,23 | 127:21 |
| **setting** | **shrugs** 12:3 | 111:1 | 61:24 62:2 | 128:8 |
| 106:7 | **sign** 49:8 | 116:19 | 62:9,20 | 129:7 |
| **settle** 31:18 | 50:20 | 119:7,25 | 64:18 70:2 | 132:11 |
| **settled** | 52:19,20 | 121:16,24 | 70:12 71:2 | 133:15,23 |
| 29:24 | 53:9,11,11 | 122:13,18 | 71:10 72:1 | 135:3 |
| 109:6 | 53:18,20 | 123:19 | 74:5,12 | 138:11 |
| **seven** 36:19 | 54:12,15 | 124:7 | 75:8,11,17 | 141:12,17 |
| 117:16 | 54:16 | 129:10,11 | 75:20 | 141:18 |
| **shape** 150:22 | 102:6 | 129:18,19 | 76:10 77:9 | 142:5,22 |
| **shareholder** | 103:1,17 | 129:25 | 78:14,17 | 144:7,16 |
| 13:14 | 103:18 | 133:10 | 78:22,25 | 146:24 |
| **sharehol...** | 108:4 | 134:6,20 | 79:3,7 | 149:7 |
| 13:10,12 | 137:18 | 135:9,14 | 80:9,12 | 152:7,8,9 |
| **Shawn** 23:22 | 139:5 | 140:18 | 81:2 82:18 | 154:12 |
| 29:25 55:1 | 143:1 | 148:5 | 83:17 84:1 | 155:25 |
| 56:9 67:7 | 145:9 | 154:10 | 84:11,18 | 156:2,6,21 |
| 67:8 95:7 | 147:19 | 155:22 | 85:4,16 | 157:5,17 |
| 96:5 | 154:16 | 156:6 | 89:19 | 157:25,25 |
| 107:23 | 173:11 | 175:16,23 | 92:11 | 158:2,7,14 |
| 108:1,13 | 177:3 | 175:24 | 93:25 | 158:17,18 |
| 130:17 | **signature** | 176:4,5,19 | 94:12 | 159:2,7,25 |
| **shelter** 88:5 | 10:3,9 | **signatures** | 96:17 | 160:6,12 |
| **Shirley** | 13:20,23 | 10:11,14 | 97:20 98:5 | 160:18,19 |
| 164:7 | 16:2 20:9 | 10:17,25 | 98:13 99:1 | 160:20 |
| **shocked** | 23:22,24 | 11:1,4 | 99:20 | 163:15 |
| 30:11 | 23:25 | 17:22 18:5 | 100:5,13 | 169:25 |
| **shoddy** | 25:22 | 18:6,12 | 100:15 | 170:14 |

173:23
174:1,8,12
183:25
**signatur...**
60:12
**signatur...**
33:9
**signed** 48:17
48:22 51:8
51:8,12
53:17
63:15
76:11,15
90:23
128:18
137:13
138:2,16
139:8
140:23
173:4
176:8
179:5
**signing** 49:5
52:18 53:7
154:11
158:12
**signs** 115:21
146:8
**similar**
57:21
**Simpson** 2:6
187:4,9,23
**simultan...**
65:16,17
78:7 80:5
**singing**
49:16
**single** 50:4
62:22
144:4
**sir** 9:20
13:16 19:2
21:15,19
33:1 40:3
57:13
64:25 72:9
76:9 97:18
98:18
102:17
105:19

133:9
136:2
176:10
**sit** 110:25
**sitting**
116:9
143:6
**six** 28:6
36:19
47:16 83:6
116:21,22
117:16
166:4
167:16
**size** 30:16
**Slayer** 101:2
**slow** 44:9
50:6
174:24
**small** 88:7
98:8
127:16
184:1
**smaller**
180:5
**smarter**
108:13
**smoke** 122:6
**smoking**
122:2
**SMU** 121:8
122:9
**solid** 100:11
**somebody**
10:16,17
23:16
38:14
76:15
98:11
100:19
101:8
105:5
128:18,19
132:9
151:10
168:17
184:8
**someone's**
174:10
**someplace**

11:14
**soon** 22:8
70:4
**sorry** 13:11
19:21 20:2
20:3 21:14
25:9,14
45:5,13
50:13
53:22
58:10
59:18,25
64:21
72:13
88:10
106:16
118:3
130:4
154:14,20
**sort** 16:8
38:10
40:18 55:7
65:5 71:9
109:23
135:4
184:19
185:11
**sorts** 16:24
**sounds** 34:13
48:6
106:25
**source** 119:3
131:5
136:16,19
162:3
173:6
178:19
**sourced** 90:6
90:15
105:21
106:10
119:11
135:13
136:9
165:7
173:20
**sourcing**
41:10
101:10
**South** 19:8

25:5 35:8
72:4,4
**speak** 44:13
136:14
142:6
159:9
**speaking**
177:2
**specific...**
15:3,7
**spell** 28:4
33:13
105:8
**spend** 37:17
113:8
149:23
**spending**
145:21
**spilling**
156:4
**spin** 148:13
**split** 104:20
**spoke** 29:5
66:6 91:6
132:5
185:4,4
**sporadic**
123:2,3,9
123:19
**spring** 53:18
**Springs** 9:14
9:19
**Square** 2:8
3:6,12
**stack** 69:9
69:16
**staggered**
68:24
**standard**
86:9 95:19
**standpoint**
181:1,2
**stapled**
62:23 63:8
63:13,19
**Star** 171:22
**start** 30:12
41:10 66:1
70:19 81:3
107:14

111:8
113:10,11
156:4
182:5
**started**
45:10
56:14 70:9
109:17
111:9
113:13,16
120:1
122:2,21
122:22
124:11,25
126:4
**starts** 68:22
**startup**
113:12
**state** 8:18
9:11 14:16
14:20
16:24
19:10,11
26:8,8,12
26:12
41:12
44:23 56:2
63:19,24
65:8,8,8
70:23 73:2
78:17
79:19
82:13,21
84:23
86:22,23
88:20 90:6
90:14
95:10
101:14
106:12
111:5
138:20
143:17
149:12,13
152:4,14
153:25
181:14,16
**stated**
187:15
**statement**

63:13 64:1
**states** 1:1
17:20 18:1
18:5,11,15
19:1 20:15
25:10 27:6
27:21
38:12 41:7
41:11 65:4
67:17,20
68:9 69:7
69:14,18
72:10,11
73:1,8,18
74:6,18,21
75:3,6
77:23
78:14,16
78:21 85:4
85:7,14,15
96:13
97:14,23
97:24 98:2
98:4
110:11,15
113:24
114:10
133:14
163:2,4,10
163:12,13
163:16
164:9,16
169:8
170:4
181:17
182:8,10
184:7,15
**state's**
167:3
**state-wide**
100:4
**status** 99:17
**statute**
53:13,19
**stay** 12:2
79:12,16
80:2,11
83:8,14
84:3,25
85:10,18

134:11
184:25
185:8
**stayed** 79:14
82:1 83:21
83:24 84:4
84:4,7
127:3
**staying**
81:23
102:15
**Stein** 167:4
169:21,24
**stems** 52:9
**stiffed**
123:17,21
**stop** 115:12
141:14,17
141:18,18
141:19
142:4,9,15
142:17
143:14,24
144:3,16
145:11
157:8
171:22
**stopped**
32:18
141:14
142:4
143:17
164:6
**stopping**
179:7
**store** 122:7
**straight**
15:17
68:18
113:19
**strategies**
99:17
**strategy**
104:14
108:13
115:18
**Strauss**
173:20
**Strawberry**
2:8 3:12

**street** 56:7
79:25
146:4
**stricken**
61:25 62:3
64:17
**strike** 43:10
86:20
88:18
134:24
139:24
**struck** 44:20
59:15 60:9
63:16
**structure**
71:21
**stubborn**
30:20
**stuck** 159:16
**stuff** 13:25
14:1,12
15:23 16:8
16:21 17:4
17:16,17
26:12,19
26:20,24
27:1 29:21
40:18 43:4
55:5 56:23
76:19
77:17
82:11,12
88:9,11,16
91:12,24
94:9
100:17
108:23
111:1,13
115:19
119:6
124:22
127:9
128:23
129:11,12
131:1
133:18
134:2
149:9
150:2
153:24

164:15
165:23
166:11
171:3
175:20,22
180:7,12
183:8,24
184:20
**stuff's**
171:1
**subcontract**
30:6 36:24
66:12,17
66:23 67:2
67:11,16
101:9,18
103:21
104:4,6
134:24
**subcontr...**
21:14,23
21:24 23:5
23:18,19
23:20,25
30:7 66:25
67:7 98:10
98:11
100:2,19
101:8,19
103:24
104:7
164:18
183:4
184:7
**subcontr...**
21:2,21
23:3 30:16
31:10 67:1
98:9,9
130:14
**submission**
62:4
**submit** 38:13
38:22
**submitted**
48:12 60:8
61:4,23
62:1 170:2
**sub-out**
67:19

**succeed**
157:12:1
**successful**
104:23
145:17
**successf...**
122:10
**sucky** 150:5
**Suite** 3:5
**Sumbles** 28:7
35:13 46:9
**summer** 18:1
31:11
32:14,15
33:8 36:19
36:22 97:9
97:12
121:23,23
122:25
129:4
135:18
163:5,16
164:11
182:25
**Sunset**
101:21
**super** 121:5
**supporter**
41:4
**supporting**
162:19
**supposed**
109:22
116:3,6
120:15
126:2,23
127:6
169:24
172:17
**Supreme**
114:21
115:6,22
117:4,10
125:15
133:18
134:3,14
134:21
170:17
**sure** 9:5
11:21,25

12:16,22
14:11 18:4
24:8,10
26:7,15
27:20 34:3
37:6 39:10
39:22
40:19 43:8
47:3 48:21
49:25
50:12,23
51:2,8,10
57:10,10
57:11,15
61:8 74:2
75:19
78:24 84:9
84:24 91:5
91:6 97:7
100:18
108:2,8,9
108:15
109:22
110:10
111:6
114:15
118:20
124:17
125:12,12
125:13
127:19
128:17,22
137:2
138:18,22
139:1
142:13
143:16,21
145:17
150:25
152:9
154:5
157:6,11
157:13
160:9,13
160:22
162:13,13
162:13,13
168:18
172:3
178:20

180:20
186:3
**suspect**
  38:19
**suspend**
  186:7
**suspicion**
  175:13
**switching**
  80:22
**sworn** 7:3
  62:8
  187:12

——— **T** ———
**table** 12:25
**take** 8:11,11
  9:3 11:11
  12:5,23,25
  39:22
  50:23
  60:19 70:8
  72:13 76:3
  78:3 86:3
  93:16
  94:22,22
  95:5
  114:16
  115:10,11
  125:3
  140:7
  154:3
  157:4
  161:19,25
  175:3,12
  185:16
**taken** 2:3,5
  22:17
  93:19
  175:7
  187:14
**talk** 13:3
  16:6,11,12
  17:9,14
  27:3 43:6
  77:18,18
  77:22
  78:12
  87:22 89:4
  89:18

97:16
126:5,8
128:7
141:2
161:17
165:21
179:2
**talked** 56:25
  87:13,14
  133:13,19
  134:23
  149:8
  150:17
  152:2
  161:3
  165:15,18
  165:20
  166:18
  167:1,20
  168:1,2,25
  169:2,4,21
  169:23
  170:6,15
  170:19
  171:21
  172:1
  175:21,22
**talking** 29:7
  55:8 58:19
  91:8 92:25
  93:13
  107:6
  108:12
  141:18
  146:4
  159:21
  165:23
  174:15
**talks** 86:23
**Talton**
  134:13
**tanked** 124:9
**target** 55:19
  56:4
**taught** 56:15
**Teach** 75:13
**team** 28:12
  28:14
  152:22
  173:19

**teamed**
  127:25
  128:2
**technically**
  32:12 66:8
  103:24
  118:18
  155:3,10
  158:9
**Ted** 17:17
  53:11
  113:18
  168:25
**tell** 12:15
  29:9 57:9
  60:25
  65:13 91:7
  110:3
  111:24
  120:24
  156:13
  172:14
  176:16
**template**
  95:21
**ten** 28:7
  93:17
  94:23
  104:25
  105:1
  110:5,6,7
  147:1
**terms** 71:25
  87:8
  117:23
**tertiary**
  69:21
**Tessator**
  63:4,5
**Tessatori**
  63:5
**testified**
  7:3 11:8
  52:9 68:21
  104:18
  123:5
  182:7,24
**testify** 7:12
  9:10 64:6
  187:12

**testimony**
  9:7 42:25
  105:4
  168:6
**Texas** 9:14
  11:12
  35:15
  64:24 88:1
  88:2,5
  89:13,14
  114:22
  117:20,21
  118:5
  125:22
  134:18,21
  170:17
  171:23
**text** 96:23
**texts** 33:23
**Thank** 11:18
  19:23
  25:15
  64:22
  124:6
  140:1
  144:25
**Thanks** 76:2
**that'd** 47:3
  48:3
**theoreti...**
  113:15
**they'd**
  131:24
  158:16
  159:23
  177:15,16
**thing** 12:24
  34:5 42:7
  50:4,4
  63:20,22
  67:10
  71:12
  93:18 97:1
  97:6,8
  103:25
  108:6
  113:3
  114:22
  115:7
  119:5

120:14
147:10
162:21
164:13
177:22
180:25
181:1,7
**things** 16:24
17:8,15
65:4 87:17
88:6,7
112:20
144:12
178:11
185:12
**think** 8:3
9:2 11:3
14:25
15:24
17:25 18:1
18:8,10,23
19:13
21:12 22:6
26:11
28:23
33:14
34:17,21
36:7 38:15
40:6,21
41:18 44:4
45:3 48:2
48:3 51:20
52:7 55:8
56:24 64:4
64:13
68:21 71:9
71:14,19
71:19,21
79:15
83:25
84:12,13
84:17
89:16
90:19
91:20,24
94:25,25
95:17
96:23
100:6,6
101:1

103:25
104:25
105:15
107:10,23
108:5
110:5
111:15
112:19,22
118:10,12
119:15
120:4
122:16
123:12,13
123:25
128:25
129:21
132:7
133:16
134:7,16
136:5,9,11
137:9,18
138:16
139:22
150:1
157:16
158:4
161:20,23
164:5
165:1,8,11
165:18,22
166:5
167:3,20
167:23
169:12
172:13
174:6
180:9
181:24
182:7,22
182:25
183:24
184:15,18
**thinking**
128:24
157:17
185:24
**thinks**
107:18
178:14
**third** 9:3

19:4
132:24
**Thirteen**
140:2
**Thompson**
164:7
**thorough**
57:8 94:8
178:22
**thought**
54:24
59:24 60:4
77:13
86:16 87:3
108:12
120:20
131:14
137:24
169:15
184:8
**thousand**
160:25
**Thousands**
51:25
**three** 28:2
33:21
44:22 45:2
48:2 88:6
91:12,15
91:17
92:13
94:17 98:2
100:2
132:2
149:21
150:1
166:3
167:4
172:21
173:17,23
173:24,25
**threw** 100:5
**throw** 111:5
174:14
**thumbs** 116:9
**Thursday**
185:8
**ticking**
90:13
**Tim** 33:11

36:6 46:21
**time** 21:5
31:21 32:5
34:4 38:24
43:24
44:13
48:19 58:2
60:19
65:19
66:18
70:19
72:19 74:3
78:7,11
80:10 87:7
92:9,10
101:15
110:25
111:2
113:16,18
114:17
120:1
121:18,22
122:3,21
125:15
127:11
132:25
138:5
139:10
142:21
143:14
149:23
155:14
161:19
168:13
173:12,14
174:21
183:2,3
187:15
**timeline**
73:10,16
113:21
118:15
127:9
182:20
**timelines**
68:20
73:19
**timeline's**
167:24
**times** 9:25

10:2 29:16
48:2 49:23
78:5
122:23
141:11
**today** 58:5
101:22
143:6
166:6
**today's** 7:9
**Todd** 89:9
**told** 9:1
30:11 32:1
37:25 42:1
49:19
56:11 63:2
70:8 77:14
91:20 92:6
92:12
106:10
107:22
131:2
136:8
141:14
142:4,5
147:14
149:10
151:2
153:3
171:18
173:13,15
**Tom** 15:18
**tomorrow**
7:19 29:2
29:3 34:1
58:5 73:14
103:8
153:20
178:1
180:18
184:17
185:1
186:8
**tonight**
101:6
153:19
165:12
177:25
179:9,20
**tooth** 10:20

**top** 32:13
70:21
**topics** 7:13
**torn** 134:10
**total** 61:23
100:7
116:5
**touch** 150:7
151:11,12
177:15
**tough** 26:10
**town** 186:17
186:19
**to-door** 39:9
**train** 56:12
58:1 75:9
114:13
135:18
**trained**
49:17 57:7
57:9 58:1
75:14
135:19
**training**
56:25 57:1
57:3,21
58:2,4
**transcript**
1:22 187:9
187:10
**transferred**
121:2,8
**transpor...**
114:12
**Trautman**
158:24
159:7
**travel** 92:10
148:12
**traveling**
78:9,12
**Travis** 88:3
**tremendo...**
44:9
**Trent** 14:4
14:14,14
171:4,6,6
171:14,15
**Trenton** 1:6
1:15 2:3

4:4 7:3
9:12 13:14
43:12
77:20
114:18
116:12
117:22
118:1,21
118:24
119:20
133:17
139:16
187:8
**tried** 62:24
84:7 90:17
92:5
104:16
107:4
126:20
147:13
165:14
**trip** 78:3
**true** 29:11
29:12 64:1
73:4
132:17
155:8
166:1,5
170:9
187:10
**Trump** 22:5,5
22:20 23:2
24:21
27:15
74:25
113:8
162:19
170:15
**trust** 22:13
22:14
**truth** 12:2
187:13,13
187:14
**truthfully**
12:21
**try** 21:17
41:10
53:17
57:18
72:15

80:16
81:13
114:7
135:19
136:4
149:4
158:2
179:8
180:24
181:21
**trying** 10:24
41:6 42:14
75:15
108:16
111:12
125:3
128:7
143:1
178:19
**Tuesday** 2:9
**turn** 108:23
140:10
**turned** 61:15
62:20
100:14
113:18
**turn-in**
174:11
**Twenty** 147:3
**twice** 10:1
78:4
**twiddling**
116:9
**two** 17:1
26:17 28:2
30:19 61:6
65:20 68:6
69:14
72:11
74:20
75:19
84:14
87:23 90:9
92:12
100:2,11
100:20,24
103:1,16
103:18
111:18
113:5

114:7
115:24
116:1
117:4
134:5
149:20,25
160:25
166:3
169:14
170:12
174:17,25
**two-page**
58:4
**type** 16:21
82:24
103:23
177:22
**typed** 138:24
**typical**
86:13,17
**typo** 94:3

_____ U _____

**U** 86:16
**Uber** 119:2
**Uh-huh** 35:16
40:1 75:12
78:24
99:19
124:3
128:12
135:23,25
141:13
142:23
150:16
167:6
168:23
169:1,3
170:16
181:15
**uh-huhs** 12:4
**Uh-uh** 25:23
**uh-uhs** 12:4
**underneath**
47:5,6
**undersigned**
2:5
**understand**
12:14
14:25 16:8

29:12 34:7
38:10,11
39:23 41:5
49:7 55:9
64:5
100:18
107:3
118:21
131:13
144:21
145:2
**understa...**
12:16
107:1
173:5
**understood**
12:9,20
160:15
184:6
**unfortun...**
92:8
**unique** 38:15
**UNITED** 1:1
**update** 29:3
34:1,1
**upside** 61:20
**use** 14:6
63:24
71:10
86:19
101:4
131:5
148:12
178:18
179:20
**uses** 26:1
135:10
**utilized**
92:5
**U.S** 62:7
63:23

_____ V _____

**valid** 38:24
39:5,6,7
39:12 62:1
81:2
**validate**
39:11 59:4
**validity**

58:8,12,12
58:17,19
59:5
183:10
**variable**
39:13
**various**
17:19 26:1
65:3 78:16
113:24
**verbal** 106:8
110:18
**verbally**
12:1
**verifica...**
62:6
140:11
**verified**
175:14
**Vermont** 18:7
20:22
24:11
65:12,18
68:4,5,8
68:12,14
78:2,3
79:3,4
169:5,6
**versus** 14:14
52:4 99:20
**Victory**
101:1
**view** 29:13
29:13
**views** 142:6
**Virginia**
19:12 25:7
35:1,3
38:20
99:24
103:4,20
112:6
169:22
**virtually**
21:5
**volunteer**
77:2
123:20,20
123:22
**voluntee...**

126:4
**volunteers**
99:2 149:8
149:16
**Vonne** 91:23
148:22
150:14
162:3,10
162:12
**voter** 49:21
49:22
50:18 54:1
56:5,6
57:12,14
57:16,24
136:24
145:8
**voters** 39:10
50:8 55:6
55:12,13
76:11
122:10
136:23
154:15
177:3
**voting** 139:2
**vs** 1:8

————— W —————
**W** 82:24
**wait** 21:15
**waiting**
128:6
**walk** 22:12
144:10
147:11,11
**walking**
49:20
**wall** 149:22
**Walmart**
144:15
153:2
**want** 9:5
10:20
11:23 12:1
12:16 13:1
16:6,11
26:8,15
34:6 52:20
53:4 57:8

64:6,6
72:15
77:11,12
98:2
100:18
104:17
108:2,5
118:20
132:6
134:10
140:12
143:16
147:16
149:14
160:17,22
160:24
164:25
165:2
166:4
172:3
177:3
179:10
180:9
181:13,17
181:20
**wanted** 10:22
49:24
64:20
69:23
75:14
89:21 90:4
90:15,18
92:9
103:23
104:1,15
107:22
108:8
120:18
123:22
124:7
149:7
161:17
162:16
174:20
**wanting**
16:19
**Warner**
159:17
**Washington**
19:9,10

25:6
**wasn't** 17:5
45:17 47:1
50:24 58:9
60:11
63:18
67:19
79:25
102:22,25
117:24
122:23
131:5
133:11
134:7
168:13
170:3
179:5
183:22
**waste** 34:3
**water** 87:24
**Wausau** 83:1
**Wausauwee**
82:23
**way** 15:17
26:7,9
33:14
38:13 63:1
72:5 73:8
74:15 87:4
87:6
101:10
108:1
109:23
115:15
117:6
131:7
147:13
157:7,11
166:14
172:1
179:16
180:25
187:19
**ways** 37:2
55:23
**website** 17:7
**week** 32:3
61:12 90:8
90:13
128:6

149:18
174:21
**weekend** 66:6
**weeks** 111:18
114:7
149:20
**weird** 21:3
77:13
101:20
**Weld** 99:11
**went** 29:22
29:23
30:13,22
49:18
53:24
54:19 56:4
68:9,10,17
68:17 69:1
70:5,24
72:17 78:2
79:10
84:19
103:3
111:20
120:25
121:1,7
122:24
125:25
126:25
127:1,14
128:25
129:3
134:13
138:19,22
150:19
153:6,10
157:15
163:12
171:9
172:1
173:21,22
**weren't** 17:4
17:5 39:11
49:23
69:23
79:23
123:24
128:18
142:18
150:3

Page 36

157:24
we'll 16:12
16:20
17:14
19:16  32:2
40:24
41:18
47:19
60:16
72:19
77:18
117:8
162:1
165:20
185:19,23
185:24
186:7
we're 8:3
26:21  29:1
29:7  41:6
42:12
48:21  50:8
50:15,16
52:10
73:14
81:21
89:22
109:18
110:24
111:2,3,4
111:20
112:2,15
112:23,23
134:2
159:21
160:10,13
161:16,23
162:20
174:22
180:14,14
186:19
we've 7:19
9:4  13:25
33:21  88:6
135:19
149:15
161:20
165:15,18
185:22
wife 28:12

28:14
William 28:3
35:7  46:4
84:13
99:11
158:24
159:22
164:25
willingness
184:25
Wilmont's
96:5
Wilmoth
23:22
29:25  55:1
67:8  95:7
Wilson
105:13
106:4
107:1
108:20
window
112:17,18
112:19
Wisconsin
18:22,24
19:12
24:24  25:7
70:4,6,7
82:16
169:15
wish 54:9
74:15
164:25
Witmer 26:13
28:1  29:5
34:7,11
41:15
42:15
45:16
116:19
125:2
135:3
152:19
164:21
184:13
Witmers
39:16
156:20
witness 4:4

37:14
40:17
51:15,16
52:13
56:13
90:19  91:4
91:9
102:20
105:4,17
106:4,21
127:23
128:1,11
130:4,11
130:23
131:7
132:4
137:14,15
138:1,15
138:24
139:5,6
145:4
147:6,25
149:5
154:18,21
158:15,24
160:3
161:8
173:19
177:2
187:12
witnessed
48:15,16
witnesses
29:23
37:17  40:8
41:10  44:7
52:1  54:20
58:2  89:24
91:21  92:7
93:7
106:11
107:21
131:5,16
136:4,20
138:20
146:21
154:10,25
155:9,24
156:18
157:22

158:20
159:23
172:21
176:19
177:7,18
178:19
witnessing
49:23
105:5
156:12,18
157:3
witted 50:6
Won 88:5
word 95:3
135:13
177:5
work 10:3
13:17
16:10  19:3
19:7  27:5
27:9,12,15
27:18  30:6
30:19
31:17  32:7
32:24
36:15  37:3
39:2,4
42:4  47:22
48:14,19
50:3  66:15
66:17
67:13  68:1
76:20
86:21
88:19,22
89:20
90:15
97:17
100:11
101:8,23
103:5
104:6
109:15,16
113:24
114:2,17
114:18,18
118:18,25
119:24
120:18
124:18

125:1
126:1,2,21
127:3
130:2
131:7,14
131:22
132:18
133:10
134:18,21
137:17,18
137:22
139:13
147:16
148:9
159:4,18
159:20
160:8,23
160:23
161:1
163:1,2
164:9,23
166:8,21
173:16
182:4,7,11
182:20
184:1,1
186:13
worked 16:7
16:17
27:24
29:24  33:6
33:7,8
41:7  42:1
42:3  65:1
65:3,4
66:10  72:6
82:22  97:8
97:11
103:22
104:8,8
106:9
107:16
120:10
128:3
129:23
138:4
150:21
161:9,15
163:4,9,10
163:15,19

163:22
181:8,18
181:20,22
182:1
183:2,3,6
183:7
**workers** 69:4
**working**
  15:20
  17:18,19
  26:21
  30:10,12
  42:10 51:5
  66:9 72:1
  80:5,7
  87:8 100:3
  100:16
  112:7
  115:3
  122:22
  123:6
  124:23
  125:1
  129:5
  132:9
  147:3
  150:21
  155:5,9,13
  156:2,14
  163:2
  168:8,10
  168:14,14
**workload**
  161:1
**works** 66:6
  72:5
**world** 36:18
  39:16,16
  39:17 87:4
  156:20
**worst** 93:10
**worth** 107:19
**wouldn't**
  64:1 107:7
  125:7
  139:6
  147:6
  155:24
  158:1,1
  177:16

**would've**
  54:9 70:16
**Wright** 28:3
  28:4 35:7
  46:4 84:13
**write** 73:20
  109:1
  172:3
  179:10,11
  179:13
**writes** 61:20
**writing** 17:4
**written**
  36:13,18
  43:22 92:3
  106:3,14
**wrong** 30:15
  32:2
**wrote** 29:18
  31:23 32:6
  88:13
  119:16
**Wyoming** 19:9
  25:6
**W-R** 28:4
**W-R-I-G-H-T**
  28:5
**W-9s** 165:10

        **X**

**X** 4:1

_____
        **Y**
_____

**yeah** 8:17
  10:4 11:4
  15:23
  18:10 19:6
  19:19 20:7
  21:17
  23:20
  26:11 27:8
  27:17,23
  28:19,23
  31:7,9,16
  33:17,19
  34:10,14
  35:5,24
  37:21 38:6
  38:6,21
  39:14

40:16
41:23 42:9
42:11 43:3
47:9,14,19
48:6,16,19
48:24 49:1
49:10,12
50:24
51:18,18
51:24,24
54:21
55:14,23
55:23,24
56:21,24
57:4 60:6
60:23 61:9
61:21
62:16 63:7
64:7,11
65:18
67:14,14
68:14 70:9
71:19 72:6
72:18,20
73:4,17,23
74:7,7,12
74:19
76:16,21
77:5 78:17
79:18 80:6
80:10,24
81:17 83:4
83:6,10,13
83:25 85:2
85:12,12
85:17
86:11,13
86:17 87:2
87:10,15
87:21 89:6
89:8,22,25
90:1 93:4
93:9 94:2
94:13,25
95:3,17,17
95:23,23
96:1,16,20
98:4 102:9
102:11,19
104:20,25

108:3
109:14,18
110:10,12
110:21
111:15
113:23,23
114:2,5
116:14,14
116:16
117:21
119:8
121:18
123:3,15
123:23
125:7,21
125:23,23
126:19,22
127:6,14
127:22,24
128:10
129:8
130:18,18
130:20,24
131:19,21
132:1,17
132:21
133:6
134:19
136:15,21
137:20,23
138:14
139:7,7,17
140:21
141:1,7,8
141:18
142:10,12
142:13
143:10,22
144:21
145:18
146:23
148:20,24
151:9,9,24
152:14,16
153:18,23
153:24
154:5
155:7,10
155:12,16
155:19

156:22
157:23
158:4,9,18
158:22
159:24
160:2,8,13
160:16,19
160:21
161:6
164:8,12
165:22
166:10,10
166:20,20
167:23
168:2,16
168:21
169:9,23
170:7,9,14
171:8,17
172:24
176:21,24
177:1,14
178:10,20
179:1,6
180:3
181:13,19
181:23
182:15,22
183:4,16
183:20
185:2,14
**year** 14:6
  16:23
  17:17
  109:12,14
  118:16,18
  120:3
  121:22
  122:20
  130:2
  171:2
  184:10
**years** 122:25
**year's**
  139:14
**yep** 12:13
  13:2 24:16
  24:19,22
  27:11,14
  29:6 76:16

**yesterday**
  29:5 105:3
**Yoachum**
  146:18,18
  146:19
  147:20
  152:5
  174:20
**York** 19:16
  25:5
**y'all** 33:18
  57:5 63:24
  149:14
  171:12
  177:24
  178:10
  180:19
**y'all's**
  63:10

