**EXHIBIT 5**

1

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE MIDDLE DISTRICT

3                    OF PENNSYLVANIA

4                 *  *  *  *  *  *  *  *

5   BENEZET CONSULTING, LLA,      *

6   AND TRENTON POOL              *

7       Plaintiff                 *   Case No.

8       vs.                       *   1:16-CV-0074

9   PEDRO A. CORTES,              *

10  AND JONATHAN MARKS            *

11      Defendant                 *

12                 *  *  *  *  *  *  *  *

13

14                     DEPOSITION OF

15                      ANDY JACOBS

16               Monday, September 30, 2016

17

18

19

20

21

22

23

24     Any reproduction of this transcript is prohibited

25       without authorization by the certifying agency.

2

```
 1                    DEPOSITION

 2                         OF

 3   ANDY JACOBS, taken on behalf of the Defendant herein,

 4   pursuant to the Rules of Civil Procedure, taken before

 5   me, the undersigned, Bernadette Black, a Court

 6   Reporter and Notary Public in and for the Commonwealth

 7   of Pennsylvania, at the offices of Attorney General,

 8   13th Floor, Strawberry Square, Harrisburg,

 9   Pennsylvania on Monday, September 30, 2016 beginning

10   at 2:00 p.m.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                    A P P E A R A N C E S

 2

 3    PAUL ANTHONY ROSSI, ESQUIRE

 4    Office of Paul Rossi

 5    316 Hill Street

 6    Mountville, PA  17554

 7        COUNSEL FOR PLAINTIFF

 8

 9    KENNETH L. JOEL, ESQUIRE

10    Chief Deputy Attorney General

11    Office of Attorney General

12    Litigation Section

13    15th Floor

14    Strawberry Square

15    Harrisburg, PA  17120

16        COUNSEL FOR DEFENDANT

17

18

19    ALSO PRESENT:

20    NICOLE RADZIEWICZ

21

22

23

24

25
```

4

1                          I N D E X

2

3    <u>WITNESS:</u> ANDY JACOBS

4    EXAMINATION

5        By Attorney Joel                          7 - 40

6    EXAMINATION

7        By Attorney Rossi                        40 - 59

8    EXAMINATION

9        By Attorney Joel                         59 - 62

10   CERTIFICATE                                      64

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1                        EXHIBIT PAGE

2

3                                          PAGE

4  NUMBER   DESCRIPTION                  IDENTIFIED

5                      NONE OFFERED

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

1                           OBJECTION PAGE

2

3   ATTORNEY                                        PAGE

4   Joel                                          48, 50

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

7

1                    P R O C E E D I N G S

2   --------------------------------------------------------

3   ANDY JACOBS, HAVING FIRST BEEN DULY SWORN, TESTIFIED

4   AS FOLLOWS:

5   --------------------------------------------------------

6   EXAMINATION

7   BY ATTORNEY JOEL:

8   Q.   Good afternoon, Mr. Jacobs.  My name is Kenneth

9   Joel.  I'm with the Office of Attorney General.  I

10  represent the Defendants in this case, along with my

11  colleague, Nicole Radziewicz.  Have you ever been

12  deposed before?

13  A.   Yes.

14  Q.   How many times?

15  A.   Geez, I think at least twice.  No, three times.

16  Three times.

17  Q.   Were they in connection with your efforts at

18  collecting signatures?

19  A.   Yes.

20  Q.   All three times?

21  A.   Yes.

22  Q.   Tell me about each one of them, please.

23  A.   One was in Illinois and it was during the ---

24  Illinois has a petition challenge process.  It was a

25  challenge of the signatures.

8

1    Q.    Okay.

2    A.    And then, one was, I --- well two of them, I

3    actually testified in written depositions.  So I think

4    they deposed me, I mean, is that the same thing?

5    Q.    Let's break it out a little bit.  So, the one,

6    let's ---.

7    A.    The Illinois ---.

8    Q.    Let me tell you a few rules.

9    A.    Yeah.

10    Q.    Usually I ask if you've been deposed, people say

11    no, and then I give you the rules.  Let me give you

12    the rules.

13    A.    Okay.

14    Q.    Then we'll get into your deposition.

15    A.    Okay.

16    Q.    First rule, try to wait really hard for me to

17    finish.

18    A.    Yeah.

19    Q.    And I'll try really hard for you to finish.

20    Okay?

21    A.    Yeah.

22    Q.    It's a lot easier for her to do her job.  All

23    right?  If at any point you don't hear me, just ask me

24    to repeat the question, I will do so.  Is that okay?

25    A.    Yeah.

9

1   Q.   Answer everything verbally, yes, no, whatever

2   your answer is, it's fine, as long as it's truthful.

3   But, just answer verbally, because the nonverbal

4   communication will be hard for us to --- hard for her

5   to pick up and hard for us to know what you mean later

6   on down the road.   Okay?

7   A.   Yes.

8   Q.   If at any point you don't understand, tell me

9   what's confusing, tell me what you don't understand

10  and I'll rephrase the question.   Okay?

11  A.   Yes.

12  Q.   If at any point you need a break, all I ask is

13  that you answer whatever question is on the table and

14  then you can take whatever break you need.   Okay?

15  A.   Yeah.

16  Q.   Any reason medically or otherwise that you can't

17  hear, understand, or answer truthfully today?

18  A.   No.

19  Q.   With that then, can we agree that if you give an

20  answer, you've not only heard me, but you've

21  understood me and you've answered truthfully to the

22  best of your ability?

23  A.   Yes.

24  Q.   Fair enough.   All right.   So, you mentioned

25  Illinois.   When was that deposition?

10

1   A.    2014.

2   Q.    And was that by written question or was that

3   live?

4   A.    It was live, but it was done over a video

5   conference.   In other words, I was not present in

6   Illinois.   I was actually in Wyoming and I testified

7   over a video phone.

8   Q.    And that was in connection with some sort of

9   challenge to signatures that you had collected in

10  Illinois, I assume?

11  A.    Yes.   Yeah.

12  Q.    Do you know what ended up happening in that case?

13  A.    We won.   Our side won and my signatures counted.

14  It was for the Libertarian Party.

15  Q.    Who brought the challenge, do you know?

16  A.    Some Republicans.

17  Q.    So if I understand what probably was going on,

18  let me tell you what I think was going on and you tell

19  me if I'm right or not.   And if I'm not, you let me

20  know.   You collected signatures in Illinois for a

21  Libertarian candidate or the party?

22  A.    Well, it was a slate of Libertarian candidates.

23  They put --- the way that the petitions are formatted,

24  they have the names of multiple candidates on the

25  petition.

11

1  Q.   And in 2014, what office was that for?

2  A.   There was Governor and there were some other

3  offices on there.   Whatever --- it was statewide

4  offices.

5  Q.   Okay.

6  A.   It was the statewide slate of candidates.   I

7  think there were six of them.

8  Q.   And if I understand you correctly, you collected

9  signatures for the statewide Libertarian officers, or

10  candidates in 2014, in Illinois, you then turned those

11  signatures in to whatever the appropriate body was in

12  Illinois?

13  A.   I turned them in to somebody in the Libertarian

14  Party in Illinois and then they turned them in to the

15  Secretary of State's Office.

16  Q.   Fair enough.   And then a Republican challenged

17  those signatures as not being valid as a way of

18  keeping those folks off the ballot?

19  A.   Yes.

20  Q.   And ultimately your side prevailed and the

21  Libertarians stayed on the ballot?

22  A.   Yes.

23  Q.   Very good.   You mentioned that you've been

24  deposed three times in connection with signature

25  gathering.   What was the second time?

12

1   A.   Well, that was actually the third time.

2   Q.   Okay.

3   A.   The first time was Nebraska in 2006.  Now this

4   was in a written --- I did a written deposition, so is

5   that the same thing?  I talked to an attorney and they

6   asked me questions, and then they --- I didn't go in

7   person --- like I wasn't sitting in a Court or

8   anything, but it was in the form of a written

9   deposition.

10  Q.   So, did you have a Court Reporter there taking

11  down answers?  Or did you just have an attorney there

12  interviewing you and writing down what you said?

13  A.   I think it was just an attorney.

14  Q.   And did that attorney then prepare something, an

15  affidavit, a declaration, something with what your

16  answers were and then you reviewed it and signed it?

17  A.   Yes.

18  Q.   Is that what happened?

19  A.   Yes.

20  Q.   And that was in connection with signatures that

21  you gathered in Nebraska in 2006?

22  A.   Yeah, but we weren't --- the court case wasn't

23  about the signatures, it was we were getting kicked

24  out of locations, like that carried public foot

25  traffic, and the lawsuit was over petitioners getting

13

1   run out of locations where the public comes and goes.

2   Q.    All right.

3   A.    And so our side ended up winning the lawsuit.

4   Q.    Where you the plaintiff in that case, or ---?

5   A.    I was not the plaintiff.  I think the proponent

6   of one of the petitions was the plaintiff.  I think

7   his last name was Groene, G-R-O-E-N-E.  Groene.

8   Q.    And where were you interviewed by that attorney?

9    Were you interviewed in Nebraska or elsewhere?

10  A.    I went to a law office in Nebraska.

11  Q.    And were the signatures --- not signatures,

12  because it wasn't a signature case.  Was the case

13  pending in Nebraska?  Was it about being in a Nebraska

14  property and getting kicked out?

15  A.    It was about being kicked out of locations in

16  Nebraska, so we were collecting signatures in Nebraska

17  and we were getting kicked out of everywhere.  DMVs,

18  libraries, public festivals, shopping centers, et

19  cetera and so, and then also the opposition to the

20  campaigns had hired blockers.  And so we had people

21  who were getting paid to come out and harass us and

22  jump in front of us and try to get people to not sign

23  the petitions, and so they filed a lawsuit, you know,

24  so we could get access to locations to ask people to

25  sign, so we could get enough signatures to get --- we

14

1   were doing ballot initiatives to get the initiatives

2   on the ballot.

3   Q.    Was that lawsuit filed while you were already

4   there collecting signatures?  Is that what happened?

5   A.    Yes, yes.

6   Q.    And what was the middle time that you were

7   deposed?

8   A.    What was ---?

9   Q.    You said three times.

10   A.    Oh, the other time.

11   Q.    Nebraska was the first, Illinois was the last.

12   A.    The second time was South Dakota.

13   Q.    When was that?

14   A.    Geez, I'm not exactly sure.  Let me think here,

15   it was probably sometime between 2007 and maybe 2012,

16   I would guess.  I'd have to look it up, I'm not

17   exactly even sure.  It was, the case was about a ban

18   on out-of-state petition circulators.  And it was

19   filed by the Libertarian Party and I testified over

20   the phone.  It might have been 2009 but not sure, I'd

21   have to look it up.  Maybe 2010.

22   Q.    So, were you in an office like this with a court

23   reporter with you?