---

**Z**

**Zahm** 100:25
**Zimmerman**
  14:3 88:12
**zip** 9:21

---

**$**

**$1** 107:24
**$1,000** 30:22
**$1,500** 31:24
  32:6
**$10** 32:22
  106:14,20
  108:1
  130:12
  155:17
**$10,000**
  116:5
**$2** 40:23
**$2,000** 31:23
**$20** 88:4
  160:25
**$20,000**
  149:15
**$22,500** 30:1
**$3** 32:20
**$3,000**
  120:19
**$3.50** 41:23
**$30** 30:1

---

**$30,000**
  115:10
  122:5
**$300** 109:8
**$4** 32:20
  45:3 58:11
**$4,000**
  120:19
**$400** 109:8
**$450** 32:5
**$5,000** 116:5
**$500** 149:17
**$6** 40:6,6
**$6.50** 40:23
  41:13
  131:9
**$7** 40:6,12
  40:13
  131:9
**$8** 44:4
**$9** 32:22
**$900** 29:10

---

**1**

**1st** 111:15
  111:16,16
**1,000** 22:7
  75:16
  104:1
  113:5
  170:3,14
**1,200** 48:3
**1,300-so...**
  121:6
**1,400** 121:5
**1,500** 100:15
  102:11
  104:21
  183:25
**1:16-CV-...**
  1:8
**10** 94:18,22
  94:25
  119:11
  123:10
**10,000**
  100:12
  112:1
  160:20
**10:00** 185:24

---

**100** 58:17
  70:13
  117:8,9
  185:10
**11** 94:18,22
  95:11,21
  96:16
**11,000** 48:11
  48:13
**11:00** 2:10
**110** 5:13
**12** 109:25
  152:1
**12,000** 48:12
**12,315** 61:23
**12,500** 100:9
**13** 116:23
  140:3,7
**14** 116:11,22
  116:24
  150:24
  172:7,11
  174:18
**140** 5:14
**15** 61:22
  165:14
  175:8,12
  176:3
**15th** 62:5
  68:23 70:5
**16** 118:19
  176:12,13
**17** 18:1
  154:17
  169:12
**17120** 3:13
**172** 5:15
**175** 5:16
**176** 5:17
**18** 175:20
**185** 4:6,7
**186** 4:7
**187** 4:8
**19** 175:22
**19348** 3:6

---

**2**

**2,000** 100:14
**2,500** 104:22
**20** 75:10

---

**100:7**
  119:11
  147:3
**200** 149:15
  151:1
**200-some...**
  157:17
**2006** 34:19
  120:4,5,8
  121:16,25
  122:13,21
  166:6
  167:21,23
**2007** 122:18
  123:1,10
**2008** 166:6
  167:17
**2010** 121:15
  123:1
  124:2,15
  124:18
  125:12
**2011** 125:5
  125:12,13
**2012** 124:25
  125:10,11
  125:25
  126:8,13
  126:25
  127:5
  128:21,25
  129:3
  132:8
  133:10,14
  166:18,21
  167:10
  168:4
**2013** 13:5
  114:25
  116:11,22
  129:1
  133:17
  134:18,21
**2014** 13:11
  13:24 16:3
  16:15
  20:12
  109:10,12
  109:17
  114:16,24

---

**114:24**
  115:7
  117:18,19
  117:22
  118:3,9
  119:24
  133:22
  134:23
**2015** 10:7
  14:4 20:9
  52:4
  109:15
  118:1,2,11
  118:12,20
  118:22
  171:1
**2016** 1:16
  2:10 17:23
  20:5 61:22
  62:5 87:7
  88:20
  95:13
  102:16
  109:13
  114:11,16
  118:24
  119:5,20
  155:14
  169:22
  170:22
  171:23
  182:14
  183:7
**2017** 139:14
**25** 45:8 47:9
  174:8,12
**26th** 68:22
  68:24
**27** 1:16 2:9
**27th** 90:10
**28th** 90:10
**29th** 90:10

---

**3**

**3,000** 160:21
**3,792** 61:24
**30** 33:11,20
  43:4
  174:23
**30(b)(6)** 7:9

**30,000** 71:2
**30-page** 60:8
**300** 48:1
  103:25
**35,000** 99:20
**350** 169:24
**3800** 9:16,19

**4**

**4** 8:3,4,11
  8:16
**4,000** 48:4,5
  104:18
**4,500** 102:13
**4:30** 186:23
**40** 33:11
  43:4
  174:22

**5**

**5** 60:19,21
**5,000** 48:8
  98:25  99:2
  99:20
**5,600** 119:12
**50** 27:4,4
  154:1
  157:20
  174:23
**500** 22:7
  81:2

**6**

**6** 75:23  76:2
**6,000** 62:21
  119:12
**60** 5:6
**633** 180:6

**7**

**7** 4:3  85:24
  86:3
**7,582** 62:9
**70** 58:12
**700** 107:7
**705** 3:5
**75** 5:7
**7862** 0 9:22

**8**

**8** 4:3,6  5:5
  92:21,25
**8,454** 62:2
**85** 5:8
**873** 3:4

**9**

**9** 61:22
  94:18,22
  95:5
**9,000** 100:12
**9/27/16**
  187:8
**92** 5:9
**94** 5:10,11
  5:12

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BENEZET CONSULTING, LLC          :
*and* TRENTON POOL,              :          No. 1:16-CV-0074
            **Plaintiffs**  :
                         :          **Judge Kane**
         **v.**        :
                         :          *Complaint filed 01/14/16*

PEDRO A. CORTÉS *and*            :
JONATHAN MARKS,                  :
            **Defendants**  :          **Electronically Filed Document**

## <u>NOTICE OF DEPOSITION PURSUANT TO</u>
## <u>FEDERAL RULE OF CIVIL PROCEDURE 30(b)(6)</u>

TO:   BENEZET CONSULTING, LLC
       c/o Paul Anthony Rossi
       873 East Baltimore Pike, Ste. 705
       Kennett Square, PA  19348-1801

**PLEASE TAKE NOTICE** that, pursuant to Federal Rule of Civil Procedure 30(b)(6), Defendants Pedro A. Cortés and Jonathan Marks, shall take the deposition of an individual representative of Plaintiff Benezet Consulting, LLC, on the topics detailed in **Attachment "A." The deposition will be conducted on September 27, 2016, beginning at 9:00 a.m., and continuing from day to day until completed, at the Office of Attorney General, Strawberry Square, 15th Floor, Harrisburg, Pennsylvania 17120.** The deposition will be recorded by stenographic means before an officer authorized to administer oaths, and may be videotaped. Defendants provide notice that the



EXHIBIT

Def 4
9-27-16 CB

deposition may be used at the time of trial.  Benezet Consulting, LLC shall identify

the person(s) who will speak on its behalf on each topic listed in **Attachment "A"**

at least seven (7) days before the deposition.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Federal Rules of

Civil Procedure 30 and 34, the deponent is to produce at the deposition the

documents identified in **Attachment "B."**

**BRUCE L. CASTOR, JR.**
**First Deputy Attorney General**

By: _____

**KENNETH L. JOEL**
**Chief Deputy Attorney General**
**Chief, Litigation Section**

**NICOLE J. RADZIEWICZ**
**Deputy Attorney General**

*Counsel for Defendants*

**Office of Attorney General**
**Litigation Section**
**15th Floor, Strawberry Square**
**Harrisburg, PA  17120**
**Direct:  717-787-1179**
**Fax:      717-772-4526**
**mgiunta@attorneygeneral.gov**

**Date:  July 27, 2016**

2

## ATTACHMENT "A"

1.    Produce someone who is knowledgeable to testify about the operation and organization of Benezet Consulting, LLC, including, but not limited to, the nature of its business, its organizational structure, its financial viability, the day-to-day operations of Benezet Consulting, LLC, its employees or contractors hired to collect signatures, and the schedules of such employees or contractors.

2.    Produce someone who is knowledgeable to testify about Benezet Consulting, LLC's policies and procedures regarding the assignment of duties within Plaintiff's organization, including, but not limited to, the scheduling of assignments and projects, the assigning of employees and/or agents to work on assignments and projects, the chain-of-command related to assignments and projects, and the duties of employees and/or agents related to assignments and projects.

3.    Produce someone who is knowledgeable to testify about Benezet Consulting, LLC's policies and procedures regarding payment of wages and/or fees, and travel expenses, to individuals hired to circulate and/or witness nomination petitions.

4.    Produce someone who is knowledgeable to testify to the names of all employees, officers, owners and shareholders of Benezet Consulting, LLC.

5.    Produce someone who is knowledgeable to testify about the dealings (contractual or otherwise) between Benezet Consulting, LLC, and political campaigns, candidates, or delegates whereby Benezet Consulting, LLC was seeking to be hired, or was hired, by a political campaign, candidate, or delegate to gather signatures for the candidate or delegate.

6.    Produce someone who is knowledgeable to testify about the allegations set forth in the Second Amended Complaint.

7.    Produce someone who is knowledgeable to testify about the purported damages incurred by Benezet Consulting, LLC.

## ATTACHMENT "B'

**Please produce the documents listed below, dating from January 2013 through the present.** In answering the requests which follow, assume that all words used have their ordinary meanings except as provided in the next section entitled **"DEFINITIONS,"** or where context requires other interpretation.

## DEFINITIONS

1.  **Communications** – All inquiries, discussions, conversations, negotiations, agreements, understandings, meetings, telephone conversations, letters, notes, telegrams, facsimiles, advertisements, and any form of verbal intercourse whether oral or written.

2.  **Defendants** – Pedro Cortés or Jonathan Marks.

3.  **Describe or description** – when used with respect to a **document**, means to state the (a) name, (b) date, (c) author, (d) addressee, (e) subject matter, and (f) type of document, (e.g., letter, email, diary, etc.), and (g) to identify its last known custodian and location.  When used with respect to a **person**, means to state his/her (a) title if any; (b) first name, middle initial, and last name; (c) present address; (d) telephone number; and (e) relationship to Plaintiff.  When used with respect to a **communication or event**, means to state the (a) date, (b) place, (c) time, (d) nature of the communication or event, and (e) description of what

occurred or what was said by each person involved, as close to verbatim as possible.

4.   **Document** – Any written or graphic matter of any kind whatsoever, however, produced or reproduced, any electronically or magnetically recorded matter of any kind or character, however produced or reproduced, and any other matter constituting the recording of data or information upon any tangible thing by any means, whether recorded (a) by videotape, (b) audiotape, (c) in writing, (d) by electronic or magnetic impulse, (e) digitally or in any other manner, including, but not limited to:  email, letters, correspondence, memoranda, minutes, notes, logs, records, sketches, diagrams, blueprints, maps, photographs, motion pictures, audiotapes, video tapes, transcripts, facsimiles, contracts, agreements, computer printouts, computer disc, telephone or personal conversations, diaries, and material similar to the forgoing, however denominated, which are in the possession, custody or control of Plaintiff or his attorney, or of which Plaintiff is aware, has had, or can obtain access to, and including non-identical copies, preliminary versions, drafts, revisions, or amendments of any of the foregoing and any supporting, underlying, or preparatory material.

5.   **Identify or identity** – When used with respect to a **document**, means to state the (a) name, (b) date, (c) author, (d) addressee, (e) subject matter, and (f) type of document, (e.g., letter, email diary, etc.), and (g) to identify its last known

custodian and location.  When used with respect to a **person**, means to state his/her (a) title if any; (b) first name, middle initial, and last name; (c) present address; (d) telephone number; and (e) relationship to the Plaintiff.  When used with respect to a **communication**, means to state the (a) date, (b) place, (c) time, (d) nature of the communication, and (e) a description of what was said by each person involved, as close to verbatim as possible.

6.    **Incident(s)** – Those occurrence(s) that are described in the Complaint that form the basis for the Plaintiff's claims against the Defendants.

7.    **Monetary harm** – any financial injury experienced, whether direct or indirect in nature.

8.    **Person** – Any individual, or corporate or governmental entity, including but not limited to any business, corporation, association, or other organization.

9.    **Physical or mental injury** – Any condition, defect, disorder, or other irregularity of the body or mind.

10.   **Plaintiff** – Benezet Consulting, LLC or anybody acting, or purporting to act, on its behalf including, without limitation, its attorney.

11.   **Possession, custody or control** – Possession, custody, or control as used in Fed.R.Civ.P. 34.

12.   **Relate to** – Consist of, refer to, deal with, or in any way logically or factually connected with the matter involved.

13.   **Relevant** – Relevant as used in Fed.R.Civ.P. 26(b)(1).

14.   **"You" or "your"** – Benezet Consulting, LLC or anybody acting, or purporting to act, on its behalf including, without limitation, its attorney.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

1)   Any and all documents describing or setting forth the corporate structure of Benezet Consulting, LLC.

2)   Any and all schedules, calendars, diaries, day-timers, and/or logbooks relating to assignments and projects of Benezet Consulting, LLC, including those maintained by employees, those maintained by contractors to Benezet Consulting, LLC, and those maintained by management.

3)   Any and all travel receipts and/or expense vouchers submitted by any employee and/or agent of Benezet Consulting, LLC, related to any and all assignments or projects of Benezet Consulting, LLC, including, but not limited to, receipts for travel, hotels, mileage, food, transportation, and entertainment.

4)   Any and all time-keeping records and bills and/or invoices submitted to clients of Benezet Consulting, LLC.

5)   Any and all payroll records related to any and all assignments and projects of Benezet Consulting, LLC.

6)   The tax returns of Benezet Consulting, LLC.

7)   Any and all communications between Benezet Consulting, LLC and its employees and/or agents and/or officers, and between Benezet Consulting, LLC and its clients, regarding time spent traveling in connection with assignments and projects of Benezet Consulting, LLC.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BENEZET CONSULTING, LLC** | : | |
| *and* **TRENTON POOL,** | : | **No. 1:16-CV-0074** |
| **Plaintiffs** | : | |
| | : | **Judge Kane** |
| **v.** | : | |
| | : | *Complaint filed 01/14/16* |
| **PEDRO A. CORTÉS** *and* | : | |
| **JONATHAN MARKS,** | : | |
| **Defendants** | : | **Electronically Filed Document** |

## CERTIFICATE OF SERVICE

I, Kenneth L. Joel, Chief Deputy Attorney General for the Commonwealth

of Pennsylvania, Office of Attorney General, hereby certify that on July 27, 2016, I

caused to be served a true and correct copy of the foregoing document titled Notice

of Deposition to the following:

## VIA U.S. MAIL

**Paul Anthony Rossi**
**873 East Baltimore Pike**
**Suite 705**
**Kennett Square, PA 19348-1801**
paularossi@comcast.net
*Counsel for Plaintiffs*

**KENNETH L. JOEL**
Chief Deputy Attorney General

### IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
### CIVIL DIVISION

CITY OF PITTSBURGH,

               Petitioner

    v.

OPENPITTSBURGH.ORG; and COUNTY
OF ALLEGHENY, DEPARTMENT OF
ADMINISTRATIVE SERVICES,
ELECTION DIVISION,

               Respondents.

No.   GD 16-015884

## OPINION

James, J.                                                            September 20, 2016

This action began with a petition circulated by OpenPittsburgh.org who is seeking

to amend the City of Pittsburgh's Home Rule Charter ("HRC").   OpenPittsburgh.org

wants to require the City to put more of its information and meetings online and to

establish a citizen's advisory committee by placing the following question on the

November 8, 2016 ballot:

> Shall Pittsburgh's Charter be amended to delete Article 6:
> Community Advisory Boards (voided, Dec. 31, 2000) and
> substitute Article 6: Open Government, providing greater
> public disclosure; requiring public information, notices, and
> meetings be Internet accessible;   setting   applicable
> standards; creating a selectable notification process; and
> establishing an open membership Citizen Advisory Panel to
> which pending legislative and administrative actions must be
> explained and through which citizens can develop and
> provide information and comment before final approval?



EXHIBIT

D#5

9-27-16 CPS

No.  GD 16-015884

The original deadline for OpenPittsburgh.org to submit the petition and signatures was Tuesday, August 8, 2016.  On July 22, 2016, OpenPittsburgh.org filed a federal lawsuit seeking to strike down the following requirements claiming that they violated their First Amendment rights: (i) the Petition circulators must be Pennsylvania residents; (ii) the Petition circulators must be registered Electors of Pennsylvania; (iii) the "Affidavit of Circulator" on a petition must be made before a notary public or a sworn affidavit; and (iv) a petition signatory must be a registered voter, as a matter of state statutory interpretation.

On August 1, 2016, OpenPittsburgh.org sought emergency relief in federal court before Judge Mark. R. Hornak.  Judge Hornak granted in part and denied in part OpenPittsburgh.org's request.  On August 9, 2016, Judge Hornak extended the deadline for OpenPittsburgh.org's petitions but denied preliminary injunctive relief and directed the Elections Division to accept referendum petitions circulated by an out-of-state circulator as long as certain information including their name, residence, age and citizenship were included.  Judge Hornak also stated:

> In furtherance of the relief granted by this Order, it is hereby ORDERED that Defendants Mark Wolosik, John P. DeFazio, Rich Fitzgerald, and Samuel Demarco shall, until 5:00 p.m. EDT on August 15, 2016, accept referendum Petitions from Plaintiff OpenPittsburgh.org ("OPO") signed by petitioners between 5:00 p.m. EDT on August 9, 2016 and 4:00 p.m. EDT August 15, 2016.  All such Petitions shall be subject to review under and compliance with applicable law, except to the extent otherwise provided by this Order.

OpenPittsburgh.org submitted petitions on August 9 and 15, 2016.  The Elections Division "reluctantly" decided to accept them and place their question on the ballot.  On

No.  GD 16-015884

August 22, 2016, the City filed Objections to the Question for Referendum.

The City has standing to challenge the number of signatures submitted by OpenPittsburgh.org.  The City is "aggrieved" by having a "substantial, direct, and immediate interest in the outcome."  Pennsylvania Gaming Control Bd. v. City Council of Philadelphia, 928 A.2d 1255, 1265-66 (Pa. 2007).  The HRC is the City's foundational document and OpenPittsburgh.org is attempting to introduce numerous changes which will cause a fundamental change in how the City functions.

OpenPittsburgh.org has failed to muster the necessary number of qualifying signatures to place the referendum on the ballot.  According to the formula provided in 53 Pa. C.S.A. § 2943(a), 7,582 signatures are necessary to place the question on the ballot.  On August 9 and 15, 2016, OpenPittsburgh.org submitted a total of 12,315 signatures to the Elections Division.  However, 3,792 of those signatures must be stricken primarily because the petition paper was not submitted with a valid notarized affidavit as required.  Additionally, another 8,454 signatures must be stricken because they were gathered by out-of-state circulators prior to the extended submission deadline of August 15, 2016.  Furthermore, there is no verification that the out-of-state circulators were adults or U.S. citizens.  Finally, they were not notarized or sworn.  That leaves OpenPittsburgh.org with less than 7,582 required signatures necessary to place the question on the ballot.  Judge Hornak made those additional requirements a condition for the extension of the filing deadline. The failure to comply with those requirements is a fatal defect and cannot be cured by an amendment.

The Elections Division received timely notice of the City's Objections. OpenPittsburgh.org claims that the City did not properly serve the Elections Division

within the statutorily mandated timeframe under 25 P.S. §2937. They note that "[s]ervice by mail is not precluded by the Election Code, but receipt of notice within the seven day period is mandatory, so as a practical matter, personal service is required." However, the Pennsylvania Supreme Court defined "service" as "the exhibition or delivery of a legal document 'to a person who is thereby advised or warned of some action or step which he is commanded to take or forebear.'" Petition of Acosta, 578 A.2d 407, 409 n.4 (Pa. 1990). Council for the City exhibited the Objections to the County Solicitor prior to the 5:00 p.m. deadline. As stated above, Judge Hornak ordered that the County "shall, until 5:00 p.m. EDT on August 15, 2016, accept referendum Petitions from Plaintiff OpenPittsburgh.org ("OPO") signed by petitioners between 5:00 p.m. EDT on August 9, 2016 and 4:00 p.m. EDT August 15, 2016." The seven day period for challenging the referendum began to run on Friday, August 19, 2016 when the Elections Division sent its letter stating that they were reluctantly accepting OpenPittsburgh.org's submissions. The County Solicitor received an e-mail copy of the Objections on August 22nd at 5:11 p.m and the Court of Common Pleas received a copy of the petition on August 23rd.

OpenPittsburgh.org's referendum question contains "material errors or defects" under 25 P.S. §2936(a) and shall not be permitted to be filed. OpenPittsburgh.org's proposed amendment consists of approximately 12,000 words of legal requirements and provisions and the current HRC contains only about 9,000 words. It is impossible for a 75 word question on the ballot to accurately represent the scope of OpenPittsburgh.org's 12,000 word proposed amendment. In a similar case, the Commonwealth Court held that a vaguely worded referendum may not be placed on the

No.  GD 16-015884

ballot.  In City of Pittsburgh v. Cty. Of Allegheny Dep't of Admin. Servs., Election Div., 860 A.2d 616, 619 (Pa. Cmwlth. 2004), the following referendum was proposed:

> In order to maintain adequate Health and Safety for all residents, including seniors, children and adults in the City of Pittsburgh, the National Fire Protection Association's NFPA 1710 Standards for Organization and Deployment of Fire Suppression Operations shall be a mandatory standard to be implemented and followed by the City of Pittsburgh and the Pittsburgh Fire Bureau.

The referendum contained changes that would have a significant impact on governmental budgets and resource management.  The Commonwealth Court found that due to the way it was worded, the referendum was defective and should not appear on the ballot.  The Court stated, "the original referendum question was written in very non-specific terms and in a manner that appealed to the sensibilities of any reasonable lay person, i.e., the question began with the statement '[i]n order to maintain adequate Health and Safety for all residents, including seniors, children and adults in the City of Pittsburgh...'  In other words, any reasonable lay person would not be hesitant to sign a petition with the question as presented, especially where that question seems to imply that the adoption of the NFPA 1710 standards was necessary to ensure that person's health and safety.]"  Id. at 619 n. 6.  Similarly, OpenPittsburgh.org's referendum question does not accurately describe the nature of the changes it would make to the HRC.

Based upon the foregoing, the City's Objections to the Question for Referendum are sustained and OpenPittsburgh.org's Question for Referendum is set aside.

### IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
### CIVIL DIVISION

CITY OF PITTSBURGH,

          Petitioner

     v.

OPENPITTSBURGH.ORG; and COUNTY
OF ALLEGHENY, DEPARTMENT OF
ADMINISTRATIVE SERVICES,
ELECTION DIVISION,

         Respondents.

No.  GD 16-015884

## ORDER OF COURT

AND NOW, this _20th_ day of September 2016, upon consideration of the
City of Pittsburgh's Objection to the Question for Referendum, it is hereby Ordered that
the City's Objections are sustained and the Question for Referendum at issue is set
aside.

By the Court,

*Josephm James*      J.

**Commonwealth of Pennsylvania**
DEPARTMENT OF STATE

OFFICIAL USE ONLY

**ATTENTION!**
A. This Petition may be used to submit for Nomination the Name of One Candidate for One Office Only.
B. Please refer to the instruction page provided with this petition for detailed information about completion of this form.

NOMINATION PETITION FOR:   PRESIDENT OF THE UNITED STATES

DISTRICT NUMBER:  Statewide

YEAR OF PRIMARY:  2016

CANDIDATE'S NAME(PRINT OR TYPE NAME):   Roque Rocky De La Fuente

OCCUPATION:  Entrepreneur

RESIDENTIAL STREET ADDRESS:   700 Front Street, Apt. 2106

CITY, BOROUGH OR TWP.:   San Diego

COUNTY OF SIGNERS:  ALLEGHENY 02          PARTY OF SIGNERS:   Democratic

EXHIBIT
D # 6
9-27-16 CRS

To the SECRETARY OF THE COMMONWEALTH:

We, the undersigned, all of whom severally declare that we are qualified electors of the County and of the political district set forth above, that we are registered and enrolled members of the Political Party set forth above, and have signed no petition inconsistent herewith, do hereby petition the Secretary of the Commonwealth to have the candidate whose Name, Occupation and Residence are as set forth above, certified to the County Board of Elections of said County or Counties in said District, to be printed on the Primary Ballot of said Party, for the Year and Office set forth above.

| | SIGNATURE OF ELECTOR | PRINTED NAME OF ELECTOR | House No. | Street or Road | City, Boro or Twp. | DATE OF SIGNING |
|---|---|---|---|---|---|---|
| 1. | | Tim Barron | 1614 | Mill St | Pgh | 2/8 2016 |
| 2. | | David Pritilosi | 5529 | Darlington | Pga. | 2/8/16 |
| 3. | | Rona Scoraton | 1432 | Beechwood | Pgh | 2/8/2016 |
| 4. | | Wesa Buigar #070 | 070 | Forward | Pgh | 2-9-16 |
| 5. | Sharon M Donald | Sharon M Donald | | Abbas Str 15088 | | 2-8-16 |
| 6. | Susan Reinfeld | Susan Reinfeld | 6729 | Crombie St | Pgh 15217 | 2-9-16 |
| 7. | Ivan Engd | Ivan Engd | 6582 | Rosemar St | Pgh, Pa | 2/9/16 |
| 8. | | Renata Nelson | 6311 | Jackson St | Pgh 15206 | 2/9/16 |
| 9. | James V. McIny | James V. McInerney | 610 | Wirth St | Pittsburgh | 2-9-16 |
| 10. | | Mary Hart | 747 | Washington | Pittsburgh | 2/9/16 |
| 11. | Stephen DAndrea | Stephen DAndrea | 5714 | Beacon | Pgh | 2/9/16 |
| 12. | Samuel T Finder | Samuel T Finder | 5627 | Hobart | Pittsburgh | 2/9/16 |
| 13. | Brad Kindel berg | Brad Kindel berg | 847 | Middle Rd | Pittsburgh | 2/9/16 |
| 14. | | Arthur C. Solomon | 2219 | Shady Ave | Pittsburgh | 2/9/16 |

DSBE-SS (5/13) ALLEGHENY 02          Department of State          Page_____ Side 1

| | SIGNATURE OF ELECTOR | PRINTED NAME OF ELECTOR | House No. | Street or Road | City, Boro or Twp. | DATE OF SIGNING |
|---|---|---|---|---|---|---|
| 15. | | Thomas J Vogler | 7437 | Melwood | Pgh 15218 | 2/9/16 |
| 16. | | Sarah Minion | 5630 | Hobart | Pgh 15217 | 2/9/16 |
| 17. | | Jessica Kamminsky | 204 | Dilworth | Pgh 15217 | 2/9/16 |
| 18. | | Marco Forni | 352 | McRan | Pgh PA 15213 | 2/9/16 |
| 19. | | Jason Rifecle | 4750 | Centre | Pgh PA 15213 | 2/8/16 |
| 20. | | Jake Falbec | 5837 | Delgyn | Pgh PA 0213 | 2/8/16 |
| 21. | | Aaron Pivovarnik | 3468 | Broad St | 8G4 PA 15202 | 2/9/16 |
| 22. | | Kara Peters | 6364 | Phillips Ave | Pgh PA 15217 | 2/8/16 |
| 23. | | | | | | |
| 24. | | | | | | |
| 25. | | | | | | |
| 26. | | | | | | |
| 27. | | | | | | |
| 28. | | | | | | |
| 29. | | | | | | |
| 30. | | | | | | |

## AFFIDAVIT OF CIRCULATOR

COMMONWEALTH OF PENNSYLVANIA

COUNTY OF _Allegheny_  SS:

| CIRCULATOR SHOULD COMPLETE 1 - 5 BELOW |

I do swear (or affirm) that I am a qualified elector of the Commonwealth, duly registered and enrolled as a member of the political party designated in this nomination petition; that my residence is as set forth below; that the signers to the foregoing petition signed the same with full knowledge of the contents thereof; that their respective residences are correctly stated therein; that each signed on the date set opposite his or her name; that to the best of my knowledge and belief, the signers are qualified electors, duly registered and enrolled members of the political party and of the political district designated in this petition, and that they are residents in the County specified in number one below.

Sworn to and subscribed before me this _____ 11

1  _Allegheny_
County of Petition Signers Residence

day of _February_ 20 _16_

2  _Curtis Jones_
Signature of Circulator

_Jeanne E Braunlich_

3  _Curtis Jones_
Printed Name of Circulator

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Joanne E. Braunlich, Notary Public
Ross Twp., Allegheny County
My Commission Expires Sept 7, 2016
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

4  _4255 Coleridge St_
Street

My commission expires

5  _Pgh PA_                    _15201_
City, Borough or Twp.        Zip Code

NOTE: THIS AFFIDAVIT MUST BE EXECUTED AFTER ALL SIGNATURES HAVE BEEN OBTAINED.





**Commonwealth of Pennsylvania**
DEPARTMENT OF STATE

OFFICIAL USE ONLY

**ATTENTION!**
A. This Petition may be used to submit for Nomination the Name of One Candidate for One Office Only.
B. Please refer to the instruction page provided with this petition for detailed information about completion of this form.