24   A.    No, no.  It was over the phone.

25   Q.    So were you actually testifying, being asked

15

```
 1  questions and answered, like we're doing today?
 2  A.   Well, it was for a written deposition.  The
 3  attorney took notes on what I said and then they
 4  forwarded something to me, and then I signed it.  I
 5  think I got it notarized and sent it back to them.
 6  Q.   And where were you when you giving that
 7  information?
 8  A.   I'm not sure, I mean, I could have been in a
 9  number of --- I'd have to, you know, I'd have to see
10  if I have anything dated, that has that on it.  I'm
11  not sure where I was.  I might have, it's possible
12  that I could have been in Maine, I might have been in
13  Pennsylvania, I could have been in --- I'm not 100
14  percent sure, I'd have to look, but I was not in South
15  Dakota.
16  Q.   And just to make sure I understand, wherever you
17  were, were the questions being asked to you over the
18  phone, or was there somebody there with you asking the
19  questions?
20  A.   No, it was just totally over the phone.
21  Q.   So you were someplace, and there was somebody on
22  the other end of the phone asking you a series of
23  questions?
24  A.   Uh-huh (yes).
25  Q.   Yes or no, for her?
```

16

1  A.    Yes.

2  Q.    And then was that verbatim typed up, or was the

3  information you provided typed up?

4  A.    Somebody was taking notes.  I don't know if they

5  typed, you know, verbatim, but they at least got the

6  general point of what I said.

7  Q.    And then you signed that statement?

8  A.    Yes.

9  Q.    And is that the same thing that happened in

10  Illinois?

11  A.    No --- Illinois, there was an actual court case

12  going on.  I mean, like, I was in --- I was testifying

13  over a video phone and the video was in an actual

14  court.  There were attorneys there.  And I think there

15  was a judge there and a court reporter, and so I just

16  wasn't able to make it there, so somebody set it up so

17  I could do it over video conference.

18  Q.    And the one in Nebraska, was that like the South

19  Dakota one, except that the attorney was actually in

20  the room with you, asking you a bunch of questions?

21  A.    Yeah, Nebraska, yeah, I went to a law office.

22  Q.    And you had an interaction with some attorney

23  asking questions, providing information and then do I

24  understand you correctly, that some sort of a

25  statement was typed up and you signed that statement?

17

1   A.    Yes.

2   Q.    What's your address?

3   A.    Well, I'm --- it's 3403 Hawthorn Drive, Camp

4   Hill, PA, 17011.

5   Q.    And how long have you been there?

6   A.    Well, that's my parents' address.  So I've kind

7   of bounced in and out of there multiple times over

8   several years.  My parents have been there since, I

9   guess, 1989.  But I mean, you know, I was living

10  there, I moved out, and then, you know, I travel

11  frequently, and I've actually kind of been living on

12  the road for the last several years.  But I do pop in

13  sometimes.  You know, I pop in, sometimes I'm there

14  for a few days, sometimes I'm there for a few months.

15  Q.    Do I understand, are you a professional signature

16  collector?

17  A.    Yes.

18  Q.    Is that what you do for a living?  How long have

19  you been doing that?

20  A.    Sixteen (16) years.

21  Q.    And are you a resident of the state of

22  Pennsylvania?

23  A.    Yeah, I mean, I have a situation, though.  I have

24  a driver's license in a different state.

25  Q.    What state is that?

18

1  A.    North Dakota.

2  Q.    Are you a registered voter in Pennsylvania?

3  A.    I am registered to vote in Pennsylvania, yeah.

4  I'm still on the voter rolls here, yes.

5  Q.    Are you registered as a Democrat or Republican?

6  A.    I registered actually as a Libertarian.  Now, at

7  the time, when we were --- I was registered as a

8  Republican, but I switched it to Libertarian just ---

9  not too long ago.

10  Q.    Did you --- strike that.

11        In 2016, were you an independent contractor for

12  Benezet?

13  A.    Yes.

14  Q.    When did you become an independent contractor for

15  Benezet?

16  A.    I guess it would have been, let's see --- I guess

17  it would have been, I guess in Indiana.  I guess

18  Indiana would have been in January.  It could have

19  been late December, early January.

20  Q.    Did you collect signatures at all as an

21  independent contractor for Benezet in Pennsylvania

22  this past election sign up?

23  A.    Yes.

24  Q.    Who'd you collect for?

25  A.    Ted Cruz.

19

1    Q.    So if I understand correctly, you collected
2    signatures for Ted Cruz, to get his name on the
3    Presidential Primary Ballot, the Republican Primary in
4    Pennsylvania?
5    A.    Yes.
6    Q.    How many signatures did you collect?
7    A.    Oh geez, I don't remember.
8    Q.    Did you go door to door collecting for Ted Cruz?
9    A.    I did.
10   Q.    Did you have a witness with you?
11   A.    Yes.
12   Q.    Why did you have a witness with you if you're a
13   Pennsylvania registered voter?
14   A.    Because there was concern about me not having an
15   in-state license and we didn't have an answer about
16   whether that was going to be an issue or not.  And I
17   didn't think it was going to be an issue, but Trent
18   was afraid that it could come up as an issue if we got
19   challenged.  Because I had talked to a woman named
20   Edee Baggett, who was working the Donald Trump
21   campaign, and I was going to work on the Trump
22   petition at one point.  And I told Edee that I was
23   registered to vote in Pennsylvania, but I did not have
24   a Pennsylvania driver's license.  I told her that I
25   could work with a witness if she wanted me to, and

20

1    then, I don't know, she ended up hiring other people.

2    But then, actually, I did get a call back from

3    somebody that was working with Edee Baggett, offering

4    me to work on the Donald Trump petition.  But by the

5    time they called me back I had already made an

6    agreement with Trent to work on the Ted Cruz petition.

7    And so I had to decline the Donald Trump petition

8    because of the law here, you know, and so, anyway, I -

9    -- and so Trent was afraid that Edee Baggett might

10   make an issue or tell somebody in the Trump campaign

11   that I didn't have a PA driver's license, and so,

12   that's why.

13   Q.    Okay.

14   A.    We didn't know if it would be an issue or not.

15   Q.    How long have you had a North Dakota driver's

16   license?

17   A.    Well I got one in 2012, but I was actually just

18   in North Dakota and I renewed it in North Dakota.

19   Q.    Do you have an address in North Dakota?

20   A.    I had an address that I was staying at.  I was

21   there for several months.

22   Q.    And what made you decide to go door to door for

23   Ted Cruz as opposed to going to an event or something

24   like that?

25   A.    I didn't have any good events to go to and the

21

1  signers have to be registered Republican.  Only

2  registered Republicans can sign.

3  Q.    Did you have some sort of a list that you walked

4  around with to at least identify what houses had

5  registered Republicans in them?

6  A.    Yes.

7  Q.    Who got you that list?

8  A.    My brother got it at the election office.

9  Q.    Does your brother collect signatures for a

10 living?

11 A.    Sometimes.

12 Q.    Is he a Pennsylvania registered voter?

13 A.    Yes, he is.

14 Q.    Do you know any other Pennsylvania registered

15 voters who collect signatures?

16 A.    I do.

17 Q.    How many?

18 A.    Not too many, because Pennsylvania doesn't have

19 petitions very often, so there's not a lot of people

20 who are experienced who've done it in Pennsylvania, so

21 people who, I don't know, maybe who do this type of

22 work on a regular or at least semi-regular basis?

23 Maybe like four.  Four or five, maybe.

24 Q.    Did you collect any signatures for Rocky De La

25 Fuente as a candidate for the Democratic primary in

22

1  Pennsylvania?

2  A.    No.   I did in Indiana but not in Pennsylvania.

3  Q.    Yeah, I'm sorry, I meant in Pennsylvania.   Thank

4  you for clarifying.

5  A.    Yeah.   No, not in Pennsylvania.   I wanted to but

6  I was unable to because I didn't have a Democrat

7  witness.

8  Q.    Your witness for the Cruz collection, was that

9  one of the Cruz delegates?

10  A.   No, it was my brother.

11  Q.   Oh, I'm sorry, it was your brother.

12  A.   Yeah.

13  Q.   And were you able to collect signatures, I'm

14  assuming?

15  A.   Yes.   For Cruz, but not Rocky.

16  Q.   Right.   And for Cruz, I think you told me you

17  don't remember how many you did, but you did collect

18  some.

19  A.   Yes.

20  Q.   Did you sign the affidavit or did your brother?

21  A.   He signed the affidavits.

22  Q.   And he did have the affidavit notarized?

23  A.   Yes, he did.

24  Q.   What did you do when you were meeting with the

25  people --- strike that.

23

1     Let's ask you this way. When go up to a door,
2  what was your pitch to the people to try to get them
3  to sign?
4  A.   Just, you know, could you take a moment to sign a
5  petition? Just trying to get some, you know,
6  Republican candidates on the ballot for the primaries
7  and your house is on the list of registered
8  Republicans in this area.
9  Q.   How long was your interaction, usually, from the
10 time that they answered the door until you either left
11 with a signature or left with no signature?
12 A.   Usually not very long.
13 Q.   Can you give me any sense as to the doors you
14 knocked on, how many you walked away with a signature
15 versus not with a signature?
16 A.   I'm not sure, but most of them not, because a lot
17 of people aren't home. And then out of the people
18 that are home, they're not all registered Republican.
19 And out of the ones who --- I mean, sometimes somebody
20 else answers the door. Sometimes, somebody who moved
21 --- you know, that person that lived there doesn't
22 live there anymore. Or their wife answers the door
23 and she's not registered Republican, or vice versa.
24 And then also, a lot of people aren't home.
25 Q.   So would you put it 30 percent success rate?

24

1  Twenty (20)?  Forty (40)?  What would you give it?

2  A.  Oh geez, that's hard to say.  I don't know, maybe

3  one or two out of ten, something, maybe.

4  Q.  And it was because of those reasons you just

5  testified to?

6  A.  Primarily, yeah.

7  Q.  Do you have your own business when it comes to

8  petition circulating?  And by that I mean something

9  like Benezet, where you have a company and then you

10  engage independent contractors?

11  A.  Yeah, but I mean you don't necessarily have to, I

12  mean, you can do it as yourself.  But, you know, yeah.

13  Q.  Did you collect signatures for any other campaign

14  or initiative in Pennsylvania in 2016?

15  A.  No.

16  Q.  You weren't part of the Open Pittsburgh

17  gathering?

18  A.  Nope.

19  Q.  Were you asked?

20  A.  Oh, oh, I'm sorry.  I did work on some other

21  petitions in Pennsylvania.

22  Q.  Okay.

23  A.  I worked on Rocky De La Fuente, Green Party and

24  the Libertarian Party.

25  Q.  And was that for Rocky De La Fuente as an

25

1   independent candidate?

2   A.   Yes.

3   Q.   An American Delta Party Candidate?

4   A.   Yeah, yes.

5   Q.   When were you in Pennsylvania for those

6   collections?

7   A.   That would have been the spring and summer.

8   Q.   Can you give me any sense as to how many

9   signatures you got for Rocky De La Fuente as an

10  Independent candidate?

11  A.   I think it was 937.

12  Q.   And that's you personally?

13  A.   Yes.

14  Q.   How about for the Green Party?

15  A.   It was 438.

16  Q.   And how about for the Libertarians?

17  A.   I think it was 1,661.

18  Q.   And what time period were you in Pennsylvania

19  collecting those?

20  A.   Well I guess the first collection was in May.  I

21  did leave, and then I left and went to another state

22  and then I came back.  And then I collected more

23  signatures in June and July.

24  Q.   How many days were you out collecting signatures?

25  A.   It's hard to say.  I was out most days but I

26

1   don't know that I was necessarily out every day.  I

2   mean this occurred over a period of, I would say,

3   sometime in mid to late May, and then, like I said, I

4   did leave the state and then I came back and then in

5   June --- I think I was sick for a few days also.

6       So we're talking all told, this was, like I said,

7   this was between about mid-May to about the deadline,

8   which was the first of August.  Most days --- but I

9   didn't necessarily collect signatures every day, and I

10  also didn't have --- I was gone for a few days.  I

11  left the state for a few days.  And then I was also

12  sick for a few days, maybe five days, maybe a week.