NOMINATION PETITION FOR:   PRESIDENT OF THE UNITED STATES

DISTRICT NUMBER:   Statewide

YEAR OF PRIMARY:   2016

CANDIDATE'S NAME(PRINT OR TYPE NAME):   Roque Rocky De La Fuente

OCCUPATION:   Entrepreneur

RESIDENTIAL STREET ADDRESS:   700 Front Street, Apt. 2106,

CITY, BOROUGH OR TWP.:   San Diego

COUNTY OF SIGNERS:   ALLEGHENY 02          PARTY OF SIGNERS:   Democratic

To the SECRETARY OF THE COMMONWEALTH:

We, the undersigned, all of whom severally declare that we are qualified electors of the County and of the political district set forth above, that we are registered and enrolled members of the Political Party set forth above, and have signed no petition Inconsistent herewith, do hereby petition the Secretary of the Commonwealth to have the candidate whose Name, Occupation and Residence are as set forth above, certified to the County Board of Elections of said County or Counties in said District, to be printed on the Primary Ballot of said Party, for the Year and Office set forth above.

| | SIGNATURE OF ELECTOR | PRINTED NAME OF ELECTOR | PLACE OF RESIDENCE | | | DATE OF SIGNING |
|---|---|---|---|---|---|---|
| | | | House No. | Street or Road | City, Boro or Twp. | |
| 1. | | Jordan Barr | 3861 | Shadela | Pittsburgh | 2/4/16 |
| 2. | | Marie Merle | Apt 2R | Centex | Pittsburgh | 2/4/16 |
| 3. | Pamela Green | PAMELA GREEN | 185 | Orchard D | Penn Hills 15235 | 2/4/16 |
| 4. | Jonny Long | Jonny Yong | 112 | Grandview | McKeesport | 2/4/16 |
| 5. | Bridget Sned | Bridget Sned | 1512 | Woodland Ave | Psh, PA | 15 |
| 6. | Cornelius William | Cornelius William | 909 | Carrington | Pittsburg PA | 2/4/16 |
| 7. | Debbie Cromlish | Debbie Cromlish | 1619 | Antrim St | Pgh. PA. | 2-9-16 |
| 8. | Alyssa P. Rivera | ALYSSA J Rivera | 15217 | Shady Ave | PGH | 2.9.16 |
| 9. | Jessica Appleman | Jessica Appleman | 1122 | Province St | PGH | 2/9/16 |
| 10. | Kathleen Brant | Kathleen Brant | 714 | Boggs Ave | PGH | 2/9/16 |
| 11. | Robert Korzta | Robert Korzta | 135 | mLyndhurst | Pgh | 2/9/16 |
| 12. | Dwayne Robinson | Dwayne Robinson | 3726 | Okenwood | PGH | 2/9/16 |
| 13. | Elaine Levine | Elaine Levine | 6209 | Monitor | Pgh | 2/9/16 |
| 14. | Reginald Bailey | Reginald Bailey | 120 | SouthNeylan | Pgh, PA | 2/9/16 |

DSBE-SC(5/13) ALLEGHENY 02          Department of State          Page        Side 1

| | SIGNATURE OF ELECTOR | PRINTED NAME OF ELECTOR | PLACE OF RESIDENCE | | | | DATE OF SIGNING |
|---|---|---|---|---|---|---|---|
| | | | House No. | Street or Road | City, Boro or Twp. | | |
| 15. | Jeffery M. Prince | Jeffrey M. Prince | 1104 | Wesley | Rd, PA 15221 | | 2-9-2016 |
| 16. | | | | | | | |
| 17. | | | | | | | |
| 18. | | | | | | | |
| 19. | | | | | | | |
| 20. | | | | | | | |
| 21. | | | | | | | |
| 22. | | | | | | | |
| 23. | | | | | | | |
| 24. | | | | | | | |
| 25. | | | | | | | |
| 26. | | | | | | | |
| 27. | | | | | | | |
| 28. | | | | | | | |
| 29. | | | | | | | |
| 30. | | | | | | | |

## AFFIDAVIT OF CIRCULATOR

COMMONWEALTH OF PENNSYLVANIA

COUNTY OF _Allegheny_ SS:

CIRCULATOR SHOULD COMPLETE 1 - 5 BELOW

I do swear (or affirm) that I am a qualified elector of the Commonwealth, duly registered and enrolled as a member of the political party designated in this nomination petition; that my residence is as set forth below; that the signers to the foregoing petition signed the same with full knowledge of the contents thereof; that their respective residences are correctly stated therein; that each signed on the date set opposite his or her name; that to the best of my knowledge and belief, the signers are qualified electors, duly registered and enrolled members of the political party and of the political district designated in this petition, and that they are residents in the County specified in number one below.

Sworn to and subscribed before me this ___11___

1  _Allegheny_
County of Petition Signers Residence

day of _February_ 20 _16_

2  _Chris Jones_
Signature of Circulator

3  _Chris Jones_
Printed Name of Circulator

4  _4357 Coleorg St_
Street

_Joanne W Braunlich_

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Joanne E. Braunlich, Notary Public
Ross Twp., Allegheny County
My Commission Expires Sept. 7, 2018
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

(Official Title)

My commission expires _____

5  _Pgh   PA   15201_
City, Borough or Twp.      Zip Code

NOTE: THIS AFFIDAVIT MUST BE EXECUTED AFTER ALL SIGNATURES HAVE BEEN OBTAINED.





## Commonwealth of Pennsylvania
### DEPARTMENT OF STATE

**ATTENTION!**

A. This Petition may be used to submit for Nomination the Name of One Candidate for One Office Only.
B. Please refer to the instruction page provided with this petition for detailed information about completion of this form.

OFFICIAL USE ONLY

NOMINATION PETITION FOR:   PRESIDENT OF THE UNITED STATES

DISTRICT NUMBER:   Statewide

YEAR OF PRIMARY:   2016

CANDIDATE'S NAME(PRINT OR TYPE NAME):   Roque Rocky De La Fuente

OCCUPATION:   Entrepreneur

RESIDENTIAL STREET ADDRESS:   700 Front Street, Apt. 2106,

CITY, BOROUGH OR TWP.:   San Diego

COUNTY OF SIGNERS:   ALLEGHENY 02          PARTY OF SIGNERS:   Democratic

To the SECRETARY OF THE COMMONWEALTH:

We, the undersigned, all of whom severally declare that we are qualified electors of the County and of the political district set forth above, that we are registered and enrolled members of the Political Party set forth above, and have signed no petition inconsistent herewith, do hereby petition the Secretary of the Commonwealth to have the candidate whose Name, Occupation and Residence are as set forth above, certified to the County Board of Elections of said County or Counties in said District, to be printed on the Primary Ballot of said Party, for the Year and Office set forth above.

| | SIGNATURE OF ELECTOR | PRINTED NAME OF ELECTOR | PLACE OF RESIDENCE | | | DATE OF SIGNING |
|---|---|---|---|---|---|---|
| | | | House No. | Street or Road | City, Boro or Twp. | |
| 1. | Rasheeda Moore | Rasheeda Moore | 3103 | Ashly St | Pgh, PA | 2-4-16 |
| 2. | Tahji moore | Tahji moore | 3103 | Ashly St | Pgh PA 15204 | 2-4-16 |
| 3. | Lyric Moore | Lyric Moore | 3103 | Ashly St | Pgh PA 15204 | 2-4-16 |
| 4. | Jamie Kauffman | JAMIE KAUFFMN | 315 51st | W.N. Pgh PA | 2-4-16 |
| 5. | Brandy Christina | Brandy Christina | 13 | Pride St | Pittsburgh | 2-4-16 |
| 6. | Felicia Blackwell | Felicia Blackwell | 159 | Pinford St | Pgh | 2-4-16 |
| 7. | Lishon Dean | Lishon Dean | 1114 | Faulkner | Pgh PA | 2-4-16 |
| 8. | Jade Lines | Jade Lines | 316 | Pine St. | Curwensville | 2-4-16 |
| 9. | Devin Gibson | Devin Gibson | 525 | Penn Av | Pgh PA | 2-4-16 |
| 10. | Dylan Chieffalo | Dylan Chieffalo | 623 | N Negley | Pgh PA | 2-4-16 |
| 11. | Carmen Smith | Carmen Smith | 357 | Mitchell | Pgh | 2-4-16 |
| 12. | Esther Spurlock | Esther Spurlock | 241 | Edgewood Ave | Edgewood | 2-4-16 |
| 13. | Shawn Charles | Shawn Charles | 4508 | Sylvan Ave | Park PA 15207 | 2-8-10 |
| 14. | Kristin Boehm | Kristin Boehm | 160566 | Cross Creek | Cranberry PA | 2-4-16 |

DSBE-SC(5/13) ALLEGHENY 02          Department of State          Page_____Side 1

Case 1:16-cv-00074-YK-WIA   Document 42-2   Filed 12/22/16   Page 109 of 219

| | SIGNATURE OF ELECTOR | PRINTED NAME OF ELECTOR | PLACE OF RESIDENCE | | | DATE OF SIGNING |
| --- | --- | --- | --- | --- | --- | --- |
| | | | House No. | Street or Road | City, Boro or Twp. | |
| 15. | | Stephen Mazur | 11 | Center Dr | Monessen | 2-4-16 |
| 16. | | | | | | |
| 17. | | | | | | |
| 18. | | | | | | |
| 19. | | | | | | |
| 20. | | | | | | |
| 21. | | | | | | |
| 22. | | | | | | |
| 23. | | | | | | |
| 24. | | | | | | |
| 25. | | | | | | |
| 26. | | | | | | |
| 27. | | | | | | |
| 28. | | | | | | |
| 29. | | | | | | |
| 30. | | | | | | |

## AFFIDAVIT OF CIRCULATOR

COMMONWEALTH OF PENNSYLVANIA

COUNTY OF __Allegheny__ SS:

CIRCULATOR SHOULD COMPLETE 1 - 5 BELOW

I do swear (or affirm) that I am a qualified elector of the Commonwealth, duly registered and enrolled as a member of the political party designated in this nomination petition; that my residence is as set forth below; that the signers to the foregoing petition signed the same with full knowledge of the contents thereof; that their respective residences are correctly stated therein; that each signed on the date set opposite his or her name; that to the best of my knowledge and belief, the signers are qualified electors, duly registered and enrolled members of the political party and of the political district designated in this petition, and that they are residents in the County specified in number one below.

Sworn to and subscribed before me this _____

1 __William Trautman Allegheny__
County of Petition Signers Residence

day of ____11th Feb____ 20_16_

2 __Will_____
Signature of Circulator

_Joanne E. Beaudry_

3 __William Trautman__
Printed Name of Circulator

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Joanne E. Beaudry, Notary Public
Ross Twp., Allegheny County
My Commission Expires Sept. 7, 2018
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

4 __2044 Brownsville__
Street

My commission expires _____

5 __2044 Brownsville   Psh PA 15210__
City, Borough or Twp.      Zip Code

NOTE: THIS AFFIDAVIT MUST BE EXECUTED AFTER ALL SIGNATURES HAVE BEEN OBTAINED.




**Commonwealth of Pennsylvania**
DEPARTMENT OF STATE

OFFICIAL USE ONLY

**ATTENTION!**
A. This Petition may be used to submit for Nomination the Name of One Candidate for One Office Only.
B. Please refer to the instruction page provided with this petition for detailed information about completion of this form.

NOMINATION PETITION FOR:   PRESIDENT OF THE UNITED STATES

DISTRICT NUMBER:   Statewide

YEAR OF PRIMARY:   2016

CANDIDATE'S NAME(PRINT OR TYPE NAME):   Roque Rocky De La Fuente

OCCUPATION:   Entrepreneur

RESIDENTIAL STREET ADDRESS:   700 Front Street, Apt. 2106,

CITY, BOROUGH OR TWP.:   San Diego

COUNTY OF SIGNERS:   ALLEGHENY 02          PARTY OF SIGNERS:   Democratic

To the SECRETARY OF THE COMMONWEALTH:

We, the undersigned, all of whom severally declare that we are qualified electors of the County and of the political district set forth above, that we are registered and enrolled members of the Political Party set forth above, and have signed no petition inconsistent herewith, do hereby petition the Secretary of the Commonwealth to have the candidate whose Name, Occupation and Residence are as set forth above, certified to the County Board of Elections of said County or Counties in said District, to be printed on the Primary Ballot of said Party, for the Year and Office set forth above.

| | SIGNATURE OF ELECTOR | PRINTED NAME OF ELECTOR | PLACE OF RESIDENCE | | | DATE OF SIGNING |
|---|---|---|---|---|---|---|
| | | | House No. | Street or Road | City, Boro or Twp. | |
| 1. | | Dasia Clemons | 2615 | S. Braddry | Pittsburgh PA | 2/4/16 |
| 2. | | Deborah Kiesel-Ryan | 828 | Hulton Rd | Verona 15147 | 2/4/16 |
| 3. | Rashad Lewis | Rashad Lewis | 310 | 310 Elmor | Pittsburgh | 2/4/16 |
| 4. | | JAMES C DAVIS | 211 | Lucust St | Pittsburgh | 2/4/16 |
| 5. | | | | | | |
| 6. | | | | | | |
| 7. | | | | | | |
| 8. | | | | | | |
| 9. | | | | | | |
| 10. | | | | | | |
| 11. | | | | | | |
| 12. | | | | | | |
| 13. | | | | | | |
| 14. | | | | | | |

DSBE-SC(5/13) ALLEGHENY 02          Department of State          Page_____ Side 1

| | SIGNATURE OF ELECTOR | PRINTED NAME OF ELECTOR | PLACE OF RESIDENCE | | |
| --- | --- | --- | --- | --- | --- |
| | | | House No. | Street or Road | City, Boro or Twp. |
| 15. | | | | | |
| 16. | | | | | |
| 17. | | | | | |
| 18. | | | | | |
| 19. | | | | | |
| 20. | | | | | |
| 21. | | | | | |
| 22. | | | | | |
| 23. | | | | | |
| 24. | | | | | |
| 25. | | | | | |
| 26. | | | | | |
| 27. | | | | | |
| 28. | | | | | |
| 29. | | | | | |
| 30. | | | | | |

## AFFIDAVIT OF CIRCULATOR

COMMONWEALTH OF PENNSYLVANIA

COUNTY OF *Allegheny* SS:

> CIRCULATOR SHOULD COMPLETE 1 - 5 BELOW

I do swear (or affirm) that I am a qualified elector of the Commonwealth, duly registered and enrolled as a member of the political party designated in this nomination petition; that my residence is as set forth below; that the signers to the foregoing petition signed the same with full knowledge of the contents thereof; that their respective residences are correctly stated therein; that each signed on the date set opposite his or her name; that to the best of my knowledge and belief, the signers are qualified electors, duly registered and enrolled members of the political party and of the political district designated in this petition, and that they are residents in the County specified in number one below.

Sworn to and subscribed before me this ____

day of _February_ 20_16_

*Jeanne M Braunlich*

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
(Officname) Jeanne Braunlich, Notary Public
Ross Twp., Allegheny County
My Commission Expires Sept. 7, 2018
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

My commission expires ____

1  *William Trautman* Allegheny
   County of Petition Signers Residence
2  *Will*
   Signature of Circulator
3  *William Troutman*
   Printed Name of Circulator
4  *7044 Brownsville*
   Street
5  *2044 Brownsville Rd PA 15210*
   City, Borough or Twp.        Zip Code

NOTE: THIS AFFIDAVIT MUST BE EXECUTED AFTER ALL SIGNATURES HAVE BEEN OBTAINED.





## AGREEMENT FOR CONSULTING SERVICES

**THIS AGREEMENT FOR CONSULTING SERVICES** (this "*Agreement*") is made and entered into as of the 11th day of November, 2015, by and between Cruz for President ("*CFP*"), a Texas nonprofit corporation, and Benezet Consulting LLC, a Texas limited liability company. ("*Consultant*").

### RECITALS

**WHEREAS,** CFP desires to retain Consultant for ballot access services as described in Attachment A and Consultant desires to be retained by CFP in said capacity; and

**WHEREAS,** Each party desires to set forth in writing the terms and conditions of their understandings and agreement.

**NOW, THEREFORE,** in consideration of the mutual covenants and obligations contained herein, the sufficiency of which is hereby acknowledged by the parties, CFP hereby agrees to retain Consultant, and Consultant hereby accepts such engagement upon the terms and conditions set forth in this Agreement.

### AGREEMENT

### ARTICLE 1
### POSITION, DUTIES AND TERM

**1.1    Services and Duties.** Consultant shall provide the services to CFP as described in Attachment A (the "*Services*"). Consultant warrants that all Services under this Agreement shall be performed and completed in a professional, ethical, and competent manner.

**1.2    Relationship of Parties.** Consultant shall act as an independent contractor in performing the Services described in this Agreement. Nothing contained herein shall be deemed to make Consultant the agent, employee, joint venturer, or partner of CFP, or be deemed to provide Consultant with the power or authority to act for or on behalf of CFP, or to bind CFP to any contract, agreement, or arrangement with any other person, except as specifically set forth herein. Personnel supplied by Consultant will be deemed to be Consultant's employees, representatives, agents or subcontractors, and will not for any purpose be considered employees or agents of CFP.

**1.3    Use of Employees and Subcontractors.** Consultant will keep CFP informed as to the identity of any individual or individuals retained by Consultant who may be performing services on Consultant's behalf under this Agreement. Actual direction and control of such employees, agents and independent contractors shall at all times be Consultant's responsibility. Notwithstanding the forgoing, CFP may, at any time and for any reason, request that such employees and/or subcontractors be reassigned and different employees or subcontractors be assigned to work on CFP's account.

**1.4    Term.** The term of this contract shall commence on November 9, 2015 (the "*Commencement Date*"), shall continue until January 11, 2016.

**1.5    Termination by Either Party.** Either party may terminate this Agreement at any time, and for any reason, by providing seven (7) days written notice to the other party. In the event of termination, all accrued compensation and reimbursement of all properly approved expenses incurred through the seventh (7th) day subsequent to receipt of such notice shall be paid. Notwithstanding the foregoing, this Agreement shall automatically terminate upon the withdrawing of Ted Cruz's 2016

EXHIBIT
D. Hy
9-27-16 c/s

TDP

Statement of Candidacy for President of the United States with the Federal Election Commission or a public statement by Ted Cruz or CFP that Ted Cruz is terminating, winding up, or suspending his 2016 campaign for President of the United States.

**1.6     Termination by CFP for Cause.** CFP may terminate this Agreement at any time for Cause. Upon termination by CFP for Cause, Consultant shall only be entitled to accrued compensation and reimbursement of all properly approved expenses. The Consultant's termination for Cause becomes effective immediately upon notice. "Cause" means any of the following:

**(a)**     Consultant's commission of theft, embezzlement, any other act of dishonesty relating to Consultant's Services to CFP, or any violation of CFP policies, or any law, rules, or regulations applicable to the CFP;

**(b)**     Consultant's conviction of, or pleading guilty or nolo contendere to, a felony or any lesser crime having as its predicate element fraud, dishonesty, misappropriation, or moral turpitude;

**(c)**     Consultant's failure to perform the Services under this Agreement, which failure to perform is not remedied within ten (5) days after notice thereof to the Consultant by CFP; or

**(d)**     Consultant's commission of an act or acts in the performance of his/her duties under this Agreement amounting to gross negligence or willful misconduct, including, but not limited to, any breach of Section 4.1.

**ARTICLE 2**
**COMPENSATION AND EXPENSES**

**2.1     Compensation.** For the performance of the Services and duties described in Article 1 and in Attachment A, in accordance with the terms of this Agreement, CFP agrees to pay Consultant as set forth below.

**2.2     Reimbursement on Signature Basis.** CFP agrees to reimburse Consultant on a per valid signature cost for signatures collected by paid signature gatherers pursuant to this section and the schedule in Attachment A. Consultant may hire, as independent contractors to Consultant, signature gatherers/circulators/field managers, upon prior approval of CFP, subject to the terms and conditions of Attachment A.

**2.3     Reimbursement of Expenses.** CFP shall reimburse Consultant for the business expenses that are reasonable and necessary and are incurred by Consultant while performing the Services under this Agreement upon presentation of expense statements, receipts and/or vouchers, or such other information and documentation as CFP may reasonably require. Any travel, or combination of expenditures exceeding $50 must be pre-approved in writing by Greg Graves or Mark Campbell or his or her designee prior to incurring such expense, and CFP reserves the right to reject any such proposed expenditure. Consultant shall provide, upon request, an explanation of the purpose of any particular business expense and an estimate of the cost of the same, prior to incurring any expense related to the same. CFP reserves the right to reject any business expense.

**2.4     Billing and Payment.** Consultant shall submit invoices to CFP on an as-completed basis. If Consultant transmits an invoice to CFP on a timely basis, then CFP shall pay such invoice within fourteen (14) days of its submission to CFP. Consultant shall be entitled to discontinue services under this Agreement in the event that any invoice is not paid when due; notwithstanding the foregoing, CFP shall



not be responsible for the payment of Consultant's invoices that are billed more than sixty (60) days subsequent to the date in which the work was performed or the expense was incurred.

## ARTICLE 3
## COMPLIANCE AND AUTHORITY

**3.1     Compliance Responsibilities.** Consultant represents to CFP that Consultant is knowledgeable of the compliance and legal obligations of CFP pursuant to the Federal Election Campaign Act of 1971, as amended, and its implementing regulations found in Chapter 11 of the Code of Federal Regulations, and Consultant agrees to comply with the provisions of such laws in all respects applicable to the performance of the Services under this Agreement. Consultant further agrees to consult with CFP legal counsel in the event that Consultant has questions regarding the application of any federal, state, and/or local laws and regulations to Consultant's Services for CFP.

**3.2     Authority.** Consultant may not enter into any legally binding agreement, written or oral, or take any other legal act in the name of CFP without the prior approval of Greg Graves or Mark Campbell.

## ARTICLE 4
## CONFIDENTIALITY

**4.1     Nondisclosure.** Consultant agrees and acknowledges that, contemporaneously with the execution of this Agreement and throughout the course of his/her engagement with CFP, CFP may disclose to Consultant various "Confidential Information" (defined below) which Consultant would not otherwise receive. Except as set forth herein, at all times during Consultant's engagement and thereafter, Consultant will hold in strictest confidence and will not disclose, use, provide access to, or publish any Confidential Information. Except as set forth herein, Consultant agrees that all Confidential Information, whether prepared by Consultant or otherwise coming into Consultant's possession, shall remain the exclusive property of the CFP. Consultant hereby assigns to CFP any rights Consultant may have or acquire in such Confidential Information and recognizes that all Confidential Information is the sole property of CFP and its assigns.

**(a)     Confidential Information.** "Confidential Information" is defined as consisting of, but not limited to, information relating to CFP's: (1) operations and methods; (2) existing and proposed strategies; (3) financial information; (4) compensation arrangements and amounts; (5) contractual relationships (including this Agreement); (6) business and political partners and relationships; (7) internal affairs, including donor lists, polling data, and other non-public information related to politically-related activity; (8) business, political, and marketing plans and strategies; (9) lists with information or requirements related to existing or prospective donors, partners, or service providers; (10) confidential or proprietary information, regardless of the medium in which any such information is contained and includes information that is used in the operation, technology, and   dealings of CFP. Confidential Information shall not include: (A) information that Consultant may furnish to third parties after prior written approval by CFP under this Section 4.1, (B) information that Consultant is required by law, regulation, court order or discovery demand to disclose; provided, however, that in the case of clause (B), Consultant gives CFP, to the extent permitted by law, reasonable notice prior to the disclosure of the Confidential Information and the reasons and circumstances surrounding such disclosure to provide CFP an opportunity to seek a protective order or other appropriate request for confidential treatment of the applicable Confidential Information, or (C) information publicly known at the time of disclosure or subsequently becomes publicly known through no fault of the Consultant.



**(b)     Exclusive Property.** Consultant agrees that all Confidential Information, whether prepared by Consultant or otherwise coming into his/her possession during Consultant's engagement with the CFP, shall remain the exclusive property of the CFP.

**(c)     Prior Approval.** Consultant agrees not to communicate, directly or indirectly, with any member of the news media about, or on behalf of, CFP without the prior written approval of Mark Campbell or his or her designee. Consultant further agrees that Consultant shall not, without the prior written approval of Mark Campbell use, disclose, provide access to, or publish to any third party any of the Confidential Information described herein, directly or indirectly, either during Consultant's engagement with the CFP or at any time following the termination of Consultant's employment with CFP, except as otherwise provided for in subparagraph (a) above.

**(d)     Return of Materials.** Upon termination of this Agreement, Consultant agrees that all Confidential Information and other files, documents, materials, records, notebooks, customer or donor lists, proposals, contracts, agreements and other repositories containing information concerning CFP or the business of CFP (including all copies and electronic versions thereof) in Consultant's possession, custody or control, whether prepared by Consultant or others, shall remain with or be returned to CFP promptly (within twenty-four (24) hours) after the termination date.

**(e)     Survival of Covenants.** This Section 4.1 shall survive the expiration or termination of this Agreement for any reason. Consultant agrees not to challenge the enforceability or scope of this Section 4.1. Consultant further agrees to notify all future persons, organizations, funds or businesses, with which he/she becomes affiliated or employed by, though December 2016, of the restrictions set forth in this Section 4.1, prior to the commencement of any such affiliation or employment

**(f)     Remedies.** The parties recognize and affirm that in the event of a breach or threatened breach of Section 4.1 of this Agreement, money damages would be inadequate and CFP would not have an adequate remedy at law. Accordingly, the parties agree that in the event of a breach or a threatened breach of Sections 4.1, CFP may, in addition and supplementary to other rights and remedies existing in its favor, apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce or prevent any violations of the provisions hereof without posting a bond or other security.

## ARTICLE 5
## OWNERSHIP OF MATERIALS

**5.1     Exclusive Ownership.** CFP retains and reserves the right of exclusive ownership and use of any copy, product, publication, or any facsimile thereof which may result from Consultant's Services. Consultant and CFP agree that the work described in Article 1 and Attachment A will be considered a "work for hire" for the purpose of the United States copyright law, 17 U.S.C. § 101 *et seq.*, and that Consultant hereby irrevocably assigns and transfers to CFP all right, title and interest in and to the Consultant's work and Services to CFP, including, without limitation, all patent and copyright interests, and agrees to execute all documents reasonably requested by CFP for the purpose of applying for and obtaining any patent and copyright registrations.



## ARTICLE 6
## MISCELLANEOUS

**6.1    Complete Agreement.** This Agreement represents the complete and entire agreement between CFP and Consultant and completely replaces and supersedes all previous agreements, whether written or oral, pertaining to the subject matter hereof.

**6.2    No Inconsistent Obligations.** Consultant represents and warrants that to his/her knowledge Consultant has no obligations, legal, in contract, or otherwise, inconsistent with the terms of this Agreement or with Consultant's undertaking employment with CFP to perform the Services and duties described herein. Consultant will not disclose to CFP, or use, or induce CFP to use, any confidential, proprietary, or trade secret information of others. Consultant represents and warrants that to Consultant's knowledge Consultant has returned all property and confidential information belonging to all prior employers, if Consultant is obligated to do so.

**6.3    Binding Agreement.** This Agreement shall inure to the benefit of and be binding upon Consultant, his/her heirs and personal representatives, and CFP, its successors and assigns.

**6.4    Non-Assignability.** This Agreement shall not be assigned by Consultant without the prior written approval of Mark Campbell.  CFP may assign its rights and obligations under this Agreement.

**6.5    Modification or Waiver.** The failure or omission of CFP to require Consultant's strict compliance of any one or more terms, covenants, conditions, or provisions of this Agreement, or to exercise any of its rights or remedies in any circumstance, shall not constitute a waiver or relinquishment of any of CFP's rights granted hereunder or or of any future performance of such terms, covenants, conditions, or provisions, constitute a precedent, or otherwise affect the interpretation of this Agreement. No terms or provisions of this Agreement may be amended, waived, or modified without a written agreement that expressly references this Agreement and that is signed by both the Consultant and a duly authorized representative for CFP.

**6.6    Notices.** All notices and other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given if delivered personally, mailed by certified mail (return receipt requested) or sent by overnight delivery service, electronic mail, or facsimile transmission (with electronic confirmation of successful transmission) to the parties at the following addresses or at such other addresses as shall be specified by the parties by like notice, in order of preference of the recipient:

**If to CFP:**
Cruz for President
P.O. Box 25376
Houston, TX 77265

**If to Consultant:**
Benezet Consulting LLC
3800 Creek Rd
Dripping Springs, TX 78620

Notice so given shall, in the case of mail, be deemed to be given and received on the fifth calendar day after posting, in the case of overnight delivery service, on the date of actual delivery and, in the case of



facsimile transmission, electronic mail or personal delivery, on the date of actual transmission or, as the case may be, personal delivery.

      6.7     **Attorneys' Fees.** In the event either party must bring suit for any reason under this Agreement, the prevailing party shall be entitled to recover all costs of such suit, including reasonable attorneys' fees, from the other party.

      6.8     **Choice of Law and Venue.** CFP and Consultant agree that the terms of this Agreement shall be deemed to be made under, governed by, and construed in accordance with, the laws of the State of Texas, without regard to any conflict of laws rule or principle which might refer the governance or construction of this Agreement to the laws of another jurisdiction. Any action in regard to this Agreement or arising out of its terms and conditions shall only be instituted in Harris County, Texas.

      6.9     **Dispute Resolution. Any dispute arising out of, or relating to, this Agreement shall be settled by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules then in effect to be held in Harris County, Texas, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. If the amount in controversy exceeds $500,000, arbitration shall be conducted under the Procedures for Large, Complex Commercial Disputes.**

      6.10    **Headings.** The headings in this Agreement are included for the sole purpose of convenience, and they shall not in any way limit or affect the meaning or interpretation of any of the terms or provisions contained in this Agreement.

      6.11    **Severability and Reformation.** If any of the terms or provisions contained in this Agreement are held to be invalid, void, or unenforceable by a court of competent jurisdiction, then the remaining terms and provisions shall continue in full force and effect, and the invalid, void or unenforceable provisions shall be deemed severable. Moreover, if any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to duration, activity, or subject, it shall be reformed by limiting and reducing it to the minimum extent necessary, so as to be enforceable to the extent compatible with applicable law.

      6.12    **Counterparts and Facsimile.** This Agreement may be executed in counterparts, and all counterparts will be considered as part of one agreement binding on all parties to this Agreement. This Agreement may be executed via facsimile, the signatures of which shall be deemed legal and binding as an original signature hereto.

      6.13    **Time is of the Essence.** The parties acknowledge and agree that time is of the essence in performing their respective obligations under this Agreement.



**IN WITNESS WHEREOF**, CFP and Consultant have executed this Agreement, effective as of the day and year first above written.

**For Cruz for President:**

Dated: _2-4-16_____

By: _Sarah Hall_____

Print Name: _Sarah Hoeller_____

Title: _Director of Operations___

**For Benezet Consulting LLC**

Dated: _11/12/15_____

By: _____

Print Name: _Justin Pool_____

Title: _President, Benezet Consulting___

**Attachment A**

1.  To qualify Ted Cruz for the 2016 Republican Primary Ballot in **Vermont:**

    a.  **Legal Compliance:** Consultant agrees to work with CFP's legal team in reviewing ballot access requirements for Vermont  This review will include determination of ballot access deadlines for commencement of the ballot access process, the deadline on when ballot access must be achieved, and to assist in reviewing all forms and any petitions or any other documents required to comply with Vermont's ballot access laws. Consultant will assist CFP with determining, among other things, residency requirements for circulators, the classification of who may sign ballot access petitions in each jurisdiction, and compliance with signature distribution requirements where required. With respect to any requirement related to signature gathering, CFP shall have the controlling interpretation of any rule, regulation, or practice.

    b.  **Ballot Access/Signature Collection:** Consultant, in consultation with CFP, will place experienced signature gatherers to collect the signatures. For paid gatherers, Consultant will (1) provide oversight, training and management of the collection of the signatures (2) recommend to CFP optimum pricing to pay circulators and local field managers to ensure the net valid signatures are collected within the deadline periods (3) provide circulators with any campaign literature and CFP guiding principles; and (4) monitor the pace of the signature collection and report signatures collected in each jurisdiction on a weekly or twice weekly basis or as reasonably requested by CFP.

    c.  **Scans for Daily Verification.** Consultant must, on a daily basis, provide scans or acceptable copies of petition pages to Cruz for President headquarters, in a manner as specified by Cruz for President or its agent, for the essential signature verification process (determining the validity of the signatures).

    d.  **Original Petition sheets.** The original petition sheets gathered by Consultant are property of Cruz for President and must be held securely by Consultant until filing at a time to be designated by Cruz for President, acting through its agents Greg Graves or Mark Campbell.