13      And then I also didn't have all three of the

14  petitions the whole time.  At first I was just doing

15  Libertarian Party and then later on I did the Green

16  Party.  And then I had actually been told the Green

17  Party was over at one point, and so I stopped working

18  it.  And then I was later told it wasn't over and to

19  get a few more, which I did.  And then I picked up

20  Rocky, was the last one I've got.

21  Q.   When you were collecting signatures in

22  Pennsylvania for any of those, did I understand you

23  correctly that you didn't work every day?  There were

24  some days you took off?

25  A.   Yeah.  Like I said, I left the state for a few

27

1   days as well.

2   Q.    Right.  But, I mean, of the days that you were in

3   Pennsylvania working --- strike that.

4         The days that you were in Pennsylvania, did you

5   work every day that you were here or did you take some

6   time off?

7   A.    Almost every day --- I mean, the only days that I

8   didn't work were like, there was a few days I was

9   sick, there was a few days it was raining and there

10  were some days where I couldn't find a location.

11  Q.    Any other signature collection efforts in

12  Pennsylvania in 2016?

13  A.    No.

14  Q.    And have you collected signatures in Pennsylvania

15  for any other election period?

16  A.    Yes.

17  Q.    Which ones?

18  A.    2000, 2004, 2008 and 2012.

19  Q.    So only the presidential years?

20  A.    Yeah.

21  Q.    In 2000, in Pennsylvania, who did you collect

22  for?

23  A.    Libertarian Party.

24  Q.    Were you engaged as an independent contractor by

25  somebody or did you contract directly with the

28

1  Libertarian Party?

2  A.    I was working directly with the Libertarian

3  Party.

4  Q.    Any estimate as to how many signatures you got?

5  A.    About 400.

6  Q.    And what time frame would it take you to get

7  those?

8  A.    Like a week.

9  Q.    And back in 2000, when you were doing it for the

10  Libertarian Party, did you have a witness with you or

11  did you witness your own stuff?

12  A.    No, I believe I was still on the PA voter rolls

13  at that point.  I voted in '96 in Pennsylvania and I

14  had not registered to vote anywhere else, so I was

15  still a Pennsylvania registered voter.

16  Q.    So you were able to sign your own affidavits?

17  A.    Yes.

18  Q.    And did you get those notarized?

19  A.    Yes.

20  Q.    Did you collect for anybody else in the 2000

21  presidential election campaign or just the Libertarian

22  Party?

23  A.    No.  Just the Libertarian Party.

24  Q.    How about 2004, who did you collect for?

25  A.    Libertarian Party and Constitution Party.

29

Q.    Can you give me a sense of how many signatures you got for either?

A.    I don't --- I think I was only here for a couple weeks.  And I think it rained every day one of the weeks, so I don't think I did a tremendous number.  I don't remember.  I mean, it was a long time ago and I mean, it could --- it was probably a few hundred but I don't remember exactly.

Q.    That's all right.  That's fair.

A.    Let's see, 400 or 500 something.  600 maybe.

Q.    Was that for each or for both combined?

A.    Probably about both combined.  Somewhere thereabouts.

Q.    And in 2004 did you have a witness with you or did you sign your own affidavit?

A.    I think my brother was witnessing for me.

Q.    Why didn't you witness?

A.    I think I was off the Pennsylvania voter rolls at that point.

Q.    How does one get off the voter rolls?

A.    Well, I'd registered to vote and I voted in California.

Q.    When did you vote in California?

A.    I guess --- actually I went back to California in 2000 and I voted in the presidential race in

30

1    California in 2000.  And in 2002, so I voted in

2    California.

3    Q.    And in the 2004, the signatures you collected for

4    the Libertarian and Constitution Party in

5    Pennsylvania, was your brother's signature notarized?

6    A.    I believe so.

7    Q.    2008, who did you collect for in Pennsylvania?

8    A.    Ron Paul, and then Libertarian Party.

9    Q.    Did you do Ron Paul for the Republican primary?

10   A.    Yes.

11   Q.    Do you know how many signatures you got for Mr.

12   Paul?

13   A.    I don't remember.  It was a long time ago.

14   Q.    Did you sign your own affidavit?

15   A.    No.

16   Q.    And is that because you hadn't re-registered to

17   vote here in Pennsylvania?

18   A.    Yeah.  I had not re-registered to vote in

19   Pennsylvania.

20   Q.    Did your brother sign your affidavit again?

21   A.    Yeah.

22   Q.    And was your brother's affidavit notarized?

23   A.    Yes.

24   Q.    Libertarian Party, do you know how many

25   signatures you got for that?

31

1   A.   I think it was like 5,000.

2   Q.   And did your --- I'm assuming you didn't sign

3   that affidavit either?

4   A.   No.

5   Q.   Your brother did?

6   A.   Yeah.

7   Q.   And was that notarized?

8   A.   Yes.

9   Q.   2012, who did you collect signatures for?

10  A.   Ted Cruz and ---.

11  Q.   2012.

12  A.   Oh, 2012, 2012.

13  Q.   I don't think ---.

14  A.   Ron Paul.  That's right, that's right.  Ron Paul.

15  Q.   Anybody else or just Ron Paul?

16  A.   It was Ron Paul --- well he had a delegate slate

17  too.  The same thing with the --- there was a delegate

18  slate.

19  Q.   So in '08, backing up a second, did you collect

20  signatures for Ron Paul and also for those delegates?

21  A.   Yeah.

22  Q.   In 2012, did you collect signatures for Ron Paul

23  and for his delegates?

24  A.   Yeah.

25  Q.   Any recollection of how many signatures you got,

32

1   either for Mr. Paul or for his delegates?

2   A.    No.

3   Q.    Did you sign the affidavit of circulation?

4   A.    No.

5   Q.    Did your brother?

6   A.    Yes.

7   Q.    And was your brother's signature notarized?

8   A.    I believe so.

9   Q.    Any other collection efforts in the Commonwealth

10  of Pennsylvania other than what you told me about?

11  A.    No.

12  Q.    Now are you aware that in the State of

13  Pennsylvania, to get on the primary ballot as either a

14  Democrat or Republican, are you aware that it's 2,000

15  signatures?

16  A.    Yeah, for the presidential candidate, yeah.

17  Q.    Right.  That's what I'm talking about, thank you.

18  In your experience, having done this for a number of

19  years, what does a campaign ask you to get, if they

20  need to end up at the end of the day with 2,000 ballot

21  signatures?

22  A.    Well I would say they're going to always want to

23  get more than that.  They're going to get, I would

24  say, at least 3,000.  Maybe 5,000 or 6,000.  You know,

25  some of them even go for more.  In fact, I remember

33

1   hearing and I never actually got verified whether or

2   not this was true.  Maybe somebody didn't like me if

3   this not true, but somebody, I remember during the Ron

4   Paul thing, was saying that if we got --- if Ron Paul

5   turned in the most signatures he would get the top

6   spot on the ballot.  Is that true?

7   Q.   No idea.

8   A.   Okay.  Well, I don't know either, but I know they

9   were trying to do that in 2008.  I don't think they

10  did that in 2012, but I do remember in 2008 they were

11  trying to turn in more signatures than the other

12  candidate, because somebody was claiming that that

13  would give them the top spot on the ballot.

14  Q.   That's not true.  That sounds like a ---

15  A.   It could be something ---.

16  Q.   --- sounds like a motivational effort.

17  A.   It could be somebody that didn't know what they

18  were talking about.  They didn't.

19  Q.   So you'd want more than the 2,000?

20  A.   Yes.

21  Q.   And in your experience with campaigns --- strike

22  that.

23       Do campaigns or --- strike.

24       Let me ask this way.  As a professional signature

25  collector are you paid per signature you get?

34

1   A.    Yes.

2   Q.    And whether --- and you're paid per signature you

3   get when you worked directly for the campaigns or the

4   parties; correct?

5   A.    Yes.

6   Q.    And also when you've worked, example, for

7   Benezet, this year, you were paid per signature?

8   A.    Yes.  There are a few states that have a paid by

9   the hour, or some campaigns that, even though there

10  was no law that required them to pay by the hour, they

11  did.  But, that's not the way most of them operate,

12  because it's not really efficient and it's not

13  required by law in most states.  And I know that there

14  was an effort to pass that in Colorado a few years ago

15  and then it got thrown out in court, so they don't

16  have to pay by the hour.

17  Q.    Why in your opinion, is it more efficient to pay

18  by the signature?

19  A.    Because people are not motivated to work very

20  hard if they're getting paid by the hour.  They could

21  just go sit at the slowest location possible and make

22  the same amount of money as the others.  You know, why

23  go out and kill yourself if you're not going to make -

24  -- there's no benefit to the petitioner.

25  Q.    Okay.

35

1   A.    So it's inefficient to pay by the hour.

2   Q.    In your experience is --- strike that.

3         So you were paid by Benezet this year, per

4   signature?  Is it your understanding that Benezet was

5   paid by the Cruz campaign per signature?

6   A.    As far as I know.

7   Q.    Are you aware of whether or not, and let's take

8   Benezet and the Cruz campaign, the Cruz campaign said,

9   get as many signatures as you can?  Or was it, we need

10  2,000 to get on the ballot, get us 4,000 to make sure?

11  A.    Um ---.

12  Q.    I believe they set some sort of an upper limit

13  that they gave?

14  A.    They do, but I mean, I don't know what that was.

15  Q.    Okay.

16  A.    That would --- Trent might know that, but I

17  don't.

18  Q.    But, in your experience, the campaigns would set

19  some sort of an upper limit for what they were looking

20  for?

21  A.    Usually.

22  Q.    Because after a certain number it just doesn't

23  matter?

24  A.    Yeah, but I mean I have seen campaigns that will

25  just go for as many as possible, too.

36

1   Q.   But do the majority of campaigns do that?   Or do

2   the majority set some sort of an upper limit?

3   A.   No.   Well, the majority then will set a limit,

4   and they'll try to, they'll try to maybe do a validity

5   check.   It depends on how organized they are and if

6   they're able to somehow get a voter list and check the

7   validity, then they'll be keeping track of what their

8   validity is.   But, then there are other campaigns that

9   are not so organized and don't do that.   And they'll

10  just get as many as possible.

11  Q.   As a professional signature collector, I'm

12  assuming it's your goal to get as many signatures as

13  you can, in the least amount of time it takes?

14  A.   Yeah.

15  Q.   Tell me a little bit about your educational

16  background.

17  A.   I went to high school.   You know, went to college

18  but never graduated.

19  Q.   Did you go to high school here in Camp Hill, or

20  ---?

21  A.   Yes.

22  Q.   When did you re-become a registered voter in

23  Pennsylvania?

24  A.   When did I register?   I think it was 2011.

25  Q.   Is there anything that prevented you from

37

1  renewing your driver's license here in Pennsylvania?

2  A.   Well one issue was I wasn't in the state when my

3  other license expired.  So, I ---.

4  Q.   When your North Dakota license expired?

5  A.   Yeah, no, I had a California license actually.

6  My license was in California and it expired while I

7  was in North Dakota and it was going to cost me too

8  much money to get back to California and I was in

9  North Dakota for a few months, so I just got a North

10  Dakota license.

11  Q.   How about when that just expired and you renewed

12  it.