## VERMONT

| | Net Valid Signatures | Cost/Valid Signature | Total Cost |
|---|---|---|---|
| **TOTAL VERMONT SIGNATURE COST** | 1,500 | $4.50 | $6,750 |



**FIRST AMENDMENT TO AGREEMENT FOR CONSULTING SERVICES**

THIS FIRST AMENDATORY AGREEMENT is made as of the execution date set forth below by and between Cruz for President ("*CFP*"), a Texas nonprofit corporation, and Benezet Consulting LLC, a Texas limited liability company. ("*Consultant*").

WHEREAS, CFP and Consultant entered into an agreement on November 11, 2015 to provide professional consulting services ("*Agreement*"); and

WHEREAS, CFP and Consultant desire to add an additional location and terms to the Agreement;

NOW, THEREFORE, CFP and Consultant agree as follows;

ARTICLE 1.4, TERM shall be amended to extend the term of the agreement to February 1, 2016.

ARTICLE 2.2, REIMBURSEMENT ON SIGNATURE BASIS shall be amended to strike "valid."

ARTICLE 2.3, REIMBURSEMENT OF EXPENSES shall be amended to add: "Notwithstanding the foregoing, compensation for services performed in Rhode Island will not include reimbursable expenses."

ATTACHMENT A shall be amended to:

Add to existing section 1: "and Rhode Island"

Strike references to valid signatures

Add **Rhode Island**

| | Net Signatures | Cost/ Signature | Total Cost |
|---|---|---|---|
| **TOTAL RHODE ISLAND SIGNATURE COST** | 300 | $8.00 | $2400.00 |

All other terms and conditions contained in the Agreement shall remain in full force and effect.

This First Amendatory Agreement is hereby executed on this 29 day of January 2016

**For Cruz for President:**

Dated: 2-4-16

By: _Sarah Hoeller_

Name: Sarah Hoeller
Title: Director of Operations

**For Benezet Consulting LLC:**

Dated: _____

By: _____

Name: Trenton Pool
Title: President, Benezet Consulting LLC

**SECOND AMENDMENT TO AGREEMENT FOR CONSULTING SERVICES**

THIS SECOND AMENDATORY AGREEMENT is made as of the execution date set forth below by and between Cruz for President (*"CFP"*), a Texas nonprofit corporation, and Benezet Consulting LLC, a Texas limited liability company. (*"Consultant"*).

WHEREAS, CFP and Consultant entered into an agreement on November 11, 2015 to provide professional consulting services (*"Agreement"*), which was amended on January 30, 2016; and

WHEREAS, CFP and Consultant desire to add an additional location and terms to the Agreement;

NOW, THEREFORE, CFP and Consultant agree as follows;

ARTICLE 1.4, TERM shall be amended to extend the term of the agreement to March 1, 2016.

ARTICLE 2.2, REIMBURSEMENT ON SIGNATURE BASIS shall be re-amended to add "valid."

ARTICLE 2.3, REIMBURSEMENT OF EXPENSES shall be amended to add: "Notwithstanding the foregoing, compensation for services performed in Pennsylvania will not include reimbursable expenses except notary fees up to $1000.00."

ATTACHMENT A shall be amended to:

Add to existing section 1: "and Pennsylvania"

Un-strike references to valid signatures

Add to existing section 1.b.(4): For Pennsylvania, Consultant must report total signatures gathered at 5 PM and 10 PM each day.

Add e. **Data.** For Pennsylvania, CFP is to provide I360 access for block-walking immediately upon contract commencement.

1

Add **Pennsylvania**

| CD | Net Presidential Signatures | Net Delegate Signatures | Total Signatures | Cost/ Signature | Total Cost |
|---|---|---|---|---|---|
| 4 | 275 | 275 x 3 | 1100 | $6.50 | $7150 |
| 5 | 275 | 275 x 3 | 1100 | $6.50 | $7150 |
| 6 | 275 | 275 x 3 | 1100 | $6.50 | $7150 |
| 8 | 275 | 275 x 3 | 1100 | $6.50 | $7150 |
| 14 | 275 | 275 x 3 | 1100 | $6.50 | $7150 |
| | | | | | $35750 |

Half of the total Pennsylvania cost is to be paid upfront to Consultant.

All other terms and conditions contained in the Agreement shall remain in full force and effect.

This Second Amendatory Agreement is hereby executed on this 3rd day of February 2016

**For Cruz for President:**

Dated: 2-4-16

By: _Sarah Hoeller_

Name: Sarah Hoeller

Title: Director of Operations

**For Benezet Consulting LLC:**

Dated: _____

By: _____

Name: Trenton Pool

Title: President, Benezet Consulting LLC

2

# M Gmail

Trenton Pool <tdonnpool@gmail.com>

## Delegate Process
1 message

Trenton Pool <tdonnpool@gmail.com>
To: Greg Graves <ggraves@tedcruz.org>, Vonne Andring <Vonne@pacruzade.com>

Sun, Feb 7, 2016 at 12:29 PM

Hey Guys-

Based on my communications earlier wanted to re-iterate there are a few delegates statewide who were RP committed and could poach for Cruz most likely- Larry Borland (12th) has over 300 signatures and is a good example.

Also, attached is a list of people instrumental in the state in 2012's collection process....

| | | | | | |
|---|---|---|---|---|---|
| 1 | Dale | Kerns | kerns.dr40@gmail.com | 484.574.5596 | Yes |
| 2 | Bill | Faust | williamfaust234@comcast.net | 267-639-5183 | Yes |
| 3 | Brandon | Magoon | brandon.magoon@gmail.com | 814-218-6409 | Yes |
| 4* | David | Garry | dgarry7@hotmail.com | 717-943-2817 | Yes |
| 4 | Rebekah | Forney | window-of-opportunity@hotmail.com | 443-974-0324 | Yes |
| 5 | Thomas | Brown | thomas.g.brown@hotmail.com | 570-417-3695 | Yes |
| 5 | Mark | Brady | mavmrb3@gmail.com | 814-880-4780 | Yes |
| 6 | Gary | Lloyd | garyelloyd@gmail.com | 215-313-0827 | Yes |
| 7* | Pat | Sellers | psellers624@gmail.com | 610-942-9449 | Yes |
| 8* | Rob | Pepe | rob@pfpusa.com | 215-801-5033 | Yes |

EXHIBIT
#8
D
P-27-16 JJS
PENGAD 800-631-6989

| | | | | | |
|---|---|---|---|---|---|
| 9 | Audra | Cruder | audrarp2012@gmail.com | 724-288-5888 | Yes |
| 9 | Patricia | Gambol | pgambol@gmail.com | 626-216-8081 | Yes |
| 10 | Billy | Allred | billy.allred@spx.com | 570-974-9749 | Yes |
| 11 | Scott | Davis | scott@ronpaulpa.com | 717-884-9030 | Yes |
| 12* | Lawrence | Borland | blckrose@pitt.edu | 412-606-7798 | Yes |
| 13 | Ken | Fichtner | kafsi26@gmail.com | 610.621.6614 | Yes |
| 13 | Steven | Gilber | sgilber@aol.com | 267-205-2068 | Yes |
| 14 | Andy | Maul | andymaul@yahoo.com | 412-478-9082 | Yes |
| 14 | Jared | Yanovich | slovichon@gmail.com | 724-875-9380 | Yes |
| 15 | Rich | Piotrowski | rich@richpiotrowski.org | 610-400-3120 | Yes |
| 15 | Giovanni | Landi | tfhgino@yahoo.com | 484-706-0360 | Yes |
| 16 | Ben | Sheaffer | bugsmashers@hotmail.com | 717-271-1896 | Yes |
| 17 | Eric | Villano | ericvillano@aol.com | 570-451-1152 | Yes |
| 18* | Elizabeth | Heaton | curly_brown2001@yahoo.com | 727-253-5550 | Yes |

Thanks,

**Trenton Donn Pool**
President

Direct: 512-784-0132
Email: tdonnpool@gmail.com

**Benezet Consulting, LLC**
3800 Creek Rd
Dripping Springs, TX 78620

## AGREEMENT FOR CONSULTING SERVICES

THIS AGREEMENT FOR CONSULTING SERVICES (this "*Agreement*") is made and entered into as of the 31th day of January, 2016, by and between Signature Masters Inc., a Wyoming corporation (*"Masters"*), and Benezet Consulting LLC, a Texas limited liability company. ("*Consultant*").

### RECITALS

WHEREAS, Masters desires to retain Consultant for ballot access services as described in Attachment A and Consultant desires to be retained by Masters in said capacity; and

WHEREAS, Each party desires to set forth in writing the terms and conditions of their understandings and agreement.

NOW, THEREFORE, in consideration of the mutual covenants and obligations contained herein, the sufficiency of which is hereby acknowledged by the parties, Masters hereby agrees to retain Consultant, and Consultant hereby accepts such engagement upon the terms and conditions set forth in this Agreement.

### AGREEMENT

### ARTICLE 1
### POSITION, DUTIES AND TERM

1.1     **Services and Duties.** Consultant shall provide the services to Masters as described in Attachment A (the "*Services*"). Consultant warrants that all Services under this Agreement shall be performed and completed in a professional, ethical, and competent manner.

1.2     **Relationship of Parties.** Consultant shall act as an independent contractor in performing the Services described in this Agreement. Nothing contained herein shall be deemed to make Consultant the agent, employee, joint venturer, or partner of Masters, or be deemed to provide Consultant with the power or authority to act for or on behalf of Masters, or to bind Masters to any contract, agreement, or arrangement with any other person, except as specifically set forth herein. Personnel supplied by Consultant will be deemed to be Consultant's employees, representatives, agents or subcontractors, and will not for any purpose be considered employees or agents of Masters.

1.3     **Use of Employees and Subcontractors.** Consultant may retain any individual or individuals to perform services on Consultant's behalf under this Agreement. Actual direction and control of such employees, agents and independent contractors shall at all times be Consultant's responsibility.

1.4     **Term.** The term of this contract shall commence on January 31, 2016 (the "*Commencement Date*"), shall continue until December 31, 2016.

1.5     **Termination by Either Party.** Either party may terminate this Agreement at any time, and for any reason, by providing five (5) days written notice to the other party. In the event of termination, all accrued compensation and reimbursement of all properly approved expenses incurred through the day subsequent to receipt of such notice shall be paid.



## ARTICLE 2
## COMPENSATION AND EXPENSES

      **2.1**     **Compensation.** For the performance of the Services and duties described in Article 1 and in Attachment A, in accordance with the terms of this Agreement, Masters agrees to pay Consultant as set forth below.

      **2.2**     **Reimbursement on Signature Basis.** Masters agrees to reimburse Consultant on a per signature cost for signatures collected by paid signature gatherers pursuant to this section and the schedule in Attachment A.

      **2.3**     **Reimbursement of Expenses.** Masters shall reimburse Consultant for the reasonable and necessary expenses that are incurred by Consultant while performing the Services under this Agreement, including travel into state and specific directed in-state travel at a .45/mile rate or gas receipts directly related to specific, directed travel into state or in-state travel, lodging, rental cars, copying/scanning/mailing costs, notarization and witnessing fees, upon presentation of expense statements, receipts and/or vouchers, or such other information and documentation as Masters may reasonably require.

      **2.4**     **Billing and Payment.** Consultant shall submit invoices to Masters on an as-completed basis. If Consultant transmits an invoice to Masters on a timely basis, then Masters shall pay such invoice within seven (7) days of its submission to Masters. Consultant shall be entitled to discontinue services under this Agreement in the event that any invoice is not paid when due.

                           `KII Y`

      **3.1**     **Authority.** Consultant may not enter into any legally binding agreement, written or oral, or take any other legal act in the name of Masters without prior approval.

## ARTICLE 4
## MISCELLANEOUS

      **4.1**     **Complete Agreement.** This Agreement represents the complete and entire agreement between Masters and Consultant and completely replaces and supersedes all previous agreements, whether written or oral, pertaining to the subject matter hereof.

      **4.2**     **No Inconsistent Obligations.** Consultant represents and warrants that to his/her knowledge Consultant has no obligations, legal, in contract, or otherwise, inconsistent with the terms of this Agreement or with Consultant's undertaking employment with Masters to perform the Services and duties described herein. Consultant will not disclose to Masters, or use, or induce Masters to use, any confidential, proprietary, or trade secret information of others. Consultant represents and warrants that to Consultant's knowledge Consultant has returned all property and confidential information belonging to all prior employers, if Consultant is obligated to do so.

      **4.3**     **Binding Agreement.** This Agreement shall inure to the benefit of and be binding upon Consultant, his/her heirs and personal representatives, and Masters, its successors and assigns.

**4.4     Non-Assignability.** This Agreement shall not be assigned without prior written approval.

**4.5     Modification or Waiver.** The failure or omission of Masters to require Consultant's strict compliance of any one or more terms, covenants, conditions, or provisions of this Agreement, or to exercise any of its rights or remedies in any circumstance, shall not constitute a waiver or relinquishment of any of Masters's rights granted hereunder or of any future performance of such terms, covenants, conditions, or provisions, constitute a precedent, or otherwise affect the interpretation of this Agreement. No terms or provisions of this Agreement may be amended, waived, or modified without a written agreement that expressly references this Agreement and that is signed by both the Consultant and a duly authorized representative for Masters.

**4.6     Notices.** All notices and other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given if delivered personally, mailed by certified mail (return receipt requested) or sent by overnight delivery service, electronic mail, or facsimile transmission (with electronic confirmation of successful transmission) to the parties at the following addresses or at such other addresses as shall be specified by the parties by like notice, in order of preference of the recipient:

**If to Masters:**
Signature Masters Inc.
1623 Central Ave
Suite 145
Cheyenne, Wyoming 82001

**If to Consultant:**
Benezet Consulting LLC
3800 Creek Rd
Dripping Springs, TX 78620

Notice so given shall, in the case of mail, be deemed to be given and received on the fifth calendar day after posting, in the case of overnight delivery service, on the date of actual delivery and, in the case of facsimile transmission, electronic mail or personal delivery, on the date of actual transmission or, as the case may be, personal delivery.

**4.7     Attorneys' Fees.** In the event either party must bring suit for any reason under this Agreement, the prevailing party shall be entitled to recover all costs of such suit, including reasonable attorneys' fees, from the other party.

**4.8     Choice of Law and Venue.** Masters and Consultant agree that the terms of this Agreement shall be deemed to be made under, governed by, and construed in accordance with, the laws of the State of Texas, without regard to any conflict of laws rule or principle which might refer the governance or construction of this Agreement to the laws of another jurisdiction. Any action in regard to this Agreement or arising out of its terms and conditions shall only be instituted in Hays County, Texas.

**4.9     Headings.** The headings in this Agreement are included for the sole purpose of convenience, and they shall not in any way limit or affect the meaning or interpretation of any of the terms or provisions contained in this Agreement.

**4.10    Severability and Reformation.** If any of the terms or provisions contained in this Agreement are held to be invalid, void, or unenforceable by a court of competent jurisdiction, then the remaining terms and provisions shall continue in full force and effect, and the invalid, void or unenforceable provisions shall be deemed severable. Moreover, if any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to duration, activity, or subject, it shall be reformed by limiting and reducing it to the minimum extent necessary, so as to be enforceable to the extent compatible with applicable law.

**4.11    Counterparts and Facsimile.** This Agreement may be executed in counterparts, and all counterparts will be considered as part of one agreement binding on all parties to this Agreement. This Agreement may be executed via facsimile, the signatures of which shall be deemed legal and binding as an original signature hereto.

**4.12    Time is of the Essence.** The parties acknowledge and agree that time is of the essence in performing their respective obligations under this Agreement.

**IN WITNESS WHEREOF,** Masters and Consultant have executed this Agreement, effective as of the day and year first above written.

**For Signature Masters Inc.:**

Dated: 02/08/2015 _____                By: _Shawn D.Wilmoth_____

                                            Print Name:
                                            Shawn D.Wilmoth _____

                                            Title:
                                            Chief Relations Officer at Signature Masters Inc

**For Benezet Consulting LLC**

Dated: _____                          By: _____

                                            Print Name:
                                            _____

                                            Title:
                                            _____

**Attachment A**

1.  To qualify Rocque de la Fuente for the 2016 Republican Primary Ballot in
    **Pennsylvania:**
    a.  **Ballot Access/Signature Collection:**  Consultant, in consultation with Masters,
        will place experienced signature gatherers and make a good faith attempt to
        collect the below numbers of signatures.
    b.  **Original Petition sheets.**  The original petition sheets gathered by Consultant are
        property of Masters and must be held securely by Consultant until collected for
        filing by Masters.

**Pennsylvania**

| Signatures | Rate | Additional Fees | Rate |
|---|---|---|---|
| 3000+ | $5.00 | Witness | $10/hour |

## AGREEMENT FOR CONSULTING SERVICES

**THIS AGREEMENT FOR CONSULTING SERVICES** (this "*Agreement*") is made and entered into as of the 11ᵗʰ day of November, 2015, by and between Cruz for President ("*CFP*"), a Texas nonprofit corporation, and Benezet Consulting LLC, a Texas limited liability company. ("*Consultant*").

### RECITALS

**WHEREAS,** CFP desires to retain Consultant for ballot access services as described in Attachment A and Consultant desires to be retained by CFP in said capacity; and

**WHEREAS,** Each party desires to set forth in writing the terms and conditions of their understandings and agreement.

**NOW, THEREFORE,** in consideration of the mutual covenants and obligations contained herein, the sufficiency of which is hereby acknowledged by the parties, CFP hereby agrees to retain Consultant, and Consultant hereby accepts such engagement upon the terms and conditions set forth in this Agreement.

### AGREEMENT

### ARTICLE 1
### POSITION, DUTIES AND TERM

**1.1    Services and Duties.** Consultant shall provide the services to CFP as described in Attachment A (the "*Services*"). Consultant warrants that all Services under this Agreement shall be performed and completed in a professional, ethical, and competent manner.

**1.2    Relationship of Parties.** Consultant shall act as an independent contractor in performing the Services described in this Agreement. Nothing contained herein shall be deemed to make Consultant the agent, employee, joint venturer, or partner of CFP, or be deemed to provide Consultant with the power or authority to act for or on behalf of CFP, or to bind CFP to any contract, agreement, or arrangement with any other person, except as specifically set forth herein. Personnel supplied by Consultant will be deemed to be Consultant's employees, representatives, agents or subcontractors, and will not for any purpose be considered employees or agents of CFP.

**1.3    Use of Employees and Subcontractors.** Consultant will keep CFP informed as to the identity of any individual or individuals retained by Consultant who may be performing services on Consultant's behalf under this Agreement. Actual direction and control of such employees, agents and independent contractors shall at all times be Consultant's responsibility. Notwithstanding the forgoing, CFP may, at any time and for any reason, request that such employees and/or subcontractors be reassigned and different employees or subcontractors be assigned to work on CFP's account.

**1.4    Term.** The term of this contract shall commence on November 9, 2015 (the "*Commencement Date*"), shall continue until January 11, 2016.

**1.5    Termination by Either Party.** Either party may terminate this Agreement at any time, and for any reason, by providing seven (7) days written notice to the other party. In the event of termination, all accrued compensation and reimbursement of all properly approved expenses incurred through the seventh (7th) day subsequent to receipt of such notice shall be paid. Notwithstanding the foregoing, this Agreement shall automatically terminate upon the withdrawing of Ted Cruz's 2016

EXHIBIT
D #10
9-27-16 C/S

TDP

Statement of Candidacy for President of the United States with the Federal Election Commission or a public statement by Ted Cruz or CFP that Ted Cruz is terminating, winding up, or suspending his 2016 campaign for President of the United States.

**1.6     Termination by CFP for Cause.** CFP may terminate this Agreement at any time for Cause. Upon termination by CFP for Cause, Consultant shall only be entitled to accrued compensation and reimbursement of all properly approved expenses. The Consultant's termination for Cause becomes effective immediately upon notice. "Cause" means any of the following:

**(a)**     Consultant's commission of theft, embezzlement, any other act of dishonesty relating to Consultant's Services to CFP, or any violation of CFP policies, or any law, rules, or regulations applicable to the CFP;

**(b)**     Consultant's conviction of, or pleading guilty or nolo contendere to, a felony or any lesser crime having as its predicate element fraud, dishonesty, misappropriation, or moral turpitude;

**(c)**     Consultant's failure to perform the Services under this Agreement, which failure to perform is not remedied within ten (5) days after notice thereof to the Consultant by CFP; or

**(d)**     Consultant's commission of an act or acts in the performance of his/her duties under this Agreement amounting to gross negligence or willful misconduct, including, but not limited to, any breach of Section 4.1.

## ARTICLE 2
## COMPENSATION AND EXPENSES

**2.1     Compensation.** For the performance of the Services and duties described in Article 1 and in Attachment A, in accordance with the terms of this Agreement, CFP agrees to pay Consultant as set forth below.

**2.2     Reimbursement on Signature Basis.** CFP agrees to reimburse Consultant on a per valid signature cost for signatures collected by paid signature gatherers pursuant to this section and the schedule in Attachment A. Consultant may hire, as independent contractors to Consultant, signature gatherers/circulators/field managers, upon prior approval of CFP, subject to the terms and conditions of Attachment A.

**2.3     Reimbursement of Expenses.** CFP shall reimburse Consultant for the business expenses that are reasonable and necessary and are incurred by Consultant while performing the Services under this Agreement upon presentation of expense statements, receipts and/or vouchers, or such other information and documentation as CFP may reasonably require. Any travel, or combination of expenditures exceeding $50 must be pre-approved in writing by Greg Graves or Mark Campbell or his or her designee prior to incurring such expense, and CFP reserves the right to reject any such proposed expenditure. Consultant shall provide, upon request, an explanation of the purpose of any particular business expense and an estimate of the cost of the same, prior to incurring any expense related to the same. CFP reserves the right to reject any business expense.

**2.4     Billing and Payment.** Consultant shall submit invoices to CFP on an as-completed basis. If Consultant transmits an invoice to CFP on a timely basis, then CFP shall pay such invoice within fourteen (14) days of its submission to CFP. Consultant shall be entitled to discontinue services under this Agreement in the event that any invoice is not paid when due; notwithstanding the foregoing, CFP shall



not be responsible for the payment of Consultant's invoices that are billed more than sixty (60) days subsequent to the date in which the work was performed or the expense was incurred.

## ARTICLE 3
## COMPLIANCE AND AUTHORITY

**3.1    Compliance Responsibilities.** Consultant represents to CFP that Consultant is knowledgeable of the compliance and legal obligations of CFP pursuant to the Federal Election Campaign Act of 1971, as amended, and its implementing regulations found in Chapter 11 of the Code of Federal Regulations, and Consultant agrees to comply with the provisions of such laws in all respects applicable to the performance of the Services under this Agreement. Consultant further agrees to consult with CFP legal counsel in the event that Consultant has questions regarding the application of any federal, state, and/or local laws and regulations to Consultant's Services for CFP.

**3.2    Authority.** Consultant may not enter into any legally binding agreement, written or oral, or take any other legal act in the name of CFP without the prior approval of Greg Graves or Mark Campbell.

## ARTICLE 4
## CONFIDENTIALITY

**4.1    Nondisclosure.** Consultant agrees and acknowledges that, contemporaneously with the execution of this Agreement and throughout the course of his/her engagement with CFP, CFP may disclose to Consultant various "Confidential Information" (defined below) which Consultant would not otherwise receive. Except as set forth herein, at all times during Consultant's engagement and thereafter, Consultant will hold in strictest confidence and will not disclose, use, provide access to, or publish any Confidential Information. Except as set forth herein, Consultant agrees that all Confidential Information, whether prepared by Consultant or otherwise coming into Consultant's possession, shall remain the exclusive property of the CFP. Consultant hereby assigns to CFP any rights Consultant may have or acquire in such Confidential Information and recognizes that all Confidential Information is the sole property of CFP and its assigns.

(a)    **Confidential Information.** "Confidential Information" is defined as consisting of, but not limited to, information relating to CFP's: (1) operations and methods; (2) existing and proposed strategies; (3) financial information; (4) compensation arrangements and amounts; (5) contractual relationships (including this Agreement); (6) business and political partners and relationships; (7) internal affairs, including donor lists, polling data, and other non-public information related to politically-related activity; (8) business, political, and marketing plans and strategies; (9) lists with information or requirements related to existing or prospective donors, partners, or service providers; (10) confidential or proprietary information, regardless of the medium in which any such information is contained and includes information that is used in the operation, technology, and  dealings of CFP. Confidential Information shall not include: (A) information that Consultant may furnish to third parties after prior written approval by CFP under this Section 4.1, (B) information that Consultant is required by law, regulation, court order or discovery demand to disclose; provided, however, that in the case of clause (B), Consultant gives CFP, to the extent permitted by law, reasonable notice prior to the disclosure of the Confidential Information and the reasons and circumstances surrounding such disclosure to provide CFP an opportunity to seek a protective order or other appropriate request for confidential treatment of the applicable Confidential Information, or (C) information publicly known at the time of disclosure or subsequently becomes publicly known through no fault of the Consultant.



**(b)     Exclusive Property.** Consultant agrees that all Confidential Information, whether prepared by Consultant or otherwise coming into his/her possession during Consultant's engagement with the CFP, shall remain the exclusive property of the CFP.

**(c)     Prior Approval.** Consultant agrees not to communicate, directly or indirectly, with any member of the news media about, or on behalf of, CFP without the prior written approval of Mark Campbell or his or her designee. Consultant further agrees that Consultant shall not, without the prior written approval of Mark Campbell use, disclose, provide access to, or publish to any third party any of the Confidential Information described herein, directly or indirectly, either during Consultant's engagement with the CFP or at any time following the termination of Consultant's employment with CFP, except as otherwise provided for in subparagraph (a) above.

**(d)     Return of Materials.** Upon termination of this Agreement, Consultant agrees that all Confidential Information and other files, documents, materials, records, notebooks, customer or donor lists, proposals, contracts, agreements and other repositories containing information concerning CFP or the business of CFP (including all copies and electronic versions thereof) in Consultant's possession, custody or control, whether prepared by Consultant or others, shall remain with or be returned to CFP promptly (within twenty-four (24) hours) after the termination date.

**(e)     Survival of Covenants.** This Section 4.1 shall survive the expiration or termination of this Agreement for any reason. Consultant agrees not to challenge the enforceability or scope of this Section 4.1. Consultant further agrees to notify all future persons, organizations, funds or businesses, with which he/she becomes affiliated or employed by, though December 2016, of the restrictions set forth in this Section 4.1, prior to the commencement of any such affiliation or employment

**(f)     Remedies.** The parties recognize and affirm that in the event of a breach or threatened breach of Section 4.1 of this Agreement, money damages would be inadequate and CFP would not have an adequate remedy at law. Accordingly, the parties agree that in the event of a breach or a threatened breach of Sections 4.1, CFP may, in addition and supplementary to other rights and remedies existing in its favor, apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce or prevent any violations of the provisions hereof without posting a bond or other security.

## ARTICLE 5
## OWNERSHIP OF MATERIALS

**5.1     Exclusive Ownership.** CFP retains and reserves the right of exclusive ownership and use of any copy, product, publication, or any facsimile thereof which may result from Consultant's Services. Consultant and CFP agree that the work described in Article 1 and Attachment A will be considered a "work for hire" for the purpose of the United States copyright law, 17 U.S.C. § 101 *et seq.*, and that Consultant hereby irrevocably assigns and transfers to CFP all right, title and interest in and to the Consultant's work and Services to CFP, including, without limitation, all patent and copyright interests, and agrees to execute all documents reasonably requested by CFP for the purpose of applying for and obtaining any patent and copyright registrations.



### ARTICLE 6
### MISCELLANEOUS

**6.1     Complete Agreement.** This Agreement represents the complete and entire agreement between CFP and Consultant and completely replaces and supersedes all previous agreements, whether written or oral, pertaining to the subject matter hereof.

**6.2     No Inconsistent Obligations.** Consultant represents and warrants that to his/her knowledge Consultant has no obligations, legal, in contract, or otherwise, inconsistent with the terms of this Agreement or with Consultant's undertaking employment with CFP to perform the Services and duties described herein. Consultant will not disclose to CFP, or use, or induce CFP to use, any confidential, proprietary, or trade secret information of others. Consultant represents and warrants that to Consultant's knowledge Consultant has returned all property and confidential information belonging to all prior employers, if Consultant is obligated to do so.

**6.3     Binding Agreement.** This Agreement shall inure to the benefit of and be binding upon Consultant, his/her heirs and personal representatives, and CFP, its successors and assigns.

**6.4     Non-Assignability.** This Agreement shall not be assigned by Consultant without the prior written approval of Mark Campbell. CFP may assign its rights and obligations under this Agreement.

**6.5     Modification or Waiver.** The failure or omission of CFP to require Consultant's strict compliance of any one or more terms, covenants, conditions, or provisions of this Agreement, or to exercise any of its rights or remedies in any circumstance, shall not constitute a waiver or relinquishment of any of CFP's rights granted hereunder or of any future performance of such terms, covenants, conditions, or provisions, constitute a precedent, or otherwise affect the interpretation of this Agreement. No terms or provisions of this Agreement may be amended, waived, or modified without a written agreement that expressly references this Agreement and that is signed by both the Consultant and a duly authorized representative for CFP.