13  A.   It didn't actually expire.  What happened was, I

14  had a situation that occurred in 2013.  I was driving

15  in the state of South Carolina, and I was involved in

16  a minor car accident.  And the police had falsely

17  reported that I didn't have car insurance, but I

18  didn't know that they had reported this.  And in fact,

19  the insurance actually paid for the accident.  And I

20  was not cited for not having car insurance.  So I was

21  driving around for several months and I forgot about

22  it, and I was pulled over by the police --- this was

23  well after this happened --- in Oklahoma, and they

24  said my license was canceled.  And I didn't know what

25  they were talking about so I told them that I had lost

38

1  my license a few months prior to this. When I was in
2  California I actually lost my driver's license. And I
3  had to contact the DMV at North Dakota to mail me
4  another license, which they did, and I paid a fee for
5  that. And so I thought maybe they meant they had
6  canceled the old license and mailed me a new one.

7      So that's what I told the police and they let me
8  go. And then I got pulled over somewhere else and the
9  same thing happened and they let me go. And then I
10  got pulled over somewhere else and the same thing
11  happened. So I called up the DMV in North Dakota and
12  they told me about the thing from South Carolina. So
13  then I called the DMV in South Carolina and they told
14  me that the police had reported that I didn't have car
15  insurance. And I said that that wasn't true. And so
16  they told me to call my insurance company and that the
17  insurance company would contact the DMV in South
18  Carolina and let them know that I did have insurance,
19  which they did. And then they also said they were
20  contacting the DMV in North Dakota and --- which they
21  did.

22      And so I thought that was the end of it. Well,
23  when I was in North Dakota, I got pulled over and they
24  said that my license was still canceled or something.
25  Or basically they said that I had to go pay a fee and

39

1   get another license.  So I paid a fee and I got

2   another new North Dakota license just recently.

3   Q.   Okay.

4   A.   I was in North Dakota for work.  So that's why I

5   was there.

6   Q.   But is there any reason you couldn't have just

7   kept your license going in Pennsylvania?

8   A.   Well the last time I had a Pennsylvania license

9   was --- I mean I got --- I was living in California

10  for several years, and so I left Pennsylvania and I

11  was in California, and my Pennsylvania license expired

12  while I was in California.  So I got a California

13  license.

14                  ATTORNEY JOEL:

15                  Let's take a break, I'm getting close.

16                  ATTORNEY ROSSI:

17                  Okay.

18  SHORT BREAK TAKEN

19  BY ATTORNEY JOEL:

20  Q.   Mr. Jacobs, what's your address in North Dakota?

21  A.   1090 12th Avenue, North Fargo, 58102.

22  Q.   And is that the address you've had in North

23  Dakota for how long?

24  A.   No, that was just, I was there for, I don't know,

25  maybe like a month and a half.  No, I was ---

40

```
 1  previously I had 525 Main Avenue East in West Fargo.
 2  Q.   How long were you at that address?
 3  A.   I was there for a few months.  It was probably
 4  like six months.  Something like that.
 5  Q.   When you're out collecting signatures in
 6  Pennsylvania, how many boards do you usually have on
 7  you?
 8  A.   I usually carry at least six.  Sometimes it's
 9  four.  I would say three to six.
10  Q.   And do you carry a similar amount of boards when
11  you're collecting in other states?
12  A.   Yes.
13  Q.   So that's your comfort level, is three to six
14  boards?
15  A.   Yeah.  There have been some occasions where I've
16  carried more, though.
17  Q.   Okay.
18  A.   I think the most I've ever carried is maybe like
19  12 or 16.  No, seriously.  And maybe about the least
20  has been maybe like two or three.
21  Q.   When your brother comes along with you when
22  you're collecting in Pennsylvania, does he also have a
23  board to collect signatures?
24  A.   Sometimes he does.
25  Q.   What does he do for a living?
```

41

1   A.   Right now he's doing a --- works for a

2   merchandising company.  I mean, sometimes he

3   petitions.

4   Q.   Have you, in Pennsylvania, petitioned --- strike

5   that.

6        All the experience you have petitioning and

7   signature gathering in Pennsylvania has been at the

8   presidential level?

9   A.   Yeah.  I mean I guess, technically, on like the

10  Libertarian Party petition, they generally will have a

11  slate of candidates on the same petition, or the ---

12  you know, same thing with the Green Party petition.

13  So, there's --- you know, they'll have other

14  candidates on there besides president.

15  Q.   I understand, thank you.  Mr. Rossi may have some

16  questions for you, but I think that's all I have.

17  A.   Okay.

18  Q.   That may spur some more for me, but that's it

19  right now.

20                  ATTORNEY ROSSI:

21                  It always does.

22  EXAMINATION

23  BY ATTORNEY ROSSI:

24  Q.   You testified that you did not circulate for

25  Rocky De La Fuente for Democrat?

42

1    A.    Not in Pennsylvania.  I did in Indiana, though.

2    Q.    And why did you not circulate for Rocky De La

3    Fuente?

4    A.    Because I couldn't find a Democrat witness.

5    Q.    Did you reach out to anybody to ---?

6    A.    I tried to find a Democrat witness.

7    Q.    Let me ask my question first, then answer my

8    questions.

9    A.    Sure.

10   Q.    Let's ask that again.  Strike that question.

11         Did you reach out to anyone to find a witness?

12   A.    To Trent.

13   Q.    And what was Trent's reply?

14   A.    He did try to find a witness for me and was

15   unsuccessful.

16   Q.    How long were you in Pennsylvania during the

17   circulation of petitions?  About how long were you in

18   Pennsylvania?

19   A.    For the whole three-week period.

20   Q.    And that's the period of time that petitions are

21   allowed to be circulated?

22   A.    For the major party primaries, yes.

23   Q.    You testified that you were circulating for Ted

24   Cruz as well?

25   A.    Yes.

43

1  Q.    I'm assuming, because you wanted to circulate

2  for Rocky De La Fuente, there were days that you were

3  not circulating for Ted Cruz?

4  A.    Yeah.   Well here's what happened.   We were in

5  Indiana and we were doing Rand Paul and Ted Cruz.   And

6  then I briefly worked Donald Trump and I briefly

7  worked Rocky De La Fuente in Indiana, and I was doing

8  them all at the same time.   So I was doing Ted Cruz

9  --- I was doing Rand Paul and Ted Cruz the whole time.

10 And then I briefly worked Donald Trump along with Ted

11 Cruz and Rand Paul.   And then I briefly worked Rocky

12 De La Fuente along with Ted Cruz and Rand Paul ---

13 this is in Indiana.

14     And then we came into Pennsylvania and we were

15 coming in to work Rand Paul.   We thought we were going

16 to do Rand Paul.   That's what I wanted to do.   I

17 wanted to work Rand Paul.   And the Rand Paul campaign

18 was not sure what they were going to do in

19 Pennsylvania because they were basically --- Rand Paul

20 wanted to see how he did in the Iowa Caucus to see

21 whether he was going to continue.   So he was waiting

22 for the Iowa Caucus vote, and so they were kind of

23 stalling us on to whether or not they were going to

24 hire us or not.

25     And so now Trent had put out a feeler with the

44

1   Ted Cruz people, but we didn't have any deal with Ted
2   Cruz either.  And I had talked to Edee Baggett about
3   working Donald Trump.  So basically I came into
4   Pennsylvania without any deal, but just thinking that
5   I was going to get one.  And so I came in to
6   Pennsylvania and I ended up sitting out of work for
7   the first --- I think it was week and a half.  I had
8   no work because we didn't --- the Rand Paul thing was
9   stalling and then they ended up coming in like fifth
10  place in the Iowa Caucus so he decided to drop out.
11  And then, now, the other guys --- I mean Trent went to
12  Pittsburgh and then we had some other guys that were
13  in Philadelphia.  And I went to Central Pennsylvania
14  because this is where my family's at.  And so they got
15  the Rocky De La Fuente petition pretty early on in the
16  process.  And apparently it was easier to find
17  Democrat witnesses in Pittsburgh and Philadelphia
18  because those are more heavily Democrat areas and
19  they're more densely populated.
20      Now I could have gone to Philadelphia or
21  Pittsburgh and it would have probably been --- I
22  would've probably had an easier time finding a witness
23  there, but I wanted to work in Central Pennsylvania
24  because it's, you know, where my family's at and
25  everything.  And so I don't get to see them, you know,

45

1  that often.  And so, also, we kept thinking that
2  another one of these deals was going to come through.
3  And so I didn't want to drive all the way off to
4  Pittsburgh or Philadelphia and then have like a day or
5  two later, one of these other deals comes through.
6  Or, Trent was also trying to find me a witness around
7  here.  And so I thought that maybe a witness here was
8  going to materialize and then one never did.  So
9  basically I ended up wasting about the first half of
10  the circulating period not even working at all.
11  A.    So you came into Pennsylvania without contract,
12  but the first one that came available for you to work
13  was Rocky De La Fuente?
14  A.    Yes.
15  Q.    And you could not --- and because you didn't have
16  a witness you were not able to work his petitions?
17  A.    Yes.
18  Q.    And then at some point --- and you said, about a
19  week and a half you were not working?
20  A.    Yes.  And then --- and then the Ted Cruz thing
21  materialized.
22  Q.    Benezet Consulting got the Ted Cruz contract?
23  A.    Yes.
24  Q.    And did you circulate for delegates and Ted Cruz?
25  A.    And Ted Cruz, yes.

46

1   Q.    And then from that period of time to the end of

2   the three-week circulation period you worked

3   exclusively for Ted Cruz?

4   A.    Yes.

5   Q.    And your brother was your witness?

6   A.    Yes.

7   Q.    Was there any discussion about your brother

8   switching to the Democratic party so he could be a

9   witness for you?

10  A.    No, he --- I mean, well, we had thought about

11  that, but we didn't know if you could do that, first

12  of all.  Second of all, we kept thinking one of the

13  other deals was going to come through, so we didn't

14  think it was going to be necessary.

15  Q.    Now, you've testified that you circulated in

16  other states other than Pennsylvania.

17  A.    Yes.

18  Q.    Have you ever circulated in a state where you're

19  allowed to collect signatures for more than one

20  candidate for office?

21  A.    Yes.  Yes.

22  Q.    Is it your experience that some signers are

23  willing to do that?

24  A.    Yes.

25  Q.    Roughly what proportion, in your experience?

47

A.   I would say the majority of them.  I mean, almost
--- I would say, more people than not will sign for
more than one.

Q.   But there are some people who are dedicated to a
single candidate?  That they won't sign for more than
one?

A.   Yeah.  I mean, when I was in Indiana doing Rand
Paul and Ted Cruz, I would say the majority of the
people signed both, but I did run into some people
that would, you know, wanted Rand Paul and not Ted
Cruz.  And some people wanted Ted Cruz and not Rand
Paul.

Q.   Let me ask you this question, do you find, in
your experience, that people will sign for candidates
of similar political persuasion?

A.   Yeah, but I'll tell you, when I was doing
Libertarian Party and Green Party at the same time I
had most of the people sign both of them.

Q.   Is it your experience that they do that because
they want choice?

A.   Yeah.  Yeah.  A lot of people want other choices
on the ballot.

Q.   We're going to say the Republican and Democrats.
Would you agree that in this election there were a
uniquely --- an abnormally large number of candidates

1  running in the Republican Party?