**6.6     Notices.** All notices and other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given if delivered personally, mailed by certified mail (return receipt requested) or sent by overnight delivery service, electronic mail, or facsimile transmission (with electronic confirmation of successful transmission) to the parties at the following addresses or at such other addresses as shall be specified by the parties by like notice, in order of preference of the recipient:

> **If to CFP:**
> Cruz for President
> P.O. Box 25376
> Houston, TX 77265

> **If to Consultant:**
> Benezet Consulting LLC
> 3800 Creek Rd
> Dripping Springs, TX 78620

Notice so given shall, in the case of mail, be deemed to be given and received on the fifth calendar day after posting, in the case of overnight delivery service, on the date of actual delivery and, in the case of



facsimile transmission, electronic mail or personal delivery, on the date of actual transmission or, as the case may be, personal delivery.

**6.7     Attorneys' Fees.** In the event either party must bring suit for any reason under this Agreement, the prevailing party shall be entitled to recover all costs of such suit, including reasonable attorneys' fees, from the other party.

**6.8     Choice of Law and Venue.** CFP and Consultant agree that the terms of this Agreement shall be deemed to be made under, governed by, and construed in accordance with, the laws of the State of Texas, without regard to any conflict of laws rule or principle which might refer the governance or construction of this Agreement to the laws of another jurisdiction. Any action in regard to this Agreement or arising out of its terms and conditions shall only be instituted in Harris County, Texas.

**6.9     Dispute Resolution.** Any dispute arising out of, or relating to, this Agreement shall be settled by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules then in effect to be held in Harris County, Texas, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. If the amount in controversy exceeds $500,000, arbitration shall be conducted under the Procedures for Large, Complex Commercial Disputes.

**6.10     Headings.** The headings in this Agreement are included for the sole purpose of convenience, and they shall not in any way limit or affect the meaning or interpretation of any of the terms or provisions contained in this Agreement.

**6.11     Severability and Reformation.** If any of the terms or provisions contained in this Agreement are held to be invalid, void, or unenforceable by a court of competent jurisdiction, then the remaining terms and provisions shall continue in full force and effect, and the invalid, void or unenforceable provisions shall be deemed severable. Moreover, if any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to duration, activity, or subject, it shall be reformed by limiting and reducing it to the minimum extent necessary, so as to be enforceable to the extent compatible with applicable law.

**6.12     Counterparts and Facsimile.** This Agreement may be executed in counterparts, and all counterparts will be considered as part of one agreement binding on all parties to this Agreement. This Agreement may be executed via facsimile, the signatures of which shall be deemed legal and binding as an original signature hereto.

**6.13     Time is of the Essence.** The parties acknowledge and agree that time is of the essence in performing their respective obligations under this Agreement.



**IN WITNESS WHEREOF,** CFP and Consultant have executed this Agreement, effective as of the day and year first above written.

**For Cruz for President:**

Dated: _2-4-16_

By: _Sarah Hall_

Print Name: _Sarah Hoeller_

Title: _Director of Operations_

**For Benezet Consulting LLC**

Dated: _11│12│15_

By: _[signature]_

Print Name: _Justine Pool_

Title: _President, Benezet Consulting_

Page 7 of 8

**Attachment A**

1.  To qualify Ted Cruz for the 2016 Republican Primary Ballot in Vermont:
    a.  **Legal Compliance:** Consultant agrees to work with CFP's legal team in reviewing ballot access requirements for Vermont. This review will include determination of ballot access deadlines for commencement of the ballot access process, the deadline on when ballot access must be achieved, and to assist in reviewing all forms and any petitions or any other documents required to comply with Vermont's ballot access laws. Consultant will assist CFP with determining, among other things, residency requirements for circulators, the classification of who may sign ballot access petitions in each jurisdiction, and compliance with signature distribution requirements where required. With respect to any requirement related to signature gathering, CFP shall have the controlling interpretation of any rule, regulation, or practice.
    b.  **Ballot Access/Signature Collection:** Consultant, in consultation with CFP, will place experienced signature gatherers to collect the signatures. For paid gatherers, Consultant will (1) provide oversight, training and management of the collection of the signatures (2) recommend to CFP optimum pricing to pay circulators and local field managers to ensure the net valid signatures are collected within the deadline periods (3) provide circulators with any campaign literature and CFP guiding principles; and (4) monitor the pace of the signature collection and report signatures collected in each jurisdiction on a weekly or twice weekly basis or as reasonably requested by CFP.
    c.  **Scans for Daily Verification.** Consultant must, on a daily basis, provide scans or acceptable copies of petition pages to Cruz for President headquarters, in a manner as specified by Cruz for President or its agent, for the essential signature verification process (determining the validity of the signatures).
    d.  **Original Petition sheets.** The original petition sheets gathered by Consultant are property of Cruz for President and must be held securely by Consultant until filing at a time to be designated by Cruz for President, acting through its agents Greg Graves or Mark Campbell.

## VERMONT

|  | Net Valid Signatures | Cost/Valid Signature | Total Cost |
|---|---|---|---|
| **TOTAL VERMONT SIGNATURE COST** | 1,500 | $4.50 | $6,750 |



## FIRST AMENDMENT TO AGREEMENT FOR CONSULTING SERVICES

THIS FIRST AMENDATORY AGREEMENT is made as of the execution date set forth below by and between Cruz for President ("*CFP*"), a Texas nonprofit corporation, and Benezet Consulting LLC, a Texas limited liability company. ("*Consultant*").

WHEREAS, CFP and Consultant entered into an agreement on November 11, 2015 to provide professional consulting services ("*Agreement*"); and

WHEREAS, CFP and Consultant desire to add an additional location and terms to the Agreement;

NOW, THEREFORE, CFP and Consultant agree as follows:

ARTICLE 1.4, TERM shall be amended to extend the term of the agreement to February 1, 2016.

ARTICLE 2.2, REIMBURSEMENT ON SIGNATURE BASIS shall be amended to strike "valid."

ARTICLE 2.3, REIMBURSEMENT OF EXPENSES shall be amended to add: "Notwithstanding the foregoing, compensation for services performed in Rhode Island will not include reimbursable expenses."

ATTACHMENT A shall be amended to:

Add to existing section 1: "and Rhode Island"

Strike references to valid signatures

Add **Rhode Island**

|  | Net Signatures | Cost/ Signature | Total Cost |
|---|---|---|---|
| TOTAL RHODE ISLAND SIGNATURE COST | 300 | $8.00 | $2400.00 |

All other terms and conditions contained in the Agreement shall remain in full force and effect.

This First Amendatory Agreement is hereby executed on this 29 day of January 2016

**For Cruz for President:**

Dated: _2-4-16_

By: _Sarah Hoeller_

Name: _Sarah Hoeller_

Title: _Director of Operations_

**For Benezet Consulting LLC:**

Dated: _2/4/16_

By: _[signature]_

Name: Trenton Pool

Title: President, Benezet Consulting LLC

## SECOND AMENDMENT TO AGREEMENT FOR CONSULTING SERVICES

THIS SECOND AMENDATORY AGREEMENT is made as of the execution date set forth below by and between Cruz for President ("*CFP*"), a Texas nonprofit corporation, and Benezet Consulting LLC, a Texas limited liability company. ("*Consultant*").

WHEREAS, CFP and Consultant entered into an agreement on November 11, 2015 to provide professional consulting services ("*Agreement*"), which was amended on January 30, 2016; and

WHEREAS, CFP and Consultant desire to add an additional location and terms to the Agreement;

NOW, THEREFORE, CFP and Consultant agree as follows;

ARTICLE 1.4, TERM shall be amended to extend the term of the agreement to March 1, 2016.

ARTICLE 2.2, REIMBURSEMENT ON SIGNATURE BASIS shall be re-amended to add "valid."

ARTICLE 2.3, REIMBURSEMENT OF EXPENSES shall be amended to add: "Notwithstanding the foregoing, compensation for services performed in Pennsylvania will not include reimbursable expenses except notary fees up to $1000.00."

ATTACHMENT A shall be amended to:

Add to existing section 1: "and Pennsylvania"

Un-strike references to valid signatures

Add to existing section 1.b.(4): For Pennsylvania, Consultant must report total signatures gathered at 5 PM and 10 PM each day.

Add e. **Data.** For Pennsylvania, CFP is to provide I360 access for block-walking immediately upon contract commencement.

1



Add **Pennsylvania**

| CD | Net Presidential Signatures | Net Delegate Signatures | Total Signatures | Cost/ Signature | Total Cost |
|----|----|----|----|----|----|
| 4 | 275 | 275 x 3 | 1100 | $6.50 | $7150 |
| 5 | 275 | 275 x 3 | 1100 | $6.50 | $7150 |
| 6 | 275 | 275 x 3 | 1100 | $6.50 | $7150 |
| 8 | 275 | 275 x 3 | 1100 | $6.50 | $7150 |
| 14 | 275 | 275 x 3 | 1100 | $6.50 | $7150 |
| | | | | | $35750 |

Half of the total Pennsylvania cost is to be paid upfront to Consultant.

All other terms and conditions contained in the Agreement shall remain in full force and effect.

This Second Amendatory Agreement is hereby executed on this 3rd day of February 2016

**For Cruz for President:**          **For Benezet Consulting LLC:**

Dated: _2-4-16_                     Dated: _2/4/16_

By: _Sarah Hoeller_                 By: _____

Name: Sarah Hoeller                 Name: Trenton Pool

Title: Director of Operations       Title: President, Benezet Consulting LLC

2

## AGREEMENT FOR CONSULTING SERVICES

**THIS AGREEMENT FOR CONSULTING SERVICES** (this *"Agreement"*) is made and entered into as of the 6th day of June, 2016, by and between _____ ("*Client*") and Benezet Consulting LLC, a Texas limited liability company. ("*Consultant*").

### RECITALS

**WHEREAS**, Client desires to retain Consultant for ballot access services as described in Attachment A and Consultant desires to be retained by Client in said capacity; and

**WHEREAS**, Each party desires to set forth in writing the terms and conditions of their understandings and agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants and obligations contained herein, the sufficiency of which is hereby acknowledged by the parties, Client hereby agrees to retain Consultant, and Consultant hereby accepts such engagement upon the terms and conditions set forth in this Agreement.

### AGREEMENT

### ARTICLE 1
### POSITION, DUTIES AND TERM

**1.1    Services and Duties.** Consultant shall provide the services to Client as described in Attachment A (the *"Services"*). Consultant warrants that all Services under this Agreement shall be performed and completed in a professional, ethical, and competent manner.

**1.2    Relationship of Parties.** Consultant shall act as an independent contractor in performing the Services described in this Agreement. Nothing contained herein shall be deemed to make Consultant the agent, employee, joint venturer, or partner of Client, or be deemed to provide Consultant with the power or authority to act for or on behalf of Client, or to bind Client to any contract, agreement, or arrangement with any other person, except as specifically set forth herein. Personnel supplied by Consultant will be deemed to be Consultant's employees, representatives, agents or subcontractors, and will not for any purpose be considered employees or agents of Client.

**1.3    Use of Employees and Subcontractors.** Consultant may retain any individual or individuals to perform services on Consultant's behalf under this Agreement. Actual direction and control of such employees, agents and independent contractors shall at all times be Consultant's responsibility.

**1.4    Term.** The term of this contract shall commence on June 2, 2016 (the *"Commencement Date"*), shall continue until December 31, 2016.

**1.5    Termination by Either Party.** Either party may terminate this Agreement at any time, and for any reason, by providing seven (7) days written notice to the other party. In the event of termination, all accrued compensation and reimbursement of all properly approved expenses incurred through the day subsequent to receipt of such notice shall be paid.

EXHIBIT #11

## ARTICLE 2
## COMPENSATION AND EXPENSES

**2.1     Compensation.** For the performance of the Services and duties described in Article 1 and in Attachment A, in accordance with the terms of this Agreement, Client agrees to pay Consultant as set forth below.

**2.2     Reimbursement on Signature Basis.** Client agrees to reimburse Consultant on a per signature cost for signatures collected by paid signature gatherers pursuant to this section and the schedule in Attachment A.

**2.3     Reimbursement of Expenses.** Client shall reimburse Consultant for printing and scanning expenses that are incurred by Consultant while performing the Services under this Agreement upon presentation of expense statements, receipts and/or vouchers, or such other information and documentation as Client may reasonably require, not to exceed $1000.00.

**2.4     Billing and Payment.** Consultant shall submit invoices to Client on an as-completed basis. If Consultant transmits an invoice to Client on a timely basis, then Client shall pay such invoice within three (3) days of its submission to Client. Consultant shall be entitled to discontinue services under this Agreement in the event that any invoice is not paid when due.

## ARTICLE 3
## COMPLIANCE AND AUTHORITY

**3.1     Authority.** Consultant may not enter into any legally binding agreement, written or oral, or take any other legal act in the name of Client without prior approval.

## ARTICLE 5
## MISCELLANEOUS

**4.1     Complete Agreement.** This Agreement represents the complete and entire agreement between Client and Consultant and completely replaces and supersedes all previous agreements, whether written or oral, pertaining to the subject matter hereof.

**4.2     Binding Agreement.** This Agreement shall inure to the benefit of and be binding upon Consultant, his/her heirs and personal representatives, and Client, its successors and assigns.

**4.3     Non-Assignability.** This Agreement shall not be assigned without prior written approval.

**4.4     Modification or Waiver.** The failure or omission of either party to require strict compliance of any one or more terms, covenants, conditions, or provisions of this Agreement, or to exercise any of its rights or remedies in any circumstance, shall not constitute a waiver or relinquishment of any rights granted hereunder or of any future performance of such terms, covenants, conditions, or provisions, constitute a precedent, or otherwise affect the interpretation of this Agreement. No terms or provisions of this Agreement may be amended, waived, or modified without a written agreement that expressly references this Agreement and that is signed by both the Consultant and a duly authorized representative for Client.

**4.5**   **Notices.** All notices and other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given if delivered personally, mailed by certified mail (return receipt requested) or sent by overnight delivery service, electronic mail, or facsimile transmission (with electronic confirmation of successful transmission) to the parties at the following addresses or at such other addresses as shall be specified by the parties by like notice, in order of preference of the recipient:

**If to Client:**

_____

_____

_____

**If to Consultant:**
Benezet Consulting LLC
3800 Creek Rd
Dripping Springs, TX 78620

Notice so given shall, in the case of mail, be deemed to be given and received on the fifth calendar day after posting, in the case of overnight delivery service, on the date of actual delivery and, in the case of facsimile transmission, electronic mail or personal delivery, on the date of actual transmission or, as the case may be, personal delivery.

**4.6**   **Attorneys' Fees.** In the event either party must bring suit for any reason under this Agreement, the prevailing party shall be entitled to recover all costs of such suit, including reasonable attorneys' fees, from the other party.

**4.7**   **Choice of Law and Venue.** Client and Consultant agree that the terms of this Agreement shall be deemed to be made under, governed by, and construed in accordance with, the laws of the State of Texas, without regard to any conflict of laws rule or principle which might refer the governance or construction of this Agreement to the laws of another jurisdiction. Any action in regard to this Agreement or arising out of its terms and conditions shall only be instituted in Hays County, Texas.

**4.8**   **Headings.** The headings in this Agreement are included for the sole purpose of convenience, and they shall not in any way limit or affect the meaning or interpretation of any of the terms or provisions contained in this Agreement.

**4.9**   **Severability and Reformation.** If any of the terms or provisions contained in this Agreement are held to be invalid, void, or unenforceable by a court of competent jurisdiction, then the remaining terms and provisions shall continue in full force and effect, and the invalid, void or unenforceable provisions shall be deemed severable. Moreover, if any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to duration, activity, or subject, it shall be reformed by limiting and reducing it to the minimum extent necessary, so as to be enforceable to the extent compatible with applicable law.

**4.10   Counterparts and Facsimile.** This Agreement may be executed in counterparts, and all counterparts will be considered as part of one agreement binding on all parties to this Agreement. This Agreement may be executed electronically, the signatures of which shall be deemed legal and binding as an original signature hereto.

**4.11   Time is of the Essence.**   The parties acknowledge and agree that time is of the essence in performing their respective obligations under this Agreement.

**IN WITNESS WHEREOF**, Client and Consultant have executed this Agreement, effective as of the day and year first above written.

**For Client:**

Dated: _____        By: _____

                                    Print Name: _____

                                    Title: _____

**For Benezet Consulting LLC:**

Dated: _____        By: _____

                                    Print Name: Trenton D. Pool

                                    Title: President, Benezet Consulting LLC

**Attachment A**

1.  To qualify Rocque de la Fuente to be an independent candidate on the 2016 November General Election Ballot in **Ohio**:

    a.  **Ballot Access/Signature Collection:** Consultant, in consultation with Client, will place signature gatherers to collect the below numbers of signatures.
    b.  **Original Petition sheets.** The original petition sheets gathered by Consultant are property of Client and must be held securely by Consultant until collected for filing by Client. Client is solely responsible for arranging courier service to pick up and deliver or mail such petition sheets for filing. Client may separately contract with Consultant for such services, at Client's expense.
    c.  **Payment Schedule.** One third of the contract value ($8000.00) is payable to Consultant up front before signature collection begins. One third of the contract value ($8000.00) is payable to Consultant upon the provision of scanned proof of collection of 5000 signatures. The final contract balance is payable to Consultant upon filing.

**Ohio**

| Signatures | Rate | Contract Value |
|---|---|---|
| 8000 | $3.00 | $24,000.000 |

## FIRST AMENDMENT TO AGREEMENT FOR CONSULTING SERVICES

THIS FIRST AMENDATORY AGREEMENT is made as of the execution date set forth below by and between Benezet Consulting LLC, a Texas limited liability company. ("Consultant") and XXX ("Client").

WHEREAS, Client and Consultant entered into an agreement on XXX to provide professional consulting services ("Agreement"), and

WHEREAS, Client and Consultant desire to amend the petitioning locations and add state-specific terms;

NOW, THEREFORE, Client and Consultant agree as follows;

1. Section 2.3 of the Agreement is amended to amended to state: **Reimbursement of Expenses.** Client shall reimburse Consultant for necessary expenses that are incurred by Consultant while performing the Services under this Agreement upon presentation of expense statements, receipts and/or vouchers, or such other information and documentation as Client may reasonably require, not to exceed the expense limit for the state in which the expense is incurred as listed in Attachment A. Reimbursable expenses may exceed expense limits in Attachment A only with prior approval of the Client.

2. Section 1 of Attachment A is amended to state:  To qualify Rocque de la Fuente to be an independent candidate on the 2016 November General Election Ballot in the states below:

3. Section 1.C of Attachment A is stricken.

4. The heading and table appearing in Attachment A is stricken and replaced with the following:

### Multi-State Rate Card, Expenses, and Payment Terms

| State | Signatures | Rate | Contract Value | Expense Limits | Payment Schedule |
|---|---|---|---|---|---|
| Ohio | 8,000 | $3.00 | $24,000.00 | 1,000.00 | One third of the contract value ($8000.00) is payable to Consultant up front before signature collection begins. One third of the contract value ($8000.00) is payable to Consultant upon the provision of scanned proof of collection of 5000 signatures. The final contract balance is payable to Consultant upon filing. |
| Pennsylvania | 32,000 | $4.50 | $144,000.00 | 10,000.00* | $60,000.00 of the contract value is payable to Consultant up front before signature collection begins. The remainder will come due in quarterly installments of $21,000 upon provision of scanned proof of collection of ¼ (8,000) of the total contract signatures. |
| Massachusetts | 16,000 | $3.50 | $56,000.00 | 12,000.00 | Half of the contract value is payable to Consultant up front before signature collection begins. The remaining half will come due in two equal payments, the first upon provision of scanned proof of collection of ½ of the contract signatures and remaining balance upon filing. |
| Virginia | 8,000 | $6.00 | $24,000.00 | 2,500.00 | Half of the contract value is payable to Consultant up front before signature collection begins. The remaining half will come due in two equal payments, the first upon provision of scanned proof of collection of ½ of the contract signatures and remaining balance upon filing. |
| Rhode Island | 2,000 | $3.50 | $7,000 | 5,000.00 | Half of the contract value is payable to Consultant up front before signature collection begins. The remaining half will come due in two equal payments, the first upon provision of scanned proof of collection of ½ of the contract signatures and remaining balance upon filing. |
| Vermont | 2,000 | $3.50 | $7,000 | 2,000.00 | Half of the contract value is payable to Consultant up front before signature collection begins. The remaining half will come due in two equal payments, the first upon provision of scanned proof of collection of ½ of the contract signatures and remaining balance upon filing. |



| Alaska | 5,000 | $9.00 | $45,000 | 5,000.00 | Half of the contract value is payable to Consultant up front before signature collection begins. The remaining half will come due in two equal payments, the first upon provision of scanned proof of collection of ½ of the contract signatures and remaining balance upon filing. |
|---|---|---|---|---|---|
| Washington | 2,000 | $7.50 | $15,000 | 3,000.00 | Half of the contract value is payable to Consultant up front before signature collection begins. The remaining half will come due in two equal payments, the first upon provision of scanned proof of collection of ½ of the contract signatures and remaining balance upon filing. |
| Connecticut | 12,000 | $3.50 | $42,000 | 5,000.00 | Half of the contract value is payable to Consultant up front before signature collection begins. The remaining half will come due in two equal payments, the first upon provision of scanned proof of collection of ½ of the contract signatures and remaining balance upon filing. |

* PA expense limit contingent on confirmation of no notarization requirement

All other terms and conditions contained in the Agreement shall remain in full force and effect.

This First Amendatory Agreement is hereby executed on this 11th day of June, 2016.

**For Client:**                                    **For Benezet Consulting LLC:**

Dated: _____          Dated: _____

By: _____          By: _____

Name:                                              Name: Trenton Pool

Title: _____          Title: President, Benezet Consulting LLC

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **BENEZET CONSULTING, LLC;** : | |
| **TRENTON POOL** *and* **CAROL LOVE** : | |
| : | **CIVIL ACTION** |
| **PLAINTIFFS,** : | |
| : | **No. 1:16-CV-00074** |
| **vs.** : | **Hon. Yvette Kane** |
| : | |
| **PEDRO A. CORTÉS, in his official capacity** : | |
| **as the Secretary of the Commonwealth of** : | |
| **Pennsylvania; and JONATHAN MARKS,** : | **RECEIVED** |
| **in his official capacity as Commissioner,** : | |
| **of the Bureau of Commissions, Elections and** : | JUN 2 1 2016 |
| **Legislation** : | Office of Attorney General |
| : | Litigation Section |
| : | |
| **DEFENDANTS.** : | |

## PLAINTIFF BENEZET CONSULTING'S OBJECTIONS AND RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES DIRECTED TO BENEZET CONSULTING, LLC

### GENERAL OBJECTIONS

1.      Plaintiff Benezet Consulting objects to Defendants' interrogatories to the extent that Defendants' seek the discovery of information which is beyond the scope of this lawsuit, and therefore irrelevant, immaterial, and not reasonably calculated to lead to the discovery of admissible evidence.

2.      Plaintiff Benezet Consulting objects to Defendants' interrogatories to the extent that Defendants' interrogatories are overly broad, unduly burdensome and calculated to annoy and harass Plaintiff for defending rights guaranteed to her under the First and Fourteenth Amendments to the United States Constitution.

3.      Plaintiff Benezet Consulting objects to Defendants' interrogatories to the extent that Defendants' interrogatories seek information which is privileged from disclosure by the attorney-client privilege, attorney work-product doctrine and other applicable privileges.

4.      Plaintiff Benezet Consulting objects to Defendants' interrogatories to the extent that the information requested is in the possession of Defendants and/or publicly available on the Defendants' own internet portal. The burden of responding to such request is substantially the same or less for the Defendants as for Plaintiff Benezet Consulting.

1



5.      Plaintiff Benezet Consulting objects to Defendants' interrogatories to the extent that they seek information that no longer exists or has otherwise been lost, misplaced, or destroyed.

Subject to and without waiving the foregoing objections, Plaintiff Benezet Consulting provides the following specific objections and responses to Defendants' First Set of Interrogatories Directed to Benezet Consulting, LLC:

### SPECIFIC OBJECTIONS AND RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES DIRECTED TO TRENTON POOL

1.      Identify all persons who, to your knowledge or information, have information relevant to and relating to Plaintiff's claims against Defendants. For each such person, list and describe the information or knowledge possessed and how the person acquired such information or knowledge.

**Response:**
(1) Vonn Andring, Principal, Big Table Strategies, LLC, www.bigtablestrategies.com, P.O.Box 25384, Houston, Texas. Mr, Andring was the Pennsylvania Political Director for Cruz for President. Mr. Andring, as the director of the Cruz 2016 petition drive in Pennsylvania would have complete knowledge as to the out-of-state witness restriction for the circulation of nomination petitions, the prohibition of registered qualified electors from signing more than one nomination petition per office per election and the requirement that each page of a nomination petition must be notarized. Mr. Andring was also aware of the lawsuit filed in this action and the claims made therein.

(2) Edee Baggett (aka Mary E. Baggett, National Ballot Access, 925 Hillary Lane, Lawrenceville, GA 30043-6698. Edee Baggett was in charge of the 2016 nomination petition drive in Pennsylvania for Donald Trump's 2016 presidential campaign. Plaintiffs Benezet Consulting and Pool were going to circulate nomination petitions for Trump in Pennsylvania but as a result of the in-state witness restriction, Plaintiff Pool contacted the Allegheny County Republican Committee to ask if they had any witnesses that could assist in the petition drive for Trump with out-of-state witnesses. When Ms. Baggett learned that Plaintiff Pool had contacted the local GOP for help, she became angry alleged that the party was out to hurt Trump and, as a result, Ms. Baggett pulled the Pennsylvania Trump contract from Plaintiff Benezet Consulting. Accordingly, Ms. Baggett is well aware of the out-of-state circulator restriction, as well as, the prohibition on registered qualified electors from signing more than 1 nomination petition per office per election and the requirement that each paper of the nomination petition must be individually executed and notarized. Ms. Baggett is also well aware of the litigation initiated by Plaintiffs and Plaintiffs claims in this action.

(3) Ron Yoachum, 220 South Home Avenue, Avalon, PA 15202, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(4) Ed Mason, 155 Main Street, Felton, Pennsylvania 17322, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one

2

nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(5) Denise Mason, 155 Main Street, Felton, Pennsylvania 17322, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(6) Rick Churra, 600 West College Avenue, Apartment 301, State College, PA 16801, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(7) Andy Maul (no address yet available, when address has been obtained a supplemental answer will be served) based on information and belief a resident of Pittsburgh, Pennsylvania, 412-478-9082, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(8) Milton Lukens (no address yet available, when address has been obtained a supplemental answer will be served) 703-869-1421 resident based on information and belief in Virginia, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(9) Andy Jacobs, 3403 Hawthorne Drive, Camp Hill, PA 17011, 702-785-4738 circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(10) Michael Alexander (no address yet available, when address has been obtained a supplemental answer will be served) 617-987-1144 resident based on information and belief in Massachusetts, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(11) Brian Lyyra (no address yet available, when address has been obtained a supplemental answer will be served) resident based on information and belief in Massachusetts, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

3

(12) Jim Edwards (no address yet available, when address has been obtained a supplemental answer will be served) 814-883-6756, circulated and/or witneesed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(13) Mike Jennings, c/o Mary Outing, 9828 Dauphine Drive, Charlotte, NC 28216, 818-643-9713, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(14) Jake Witmer, 6402 Hampton Drive, Anchorage, AK 99504 (physical address)/1319 Everett Avenue, Des Plaines, Illinois 60018 (mailing address) 701-204-3215, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(15) Mark Gailey, 105 Forest Street, Apartment #1, Berea Kentucky 40403, 859-979-0389, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(16) Lowman Henry, 453 Springlake Road, Harrisburg, PA 17112 assisted in the filing of Cruz 2016 nomination petitions (after they were signed, executed and notarized).

2.   Identify each and every person, excluding legal counsel, by name, address and telephone number to whom you have spoken or otherwise communicated concerning this action, and any of the claims within this action, or any of the facts giving rise to the claims in this action. For each individual identified, state the date(s) of the communication, the method of communication, those present during the conversation, and describe in detail the entire communication including all facts obtained from the other individual relevant to any of the claims set forth in this action.

Response:

(1) Richard Wenger, P.O.Box 470296, San Francisco, CA 94147, 415-922-9779, Plaintiff Pool spoke to Richard Wenger after Plaintiff Pool learned that *Green Party of Pennsylvania* was not going to be applied to nomination petitions in Pennsylvania. Plaintiff Pool discussed the potential claims of any lawsuit against Defendants with Richard Wenger and Mr. Wenger advised Plaintiff Pool to contact Paul Rossi, Esq. to discuss imitating the instant legal action.

4

(2)  Michael Arno, Arno Political Consultants, Inc., 3235 Sunrise Blvd. Suite #1, Rancho Cordova, CA 95742, 916-638-1596, was Plaintiff Pool's initial contact with the Rand Paul Campaign. Mr. Arno informed Plaintiff Pool that he was no longer bidding out contracts for the campaign and advised Plaintiff Pool to contact Patrick Wohl to bid on the Rhode Island and Pennsylvania petition drive contracts.  Briefly discussed the legal issues in Pennsylvania and wished Plaintiff Pool luck in a potential lawsuit against Pennsylvania.

(3) Patrick Wohl, Rand Paul campaign (currently with the "Greitens for Governor of Missouri campaign"), 913 East Ash Street, Columbia MO 65201, 573-227-8610, discussed Pennsylvania petition drive with Plaintiff Pool and the legal issues of this lawsuit with Plaintiff Pool, directed Plaintiff Pool to contact Michael Biundo to discuss Rand campaign contract for Pennsylvania petition drive.

(4)  Michael Biundo, Partner, RightVoter, 7915 South Emerson Avenue, Indianapolis, Indiana  46237, 970-219-2831, discussed Pennsylvania petition drive contract with Plaintiff Pool where Plaintiff Pool discussed the instant lawsuit and advised Mr. Biundo that if Plaintiff Pool succeeded on his request for emergency injunctive relief against Pennsylvania's out-of-state witness restriction Plaintiff Pool could offer to charge a lower rate per signature when Mr. Biundo asked why Pennsylvania petition drives were so expensive.  Mr. Biundo and Plaintiff Pool discussed the instant lawsuit.  When Judge Kane refused to enjoin the challenged provisions of the Pennsylvania Election Code Mr. Biundo declined to use Plaintiff Benezet Consulting for the Rand petition drive in Pennsylvania.