2  A.   Yes.

3  Q.   Would you agree that candidates would gravitate

4  towards being more conservative or more liberal?

5  A.   Yeah.

6  Q.   Is it your experience, and I'm just asking

7  because I don't know, I'm curious.  Did --- strike

8  that.  Because you can't sign for more than one in

9  Pennsylvania, I'm sorry.

10 A.   Yeah.

11 Q.   In other states, outside of Pennsylvania, ---

12 strike that.

13     Did you circulate for Republican candidates

14 outside of Pennsylvania?

15 A.   Yes.

16 Q.   In the 2016 primary election?

17 A.   Yes, but the petitioning started in 2015.

18 Q.   Correct.

19 A.   I was in Illinois in 2015 and then I went to

20 Indiana.  I was in Indiana from like November of 2015

21 to January of 2016.

22 Q.   But this is for the 2016 primaries?

23 A.   Yes.  Yes.

24 Q.   And in those states, are you allowed to collect

25 signatures for more than one candidate per office?

49

1    A.   Yes, but in Illinois there is a stupid thing

2    where you can only collect for one party.  But you can

3    do multiple Republicans or multiple Democrats.  But in

4    Indiana you can do as many Democrats and Republicans

5    as you want to.

6    Q.   But in Indiana you're allowed to circulate for as

7    many candidates as you want?

8    A.   Yeah, regardless of party.

9    Q.   Thank you.  In those states did you find that of

10   those signers willing to sign more than one petition,

11   that they would sign for candidates closely aligned to

12   a political view point?

13                  ATTORNEY JOEL:

14                  Objection.

15   A.   No.

16                  ATTORNEY JOEL:

17                  I'm going to have to strike that.  I

18   think he testified that they only collected for Cruz

19   and Paul.

20   A.   No ---.

21                  ATTORNEY ROSSI:

22                  No, no, no, no, no, no, no, no, no.

23   Hang on.  Well, first of all, the objection is proper,

24   it was --- I strike that question.  Let's just start

25   from scratch.

50

1   BY ATTORNEY ROSSI:

2   Q.    In Indiana, who did you circulate for?

3   A.    I did Rand Paul and Ted Cruz most of the time.   I

4   mean actually, almost the whole time I was there I was

5   doing those two.   But then I did briefly work Rand

6   Paul, Ted Cruz and Donald Trump.   And then I also

7   briefly worked Rand Paul, Ted Cruz and Rocky De La

8   Fuente.   And then actually, at the end, I ended up

9   getting a few signatures for Ben Carson and Rick

10  Santorum.   You know, Trent kind of talked me into it.

11  I didn't really want to do it but I did it anyway.

12  Q.    Let's break that --- and you're talking about

13  Indiana?

14  A.    Indiana, yes.

15  Q.    Let's explore that.   In Indiana, there's a party

16  registration requirement in order to sign a petition,

17  to the best of your knowledge?

18  A.    No, there is not.

19  Q.    So a Republican can sign a Democrat petition?

20  A.    In Indiana they don't register by party.   In

21  Indiana, it's one of the states they don't register by

22  party.   They're all registered basically as ---

23  there's several states --- I think there's probably

24  20-some-odd states that don't have partisan voter

25  registration.   They're all registered independent, and

51

1  then at the polls they say, you know, they go vote in

2  the primaries and they say, I would like a Democrat

3  ballot or I would like a Republican ballot.

4  Q.   Okay.   I did not know that.   So then in Indiana,

5  somebody could vote --- somebody could sign for a Ron

6  Paul and a Rocky petition ---?

7  A.   Rand.   Rand.

8  Q.   I'm sorry.   Rand Paul and a Rocky petition at the

9  same time?

10 A.   Yes.

11 Q.   Would you agree that their political viewpoints

12 are --- would you consider their political viewpoints

13 to be fairly disparate?

14                    ATTORNEY JOEL:

15                    Objection.

16 A.   Yeah.

17 BY ATTORNEY ROSSI:

18 Q.   Let me ask you this, did people sign for both Ron

19 Paul and for Rocky --- Rand Paul and Rocky?

20 A.   Yes, I had some.   There was a lower flip rate.   I

21 call it the flip rate.   I mean, like, in other words,

22 my flip rate was really high when I was doing Ted Cruz

23 and Rand Paul.   I don't know what the percent was but

24 I had a large percent sign.   And I did have those

25 people that were only for Rand and they would only

52

1    sign that one.  And I had some people that would only

2    sign Cruz.  But I'm saying, when I was doing the

3    Republicans, I had a higher percentage of people sign

4    them all than when I was doing the Republicans and

5    Rocky.  But I still did have some people who signed

6    Rocky and all of them.  Some people would sign Rocky

7    and Rand and not sign Cruz.  And you know, vice ---

8    you know what I mean?

9  Q.    And by flip rate, what do you mean by that?

10  A.    The percent of people that signed them all, or

11  what percent of people signed all the petitions.

12  Q.    Now when you're working in Pennsylvania with a

13  witness, has it always been your brother?

14  A.    Yeah.

15  Q.    So there's no issue with respect to getting your

16  brother to notarize and affidavit for you?

17  A.    Not as much.  I mean sometimes he complains about

18  it, but you know.

19  Q.    But nevertheless, he doesn't disappear?

20  A.    No.  I know that's happened with other people

21  though.  I almost had it happen to me in another state

22  one time.

23  Q.    Explain that.

24  A.    I had a witness who --- I was in Maine doing an

25  initiative and I had to work with a witness, and the

53

1  witness disappeared on me and then kind of re-

2  appeared, and kind of developed an attitude and he

3  wasn't going to do it. And somebody else who was

4  working on the campaign basically had to yell at him

5  and sort of badger him into doing it.

6  Q.   And presumably because, and back to Pennsylvania,

7  presumably because your brother is your witness, you

8  can execute the petitions at your leisure?

9  A.   Well, I guess it's more reliable than relying on

10 somebody who's, you know, just some random person that

11 I don't really know as well.

12 Q.   Because you circulated with your brother, you

13 don't have to stop in the middle of the day to find a

14 notary?

15 A.   Well it depends on when they have the notary

16 scheduled. I mean it's varied, because it's not like

17 you can get notaries 24 hours a day. So it depends on

18 who's doing the notarization, where they're being

19 notarized. So it depends upon a variety of factors.

20 Q.   In what circumstance would you be --- you

21 testified that the maximum number of boards that

22 you've run was 16?

23 A.   Uh-huh (yes).

24 Q.   Do you remember a specific instance when you ran

25 16 boards at once?

54

1   A.   Yeah, I was in Massachusetts.

2   Q.   And why, in that situation, were you able to run

3   16 boards?

4   A.   Because there were --- they have to separate

5   petitions by the towns.  Like every town has to be on

6   a separate page and there's 359 cities and towns in

7   Massachusetts.  And then also I had multiple petitions

8   and in Massachusetts they have what's known as open

9   access, which means you can legally go set up anywhere

10  the public has access, including storefronts.  And you

11  can have a table.  And so I had a table set up with 16

12  clipboards on it.

13  Q.   Okay.

14  A.   And sit in front of stores.

15  Q.   So in that context, you're not physically holding

16  16 boards?

17  A.   No.  But there have been, I mean, there's been

18  occasions where I'm holding six or eight boards.

19  Q.   Okay.  So you can manipulate six to eight boards?

20  A.   Yeah.

21  Q.   And so in other states where you can't set up

22  tables, you could --- your testimony is you generally

23  run three to six?

24  A.   Yeah.  Usually three would be if I was going door

25  to door, usually if I'm out at public venues I usually

55

1  carry six.

2  Q.    Why do you want six boards?

3  A.    So I can have groups of people stop, signing at

4  the same time.

5  Q.    When you're circulating in a crowd do you remain

6  static or do you move through the crowd?

7  A.    Usually walk around.

8  Q.    Why do you do that instead of remaining static?

9  A.    Because you can usually get more signatures

10  walking around.  I mean it depends upon the way the

11  venue's set up, but you need to have the versatility

12  to be able to walk around, you know, so it helps to

13  have the versatility.  Because sometimes the people

14  don't come to you.  Sometimes you've got to go to the

15  people.  Every situation is different, though.

16  Q.    Sure.  So as you're sitting here today, you don't

17  know --- you're not clear in your mind as to whether

18  or not you are qualified to execute an affidavit of

19  circulation?

20  A.    Yeah.  I mean I'm not 100 percent sure.  I know

21  that I've been told different things by different

22  people, so --- and then, you know, there's other

23  states where I know that people have had a driver's

24  license from a different state, but they registered to

25  vote in the state they were in and were able to sign

1   off on declarations. Now there is other states that
2   don't even have declarations on petitions. Some
3   states have declarations but the declarations do not
4   have to be notarized. And then some states have
5   declarations that don't have to be notarized and you
6   don't have to be a state resident. So most states you
7   don't have to be a state resident to petition there,
8   and there's been lawsuits over this in multiple
9   states.

10  Q.    Have you ever been --- strike that.

11       To the best of your knowledge, has there been any
12  allegation lodged against you with respect to petition
13  fraud?

14  A.    The only one I'm aware of is the one in Illinois
15  in 2014. But I was --- you know, I prevailed and they
16  were false allegations.

17  Q.    And what were the allegations?

18  A.    I think they were basically accusing us of
19  everything they could, to try to get the petition
20  disqualified. So they basically accused everybody who
21  worked on the petition drive of engaging in multiple
22  fraudulent acts.

23  Q.    And this is the signature challenge that you
24  testified to earlier?

25  A.    Yeah. Illinois, 2014, Libertarian Party.

57

```
 1  Q.    So these were allegations made as part of a
 2  signature challenge?
 3  A.    Yes.
 4  Q.    To the best of your knowledge, have you ever been
 5  investigated by law enforcement with respect to any
 6  kind of petition fraud?
 7  A.    No.
 8  Q.    Would you ever commit petition fraud?
 9  A.    No.
10  Q.    Do you know people who do commit petition fraud?
11  A.    I mean, I've met a lot of people over the years.
12  I don't know who's committed fraud and who hasn't.  I
13  mean I've heard various stories, you know, and
14  everything.  But, you know, it's hard for me to say.
15  You know, there's probably people out there who've
16  done it.  But, you know, I've met lots of people.  I
17  don't know who all's done what.
18  Q.    Fair enough.  You said that you collected 5,000
19  signatures for the Libertarian Party in 2008?
20  A.    I believe so, yeah.
21  Q.    Now over what span of time did you collect those
22  signatures?
23  A.    This was over several weeks.  I mean I don't
24  remember --- it was several weeks, though.  I was, you
25  know, at some high volume locations.
```

58

1    Q.    And your brother was your witness for those?

2    A.    Yeah.

3    Q.    Are there any candidates that you would never

4    circulate a petition for?

5    A.    Generally, some of the big main-screen

6    politicians, you know.  Hillary Clinton I wouldn't do.

7    I wouldn't do like, Jeb Bush or something I wouldn't

8    do.  I mean, you know --- so.

9    Q.    Sure.

10   A.    I really didn't want to do Rick Santorum but

11   Trent kind of pushed me into it.

12   Q.    Okay.

13   A.    I mean I only worked it for a few days.

14   Q.    Have there been states that you worked --- other

15   than Pennsylvania, have there been states where you've

16   worked petitions where you did have to have a witness

17   with you?