(5)  Edee Baggett (aka Mary E. Baggett, National Ballot Access, 925 Hillary Lane, Lawrenceville, GA 30043-6698.  Edee Baggett was in charge of the 2016 nomination petition drive in Pennsylvania for Donald Trump's 2016 presidential campaign.  Plaintiffs Benezet Consulting and Pool were going to circulate nomination petitions for Trump in Pennsylvania but as a result of the in-state witness restriction, Plaintiff Pool contacted the Allegheny County Republican Committee to ask if they had any witnesses that could assist in the petition drive for Trump with out-of-state witnesses.  When Ms. Baggett learned that Plaintiff Pool had contacted the local GOP for help, she became angry alleged that the party was out to hurt Trump and, as a result, Ms. Baggett pulled the Pennsylvania Trump contract from Plaintiff Benezet Consulting.  Accordingly, Ms. Baggett is well aware of the out-of-state circulator restriction, as well as, the prohibition on registered qualified electors from signing more than 1 nomination petition per office per election and the requirement that each paper of the nomination petition must be individually executed and notarized. Ms. Baggett is also well aware of the litigation initiated by Plaintiffs and Plaintiffs claims in this action.  Furthermore, Plaintiff Pool discussed the instant lawsuit with Ms. Baggett during the course of their dealings together.

(6)  ) Vonn Andring, Principal, Big Table Strategies, LLC, www.bigtablestrategies.com, P.O.Box 25384, Houston, Texas.  Mr, Andring was the Pennsylvania Political Director for Cruz for President.  Mr. Andring, as the director of the Cruz 2016 petition drive in Pennsylvania would have complete knowledge as to the out-of-state witness restriction for the circulation of nomination petitions, the prohibition of registered qualified electors from signing more than one nomination petition per office per election and the requirement that each page of a nomination petition must be notarized.  Mr. Andring was also aware of the lawsuit filed in this action and the claims made therein.  Furthermore,

Plaintiff Pool discussed the instant lawsuit with Mr. Andring during the course of their dealings together.

(7) Ron Yoachum, 220 South Home Avenue, Avalon, PA 15202, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized. Furthermore, Plaintiff Pool may have discussed the instant lawsuit with Mr. Yoachum during the course of their dealings together.

(8) Ed Mason, 155 Main Street, Felton, Pennsylvania 17322, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized. Furthermore, Plaintiff Pool may have discussed the instant lawsuit with Mr. Mason during the course of their dealings together.

(9) Denise Mason, 155 Main Street, Felton, Pennsylvania 17322, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized. Furthermore, Plaintiff Pool may have discussed the instant lawsuit with Ms. Mason during the course of their dealings together.

(10) Rick Churra, 600 West College Avenue, Apartment 301, State College, PA 16801, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized. Furthermore, Plaintiff Pool may have discussed the instant lawsuit with Mr. Churra during the course of their dealings together.

(11) Andy Maul (no address yet available, when address has been obtained a supplemental answer will be served) based on information and belief a resident of Pittsburgh, Pennsylvania, 412-478-9082, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized. Furthermore, Plaintiff Pool may have discussed the instant lawsuit with Mr. Maul during the course of their dealings together.

(12) Milton Lukens (no address yet available, when address has been obtained a supplemental answer will be served) 703-869-1421 resident based on information and belief in Virginia, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized. Furthermore, Plaintiff Pool may have discussed the instant lawsuit with Mr. Lukens during the course of their dealings together.

(13)  Andy Jacobs, 3403 Hawthorne Drive, Camp Hill, Pennsylvania  17011, 702-785-4738, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.  Furthermore, Plaintiff Pool discussed the instant lawsuit with Mr. Jacobs during the course of their dealings together.

(14)  Michael Alexander (no address yet available, when address has been obtained a supplemental answer will be served)  617-987-1144 resident based on information and belief in Massachusetts, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.  Furthermore, Plaintiff Pool may have discussed the instant lawsuit with Mr. Alexander during the course of their dealings together.

(15)  Brian Lyyra (no address yet available, when address has been obtained a supplemental answer will be served) resident based on information and belief in Massachusetts, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.  Furthermore, Plaintiff Pool may have discussed the instant lawsuit with Mr. Lyyra during the course of their dealings together.

(16)  Jim Edwards (no address yet available, when address has been obtained a supplemental answer will be served)  814-883-6756, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.  Furthermore, Plaintiff Pool may have discussed the instant lawsuit with Mr. Edwards during the course of their dealings together.

(17)  Mike Jennings, c/o Mary Outing, 9828 Dauphine Drive, Charlotte, NC  28216, 818-643-9713, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.  Furthermore, Plaintiff Pool discussed the instant lawsuit with Mr. Jennings during the course of their dealings together.

(18)  Jake Witmer, 6402 Hampton Drive, Anchorage, AK  99504 (physical address)/1319 Everett Avenue, Des Plaines, Illinois  60018 (mailing address) 701-204-3215, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.  Furthermore, Plaintiff Pool discussed the instant lawsuit with Mr. Witmer during the course of their dealings together.

7

(19) Mark Gailey, 105 Forest Street, Apartment #1, Berea  Kentucky  40403, 859-979-0389, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.  Furthermore, Plaintiff Pool discussed the instant lawsuit with Mr. Gailey during the course of their dealings together.

3.      Identify all witnesses you expect or intend to call at the time of the trial.

Response: Plaintiffs object to this interrogatory on the basis that Plaintiffs Pool and Benezet Consulting have not yet determined each and every witness that they may call to testify at any hearing, trial or for any dispositive motions or in opposition to any dispositive motions, as it is too early in the discovery process to make such determinations.  However, subject to the foregoing objection and reserving the right to expand the following list of witnesses, Plaintiffs currently intend on calling the following as witnesses at any hearing, trial or in favor of any dispositive motions or to oppose any dispositive motions:

(1) Plaintiff Trenton Pool, 3800 Creek Road, Dripping Springs, TX  78620;

(2) Carl Romanelli, 344 South Franklin Street, Wilkes-Barre, Pennsylvania;

(3) Andrew Jacobs, 3403 Hawthorne Drive, Camp Hill, PA  17011;

(4) Jake Witmer, 6402 Hampton Drive, Anchorage, AK  99504; 1319 Everett Avenue, Des Plaines, Illinois 60018;

(5) Mark Gailey, 105 Forest Street, Apartment #1, Berea, Kentucky  40403;

(6) Plaintiff Carol Love

(7) Defendant Jonathan Marks

(8) Edee Baggett (aka Mary E. Baggett, National Ballot Access, 925 Hillary Lane, Lawrenceville, GA 30043-6698.

(9) Michael Alexander, 617-987-1144

(10) Bob Lynch, 804-397-4771

4.      Identify all exhibits you may use at any hearing and trial of this matter.

Response: Plaintiffs object to this interrogatory on the basis that Plaintiffs Pool and Benezet Consulting have not yet determined each and every exhibit that may be used at any hearing, trial or in favor of any dispositive motions or in opposition to any dispositive motions, as it is too early in the discovery process to make such determinations.  However, subject to the foregoing objection and reserving the right to expand the following list of exhibits, Plaintiffs currently intend on using the

following exhibits at any hearing, trial or in favor or opposition to any dispositive motions that might be filed:

(1) 2016 Pennsylvania Nomination Petition;

(2) 2016 Pennsylvania Nomination Paper;

(3) 2016 Cruz Contract by and between Cruz campaign and Benezet Consulting, LLC, as executed by Plaintiff Pool.

5.  Describe with particularity each and every injury you have suffered as a result of the conduct complained of in the complaint.  The term "injury" includes physical, mental and monetary damage to you.  For each such injury, identify and describe how the injury occurred, the monetary value of such injury, whether you paid any monies on account of the injury and, if so to whom, how much and when.

Response:  Plaintiffs are only seeking prospective equitable relief from the challenged provisions of the Pennsylvania Election Code and Defendants' continued enforcement of the challenged provisions in clear violation of rights guaranteed under the First and Fourteenth Amendments to the United States Constitution by impairing and limiting plaintiffs' ability to communicate and associate with more voters and more candidates in Pennsylvania and limiting plaintiffs' political speech and ability to advance the political messages of the candidates he supports, as set forth more specifically in Plaintiffs Second Amended Complaint.  Plaintiffs do not seek monetary relief, as no such relief is available under current jurisprudence.  However, Plaintiffs have suffered significant economic harm in the following ways: (1) required to pay compensation to Pennsylvania witnesses to execute nomination petitions circulated by out-of-state residents; (2)  lost Rand Paul contract due to the higher costs imposed on out-of-state circulators needing to circulate nomination petition with in-state residents; (3) lost Trump contract, valued at $5,000-$6,000,when Plaintiff Pool contacted the local Allegheny Republican Committee for help in locating witnesses to assist in the petition drive with out-of-state circulators because Trump campaign did not trust local GOP committees, as Plaintiff Pool would not have had to contact the local party for help in finding in-state witnesses had the out-of-state witness restriction not been in force; (4) was requires to pay an additional $500 to a Pennsylvania witness who extorted and demanded an additional $500 over and above the agreed upon witness fee when the witness and circulator were at the notary public to execute the nomination petition;  (5)  Was not able to complete Cruz petition in one Congressional District because the witness used in that Congressional District would talk to herself in front of prospective registered qualified electors asked to sign the Cruz nomination petition, forcing Plaintiff Pool to pull the circulator out of that Congressional District , costing Plaintiffs Benezet Consulting and Pool the economic value of the signatures needed to be gathered in that Congressional District; (6)  the additional time and costs needed to circulate nomination petitions for extended periods of time because the challenged provision of the Pennsylvania Election Code prevents registered qualified electors from signing more than one nomination petition per election cycle for the same office; (7) he costs of notarizing each and every page of the nomination petitions circulated by Plaintiffs Benezet

9

Consulting and Pool; (8) lost revenue during that period of time that Plaintiffs Benezet Consulting and Pool were in Pennsylvania ready to circulate nomination petitions but could not because Plaintiffs had not secured the services of in-state witnesses for Plaintiffs' out-of-state circulators;  and (9) the economic/monetary costs of advertising for in-state Pennsylvania witnesses.

6.     Please identify all expert witnesses that you may call at any hearing or trial of this matter and indicate whether such expert witnesses will be proffered for liability or damages.

**Response:  None.**

7.     Please identify all cases, since January 1, 2010, in which your identified expert witnesses have testified and include whether they have testified on liability or damages or for the Plaintiff or for the Defense.

**Response:  None.**

8.     Please identify all documents reviewed by your experts in connection with the preparation of any expert report or expert testimony.

**Response:  None.**

9.     Please describe with particularity all of the expert's opinions and conclusions and the basis for them, including all facts and documents relied on.

**Response: Not applicable.**

10.     Provide a calculation of all damages sought from Defendants.

**Response:  Plaintiffs do not seek economic damages from Defendants, but actual economic harm likely exceeds $10,000.**

11.     Are you claiming any loss of earnings or income?  If so, state the total amount, how it is computed and whether it is the total claimed or only the total to date.

**Response:  Plaintiffs do not seek loss earnings or income, but actual economic loss as a direct and proximate result of the challenged provisions of the Pennsylvania Election Code likely exceed $10,000.**

12.     Identify all persons who witnesses any of the alleged events described in your Second Amended Complaint and please identify what events each person witnesses.

**Response:**

(1) Vonn Andring, Principal, Big Table Strategies, LLC, www.bigtablestrategies.com, P.O.Box 25384, Houston, Texas.  Mr, Andring was the Pennsylvania Political Director for Cruz for President.  Mr. Andring, as the director of the Cruz 2016 petition drive in Pennsylvania would have complete knowledge as to the out-of-state witness restriction for the circulation of nomination petitions, the prohibition of registered qualified electors from signing more than one nomination petition per office

per election and the requirement that each page of a nomination petition must be notarized. Mr. Andring was also aware of the lawsuit filed in this action and the claims made therein.

(2) Edee Baggett (aka Mary E. Baggett, National Ballot Access, 925 Hillary Lane, Lawrenceville, GA 30043-6698. Edee Baggett was in charge of the 2016 nomination petition drive in Pennsylvania for Donald Trump's 2016 presidential campaign. Plaintiffs Benezet Consulting and Pool were going to circulate nomination petitions for Trump in Pennsylvania but as a result of the in-state witness restriction, Plaintiff Pool contacted the Allegheny County Republican Committee to ask if they had any witnesses that could assist in the petition drive for Trump with out-of-state witnesses. When Ms. Baggett learned that Plaintiff Pool had contacted the local GOP for help, she became angry alleged that the party was out to hurt Trump and, as a result, Ms. Baggett pulled the Pennsylvania Trump contract from Plaintiff Benezet Consulting. Accordingly, Ms. Baggett is well aware of the out-of-state circulator restriction, as well as, the prohibition on registered qualified electors from signing more than 1 nomination petition per office per election and the requirement that each paper of the nomination petition must be individually executed and notarized. Ms. Baggett is also well aware of the litigation initiated by Plaintiffs and Plaintiffs claims in this action.

(3) Ron Yoachum, 220 South Home Avenue, Avalon, PA 15202, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(4) Ed Mason, 155 Main Street, Felton, Pennsylvania 17322, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(5) Denise Mason, 155 Main Street, Felton, Pennsylvania 17322, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(6) Rick Churra, 600 West College Avenue, Apartment 301, State College, PA 16801, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(7) Andy Maul (no address yet available, when address has been obtained a supplemental answer will be served) based on information and belief a resident of Pittsburgh, Pennsylvania, 412-478-9082, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

11

(8) Milton Lukens (no address yet available, when address has been obtained a supplemental answer will be served) 703-869-1421 resident based on information and belief in Virginia, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(9) Andy Jacobs (no address yet available, when address has been obtained a supplemental answer will be served) 702-785-4738 resident based on information and belief in Nevada, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(10) Michael Alexander (no address yet available, when address has been obtained a supplemental answer will be served) 617-987-1144 resident based on information and belief in Massachusetts, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(11) Brian Lyyra (no address yet available, when address has been obtained a supplemental answer will be served) resident based on information and belief in Massachusetts, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(12) Jim Edwards (no address yet available, when address has been obtained a supplemental answer will be served) 814-883-6756, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(13) Mike Jennings, c/o Mary Outing, 9828 Dauphine Drive, Charlotte, NC 28216, 818-643-9713, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(14) Jake Witmer, 6402 Hampton Drive, Anchorage, AK 99504 (physical address)/1319 Everett Avenue, Des Plaines, Illinois 60018 (mailing address) 701-204-3215, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(15) Mark Gailey, 105 Forest Street, Apartment #1, Berea Kentucky 40403, 859-979-0389, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(16) Lowman Henry, 453 Springlake Road, Harrisburg, PA 17112 assisted in the filing of Cruz 2016 nomination petitions (after they were signed, executed and notarized).

(17) Justin Freyermuth, Pennsylvania resident, democrat witness for Rocky De La Fuente nomination petitions. Observed the witness process. Address is currently not known to Plaintiffs. As part of Plaintiffs' ongoing discovery, Plaintiffs will file a supplemental response to this interrogatory when this address becomes known to Plaintiffs.

(18) William Trautman, Pennsylvania resident, democrat witness for Rocky De La Fuente nomination petitions. Observed the witness process. Address is currently not known to Plaintiffs. As part of Plaintiffs' ongoing discovery, Plaintiffs will file a supplemental response to this interrogatory when this address becomes known to Plaintiffs.

(19) Charles McConville, Pennsylvania resident, democrat witness for Rocky De La Fuente nomination petitions. Observed the witness process. Address is currently not known to Plaintiffs. As part of Plaintiffs' ongoing discovery, Plaintiffs will file a supplemental response to this interrogatory when this address becomes known to Plaintiffs.

(20) Ashley Waner, Pennsylvania resident, democrat witness for Rocky De La Fuente nomination petitions. Observed the witness process. Address is currently not known to Plaintiffs. As part of Plaintiffs' ongoing discovery, Plaintiffs will file a supplemental response to this interrogatory when this address becomes known to Plaintiffs.

(21) Jovan Brown, Pennsylvania resident, democrat witness for Rocky De La Fuente nomination petitions. Observed the witness process. Address is currently not known to Plaintiffs. As part of Plaintiffs' ongoing discovery, Plaintiffs will file a supplemental response to this interrogatory when this address becomes known to Plaintiffs.

(22) Lauren Green, Pennsylvania resident, democrat witness for Rocky De La Fuente nomination petitions. Observed the witness process. Address is currently not known to Plaintiffs. As part of Plaintiffs' ongoing discovery, Plaintiffs will file a supplemental response to this interrogatory when this address becomes known to Plaintiffs.

13.     In your Second Amended Complaint, you make reference to persons whom you claim were going to provide signature collection services (and/or who did provide signature collection services) for you either on a paid basis or on a volunteer basis. Identify each of those persons and provide current addresses for them so that they may be subpoenaed to testify at a deposition and/or trial and so that they can be commanded to provide documents in their possession relating to the services they were going to provide to you.

**Response:**

(1) Ron Yoachum, 220 South Home Avenue, Avalon, PA 15202, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(2) Ed Mason, 155 Main Street, Felton, Pennsylvania 17322, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(3) Denise Mason, 155 Main Street, Felton, Pennsylvania 17322, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(4) Rick Churra, 600 West College Avenue, Apartment 301, State College, PA 16801, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(5)  Andy Maul (no address yet available, when address has been obtained a supplemental answer will be served)  based on information and belief a resident of Pittsburgh, Pennsylvania, 412-478-9082, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(6) Milton Lukens (no address yet available, when address has been obtained a supplemental answer will be served)  703-869-1421 resident based on information and belief in Virginia, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(7) Andy Jacobs (no address yet available, when address has been obtained a supplemental answer will be served)  702-785-4738 resident based on information and belief in Nevada, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(8) Michael Alexander (no address yet available, when address has been obtained a supplemental answer will be served) 617-987-1144 resident based on information and belief in Massachusetts, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(9) Brian Lyyra (no address yet available, when address has been obtained a supplemental answer will be served) resident based on information and belief in Massachusetts, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(10)    Jim Edwards (no address yet available, when address has been obtained a supplemental answer will be served) 814-883-6756, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(11)    Mike Jennings, c/o Mary Outing, 9828 Dauphine Drive, Charlotte, NC  28216, 818-643-9713, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(12)    Jake Witmer, 6402 Hampton Drive, Anchorage, AK  99504 (physical address)/1319 Everett Avenue, Des Plaines, Illinois  60018 (mailing address) 701-204-3215, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(13)    Mark Gailey, 105 Forest Street, Apartment #1, Berea  Kentucky  40403, 859-979-0389, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

14.    Identify any and all persons whom you have employed or contracted with or used to provide signature collection services for you.  The time frame for this interrogatory is January 1, 2010 until present.

Response: Plaintiffs Benezet Consulting and Pool object to this interrogatory to the extent that Defendants' seek the discovery of information which is beyond the scope of this lawsuit, and therefore irrelevant, immaterial, and not reasonably calculated to lead to the discovery of admissible

evidence, Plaintiffs' circulation of election petitions in other states under laws not subject to this challenge is irrelevant to the facts and legal merits of the instant action.  Plaintiffs also object to this interrogatory to the extent that it is overly broad, unduly burdensome and calculated to annoy and harass Plaintiffs for defending rights guaranteed to her under the First and Fourteenth Amendments to the United States Constitution by requiring Plaintiffs to search and produce documents from 6 years' worth of records, to the extent they even still exist is, is plainly beyond the scope of this action and would force Plaintiffs to cease from their current employment/business activities in circulating election petitions in multiple states for the 2016 general election ballot.  Plaintiffs also object to this interrogatory to the extent Defendants seek information that no longer exists or has otherwise been lost, misplaced, or destroyed as most of the records beyond the 2016 Pennsylvania circulation drive have not been maintained and are no longer in the custody of Plaintiffs nor available to answer this interrogatory.  However, subject to and without waiving the foregoing objections, Plaintiffs Benezet Consulting and Pool provide the following:

(1) Ron Yoachum, 220 South Home Avenue, Avalon, PA  15202, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(2)  Ed Mason, 155 Main Street, Felton, Pennsylvania  17322, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(3) Denise Mason, 155 Main Street, Felton, Pennsylvania  17322, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(4) Rick Churra, 600 West College Avenue, Apartment 301, State College, PA  16801, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(5)  Andy Maul (no address yet available, when address has been obtained a supplemental answer will be served)  based on information and belief a resident of Pittsburgh, Pennsylvania, 412-478-9082, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(6) Milton Lukens (no address yet available, when address has been obtained a supplemental answer will be served) 703-869-1421 resident based on information and belief in Virginia, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(7)  Andy Jacobs (no address yet available, when address has been obtained a supplemental answer will be served)  702-785-4738 resident based on information and belief in Nevada, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(8) Michael Alexander (no address yet available, when address has been obtained a supplemental answer will be served)  617-987-1144 resident based on information and belief in Massachusetts, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(9)  Brian Lyyra (no address yet available, when address has been obtained a supplemental answer will be served) resident based on information and belief in Massachusetts, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(10)  Jim Edwards (no address yet available, when address has been obtained a supplemental answer will be served) 814-883-6756, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(11)  Mike Jennings, c/o Mary Outing, 9828 Dauphine Drive, Charlotte, NC  28216, 818-643-9713, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(12)  Jake Witmer, 6402 Hampton Drive, Anchorage, AK  99504 (physical address)/1319 Everett Avenue, Des Plaines, Illinois  60018 (mailing address) 701-204-3215, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(13)  Mark Gailey, 105 Forest Street, Apartment #1, Berea  Kentucky  40403, 859-979-0389, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool In 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

15.     Identify any and all elections that you have tried to collect, or actually collected, signatures and identify the candidate or delegate for whom you collected signatures the state of the election, and the date of the election.  The time frame for this interrogatory is January 1, 2010 until the present.

Response:  :  Plaintiffs Benezet Consulting and Pool object to this interrogatory to the extent that Defendants' seek the discovery of information which is beyond the scope of this lawsuit, and therefore irrelevant, immaterial, and not reasonably calculated to lead to the discovery of admissible evidence, Plaintiffs' circulation of election petitions in other states under laws not subject to this challenge is irrelevant to the facts and legal merits of the instant action.  Plaintiffs also object to this interrogatory to the extent that it is overly broad, unduly burdensome and calculated to annoy and harass Plaintiffs for defending rights guaranteed to her under the First and Fourteenth Amendments to the United States Constitution by requiring Plaintiffs to search and produce documents from 6 years' worth of records, to the extent they even still exist is, is plainly beyond the scope of this action and would force Plaintiffs to cease from their current employment/business activities in circulating election petitions in multiple states for the 2016 general election ballot.  Plaintiffs also object to this interrogatory to the extent Defendants seek information that no longer exists or has otherwise been lost, misplaced, or destroyed as most of the records beyond the 2016 Pennsylvania circulation drive have not been maintained and are no longer in the custody of Plaintiffs nor available to answer this interrogatory.  However, subject to and without waiving the foregoing objections, Plaintiffs Benezet Consulting and Pool provide the following:

Plaintiff Pool in his individual capacity circulated election petitions, to the best of his knowledge, for the following election contests:

(1)     Ron Paul, Pennsylvania, 2012 Primary Election;

(2)     Gary Johnson, Pennsylvania, 2012 General Election;

(3)     Gary Johnson and Jill Stein, Alaska, 2012 General Election;

(4)     New Party nomination petitions for "Americans Elect" Alaska, 2012;

(5)     New Party nomination petitions for "Americans Elect" North Dakota, 2012;

(6)     New Party nomination petitions for "Americans for Limited Government" Oregon, 2008;

(7)     Casino Gaming Referendum petitions, Arkansas, 2012

(8)     Medical Marijuana referendum petitions, Arkansas, 2012

Plaintiff Benezet Consulting, LLC circulated nomination petitions, to the best of its knowledge, for the following election contests:

(1)     Ted Cruz, Pennsylvania, Illinois, Vermont, Indiana and Rhode Island, 2016 Primary Election;

(2)     Rocky De La Fuente, Pennsylvania, Indiana, Wisconsin, Connecticut 2016 Primary Election;

(3)     Rand Paul, Indiana, Vermont, Illinois, Rhode Island, 2016 Primary Election;

(4)     Rocky De La Fuente, Pennsylvania, Alaska, Ohio (and likely many more states – contract may evolve to include more states) 2016 General Election;

(5)     Jill Stein, Virginia, 2016 General Election;

(6)     Rick Santorum, Indiana, 2016 Primary Election;

(7)     Carly Fiorina, Indiana, 2016 Primary Election;

(8)     Ben Carson, Indiana, 2016 Primary Election;

(9)     Donald Trump, Indiana, 2016 Primary Election;

(10)    Texas Supreme Court candidates, Joe Pool, Sharon McCalley, Robert Talton, Texas, 2014

(11)    Alicia Franklin, 330th Family Court Judge, Texas (year unknown);

(12)    Houston Equal Rights Ordinance referendum, Texas, 2015;

(13)    Leonila Olivares Salazar, Justice of the Peace, District #2 Harris County, Texas, 2014;

(14)    Anne Kitchen, Austin City Council, Texas 2016;

(15)    Gary Johnson, Ohio, General Election 2016;

(16)    Stop the Lone Star Rail Imitative, City of Kyle, Texas, 2016.

16.   In your Second Amended Complaint, you make reference to an outburst. Identify this person (and all witnesses to this alleged outburst) and provide current addresses for them so that they may be subpoenaed to testify at a deposition and/or trial and so they can be commanded to provide documents in their possession relating to the services they were going to provide to you.

**Response:** Ben Prissette, 412-583-4299. Current address is not known. Subject to continuing discovery efforts, Plaintiffs will file a supplemental answer to this interrogatory when his address is determined.

Respectfully submitted,

Dated: June 16, 2016

Paul A. Rossi, Esq.
IMPG Advocates, Inc.
*Attorney for Plaintiffs*
Attorney I.D. # 84947
873 East Baltimore Pike, Suite #705
Kennett Square, PA  19348
717.961.8978
Paul-Rossi@comcast.net

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BENEZET CONSULTING, LLC;** | : | |
| **TRENTON POOL** *and* **CAROL LOVE** | : | |
| | : | **CIVIL ACTION** |
| **PLAINTIFFS,** | : | |
| | : | **No. 1:16-CV-00074** |
| **vs.** | : | **Hon. Yvette Kane** |
| | : | |
| **PEDRO A. CORTÉS,  in his official capacity** | : | |
| **as the Secretary of the Commonwealth of** | : | |
| **Pennsylvania; and JONATHAN MARKS,** | : | |
| **in his official capacity as Commissioner,** | : | |
| **of the Bureau of Commissions, Elections and** | : | |
| **Legislation** | : | |
| | : | |
| **DEFENDANTS.** | : | |

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that on June 16, 2016, he served, via first class mail upon the following defendants' legal counsel a true and correct copy of "Plaintiff Benezet Consulting's Objections and Responses to Defendants' First Set of Interrogatories Directed to Benezet Consulting, LLC" at the following address:

Kenneth L. Joel, Esq.
Chief Deputy Attorney General
Office of Attorney General
15th Floor, Strawberry Square
Harrisburg, PA  17120

Dated:    June 16, 2016

_____
Paul A. Rossi, Esq.

21

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BENEZET CONSULTING, LLC; <br> TRENTON POOL *and* CAROL LOVE : <br><br> PLAINTIFFS, : <br><br> vs. : <br><br> PEDRO A. CORTÉS, in his official capacity : <br> as the Secretary of the Commonwealth of : <br> Pennsylvania; and JONATHAN MARKS, : <br> in his official capacity as Commissioner, : <br> of the Bureau of Commissions, Elections and : <br> Legislation : <br><br> DEFENDANTS. : | **CIVIL ACTION** <br><br> **No. 1:16-CV-00074** <br> **Hon. Yvette Kane** |

### VERIFICATION OF INTERROGATORY ANSWERS

I, Trenton Pool, on behalf of Benezet Consulting, LLC, believe, based on reasonable inquiry, that the foregoing answers are true and correct to the best of my knowledge, information and belief.

I verify, under penalty of perjury, that the foregoing is true and correct.


Dated:  June 16, 2016

Trenton Pool on Behalf of
Benezet Consulting, LLC

22

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BENEZET CONSULTING, LLC;<br>TRENTON POOL *and* CAROL LOVE<br><br>PLAINTIFFS,<br><br>vs.<br><br>PEDRO A. CORTÉS,  in his official capacity<br>as the Secretary of the Commonwealth of<br>Pennsylvania; and JONATHAN MARKS,<br>in his official capacity as Commissioner,<br>of the Bureau of Commissions, Elections and<br>Legislation<br><br>DEFENDANTS. | CIVIL ACTION<br><br>No. 1:16-CV-00074<br>Hon. Yvette Kane<br><br>RECEIVED<br><br>JUN 21 2016<br><br>Office of Attorney General<br>Litigation Section |

## PLAINTIFF POOL'S OBJECTIONS AND RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES DIRECTED TO TRENTON POOL

### GENERAL OBJECTIONS

1.      Plaintiff Pool objects to Defendants' interrogatories to the extent that Defendants' seek the discovery of information which is beyond the scope of this lawsuit, and therefore irrelevant, immaterial, and not reasonably calculated to lead to the discovery of admissible evidence.

2.      Plaintiff Pool objects to Defendants' interrogatories to the extent that Defendants' interrogatories are overly broad, unduly burdensome and calculated to annoy and harass plaintiff for defending rights guaranteed to her under the First and Fourteenth Amendments to the United States Constitution.

3.      Plaintiff Pool objects to Defendants' interrogatories to the extent that Defendants' interrogatories seek information which is privileged from disclosure by the attorney-client privilege, attorney work-product doctrine and other applicable privileges.

4.      Plaintiff Pool objects to Defendants' interrogatories to the extent that the information requested is in the possession of Defendants and/or publicly available on the Defendants' own internet portal.  The burden of responding to such request is substantially the same or less for the Defendants as for Plaintiff Pool.

1

EXHIBIT
# 15
9-27-16

5.      Plaintiff Pool objects to Defendants' interrogatories to the extent that they seek information that no longer exists or has otherwise been lost, misplaced, or destroyed.

        Subject to and without waiving the foregoing objections, Plaintiff Pool provides the following specific objections and responses to Defendants' First Set of Interrogatories Directed to Trenton Pool:

**SPECIFIC OBJECTIONS AND RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES DIRECTED TO TRENTON POOL**

1.      Identify all persons who, to your knowledge or information, have information relevant to and relating to Plaintiff's claims against Defendants.  For each such person, list and describe the information or knowledge possessed and how the person acquired such information or knowledge.