18   A.    A few places, yeah.

19   Q.    What states?

20   A.    Maine.  I'm trying to think where else.  Maine

21   --- oh, in California there used to be a requirement

22   in some of the cities and counties that you had to be

23   a resident of X city or X county to circulate a local

24   petition there.  Now there was not for the state, or

25   at least in the time that I've been petitioning in

59

1   California, which goes back to 2001.  But there were

2   some cities that had that.  And that was actually

3   struck down in a court case in 2007 in San Clemente.

4   So now in California you don't have to be a resident

5   anywhere to circulate any city or county petitions,

6   but I did work a few before that happened.

7   Q.    But before 2007, okay.  That was my next

8   question.  Before 2007, had you worked some of those

9   cities and towns?

10  A.    Yes.

11  Q.    And were you allowed to actually carry boards?

12  A.    Yes.

13  Q.    But you had a city witness with you?

14  A.    Yes.

15  Q.    Were there any issues with those witnesses at

16  that time?

17  A.    Yes.

18  Q.    Can you please describe?

19  A.    Witnesses flaking out, like not showing up.

20  Wanting to leave early.  Just being annoying.  You

21  know, sometimes repelling people from signing, you

22  know.  So I was glad when the witness --- I've

23  actually avoided some petition drives because of the

24  witness requirement.  Like I was going to go to

25  Michigan in 2012 and I decided not to go because I

60

1    know what a pain it is to work with witnesses.   Now

2    there was a court case a year or two after 2012 where

3    the witness requirement was thrown out of Michigan,

4    but I declined the Michigan job because I didn't want

5    to have to deal with witnesses.

6    Q.   That's all I have.   Thank you.

7    EXAMINATION

8    BY ATTORNEY JOEL:

9    Q.   A few follow ups.   Before showing up to your

10   deposition, did you talk to anybody about your

11   deposition testimony today?

12   A.   I guess I talked to Mr. Rossi just in the lobby,

13   briefly, but ---.

14   Q.   Anybody else?

15   A.   No.

16   Q.   Not Trenton Pool or anyone else?

17   A.   I did not talk to Trent today.

18   Q.   Did you talk to him at any point prior to this as

19   it relates to your deposition?

20   A.   I talked to him yesterday.

21   Q.   What did you talk about?

22   A.   I think he just talked about some of the things

23   that were going on with the case and stuff like that.

24   Q.   Did he tell you the type of questions that I was

25   going to be asking?

61

1   A.   We talked about that briefly.   And somebody, I

2   don't actually --- was it Trent or was it Mr. Rossi

3   here who said something about, you know, that I may be

4   asked about past petition drives, like that I worked

5   years ago?

6   Q.   Did you talk to anybody else in connection with

7   this case other than Mr. Rossi and Mr. Pool as it

8   relates to the deposition today?

9   A.   No.   No.

10  Q.   Have you ever been registered as a Democrat?

11  A.   No.

12  Q.   You laughed when you said Trent talked you into

13  working some boards for Carson and Santorum.

14  A.   Yes.

15  Q.   Why did you laugh?

16  A.   Well I strongly dislike Rick Santorum.   Carson I

17  don't mind as much, but I wasn't really that enthused

18  about it.   But yeah, I didn't want to work Rick

19  Santorum at all.

20  Q.   But you did?

21  A.   I worked it for a few days, yeah.   It was hard to

22  get signed, too.

23  Q.   When you are gathering signatures, do you have

24  better success when you go door to door or better

25  success when you're in an open group?

62

1  A.    It depends.   I mean it depends on the type of

2  petition.   It depends on a variety of factors so

3  that's really a difficult question to answer.

4  Q.    What factors does it depend on?

5  A.    Well it depends on, you know, what kind of public

6  locations are available.   You know, what's the weather

7  like?  What are the qualifications people have to have

8  to sign the petition?  Like is it a petition that just

9  anybody can sign?  Or is it something that, you know,

10 that they have to be registered to vote under a

11 particular party banner to sign?  You know, what's the

12 jurisdiction?  Do they have to live within a

13 congressional district or a state legislative

14 district?  Or is it for the whole state or county?  So

15 it depends upon those criteria as to what's going to

16 be better.

17 Q.    And is it true based on that description that you

18 just gave, which was very helpful, that there are a

19 lot of factors going in to how successful you can be

20 with gathering signatures in any petition drive?

21 A.    Yes.

22 Q.    And that's a petition for president, initiative,

23 congress, senate, it doesn't matter?

24 A.    Yes.

25 Q.    There's a bunch of factors, from the weather to

63

1   party affiliation and everything in between that can
2   affect your success rate?
3   A.   Yes.
4   Q.   And that's true in Pennsylvania as well as other
5   states you've worked?
6   A.   Yes.   Although I guess there's more issues here
7   in Pennsylvania with the major party primary petitions
8   since only registered people from that party can sign.
9   Now there's other states that anybody can sign those
10  petitions or any registered voter can sign those
11  petitions.   And there's other states, where like in
12  Massachusetts, you've got to be --- they'll accept
13  signatures from registered Independents or registered
14  Republicans if it's a Republican petition.   Or
15  registered Independents, which in Massachusetts they
16  call unenrolled, or Democrats to sign a Democrat
17  petition.   So in other words there's a greater pool of
18  people that can sign because they take signatures from
19  the Independents.   Same thing with Arizona.
20  Q.   But the bottom line is there's a whole lot of
21  factors that played into how successful or
22  unsuccessful you are in any given petition drive?
23  A.   Yes.
24  Q.   In any given signature collection effort?
25  A.   Yes.

64

1   Q.   I think that's all I have.   Thanks.

2   A.   Okay.

3                    ATTORNEY ROSSI:

4               Done.

5                    *  *  *  *  *  *  *  *

6          DEPOSITION CONCLUDED AT 3:27 P.M.

7                    *  *  *  *  *  *  *  *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

65

1   COMMONWEALTH OF PENNSYLVANIA  )

2   COUNTY OF BEDFORD                )

3                    CERTIFICATE

4        I, Bernadette M. Black, a Notary Public in

5   and for the Commonwealth of Pennsylvania, do hereby

6   certify:

7        That the foregoing proceedings, deposition of

8   Andy Jacobs was reported by me on 9/30/16 and that I,

9   Bernadette M. Black, read this transcript, and that I

10  attest that this transcript is a true and accurate

11  record of the proceeding.

12       That the witness was first duly sworn to

13  testify to the truth, the whole truth, and nothing but

14  the truth and that the foregoing deposition was taken

15  at the time and place stated herein.

16       I further certify that I am not a relative,

17  employee or attorney of any of the parties, nor a

18  relative or employee of counsel, and that I am in no

19  way interested directly or indirectly in this action.

20

21       COMMONWEALTH OF PENNSYLVANIA          *Bernadette M. Black*
             Notarial Seal
22    Bernadette M. Black, Notary Public
          Everett Boro, Bedford County
23   My Commission Expires Jan. 17, 2017        Bernadette M. Black,
     MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

24                                              Court Reporter

25

**A**

ability 9:22
able 16:16
  22:13
  28:16 36:6
  45:16 54:2
  55:12,25
abnormally
  47:25
accept 63:12
access 13:24
  54:9,10
accident
  37:16,19
accurate
  65:10
accused
  56:20
accusing
  56:18
action 65:19
acts 56:22
actual 16:11
  16:13
address 17:2
  17:6 20:19
  20:20
  39:20,22
  40:2
affect 63:2
affidavit
  12:15
  22:20,22
  29:15
  30:14,20
  30:22 31:3
  32:3 52:16
  55:18
affidavits
  22:21
  28:16
affiliation
  63:1
afraid 19:18
  20:9
afternoon
  7:8
agency 1:25
ago 18:9
  29:6 30:13

34:14 61:5
agree 9:19
  47:24 48:3
  51:11
agreement
  20:6
aligned
  49:11
allegation
  56:12
allegations
  56:16,17
  57:1
allowed
  42:21
  46:19
  48:24 49:6
  59:11
all's 57:17
American
  25:3
amount 34:22
  36:13
  40:10
Andy 1:15
  2:3 4:3
  7:3 65:8
annoying
  59:20
answer 9:1,2
  9:3,13,17
  9:20 19:15
  42:7 62:3
answered
  9:21 15:1
  23:10
answers
  12:11,16
  23:20,22
ANTHONY 3:3
anybody
  28:20
  31:15 42:5
  60:10,14
  61:6 62:9
  63:9
anymore
  23:22
anyway 20:8
  50:11

apparently
  44:16
appeared
  53:2
appropriate
  11:11
area 23:8
areas 44:18
Arizona
  63:19
asked 12:6
  14:25
  15:17
  24:19 61:4
asking 15:18
  15:22
  16:20,23
  48:6 60:25
assume 10:10
assuming
  22:14 31:2
  36:12 43:1
attest 65:10
attitude
  53:2
attorney 2:7
  3:10,11
  4:5,7,9
  6:3 7:7,9
  12:5,11,13
  12:14 13:8
  15:3 16:19
  16:22
  39:14,16
  39:19
  41:20,23
  49:13,16
  49:21 50:1
  51:14,17
  60:8 64:3
  65:17
attorneys
  16:14
August 26:8
authoriz...
  1:25
available
  45:12 62:6
Avenue 39:21
  40:1

avoided
  59:23
aware 32:12
  32:14 35:7
  56:14

**B**

back 15:5
  20:2,5
  25:22 26:4
  28:9 29:24
  37:8 53:6
  59:1
background
  36:16
backing
  31:19
badger 53:5
Baggett
  19:20 20:3
  20:9 44:2
ballot 11:18
  11:21 14:1
  14:2 19:3
  23:6 32:13
  32:20 33:6
  33:13
  35:10
  47:22 51:3
  51:3
ban 14:17
banner 62:11
based 62:17
basically
  38:25
  43:19 44:3
  45:9 50:22
  53:4 56:18
  56:20
basis 21:22
BEDFORD 65:2
beginning
  2:9
behalf 2:3
believe
  28:12 30:6
  32:8 35:12
  57:20
Ben 50:9
benefit

34:24
Benezet 1:5
  18:12,15
  18:21 24:9
  34:7 35:3
  35:4,8
  45:22
Bernadette
  2:5 65:4,9
  65:23
best 9:22
  50:17
  56:11 57:4
better 61:24
  61:24
  62:16
big 58:5
bit 8:5
  36:15
Black 2:5
  65:4,9,23
blockers
  13:20
board 40:23
boards 40:6
  40:10,14
  53:21,25
  54:3,16,18
  54:19 55:2
  59:11
  61:13
body 11:11
bottom 63:20
bounced 17:7
break 8:5
  9:12,14
  39:15,18
  50:12
briefly 43:6
  43:6,10,11
  50:5,7
  60:13 61:1
brother 21:8
  21:9 22:10
  22:11,20
  29:16
  30:20 31:5
  32:5 40:21
  46:5,7
  52:13,16