**Response:**
(1) Vonn Andring, Principal, Big Table Strategies, LLC, www.bigtablestrategies.com, P.O.Box 25384, Houston, Texas.  Mr. Andring was the Pennsylvania Political Director for Cruz for President.  Mr. Andring, as the director of the Cruz 2016 petition drive in Pennsylvania would have complete knowledge as to the out-of-state witness restriction for the circulation of nomination petitions, the prohibition of registered qualified electors from signing more than one nomination petition per office per election and the requirement that each page of a nomination petition must be notarized.  Mr. Andring was also aware of the lawsuit filed in this action and the claims made therein.

(2) Edee Baggett (aka Mary E. Baggett, National Ballot Access, 925 Hillary Lane, Lawrenceville, GA 30043-6698.  Edee Baggett was in charge of the 2016 nomination petition drive in Pennsylvania for Donald Trump's 2016 presidential campaign.  Plaintiffs Benezet Consulting and Pool were going to circulate nomination petitions for Trump in Pennsylvania but as a result of the in-state witness restriction, Plaintiff Pool contacted the Allegheny County Republican Committee to ask if they had any witnesses that could assist in the petition drive for Trump with out-of-state witnesses.  When Ms. Baggett learned that Plaintiff Pool had contacted the local GOP for help, she became angry alleged that the party was out to hurt Trump and, as a result, Ms. Baggett pulled the Pennsylvania Trump contract from Plaintiff Benezet Consulting.  Accordingly, Ms. Baggett is well aware of the out-of-state circulator restriction, as well as, the prohibition on registered qualified electors from signing more than 1 nomination petition per office per election and the requirement that each paper of the nomination petition must be individually executed and notarized.  Ms. Baggett is also well aware of the litigation initiated by Plaintiffs and Plaintiffs claims in this action.

(3) Ron Yoachum, 220 South Home Avenue, Avalon, PA  15202, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(4) Ed Mason, 155 Main Street, Felton, Pennsylvania 17322, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one

2

nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(5) Denise Mason, 155 Main Street, Felton, Pennsylvania 17322, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(6) Rick Churra, 600 West College Avenue, Apartment 301, State College, PA 16801, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(7)  Andy Maul (no address yet available, when address has been obtained a supplemental answer will be served)  based on information and belief a resident of Pittsburgh, Pennsylvania, 412-478-9082, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(8) Milton Lukens (no address yet available, when address has been obtained a supplemental answer will be served)  703-869-1421 resident based on information and belief in Virginia, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(9)  Andy Jacobs, 3403 Hawthorne Drive, Camp Hill, PA 17011, 702-785-4738 circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(10) Michael Alexander (no address yet available, when address has been obtained a supplemental answer will be served)  617-987-1144 resident based on information and belief in Massachusetts, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(11)  Brian Lyyra (no address yet available, when address has been obtained a supplemental answer will be served) resident based on information and belief in Massachusetts, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

3

(12)  Jim Edwards (no address yet available, when address has been obtained a supplemental answer will be served) 814-883-6756, circulated and/or witneesed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(13)  Mike Jennings, c/o Mary Outing, 9828 Dauphine Drive, Charlotte, NC  28216, 818-643-9713, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(14)  Jake Witmer, 6402 Hampton Drive, Anchorage, AK  99504 (physical address)/1319 Everett Avenue, Des Plaines, Illinois  60018 (mailing address) 701-204-3215, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(15)  Mark Gailey, 105 Forest Street, Apartment #1, Berea  Kentucky  40403, 859-979-0389, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(16)  Lowman Henry, 453 Springlake Road, Harrisburg, PA  17112 assisted in the filing of Cruz 2016 nomination petitions (after they were signed, executed and notarized).

2.      Identify each and every person, excluding legal counsel, by name, address and telephone number to whom you have spoken or otherwise communicated concerning this action, and any of the claims within this action, or any of the facts giving rise to the claims in this action.  For each individual identified, state the date(s) of the communication, the method of communication, those present during the conversation, and describe in detail the entire communication including all facts obtained from the other individual relevant to any of the claims set forth in this action.

<u>Response:</u>

(1) Richard Wenger, P.O.Box 470296, San Francisco, CA  94147, 415-922-9779, Plaintiff Pool spoke to Richard Wenger after Plaintiff Pool learned that *Green Party of Pennsylvania* was not going to be applied to nomination petitions in Pennsylvania.  Plaintiff Pool discussed the potential claims of any lawsuit against Defendants with Richard Wenger and Mr. Wenger advise Plaintiff Pool to contact Paul Rossi, Esq. to discuss imitating the instant legal action.

4

(2) Michael Arno, Arno Political Consultants, Inc., 3235 Sunrise Blvd. Suite #1, Rancho Cordova, CA 95742, 916-638-1596, was Plaintiff Pool's initial contact with the Rand Paul Campaign. Mr. Arno informed Plaintiff Pool that he was no longer bidding out contracts for the campaign and advised Plaintiff Pool to contact Patrick Wohl to bid on the Rhode Island and Pennsylvania petition drive contracts. Briefly discussed the legal issues in Pennsylvania and wished Plaintiff Pool luck in a potential lawsuit against Pennsylvania.

(3) Patrick Wohl, Rand Paul campaign (currently with the "Greitens for Governor of Missouri campaign"), 913 East Ash Street, Columbia MO 65201, 573-227-8610, discussed Pennsylvania petition drive with Plaintiff Pool and the legal issues of this lawsuit with Plaintiff Pool, directed Plaintiff Pool to contact Michael Biundo to discuss Rand campaign contract for Pennsylvania petition drive.

(4) Michael Biundo, Partner, RightVoter, 7915 South Emerson Avenue, Indianapolis, Indiana 46237, 970-219-2831, discussed Pennsylvania petition drive contract with Plaintiff Pool where Plaintiff Pool discussed the instant lawsuit and advised Mr. Biundo that if Plaintiff Pool succeeded on his request for emergency injunctive relief against Pennsylvania's out-of-state witness restriction Plaintiff Pool could offer to charge a lower rate per signature when Mr. Biundo asked why Pennsylvania petition drives were so expensive. Mr. Biundo and Plaintiff Pool discussed the instant lawsuit. When Judge Kane refused to enjoin the challenged provisions of the Pennsylvania Election Code Mr. Biundo declined to use Plaintiff Benezet Consulting for the Rand petition drive in Pennsylvania.

(5) Edee Baggett (aka Mary E. Baggett, National Ballot Access, 925 Hillary Lane, Lawrenceville, GA 30043-6698. Edee Baggett was in charge of the 2016 nomination petition drive in Pennsylvania for Donald Trump's 2016 presidential campaign. Plaintiffs Benezet Consulting and Pool were going to circulate nomination petitions for Trump in Pennsylvania but as a result of the in-state witness restriction, Plaintiff Pool contacted the Allegheny County Republican Committee to ask if they had any witnesses that could assist in the petition drive for Trump with out-of-state witnesses. When Ms. Baggett learned that Plaintiff Pool had contacted the local GOP for help, she became angry alleged that the party was out to hurt Trump and, as a result, Ms. Baggett pulled the Pennsylvania Trump contract from Plaintiff Benezet Consulting. Accordingly, Ms. Baggett is well aware of the out-of-state circulator restriction, as well as, the prohibition on registered qualified electors from signing more than 1 nomination petition per office per election and the requirement that each paper of the nomination petition must be individually executed and notarized. Ms. Baggett is also well aware of the litigation initiated by Plaintiffs and Plaintiffs claims in this action. Furthermore, Plaintiff Pool discussed the instant lawsuit with Ms. Baggett during the course of their dealings together.

(6) ) Vonn Andring, Principal, Big Table Strategies, LLC, www.bigtablestrategies.com, P.O.Box 25384, Houston, Texas. Mr, Andring was the Pennsylvania Political Director for Cruz for President. Mr. Andring, as the director of the Cruz 2016 petition drive in Pennsylvania would have complete knowledge as to the out-of-state witness restriction for the circulation of nomination petitions, the prohibition of registered qualified electors from signing more than one nomination petition per office per election and the requirement that each page of a nomination petition must be notarized. Mr. Andring was also aware of the lawsuit filed in this action and the claims made therein. Furthermore,

Plaintiff Pool discussed the instant lawsuit with Mr. Andring during the course of their dealings together.

(7) Ron Yoachum, 220 South Home Avenue, Avalon, PA 15202, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.  Furthermore, Plaintiff Pool may have discussed the instant lawsuit with Mr. Yoachum during the course of their dealings together.

(8) Ed Mason, 155 Main Street, Felton, Pennsylvania 17322, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.  Furthermore, Plaintiff Pool may have discussed the instant lawsuit with Mr. Mason during the course of their dealings together.

(9) Denise Mason, 155 Main Street, Felton, Pennsylvania 17322, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.  Furthermore, Plaintiff Pool may have discussed the instant lawsuit with Ms. Mason during the course of their dealings together.

(10) Rick Churra, 600 West College Avenue, Apartment 301, State College, PA 16801, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized. Furthermore, Plaintiff Pool may have discussed the instant lawsuit with Mr. Churra during the course of their dealings together.

(11)  Andy Maul (no address yet available, when address has been obtained a supplemental answer will be served) based on information and belief a resident of Pittsburgh, Pennsylvania, 412-478-9082, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized. Furthermore, Plaintiff Pool may have discussed the instant lawsuit with Mr. Maul during the course of their dealings together.

(12) Milton Lukens (no address yet available, when address has been obtained a supplemental answer will be served) 703-869-1421 resident based on information and belief in Virginia, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.  Furthermore, Plaintiff Pool may have discussed the instant lawsuit with Mr. Lukens during the course of their dealings together.'

(13)  Andy Jacobs, 3403 Hawthorne Drive, Camp Hill, Pennsylvania  17011, 702-785-4738, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.  Furthermore, Plaintiff Pool discussed the instant lawsuit with Mr. Jacobs during the course of their dealings together.

(14) Michael Alexander (no address yet available, when address has been obtained a supplemental answer will be served)  617-987-1144 resident based on information and belief in Massachusetts, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.  Furthermore, Plaintiff Pool may have discussed the instant lawsuit with Mr. Alexander during the course of their dealings together.

(15) Brian Lyyra (no address yet available, when address has been obtained a supplemental answer will be served) resident based on information and belief in Massachusetts, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.  Furthermore, Plaintiff Pool may have discussed the instant lawsuit with Mr. Lyyra during the course of their dealings together.

(16) Jim Edwards (no address yet available, when address has been obtained a supplemental answer will be served)  814-883-6756, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.  Furthermore, Plaintiff Pool may have discussed the instant lawsuit with Mr. Edwards during the course of their dealings together.

(17) Mike Jennings, c/o Mary Outing, 9828 Dauphine Drive, Charlotte, NC  28216, 818-643-9713, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.  Furthermore, Plaintiff Pool discussed the instant lawsuit with Mr. Jennings during the course of their dealings together.

(18) Jake Witmer, 6402 Hampton Drive, Anchorage, AK  99504 (physical address)/1319 Everett Avenue, Des Plaines, Illinois  60018 (mailing address) 701-204-3215, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.  Furthermore, Plaintiff Pool discussed the instant lawsuit with Mr. Witmer during the course of their dealings together.

(19) Mark Gailey, 105 Forest Street, Apartment #1, Berea Kentucky 40403, 859-979-0389, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized. Furthermore, Plaintiff Pool discussed the instant lawsuit with Mr. Gailey during the course of their dealings together.

3.      Identify all witnesses you expect or intend to call at the time of the trial.

Response: Plaintiffs object to this interrogatory on the basis that Plaintiffs Pool and Benezet Consulting have not yet determined each and every witness that they may call to testify at any hearing, trial or for any dispositive motions or in opposition to any dispositive motions, as it is too early in the discovery process to make such determinations. However, subject to the foregoing objection and reserving the right to expand the following list of witnesses, Plaintiffs currently intend on calling the following as witnesses at any hearing, trial or in favor of any dispositive motions or to oppose any dispositive motions:

(1) Plaintiff Trenton Pool, 3800 Creek Road, Dripping Springs, TX 78620;

(2) Carl Romanelli, 344 South Franklin Street, Wilkes-Barre, Pennsylvania;

(3) Andrew Jacobs, 3403 Hawthorne Drive, Camp Hill, PA 17011;

(4) Jake Witmer, 6402 Hampton Drive, Anchorage, AK 99504; 1319 Everett Avenue, Des Plaines, Illinois 60018;

(5) Mark Gailey, 105 Forest Street, Apartment #1, Berea, Kentucky 40403;

(6) Plaintiff Carol Love

(7) Defendant Jonathan Marks

(8) Edee Baggett (aka Mary E. Baggett, National Ballot Access, 925 Hillary Lane, Lawrenceville, GA 30043-6698.

(9) Michael Alexander, 617-987-1144

(10) Bob Lynch, 804-397-4771

4.      Identify all exhibits you may use at any hearing and trial of this matter.

Response: Plaintiffs object to this interrogatory on the basis that Plaintiffs Pool and Benezet Consulting have not yet determined each and every exhibit that may be used at any hearing, trial or in favor of any dispositive motions or in opposition to any dispositive motions, as it is too early in the discovery process to make such determinations. However, subject to the foregoing objection and reserving the right to expand the following list of exhibits, Plaintiffs currently intend on using the

8

following exhibits at any hearing, trial or in favor or opposition to any dispositive motions that might be filed:

(1) 2016 Pennsylvania Nomination Petition;

(2) 2016 Pennsylvania Nomination Paper;

(3) 2016 Cruz Contract by and between Cruz campaign and Benezet Consulting, LLC, as executed by Plaintiff Pool.

5.      Describe with particularity each and every injury you have suffered as a result of the conduct complained of in the complaint.  The term "injury" includes physical, mental and monetary damage to you.  For each such injury, identify and describe how the injury occurred, the monetary value of such injury, whether you paid any monies on account of the injury and, if so to whom, how much and when.

Response:  Plaintiffs are only seeking prospective equitable relief from the challenged provisions of the Pennsylvania Election Code and Defendants' continued enforcement of the challenged provisions in clear violation of rights guaranteed under the First and Fourteenth Amendments to the United States Constitution by impairing and limiting plaintiffs' ability to communicate and associate with more voters and more candidates in Pennsylvania and limiting plaintiffs' political speech and ability to advance the political messages of the candidates he supports, as set forth more specifically in Plaintiffs Second Amended Complaint.  Plaintiffs do not seek monetary relief, as no such relief is available under current jurisprudence.  However, Plaintiffs have suffered significant economic harm in the following ways: (1) required to pay compensation to Pennsylvania witnesses to execute nomination petitions circulated by out-of-state residents; (2)  lost Rand Paul contract due to the higher costs imposed on out-of-state circulators needing to circulate nomination petition with in-state residents; (3) lost Trump contract, valued at $5,000-$6,000,when Plaintiff Pool contacted the local Allegheny Republican Committee for help in locating witnesses to assist in the petition drive with out-of-state circulators because Trump campaign did not trust local GOP committees, as Plaintiff Pool would not have had to contact the local party for help in finding in-state witnesses had the out-of-state witness restriction not been in force; (4) was requires to pay an additional $500 to a Pennsylvania witness who extorted and demanded an additional $500 over and above the agreed upon witness fee when the witness and circulator were at the notary public to execute the nomination petition; (5)  Was not able to complete Cruz petition in one Congressional District because the witness used in that Congressional District would talk to herself in front of prospective registered qualified electors asked to sign the Cruz nomination petition, forcing Plaintiff Pool to pull the circulator out of that Congressional District , costing Plaintiffs Benezet Consulting and Pool the economic value of the signatures needed to be gathered in that Congressional District; (6)  the additional time and costs needed to circulate nomination petitions for extended periods of time because the challenged provision of the Pennsylvania Election Code prevents registered qualified electors from signing more than one nomination petition per election cycle for the same office; (7) he costs of notarizing each and every page of the nomination petitions circulated by Plaintiffs Benezet

Consulting and Pool; (8) lost revenue during that period of time that Plaintiffs Benezet Consulting and Pool were in Pennsylvania ready to circulate nomination petitions but could not because Plaintiffs had not secured the services of in-state witnesses for Plaintiffs' out-of-state circulators; and (9) the economic/monetary costs of advertising for in-state Pennsylvania witnesses.

6.      Please identify all expert witnesses that you may call at any hearing or trial of this matter and indicate whether such expert witnesses will be proffered for liability or damages.

**Response: None.**

7.      Please identify all cases, since January 1, 2010, in which your identified expert witnesses have testified and include whether they have testified on liability or damages or for the Plaintiff or for the Defense.

**Response: None.**

8.      Please identify all documents reviewed by your experts in connection with the preparation of any expert report or expert testimony.

**Response: None.**

9.      Please describe with particularity all of the expert's opinions and conclusions and the basis for them, including all facts and documents relied on.

**Response: Not applicable.**

10.     Provide a calculation of all damages sought from Defendants.

**Response: Plaintiffs do not seek economic damages from Defendants, but actual economic harm likely exceeds $10,000.**

11.     Are you claiming any loss of earnings or income? If so, state the total amount, how it is computed and whether it is the total claimed or only the total to date.

**Response: Plaintiffs do not seek loss earnings or income, but actual economic loss as a direct and proximate result of the challenged provisions of the Pennsylvania Election Code likely exceed $10,000.**

12.     Identify all persons who witnesses any of the alleged events described in your Second Amended Complaint and please identify what events each person witnesses.

**Response:**

**(1) Vonn Andring, Principal, Big Table Strategies, LLC, www.bigtablestrategies.com, P.O.Box 25384, Houston, Texas. Mr, Andring was the Pennsylvania Political Director for Cruz for President. Mr. Andring, as the director of the Cruz 2016 petition drive in Pennsylvania would have complete knowledge as to the out-of-state witness restriction for the circulation of nomination petitions, the prohibition of registered qualified electors from signing more than one nomination petition per office**

per election and the requirement that each page of a nomination petition must be notarized.  Mr. Andring was also aware of the lawsuit filed in this action and the claims made therein.

(2) Edee Baggett (aka Mary E. Baggett, National Ballot Access, 925 Hillary Lane, Lawrenceville, GA 30043-6698.  Edee Baggett was in charge of the 2016 nomination petition drive in Pennsylvania for Donald Trump's 2016 presidential campaign.  Plaintiffs Benezet Consulting and Pool were going to circulate nomination petitions for Trump in Pennsylvania but as a result of the in-state witness restriction, Plaintiff Pool contacted the Allegheny County Republican Committee to ask if they had any witnesses that could assist in the petition drive for Trump with out-of-state witnesses.  When Ms. Baggett learned that Plaintiff Pool had contacted the local GOP for help, she became angry alleged that the party was out to hurt Trump and, as a result, Ms. Baggett pulled the Pennsylvania Trump contract from Plaintiff Benezet Consulting.  Accordingly, Ms. Baggett is well aware of the out-of-state circulator restriction, as well as, the prohibition on registered qualified electors from signing more than 1 nomination petition per office per election and the requirement that each paper of the nomination petition must be individually executed and notarized.  Ms. Baggett is also well aware of the litigation initiated by Plaintiffs and Plaintiffs claims in this action.

(3) Ron Yoachum, 220 South Home Avenue, Avalon, PA  15202, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(4)  Ed Mason, 155 Main Street, Felton, Pennsylvania  17322, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(5) Denise Mason, 155 Main Street, Felton, Pennsylvania  17322, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(6) Rick Churra, 600 West College Avenue, Apartment 301, State College, PA  16801, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(7)  Andy Maul (no address yet available, when address has been obtained a supplemental answer will be served)  based on information and belief a resident of Pittsburgh, Pennsylvania, 412-478-9082, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(8) Milton Lukens (no address yet available, when address has been obtained a supplemental answer will be served)  703-869-1421 resident based on information and belief in Virginia, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(9)  Andy Jacobs (no address yet available, when address has been obtained a supplemental answer will be served)  702-785-4738 resident based on information and belief in Nevada, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(10) Michael Alexander (no address yet available, when address has been obtained a supplemental answer will be served)  617-987-1144 resident based on information and belief in Massachusetts, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(11) Brian Lyyra (no address yet available, when address has been obtained a supplemental answer will be served) resident based on information and belief in Massachusetts, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(12) Jim Edwards (no address yet available, when address has been obtained a supplemental answer will be served)  814-883-6756, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(13) Mike Jennings, c/o Mary Outing, 9828 Dauphine Drive, Charlotte, NC 28216, 818-643-9713, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(14) Jake Witmer, 6402 Hampton Drive, Anchorage, AK 99504 (physical address)/1319 Everett Avenue, Des Plaines, Illinois 60018 (mailing address) 701-204-3215, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

12

(15)  Mark Gailey, 105 Forest Street, Apartment #1, Berea  Kentucky  40403, 859-979-0389, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(16)  Lowman Henry, 453 Springlake Road, Harrisburg, PA  17112 assisted in the filing of Cruz 2016 nomination petitions (after they were signed, executed and notarized).

(17)  Justin Freyermuth, Pennsylvania resident, democrat witness for Rocky De La Fuente nomination petitions.  Observed the witness process.  Address is currently not known to Plaintiffs.  As part of Plaintiffs' ongoing discovery, Plaintiffs will file a supplemental response to this interrogatory when this address becomes known to Plaintiffs.

(18)  William Trautman, Pennsylvania resident, democrat witness for Rocky De La Fuente nomination petitions.  Observed the witness process.  Address is currently not known to Plaintiffs.  As part of Plaintiffs' ongoing discovery, Plaintiffs will file a supplemental response to this interrogatory when this address becomes known to Plaintiffs.

(19)  Charles McConville, Pennsylvania resident, democrat witness for Rocky De La Fuente nomination petitions.  Observed the witness process.  Address is currently not known to Plaintiffs.  As part of Plaintiffs' ongoing discovery, Plaintiffs will file a supplemental response to this interrogatory when this address becomes known to Plaintiffs.

(20)  Ashley Waner, Pennsylvania resident, democrat witness for Rocky De La Fuente nomination petitions.  Observed the witness process.  Address is currently not known to Plaintiffs.  As part of Plaintiffs' ongoing discovery, Plaintiffs will file a supplemental response to this interrogatory when this address becomes known to Plaintiffs.

(21)  Jovan Brown, Pennsylvania resident, democrat witness for Rocky De La Fuente nomination petitions.  Observed the witness process.  Address is currently not known to Plaintiffs.  As part of Plaintiffs' ongoing discovery, Plaintiffs will file a supplemental response to this interrogatory when this address becomes known to Plaintiffs.

(22)  Lauren Green, Pennsylvania resident, democrat witness for Rocky De La Fuente nomination petitions.  Observed the witness process.  Address is currently not known to Plaintiffs.  As part of Plaintiffs' ongoing discovery, Plaintiffs will file a supplemental response to this interrogatory when this address becomes known to Plaintiffs.

13.     In your Second Amended Complaint, you make reference to persons whom you claim were going to provide signature collection services (and/or who did provide signature collection services) for you either on a paid basis or on a volunteer basis.  Identify each of those persons and provide current addresses for them so that they may be subpoenaed to testify at a deposition and/or trial and so that they can be commanded to provide documents in their possession relating to the services they were going to provide to you.

**Response:**

(1) Ron Yoachum, 220 South Home Avenue, Avalon, PA 15202, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(2) Ed Mason, 155 Main Street, Felton, Pennsylvania 17322, circulated and/or witnessed nomination petitions for Plaintffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(3) Denise Mason, 155 Main Street, Felton, Pennsylvania 17322, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(4) Rick Churra, 600 West College Avenue, Apartment 301, State College, PA 16801, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(5) Andy Maul (no address yet available, when address has been obtained a supplemental answer will be served) based on information and belief a resident of Pittsburgh, Pennsylvania, 412-478-9082, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(6) Milton Lukens (no address yet available, when address has been obtained a supplemental answer will be served) 703-869-1421 resident based on information and belief in Virginia, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(7) Andy Jacobs (no address yet available, when address has been obtained a supplemental answer will be served) 702-785-4738 resident based on information and belief in Nevada, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(8) Michael Alexander (no address yet available, when address has been obtained a supplemental answer will be served) 617-987-1144 resident based on information and belief in Massachusetts, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and

are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(9) Brian Lyyra (no address yet available, when address has been obtained a supplemental answer will be served) resident based on information and belief in Massachusetts, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(10) Jim Edwards (no address yet available, when address has been obtained a supplemental answer will be served) 814-883-6756, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(11) Mike Jennings, c/o Mary Outing, 9828 Dauphine Drive, Charlotte, NC 28216, 818-643-9713, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(12) Jake Witmer, 6402 Hampton Drive, Anchorage, AK 99504 (physical address)/1319 Everett Avenue, Des Plaines, Illinois 60018 (mailing address) 701-204-3215, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(13) Mark Gailey, 105 Forest Street, Apartment #1, Berea Kentucky 40403, 859-979-0389, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

14. Identify any and all persons whom you have employed or contracted with or used to provide signature collection services for you. The time frame for this interrogatory is January 1, 2010 until present.

Response: Plaintiffs Benezet Consulting and Pool object to this interrogatory to the extent that Defendants' seek the discovery of information which is beyond the scope of this lawsuit, and therefore irrelevant, immaterial, and not reasonably calculated to lead to the discovery of admissible evidence, Plaintiffs' circulation of election petitions in other states under laws not subject to this challenge is irrelevant to the facts and legal merits of the instant action. Plaintiffs also object to this

interrogatory to the extent that it is overly broad, unduly burdensome and calculated to annoy and harass Plaintiffs for defending rights guaranteed to her under the First and Fourteenth Amendments to the United States Constitution by requiring Plaintiffs to search and produce documents from 6 years' worth of records, to the extent they even still exist is, is plainly beyond the scope of this action and would force Plaintiffs to cease from their current employment/business activities in circulating election petitions in multiple states for the 2016 general election ballot. Plaintiffs also object to this interrogatory to the extent Defendants seek information that no longer exists or has otherwise been lost, misplaced, or destroyed as most of the records beyond the 2016 Pennsylvania circulation drive have not been maintained and are no longer in the custody of Plaintiffs nor available to answer this interrogatory. However, subject to and without waiving the foregoing objections, Plaintiffs Benezet Consulting and Pool provide the following:

(1) Ron Yoachum, 220 South Home Avenue, Avalon, PA 15202, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(2) Ed Mason, 155 Main Street, Felton, Pennsylvania 17322, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(3) Denise Mason, 155 Main Street, Felton, Pennsylvania 17322, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(4) Rick Churra, 600 West College Avenue, Apartment 301, State College, PA 16801, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(5) Andy Maul (no address yet available, when address has been obtained a supplemental answer will be served) based on information and belief a resident of Pittsburgh, Pennsylvania, 412-478-9082, circulated and/or witnessed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(6) Milton Lukens (no address yet available, when address has been obtained a supplemental answer will be served) 703-869-1421 resident based on information and belief in Virginia, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware

of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(7)  Andy Jacobs (no address yet available, when address has been obtained a supplemental answer will be served)  702-785-4738 resident based on information and belief in Nevada, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(8) Michael Alexander (no address yet available, when address has been obtained a supplemental answer will be served)  617-987-1144 resident based on information and belief in Massachusetts, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(9)  Brian Lyyra (no address yet available, when address has been obtained a supplemental answer will be served) resident based on information and belief in Massachusetts, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(10)    Jim Edwards (no address yet available, when address has been obtained a supplemental answer will be served)  814-883-6756, circulated and/or witneesed nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(11)    Mike Jennings, c/o Mary Outing, 9828 Dauphine Drive, Charlotte, NC  28216, 818-643-9713, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(12)    Jake Witmer, 6402 Hampton Drive, Anchorage, AK  99504 (physical address)/1319 Everett Avenue, Des Plaines, Illinois  60018 (mailing address) 701-204-3215, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

(13)    Mark Galley, 105 Forest Street, Apartment #1, Berea  Kentucky  40403, 859-979-0389, circulated nomination petitions for Plaintiffs Benezet Consulting and Pool in 2016 in Pennsylvania and

are aware of the out-of-state circulator restrictions, the prohibition on registered qualified electors signing more than one nomination petition per office per election cycle and the requirement that each paper of a nomination petition be separately executed and notarized.

15.     Identify any and all elections that you have tried to collect, or actually collected, signatures and identify the candidate or delegate for whom you collected signatures the state of the election, and the date of the election.  The time frame for this interrogatory is January 1, 2010 until the present.

**Response:** :  Plaintiffs Benezet Consulting and Pool object to this interrogatory to the extent that Defendants' seek the discovery of information which is beyond the scope of this lawsuit, and therefore irrelevant, immaterial, and not reasonably calculated to lead to the discovery of admissible evidence, Plaintiffs' circulation of election petitions in other states under laws not subject to this challenge is irrelevant to the facts and legal merits of the instant action.  Plaintiffs also object to this interrogatory to the extent that it is overly broad, unduly burdensome and calculated to annoy and harass Plaintiffs for defending rights guaranteed to her under the First and Fourteenth Amendments to the United States Constitution by requiring Plaintiffs to search and produce documents from 6 years' worth of records, to the extent they even still exist is, is plainly beyond the scope of this action and would force Plaintiffs to cease from their current employment/business activities in circulating election petitions in multiple states for the 2016 general election ballot.  Plaintiffs also object to this interrogatory to the extent Defendants seek information that no longer exists or has otherwise been lost, misplaced, or destroyed as most of the records beyond the 2016 Pennsylvania circulation drive have not been maintained and are no longer in the custody of Plaintiffs nor available to answer this interrogatory.  However, subject to and without waiving the foregoing objections, Plaintiffs Benezet Consulting and Pool provide the following:

Plaintiff Pool in his individual capacity circulated election petitions, to the best of his knowledge, for the following election contests:

(1)     Ron Paul, Pennsylvania, 2012 Primary Election;

(2)     Gary Johnson, Pennsylvania, 2012 General Election;

(3)     Gary Johnson and Jill Stein, Alaska, 2012 General Election;

(4)     New Party nomination petitions for "Americans Elect" Alaska, 2012;

(5)     New Party nomination petitions for "Americans Elect" North Dakota, 2012;

(6)     New Party nomination petitions for "Americans for Limited Government" Oregon, 2008;

(7)     Casino Gaming Referendum petitions, Arkansas, 2012

(8)     Medical Marijuana referendum petitions, Arkansas, 2012

Plaintiff Benezet Consulting, LLC circulated nomination petitions, to the best of its knowledge, for the following election constests:

(1)     Ted Cruz, Pennsylvania, Illinois, Vermont, Indiana and Rhode Island, 2016 Primary Election;

(2)     Rocky De La Fuente, Pennsylvania, Indiana, Wisconsin, Connecticut 2016 Primary Election;

(3)     Rand Paul, Indiana, Vermont, Illinois, Rhode Island, 2016 Primary Election;

(4)     Rocky De La Fuente, Pennsylvania, Alaska, Ohio (and likely many more states – contract may evolve to include more states) 2016 General Election;

(5)     Jill Stein, Virginia, 2016 General Election;

(6)     Rick Santorum, Indiana, 2016 Primary Election;

(7)     Carly Fiorina, Indiana, 2016 Primary Election;

(8)     Ben Carson, Indiana, 2016 Primary Election;

(9)     Donald Trump, Indiana, 2016 Primary Election;

(10)    Texas Supreme Court candidates, Joe Pool, Sharon McCalley, Robert Talton, Texas, 2014

(11)    Alicia Franklin, 330th Family Court Judge, Texas (year unknown);

(12)    Houston Equal Rights Ordinance referendum, Texas, 2015;

(13)    Leonila Olivares Salazar, Justice of the Peace, District #2 Harris County, Texas, 2014;

(14)    Anne Kitchen, Austin City Council, Texas 2016;

(15)    Gary Johnson, Ohio, General Election 2016;

(16)    Stop the Lone Star Rail Imitative, City of Kyle, Texas, 2016.