28:25 30:4
Consulting
  1:5 45:22
contact 38:3
  38:17
contacting
  38:20
context
  54:15
continue
  43:21
contract
  27:25
  45:11,22
contractor
  18:11,14
  18:21
  27:24
contractors
  24:10
correct 34:4
  48:18
correctly
  11:8 16:24
  19:1 26:23
CORTES 1:9
cost 37:7
counsel 3:7
  3:16 65:18
counted
  10:13
counties
  58:22
county 58:23
  59:5 62:14
  65:2
couple 29:3
court 1:1
  2:5 12:7
  12:10,22
  14:22
  16:11,14
  16:15
  34:15 59:3
  60:2 65:24
criteria
  62:15
crowd 55:5,6
Cruz 18:25
  19:2,8

20:6,23
22:8,9,15
22:16
31:10 35:5
35:8,8
42:24 43:3
43:5,8,9
43:11,12
44:1,2
45:20,22
45:24,25
46:3 47:8
47:11,11
49:18 50:3
50:6,7
51:22 52:2
52:7
curious 48:7

        D
D 4:1 7:1
Dakota 14:12
  15:15
  16:19 18:1
  20:15,18
  20:18,19
  37:4,7,9
  37:10 38:3
  38:11,20
  38:23 39:2
  39:4,20,23
dated 15:10
day 26:1,9
  26:23 27:5
  27:7 29:4
  32:20 45:4
  53:13,17
days 17:14
  25:24,25
  26:5,8,10
  26:11,12
  26:12,24
  27:1,2,4,7
  27:8,9,10
  43:2 58:13
  61:21
De 21:24
  24:23,25
  25:9 41:25
  42:2 43:2

43:7,12
44:15
45:13 50:7
deadline
  26:7
deal 44:1,4
  60:5
deals 45:2,5
  46:13
December
  18:19
decide 20:22
decided
  44:10
  59:25
declaration
  12:15
declarat...
  56:1,2,3,3
  56:5
decline 20:7
declined
  60:4
dedicated
  47:4
Defendant
  1:11 2:3
  3:16
Defendants
  7:10
delegate
  31:16,17
delegates
  22:9 31:20
  31:23 32:1
  45:24
Delta 25:3
Democrat
  18:5 22:6
  32:14
  41:25 42:4
  42:6 44:17
  44:18
  50:19 51:2
  61:10
  63:16
Democratic
  21:25 46:8
Democrats
  47:23 49:3

49:4 63:16
densely
  44:19
depend 62:4
depends 36:5
  53:15,17
  53:19
  55:10 62:1
  62:1,2,5
  62:15
deposed 7:12
  8:4,10
  11:24 14:7
deposition
  1:14 2:1
  8:14 9:25
  12:4,9
  15:2 60:10
  60:11,19
  61:8 64:6
  65:7,14
depositions
  8:3
Deputy 3:10
describe
  59:18
description
  5:4 62:17
developed
  53:2
different
  17:24
  55:15,21
  55:21,24
difficult
  62:3
directly
  27:25 28:2
  34:3 65:19
disappear
  52:19
disappeared
  53:1
discussion
  46:7
dislike
  61:16
disparate
  51:13
disquali...

56:20
district 1:1
  1:2 62:13
  62:14
DMV 38:3,11
  38:13,17
  38:20
DMVs 13:17
doing 14:1
  15:1 17:19
  26:14 28:9
  41:1 43:5
  43:7,8,9
  47:7,16
  50:5 51:22
  52:2,4,24
  53:5,18
Donald 19:20
  20:4,7
  43:6,10
  44:3 50:6
door 19:8,8
  20:22,22
  23:1,10,20
  23:22
  54:24,25
  61:24,24
doors 23:13
drive 17:3
  45:3 56:21
  62:20
  63:22
driver's
  17:24
  19:24
  20:11,15
  37:1 38:2
  55:23
drives 59:23
  61:4
driving
  37:14,21
drop 44:10
duly 7:3
  65:12

        E
E 3:1,1 4:1
  7:1,1
earlier

gravitate
  48:3
greater
  63:17
Green 24:23
  25:14
  26:15,16
  41:12
  47:17
Groene 13:7
  13:7
group 61:25
groups 55:3
guess 14:16
  17:9 18:16
  18:16,17
  18:17
  25:20
  29:24 41:9
  53:9 60:12
  63:6
guys 44:11
  44:12
G-R-O-E-N-E
  13:7

H
half 39:25
  44:7 45:9
  45:19
Hang 49:23
happen 52:21
happened
  12:18 14:4
  16:9 37:13
  37:23 38:9
  38:11 43:4
  52:20 59:6
happening
  10:12
harass 13:21
hard 8:16,19
  9:4,4,5
  24:2 25:25
  34:20
  57:14
  61:21
Harrisburg
  2:8 3:15
Hawthorn

17:3
hear 8:23
  9:17
heard 9:20
  57:13
hearing 33:1
heavily
  44:18
helpful
  62:18
helps 55:12
high 36:17
  36:19
  51:22
  57:25
higher 52:3
Hill 3:5
  17:4 36:19
Hillary 58:6
hire 43:24
hired 13:20
hiring 20:1
holding
  54:15,18
home 23:17
  23:18,24
hour 34:9,10
  34:16,20
  35:1
hours 53:17
house 23:7
houses 21:4
hundred 29:7

I
idea 33:7
IDENTIFIED
  5:4
identify
  21:4
Illinois
  7:23,24
  8:7 9:25
  10:6,10,20
  11:10,12
  11:14
  14:11
  16:10,11
  48:19 49:1
  56:14,25

including
  54:10
independent
  18:11,14
  18:21
  24:10 25:1
  25:10
  27:24
  50:25
Independ...
  63:13,15
  63:19
Indiana
  18:17,18
  22:2 42:1
  43:5,7,13
  47:7 48:20
  48:20 49:4
  49:6 50:2
  50:13,14
  50:15,20
  50:21 51:4
indirectly
  65:19
inefficient
  35:1
information
  15:7 16:3
  16:23
initiative
  24:14
  52:25
  62:22
initiatives
  14:1,1
instance
  53:24
insurance
  37:17,19
  37:20
  38:15,16
  38:17,18
interaction
  16:22 23:9
interested
  65:19
interviewed
  13:8,9
intervie...
  12:12

investig...
  57:5
involved
  37:15
in-state
  19:15
Iowa 43:20
  43:22
  44:10
issue 19:16
  19:17,18
  20:10,14
  37:2 52:15
issues 59:15
  63:6

J
Jacobs 1:15
  2:3 4:3
  7:3,8
  39:20 65:8
January
  18:18,19
  48:21
Jeb 58:7
job 8:22
  60:4
Joel 3:9 4:5
  4:9 6:4
  7:7,9
  39:14,19
  49:13,16
  51:14 60:8
JONATHAN
  1:10
judge 16:15
July 25:23
jump 13:22
June 25:23
  26:5
jurisdic...
  62:12

K
keeping
  11:18 36:7
Kenneth 3:9
  7:8
kept 39:7
  45:1 46:12

kicked 12:23
  13:14,15
  13:17
kill 34:23
kind 17:6,11
  43:22
  50:10 53:1
  53:2 57:6
  58:11 62:5
knocked
  23:14
know 9:5
  10:12,15
  10:20
  13:23 15:9
  16:4,5
  17:9,10,13
  20:1,8,14
  21:14,21
  23:4,5,21
  24:2,12
  26:1 30:11
  30:24
  32:24 33:8
  33:8,17
  34:13,22
  35:6,14,16
  36:17
  37:18,24
  38:18
  39:24
  41:12,13
  44:24,25
  46:11
  47:10 48:7
  50:10 51:1
  51:4,23
  52:7,8,18
  52:20
  53:10,11
  55:12,17
  55:20,22
  55:23
  56:15
  57:10,12
  57:13,14
  57:15,16
  57:17,25
  58:6,8
  59:21,22

**necessarily**
24:11 26:1
26:9
**necessary**
46:14
**need** 9:12,14
32:20 35:9
55:11
**never** 33:1
36:18 45:8
58:3
**neverthe...**
52:19
**new** 38:6
39:2
**Nicole** 3:20
7:11
**nonverbal**
9:3
**Nope** 24:18
**North** 18:1
20:15,18
20:18,19
37:4,7,9,9
38:3,11,20
38:23 39:2
39:4,20,21
39:22
**notaries**
53:17
**notariza...**
53:18
**notarize**
52:16
**notarized**
15:5 22:22
28:18 30:5
30:22 31:7
32:7 53:19
56:4,5
**notary** 2:6
53:14,15
65:4
**notes** 15:3
16:4
**November**
48:20
**number** 5:4
15:9 29:5
32:18

35:22
47:25
53:21

_____
**O**
**O** 7:1
**objection**
6:1 49:14
49:23
51:15
**occasions**
40:15
54:18
**occurred**
26:2 37:14
**OFFERED** 5:5
**offering**
20:3
**office** 3:4
3:11 7:9
11:1,15
13:10
14:22
16:21 21:8
46:20
48:25
**officers**
11:9
**offices** 2:7
11:3,4
**oh** 14:10
19:7 22:11
24:2,20,20
31:12
58:21
**okay** 8:1,13
8:15,20,24
9:6,10,14
11:5 12:2
20:13
24:22 33:8
34:25
35:15 39:3
39:17
40:17
41:17 51:4
54:13,19
58:12 59:7
64:2
**Oklahoma**

37:23
**old** 38:6
**once** 53:25
**ones** 23:19
27:17
**open** 24:16
54:8 61:25
**operate**
34:11
**opinion**
34:17
**opposed**
20:23
**opposition**
13:19
**order** 50:16
50:20,22
56:25
57:19
62:11 63:1
63:7,8
**out-of-s...**
14:18

_____
**P**
**P** 3:1,1 7:1
**PA** 3:6,15
17:4 20:11
28:12
**page** 5:1,3
6:1,3 54:6
**paid** 13:21
33:25 34:2
34:7,8,20
35:3,5
37:19 38:4
39:1
**pain** 60:1
**parents** 17:6
17:8
**part** 24:16
57:1
**particular**
62:11
**parties** 34:4
65:17
**partisan**
50:24
**party** 10:14
10:21
11:14

14:19
24:23,24
25:3,14
26:15,16
26:17
27:23 28:1
28:3,10,22
28:23,25
28:25 30:4
30:8,24
41:10,12
42:22 46:8
47:17,17
48:1 49:2
49:8 50:15
50:20,22
56:25
57:19
62:11 63:1
63:7,8
**pass** 34:14
**Paul** 3:3,4
30:8,9,12
31:14,14
31:15,16
31:20,22
32:1 33:4
33:4 43:5
43:9,11,12
43:15,16
43:17,17
43:19 44:8
47:8,10,12
49:19 50:3
50:6,7
51:6,8,19
51:19,23
**pay** 34:10,16
34:17 35:1
38:25
**PEDRO** 1:9
**pending**
13:13
**Pennsylv...**
1:3 2:7,9
15:13
17:22 18:2
18:3,21
19:4,13,23
19:24

21:12,14
21:18,20
22:1,2,3,5
24:14,21
25:5,18
26:22 27:3
27:4,12,14
27:21
28:13,15
29:18 30:5
30:7,17,19
32:10,13
36:23 37:1
39:7,8,10
39:11 40:6
40:22 41:4
41:7 42:1
42:16,18
43:14,19
44:4,6,13
44:23
45:11
46:16 48:9
48:11,14
52:12 53:6
58:15 63:4
63:7 65:1
65:5
**people** 8:10
13:20,22
13:24 20:1
21:19,21
22:25 23:2
23:17,17
23:24
34:19 44:1
47:2,4,9,9
47:11,14
47:18,21
51:18,25
52:1,3,5,6
52:10,11
52:20 55:3
55:13,15
55:22,23
57:10,11
57:15,16
59:21 62:7
63:8,18
**percent**