16.    In your Second Amended Complaint, you make reference to an outburst.  Identify this person
       (and all witnesses to this alleged outburst) and provide current addresses for them so that they
       may be subpoenaed to testify at a deposition and/or trial and so they can be commanded to
       provide documents in their possession relating to the services they were going to provide to
       you.

Response:  Ben Prissette, 412-583-4299.  Current address is not known.  Subject to continuing
discovery efforts, Plaintiffs will file a supplemental answer to this interrogatory when his address is
determined.

                                        Respectfully submitted,


Dated: June 16, 2016

                                        Paul A. Rossi, Esq.
                                        IMPG Advocates, Inc.
                                        *Attorney for Plaintiffs*
                                        Attorney I.D. # 84947
                                        873 East Baltimore Pike, Suite #705
                                        Kennett Square, PA  19348
                                        717.961.8978
                                        Paul-Rossi@comcast.net

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BENEZET CONSULTING, LLC;** | : | |
| **TRENTON POOL *and* CAROL LOVE** | : | |
| | : | **CIVIL ACTION** |
| **PLAINTIFFS,** | : | |
| | : | **No. 1:16-CV-00074** |
| **vs.** | : | **Hon. Yvette Kane** |
| | : | |
| **PEDRO A. CORTÉS, in his official capacity** | : | |
| **as the Secretary of the Commonwealth of** | : | |
| **Pennsylvania; and JONATHAN MARKS,** | : | |
| **in his official capacity as Commissioner,** | : | |
| **of the Bureau of Commissions, Elections and** | : | |
| **Legislation** | : | |
| | : | |
| **DEFENDANTS.** | : | |

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that on June 16, 2016, he served via first class mail upon the following defendants' legal counsel a true and correct copy of "Plaintiff Pool's Objections and Responses to Defendants' First Set of Interrogatories Directed to Trenton Pool" at the following address:

Kenneth L. Joel, Esq.
Chief Deputy Attorney General
Office of Attorney General
15th Floor, Strawberry Square
Harrisburg, PA 17120

Dated:    June 16, 2016

_____
Paul A. Rossi, Esq.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BENEZET CONSULTING, LLC;** | : | |
| **TRENTON POOL** *and* **CAROL LOVE** | : | |
| | : | **CIVIL ACTION** |
| **PLAINTIFFS,** | : | |
| | : | **No. 1:16-CV-00074** |
| **vs.** | : | **Hon. Yvette Kane** |
| | : | |
| **PEDRO A. CORTÉS,** in his official capacity | : | |
| as the Secretary of the Commonwealth of | : | |
| Pennsylvania; and JONATHAN MARKS, | : | |
| in his official capacity as Commissioner, | : | |
| of the Bureau of Commissions, Elections and | : | |
| Legislation | : | |
| | : | |
| **DEFENDANTS.** | : | |

### VERIFICATION OF INTERROGATORY ANSWERS

I, Trenton Pool, believe, based on reasonable inquiry, that the foregoing answers are true and correct to the best of my knowledge, information and belief.

I verify, under penalty of perjury, that the foregoing is true and correct.

Dated:  June 16, 2016

_____
Trenton Pool

the.greatwaldoneous@gmail.com

## Gmail

Move to Inbox

COMPOSE

**Inbox (8,355)**
Starred
Important
Sent Mail
**Drafts (335)**
**Circles**

[Gmail]Trash
[Imap]/Drafts
Campaign - Supreme…
Deleted Messages
Letters to Writers
marakesh
Notes
Personal
Pittsburgh Business …
Resume/Pedigree
**Sent Messages (3)**
Travel
More

## Hey Guys Post this Add

 **Trenton Pool <tdonnpool@gmail.com>**                 Feb 4
to Michael Brian

To Reading/Doylestown/Quakertown PA under Gigs

Also do Eerie/State College As well

Thanks!

----------------
NEEDED: PA registered Republicans for short term job circulating petitions for president
seeking a spot on the PA ballot.

Must be friendly, well-spoken, some political block walking or campaign experience
but not necessary. You will be paired with an experienced petition gatherer. Own
preferred.

Earn $10+ per hour with incentives and bonuses possible. Possibility of future tra
states likely if you enjoy and excel at the work.

Please call Trent at the phone number provided to discuss getting started today!
512-784-0132

Click here to Reply, Reply to all, or Forward





CROWNE PLAZA
HOTELS & RESORTS

STATES NO NOT ARIZATION

1. NM
2. AR
3. IA
4. IN
5. TN
6. MA
7. ~~FL~~
8. NH
9. UT
10. NS
11. AL
12. FL
13. MN
14. WI
15. ND
16. ~~DE~~ CA
17. WA
18. AK

AlwaysOn

EXHIBIT
Def #17

PENGAD 800-631-6989

FOR SECURE, WIRELESS PRINTING, VISIT **CROWNEPLAZAPRINTS.COM**

PA Electors + Petitioners

| name | area | cell |
|---|---|---|
| Bobby Brown | Phillie | 215-600-6456 |
| Brian Easter | Mckeesport (pgh) | 412-447-5832 |
| John James | Harrisburg | 717-963-5691 |
| Crystal Lydic | Harrisburg | 724-910-3325 |
| Roberta Dandrea | Harrisburg | 717-756-5598 |
| Sam Harris | Harrisburg | 717-686-5028 |
| Christina Schaefer | Pittsburgh | 412-888-9100 |
| Steve Foulk | uniontown | 724-434-4583 |
| Amy Strauss | Philadelphia | <u>267-602-6927</u> |
| Jennifer Fetter | Mechanicsburg | 717-421-1965 |
| Elizabeth Remrey/Durling | | <u>563-321-3489</u> |
| Carolyn Ciferni l. | Media (del county) | <u>267-595-0949</u> |
| Kendra | Philadelphia | 267-616-0587 |
| Catrina | Pittsburgh | 412-652-3190 |
| Jade Garner | Phillie | 215-715-4935 |
| David Stauffer | Harrisburg (Dauphin) | |
| Lisa Tiani | Pittsburgh | 412-370-0735 |
| Brett Davison | Pittsburgh | 724-612-2229 |
| Theresa Johnson | Phillie | 347-324-8429 |
| Megan L. Chuderewicz | Pittsburgh | 412-680-6411 |
| | ??? | 267-436-7106 |
| Michael Godwin | Pittsburgh? | 412-218-1588 |
| Aja Gaddie | Phillie | 267-974-4695 |
| Bart Morgan | Pittsburgh | 412-443-1425 |
| Trish | | 412-580-1190 |
| Barry Logan | Pittsburgh Area | 724-516-1037 |
| Tarika Peppers | Phillie | 815-923-9176 |
| Alicia | Davenport | 563-514-6748 |
| Amber | Phillie | 215-594-1037 |



PA Electors + Petitioners

quenton henderson          Rockford          708-477-7761
Quenton cousin

Bob Lynch
Justin Freyermuth
Andy Jacobs
Kevin Jacobs
Jake Witmer
Milton Lukins
Mark Gailey
Michael Jennings
Edward Mason
Mrs. Edward Mason
Gerald Bundy
Charles Mcconnville
Lauren Green
Andy Maul
Ron Tomczak
Jim Edwards
robert renk                rmrenk@hotmail.com

PA Electors + Petitioners

| email | addl info? | dob | status |
|---|---|---|---|
| rocky1112011@hotmail.com | resume | 03/20/57 | voter |
| brianeaster@rocketmail.com | | 10/05/77 | voter |
| jjnjjj | | | |
| | | | |
| red042015@gmail.com | | | |
| loyalselfmade317@gmail.com | | | |
| italianblueeyes75@gmail.com | | | |
| stevefoulk@gmail.com | | | |
| danceralways@yahoo.com | | | reg'd |
| | | | |
| baby_shimmer3@yahoo.com | | | |
| cifernic@gmail.com | | 08/02/65 | voter |
| | | | |
| | | | |
| jade.garner1987@gmail.com | | | |
| staufferd1953@gmail.com | | | |
| | | | |
| bdp18@pitt.edu | | | |
| theresaj50294@gmail.com | sales retail | | |
| meganchuderewicz@gmail.com | | | |
| | | | |
| aja.gaddie@gmail.com | | | |
| | | | |
| barrylogan48@gmail.com | | | |
| tarikapeppers@gmail.com | | | |
| mydynamite@gmail.com | | | |
| amber10231989@gmail.com | | | |

PA Electors + Petitioners

HOOLIE.EWOL@yahoo.com

From: **danceralways@yahoo.com**
Subject: February 04, 2016 at 5:48 AM Asia/Calcutta
Date: "tdonnpool@gmail.com" tdonnpool@gmail.com
To:



Hi,-my number(s)-267-288-5640*/267-602-6927

Amy
Philadelphia.PA.19136
64-9 northeast Philadelphia-Mayfair,thank you



From: **Trenton Pool** tdonnpool@gmail.com
Subject: Re:
Date: February 04, 2016 at 6:05 AM Asia/Calcutta
To: Amy Strauss danceralways@yahoo.com

thanks!

Milton and Brian are coming into the state one of them is going to be calling you soon!

On Wed, Feb 3, 2016 at 7:18 PM, <danceralways@yahoo.com> wrote:
Hi,-my number(s)-267-288-5640*/267-602-6927
Amy
Philadelphia.PA.19136
64-9 northeast Philadelphia-Mayfair,thank you

--
**Trenton Donn Pool**
President
Direct: 512-784-0132
Email: tdonnpool@gmail.com

**Benezet Consulting, LLC**
3800 Creek Rd
Dripping Springs, TX 78620

From: **Trenton Pool** tdonnpool@gmail.com
Subject: Re:
Date: February 04, 2016 at 12:46 PM Asia/Calcutta
To: Amy Strauss danceralways@yahoo.com, Michael Alexander
greatwaldoneous@gmail.com, Brian Lyyra blyra09@gmail.com

Hey Amy-

Michael and Brian are going to be in Doylestown and Phillie working with you over the next week.
We are finalizing the petitions you will be working on as a team but we should know more
tomorrow am.  I will make sure they reach out to you they are getting into phillie around 330am and
one of them should be good to partner up with you beginning tomorrow evening or friday am
working every day until the job is completed!

Thanks!

On Wed, Feb 3, 2016 at 7:18 PM, <danceralways@yahoo.com> wrote:
> Hi,-my number(s)-267-288-5640*/267-602-6927
> Amy
> Philadelphia.PA.19136
> 64-9 northeast Philadelphia-Mayfair,thank you

--
**Trenton Donn Pool**
President
Direct: 512-784-0132
Email: tdonnpool@gmail.com

**Benezet Consulting, LLC**
3800 Creek Rd
Dripping Springs, TX 78620

From: **danceralways@yahoo.com**
Subject: Re:
Date: February 12, 2016 at 8:51 PM Asia/Calcutta
To: Trenton Pool tdonnpool@gmail.com



Hi,just waiting for pay from 2 days and 14 petitions,that I got noterized,thanks


On Friday, February 12, 2016 10:20 AM, "danceralways@yahoo.com" <danceralways@yahoo.com> wrote:


Hi,just waiting for pay from 2 days and 14 petitions,that I got noterized,thanks


On Wednesday, February 3, 2016 7:18 PM, "danceralways@yahoo.com" <danceralways@yahoo.com> wrote:


Hi,-my number(s)-267-288-5640*/267-602-6927
Amy
Philadelphia.PA.19136
64-9 northeast Philadelphia-Mayfair,thank you

From: **Trenton Pool** tdonnpool@gmail.com
Subject: Re:
Date: February 12, 2016 at 11:08 PM Asia/Calcutta
To: "danceralways@yahoo.com" danceralways@yahoo.com

We will get them this weekend

On Feb 12, 2016, at 10:21 AM, <danceralways@yahoo.com> <danceralways@yahoo.com> wrote:

Hi,just waiting for pay from 2 days and 14 petitions,that I got noterized,thanks

On Friday, February 12, 2016 10:20 AM, "danceralways@yahoo.com" <danceralways@yahoo.com>
wrote:

Hi,just waiting for pay from 2 days and 14 petitions,that I got noterized,thanks

On Wednesday, February 3, 2016 7:18 PM, "danceralways@yahoo.com" <danceralways@yahoo.com>
wrote:

Hi,-my number(s)-267-288-5640*/267-602-6927
Amy
Philadelphia.PA.19136
64-9 northeast Philadelphia-Mayfair,thank you

From: **Trenton Pool** tdonnpool@gmail.com
Subject: Re:
Date: February 15, 2016 at 10:34 AM Asia/Calcutta
To: "danceralways@yahoo.com" danceralways@yahoo.com



Hey Amy do you have the petitions yo got notarized?

On Fri, Feb 12, 2016 at 12:38 PM, Trenton Pool <tdonnpool@gmail.com> wrote:
We will get them this weekend


On Feb 12, 2016, at 10:21 AM, <danceralways@yahoo.com> <danceralways@yahoo.com>
wrote:

Hi,just waiting for pay from 2 days and 14 petitions,that I got noterized,thanks


On Friday, February 12, 2016 10:20 AM, "danceralways@yahoo.com" <danceralways@yahoo.com>
wrote:


Hi,just waiting for pay from 2 days and 14 petitions,that I got noterized,thanks


On Wednesday, February 3, 2016 7:18 PM, "danceralways@yahoo.com"
<danceralways@yahoo.com> wrote:


Hi,-my number(s)-267-288-5640*/267-602-6927
Amy
Philadelphia.PA.19136
64-9 northeast Philadelphia-Mayfair,thank you


--
**Trenton Donn Pool**
President
Direct: 512-784-0132
Email: tdonnpool@gmail.com

**Benezet Consulting, LLC**
3800 Creek Rd
Dripping Springs, TX 78620

From: **Trenton Pool** tdonnpool@gmail.com
Subject: Re:
Date: February 15, 2016 at 10:34 AM Asia/Calcutta
To: "danceralways@yahoo.com" danceralways@yahoo.com



Hey Amy do you have the petitions yo got notarized?

On Fri, Feb 12, 2016 at 12:38 PM, Trenton Pool <tdonnpool@gmail.com> wrote:
We will get them this weekend


On Feb 12, 2016, at 10:21 AM, <danceralways@yahoo.com> <danceralways@yahoo.com> wrote:

Hi,just waiting for pay from 2 days and 14 petitions,that I got noterized,thanks

On Friday, February 12, 2016 10:20 AM, "danceralways@yahoo.com" <danceralways@yahoo.com> wrote:

Hi,just waiting for pay from 2 days and 14 petitions,that I got noterized,thanks

On Wednesday, February 3, 2016 7:18 PM, "danceralways@yahoo.com" <danceralways@yahoo.com> wrote:

Hi,-my number(s)-267-288-5640*/267-602-6927
Amy
Philadelphia.PA.19136
64-9 northeast Philadelphia-Mayfair,thank you


--
**Trenton Donn Pool**
President
Direct: 512-784-0132
Email: tdonnpool@gmail.com

**Benezet Consulting, LLC**
3800 Creek Rd
Dripping Springs, TX 78620

From: **danceralways@yahoo.com**
Subject: Re:
Date: February 15, 2016 at 12:52 PM Asia/Calcutta
To: Trenton Pool tdonnpool@gmail.com



I have my bank surveillance ,brian/mike took petitions with them,I do not understand the delay.

On Monday, February 15, 2016 12:04 AM, Trenton Pool <tdonnpool@gmail.com> wrote:

Hey Amy do you have the petitions yo got notarized?

On Fri, Feb 12, 2016 at 12:38 PM, Trenton Pool <tdonnpool@gmail.com> wrote:
We will get them this weekend

On Feb 12, 2016, at 10:21 AM, <danceralways@yahoo.com> <danceralways@yahoo.com> wrote:

Hi,just waiting for pay from 2 days and 14 petitions,that I got noterized,thanks

On Friday, February 12, 2016 10:20 AM, "danceralways@yahoo.com" <danceralways@yahoo.com> wrote:

Hi,just waiting for pay from 2 days and 14 petitions,that I got noterized,thanks

On Wednesday, February 3, 2016 7:18 PM, "danceralways@yahoo.com" <danceralways@yahoo.com> wrote:

Hi,-my number(s)-267-288-5640*/267-602-6927
Amy
Philadelphia.PA.19136
64-9 northeast Philadelphia-Mayfair,thank you

--
**Trenton Donn Pool**
President
Direct: 512-784-0132
Email: tdonnpool@gmail.com

**Benezet Consulting, LLC**
3800 Creek Rd
Dripping Springs, TX 78620

**From:** **danceralways@yahoo.com**
**Subject:** Re:
**Date:** February 16, 2016 at 5:57 AM Asia/Calcutta
**To:** Trenton Pool tdonnpool@gmail.com



received,thank you

On Monday, February 15, 2016 7:26 PM, "danceralways@yahoo.com" <danceralways@yahoo.com> wrote:

Received,thank you

On Monday, February 15, 2016 2:22 AM, "danceralways@yahoo.com" <danceralways@yahoo.com> wrote:

I have my bank surveillance ,brian/mike took petitions with them,I do not understand the delay.

On Monday, February 15, 2016 12:04 AM, Trenton Pool <tdonnpool@gmail.com> wrote:

Hey Amy do you have the petitions yo got notarized?

On Fri, Feb 12, 2016 at 12:38 PM, Trenton Pool <tdonnpool@gmail.com> wrote:
We will get them this weekend

On Feb 12, 2016, at 10:21 AM, <danceralways@yahoo.com> <danceralways@yahoo.com> wrote:

Hi,just waiting for pay from 2 days and 14 petitions,that I got noterized,thanks

On Friday, February 12, 2016 10:20 AM, "danceralways@yahoo.com" <danceralways@yahoo.com> wrote:

Hi,just waiting for pay from 2 days and 14 petitions,that I got noterized,thanks

On Wednesday, February 3, 2016 7:18 PM, "danceralways@yahoo.com" <danceralways@yahoo.com> wrote:

Hi,-my number(s)-267-288-5640*/267-602-6927
Amy
Philadelphia.PA.19136
64-9 northeast Philadelphia-Mayfair,thank you

--
**Trenton Donn Pool**
President
Direct: 512-784-0132
Email: tdonnpool@gmail.com

**Benezet Consulting, LLC**
3800 Creek Rd
Dripping Springs, TX 78620

**From:** **Trenton Pool** tdonnpool@gmail.com
**Subject:** Re:
**Date:** February 16, 2016 at 6:32 AM Asia/Calcutta
**To:** "danceralways@yahoo.com" danceralways@yahoo.com

No problem

On Feb 15, 2016, at 7:27 PM, <danceralways@yahoo.com> <danceralways@yahoo.com> wrote:

received,thank you

On Monday, February 15, 2016 7:26 PM, "danceralways@yahoo.com" <danceralways@yahoo.com> wrote:

Received,thank you

On Monday, February 15, 2016 2:22 AM, "danceralways@yahoo.com" <danceralways@yahoo.com> wrote:

I have my bank surveillance ,brian/mike took petitions with them,I do not understand the delay.

On Monday, February 15, 2016 12:04 AM, Trenton Pool <tdonnpool@gmail.com> wrote:

Hey Amy do you have the petitions yo got notarized?

On Fri, Feb 12, 2016 at 12:38 PM, Trenton Pool <tdonnpool@gmail.com> wrote:
We will get them this weekend

On Feb 12, 2016, at 10:21 AM, <danceralways@yahoo.com> <danceralways@yahoo.com> wrote:

Hi,just waiting for pay from 2 days and 14 petitions,that I got noterized,thanks

On Friday, February 12, 2016 10:20 AM, "danceralways@yahoo.com" <danceralways@yahoo.com> wrote:

Hi,just waiting for pay from 2 days and 14 petitions,that I got noterized,thanks

On Wednesday, February 3, 2016 7:18 PM, "danceralways@yahoo.com" <danceralways@yahoo.com> wrote:

Hi,-my number(s)-267-288-5640*/267-602-6927
Amy
Philadelphia.PA.19136
64-9 northeast Philadelphia-Mayfair,thank you


--
**Trenton Donn Pool**
President
Direct: 512-784-0132
Email: tdonnpool@gmail.com

**Benezet Consulting, LLC**
3800 Creek Rd
Dripping Springs, TX 78620

*ag  DISC 6/16*
*①*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BENEZET CONSULTING, LLC;** | : | |
| **TRENTON POOL** *and* **CAROL LOVE** | : | |
| | : | **CIVIL ACTION** |
| **PLAINTIFFS,** | : | |
| | : | **No. 1:16-CV-00074** |
| **vs.** | : | **Hon. Yvette Kane** |
| | : | |
| **PEDRO A. CORTÉS,  in his official capacity** | : | |
| **as the Secretary of the Commonwealth of** | : | |
| **Pennsylvania; and JONATHAN MARKS,** | : | |
| **in his official capacity as Commissioner,** | : | |
| **of the Bureau of Commissions, Elections and** | : | |
| **Legislation** | : | |
| | : | |
| **DEFENDANTS.** | : | |

RECEIVED
JUN 2 1 2016
Office of Attorney General
Litigation Section

## PLAINTIFF LOVE'S RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES DIRECTED TO CAROL LOVE

1.  *Identify all persons who, to your knowledge or information, have information relevant to and relating to Plaintiff's claims against Defendants.  For each such person, list and describe the information or knowledge possessed and how the person acquired such information or knowledge.*

**Response**: No individual has any information relevant to and relating to Plaintiff Love's claims against Defendants.  Plaintiff Love as not engaged in any non-privilege communication with any third party with respect to her claims against Defendants.

2.  *Identify each and every person, excluding legal counsel, by name, address and telephone number to whom you have spoken or otherwise communicated concerning this action, and any of the claims within this action, or any of the facts giving rise to the claims in this action.  For each individual identified, state the date(s) of the communication, the method of communication, those present during the conversation, and describe in detail the entire communication including all facts obtained from the other individual relevant to any of the claims set forth in this action.*

**EXHIBIT**
*Def. 20*

**Response:** No individual has any information relevant to and relating to Plaintiff Love's claims against Defendants. Plaintiff Love as not engaged in any non-privilege communication with any third party with respect to her claims against Defendants.

3.      *Identify all witnesses you expect or intend to call at the time of the trial.*

**Response:** Plaintiff Love will call Carl Romanelli, 344 South Franklin Street, Wilkes-Barre, Pennsylvania and Trenton Pool, 3800 Creek Road, Dripping Springs, Texas, 78620.

4.      *Identify all exhibits you may use at any hearing and trial of this matter.*

**Response:** Commonwealth of Pennsylvania's 2016 nomination petition.

5.      *Describe with particularity each and every injury you have suffered as a result of the conduct complained of in the complaint. The term "injury" includes physical, mental and monetary damage to you. For each such injury, identify and describe how the injury occurred, the monetary value of such injury, whether you paid any monies on account of the injury and, if so to whom, how much and when.*

**Response:** Plaintiff has suffered impairment of her First Amendment rights as Defendants' enforcement of the challenged statute prohibiting out-of-state circulators to circulate and execute nomination petitions is the direct and proximate cause of Plaintiff not being afforded the desired opportunity to exercise rights guaranteed to her under the First and Fourteenth Amendments to the United States Constitution to sign a nomination petition for the candidates of her choosing in her party's primary. Plaintiff seek prospective equitable relief only, so that in the future she may sign nomination petitions circulated by out-of-state circulators and sign as many nomination petitions for candidates seeking her party's nomination as she desires. Plaintiff Love has suffered no economic injury and paid no monies on account of her constitutional injury.

6.      *Please identify all expert witnesses that you may call at any hearing or trial of this matter and indicate whether such expert witnesses will be proffered for liability or damages.*

**Response:** None.

7.      *Please identify all cases, since January 1, 2010, in which your identified expert witnesses have testified and include whether they have testified on liability or damages or for the Plaintiff or for the Defense.*

**Response:** Not applicable.

8.      *Please identify all documents reviewed by your experts in connection with the preparation of any expert report or expert testimony.*

**Response:** Not applicable.

9.      *Please describe with particularity all of the expert's opinions and conclusions and the basis for them, including all facts and documents relied on.*

**Response:  Not applicable.**

10.     *Provide a calculation of all damages sought from Defendants.*

**Response:  Not applicable.  As is clear from the face of Plaintiffs' Second Amended Complaint, no economic damages are sought from Defendants.**

11.     *Are you claiming any loss of earnings or income?  If so, state the total amount, how it is computed and whether it is the total claimed or only the total to date.*

**Response:  No.**

12.     *Identify all persons who witnesses [sic] any of the alleged events described in your Second Amended Complaint and please identify what events each person witnesses.*

**Response:  Plaintiff was aware that a circulator intended to seek her signature for one of the candidates for President of the United States during February 2016, but none was presented for her signature.  Plaintiff, learned after the fact, that the circulator who intended to travel to Lancaster County to circulate nomination petitions in Mountville did not seek her signature for the sole reason that he was not able to secure an in-state witness in Lancaster County to witness and execute the nomination petition for Senator Cruz in Lancaster County, so the effort was abandoned.  No other individual presented themselves to Plaintiff Love in 2016 to afford her the opportunity to sign a nomination petition for one or more of the candidates that she deemed acceptable to place on the Commonwealth's 2016 Republican Presidential Primary Election.**

13.     *In your Second Amended Complaint, you make reference to persons whom you claim were going to provide signature collection services (and/or who did provide signature collection services) for you either on a paid basis or on a volunteer basis.  Identify each of those persons and provide current addresses for them so that they may be subpoenaed to testify at a deposition and/or trial and so that they can be commanded to provide documents in their possession relating to the services they were going to provide to you.*

**Response:  Plaintiff never had contact with the out-of-state circulator who intended to travel to Mountville to circulate nomination petitions(s) for one or more Republican Presidential candidates.  After the fact, Plaintiff is now aware that the individual who intended to travel to Mountville to circulate nomination petitions for Republican Presidential candidate(s) was Plaintiff Trenton Pool.**

14.     *Identify any and all nominating petitions that you have signed including, without limitation, the candidate for whom  you signed and the election when you signed.  The time frame for this interrogatory is January 1, 2010 until the present.*

**Response:**  To the best of Plaintiff Love's recollection, Plaintiff Love signed the Republican nomination petition of William Genetti in February 2015.  William Genetti was a candidate for the Republican nomination for Magisterial District Judge from district 02-1-03 covering Columbia and Mountville boroughs and West Hempfield Township in Lancaster County, Pennsylvania.

15.     *In your Second Amended Complaint, you make reference to an outburst.  Identify this person (and all witnesses to this alleged outburst) and provide current addresses for them so that they may be subpoenaed to testify at a deposition and/or trial and so they can be commanded to provide documents in their possession relating to the services they were going to provide to you.*

**Response:**  The Second Amended Complaint does not aver that Plaintiff Love was a witness to the "outburst" referenced in the above interrogatory.  Plaintiff Love has no information or knowledge with respect to this event.

Respectfully submitted,

Dated: June 16, 2016

Paul A. Rossi, Esq.
IMPG Advocates, Inc.
*Attorney for Plaintiffs*
Attorney I.D. # 84947
873 East Baltimore Pike, Suite #705
Kennett Square, PA  19348
717.961.8978
Paul-Rossi@comcast.net

4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BENEZET CONSULTING, LLC;** | : | |
| **TRENTON POOL** *and* **CAROL LOVE** | : | |
| | : | **CIVIL ACTION** |
| **PLAINTIFFS,** | : | |
| | : | **No. 1:16-CV-00074** |
| **vs.** | : | **Hon. Yvette Kane** |
| | : | |
| **PEDRO A. CORTÉS,** in his official capacity | : | |
| as the Secretary of the Commonwealth of | : | |
| Pennsylvania; and **JONATHAN MARKS,** | : | |
| in his official capacity as Commissioner, | : | |
| of the Bureau of Commissions, Elections and | : | |
| Legislation | : | |
| | : | |
| **DEFENDANTS.** | : | |

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that on June 16, 2016, he served, via First Class mail, upon the following defendants' legal counsel a true and correct copy of "Plaintiff Love's Responses to Defendants' First Set of Interrogatories Directed to Carol Love" at the following address:

Kenneth L. Joel, Esq.
Chief Deputy Attorney General
Office of Attorney General
15th Floor, Strawberry Square
Harrisburg, PA  17120

Dated:    June 16, 2016

_____
Paul A. Rossi, Esq.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BENEZET CONSULTING, LLC;** | : | |
| **TRENTON POOL** *and* **CAROL LOVE** | : | |
| | : | **CIVIL ACTION** |
| **PLAINTIFFS,** | : | |
| | : | **No. 1:16-CV-00074** |
| **vs.** | : | **Hon. Yvette Kane** |
| | : | |
| **PEDRO A. CORTÉS,  in his official capacity** | : | |
| **as the Secretary of the Commonwealth of** | : | |
| **Pennsylvania; and JONATHAN MARKS,** | : | |
| **in his official capacity as Commissioner,** | : | |
| **of the Bureau of Commissions, Elections and** | : | |
| **Legislation** | : | |
| | : | |
| **DEFENDANTS.** | : | |

## <u>VERIFICATION OF INTERROGATORY ANSWERS</u>

I, Carol Love, believe, based on reasonable inquiry, that the foregoing answers are true and correct to the best of my knowledge, information and belief.

I verify, under penalty of perjury, that the foregoing is true and correct.


Dated:  June 16, 2016

Carol Love

6