**reason** 9:16
39:6
**reasons** 24:4
**recollec...**
31:25
**record** 65:11
**regardless**
49:8
**register**
36:24
50:20,21
**registered**
18:2,3,5,6
18:7 19:13
19:23 21:1
21:2,5,12
21:14 23:7
23:18,23
28:14,15
29:21
36:22
50:22,25
55:24
61:10
62:10 63:8
63:10,13
63:13,15
**registra...**
50:16,25
**regular**
21:22
**relates**
60:19 61:8
**relative**
65:16,18
**reliable**
53:9
**relying** 53:9
**remain** 55:5
**remaining**
55:8
**remember**
19:7 22:17
29:6,8
30:13
32:25 33:3
33:10
53:24
57:24
**renewed**

20:18
37:11
**renewing**
37:1
**repeat** 8:24
**repelling**
59:21
**rephrase**
9:10
**reply** 42:13
**reported**
37:17,18
38:14 65:8
**reporter** 2:6
12:10
14:23
16:15
65:24
**represent**
7:10
**reproduc...**
1:24
**Republican**
11:16 18:5
18:8 19:3
21:1 23:6
23:18,23
30:9 32:14
47:23 48:1
48:13
50:19 51:3
63:14
**Republicans**
10:16 21:2
21:5 23:8
49:3,4
52:3,4
63:14
**required**
34:10,13
**requirement**
50:16
58:21
59:24 60:3
**resident**
17:21 56:6
56:7 58:23
59:4
**respect**
52:15

56:12 57:5
**reviewed**
12:16
**re-become**
36:22
**re-regis...**
30:16,18
**Rick** 50:9
58:10
61:16,18
**right** 8:23
9:24 10:19
13:2 22:16
27:2 29:9
31:14,14
32:17 41:1
41:19
**road** 9:6
17:12
**Rocky** 21:24
22:15
24:23,25
25:9 26:20
41:25 42:2
43:2,7,11
44:15
45:13 50:7
51:6,8,19
51:19 52:5
52:6,6
**rolls** 18:4
28:12
29:18,20
**Ron** 30:8,9
31:14,14
31:15,16
31:20,22
33:3,4
51:5,18
**room** 16:20
**Rossi** 3:3,4
4:7 39:16
41:15,20
41:23
49:21 50:1
51:17
60:12 61:2
61:7 64:3
**Roughly**
46:25

**rule** 8:16
**rules** 2:4
8:8,11,12
**run** 13:1
47:9 53:22
54:2,23
**running** 48:1

——— S ———
**S** 3:1 7:1
**San** 59:3
**Santorum**
50:10
58:10
61:13,16
61:19
**saying** 33:4
52:2
**scheduled**
53:16
**school** 36:17
36:19
**scratch**
49:25
**second** 11:25
14:12
31:19
46:12
**Secretary**
11:15
**Section** 3:12
**see** 15:9
18:16
29:10
43:20,20
44:25
**seen** 35:24
**semi-reg...**
21:22
**senate** 62:23
**sense** 23:13
25:8 29:1
**sent** 15:5
**separate**
54:4,6
**September**
1:16 2:9
**series** 15:22
**seriously**
40:19

**set** 16:16
35:12,18
36:2,3
54:9,11,21
55:11
**shopping**
13:18
**SHORT** 39:18
**showing**
59:19 60:9
**sick** 26:5,12
27:9
**side** 10:13
11:20 13:3
**sign** 13:22
13:25
18:22 21:2
22:20 23:3
23:4 28:16
29:15
30:14,20
31:2 32:3
47:2,5,14
47:18 48:8
49:10,11
50:16,19
51:5,18,24
52:1,2,3,6
52:7 55:25
62:8,9,11
63:8,9,10
63:16,18
**signature**
11:24
13:12
17:15
23:11,11
23:14,15
27:11 30:5
32:7 33:24
33:25 34:2
34:7,18
35:4,5
36:11 41:7
56:23 57:2
63:24
**signatures**
7:18,25
10:9,13,20
11:9,11,17

53:21
56:24
**testify**
65:13
**testifying**
14:25
16:12
**testimony**
54:22
60:11
**thank** 22:3
32:17
41:15 49:9
60:6
**Thanks** 64:1
**thereabouts**
29:13
**thing** 8:4
12:5 16:9
31:17 33:4
38:9,10,12
41:12 44:8
45:20 49:1
63:19
**things** 55:21
60:22
**think** 7:15
8:3 10:18
11:7 12:13
13:5,6
14:14 15:5
16:14
19:17
22:16
25:11,17
26:5 29:3
29:4,5,16
29:18 31:1
31:13 33:9
36:24
40:18
41:16 44:7
46:14
49:18
50:23
56:18
58:20
60:22 64:1
**thinking**
44:4 45:1

**third** 12:1
**thought** 38:5
38:22
43:15 45:7
46:10
**three** 7:15
7:16,20
11:24 14:9
26:13 40:9
40:13,20
54:23,24
**three-week**
42:19 46:2
**thrown** 34:15
60:3
**time** 11:25
12:1,3
14:6,10,12
18:7 20:5
23:10
25:18
26:14 27:6
28:6 29:6
30:13
36:13 39:8
42:20 43:8
43:9 44:22
46:1 47:17
50:3,4
51:9 52:22
55:4 57:21
58:25
59:16
65:15
**times** 7:14
7:15,16,20
11:24 14:9
17:7
**today** 9:17
15:1 55:16
60:11,17
61:8
**told** 19:22
19:24
22:16 26:6
26:16,18
32:10
37:25 38:7
38:12,13

38:16
55:21
**top** 33:5,13
**totally**
15:20
**town** 54:5
**towns** 54:5,6
59:9
**track** 36:7
**traffic**
12:25
**transcript**
1:24 65:9
65:10
**travel** 17:10
**tremendous**
29:5
**Trent** 19:17
20:6,9
35:16
42:12
43:25
44:11 45:6
50:10
58:11
60:17 61:2
61:12
**Trenton** 1:6
60:16
**Trent's**
42:13
**tried** 42:6
**true** 33:2,3
33:6,14
38:15
62:17 63:4
65:10
**Trump** 19:20
19:21 20:4
20:7,10
43:6,10
44:3 50:6
**truth** 65:13
65:13,14
**truthful** 9:2
**truthfully**
9:17,21
**try** 8:16,19
13:22 23:2
36:4,4

42:14
56:19
**trying** 23:5
33:9,11
45:6 58:20
**turn** 33:11
**turned** 11:10
11:13,14
33:5
**Twenty** 24:1
**twice** 7:15
**two** 8:2 24:3
40:20 45:5
50:5 60:2
**type** 21:21
60:24 62:1
**typed** 16:2,3
16:5,25

---

**U**

**Uh-huh** 15:24
53:23
**ultimately**
11:20
**Um** 35:11
**unable** 22:6
**undersigned**
2:5
**understand**
9:8,9,17
10:17 11:8
15:16
16:24
17:15 19:1
26:22
41:15
**understa...**
35:4
**understood**
9:21
**unenrolled**
63:16
**uniquely**
47:25
**UNITED** 1:1
**unsucces...**
42:15
63:22
**upper** 35:12
35:19 36:2

**ups** 60:9
**usually** 8:10
23:9,12
35:21 40:6
40:8 54:24
54:25,25
55:7,9

---

**V**

**valid** 11:17
**validity**
36:4,7,8
**varied** 53:16
**variety**
53:19 62:2
**various**
57:13
**venues** 54:25
**venue's**
55:11
**verbally** 9:1
9:3
**verbatim**
16:2,5
**verified**
33:1
**versa** 23:23
**versatility**
55:11,13
**versus** 23:15
**vice** 23:23
52:7
**video** 10:4,7
16:13,13
16:17
**view** 49:12
**viewpoints**
51:11,12
**volume** 57:25
**vote** 18:3
19:23
28:14
29:21,23
30:17,18
43:22 51:1
51:5 55:25
62:10
**voted** 28:13
29:21,25
30:1

| | |
|---|---|
| 33:10 | **7** |
| 59:25  60:2 | **7** 4:5 |
| **2013** 37:14 | |
| **2014** 10:1 | **9** |
| 11:1,10 | **9/30/16** 65:8 |
| 56:15,25 | **937** 25:11 |
| **2015** 48:17 | **96** 28:13 |
| 48:19,20 | |
| **2016** 1:16 | |
| 2:9  18:11 | |
| 24:14 | |
| 27:12 | |
| 48:16,21 | |
| 48:22 | |
| **24** 53:17 | |

**3**
**3,000** 32:24
**3:27** 64:6
**30** 1:16  2:9
   23:25
**316** 3:5
**3403** 17:3
**359** 54:6

**4**
**4,000** 35:10
**40** 4:5,7
   24:1
**400** 28:5
   29:10
**438** 25:15
**48** 6:4

**5**
**5,000** 31:1
   32:24
   57:18
**50** 6:4
**500** 29:10
**525** 40:1
**58102** 39:21
**59** 4:7,9

**6**
**6,000** 32:24
**600** 29:10
**62** 4:9
**64** 4:10



# Sargent's Court Reporting Service, Inc.

210 Main Street • Johnstown, Pennsylvania 15901 • (814) 536-8908 • www.sargents.com

**PENNSYLVANIA OFFICES**

**Clearfield**
(814) 765-8711

**Erie**
(814) 459-0551

**Greensburg**
(724) 837-8714

**Harrisburg**
(717) 234-5751

**Hollidaysburg**
(814) 696-4391

**Indiana**
(724) 349-6631

**Oil City**
(814) 677-6329

**Philadelphia**
(215) 564-9727

**Pittsburgh**
(412) 232-3882

**Reading**
(610) 374-5891

**Somerset**
(814) 445-7286

**State College**
(814) 861-3560

**Wilkes-Barre**
(570) 826-7066

**Williamsport**
(570) 601-4077

**WEST VIRGINIA OFFICES**

**Charleston, WV**
(304) 346-0826

**Morgantown, WV**
(304) 413-0125

**MARYLAND OFFICE**

**Hagerstown, MD**
(240) 310-1491

**KENTUCKY OFFICE**

**Pikeville, KY**
(606) 432-0087

October 21, 2016

Mr. Andy Jacobs
3403 Hawthorn Drive
Camp Hill, PA  17011

Dear Mr. Jacobs:

Enclosed you will find a copy of your deposition that was held on 9/30/2016 in the Benezet Consulting,LLC et al v.. Cortes, et al case.

Also enclosed you will find a correction page to review with the transcript.  While reading the deposition, you may note any corrections you wish to make.  All corrections must be noted on the correction page.  Please do not write on the transcript itself.

After you have completed reading and making your corrections, if any, take the correction page to a Notary Public and sign it in the Notary's presence.

**Please return this transcript along with the signed and notarized correction page to our Johnstown office within 30 days of the date of this letter.**

Upon receipt of your correction page, it will be mailed to Kenneth Joel, Esquire.  A copy will be sent to Paul A. Rossi, Esquire.

Thank you for your attention in this matter.  If you have any questions, feel free to contact our office.

Sincerely,

Sargent's Court Reporting Service, Inc.

No. 123343
Enclosures

cc:   Kenneth Joel, Esquire
      Paul A. Rossi, Esquire