**EXHIBIT 6**

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT

OF PENNSYLVANIA

\* \* \* \* \* \* \* \*

BENEZET CONSULTING, LLC        \*

and TRENTON POOL,              \*

    Plaintiffs             \*    Case No.

    vs.                    \*    1:16-CV-0074

PEDRO A. CORTES and            \*

JONATHAN MARKS,                \*

    Defendants              \*

        \* \* \* \* \* \* \* \*

DEPOSITION OF

JACOB WITMER

September 26, 2016



ORIGINAL

Any reproduction of this transcript is prohibited

without authorization by the certifying agency.

```
 1                        DEPOSITION

 2                            OF

 3   JACOB WITMER, taken on behalf of the Defendants herein,

 4   pursuant to the Rules of Civil Procedure, taken before

 5   me, the undersigned, Bernadette M. Black, a Court

 6   Reporter and Notary Public in and for the Commonwealth

 7   of Pennsylvania, at the Office of Attorney General,

 8   13th Floor, Strawberry Square, Harrisburg,

 9   Pennsylvania, on Monday, September 26, 2016, beginning

10   at 2:02 p.m.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                    A P P E A R A N C E S

 2

 3   PAUL ANTHONY ROSSI, ESQUIRE

 4   Office of Paul Rossi

 5   316 Hill Street

 6   Mountville, PA   17554

 7        COUNSEL FOR PLAINTIFFS

 8

 9   KENNETH L. JOEL, ESQUIRE

10   NICOLE RADZIEWICZ, ESQUIRE

11   Office of Attorney General

12   Litigation Section

13   15th Floor

14   Strawberry Square

15   Harrisburg, PA   17120-0001

16        COUNSEL FOR DEFENDANTS

17

18

19

20

21

22

23

24

25
```

4

1                          I N D E X

2

3    WITNESS: JACOB WITMER

4    EXAMINATION

5       By Attorney Joel                          7 -   89

6    EXAMINATION

7       By Attorney Rossi                        89 - 107

8    RE-EXAMINATION

9       By Attorney Joel                        107 - 108

10   CERTIFICATE                                       109

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1                          EXHIBIT PAGE

2

3                                          PAGE

4    NUMBER     DESCRIPTION                IDENTIFIED

5    Defendants:

6    Exhibit 3 Complaint                      76

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

1                          OBJECTION PAGE

2

3    ATTORNEY                                    PAGE

4    Rossi                                    84, 85

5    Joel                                        104

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

7

1        P R O C E E D I N G S
2    ----------------------------------------------------
3    JACOB WITMER, HAVING FIRST BEEN DULY SWORN, TESTIFIED
4    AS FOLLOWS:
5    ----------------------------------------------------
6    EXAMINATION
7    BY ATTORNEY JOEL:
8    Q.   Mr. Witmer, my name's Kenneth Joel.  I'm with the
9    Office of Attorney General.  My colleague and I ---.
10   My colleague, Nicole Radziewicz, and I represent the
11   Defendants in this case.  Have you ever been deposed
12   before?
13   A.   Yes.
14   Q.   Okay.  How many times?
15   A.   I believe just once.  Unless it happened much
16   earlier in my petitioning career.  But in 2014 is the
17   only time that I can remember being actually deposed.
18   Q.   Was that in connection with a petitioning matter?
19   A.   Yes.
20   Q.   What was the issue?
21   A.   My petition signatures for valid access for the
22   Illinois Libertarian Party were successful defended in
23   2014.
24   Q.   So let's just unpack that a little bit.  You
25   collected signatures for a Libertarian candidate in

8

1    Illinois?

2    A.   No.  Not per se, for the entire state slate.

3    Q.   Okay.  So you collected signatures in Illinois for

4    the 2014 election for a slate of Libertarian

5    candidates?

6    A.   Correct.

7    Q.   And somebody challenged that, whatever the process

8    is in Illinois, challenged your ---

9    A.   That's correct.

10   Q.   --- collection of signatures?

11   A.   It's a challenge state that used to work, as far

12   as I know, similarly to Pennsylvania.

13   Q.   Okay.

14   A.   An independent citizen challenged that, allegedly,

15   but generally they're a front for somebody else, ---

16   Q.   Okay.

17   A.   --- one of the major parties.

18   Q.   So somebody challenged that and then you were

19   deposed in connection with that?

20   A.   Yes.

21   Q.   Where did that deposition take place?

22   A.   It took place remotely, while I was in Wyoming.

23   Q.   Were you in Wyoming collecting signatures on

24   another campaign?  Is that what you were doing then?

25   A.   That's correct.  It was via videoconference.

9

```
 1   Q.   And who was conducting the deposition?  Was it an
 2   attorney for the individual who had challenged your
 3   signatures?
 4   A.   I believe so, yes.
 5   Q.   Okay.  Do you know when in 2014 that deposition
 6   took place, what month?
 7   A.   Summer time, it'd be in the middle of summer.  I
 8   don't remember precisely, but it would have been after
 9   the petition deadline, which is, let me see.  I think
10   the petition deadline is ---.  It's either the 27th of
11   June or 27th of July.  I don't remember ---
12   Q.   Okay.
13   A.   --- precisely.  I think it would have been after
14   the 27th of July that I was deposed.
15   Q.   Okay.  Can you give me a sense as to how far ---
16   how long after the petition deadline that took place?
17   Was it a week?  Was it two weeks?  Was it a month?
18   A.   I think it was about a month, a little more maybe.
19   Q.   Did you have to travel back to Illinois to
20   participate in any way, shape or form with that
21   challenge process or was the deposition all?
22   A.   It was a videoconference entirely.
23   Q.   Okay.  So that deposition was all ---?  You didn't
24   have to go back to Illinois and appear in court or do
25   anything like that, you just had your deposition taken?
```

10

1   A.   That's correct.

2   Q.   Do you know how ---?  You said it was successfully

3   defended.  So your signatures were ultimately held, at

4   least as many as needed to be to get the slate on the

5   ballot?

6   A.   That's correct.

7   Q.   Do you know how many signatures you had collected

8   in that matter?

9   A.   I don't recall.  I'm a traveling petitioner.  I

10   collect lots and lots of signatures on different

11   campaigns.

12   Q.   Okay.  So you've been deposed.  You probably know

13   somewhat what's going to happen.  Let me give you a few

14   rules that I usually like to use.  It'll make this go a

15   little more smoothly.  Answer all my questions

16   verbally.  Yes, no, whatever explanation you want to

17   give is fine.  Stay away from nonverbal communication.

18   The shrugs, the uh-huh, the uh-uh, because A, it's hard

19   for our court reporter to take it down, and B, it's

20   even harder for us to discern what you meant by a shrug

21   in a couple of months from now.  Okay?

22   A.   Yes, I understand.

23   Q.   If at any point you don't hear me, please ask me

24   to repeat the question and I will do so.  Is that okay?

25   A.   Yes.

11

1   Q.   And if at any point you don't understand, you

2   can't make sense of what I'm asking, let me know.   Let

3   me know what you find confusing.   I'll be happy to

4   rephrase it.   I want to make it understandable for you.

5   Okay?

6   A.   Yes.

7   Q.   Can we agree, then, that if you do answer you not

8   only heard me, but you've answered and you've

9   understood and you've answered truthfully to the best

10  of your knowledge?

11  A.   Yes.

12  Q.   Very good.   If at any point you'd like to take a

13  break, that's fine.   The only thing I ask is that you

14  answer whatever question is on the table and then we

15  take a break.   Okay?

16  A.   Yes.

17  Q.   What is your full name, please?

18  A.   Jacob Carson Witmer.

19  Q.   And where do you live?

20  A.   Anchorage, Alaska.

21  Q.   What's your address?

22  A.   6402 Hampton Drive, Anchorage, Alaska, 99504.

23  Q.   And I saw in some Interrogatory responses, and I

24  can give those to you, a Des Plaines, Illinois address;

25  is that accurate?

12

1    A.   That's a mailing address.

2    Q.   That's a mailing address?

3    A.   Correct.

4    Q.   What does that mean for you?

5    A.   That's where my mail goes.

6    Q.   Okay.  And what's that address?

7    A.   I stop off from time to time there to pick up my

8    mail there.

9    Q.   No, no, no.  What is that address in Des Plaines,

10   Illinois?

11   A.   It's a house.

12   Q.   What's the physical address?

13   A.   I'm sorry.

14   Q.   Does it have a number and a street?

15   A.   Yeah.  I'm sorry.  I thought since you said that

16   you had seen the Des Plaines address ---.

17                   ATTORNEY ROSSI:

18                   No, he's asking a question.

19   A.   Yes.  1319 Everett Avenue, that's E-V-E-R-E-T-T

20   Avenue, Des Plaines, Illinois, 60018.

21   BY ATTORNEY JOEL:

22   Q.   So you get all of your mail sent to the Des

23   Plaines, Illinois address, but your legal residence is

24   in Anchorage, Alaska?

25   A.   Correct.

13

Q.   Okay.  How long have you had your legal residence in Anchorage, Alaska?

A.   Since 2005.

Q.   And how long have you had your mail going to Des Plaines, Illinois?

A.   Since the same time in 2005.

Q.   Now you said it was a house.  Do people live there?

A.   Yes.

Q.   And you just have your mail delivered there?

A.   Yes.

Q.   Are they relatives of yours or ---?

A.   Yes.

Q.   Okay.  Who?

A.   My mother.

Q.   Anybody else live there or just your mother?

A.   No, just my mother.

Q.   There was some ---.  Have you ever lived in the State of Indiana?

A.   No.  Except visiting a friend.  And except --- I suppose I should rephrase that.  I lived there several months when I was petitioning there, ---

Q.   Okay.

A.   --- in a hotel.

Q.   Other than living in a hotel --- well, strike

14

1   that.

2       Your legal residence has never been the State of

3   Indiana?

4   A.   Correct.

5   Q.   And where you get your mail has never been the

6   State of Indiana?

7   A.   Correct.

8   Q.   What do you do for a living?

9   A.   Petition.

10  Q.   What does that mean?

11  A.   And sometimes I'm a consultant on petitioning

12  drives as well.

13  Q.   Okay.

14  A.   I petition signatures to place candidates and

15  initiatives and referenda on the ballot.

16  Q.   How long have you been doing that for?

17  A.   Since 2000, on and off.  Or 2002, on and off.

18  Q.   What do you mean by on and off?

19  A.   I've had other jobs as well, ---

20  Q.   Okay.

21  A.   --- in nonelection years, generally.

22  Q.   So let's start, I guess, at 2002.  What candidates

23  or referenda or parties or anything like that did you

24  collect for in 2002?

25  A.   I placed the Michigan Libertarian Party on the

15

1    ballot.

2    Q.   And is that on the general election ballot, is

3    that our primary election ballot?  How did that work?

4    A.   That was for the --- I believe ---.  I know that

5    it was the general election ultimately.  So I don't

6    believe that they had any primaries, but I believe that

7    my petition signatures, had they run people in the

8    primaries, they may have been able to do so based on

9    prior totals.

10   Q.   Okay.  So when you say you got the Michigan

11   Libertarian Party on the ballot, what do you mean by

12   that?

13   A.   I collected the final 2,000 signatures that they

14   needed to push them over the top in the wintertime.

15   Q.   And you said wintertime.  When were you in

16   Michigan collecting those?

17   A.   I don't recall exactly.

18   Q.   Okay.  Did you do any other petition signature

19   gathering in the 2002 election cycle?

20   A.   Not sure if I did.  I believe I did Kentucky for

21   the 2002 cycle, but I don't know, it could have been

22   done in 2003.  I don't know.  I can't recall.

23   Q.   What were you doing in Kentucky?  Was it for

24   candidates?  Was it for parties?  Was it for referenda?

25   What was it for?

16

1    A.    Three Libertarian candidates.  I think it must

2    have been 2002.  Someone has told me that it has been

3    2002, but it seems like it was 2003 to me, so I don't

4    know.

5    Q.    Okay.  Any other ---?

6    A.    I don't recall the minutiae of every drive I've

7    worked on for the past however many years in great

8    detail.

9    Q.    And that's because you've done a lot of them?

10   A.    Yes.

11   Q.    Okay.  We'll get into some of them.  Give me your

12   best memory.  Okay?

13   A.    Okay.

14   Q.    Did you do any other collections in the 2002

15   election cycle?

16   A.    Not beyond Michigan and/or Kentucky.

17   Q.    How about 2003?

18   A.    Oh, I'm sorry.  I did Illinois as well.

19   Q.    What did you do in Illinois?

20   A.    Libertarian again.

21   Q.    Was that for candidates or for the party?

22   A.    The party.  And I believe that there were some

23   candidates in addition that also then obtained valid

24   access as a result that were not a part of the

25   statewide slate.  And that's usually the case, is that

17

1   the statewide slate enables some candidates to gather

2   their signatures in addition.

3   Q.   Okay.  Any others?  You mentioned Michigan,

4   Kentucky, maybe 2002 or '03, and then Illinois.  Any

5   others in the 2002 cycle that you can remember?

6   A.   No.

7   Q.   How about 2003, recognizing Kentucky might have

8   been that year.  So any others in 2003?

9   A.   No.  I was doing a significant number of side jobs

10  for that ---.  Actually, yeah, in 2003 I know that I

11  was also in Arizona and Maryland.

12  Q.   What were you doing there?

13  A.   Same thing, party ballot access.

14  Q.   So collecting signatures to get parties on the

15  Arizona ballot and on the Maryland ballot?

16  A.   Yeah, to gain party ballot access.

17  Q.   What party?

18  A.   Libertarian Party.

19  Q.   Anything else in 2003?

20  A.   Not that I recall.

21  Q.   Okay.  How about 2004?

22  A.   2004 I worked several states.  I don't even know

23  if I can name all of them from memory.

24  Q.   Do as many as you can.

25  A.   And this is for the 2004 election cycle.  So some

18

1   of them may have gained ballot access during 2003 ---

2   Q.   Uh-huh (yes).

3   A.   --- from the work that I did.  So it's a two-year

4   cycle.

5   Q.   Right.  Thank you for clarifying that.  When I'm

6   talking about these years, I'm more interested in the

7   November election.  So what work was done to get to

8   there?  I presume some of the states, depending on what

9   it is, there might be some of the work is done in 2003

10  for this one ---

11  A.   Okay.

12  Q.   --- et cetera.  Sot that's what I'm looking at.

13  A.   I'll name as many as I can.

14  Q.   Sure.

15  A.   Let me see.  Illinois, Alabama, Pennsylvania, New

16  York, Connecticut.  There were more than that, though.

17  I don't know.  It escapes me at the moment ---

18  Q.   Okay.

19  A.   --- if I worked anywhere else.

20  Q.   Okay.  Who were you gathering signatures for?

21  Let's take them one by one.  In Illinois?

22  A.   Libertarians, all states.

23  Q.   Okay.  So in Pennsylvania you were collecting

24  signatures for a Libertarian candidate for presidency

25  or for other offices as well or ---?

19

1   A.   Yes.   Although before the convention we did not

2   know who it was for, for the presidency.

3   Q.   So the signatures you were collecting in 2004 were

4   all for Libertarians.   What offices were they for?

5   A.   In all cases statewide party ballot access.

6   Q.   What does that mean?

7   A.   It means that the Libertarian Party is considered

8   a minor party before they gain access to the ballot.

9   And they're considered a minor party with ballot access

10  or a major party or candidates that have valid access

11  after the petition signature gathering is completed.

12  Q.   Okay.   And do you know how many signatures you

13  were able to collect in Pennsylvania that year?

14  A.   I don't know.

15  Q.   Were you able to collect signatures in

16  Pennsylvania?

17  A.   Yes, I was.

18  Q.   Did you have somebody come along with you as a

19  witness?

20  A.   Yes.

21  Q.   Where did you collect in the Commonwealth?

22  A.   In Pittsburgh.

23  Q.   When you were collecting in the Commonwealth, did

24  you stay in a hotel in Pittsburgh?

25  A.   I believe I did.

20

1    Q.   Okay.  How long were you in Pennsylvania for to
2    collect those signatures?
3    A.   Only a couple of weeks, three weeks.  There was a
4    large push before the deadline, so I wasn't here long.
5    I believe it was immediately after the amount
6    sufficient to qualify, then gather it in Illinois.
7    Q.   Okay.  The signatures you collected in Pittsburgh,
8    were you able to get those notarized?
9    A.   Yes.
10   Q.   And do you know if any of the people who signed
11   those petitions had also signed other petitions?
12   A.   I believe that they had not because that would be
13   in violation of your law here, ---
14   Q.   Okay.
15   A.   --- if I recall.
16   Q.   So the signatures you were able to collect ---
17   strike that.
18        So you were able to collect signatures with a
19   witness, get them notarized and only the elector
20   signing one petition?
21   A.   Yes.
22   Q.   You were able to do that?  Okay.  Now, you
23   mentioned in ---.  What time frame were you in Illinois
24   that year, 2004, collecting?
25   A.   It would have been right before the legal

21

1    deadline.

2    Q.   Which is?

3    A.   I believe June 27th.

4    Q.   How many weeks were you there before June 27th, do

5    you know, or months?

6    A.   It was June or July.  It's terrible that I can't

7    even remember that now.  I can't.  I'm sorry.

8    Q.   Okay.  Whether it was June of July, how much time

9    were you spending in Illinois to collect your

10   signatures?

11   A.   I believe it was just a month or so.

12   Q.   Was Alabama before or after Illinois?

13   A.   It was after.

14   Q.   And how much time did you spend in Alabama?

15   A.   I believe it was about a month.

16   Q.   And was Pennsylvania ---?  Where does Pennsylvania

17   fall into that time frame?

18   A.   It might have been less than a month in Alabama,

19   because it was all very hurried.  Either a couple of

20   weeks --- between one-and-a-half weeks to probably a

21   month in each case.  And so they just kind of ---.

22   They happened immediately when one ends and the next

23   begins.

24   Q.   Okay.  So do I understand you that when ---?  So

25   you were in Illinois for about a month or so.  When

22

1   that ended you went immediately to Alabama?

2   A.   No, I believe I went to Pennsylvania ---

3   Q.   Okay.

4   A.   --- and then Alabama.  Because Alabama's deadline

5   is later or at least it was.  And now they've moved it,

6   they've changed it to be an earlier deadline, so we

7   don't have access to the universities.

8   Q.   So Illinois you were there about a month or so

9   before the deadline --- before the filing deadline,

10  collecting signatures; correct?

11  A.   Yes.  To the best of my knowledge that's correct.

12  Q.   Immediately after Illinois you went over to

13  Pennsylvania and collected signatures; correct?

14  A.   Yeah, I think so.

15  Q.   And you were there for about three weeks?

16  A.   I think so.  Although don't hold me to that, but I

17  don't remember exactly the exact dates, so ---.

18  Q.   After Pennsylvania, did you then go to Alabama

19  immediately to start collecting signatures?

20  A.   I don't believe so.  I believe I went to

21  Connecticut ---

22  Q.   Okay.

23  A.   --- and then to Alabama.

24  Q.   Or actually it could have been to New York and

25  then Connecticut.  I don't know if I went to

23

1   Connecticut before I went to New York or not.  I don't

2   recall.

3   Q.   Okay.  So piecing this together, is the order of

4   states that you did in 2004 Illinois, Pennsylvania, New

5   York or Connecticut, then the other one, then Alabama?

6   A.   That sounds correct.

7   Q.   Okay.  And you were in Illinois for about a month

8   prior to the June or July filing deadline; correct?

9   A.   I believe so.

10   Q.   And you were there collecting signatures; correct?

11   A.   Yes.

12   Q.   And then when that was over you went to

13   Pennsylvania and worked there for about three weeks

14   collecting signatures; correct?

15   A.   I believe so, yes.

16   Q.   And then from Pennsylvania did you go right on to

17   either New York or Connecticut, whichever was the next

18   state in line?

19   A.   Yeah.

20   Q.   And how long were you at either New York or

21   Connecticut for that next stint?

22   A.   I believe New York was just a couple of weeks.

23   Q.   Okay.

24   A.   That's the only thing that strikes out --- stands

25   out in my memory, really.

24

1  Q.   And then how long were you, then, in Connecticut,
2  if that was the next state?
3  A.   I believe just a couple of weeks.
4  Q.   Okay.
5  A.   Maybe shorter --- a week.
6  Q.   And then did you go from New York straight to
7  Connecticut?
8  A.   I don't ---.
9  Q.   Or go straight to New York?
10 A.   I don't recall.
11 Q.   Regardless of which way the order was, did you go
12 from one state immediately to the next state, ---
13 A.   Yes.
14 Q.   --- to collect signatures?
15 A.   Yes.
16 Q.   And then from whatever that last state was, either
17 New York or Connecticut, did you go immediately to
18 Alabama to start collecting signatures?
19 A.   I believe so.
20 Q.   And how long were you in Alabama collecting
21 signatures?
22 A.   Probably a couple of weeks.  Because I think if
23 you string it all together I couldn't have been in any
24 of these places ---.  I couldn't have been in each of
25 these places for more than two weeks.

25

1   Q.   Okay.

2   A.   Because the final deadline I believe it's

3   September something or it was in Alabama at that time.

4   Q.   And the states you just gave me, Illinois,

5   Pennsylvania, New York, Connecticut, Alabama, might

6   there be others that you worked in for the 2004 cycle

7   and that's all that you can remember now or is that

8   a ---?

9   A.   It's possible.  It's possible.  Although I believe

10  that --- you know, I just try and keep track of all the

11  states that I've worked in.  And I know that it was

12  like later I worked in Missouri and several other

13  states for initiative and referenda.  But I believe

14  those are the only states that I worked in, you know,

15  for the 2004 general election ballot access.

16  Q.   Okay.  2005, did you work ---?  For the 2005

17  election, did you collect signatures anywhere?

18  A.   Not precisely, per se, for the 2005 general

19  election, because I was doing party ballot access

20  that's open-ended ballot access via the registration

21  process in ---.  Oh, yeah, you know, I left out that it

22  was the registration process in 2003 as well.  So it

23  wasn't purely petition signatures in 2003 either, it

24  was just largely petition signatures.

25  Q.   Okay.  And what do you mean by this registration

26

1   process, getting people to sign up to register to vote?

2   A.   Many states, especially the western states, do

3   party ballot access by the number of registrations a

4   political party has in their name.  So I would ask

5   people to register as Libertarians to gain Libertarian

6   Party ballot access.

7   Q.   Got it.

8   A.   Or if I was a Republican and I was working for the

9   Republicans, I could have done that for the

10  Republicans ---

11  Q.   Okay.

12  A.   --- as well, had they not already had ballot

13  access.

14  Q.   So 2005 you worked on some party ballot access, I

15  assume, also for the Libertarians?

16  A.   Yes.

17  Q.   Anybody else or just the Libertarians?

18  A.   Only the Libertarians.

19  Q.   2006 election, did you collect signatures for that

20  election ---

21  A.   Yes.

22  Q.   --- for issues, people, anything like that?

23  A.   Yes.

24  Q.   Yes?  Okay.  What states?

25  A.   Some of these I did volunteer, passing through

27

1    states as well, just to gain the knowledge of the

2    state.

3    Q.   Okay.

4    A.   I did Missouri, Montana and Oregon for Americans

5    for Limited Government and Citizens in Charge, a set of

6    initiatives that were all initiatives to limit

7    government power.  There were three of them.  And I did

8    Libertarian registrations in every state that I did the

9    initiatives in, where that was an option, as well for

10   free as a volunteer.

11   Q.   So in Missouri, Montana and Oregon?

12   A.   Yes.

13   Q.   Okay.

14   A.   And Alaska in 2006.

15   Q.   Alaska you did Libertarian?

16   A.   I did initiatives there as well.

17   Q.   So in 2006 you did signature collecting for

18   initiatives in Missouri, Montana, Oregon and Alaska?

19   A.   Yes, that's correct.

20   Q.   And you also did signature collecting for party

21   ballot access for Libertarians in Missouri, Montana,

22   Oregon, Alaska in 2006?

23   A.   Yeah.  It's a much smaller number than ---.

24   Q.   I'm sorry, we're on 2005.

25   A.   No, no, we're on '06.

28

1   Q.   Oh, we're on '06?   Okay.   Go ahead.   Sorry.

2   A.   No worries.

3   Q.   You were about to say something, I'm sorry, I cut

4   you off.

5   A.   I did a smaller number of registrations than if I

6   was there to purely do registration works and just due

7   to me spreading information about the Libertarians.

8   Q.   Okay.   2007, did you do any signature collecting?

9   A.   No.   I may have done, I don't know, one drive or

10  something like that, a small amount of work.   I don't

11  know the exact ending dates.   Sometimes the dates ---.

12  If it was in the winter it might have overlapped

13  into ---.   I don't think so, though.

14  Q.   All right.   How about the 2008 election cycle?

15  Did you do any signature collecting that year?

16  A.   Yes.   Oh, and I also in 2006 did Illinois, ballot

17  access.

18  Q.   And did you do Illinois Libertarian signature

19  gathering as well in 2006?

20  A.   In 2006?

21  Q.   Yeah.

22  A.   That's correct.   That's what I had just mentioned.

23  Q.   Oh, I thought it was ---.   Oh, okay.

24              ATTORNEY ROSSI:

25              LP is short for Libertarian party.

29

1          ATTORNEY JOEL:

2               Okay.

3    BY ATTORNEY JOEL:

4    Q.   In 2006 in Missouri, Montana, Oregon, Illinois and

5    Alaska, can you give me the order of states

6    chronologically that you went through?

7    A.   I don't remember.  I can give you the

8    chronological order of a couple of them.  Or not the

9    chronological order, but I can give you the relative

10   order of a couple of them.

11   Q.   Okay.  Why don't you do that then.

12   A.   Missouri was first, I think, and then Montana.

13   Q.   Okay.

14   A.   And I believe then Oregon.

15   Q.   Okay.

16   A.   I could have Montana and Oregon flipped, though.

17   I don't really know.  It's kind of a blur at this

18   point.  Sorry.

19   Q.   How much time did you spend in either each of

20   these states doing your collection or in the aggregate

21   for the 2006 year?

22   A.   That's a good question.  I think it was no more

23   than three to four months.

24   Q.   And jumping back to 2004, when you were in all of

25   those states, were you staying in hotels at those

30

1    states?

2    A.    That's correct.

3    Q.    And what was your average day like in terms of

4    signature collecting?  Up at 7:00, turning in at 10:00,

5    collecting these things.  What was your average work

6    day like?

7    A.    It fluctuates quite a bit.

8    Q.    Can you give me a range?

9    A.    Usually a hundred signatures per day is what is

10   considered professional, so I believe I was generally

11   above that, because I was generally higher than what

12   was generally considered professional.  And a good day

13   is a couple hundred.  A really good day is 300 to 400.

14   If I was the first person at a university, then a good

15   day would be considered 300.

16   Q.    And did you go ---?  In those states that you

17   mentioned in 2004, Illinois, Alabama, Pennsylvania, New

18   York, Connecticut, did you go to different locations

19   around each state or were you just in one place for all

20   of your signature gathering?

21   A.    Always different locations.

22   Q.    And you'd stay at different hotels, depending on

23   the location?

24   A.    Yes.

25   Q.    Within each state.  So, for example, in Illinois.

31

1   Let me ask it this way, in Illinois do you know how

2   many locations your hit in 2004?

3   A.   I don't know.

4   Q.   Okay.   But if there were more than one location,

5   you'd be at a different hotel for each location?

6   A.   Maybe not in Illinois, because I might have stayed

7   with my mother or stayed with my brother or relatives

8   as well.

9   Q.   Okay.   How about in Alabama?   Do you know how many

10  locations you hit in Alabama in 2004?

11  A.   I think I was pretty much at the same place the

12  whole time, because they're --- or no, no, no.   That's

13  not the case.   I did work in Montgomery a little while

14  and Tuscaloosa, ---

15  Q.   Okay.

16  A.   --- so just two.

17  Q.   And did you stay in different hotels, depending on

18  whether you were working Tuscaloosa or Montgomery?

19  A.   Yes.

20  Q.   And in Pennsylvania did you work different parts

21  of the state?

22  A.   I don't remember.   I don't believe so, generally.

23  Although a lot of times if I'm traveling to a

24  destination or trying to figure out my destination,

25  I'll be like a hotel's on the way and so I just totally

32

1    don't remember situations like that, because I don't

2    remember any place that I don't stay for very long.

3    Q.   Did you go between all these states in 2004 by

4    car?

5    A.   I think so.

6    Q.   How about in 2006?  Did you go to different

7    locations in Missouri, Montana, Oregon, Alaska,

8    Illinois?

9    A.   Yeah.

10   Q.   And did you stay in different locations in the

11   different states?

12   A.   I don't really recall.

13   Q.   Did you drive amongst those states to get from

14   where you were going to where you were going?

15   A.   Yes, I always drove everywhere.

16   Q.   Okay.  So 2008, what states did you collect in?

17   A.   Illinois and Indiana, this time for Ron Paul.

18   Q.   In both states for Ron Paul?

19   A.   Yes.  And I may have gathered in a few other

20   states for ---.  I don't think I gathered for Paul in

21   any other states, but I gathered for Libertarians in

22   West Virginia and Alabama.

23   Q.   Any other states that you worked in 2008?

24   A.   I don't think so.

25   Q.   Can you give me the chronology of order of states,

33

1   which one first, second, third, fourth, out of those

2   four?

3   A.   Illinois and Indiana were much earlier and they

4   were in the wintertime.

5   Q.   Okay.

6   A.   Actually, they were in 2007, but it was for the

7   2008 ballot access cycle, because the Republican

8   deadlines are obviously earlier because they have a

9   primary.  They're a major party, ---

10  Q.   Uh-huh (yes).

11  A.   --- so their primaries are earlier.

12  Q.   So Illinois and Indiana were earlier.  Do you know

13  which one was first?

14  A.   Illinois.

15  Q.   So Illinois and then Indiana.  How about West

16  Virginia and Alabama?  Where did those fall?

17  A.   Once again, summertime.  Before the September

18  deadline in Alabama.

19  Q.   Okay.  Any other places you collected signatures

20  in 2008 other than those four?

21  A.   If there was, I don't recall.  I don't think so.

22  Q.   Did you drive between all of these states to your

23  work?

24  A.   Yes.

25  Q.   When you were in each of these states did you go

34

1    to different locations to collect signatures?

2    A.   Yes.

3    Q.   When you were in these states, did you stay at

4    different hotels?

5    A.   Not always.

6    Q.   Okay.  In Illinois, did you?

7    A.   I don't think so.

8    Q.   How about in Indiana?

9    A.   Yes.

10   Q.   How about in West Virginia?

11   A.   I don't know if I changed hotels there.  I was

12   only in Charleston, though.

13   Q.   How about in Alabama?

14   A.   I believe I did change hotels there.

15   Q.   How about in 2009?  Did you collect any

16   signatures?

17   A.   I don't think so.  Or, yeah, I did.  I'm sorry.  I

18   was in Massachusetts then.

19   Q.   And what were you collecting for in Massachusetts?

20   A.   For party ballot access for both major and minor.

21   They don't have an exclusive or exclusionary rule

22   there.

23   Q.   How long were you in Massachusetts for,

24   collecting?

25   A.   And also there's no exclusionary ---.  I'm sorry.

35

1    There's no exclusionary rule in Alabama either.
2    Q.   Okay.
3    A.   And in several of the states that's the case.  So
4    actually you said that you wanted to know who I was
5    gathering for earlier?
6    Q.   Yes.
7    A.   And I believe that I unfortunately neglected to
8    let you know that several of the states, and I can't
9    remember which is exclusionary and which are not at
10   this point, because I only cared whether the
11   Libertarians really accessed the ballot.  The others
12   were just purely for the monetary compensation.  But I
13   was gathering for Green Party, and I believe it would
14   have Nader, as an Independent as well.
15   Q.   Okay.
16   A.   And so that was the case in multiple states ---
17   Q.   Okay.
18   A.   --- as well.  And like I said I just ---.  I'm
19   sorry, I just totally don't remember which ones have an
20   exclusionary rule or not.  I know certain ones
21   definitely don't, because I do remember certain hassles
22   associated with asking people to, you know, sign for
23   the Green Party and having to explain what the Green
24   Party was when I didn't really care about Green Party
25   ballot access necessarily.

36

1    Q.    Okay.   So in 2009 you talked about collecting
2    signatures in Massachusetts.
3    A.    Uh-huh (yes).
4    Q.    Any other ---?
5    A.    And in 2008 I had also collected for, like I said,
6    Nader as an Independent as well.
7    Q.    Okay.
8    A.    And there were many people that wanted Nader on
9    the ballot in addition.   Lots of the public will ask
10   questions about, you know, are you putting these
11   candidates on.   And we'll say, well, yeah, I want all
12   the candidates on the ballot.   And so they actually
13   wanted to sign for all of them rather than just one of
14   them, so ---.
15   Q.    Any other places you collected in 2009, other than
16   Massachusetts?
17   A.    Let me think.   If there was, I don't recall.
18   Q.    Okay.   How about 2010?
19   A.    No.
20   Q.    2011?
21   A.    Yes.
22   Q.    Where did you collect?
23   A.    Just North Dakota, I think.
24   Q.    And what was that?   Was it for a candidate, an
25   initiative?   What was it for?

1    A.   That was three parties, Constitution Party, Green

2    Party and Libertarian Party.  And also I believe I, in

3    2011, also did Wyoming and that was for Independent

4    candidates.

5    Q.   When you were in --- backing up,

6    Massachusetts ---?

7    A.   Oh, I'm sorry.  In 2009 I also did Alabama.

8    Q.   Okay.  So when you were in Massachusetts, back in

9    2009 ---?

10   A.   I'm sorry.  Alabama was 2010, or it was for the

11   2010 election cycle.  Sorry.

12   Q.   That's fine.

13   A.   I didn't mean to keep you guys taking notes.

14   Q.   That's fine, that's fine.  We just want your best

15   memory.  That's fine.  So in 2009, in Massachusetts,

16   did you collect in different locations in the

17   Commonwealth of Massachusetts?

18   A.   Uh-huh (yes).

19   Q.   You have to say yes or no.

20   A.   Yes.  Sorry.

21   Q.   And did you stay in different hotels in the

22   Commonwealth of Massachusetts to collect those

23   signatures?

24   A.   Yes.

25   Q.   And did you drive in and out of Massachusetts?

38

1    You drove to Massachusetts, you work and then you drove

2    out?

3    A.    No.  I believe I actually flew.

4    Q.    Okay.  So 2010 in Alabama did you collect

5    signatures ---?  Well, first of all, what was that for?

6    Was it an initiative, a party, a candidate?

7    A.    It was a candidate.

8    Q.    Which one?

9    A.    Oh, geez.  I can't remember the guy's last name.

10   He was a Constitution Party candidate.

11   Q.    Okay.  And did you collect signatures for him in

12   different locations in Alabama?

13   A.    Only in the congressional district that is Mobile,

14   Alabama.

15   Q.    This is a candidate for Congress?

16   A.    Yes.

17   Q.    So you were in his district in Mobile and did you

18   stay in different hotels in the Mobile area or just

19   one?

20   A.    It was a couple different ones, I think.

21   Q.    And did you drive to Alabama to do this work or

22   did you fly there?

23   A.    I believe I was in a rental car at that time.

24   Q.    Okay.  2011 in North Dakota.  How long were you

25   there for?

39

1    A.   I'm sorry.  I also would have been in South Dakota

2    right before then.

3    Q.   For the 2011 cycle?

4    A.   Yeah.

5    Q.   Okay.  So let's take North Dakota first and then

6    we'll move to South Dakota.  Where did you ---?  How

7    long were you in North Dakota for?

8    A.   I don't recall exactly.

9    Q.   Did you collect signatures in ---?

10   A.   It was at least a couple of months, though.

11   Q.   Did you collect signatures in various parts of the

12   state in North Carolina?

13   A.   Yes.

14   Q.   And did you stay in hotels in various parts of

15   North Dakota while you were collecting these

16   signatures?

17   A.   Yes.

18   Q.   Did you from North Dakota to South Dakota or it

19   was the other way around?

20   A.   Other way around.

21   Q.   Okay.  Did you go directly from South Dakota to

22   North Dakota?

23   A.   Yes.

24   Q.   How long were you in South Dakota for?

25   A.   I believe it would have been just a few weeks.

40

1    Q.   And were you collecting signatures in South Dakota

2    in different parts of that state?

3    A.   Yeah.

4    Q.   And were you staying in hotels in different parts

5    of that state?

6    A.   Yes.

7    Q.   Where did Wyoming fit in on this?  Did it come

8    after North Dakota?

9    A.   I actually don't remember, I'm sorry to say.

10   Q.   That's fine.  Do you know how long you were in

11   Wyoming?

12   A.   A month or two.

13   Q.   And you were collecting for an Independent

14   candidate?

15   A.   Yes.  And for party ballet access.

16   Q.   What part?

17   A.   Libertarian and Constitution.

18   Q.   And who was the candidate?

19   A.   In 2012, I ---.

20   Q.   No, this is 2011.

21   A.   This was for the 2012 cycle, though.

22   Q.   Okay.  I was talking about the 2011 election.

23   A.   I believe all of these were for the 2012 cycle.

24   Because it starts early, so ---.

25   Q.   Okay.  So did you collect any signatures in the

41

1   2011 election cycle?

2   A.   I don't think so.

3   Q.   Okay.

4   A.   I don't think any of them were for the 2011.

5   Q.   So when you just told me about North Dakota, South

6   Dakota and now we're going into Wyoming, it was for the

7   2012 election cycle?

8   A.   Uh-huh (yes).   Yeah.

9   Q.   All right.   So who was the candidate in Wyoming

10  that you were collecting signatures for?

11  A.   Actually, you know, I don't even ---.   I don't

12  remember anyone except Don Wills.   That was the

13  only ---.   Like I said, I only tend to remember the

14  candidates that I, you know, really have a kind of a

15  personal stake in monitoring the outcome and seeing if

16  they did well.

17  Q.   What did Mr. Wills ---?   What was he running for?

18  A.   Governor.

19  Q.   Governor?   Governor of Wyoming?

20  A.   Yeah.

21  Q.   What were you collecting for in South Dakota?   Was

22  it a party?   Was it a candidate?

23  A.   Party ballot access, multiple parties once again.

24  Q.   Libertarian, Constitution and Green?

25  A.   Yeah.   I believe so.   And I'm sorry, in 2011 the

42

1    candidate, Don Wills, was actually a party of his own

2    creation.  He was an independent candidate.  And he was

3    with a party that he called the Country Party, which

4    was kind of an arbitrary name.

5    Q.   Okay.  And was that for the 2011 election or the

6    2012 election?

7    A.   That was I believe 2011.  Yeah.  It must have been

8    2011 or 2013 that I was there for Wills, so ---.

9    Q.   So for the 2012 election, you were in North Dakota

10   and South Dakota ---

11   A.   Uh-huh (yes).

12   Q.   --- and Wyoming for the Libertarian and

13   Constitution; is that correct?

14   A.   Yeah.

15   Q.   And then in 2011 and 2013 you were in Wyoming for

16   Mr. Wills?

17   A.   Yeah.

18   Q.   Where else did you collect ---?

19   A.   Actually, I don't think it was 2013 for Wills, I

20   think that was 2011, because I was back in Wyoming for

21   Wills in 2014 at the same time that I testified.

22   Q.   Okay.  Any place else that you went ---?  So the

23   2011 election you were in Wyoming collecting signatures

24   for Mr. Wills?

25   A.   Uh-huh (yes).

43

1   Q.  How long were you there for?

2   A.  A few months.

3   Q.  And did you collect signatures in various parts of

4   the State of Wyoming?

5   A.  Yes.

6   Q.  And did you stay in hotels in various parts of the

7   State of Wyoming?

8   A.  Yes.

9   Q.  Did you drive to and from the State of Wyoming?

10   A.  Yes.

11   Q.  In 2012 we talked about North Dakota, South Dakota

12   and Wyoming as it relates to the Libertarian

13   Constitution.  Now we're at 2013.  Where did you

14   collect in 2013?

15   A.  I don't think that I actually did any significant

16   signature gathering in 2013.

17   Q.  How about 2014, where did you collect?

18   A.  2014?  Wyoming and Illinois.

19   Q.  How long were you in Wyoming for?

20   A.  A little over a month, I think.

21   Q.  And was that to get signatures for Mr. Wills

22   again?

23   A.  Yes.  And Kurt Gottshall for Congress.

24   Q.  And did you collect those signatures in Wyoming in

25   various locations around the state?

44

1    A.   Yes, but mostly Cheyenne.

2    Q.   And did you stay in various locations around the

3    state to collect those signatures?

4    A.   Yes, but mostly Cheyenne.

5    Q.   Okay.  Did you drive to and from Wyoming to do

6    that work?

7    A.   I think so, yes.

8    Q.   Do you know what time of the year that was?

9    A.   Summertime.

10   Q.   Summer?  So the summer of 2014?

11   A.   Yeah.

12   Q.   Did you collect any other signatures in Wyoming

13   other than for Mr. Wills and Mr. Gottshall?

14   A.   Libertarians.

15   Q.   Candidates or the party?

16   A.   The party ballot access in Illinois, as ---.

17   Q.   I'm talking about Wyoming.

18   A.   Oh, I believe probably the Green Party.

19   Q.   In Wyoming?

20   A.   Yeah.  And they finish at different times as well,

21   so I'm not entirely certain about that.

22   Q.   Okay.  Did you go to Wyoming and then Illinois or

23   Illinois and then Wyoming?

24   A.   Illinois and then Wyoming.

25   Q.   And how long were you in Illinois for?

45

1    A.    A couple months.

2    Q.    And who did you collect for in Illinois or what

3    referenda did you ---?

4    A.    Party ballot access for the Libertarians.

5    Q.    And did you collect those signatures in different

6    parts of the state in Illinois?

7    A.    Yes.

8    Q.    Did you stay in hotels in different parts of the

9    state?

10   A.    No, I don't believe so.

11   Q.    You just stayed at your mother's house ---

12   A.    Yeah.

13   Q.    --- to do that work?

14   A.    I think so.

15   Q.    Okay.

16   A.    Like I said, I mean, if there are small exceptions

17   anywhere in this that I don't remember, you know, like

18   I want to make sure I'm telling you the whole truth to

19   the best of my memory here, but, you know, it could be

20   that I stayed, you know, like for a few days in some

21   other place.

22   Q.    Okay.

23   A.    I didn't work long in any of those other

24   locations, though.

25   Q.    Any of what other locations?

46

1   A.   If there were any other locations it was in such a

2   short amount of time that I do not recall them at this

3   point.

4   Q.   Okay.  How about 2015 election?  Did you collect

5   any signatures?

6   A.   I don't think so, no.

7   Q.   How about this election cycle, 2016?

8   A.   Yes.

9   Q.   Where have you collected?

10  A.   Oh, you know, in 2015, before the deadline ---.

11  I'm sorry, I was, but it was for the 2016 cycle.

12  Q.   So anything for the 2015 election cycle?

13  A.   No.

14  Q.   So the 2016 election cycle, where did you collect

15  signatures?

16  A.   In 2015 I started in Indiana.

17  Q.   For whom?

18  A.   It was for all the Republicans that were in the

19  race at that time.  Which to the best of my knowledge I

20  know there were like 15.  But not all of them were

21  gathering signatures there, so it was a subset of

22  those.

23  Q.   Okay.

24  A.   And the only one that I cared about was Rand Paul.

25  I gathered signatures for a bunch of the other ones.

47

1    And incidentally a bunch of people wanted to sign for

2    the ones that I did not care about.  And then when I

3    said, could you also sign for Rand Paul just to make

4    sure that everybody accesses the ballot, then they

5    would all --- you know, 99.9 percent of the people said

6    yes, that they would do that.

7    Q.   How long were you in Indiana for?

8    A.   More than two months.

9    Q.   Did you collect signatures in various locations in

10   Indiana?

11   A.   Yes.

12   Q.   And did you stay in hotels in various locations in

13   Indiana?

14   A.   Yes.

15   Q.   Where else did you collect?

16   A.   There's a district-specific requirement, so I was

17   all over the place ---

18   Q.   Okay.

19   A.   --- in the different congressional districts.

20   Q.   Where else did you collect in for this 2016

21   election cycle?

22   A.   Let me see here.  North Dakota.

23   Q.   Who did you collect for there?

24   A.   You're talking besides Pennsylvania?

25   Q.   Yeah.  We'll get to Pennsylvania.  I want a whole

48

1    list and then we'll drill down.  So you just said North

2    Dakota.  Who did you collect for there?

3    A.    Libertarians, Rocky De La Fuente and Green Party.

4    Or, I'm sorry, Constitution Party, Rocky De La Fuente

5    and Green Party.  Actually the Libertarians were

6    already done.  They had major party status from our

7    prior work, ---

8    Q.    Okay.

9    A.    --- so they did not need to be completed.

10   Q.    Were you ---?

11   A.    And ---.

12   Q.    I'm sorry.  Go ahead.

13   A.    And Illinois.

14   Q.    Were you collecting for Rocky De La Fuente as a

15   Democrat or as an Independent or in what role?

16   A.    In North Dakota?

17   Q.    Yes, North Dakota.

18   A.    As an Independent.

19   Q.    As an Independent?

20   A.    Because that was post primary cycle.

21   Q.    Okay.  How long were you in North Dakota for?

22   A.    About three weeks.  About a month.  It was almost

23   a month.  Almost one month.

24   Q.    Okay.  Did you go from Indiana to North Dakota or

25   is there some place in between?

49

1   A.   Let me think here.   It's recent, so I actually

2   should remember.   I think I ---.   There was significant

3   time ---.   Pennsylvania was before then, ---

4   Q.   Okay.

5   A.   --- of course.   And so it was Illinois and then

6   Pennsylvania.   And then I went ---.   I flew to a couple

7   of different places this time for very short petition

8   time periods.   So it was Connecticut, New Mexico and

9   Atlanta, Georgia, so ---.

10  Q.   So if I've taken notes correctly, in this 2016

11  election cycle you collected signatures in Illinois,

12  Pennsylvania, Connecticut, New Mexico, Georgia,

13  Indiana, North Dakota; is that correct?

14  A.   Yeah.

15  Q.   Any others?

16  A.   Not that I can recall right now, so ---.

17  Q.   How long were you in Illinois for?

18  A.   It was three months.   I wasn't gathering

19  signatures continuously.

20  Q.   Okay.   How long were you gathering signatures in

21  Illinois?   Strike that, that's a bad question.

22      Throughout that three-month period you were

23  collecting signatures, but it wasn't day in and day out

24  for three months, am I understanding you correctly?

25  A.   Correct.

50

Q.   Okay.   What individuals or party were you collecting for in Illinois?

A.   Only the Libertarian party, ballot access.   And I'm sorry, there were a couple of initiatives that I gathered for in 2014.   And ---

Q.   Okay.

A.   --- you didn't ask me about them, but you did ask me to say --- you wanted to know where I gathered signatures ---

Q.   Yeah.

A.   --- and what for, so ---.

Q.   So where were those in 2014?

A.   And it was also ---.   I think 2012 there was one initiative in Illinois.   It was term limits, and it was a redistricting amendment in Illinois.

Q.   That's for 2012?

A.   In 2012 there was ---.   I think that there was an initiative that failed to make the ballot, so I deleted it from my memory.   I'm sorry.   I've been trying to learn programming over the last couple of months and trying to delete all the programming knowledge and ---.   I mean, I know it sounds absurd for me to say that my brain is full, but I mean I actually am trying to just kind of put the petitioning behind me and be done with it.

51

1   Q.   Are you looking to get out of that work?

2   A.   Yes.

3   Q.   Okay.   Why?

4   A.   Absurd restrictions on my right to free speech,

5   country definitely going down the tubes because of

6   interference with free speech, police harassment

7   continuously, things of that nature.

8   Q.   2014, you just talked briefly about some

9   initiative that you did in Illinois.

10  A.   Map amendments and it's a redistricting initiative

11  and the term limits.

12  Q.   Okay.

13  A.   And all these things I kind of start and stop at

14  various different times.   Some of them I work on for

15  just a very short period of time and others I work

16  longer.   Some I hire petitioners, some I don't.

17  Q.   So around the 2016 election cycle, you told me

18  what you did in Indiana, in Illinois, in North Dakota.

19  We'll come back to Pennsylvania.   What did you do in

20  Connecticut?   Who did you collect for in Connecticut?

21  A.   It was Rocky De La Fuente as a Democrat for the

22  Democratic Primary.

23  Q.   How long were you in Connecticut then?

24  A.   And there were others as well, because there's no

25  exclusive requirement there either.

52

1    Q.   Who else?

2    A.   That's a good question.   Who was it?

3    Libertarians, I believe.   I might be wrong about that.

4    Q.   How long were you in Connecticut for,

5    collectively?

6    A.   Not long, a couple weeks.

7    Q.   Did you collect in Connecticut in different

8    locations?

9    A.   Yes.

10   Q.   And did you stay in different hotels in different

11   locations?

12   A.   Yes.

13   Q.   New Mexico, what were you collecting there for?

14   A.   Rocky De La Fuente and the short-lived Better for

15   America Party.   That was just David French.

16   Q.   Were you ---?

17   A.   Presumably David French, although it was never, I

18   believe, officially declared.

19   Q.   For the Rocky De La Fuente in New Mexico, was that

20   him as a Democrat or as an Independent?

21   A.   An Independent.

22   Q.   How long were you in New Mexico for, collectively?

23   A.   It was a very short period of time.   It could have

24   been five or six days, but I was only working for four

25   days.

53

1   Q.   Did you work and collect signatures in different

2   locations in New Mexico?

3   A.   Yes.

4   Q.   Did you stay in different locations, different

5   hotels?

6   A.   No.

7   Q.   How about in Georgia, what were you collecting for

8   there?

9   A.   Rocky De La Fuente and Green Party.

10  Q.   Were you collecting for Rocky De La Fuente as a

11  Democrat or as an Independent?

12  A.   Independent.

13  Q.   And how long were you in Georgia for collecting?

14  A.   Just four days.

15  Q.   And you'd mentioned Atlanta, I think, early on.

16  Were you only at Atlanta or did you go to different

17  locations in Georgia?

18  A.   I was in many different locations in Atlanta.

19  Q.   Okay.  Did you stay only in Atlanta or did you

20  stay in different hotels as well?

21  A.   Stayed only in Atlanta.

22  Q.   So Pennsylvania for 2016, who did you collect for

23  and what did you collect for?

24  A.   Rocky De La Fuente and Ted Cruz.  Ted Cruz's

25  delegates only.

54

1   Q.   Okay.

2   A.   And Rocky De La Fuente's delegates, of course.

3   Q.   Did you campaign (sic) for Rocky De La Fuente as a

4   Democrat or as an Independent?

5   A.   I'd say kind of an improperly-phrased question,

6   because this is not campaign work.

7                   ATTORNEY ROSSI:

8                   You said campaign.

9                   ATTORNEY JOEL:

10                  Oh, I'm sorry.

11                  ATTORNEY ROSSI:

12                  Yeah.   That was a slip of the tongue.

13  BY ATTORNEY JOEL:

14  Q.   Did you collect signatures for Rocky De La Fuente

15  as a Democrat or as an Independent?

16  A.   As a Democrat.

17  Q.   Okay.   And how long were you in Pennsylvania

18  collecting signatures for these two individuals?

19  A.   Oh, I don't know.   It was within a 21-day window,

20  which is an absurdly restrictive short time window in

21  comparison to every other state in the nation.   So it

22  had to be within that 21-day time window.   It was very

23  early in the season.

24  Q.   Okay.

25  A.   What was it like still wintery weather out,

55

1    so ---.

2    Q.   Okay.   Did you collect signatures in various

3    locations across Pennsylvania?

4    A.   Yes.

5    Q.   And did you stay in hotels in different places

6    across Pennsylvania?

7    A.   Yes.

8    Q.   Did you drive to and from Pennsylvania ---?

9    A.   And not hotels as well.

10   Q.   Okay.   So where else did you stay other than

11   hotels?

12   A.   The boss's father-in-law's house in Pittsburgh, a

13   property that he owns there.

14   Q.   Who's the boss?

15   A.   Trent Pool, ---

16   Q.   Oh, okay.

17   A.   --- Benezet Consulting.

18   Q.   So Mr. Pool's father lives in Pittsburgh?

19   A.   His father-in-law.

20   Q.   Father-in-law lives in Pittsburgh?

21   A.   I don't know that his father-in-law lives in

22   Pittsburgh.   I said that his father-in-law owned the

23   property.

24   Q.   Okay.   These other states that you've collected in

25   over your time when you stayed there, has it always

56

1    been in hotels or have you crashed at friends,

2    colleagues, boss's people, anything like that?

3    A.   If I had to say, I'd say 80 percent of it is

4    hotels.  And early on would be the 20 percent that was

5    generally party members, when I was more exclusively

6    working for the Libertarians.

7    Q.   Okay.

8    A.   I, like many other people, had kind of concluded

9    that almost all parties are generally the same.  They

10   generally tend to just be an excess to the ballot,

11   avenue to the ballot or a possible lesser of multiple

12   evils, so ---.  And many people sign all petitions

13   without general regard, just because they want everyone

14   to have access to the ballot.  The most common

15   sentiment that I run into is that people don't want ---

16   they're surprised that there's even a requirement for

17   signature gathering.  They have the rather naïve high

18   school civics view of reality that where they think

19   that candidates, if they want to run to run in a free

20   country they just go and file paperwork and then

21   they're on the ballot with no signature requirements.

22   Q.   So what is your ---?  I want to talk about

23   Benezet.  What is your relationship to Benezet?  Are

24   you an employee?  Are you a subcontractor, an owner?

25   What's your relationship to Benezet?

1    A.   Contractor.

2    OFF RECORD DISCUSSION

3    A.   Contractor.

4    BY ATTORNEY JOEL:

5    Q.   So you have no ownership interest in Benezet?

6    A.   Correct.

7    Q.   And you're not an employee of Benezet?

8    A.   Correct.

9    Q.   How long have you been a contractor for Benezet?

10   A.   On and off only for the work that I had done just

11   this year.  And, you know, there was a brief thing now

12   that you mention it.  I don't know if this is Benezet

13   or not.  I did forget to mention, because it was a very

14   short job, that I went to Texas on two occasions for

15   Trent Pool's father to place him on the ballot.

16   Q.   Okay.

17   A.   And I was paid ---.  Well, you haven't asked me

18   about pay, so ---.

19   Q.   We'll get there.

20   A.   Okay.

21   Q.   What was Mr. Pool --- Trent Pool's father looking

22   to become, what office?

23   A.   Two different offices.

24   Q.   What were they?

25   A.   It was Texas Supreme Court Judge at-large

58

1    position.

2    Q.    Okay.   What else?

3    A.    And it was Texas Railroad Commissioner.

4    Q.    And when was it that you went to Texas to try to

5    get signatures for Mr. Pool for either of those

6    positions?

7    A.    It was 2011 and 2013.

8    Q.    Okay.   So getting back, how ---?   Taking that

9    aside, when did you start working for --- providing

10   contract work for Benezet?

11   A.    I'm not sure if it was Benezet when I was working

12   for his father.   I'm not sure.   I honestly don't know

13   if it was for Benezet or just for the official campaign

14   name.   I don't know what the paperwork that they

15   filed ---

16   Q.    Okay.

17   A.    --- said about that.

18   Q.    When did you first begin working for Benezet?

19   A.    Like I said, it's contingent on me knowing the

20   answer to your prior question, so I'm uncertain.

21   Q.    When did you first meet Mr. Pool, Trent Pool?

22   A.    2005.

23   Q.    2005?

24   A.    Yes.

25   Q.    Did you do any work that you associated as being

59

1   provided by Mr. Pool from 2005 to the present?

2   A.   Yes.

3   Q.   Whether that was Benezet or whether that was Mr.

4   Pool calling you and saying, go to this place and

5   collect.

6   A.   Trent's father.

7   Q.   Okay.

8   A.   It would have started in 2011.  I did not work for

9   Trent before 2011.

10  Q.   So 2011 you started working for Trent, maybe

11  Benezet if it was incorporated at that point.  But

12  that's when you first started working for Pool, slash,

13  Benezet, is 2011?

14  A.   Correct.

15  Q.   And how many campaigns, how many signature

16  collection drives have you done for Pool, slash,

17  Benezet from 2011 to the present?

18  A.   How many?  I'd have to add up the previous ---.

19  Q.   Is it all of them or have you worked for other

20  contractors?

21  A.   Oh I've worked for other entities.

22  Q.   Why don't you tell me all the entities you've

23  worked for in the signature gathering field?

24  A.   Since when?  I mean, I thought that's what we just

25  did for the whole time period.

60

1   Q.   No.   You told me where you were collecting

2   signatures.

3   A.   Correct.

4   Q.   Was that on your own as a freelance?   Was that

5   working for a company like Benezet?   Was that working

6   for a campaign directly?   Who paid you?   Who employed

7   you?

8   A.   Always the people that I was putting on the ballot

9   paid me.

10  Q.   Okay.

11  A.   In all those previous situations you can assume

12  that that's the case.

13  Q.   Okay.

14  A.   For everything that I've previously mentioned, all

15  the people that I've worked for, you can assume they're

16  the ones that paid if I was gathering signatures for

17  them.

18  Q.   Okay.   So, for example, in 2016, gathering

19  signatures for Rocky as a Democrat in Pennsylvania, the

20  Rocky De La Fuente campaign paid you?

21  A.   Oh, I'm sorry.   That's correct.   They paid Benezet

22  and Benezet paid me.

23  Q.   That's what I want to know.

24  A.   Yes.

25  Q.   That's what I want to know.   So how many ---?

61

1    A.    But then I worked for Rocky later on my own and he

2    paid me directly.

3    Q.    Okay.  All right.  How many signature-gathering

4    drives have you done where Benezet was the person

5    hiring you as a contractor?

6    A.    Part of Indiana.

7    Q.    This past cycle, 2016?

8    A.    It was in 2015, I believe, although there then

9    goes into 2016 as well, but yes.

10   Q.    I'm talking about the 2016 election.

11   A.    Cycle.  Yes.  So it might have been part of 2015,

12   the work I did in 2015 and Indiana that I previously

13   mentioned ---

14   Q.    Okay.

15   A.    --- would have been for Benezet.

16   Q.    What other ones?

17   A.    Pennsylvania.

18   Q.    This time around 2016?

19   A.    Correct.

20   Q.    What else?

21   A.    Atlanta, New Mexico and Connecticut was Benezet.

22   But it could have also been that the people who

23   officially paid me --- Benezet had a subcontracting

24   deal with Alex Arsenault ---

25   Q.    Okay.

62

1   A.   --- in Connecticut.  And I don't know the name of

2   his company, but he paid me, I believe, for a portion

3   of the work because they were splitting the payment for

4   expenses.

5   Q.   And that was the Connecticut this go-around for

6   the 2016 election cycle?

7   A.   That's correct.

8   Q.   Okay.  So what other ---?  So you've worked for

9   Benezet.  You've worked possibly for Alex Arsenault and

10  his company.  What other companies or individuals have

11  you performed --- have you done this work for?  And

12  leaving aside the campaigns getting you directly.  I'll

13  get to them.  But let's talk about the businesses first

14  and then we'll talk about the campaigns that hired you.

15  A.   Only myself as an independent contractor, ---

16  Q.   Okay.

17  A.   --- that is it.  And then all the others were

18  directly to the campaign.

19  Q.   Okay.

20  A.   And/or candidates, if you want to split hairs on

21  terminology.

22  Q.   Have you ever worked with a person by the name of

23  Andy Jacobs?

24  A.   Yes.

25  Q.   When and where?

63

1   A.   Let me see.   Probably I'd say most of the petition

2   drives that I've worked on he's also worked on as an

3   independent contractor.

4   Q.   Okay.

5   A.   And naming them would probably require me to

6   mention almost everything, at least three-fourths of

7   everything I've worked on in the past.

8   Q.   Okay.   How is it that you're paid?   Are you paid

9   hourly, salary, by the signature?

10  A.   Per signature generally, seeking ---.   Although

11  that changes.   In some states per-signature pay is

12  forbidden.

13  Q.   Okay.

14  A.   And that is changed on and off as the courts ---

15  as a requirement has been defeated in the courts in

16  certain states and allowed to stand in other cases.

17  I'm sorry.   There's someone else I forgot.

18  Q.   Sure.

19  A.   I know I'm remembering ---.

20  Q.   No, that's fine.   Go ahead.

21  A.   Going back through the minutiae of my ---.

22  Q.   That's okay.

23  A.   I forgot in 2010 that I worked in Oregon for John

24  Michael and his company.   I don't recall the name of

25  his company.

64

1    Q.   And do you know what you were collecting for?

2    A.   Jeez, some initiative in Oregon.

3    Q.   Okay.  So in this 2016 campaign, when you worked

4    in Pennsylvania, did you have somebody --- a

5    Pennsylvania resident go with you and witness your

6    signature collections?

7    A.   Yes.

8    Q.   And whether it was for the Ted Cruz delegates or

9    for Rocky De La Fuente, you did obtain signatures for

10   both; correct?

11   A.   That's correct, at different times, due to the

12   nature of the witness requirement.

13   Q.   So let me break that up, because that was not a

14   very good question.  You did get signatures for Rocky

15   De La Fuente?

16   A.   Correct, as a Democrat for the primary.

17   Q.   As a Democrat for the primary you did obtain

18   signatures.  And you obtained signatures even though

19   you had a witness with you; correct?

20   A.   Correct.

21   Q.   And those signatures were notarized, I'm assuming;

22   correct?

23   A.   Correct.

24   Q.   And those signatures, at least to the best of your

25   knowledge, were not people double dipping and signing

65

1    multiple petitions; correct?

2    A.   Each one had to be qualified by me prior to

3    signing, that's correct.

4    Q.   And by part of that you had to make sure that they

5    hadn't signed somebody else's already?

6    A.   Yes.

7    Q.   Do you know how many signatures you got for Rocky?

8    A.   I don't.  It wasn't a large ---.  It wasn't an

9    exceptionally large number.  Maybe 500 or 600, if I

10   recall, but I don't recall exactly.

11   Q.   Okay.

12   A.   I do recall where I worked.  I tend to remember

13   what I consider to be more the salient facts of the

14   work, rather than, you know, specific start and stop

15   dates and things of that nature.

16   Q.   Okay.

17   A.   The nature of the work, as it were.

18   Q.   All right.  But not the number that you got, the

19   number of signatures?

20   A.   No, not exactly.  I don't run around with that

21   committed to memory.  Andy Jacobs does incidentally.

22   He's excellent with minutiae.

23   Q.   We'll ask him on Friday then.

24   A.   Sounds good.

25   Q.   What about Mr. Cruz?  Did you get signatures from

66

1    Mr. Cruz?

2    A.   Yes, in two different districts.

3    Q.   Do you remember how many you got?

4    A.   A small number in District 14.  I largely was

5    prevented from finishing my work in District 14 due to

6    the witness requirement there.  So that was kind of a

7    hassle.

8    Q.   Okay.  Did you get signatures for Mr. Cruz in

9    District 14?

10   A.   Yes.

11   Q.   Okay.  Did you have a witness with you?

12   A.   Yes.

13   Q.   Were they notarized?

14   A.   Yes.

15   Q.   And did you qualify people to make sure they

16   hadn't signed more than --- another petition already?

17   A.   Yes.

18   Q.   And what other district did you work in for Mr.

19   Cruz?

20   A.   State College.  I believe that's District 5

21   although don't quote me on that, because I'm not

22   totally certain.

23   Q.   Okay.  Did you get signatures from Mr. Cruz in the

24   State College area, in State College?

25   A.   That's correct.

67

1   Q.   And you did that with a witness?

2   A.   That's correct.

3   Q.   And their signatures were properly notarized?

4   A.   That's correct.

5   Q.   And you made sure before people signed that they

6   hadn't signed somebody else's petition?

7   A.   That's correct.

8   Q.   Do you know how many you got there in State

9   College?

10  A.   A few hundred, enough to qualify each one in

11  conjunction with the few hundred that Andy Jacobs got

12  as well.  And also that ---.  I believe that one of the

13  delegates went out and gathered some as a volunteer,

14  so ---.

15  Q.   And Ted Cruz was to get his delegates on the

16  ballot?

17  A.   That's correct.

18  Q.   Okay.

19  A.   And also Rocky's delegates for Rocky.

20  Q.   Did Rocky have any delegates?

21  A.   Yes.

22  Q.   How many?

23  A.   I believe three.

24  Q.   Three?

25  A.   I think that's standard.  I'm not sure if I'm

68

1  remembering that correctly.  I think I am, though, as

2  far as the delegates for Rocky.

3  Q.  Okay.  We can check the official ---

4  A.  Yeah.

5  Q.  --- and see if he had delegates or not.

6  A.  Uh-huh (yes).

7  Q.  I'm just trying to get your recollection of it.

8  A.  Now that I think about it, Rocky, I don't know if

9  he had delegates or not.  I can't remember.  I don't

10  have that in my mind.

11  Q.  Okay.  From 2011 on how much of your annual

12  compensation has been through signature gathering?  All

13  of it, most of it, some of it?

14  A.  Most of it.

15  Q.  Most of it?  How about since you started in this

16  business?

17  A.  Most of it, most years.

18  Q.  Most?

19  A.  Except for 2007 and ---.  Yeah, except for 2007.

20  Q.  For all of the work you've done as a signature

21  collector, have you always been paid per signature?

22  You have to say yes or no for her.

23  A.  I'm thinking.

24  Q.  Oh, okay.  I thought I saw you nodding.  I'm

25  sorry.

69

1   A.   No.

2   Q.   Okay.

3   A.   Because that would require me to break the law in

4   certain states, which I did not do.

5   Q.   Okay.

6   A.   In the no paper signature states I gathered on an

7   hourly basis.

8   Q.   Okay.  So if I understand you correctly, there are

9   some states where you can't be paid per signature

10  pursuant to state law.  In those states ---

11  A.   Yes.

12  Q.   --- you get an hourly rate?

13  A.   Yes.  And in those states that hourly rate is

14  commensurate with what I would make on a per-signature

15  basis.  It's just a --- essentially an extra paperwork

16  requirement designed by the state to try to eliminate

17  choices from the ballot.  It requires the initiative

18  proponents to file significantly more paperwork,

19  so ---.

20  Q.   Okay.

21  A.   I think the only state that that was the case in,

22  to my recollection, was Oregon.

23  Q.   Okay.

24  A.   It could have also have been Montana.  It was

25  several years ago.

70

1   Q.   In every other state where you were allowed to be
2   paid per signature that's how you've been paid?
3   A.   Yes or by registration.
4   Q.   Okay.  When you're on the road going to all these
5   states, do you go back to your home in Alaska in
6   between or do you just go from state to state to state
7   usually?
8   A.   State to state.
9   Q.   Okay.  Did you collect any signatures ---?  Are
10  you familiar with an initiative out in Pittsburgh by
11  OpenPittsburgh to get a ballot measure on ---?
12  A.   I'm aware of it.
13  Q.   Did you collect any signatures for that?
14  A.   I did not.
15  Q.   Are you aware that you're a named plaintiff in
16  that case?
17  A.   I believe that that was a paperwork error.
18  Q.   Oh.  Did you have any involvement with the
19  managing or recruiting or anything like that, any of
20  the folks who collected the signatures on behalf of
21  OpenPittsburgh?
22  A.   No.
23  Q.   Okay.  And you didn't collect any signatures
24  yourself?  You didn't come into Pittsburgh and do that?
25  A.   Correct, I did not.

1   Q.    Okay.  Why do you think it was a paperwork error?

2   A.    I assume that.

3   Q.    Why do you assume that?

4   A.    Because I didn't work there.

5   Q.    Huh?

6   A.    Because I didn't work there.

7                    ATTORNEY ROSSI:

8                    That's not what he's asking you.  He's

9   asking you about you being a plaintiff in that case,

10  not circulating petitions there.

11  A.    Right.  I assume it's a paperwork error, because I

12  didn't go to Pennsylvania, or I didn't go to Pittsburgh

13  for that initiative when it was going on.  So,

14  therefore, I assume that it was a paperwork error, ---

15  BY ATTORNEY JOEL:

16  Q.    Okay.

17  A.    --- if I was named ---.

18  Q.    Let me get at it ---.  No, no.  Let me get at it

19  this way.  Are you aware that you are a plaintiff

20  challenging on constitutional grounds various

21  provisions of Pittsburgh's home rule charter as it

22  relates to placing a referendum on the ballot?

23  A.    I believe that he had mentioned that I was listed

24  incorrectly as having worked on the OpenPittsburgh

25  initiative and that is the only thing that he had said

72

1    to me.

2                    ATTORNEY ROSSI:

3                    Can you clarify the question, please, for

4    him?

5                    ATTORNEY RADZIEWICZ:

6                    Maybe explain what the plaintiff is?

7                    ATTORNEY JOEL:

8                    We'll take a break.

9                    ATTORNEY ROSSI:

10                   Yeah.

11                   ATTORNEY JOEL:

12                   Let's go get the Complaint.

13                   ATTORNEY RADZIEWICZ:

14                   Okay.

15   SHORT BREAK TAKEN

16   BY ATTORNEY JOEL:

17   Q.   With your work with Benezet, do you have a

18   contract with them or is it just Trent picks up the

19   phone or e-mails you and says, go here or go there?

20   A.   That would technically be an oral contract, would

21   it not?

22   Q.   Maybe, maybe not.  Do you have a written contract

23   with Benezet to perform work?

24   A.   No.

25   Q.   Okay.  Have you ever had a written contract with

73

1   Benezet to perform work?

2   A.   Not that I can recall.

3   Q.   Okay.

4   A.   He may have shown me one once briefly and I just

5   forgot about it.  So I mean if he produces that then I

6   wouldn't be surprised, but ---.

7   Q.   For this past work that you did in Pennsylvania,

8   how much did you pay per signature?

9   A.   It's difficult to calculate exactly.  I believe it

10  was $3 and then it was a $1.50 override if I could

11  induce the witness to gather their own signatures on

12  his own.

13  Q.   What does that mean?

14  A.   If the witness was willing to gather any

15  signatures, then I was to be paid an additional amount

16  for any signatures that the witness gathered.

17  Q.   Oh, okay.

18  A.   So I would have to train him and get him to

19  produce and explain to him how to stop people and how

20  to not interfere with my signature gathering.  And so

21  that's ---.  It was just kind of prorated out to help

22  defer the cost of having a witness with me.

23  Q.   Okay.  So you mentioned training.  Did you get any

24  training to be able to be a professional signature

25  gatherer?

74

1   A.   In 2002, yes.

2   Q.   What did you get?

3   A.   I was taken to a location in Lansing, Michigan for

4   one day of petitioning on a college campus and taught

5   how to get people to stop and sign the petition, how to

6   get the maximum number of people to stop and sign a

7   petition, how to be very polite, exceptionally polite,

8   smile, make eye contact, that sort of thing.

9   Q.   Okay.  Who provided the training?

10  A.   Scott Coolhouse (phonetic).

11  Q.   Is he a professional signature gatherer as well or

12  what's his business?

13  A.   Yes.

14  Q.   Okay.

15  A.   He may call himself a campaign consultant

16  variously.  I don't want to label what he's done with

17  himself since that time.  I don't really know.

18  Q.   When you turn the signatures at --- strike that.

19       Let me again ask it this way.  When is it that you

20  get paid?  Is it when the signatures are turned in?  Is

21  it after some sort of an objection or challenge period

22  is run?  When do you get paid?

23  A.   It entirely depends on the campaign.

24  Q.   Okay.  How about this last go-around of

25  Pennsylvania?

75

A.   I was paid within one month of completing.  It was after signatures have been turned in.  And I don't know whether the campaigns had accessed the ballot at that point or not.

Q.   Okay.  So then within about a month of you turning them in you were paid?  Did I hear that correctly?

A.   Yes.  I had a payment dispute with Trent, though, so ---.

Q.   What was that over?

A.   I believe that I was not completely paid for one of the districts.

Q.   Why do you think you were not completely paid?

A.   He claimed that he did not owe me money, my calculations were something different.

Q.   Okay.  Was that based on a per-signature ---?

A.   For District 14, for Ted Cruz.

Q.   Okay.

A.   Where Ted Cruz failed to access the ballot.  Where his delegates failed to access the ballot.

Q.   Did you end up getting paid for that?

A.   I was either paid for that or I was paid for what I did in Atlanta.  And then I quit working for Trent over that dispute.

Q.   So you're no longer doing collection services for Benezet or for Trent?

76

1   A.   Correct.

2   Q.   How much money was at stake?

3   A.   $934.   And that district was the district where

4   for the first day there was no witness ready to go and

5   I had to --- you know, I want to be able to get into

6   that district and start working right away.   I need to

7   make money on this job.   So that was District 14 for

8   Ted Cruz.

9   Q.   Okay.

10  A.   Or Ted Cruz's delegates, as it were.   Because

11  technically the candidate doesn't get put on the

12  ballot, the delegates do, so ---.

13              ATTORNEY JOEL:

14              Okay.   Why don't you mark that?

15  OFF RECORD DISCUSSION

16              (Defendant's Exhibit 3 marked for

17              identification.)

18              ATTORNEY JOEL:

19              I'm showing you what's been marked as

20  Defendant's 3.   There may be an amended complaint after

21  that, but ---.

22              ATTORNEY ROSSI:

23              There is.

24              ATTORNEY JOEL:

25              Okay.   For purposes of this question,   ---

77

1          ATTORNEY ROSSI:

2          Absolutely.

3          ATTORNEY JOEL:

4          --- I think this will be fine.

5    BY ATTORNEY JOEL:

6    Q.   Turn.  Keep turning.  Keep turning.  Keep turning.

7    I mean, you can read where you want, but I've just got

8    a question.

9    A.   Uh-huh (yes).

10   Q.   Keep going.  Oh, that might be it.  All right.

11   Paragraph 16.  Nope.  There you go.  Paragraph 16, at

12   the bottom of that page, it mentions you being a

13   professional circulator for the plaintiff in that case.

14   Does that help you at all in terms of know anything

15   about that OpenPittsburgh case and your constitutional

16   challenges in it?

17   A.   I'd have to read it fully.

18   Q.   Sure.

19   WITNESS REVIEWS DOCUMENT

20   A.   Yeah.  Okay.  I knew of the initiative ---

21   BY ATTORNEY JOEL:

22   Q.   Okay.

23   A.   --- to an extent.  I didn't wind up working on it.

24   Q.   I understand that, too.  My question was, though,

25   do you know that you're a plaintiff in this lawsuit

78

1   challenging parts of the City of Pittsburgh's home rule
2   laws?
3   A.   Yes.  And to clarify, ---
4   Q.   Sure.
5   A.   --- I did not ---.  I was unfamiliar with the
6   exact wording or terminology there.  And so I thought
7   to be a plaintiff that I would have had to have worked
8   on that case there.  I was just not thinking.
9   Q.   Okay.  That's fine.
10  A.   I'm sorry.
11  Q.   That's fine.  That's why I showed you that.  I was
12  hoping that would help.  So you recognize that you're a
13  plaintiff in that litigation?
14  A.   Yes.
15  Q.   Are you aware that there was a preliminary
16  injunction hearing held on August 8th as it relates to
17  that case?
18  A.   I did not know the exact date of any hearings.
19  Q.   Okay.  You were not in Pittsburgh to attend or
20  participate in any hearing; correct?
21  A.   That's correct.
22  Q.   On August 8th were you out collecting signatures
23  some place?
24  A.   Yes.
25  Q.   Where?

79

1   A.   North Dakota.

2   Q.   Sorry.  When did you ---?

3   A.   By the way.  The way that I found out about the

4   OpenPittsburgh initiative was from Trent mentioning

5   that he might have work ---

6   Q.   Okay.

7   A.   --- in Pittsburgh.  And this was at the time of

8   the New Mexico job.

9   Q.   New Mexico or North Dakota?

10  A.   There was the possibility of me going to

11  Pittsburgh to work on the OpenPittsburgh.  It was

12  discussed between myself and Trent when I was in the

13  same hotel room that Trent was staying in, in New

14  Mexico.

15  Q.   Oh, okay.  Okay.

16  A.   So a couple of months prior.

17  Q.   Got it.  And then on August 8th you were actually

18  in North Dakota collecting signatures on another

19  matter?

20  A.   That's correct.

21  Q.   And I'm not sure if you pinned it down or not.

22  When did you separate your business relationship with

23  Mr. Pool and Benezet?

24  A.   Never formally.

25  Q.   Okay.

80

1   A.   But I would say I am not working for him in North

2   Dakota.

3   Q.   Okay.

4   A.   Had he called me up and said that he had work,

5   then I would have had to have heard what he was

6   offering.

7   Q.   Okay.  After the Pennsylvania work for Mr. Pool

8   and Benezet this past winter, have you done any more

9   work for Benezet or Trent Pool?

10  A.   Can you ask the question again?

11  Q.   Sure.  Let me get at it this way.  When you were

12  collecting signatures in Pennsylvania this past winter

13  for Cruz and Rocky, was that on behalf of Benezet?

14  A.   Correct.

15  Q.   Okay.  That's what I thought.  I just want to make

16  sure.  Since that job have you done any other jobs on

17  behalf of Benezet?

18  A.   Yes.

19  Q.   Which ones?

20  A.   Atlanta was the last one.

21  Q.   Atlanta was the last one.  And when was that?

22  A.   It would have been right before I went to North

23  Dakota.

24  Q.   Okay.  So since Atlanta was the last job you did

25  for Benezet, you haven't done any jobs for Benezet from

1    that point?

2    A.    Yes.

3    Q.    But if I understand you correctly if Mr. Pool

4    calls you with an opportunity and it sounds good

5    enough, you'll go back to working for him?

6    A.    Yeah.

7    Q.    Okay.

8    A.    Especially if he pays me the $934.

9    Q.    Do you know any of the people who collected

10   signatures in Pittsburgh for the OpenPittsburgh

11   initiative?

12   A.    I don't know if I know them.  I'd have to see a

13   list of the names.

14   Q.    Okay.  I didn't know if maybe Trent mentioned

15   anything to you?

16   A.    He only mentioned who was going --- who he wanted

17   to go there when we were discussing it.  But as I

18   understand it, I guess he didn't wind up sending

19   anyone.

20   Q.    Okay.

21   A.    Is that the case?  I don't know.

22   Q.    You don't know who he sent?  Okay.

23   A.    Well, if you give me a list of the names, then I

24   can tell you.  I don't think he sent anyone though,

25   so ---.  And I don't know if someone other than Trent

82

1    sent people I know into working OpenPittsburgh.

2    Q.   Okay.

3    A.   In the petitioning industry there are lots of

4    people that travel from state to state placing

5    initiatives and candidates on the ballot in exchange

6    for money.

7    Q.   Do you work for any of those others or have ---?

8    Yeah.  Do you currently work for any of those other

9    businesses?

10   A.   I didn't say that they were businesses.  I said

11   that they were people.

12   Q.   Oh, okay.

13   A.   They generally are independent contractors.

14   Q.   Like you are?

15   A.   And they generally travel from state to state

16   placing initiatives and referenda and candidates on the

17   ballot and parties on the ballot.

18   Q.   Like you did?

19   A.   Correct.

20   Q.   Is there anything in your relationship with

21   Benezet, for example, that would preclude you from

22   working for another individual or another business to

23   collect signatures?

24   A.   No.  Although I mean that's ---.  That could be an

25   expansively-interpreted question.  So I don't know what

83

1   sense you mean that in.  Because if Benezet has a sole

2   contract on a petitioning job in some state for some

3   client then, therefore, I wouldn't be able to work for

4   anybody else.

5   Q.   Okay.  Excepting that, let's assume going to

6   collect signatures for Donald Trump in Ohio, just to

7   say.  If there's a whole bunch of people doing that,

8   there's nothing in your relationship with Benezet that

9   would prevent you from working for Benezet or for

10  working for yourself or for working for any other

11  number of these folks in this industry; correct?

12  A.   That's correct.

13  Q.   Okay.

14  A.   Although, as I mentioned, a lot of times there are

15  companies that have a sole contractor or a sole

16  relationship.  There is also the --- a monopoly aspect

17  in certain cases where people live in a certain state.

18  And there's a prohibition on out-of-state petition

19  circulation.  So that would prevent me, if someone in

20  state had gotten that deal as a monopoly due to their

21  residency status.

22  Q.   What other states have that sort of requirement

23  that you're aware of?

24  A.   A lot of them do it for ---.

25                  ATTORNEY ROSSI:

84

1          I'm going to object to that.  That calls

2    for a legal conclusion and I don't think he's qualified

3    to make an opinion on it.  I mean, I don't care ---.  I

4    don't mind the answer, but I think that's a --- that

5    he's not in a position to answer that question

6    appropriately.

7                    ATTORNEY JOEL:

8          He has given plenty of legal opinions

9    today.  I think he's been doing this long enough he can

10   tell me what he knows, what his understanding is.

11                    ATTORNEY ROSSI:

12         You can answer the question.  I'm

13   recording my objection.

14   A.   Okay.  Out-of-state petitioner bans, when and

15   where they've been struck down, I indicated that I

16   previously didn't really know exactly where they've

17   been struck down.  But as far as I ---.  I mean,

18   obviously in Pennsylvania, but there's Illinois, but,

19   you know ---. Oh, no, not for an out-of-state

20   petitioner ban, only for multiple candidates.

21       I think that the last onerous one that struck down

22   or that maybe is still onerous is that there were a

23   bunch of western states right around the time that I

24   was hired in 2006 that had an out-of-state petitioner

25   ban and also had the pay-per-signature bans as well.

85

1    Q.   How about notary requirements?

2    A.   They do, but they're different in the other states

3    than in Pennsylvania.

4    Q.   And I think you just mentioned having people

5    double dip and sign multiple petitions.  That exists

6    elsewhere as well?

7    A.   Is double dip the term ---?

8                 ATTORNEY ROSSI:

9                 I'm going to object to that as well.  It

10   calls for a legal conclusion.

11   A.   Is that terminology that you came up with?

12                ATTORNEY ROSSI:

13                Hang on.  Let me make my objection.

14   Objection, legal conclusion.  He's not capable ---.

15   He's not competent to answer that question precisely,

16   but you may answer the question.

17   A.   Can you clarify what you mean by double dip?

18   BY ATTORNEY JOEL:

19   Q.   Sure, signing more than one petition.

20   A.   Okay.  Did you invent that term?

21   Q.   No.  I've seen it before, but ---.

22   A.   Okay.

23   Q.   But are you aware of other states where there are

24   prohibitions on signing more than one petition?

25   A.   Yes, there are.

86

1   Q.   Okay.

2   A.   For candidates, not for initiatives.

3   Q.   Getting back to the OpenPittsburgh constitutional

4   challenge.  Are you aware that the signatures that were

5   gathered in that case have been stricken by the

6   Allegheny Court of Common Pleas?

7   A.   I was not certain whether there were signatures

8   stricken or whether it failed to access the ballot for

9   another reason.

10  Q.   Okay.

11  A.   I don't know of the reasons.  If there are

12  multiple reasons or only one, I don't know.

13  Q.   When you're collecting signatures in various

14  locations, if it's different for a location, let me

15  know.  But I'm assuming ---.  I would assume that you

16  give your best efforts on whatever campaign or

17  candidate or party you happen to be working on at that

18  point; is that fair?

19  A.   I don't know if it's always fair to say that.

20  Just because when you say best efforts, I can go above

21  and beyond the call of duty in campaigning or handing

22  out literature and hand out literature for certain

23  candidates but not for others.  So I would consider

24  that question to be somewhat confusing or

25  indeterminate.  Because if I don't hand out candidate's

87

1    literature then sometimes they would consider that to

2    not be doing above and beyond or doing my best as it

3    were.   I mean, best is a scale or value, so ---.

4    Q.   Okay.   Let's ask it this way then.   When you are

5    in a state collecting signatures for a candidate, let's

6    take collecting for Cruz here in Pennsylvania this past

7    time, you get paid per signature you collect; correct?

8    A.   Yes.

9    Q.   You're trying to, therefore, collect as many

10   signatures as you can; correct?

11   A.   Correct.

12   Q.   If you are hauled out of Pennsylvania to go give a

13   deposition some place, you're not in Pennsylvania

14   collecting signatures; correct?

15   A.   Correct.

16   Q.   And if we change that to, let's suppose you're

17   collecting signatures for an initiative in North

18   Dakota, you get paid per signature?

19   A.   Correct.

20   Q.   And the more signatures you get the more money you

21   make?

22   A.   Correct.

23   Q.   And your goal, I'm assuming, is try to make as

24   much money as you can?

25   A.   Correct.

88

1    Q.    And if you're hauled out of North Dakota because

2    you have to go defend someplace else about signatures,

3    that's time away from North Dakota that you're not

4    collecting your signatures; correct?

5    A.    Yes, unless it's after the deadline.

6    Q.    Suppose it's not after the deadline.

7    A.    Then that'd be correct.

8                    ATTORNEY JOEL:

9                    Okay.  I think I'm just about done.  A

10   couple minutes to talk to my colleague.

11   SHORT BREAK TAKEN

12   BY ATTORNEY JOEL:

13   Q.    Mr. Witmer, have you ever in connection with your

14   signature collection efforts recruited others into this

15   business?

16   A.    Yes.

17   Q.    Okay.  How many times have you done that?

18   A.    Typically too many to count.

19   Q.    Okay.

20   A.    I don't know.

21   Q.    Have you provided them with any training ---

22   A.    Yes.

23   Q.    --- on how to collect signatures, how to do it

24   politely, make eye contact, get people to sign, that

25   sort of stuff?

89

1    A.   Yes.

2                    ATTORNEY JOEL:

3              Okay.  I think that's it.  I may have

4    some after Mr. Rossi questions you, but I think I'm

5    good.  Thank you.

6    EXAMINATION

7    BY ATTORNEY ROSSI:

8    Q.   Let's get your ---.  I mean, you were asked by

9    opposing counsel if you give your hundred percent

10   effort for every candidate, you know, or above and

11   beyond, just to paraphrase.  I think you also testified

12   that your heart is with the Libertarian Party and their

13   candidates.  Is that fair to say?

14   A.   With all Libertarians.

15   Q.   Okay.

16   A.   Correct.

17   Q.   Okay.

18   A.   So in the case of a Ron Paul or the case of a Ted

19   Cruz, then I would tend to be more sympathetic to those

20   types of candidates in the Republication party.

21   Q.   So you would gravitate towards those candidates

22   first and foremost that ---?

23   A.   Yeah.  Sort of Libertarian-leaning Democrat like

24   Rocky De La Fuente.

25   Q.   Can you repeat that?

1   A.   Yes.   Sort of a Libertarian-leaning Democrat like
2   Rocky De La Fuente.
3   Q.   Oh.   I just had never heard him described as a
4   Libertarian-leaning Democrat.   Okay.   That's nice to
5   know.   I'm sorry.
6   A.   Yeah.
7   Q.   That surprised me.
8   A.   No worries.   I saw that only because of his
9   stances on the 9th and 10th Amendments on his website.
10  Q.   Okay.   Fair enough.   Fair enough.   I see that
11  based on the testimony that you gave earlier in your
12  deposition you did a lot of work primarily for
13  Libertarian candidates from --- not exclusively, but
14  from 2002 through 2004.   Was that because you were a
15  volunteer at that point or were you receiving
16  compensation?
17  A.   I was receiving compensation, but I felt that I
18  had a personal stake in them accessing the ballot.
19  Q.   Okay.   So moving forward if you had a choice
20  between ---?
21  A.   in 2009 I decided that I would circulate for any
22  candidate but not an anti-Libertarian initiative.
23  Q.   So you have a threshold of acceptable candidates
24  for whom you would circulate for?
25  A.   Correct.

1   Q.   Would you ever circulate for Hillary Clinton?

2   A.   No.

3   Q.   Okay.  For any amount of money?

4   A.   It'd have to be pretty high.

5   Q.   Fair enough.  So the candidates you have supported

6   generally reflect in your estimation a consistent

7   political viewpoint of yours and getting them on the

8   ballot?

9   A.   Yes.  Until 2009.  After 2009 the only reason I

10  would circulate for anyone else is because I thought

11  that they should obtain access to the ballot because

12  everyone has a right to access the ballot.

13  Q.   Okay.  Fair enough.  So your viewpoints have

14  evolved a little bit over time ---

15  A.   Yes.

16  Q.   --- with respect to that ballot act.  So your

17  main ---?  Which is more important to you right now, a

18  libertarian, small L, getting ballot access or anyone

19  ballot access at this point?

20  A.   Anyone who pays me.  And that's also because the

21  quality of the Libertarian Party has degraded over the

22  last couple of years.

23  Q.   Fair enough.  Now we were talking earlier about

24  exclusionary rule.  I just wanted to ---.  And that was

25  your testimony, that some states don't have an

92

1   exclusionary rule.

2   A.   Yes.

3   Q.   What does that mean?  What is an exclusionary

4   rule, in your vernacular?

5   A.   There are different and Byzantine ballot access

6   regulations in every state.  And an exclusionary rule

7   would be anything that makes it more difficult to

8   gather signatures.

9   Q.   So you're not --- when ---?

10  A.   So it could mean excessive notarization

11  requirements.  It could be a small number of signatures

12  per page.  It could be an out-of-state signature ban.

13  It could be a pay-per-signature prohibition, which

14  technically violates my right to contract, in my

15  opinion.  And, you know, however we want to write the

16  contract is how we write a contract in states that

17  don't have that prohibition.  And then there's a

18  restriction on how the contract can be written.  So ---

19  Q.   Okay.

20  A.   --- I would see that as exclusionary --- and it

21  also complicates things more.

22  Q.   So when you testified earlier and used that

23  terminology, you are --- you are speaking more broadly

24  than what Mr. Joel described as double dipping as

25  prohibition on voters from signing more than one paper

93

1   at a time?

2   A.   Yeah.  I've never heard the term double

3   dipping ---

4   Q.   Well, that's fair.

5   A.   --- with regard to the ---.  Typically a

6   petitioner would say like piggybacking or stacking

7   petitions, like can that be done in a certain state, if

8   they're ascribing a job to another petitioner.  And

9   that would be the nature of that.

10   Q.   Okay.  But as Mr. Joel used it, it was pretty

11   clear he was discussing signing more than one nominee

12   petition per paper?

13   A.   Correct.

14   Q.   Is that your understanding of his question?  And

15   your answer to it?

16   A.   Yeah, I think so.

17   Q.   But exclusionary rules, your definition is simply

18   a much broader --- that double dipping would be one

19   component of exclusionary ---?

20   A.   A prohibition on double dipping as he calls it?

21   Q.   Yeah.  Would be equivalent to other ballot acts,

22   restrictions?

23   A.   Yes.

24   Q.   So an exclusionary rule, in your vernacular, is

25   the universe about access restrictions?

94

1    A.   Yes.

2    Q.   And in your view some states are better at

3    allowing ballot access than others?

4    A.   Yeah.  Not just in my opinion.  But I mean that's

5    like a pretty demonstrable fact.  I mean, that's widely

6    known and understood in the petition industry.  Every

7    single petitioner understands that, every single

8    proponent understands that.  Everybody knows that

9    that's the case.

10   Q.   Okay.

11   A.   And, in fact, if you're talking with certain

12   proponents or certain petitioners and you're talking

13   with a proponent about, do they want to get on the

14   ballot in a certain state, they may say no or they may

15   say yes based on the difficulty and the number of

16   restrictions.  You know, because every instruction

17   increases the cost of a petition to all involved.

18   Q.   Okay.  And restrictions limits your ability, in

19   your experience, to access and to --- strike that.

20        These various ballet access restrictions, in your

21   estimation and in your experience, limits your ability

22   to interact with voters?

23   A.   Yes.

24   Q.   Okay.  Let me ---.

25   A.   And frequently and in many different ways.  All

95

1    right?   Because they could totally limit my ability to
2    interact with a single voter by keeping me out of the
3    state.   And that I could be kept out of the state
4    because the requirement is so onerous that I can't make
5    good money complying with it or it could prevent the
6    entire attempt about access from even happening.   And
7    so someone would say, well, we think we're going to
8    have work for you, you know, at such and such a time
9    and then it turns out that we don't because of these
10   restrictions.
11   Q.   In those states ---?   Are there states that
12   allow ---?   Just to get it on the record, have you
13   circulated petitions in states which allow more than
14   one petitioner paper to be signed at a time?
15   A.   Yes, that's the case with most states ---
16   Q.   Okay.   And it's your testimony today ---?
17   A.   --- that I work in.
18   Q    It's your testimony today that many voters like to
19   sign more than one paper?
20   A.   Yes.
21   Q.   Okay.   Have they ever explained to you why they
22   want to?
23   A.   All the time, yes.
24   Q.   And give us some of those explanations that you've
25   been privy to.

96

1    A.   Okay.   I thought they were already on the ballot.

2    No, sir, we have to go out and gather petition

3    signatures if you want candidates on the ballot.  Or

4    no, ma'am, we have to go out and gather thousands and

5    thousands of petition signatures if you want a choice

6    on the ballot.  And then a lot of them will express

7    incredulity that that's the case and they think I'm

8    trying to scam them or something.  And so I'd have to

9    explain to them that no, in fact, if you want any

10   Republicans or any Democrats on the ballot, you have to

11   --- for those candidates somebody in your district,

12   some number of signature signers in your district in

13   the past have, in fact, signed petitions to place these

14   candidates on the ballot.

15        And then a lot of the times they'll say, well,

16   okay.  Or let me take a look at it as long as I don't

17   have to give any personal information.  At which point

18   in time if they do have to give personal information,

19   then I have to explain to them, you know, well, it just

20   goes to, you know, either the Secretary of State's

21   Office or to whoever the election authority is in that

22   state.  And then, in fact, it is required for them to

23   access the ballot.

24        And there are other ---.  There are many other

25   exclamations.  It's not just that objection or

1  that ---.   What do the voters think?   The voters think
2  all different kinds of things.   And they might say,
3  well, you know, can I sign for such and such a
4  candidate?   Usually the candidate of their preference.
5  And if that candidate is in the stack of petitions that
6  I have, then I say, yes, and by the way ---.

7      I would say --- very, like almost every petition
8  signer in North Dakota, Gary Johnson was popular and I
9  was explaining to them that he was already on the
10 ballot.   You know, we put him on previously in the
11 election cycle or the Libertarians had ballot access
12 because of our previous work in the election cycle.
13 I had to make it clear to them that I wasn't just a
14 partisan Libertarian or that I wasn't just a partisan,
15 a Constitution promoter, that I wasn't just a partisan
16 Green Party supporter.

17     And I would say that one-third of the people
18 primarily were stopping because they wanted Jill Stein
19 on the ballot and they were previous Bernie supporters.
20 And when I said can you sign for these other
21 candidates?   They would say, of course, of course,
22 would be the typical response.   So that leads me to
23 believe that they want multiple choices on the ballot
24 and only rarely would they expressly state that, but I
25 got many of courses throughout the day.

98

1    Q.   And now ---.

2    A.   And other variations of that.  Sorry.  I didn't

3    mean to ---.

4    Q.   No.  You were testifying, I was talking over you.

5    I apologize.  Now, during this deposition Mr. Joel

6    asked you in all these various states that you

7    petitioned in, whether or not you circulated different

8    locations.  Now in Pennsylvania you testified that you

9    circulated different locations previously, I believe?

10   A.   Yes.

11   Q.   And when you --- when you moved from one location

12   to another, does the in-state witness usually follow

13   you around to different parts of the state?

14   A.   They have to.  Oh, no, no.  I'm sorry.  There

15   would be a different witness in each congressional

16   district and a different witness for each candidate, of

17   course.  Because a Democrat can't witness for Ted Cruz

18   and vice versa.

19   Q.   Yeah.  Okay.

20   A.   So I had two witnesses at least in District 14 and

21   I had a witness in District 5 and I didn't do Rocky in

22   District 5.

23   Q.   Okay.  Does it take additional ---?  Are you done?

24   A.   Yeah.  Yeah.

25   Q.   Okay.

99

1   A.   I did actually do Rocky in District 5, now that I
2   recall.  So I had two witnesses in both.
3   Q.   Okay.  When you switch witnesses, does that impede
4   your ability to get up and running in the new district?
5   A.   Yes.
6   Q.   Why?
7   A.   Every time that a witness is called to a petition
8   location, that impedes the gathering of signatures.
9   Like each and every day they're late a lot of times.
10  They say that they can't work that day, got to find a
11  different witness, whatever is, so ---.  And if they
12  have to follow you to a different district because you
13  don't have like a Democrat in one district and you've
14  got the Democrat to go with you or you've got to get
15  the Republican to go with you, then that also will of
16  course be a huge obstacle.  And of course a separate
17  hotel room in some cases would have to be provided for,
18  for that.  So that increases the cost of the campaign.
19  Q.   Now in your experience are witnesses paid per
20  signature or how --- are?  Strike that.
21       In your experience how are witnesses paid in
22  Pennsylvania?
23  A.   Almost everywhere witnesses are paid hourly.
24  Q.   Okay.
25  A.   Because they won't go out and produce.

100

1   Q.   Okay.

2   A.   If they are producing per signature, it's

3   commonplace to pay them some additional small amount on

4   top of what they're paid hourly.  So that it in theory

5   works out to what the, you know, circulator is being

6   paid.

7   Q.   Okay.

8   A.   Although that's never the case, ---

9   Q.   Okay.

10  A.   --- generally speaking.

11  Q.   Have you ever had a witness that ---?

12  A.   Match my hourly rate?

13  Q.   Yes.

14  A.   No.

15  Q.   Has there ever been a situation where you wanted

16  to move, like ---?  Has there ever been a situation in

17  Pennsylvania where you wanted to move around and the

18  witness would not want to --- wanted to stay stationary

19  or ---?

20  A.   Yes.  However, that wasn't a significant

21  obstacle, because they were told, then, to listen to me

22  and to go where I wanted to go, in Pennsylvania.  But

23  in Connecticut it was a big obstacle.

24  Q.   Okay.  How so?

25  A.   There was a guy who was handicapped and couldn't

101

1   move around very well, so he just only wanted to stay

2   seated in one place.

3   Q.   Okay.

4   A.   And, you know, also generally objecting to --- you

5   know, he was also trying to get me to allow him to stay

6   at home and just lie.  You know, like trying to

7   pressure me there.  So I said, no, no, you have to come

8   out and sit in Walmart or wherever it was that I had

9   permission at that date.

10  Q.   Okay.

11  A.   And in Pennsylvania there is one additional

12  similar case where there was a problem where I was

13  petitioning and the witness got me kicked out of the

14  location.  So just him being there ---

15  Q.   How so?

16  A.   --- attracted security onto himself and myself,

17  insisting that we leave.  And they didn't leave, I'm

18  certain, because of me, because they approached him,

19  told him to stop loitering.  And just for the record he

20  may have been racially profiled, African American.  And

21  so he was told that he can't be loitering in front of

22  the store.  And they said, and tell your buddy, you

23  know, to leave, too, you know.

24  Q.   Okay.  So this was a store or private property

25  kind of situation where ---?

1  A.   And I saw them looking over at me, then, ---
2  Q.   Okay.
3  A.   --- when they came to talk to him.  And so I
4  presume that they would not have even known that I was
5  around there if he had not been asked to leave.  And so
6  then we had to get a new location, which that is
7  actually a very commonplace occurrence, where a witness
8  will unwittingly cause a petitioner to --- he has to
9  leave a location because they're standing around and
10 there are no loitering signs around.  And so they don't
11 want some guy standing there all day, you know, ---
12 Q.   Okay.
13 A.   --- in the same place anyway.  They tend to not
14 move around very much.  Like they tend to not be doing
15 what I'm doing, which is going around asking people to
16 sign, which looks like a more natural action,
17 apparently, to people who may be sitting in front of a
18 security camera or security monitor.
19 Q.   Now, in Pennsylvania the witness --- it's your
20 understanding that the witness has to execute the
21 affidavit to circulate; correct?
22 A.   Correct.
23 Q.   Now, there are hundreds of thousands of notary
24 publics in Pennsylvania, you're aware of that?
25 A.   I was not aware of that, because I only know of

103

1    one of them who would agree to meet late at night.

2    Q.   Okay.  So late at night, why would you meet with a

3    notary late at night?

4    A.   That's when I'm done petitioning for the day.

5    Q.   Okay.

6    A.   There were some people who interrupted their

7    petitioning day to go drive to a bank, get petition

8    signatures notarized and then drive back to a location.

9    Which if you consider it may be that the bank is even

10   30 or 40 minutes away and you've got to be there by

11   5:00 p.m. by the time the bank closes, that's ---.

12   Q.   Okay.

13   A.   And interruption of my day that I did not care to

14   do myself.  I did not want to reduce by one or two

15   hours the amount of signatures that I was gathering in

16   the middle of the day.

17   Q.   So stopping to get papers notarized limits your

18   ability to get signatures?  You know, it takes ---

19   A.   Yes.

20   Q.   --- time away from your signature gathering?

21   A.   Yes.  In the middle of the day.  And there are

22   peak hours and nonpeak hours during the day.

23   Q.   What are those peak hours in general, in your

24   experience?

25   A.   Morning rush hour, evening rush hour.

104

1    Q.   Okay.

2    A.   And lunchtime.

3    Q.   So if you leave to get papers notarized around

4    four o'clock, you may miss a rush hour traffic?

5    A.   Yeah.  Or even a portion of it ---

6    Q.   Okay.

7    A.   --- would be detrimental to my day, because I may

8    get 60 signatures an hour during rush hour, whereas

9    I'll get three --- or, I'm sorry, 30 signatures, you

10   know, about half of that in a non-rush hour.  Or even

11   like ten per hour in like between 2:00 and 3:00, you

12   know.  So whether it's widely like that ---.

13   Q.   You mentioned this one notary.  So you had only

14   like one notary that you could rely on whereby you

15   could wait until 11 o'clock at night to get petitions

16   notarized.  Is that what your testimony is?

17                   ATTORNEY JOEL:

18                   Objection.

19   A.   One per each.

20                   ATTORNEY ROSSI:

21                   Yeah.

22   A.   I'm sorry.

23                   ATTORNEY ROSSI:

24                   No, no.  He's allowed to object.  It's

25   okay.  It was an appropriate objection.  It was a long,

105

1    long-winded question.   Let me break it down.

2    BY ATTORNEY JOEL:

3    Q.   Was there an occasion ---?  Was there ever an

4    occasion where you waited until 11 o'clock to notarize

5    your papers?

6    A.   Yes, after 11:00, actually.

7    Q.   Okay.  And that occurred because you knew the

8    notary that would notarize that late at night?

9    A.   Yes.

10   Q.   And the witness went along with you ---

11   A.   Yes.

12   Q.   --- to that; correct?  Was there ever a situation

13   where you could not get the papers notarized because

14   the witness would not be with you later in the day?

15   A.   Yes.

16   Q.   Explain how that happened.

17   A.   Okay.  In one case it didn't fit into the

18   witness's schedule to go and get the signatures

19   notarized.  And so I knew that there was still time

20   remaining until the deadline.  And I assumed I would be

21   working in the same place.  And it turns out that we

22   needed more signatures in District 5 and that I had to

23   leave immediately to go to District 5 or it would not

24   succeed.  So I immediately left and I said, look,

25   please don't fall off the face of the planet.  I know

1   that happens a lot with witnesses.  You know, we will

2   make it worth your while, just don't stop returning our

3   phone calls because I'm going to have to come back to

4   District 14 to have your signatures notarized that are

5   not notarized.  And I called up the witness and said

6   that and he agreed that he would make himself available

7   later at that time.

8        And it wound up being where we thought for a while

9   that they were going to have to throw the signatures

10  out essentially, that they would not be counted,

11  because they wouldn't be able to be notarized.  And we

12  were very concerned that all the people that signed

13  that would then be thinking that they had signed to

14  place these candidates on the ballot when, in fact,

15  they had not.

16  Q.   Okay.  Now you talked about Trent's father-in-law.

17  Is Trent married?

18  A.   You know, technically it's his girlfriend.

19  Q.   Okay.

20  A.   They're planning on ---.  They told me they're

21  planning on getting married, so I just ---.

22  Q.   Oh.  Okay.  All right.  That makes sense.

23  A.   It's Kara's father.

24  Q.   Kara, his girlfriend's father, that's where you

25  stayed at in Pittsburgh?

1    A.   Yeah.   He says she's his fiancée, I think.

2    Q.   Okay.   Now you said you do work with Andy Jacobs.

3    You have never been employed by ---?   Let me ask ---

4    strike that.

5        Have you ever been employed by Andy Jacobs to

6    circulate petitions?

7    A.   That's kind of an interesting question, because on

8    paper I was, I believe, employed by the campaigns.

9    Q.   Okay.

10   A.   And Andy set up the job, got me to come in to work

11   on the Jacob and paid.   But I believe for the Wyoming

12   job, for example, and for the 2011 North Dakota ---

13   Q.   Okay.

14   A.   --- he may have been --- I may have been working

15   for American Liberty Consulting.   I just remembered

16   that.

17   Q.   Okay.

18                   ATTORNEY ROSSI:

19                   Okay.   I think I'm done.   Mr. Joel?

20   RE-EXAMINATION

21   BY ATTORNEY JOEL:

22   Q.   You talked about calling that person, I guess it

23   was in the District 5, that story you were just

24   telling.   Did you end up connecting with that person to

25   get everything notarized?

108

1   A.   Yeah.

2               ATTORNEY JOEL:

3               Okay.  Nothing else.

4               ATTORNEY ROSSI:

5               Very good.  I'm done.

6                   *  *  *  *  *  *  *  *

7           DEPOSITION CONCLUDED AT 4:11 P.M.

8                   *  *  *  *  *  *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

109

1    COMMONWEALTH OF PENNSYLVANIA   )

2    COUNTY OF BEDFORD              )

3                    CERTIFICATE

4         I, Bernadette M. Black, a Notary Public in

5    and for the Commonwealth of Pennsylvania, do hereby

6    certify:

7         That the foregoing proceedings, deposition of

8    Jacob Witmer was reported by me on 9/26/16 and that I,

9    Bernadette M. Black, read this transcript, and that I

10   attest that this transcript is a true and accurate

11   record of the proceeding.

12        That the witness was first duly sworn to

13   testify to the truth, the whole truth, and nothing but

14   the truth and that the foregoing deposition was taken

15   at the time and place stated herein.

16        I further certify that I am not a relative,

17   employee or attorney of any of the parties, nor a

18   relative or employee of counsel, and that I am in no

19   way interested directly or indirectly in this action.

20                              *Bernadette M. Black*

21   **COMMONWEALTH OF PENNSYLVANIA**
        Notarial Seal
22   Bernadette M. Black, Notary Public
        Everett Boro, Bedford County
23   My Commission Expires Jan. 17, 2017          Bernadette M. Black,
     MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

24                                  Court Reporter

25

**A**

ability
94:18,21
95:1 99:4
103:18
able 15:8
19:13,15
20:8,16,18
20:22
73:24 76:5
83:3
106:11
Absolutely
77:2
absurd 50:22
51:4
absurdly
54:20
acceptable
90:23
access 7:21
16:24
17:13,16
18:1 19:5
19:8,9,10
22:7 25:15
25:19,20
26:3,6,13
26:14
27:21
28:17 33:7
34:20
35:25
40:15
41:23
44:16 45:4
50:3 56:14
75:18,19
86:8 91:11
91:12,18
91:19 92:5
93:25 94:3
94:19,20
95:6 96:23
97:11
accessed
35:11 75:3
accesses
47:4
accessing

90:18
accurate
11:25
109:10
act 91:16
action
102:16
109:19
acts 93:21
add 59:18
addition
16:23 17:2
36:9
additional
73:15
98:23
100:3
101:11
address
11:21,24
12:1,2,6,9
12:12,16
12:23
affidavit
102:21
African
101:20
agency 1:25
aggregate
29:20
ago 69:25
agree 11:7
103:1
agreed 106:6
ahead 28:1
48:12
63:20
Alabama
18:15
21:12,14
21:18 22:1
22:4,18,23
23:5 24:18
24:20 25:3
25:5 30:17
31:9,10
32:22
33:16,18
34:13 35:1
37:7,10

38:4,12,14
38:21
Alabama's
22:4
Alaska 11:20
11:22
12:24 13:2
27:14,15
27:18,22
29:5 32:7
70:5
Alex 61:24
62:9
allegedly
8:14
Allegheny
86:6
allow 95:12
95:13
101:5
allowed
63:16 70:1
104:24
allowing
94:3
amended
76:20
amendment
50:15
amendments
51:10 90:9
America
52:15
American
101:20
107:15
Americans
27:4
amount 20:5
28:10 46:2
73:15 91:3
100:3
103:15
Anchorage
11:20,22
12:24 13:2
Andy 62:23
65:21
67:11
107:2,5,10

and/or 16:16
62:20
annual 68:11
answer 10:15
11:7,14
58:20 84:4
84:5,12
85:15,16
93:15
answered
11:8,9
ANTHONY 3:3
anti-Lib...
90:22
anybody
13:16
26:17 83:4
anyway
102:13
apologize
98:5
apparently
102:17
appear 9:24
approached
101:18
appropriate
104:25
appropri...
84:6
arbitrary
42:4
area 38:18
66:24
Arizona
17:11,15
Arsenault
61:24 62:9
ascribing
93:8
aside 58:9
62:12
asked 57:17
89:8 98:6
102:5
asking 11:2
12:18
35:22 71:8
71:9
102:15

aspect 83:16
associated
35:22
58:25
assume 26:15
60:11,15
71:2,3,11
71:14 83:5
86:15
assumed
105:20
assuming
64:21
86:15
87:23
Atlanta 49:9
53:15,16
53:18,19
53:21
61:21
75:22
80:20,21
80:24
attempt 95:6
attend 78:19
attest
109:10
attorney 2:8
3:11 4:5,7
4:9 6:3
7:7,9 9:2
12:17,21
28:24 29:1
29:3 54:7
54:9,11,13
57:4 71:7
71:15 72:2
72:5,7,9
72:11,13
72:16
76:13,18
76:22,24
77:1,3,5
77:21
83:25 84:7
84:11 85:8
85:12,18
88:8,12
89:2,7
104:17,20

104:23
105:2
107:18,21
108:2,4
109:17
**attracted**
101:16
**at-large**
57:25
**August** 78:16
78:22
79:17
**authority**
96:21
**authoriz...**
1:25
**available**
106:6
**avenue** 12:19
12:20
56:11
**average** 30:3
30:5
**aware** 70:12
70:15
71:19
78:15
83:23
85:23 86:4
102:24,25

**B**

**B** 10:19
**back** 9:19,24
29:24 37:8
42:20
51:19 58:8
63:21 70:5
81:5 86:3
103:8
106:3
**backing** 37:5
**bad** 49:21
**ballet** 40:15
94:20
**ballot** 10:5
14:15 15:1
15:2,3,11
17:13,15
17:15,16

18:1 19:5
19:8,9
25:15,19
25:20 26:3
26:6,12,14
27:21
28:16 33:7
34:20
35:11,25
36:9,12
41:23
44:16 45:4
47:4 50:3
50:18
56:10,11
56:14,21
57:15 60:8
67:16
69:17
70:11
71:22 75:3
75:18,19
76:12 82:5
82:17,17
86:8 90:18
91:8,11,12
91:16,18
91:19 92:5
93:21 94:3
94:14 96:1
96:3,6,10
96:14,23
97:10,11
97:19,23
106:14
**ban** 84:20,25
92:12
**bank** 103:7,9
103:11
**bans** 84:14
84:25
**based** 15:8
75:15
90:11
94:15
**basis** 69:7
69:15
**BEDFORD**
109:2
**beginning**

2:10
**begins** 21:23
**behalf** 2:4
70:20
80:13,17
**believe** 7:15
9:4 15:4,6
15:6,20
16:22
19:25 20:5
20:12 21:3
21:11,15
22:2,20,20
23:9,15,22
24:3,19
25:2,9,13
29:14
30:10
31:22
34:14 35:7
35:13 37:2
38:3,23
39:25
40:23
41:25 42:7
44:18
45:10 52:3
52:18 61:8
62:2 66:20
67:12,23
70:17
71:23 73:9
75:10
97:23 98:9
107:8,11
**Benezet** 1:5
55:17
56:23,23
56:25 57:5
57:7,9,12
58:10,11
58:13,18
59:3,11,13
59:17 60:5
60:21,22
61:4,15,21
61:23 62:9
72:17,23
73:1 75:25
79:23 80:8

80:9,13,17
80:25,25
82:21 83:1
83:8,9
**Bernadette**
2:6 109:4
109:9,23
**Bernie** 97:19
**best** 11:9
16:12
22:11
37:14
45:19
46:19
64:24
86:16,20
87:2,3
**better** 52:14
94:2
**beyond** 16:16
86:21 87:2
89:11
**big** 100:23
**bit** 7:24
30:7 91:14
**Black** 2:6
109:4,9,23
**blur** 29:17
**boss** 55:14
**boss's** 55:12
56:2
**bottom** 77:12
**brain** 50:23
**break** 11:13
11:15
64:13 69:3
72:8,15
88:11
105:1
**brief** 57:11
**briefly** 51:8
73:4
**broader**
93:18
**broadly**
92:23
**brother** 31:7
**buddy** 101:22
**bunch** 46:25
47:1 83:7

84:23
**business**
68:16
74:12
79:22
82:22
88:15
**businesses**
62:13 82:9
82:10
**Byzantine**
92:5

**C**

**C** 3:1 7:1
**calculate**
73:9
**calculat...**
75:14
**call** 74:15
86:21
**called** 42:3
80:4 99:7
106:5
**calling** 59:4
107:22
**calls** 81:4
84:1 85:10
93:20
106:3
**camera**
102:18
**campaign**
8:24 54:3
54:6,8
58:13 60:6
60:20
62:18 64:3
74:15,23
86:16
99:18
**campaigning**
86:21
**campaigns**
10:11
59:15
62:12,14
75:3 107:8
**campus** 74:4
**candidate**

7:25 18:24
36:24 38:6
38:7,10,15
40:14,18
41:9,22
42:1,2
76:11
86:17 87:5
89:10
90:22 97:4
97:4,5
98:16
**candidates**
8:5 14:14
14:22
15:24 16:1
16:21,23
17:1 19:10
36:11,12
37:4 41:14
44:15
56:19
62:20 82:5
82:16
84:20 86:2
86:23
89:13,20
89:21
90:13,23
91:5 96:3
96:11,14
97:21
106:14
**candidate's**
86:25
**capable**
85:14
**car** 32:4
38:23
**care** 35:24
47:2 84:3
103:13
**cared** 35:10
46:24
**career** 7:16
**Carolina**
39:12
**Carson** 11:18
**case** 1:7
7:11 16:25

21:21
31:13 35:3
35:16
60:12
69:21
70:16 71:9
77:13,15
78:8,17
81:21 86:5
89:18,18
94:9 95:15
96:7 100:8
101:12
105:17
**cases** 19:5
63:16
83:17
99:17
**cause** 102:8
**certain**
35:20,21
44:21
63:16
66:22 69:4
83:17,17
86:7,22
93:7 94:11
94:12,14
101:18
**CERTIFICATE**
4:10 109:3
**certify**
109:6,16
**certifying**
1:25
**cetera** 18:12
**challenge**
8:11 9:21
74:21 86:4
**challenged**
8:7,8,14
8:18 9:2
**challenges**
77:16
**challenging**
71:20 78:1
**change** 34:14
87:16
**changed** 22:6
34:11

63:14
**changes**
63:11
**Charge** 27:5
**Charleston**
34:12
**charter**
71:21
**check** 68:3
**Cheyenne**
44:1,4
**choice** 90:19
96:5
**choices**
69:17
97:23
**chronolo...**
29:8,9
**chronolo...**
29:6
**chronology**
32:25
**circulate**
90:21,24
91:1,10
102:21
107:6
**circulated**
95:13 98:7
98:9
**circulating**
71:10
**circulation**
83:19
**circulator**
77:13
100:5
**citizen** 8:14
**Citizens**
27:5
**City** 78:1
**civics** 56:18
**Civil** 2:5
**claimed**
75:13
**clarify** 72:3
78:3 85:17
**clarifying**
18:5
**clear** 93:11

97:13
**client** 83:3
**Clinton** 91:1
**closes**
103:11
**colleague**
7:9,10
88:10
**colleagues**
56:2
**collect**
10:10
14:24
19:13,15
19:21 20:2
20:16,18
21:9 24:14
25:17
26:19
32:16 34:1
34:15
36:22
37:16,22
38:4,11
39:9,11
40:25
42:18 43:3
43:14,17
43:24 44:3
44:12 45:2
45:5 46:4
46:14 47:9
47:15,20
47:23 48:2
51:20 52:7
53:1,22,23
54:14 55:2
59:5 70:9
70:13,23
82:23 83:6
87:7,9
88:23
**collected**
7:25 8:3
10:7 15:13
20:7 22:13
33:19 36:5
36:15 46:9
49:11
55:24

70:20 81:9
**collecting**
8:23 15:16
17:14
18:23 19:3
19:23
20:24
22:10,19
23:10,14
24:18,20
27:17,20
28:8,15
30:4,5
34:19,24
36:1 39:15
40:1,13
41:10,21
42:23
48:14
49:23 50:2
52:13 53:7
53:10,13
54:18 60:1
64:1 78:22
79:18
80:12
86:13 87:5
87:6,14,17
88:4
**collection**
8:10 29:20
59:16
75:24
88:14
**collections**
16:14 64:6
**collecti...**
52:5,22
**collector**
68:21
**college**
66:20,24
66:24 67:9
74:4
**come** 19:18
40:7 51:19
70:24
101:7
106:3
107:10

Page 4

69:14
Commissi...
  58:3
committed
  65:21
common 56:14
  86:6
commonplace
  100:3
  102:7
Commonwe...
  2:7 19:21
  19:23
  37:17,22
  109:1,5
communic...
  10:17
companies
  62:10
  83:15
company 60:5
  62:2,10
  63:24,25
comparison
  54:21
compensa...
  35:12
  68:12
  90:16,17
competent
  85:15
complaint
  5:6 72:12
  76:20
completed
  19:11 48:9
completely
  75:10,12
completing
  75:1
complicates
  92:21
complying
  95:5
component
  93:19
concerned
  106:12
concluded
  56:8 108:7

conclusion
  84:2 85:10
  85:14
conducting
  9:1
confusing
  11:3 86:24
Congress
  38:15
  43:23
congress...
  38:13
  47:19
  98:15
conjunction
  67:11
Connecticut
  18:16
  22:21,25
  23:1,5,17
  23:21 24:1
  24:7,17
  25:5 30:18
  49:8,12
  51:20,20
  51:23 52:4
  52:7 61:21
  62:1,5
  100:23
connecting
  107:24
connection
  7:18 8:19
  88:13
consider
  65:13
  86:23 87:1
  103:9
considered
  19:7,9
  30:10,12
  30:15
consistent
  91:6
Constitu...
  37:1 38:10
  40:17
  41:24
  42:13
  43:13 48:4

97:15
constitu...
  71:20
  77:15 86:3
consultant
  14:11
  74:15
Consulting
  1:5 55:17
  107:15
contact 74:8
  88:24
contingent
  58:19
continuo...
  49:19 51:7
contract
  58:10
  72:18,20
  72:22,25
  83:2 92:14
  92:16,16
  92:18
contractor
  57:1,3,9
  61:5 62:15
  63:3 83:15
contractors
  59:20
  82:13
convention
  19:1
Coolhouse
  74:10
correct 8:6
  8:9,25
  10:1,6
  12:3,25
  14:4,7
  22:10,11
  22:13 23:6
  23:8,10,14
  27:19
  28:22 30:2
  42:13
  49:13,25
  57:6,8
  59:14 60:3
  60:21
  61:19 62:7

64:10,11
  64:16,19
  64:20,22
  64:23 65:1
  65:3 66:25
  67:2,4,7
  67:17
  70:25 76:1
  78:20,21
  79:20
  80:14
  82:19
  83:11,12
  87:7,10,11
  87:14,15
  87:19,22
  87:25 88:4
  88:7 89:16
  90:25
  93:13
  102:21,22
  105:12
correctly
  49:10,24
  68:1 69:8
  75:6 81:3
CORTES 1:9
cost 73:22
  94:17
  99:18
counsel 3:7
  3:16 89:9
  109:18
count 88:18
counted
  106:10
country 42:3
  51:5 56:20
COUNTY 109:2
couple 10:21
  20:3 21:19
  23:22 24:3
  24:22 29:8
  29:10
  30:13
  38:20
  39:10 45:1
  49:6 50:4
  50:20 52:6
  79:16

88:10
  91:22
course 49:5
  54:2 97:21
  97:21
  98:17
  99:16,16
courses
  97:25
court 1:1
  2:6 9:24
  10:19
  57:25 86:6
  109:24
courts 63:14
  63:15
crashed 56:1
creation
  42:2
Cruz 53:24
  64:8 65:25
  66:1,8,19
  66:23
  67:15
  75:16,18
  76:8 80:13
  87:6 89:19
  98:17
Cruz's 53:24
  76:10
currently
  82:8
cut 28:3
cycle 15:19
  15:21
  16:15 17:5
  17:25 18:4
  25:6 28:14
  33:7 37:11
  39:3 40:21
  40:23 41:1
  41:7 46:7
  46:11,12
  46:14
  47:21
  48:20
  49:11
  51:17 61:7
  61:11 62:6
  97:11,12

**D**

D 4:1 7:1
Dakota 36:23
  38:24 39:1
  39:5,6,7
  39:15,18
  39:18,21
  39:22,24
  40:1,8
  41:5,6,21
  42:9,10
  43:11,11
  47:22 48:2
  48:16,17
  48:21,24
  49:13
  51:18 79:1
  79:9,18
  80:2,23
  87:18 88:1
  88:3 97:8
  107:12
date 78:18
  101:9
dates 22:17
  28:11,11
  65:15
David 52:15
  52:17
day 30:3,6,9
  30:12,13
  30:15
  49:23,23
  74:4 76:4
  97:25 99:9
  99:10
  102:11
  103:4,7,13
  103:16,21
  103:22
  104:7
  105:14
days 45:20
  52:24,25
  53:14
De 48:3,4,14
  51:21
  52:14,19
  53:9,10,24
  54:2,3,14

60:20 64:9
64:15
89:24 90:2
deadline 9:9
  9:10,16
  20:4 21:1
  22:4,6,9,9
  23:8 25:2
  33:18
  46:10 88:5
  88:6
  105:20
deadlines
  33:8
deal 61:24
  83:20
decided
  90:21
declared
  52:18
defeated
  63:15
defend 88:2
Defendants
  1:11 2:4
  3:16 5:5
  7:11
Defendant's
  76:16,20
defended
  7:22 10:3
defer 73:22
definitely
  35:21 51:5
definition
  93:17
degraded
  91:21
delegates
  53:25 54:2
  64:8 67:13
  67:15,19
  67:20 68:2
  68:5,9
  75:19
  76:10,12
delete 50:21
deleted
  50:18
delivered

13:10
Democrat
  48:15
  51:21
  52:20
  53:11 54:4
  54:15,16
  60:19
  64:16,17
  89:23 90:1
  90:4 98:17
  99:13,14
Democratic
  51:22
Democrats
  96:10
demonstr...
  94:5
depending
  18:8 30:22
  31:17
depends
  74:23
deposed 7:11
  7:17 8:19
  9:14 10:12
deposition
  1:16 2:2
  8:21 9:1,5
  9:21,23,25
  87:13
  90:12 98:5
  108:7
  109:7,14
Des 11:24
  12:9,16,20
  12:22 13:5
described
  90:3 92:24
DESCRIPTION
  5:4
designed
  69:16
destination
  31:24,24
detail 16:8
detrimental
  104:7
different
  10:10

30:18,21
30:22 31:5
31:17,20
32:6,10,11
34:1,4
37:16,21
38:12,18
38:20 40:2
40:4 44:20
45:5,8
47:19 49:7
51:14 52:7
52:10,10
53:1,4,4
53:16,18
53:20 55:5
57:23
64:11 66:2
75:14 85:2
86:14 92:5
94:25 97:2
98:7,9,13
98:15,16
99:11,12
difficult
  73:9 92:7
difficulty
  94:15
dip 85:5,7
  85:17
dipping
  64:25
  92:24 93:3
  93:18,20
directly
  39:21 60:6
  61:2 62:12
  62:18
  109:19
discern
  10:20
discussed
  79:12
discussing
  81:17
  93:11
DISCUSSION
  57:2 76:15
dispute 75:7
  75:23

district 1:1
  1:2 38:13
  38:17 66:4
  66:5,9,18
  66:20
  75:16 76:3
  76:3,6,7
  96:11,12
  98:16,20
  98:21,22
  99:1,4,12
  99:13
  105:22,23
  106:4
  107:23
districts
  47:19 66:2
  75:11
district...
  47:16
DOCUMENT
  77:19
doing 8:24
  14:16
  15:23 17:9
  17:12
  25:19
  29:20
  75:24 83:7
  84:9 87:2
  87:2
  102:14,15
Don 41:12
  42:1
Donald 83:6
double 64:25
  85:5,7,17
  92:24 93:2
  93:18,20
drill 48:1
drive 11:22
  16:6 28:9
  32:13
  33:22
  37:25
  38:21 43:9
  44:5 55:8
  103:7,8
drives 14:12
  59:16 61:4

63:2
**drove** 32:15
38:1,1
**due** 28:6
64:11 66:5
83:20
**duly** 7:3
109:12
**duty** 86:21

**E**

**E** 3:1,1 4:1
7:1,1
**earlier** 7:16
22:6 33:3
33:8,11,12
35:5 90:11
91:23
92:22
**early** 40:24
53:15
54:23 56:4
**effort** 89:10
**efforts**
86:16,20
88:14
**either** 9:10
21:19
23:17,20
24:16
25:23
29:19 35:1
51:25 58:5
75:21
96:20
**election** 8:4
15:2,3,5
15:19
16:15
17:25 18:7
25:15,17
25:19
26:19,20
28:14
37:11
40:22 41:1
41:7 42:5
42:6,9,23
46:4,7,12
46:14

47:21
49:11
51:17
61:10 62:6
96:21
97:11,12
**elector**
20:19
**eliminate**
69:16
**else's** 65:5
67:6
**employed**
60:6 107:3
107:5,8
**employee**
56:24 57:7
109:17,18
**enables** 17:1
**ended** 22:1
**ends** 21:22
**entire** 8:2
95:6
**entirely**
9:22 44:21
74:23
**entities**
59:21,22
**equivalent**
93:21
**error** 70:17
71:1,11,14
**escapes**
18:17
**especially**
26:2 81:8
**ESQUIRE** 3:3
3:9,10
**essentially**
69:15
106:10
**estimation**
91:6 94:21
**et** 18:12
**evening**
103:25
**Everett**
12:19
**everybody**
47:4 94:8

**evils** 56:12
**evolved**
91:14
**exact** 22:17
28:11 78:6
78:18
**exactly**
15:17
22:17 39:8
65:10,20
73:9 84:16
**EXAMINATION**
4:4,6 7:6
89:6
**example**
30:25
60:18
82:21
107:12
**excellent**
65:22
**Excepting**
83:5
**exceptio...**
65:9 74:7
**exceptions**
45:16
**excess** 56:10
**excessive**
92:10
**exchange**
82:5
**exclamat...**
96:25
**exclusio...**
34:21,25
35:1,9,20
91:24 92:1
92:3,6,20
93:17,19
93:24
**exclusive**
34:21
51:25
**exclusively**
56:5 90:13
**execute**
102:20
**Exhibit** 5:1
5:6 76:16

**exists** 85:5
**expansiv...**
82:25
**expenses**
62:4
**experience**
94:19,21
99:19,21
103:24
**explain**
35:23 72:6
73:19 96:9
96:19
105:16
**explained**
95:21
**explaining**
97:9
**explanation**
10:16
**explanat...**
95:24
**express** 96:6
**expressly**
97:24
**extent** 77:23
**extra** 69:15
**eye** 74:8
88:24
**e-mails**
72:19
**E-V-E-R-...**
12:19

**F**

**face** 105:25
**fact** 94:5,11
96:9,13,22
106:14
**facts** 65:13
**failed** 50:18
75:18,19
86:8
**fair** 86:18
86:19
89:13
90:10,10
91:5,13,23
93:4
**fall** 21:17

33:16
105:25
**familiar**
70:10
**far** 8:11
9:15 68:2
84:17
**father** 55:18
57:15,21
58:12 59:6
106:23,24
**father-i...**
55:19,20
55:21,22
106:16
**father-i...**
55:12
**felt** 90:17
**fiancée**
107:1
**field** 59:23
**figure** 31:24
**file** 56:20
69:18
**filed** 58:15
**filing** 22:9
23:8
**final** 15:13
25:2
**find** 11:3
99:10
**fine** 10:17
11:13
37:12,14
37:14,15
40:10
63:20 77:4
78:9,11
**finish** 44:20
**finishing**
66:5
**first** 7:3
29:12
30:14 33:1
33:13 38:5
39:5 58:18
58:21
59:12
62:13 76:4
89:22

109:12
**fit** 40:7
105:17
**five** 52:24
**flew** 38:3
49:6
**flipped**
29:16
**Floor** 2:9
3:13
**fluctuates**
30:7
**fly** 38:22
**folks** 70:20
83:11
**follow** 98:12
99:12
**FOLLOWS** 7:4
**forbidden**
63:12
**foregoing**
109:7,14
**foremost**
89:22
**forget** 57:13
**forgot** 63:17
63:23 73:5
**form** 9:20
**formally**
79:24
**forward**
90:19
**found** 79:3
**four** 29:23
33:2,20
52:24
53:14
104:4
**fourth** 33:1
**frame** 20:23
21:17
**free** 27:10
51:4,6
56:19
**freelance**
60:4
**French** 52:15
52:17
**frequently**
94:25

**Friday** 65:23
**friend** 13:20
**friends** 56:1
**front** 8:15
101:21
102:17
**Fuente** 48:3
48:4,14
51:21
52:14,19
53:9,10,24
54:3,14
60:20 64:9
64:15
89:24 90:2
**Fuente's**
54:2
**full** 11:17
50:23
**fully** 77:17
**further**
109:16

_____
**G**

**G** 7:1
**gain** 17:16
19:8 26:5
27:1
**gained** 18:1
**Gary** 97:8
**gather** 17:1
20:6 73:11
73:14 92:8
96:2,4
**gathered**
32:19,20
32:21
46:25 50:5
50:8 67:13
69:6 73:16
86:5
**gatherer**
73:25
74:11
**gathering**
15:19
18:20
19:11
28:19
30:20 35:5

35:13
43:16
46:21
49:18,20
56:17
59:23
60:16,18
68:12
73:20 99:8
103:15,20
**geez** 38:9
**general** 2:8
3:11 7:9
15:2,5
25:15,18
56:13
103:23
**generally**
8:15 14:21
30:10,11
30:12
31:22 56:5
56:9,10
63:10
82:13,15
91:6
100:10
101:4
**Georgia** 49:9
49:12 53:7
53:13,17
**getting** 26:1
58:8 62:12
75:20 86:3
91:7,18
106:21
**girlfriend**
106:18
**girlfrie...**
106:24
**give** 9:15
10:13,17
11:24
16:11 29:5
29:7,9
30:8 32:25
81:23
86:16
87:12 89:9
95:24

96:17,18
**given** 84:8
**go** 9:24
10:14
22:18
23:16 24:6
24:9,11,17
28:1 30:16
30:18 32:3
32:6 33:25
39:21
44:22
48:12,24
53:16
56:20 59:4
63:20 64:5
70:5,6
71:12,12
72:12,19
72:19 76:4
77:11 81:5
81:17
86:20
87:12 88:2
96:2,4
99:14,15
99:25
100:22,22
103:7
105:18,23
**goal** 87:23
**goes** 12:5
61:9 96:20
**going** 10:13
13:4 32:14
32:14 41:6
51:5 63:21
70:4 71:13
77:10
79:10
81:16 83:5
84:1 85:9
95:7
102:15
106:3,9
**good** 11:12
29:22
30:12,13
30:14 52:2
64:14

65:24 81:4
89:5 95:5
108:5
**gotten** 83:20
**Gottshall**
43:23
44:13
**government**
27:5,7
**Governor**
41:18,19
41:19
**go-around**
62:5 74:24
**gravitate**
89:21
**great** 16:7
**Green** 35:13
35:23,23
35:24 37:1
41:24
44:18 48:3
48:5 53:9
97:16
**grounds**
71:20
**guess** 14:22
81:18
107:22
**guy** 100:25
102:11
**guys** 37:13
**guy's** 38:9

_____
**H**

**hairs** 62:20
**half** 104:10
**Hampton**
11:22
**hand** 86:22
86:25
**handicapped**
100:25
**handing**
86:21
**Hang** 85:13
**happen** 10:13
86:17
**happened**
7:15 21:22

105:16
happening
 95:6
happens
 106:1
happy 11:3
harassment
 51:6
hard 10:18
harder 10:20
Harrisburg
 2:9 3:15
hassle 66:7
hassles
 35:21
hauled 87:12
 88:1
hear 10:23
 75:6
heard 11:8
 80:5 90:3
 93:2
hearing
 78:16,20
hearings
 78:18
heart 89:12
held 10:3
 78:16
help 73:21
 77:14
 78:12
high 56:17
 91:4
higher 30:11
Hill 3:5
Hillary 91:1
hire 51:16
hired 62:14
 84:24
hiring 61:5
hit 31:2,10
hold 22:16
home 70:5
 71:21 78:1
 101:6
honestly
 58:12
hoping 78:12
hotel 13:24

13:25
19:24 31:5
79:13
99:17
hotels 29:25
30:22
31:17 34:4
34:11,14
37:21
38:18
39:14 40:4
43:6 45:8
47:12
52:10 53:5
53:20 55:5
55:9,11
56:1,4
hotel's
31:25
hour 103:25
103:25
104:4,8,8
104:10,11
hourly 63:9
69:7,12,13
99:23
100:4,12
hours 103:15
103:22,22
103:23
house 12:11
13:7 45:11
55:12
huge 99:16
Huh 71:5
hundred 30:9
30:13
67:10,11
89:9
hundreds
102:23
hurried
21:19

I

identifi...
76:17
IDENTIFIED
5:4
Illinois

7:22 8:1,3
8:8 9:19
9:24 11:24
12:10,20
12:23 13:5
16:18,19
17:4 18:15
18:21 20:6
20:23 21:9
21:12,25
22:8,12
23:4,7
25:4 28:16
28:18 29:4
30:17,25
31:1,6
32:8,17
33:3,12,14
33:15 34:6
43:18
44:16,22
44:23,24
44:25 45:2
45:6 48:13
49:5,11,17
49:21 50:2
50:14,15
51:9,18
84:18
immediately
20:5 21:22
22:1,12,19
24:12,17
105:23,24
impede 99:3
impedes 99:8
important
91:17
improper...
54:5
incident...
47:1 65:21
incorpor...
59:11
incorrectly
71:24
increases
94:17
99:18
incredulity

96:7
independent
8:14 35:14
36:6 37:3
40:13 42:2
48:15,18
48:19
52:20,21
53:11,12
54:4,15
62:15 63:3
82:13
indeterm...
86:25
Indiana
13:19 14:3
14:6 32:17
33:3,12,15
34:8 46:16
47:7,10,13
48:24
49:13
51:18 61:6
61:12
indicated
84:15
indirectly
109:19
individual
9:2 82:22
individuals
50:1 54:18
62:10
induce 73:11
industry
82:3 83:11
94:6
information
28:7 96:17
96:18
initiative
25:13
36:25 38:6
50:14,18
51:9,10
64:2 69:17
70:10
71:13,25
77:20 79:4
81:11

87:17
90:22
initiatives
14:15 27:6
27:6,9,16
27:18 50:4
82:5,16
86:2
injunction
78:16
insisting
101:17
instruction
94:16
interact
94:22 95:2
interest
57:5
interested
18:6
109:19
interesting
107:7
interfere
73:20
interfer...
51:6
Interrog...
11:23
interrupted
103:6
interrup...
103:13
invent 85:20
involved
94:17
involvement
70:18
in-state
98:12
issue 7:20
issues 26:22
it'd 9:7
91:4
It'll 10:14

J

Jacob 1:17
2:4 4:3
7:3 11:18

107:11
109:8
**Jacobs** 62:23
65:21
67:11
107:2,5
**Jeez** 64:2
**Jill** 97:18
**job** 57:14
76:7 79:8
80:16,24
83:2 93:8
107:10,12
**jobs** 14:19
17:9 80:16
80:25
**Joel** 3:9 4:5
4:9 6:5
7:7,8
12:21 29:1
29:3 54:9
54:13 57:4
71:15 72:7
72:11,16
76:13,18
76:24 77:3
77:5,21
84:7 85:18
88:8,12
89:2 92:24
93:10 98:5
104:17
105:2
107:19,21
108:2
**John** 63:23
**Johnson** 97:8
**JONATHAN**
1:10
**Judge** 57:25
**July** 9:11,14
21:6,8
23:8
**jumping**
29:24
**June** 9:11
21:3,4,6,8
23:8

K

**Kara** 106:24
**Kara's**
106:23
**keep** 25:10
37:13 77:6
77:6,6,10
**keeping** 95:2
**Kenneth** 3:9
7:8
**Kentucky**
15:20,23
16:16 17:4
17:7
**kept** 95:3
**kicked**
101:13
**kind** 21:21
29:17
41:14 42:4
50:24
51:13 54:5
56:8 66:6
73:21
101:25
107:7
**kinds** 97:2
**knew** 77:20
105:7,19
**know** 8:12
9:5 10:2,7
10:12 11:2
11:3 15:4
15:21,22
16:4 17:10
17:22
18:17 19:2
19:12,14
20:10 21:5
22:25
25:10,11
25:14,21
28:9,11
29:17 31:1
31:3,9
33:12
34:11 35:4
35:8,20,22
36:10
40:10
41:11,14

44:8 45:17
45:19,20
46:10,20
47:5 50:8
50:22
54:19
55:21
57:11,12
58:12,14
60:23,25
62:1 63:19
64:1 65:7
65:14 67:8
68:8 74:17
75:2 76:5
77:14,25
78:18 81:9
81:12,12
81:14,21
81:22,25
82:1,25
84:16,19
86:11,12
86:15,19
88:20
89:10 90:5
92:15
94:16 95:8
96:19,20
97:3,10
100:5
101:4,5,6
101:23,23
102:11,25
103:18
104:10,12
105:25
106:1,18
**knowing**
58:19
**knowledge**
11:10
22:11 27:1
46:19
50:21
64:25
**known** 94:6
102:4
**knows** 84:10
94:8

**Kurt** 43:23

L

**L** 3:9 91:18
**La** 48:3,4,14
51:21
52:14,19
53:9,10,24
54:2,3,14
60:20 64:9
64:15
89:24 90:2
**label** 74:16
**Lansing** 74:3
**large** 20:4
65:8,9
**largely**
25:24 66:4
**late** 99:9
103:1,2,3
105:8
**law** 20:13
69:3,10
**laws** 78:2
**lawsuit**
77:25
**leads** 97:22
**learn** 50:20
**leave** 101:17
101:17,23
102:5,9
104:3
105:23
**leaving**
62:12
**left** 25:21
105:24
**legal** 12:23
13:1 14:2
20:25 84:2
84:8 85:10
85:14
**lesser** 56:11
**let's** 7:24
14:22
18:21 39:5
62:13
72:12 83:5
87:4,5,16
89:8

**libertarian**
7:22,25
8:4 14:25
15:11 16:1
16:20
17:18
18:24 19:7
26:5 27:8
27:15
28:18,25
37:2 40:17
41:24
42:12
43:12 50:3
89:12
90:13
91:18,21
97:14
**Libertar...**
18:22 19:4
26:5,15,17
26:18
27:21 28:7
32:21
35:11
44:14 45:4
48:3,5
52:3 56:6
89:14
97:11
**Libertar...**
89:23 90:1
90:4
**Liberty**
107:15
**lie** 101:6
**limit** 27:6
95:1
**Limited** 27:5
**limits** 50:14
51:11
94:18,21
103:17
**line** 23:18
**list** 48:1
81:13,23
**listed** 71:23
**listen**
100:21
**literature**

86:22,22
87:1
litigation
  3:12 78:13
little 7:24
  9:18 10:15
  31:13
  43:20
  91:14
live 11:19
  13:7,16
  83:17
lived 13:18
  13:21
lives 55:18
  55:20,21
living 13:25
  14:8
LLC 1:5
location
  30:23 31:4
  31:5 74:3
  86:14
  98:11 99:8
  101:14
  102:6,9
  103:8
locations
  30:18,21
  31:2,10
  32:7,10
  34:1 37:16
  38:12
  43:25 44:2
  45:24,25
  46:1 47:9
  47:12 52:8
  52:11 53:2
  53:4,17,18
  55:3 86:14
  98:8,9
loitering
  101:19,21
  102:10
long 9:16
  13:1,4
  14:16 20:1
  20:4 23:20
  24:1,20
  32:2 34:23

38:24 39:7
39:24
40:10 43:1
43:19
44:25
45:23 47:7
48:21
49:17,20
51:23 52:4
52:6,22
53:13
54:17 57:9
84:9 96:16
104:25
longer 51:16
  75:24
long-winded
  105:1
look 96:16
  105:24
looking
  18:12 51:1
  57:21
  102:1
looks 102:16
lot 16:9
  31:23
  83:14,24
  90:12 96:6
  96:15 99:9
  106:1
lots 10:10
  10:10 36:9
  82:3
LP 28:25
lunchtime
  104:2

          M

M 2:6 109:4
  109:9,23
mail 12:5,8
  12:22 13:4
  13:10 14:5
mailing 12:1
  12:2
main 91:17
major 8:17
  19:10 33:9
  34:20 48:6

managing
  70:19
Map 51:10
mark 76:14
marked 76:16
  76:19
MARKS 1:10
married
  106:17,21
Maryland
  17:11,15
Massachu...
  34:18,19
  34:23 36:2
  36:16 37:6
  37:8,15,17
  37:22,25
  38:1
Match 100:12
matter 7:18
  10:8 79:19
maximum 74:6
ma'am 96:4
mean 12:4
  14:10,18
  15:11 19:6
  25:25
  37:13
  45:16
  50:22,23
  59:24 73:5
  73:13 77:7
  82:24 83:1
  84:3,17
  85:17 87:3
  89:8 92:3
  92:10 94:4
  94:5 98:3
means 19:7
meant 10:20
measure
  70:11
meet 58:21
  103:1,2
members 56:5
memory 16:12
  17:23
  23:25
  37:15
  45:19

50:19
65:21
mention
  57:12,13
  63:6
mentioned
  17:3 20:23
  28:22
  30:17
  53:15
  60:14
  61:13
  71:23
  73:23
  81:14,16
  83:14 85:4
  104:13
mentioning
  79:4
mentions
  77:12
Mexico 49:8
  49:12
  52:13,19
  52:22 53:2
  61:21 79:8
  79:9,14
Michael
  63:24
Michigan
  14:25
  15:10,16
  16:16 17:3
  74:3
middle 1:2
  9:7 103:16
  103:21
mind 68:10
  84:4
minor 19:8,9
  34:20
minutes
  88:10
  103:10
minutiae
  16:6 63:21
  65:22
Missouri
  25:12 27:4
  27:11,18

27:21 29:4
29:12 32:7
Mobile 38:13
  38:17,18
moment 18:17
Monday 2:10
monetary
  35:12
money 75:13
  76:2,7
  82:6 87:20
  87:24 91:3
  95:5
monitor
  102:18
monitoring
  41:15
monopoly
  83:16,20
Montana 27:4
  27:11,18
  27:21 29:4
  29:12,16
  32:7 69:24
Montgomery
  31:13,18
month 9:6,17
  9:18 21:11
  21:15,18
  21:21,25
  22:8 23:7
  40:12
  43:20
  48:22,23
  48:23 75:1
  75:5
months 10:21
  13:22 21:5
  29:23
  39:10 43:2
  45:1 47:8
  49:18,24
  50:20
  79:16
Morning
  103:25
mother 13:15
  13:16,17
  31:7
mother's

Mountville
  3:6
move 39:6
  100:16,17
  101:1
  102:14
moved 22:5
  98:11
moving 90:19
multiple
  35:16
  41:23
  56:11 65:1
  84:20 85:5
  86:12
  97:23

        N

N 3:1 4:1
  7:1
Nader 35:14
  36:6,8
name 11:17
  17:23
  18:13 26:4
  38:9 42:4
  58:14 62:1
  62:22
  63:24
named 70:15
  71:17
names 81:13
  81:23
name's 7:8
naming 63:5
nation 54:21
natural
  102:16
nature 51:7
  64:12
  65:15,17
  93:9
naïve 56:17
necessarily
  35:25
need 48:9
  76:6
needed 10:4
  15:14
  105:22

neglected
  35:7
never 14:2,5
  52:17
  79:24 90:3
  93:2 100:8
  107:3
new 18:15
  22:24 23:1
  23:4,17,20
  23:22 24:6
  24:9,17
  25:5 30:17
  49:8,12
  52:13,19
  52:22 53:2
  61:21 79:8
  79:9,13
  99:4 102:6
nice 90:4
Nicole 3:10
  7:10
night 103:1
  103:2,3
  104:15
  105:8
nodding
  68:24
nominee
  93:11
nonelection
  14:21
nonpeak
  103:22
nonverbal
  10:17
non-rush
  104:10
Nope 77:11
North 36:23
  38:24 39:5
  39:7,12,15
  39:18,22
  40:8 41:5
  42:9 43:11
  47:22 48:1
  48:16,17
  48:21,24
  49:13
  51:18 79:1

79:9,18
80:1,22
87:17 88:1
88:3 97:8
107:12
notariza...
  92:10
notarize
  105:4,8
notarized
  20:8,19
  64:21
  66:13 67:3
  103:8,17
  104:3,16
  105:13,19
  106:4,5,11
  107:25
notary 2:7
  85:1
  102:23
  103:3
  104:13,14
  105:8
  109:4
notes 37:13
  49:10
November
  18:7
number 5:4
  12:14 17:9
  26:3 27:23
  28:5 65:9
  65:18,19
  66:4 74:6
  83:11
  92:11
  94:15
  96:12

        O

O 7:1
object 84:1
  85:9
  104:24
objecting
  101:4
objection
  6:1 74:21
  84:13

85:13,14
96:25
104:18,25
obstacle
  99:16
  100:21,23
obtain 64:9
  64:17
  91:11
obtained
  16:23
  64:18
obviously
  33:8 84:18
occasion
  105:3,4
occasions
  57:14
occurred
  105:7
occurrence
  102:7
offering
  80:6
office 2:8
  3:4,11 7:9
  57:22
  96:21
offices
  18:25 19:4
  57:23
official
  58:13 68:3
officially
  52:18
  61:23
Oh 16:18
  25:21 28:1
  28:16,23
  28:23 37:7
  38:9 44:18
  46:10
  54:10,19
  55:16
  59:21
  60:21
  68:24
  70:18
  73:17
  77:10

79:15
82:12
84:19 90:3
98:14
106:22
Ohio 83:6
okay 7:14
  8:3,13,16
  9:5,12,15
  9:23 10:12
  10:21,24
  11:5,15
  12:6 13:1
  13:14,23
  14:13,20
  15:10,18
  16:5,11,12
  16:13 17:3
  17:21
  18:11,18
  18:20,23
  19:12 20:1
  20:7,14,22
  21:8,24
  22:3,22
  23:3,7,23
  24:4 25:1
  25:16,25
  26:11,24
  27:3,13
  28:1,8,23
  29:2,11,13
  29:15 31:4
  31:9,15
  32:16 33:5
  33:19 34:6
  35:2,15,17
  36:1,7,18
  37:8 38:4
  38:11,24
  39:5,21
  40:22,25
  41:3 42:5
  42:22 44:5
  44:22
  45:15,22
  46:4,23
  47:18 48:8
  48:21,24
  49:4,20

50:1,6
51:3,12
53:19 54:1
54:17,24
55:2,10,16
55:24 56:7
57:16,20
58:2,8,16
59:7 60:10
60:13,18
61:3,14,25
62:8,16,19
63:4,8,13
63:22 64:3
65:11,16
66:8,11,23
67:18 68:3
68:11,24
69:2,5,8
69:20,23
70:4,9,23
71:1,16
72:14,25
73:3,17,23
74:9,14,24
75:5,15,17
76:9,14,25
77:20,22
78:9,19
79:6,15,15
79:25 80:3
80:7,15,24
81:7,14,20
81:22 82:2
82:12 83:5
83:13
84:14
85:20,22
86:1,10
87:4 88:9
88:17,19
89:3,15,17
90:4,10,19
91:3,13
92:19
93:10
94:10,18
94:24
95:16,21
96:1,16

98:19,23
98:25 99:3
99:24
100:1,7,9
100:24
101:3,10
101:24
102:2,12
103:2,5,12
104:1,6,25
105:7,17
106:16,19
106:22
107:2,9,13
107:17,19
108:3
once 7:15
33:17
41:23 73:4
onerous
84:21,22
95:4
ones 35:19
35:20
38:20
46:25 47:2
60:16
61:16
80:19
one-and-...
21:20
one-third
97:17
OpenPitt...
70:11,21
71:24
77:15 79:4
79:11
81:10 82:1
86:3
open-ended
25:20
opinion 84:3
92:15 94:4
opinions
84:8
opportunity
81:4
opposing
89:9

option 27:9
oral 72:20
order 23:3
24:11 29:5
29:8,9,10
32:25
Oregon 27:4
27:11,18
27:22 29:4
29:14,16
32:7 63:23
64:2 69:22
outcome
41:15
out-of-s...
83:18
84:14,19
84:24
92:12
overlapped
28:12
override
73:10
owe 75:13
owned 55:22
owner 56:24
ownership
57:5
owns 55:13
o'clock
104:4,15
105:4

P

P 3:1,1 7:1
PA 3:6,15
page 5:1,3
6:1,3
77:12
92:12
paid 57:17
60:6,9,16
60:20,21
60:22 61:2
61:23 62:2
63:8,8
68:21 69:9
70:2,2
73:15
74:20,22

75:1,6,10
75:12,20
75:21,21
87:7,18
99:19,21
99:23
100:4,6
107:11
paper 69:6
92:25
93:12
95:14,19
107:8
papers
103:17
104:3
105:5,13
paperwork
56:20
58:14
69:15,18
70:17 71:1
71:11,14
Paragraph
77:11,11
paraphrase
89:11
part 16:24
40:16 61:6
61:11 65:4
participate
9:20 78:20
parties 8:17
14:23
15:24
17:14 37:1
41:23 56:9
82:17
109:17
partisan
97:14,14
97:15
parts 31:20
39:11,14
40:2,4
43:3,6
45:6,8
78:1 98:13
party 7:22
14:25

15:11
16:21,22
17:13,16
17:17,18
19:5,7,8,9
19:10
25:19 26:3
26:4,6,14
27:20
28:25 33:9
34:20
35:13,23
35:24,24
37:1,2,2
38:6,10
40:15
41:22,23
42:1,3,3
44:15,16
44:18 45:4
48:3,4,5,6
50:1,3
52:15 53:9
56:5 86:17
89:12,20
91:21
97:16
passing
26:25
Paul 3:3,4
32:17,18
32:20
46:24 47:3
89:18
pay 57:18
63:11 73:8
100:3
payment 62:3
75:7
pays 81:8
91:20
pay-per-...
84:25
92:13
peak 103:22
103:23
PEDRO 1:9
Pennsylv...
1:3 2:8,10
8:12 18:15

18:23
19:13,16
20:1 21:16
21:16 22:2
22:13,18
23:4,13,16
25:5 30:17
31:20
47:24,25
49:3,6,12
51:19
53:22
54:17 55:3
55:6,8
60:19
61:17 64:4
64:5 71:12
73:7 74:25
80:7,12
84:18 85:3
87:6,12,13
98:8 99:22
100:17,22
101:11
102:19,24
109:1,5
**people** 13:7
15:7 20:10
26:1,5,22
35:22 36:8
47:1,5
56:2,8,12
56:15 60:8
60:15
61:22
64:25
66:15 67:5
73:19 74:5
82:1,4,11
83:7,17
85:4 88:24
97:17
102:15,17
103:6
106:12
**percent** 47:5
56:3,4
89:9
**perform**

72:23 73:1
**performed**
62:11
**period** 49:22
51:15
52:23
59:25
74:21
**periods** 49:8
**permission**
101:9
**person** 30:14
61:4 62:22
107:22,24
**personal**
41:15
90:18
96:17,18
**per-sign...**
63:11
69:14
75:15
**petition**
7:21 9:9
9:10,16
14:9,14
15:7,18
19:11
20:20
25:23,24
49:7 63:1
66:16 67:6
74:5,7
83:18
85:19,24
93:12 94:6
94:17 96:2
96:5 97:7
99:7 103:7
**petitioned**
98:7
**petitioner**
10:9 84:14
84:20,24
93:6,8
94:7 95:14
102:8
**petitioners**
51:16
94:12

**petitioning**
7:16,18
13:22
14:11
50:24 74:4
82:3 83:2
101:13
103:4,7
**petitions**
20:11,11
56:12 65:1
71:10 85:5
93:7 95:13
96:13 97:5
104:15
107:6
**phone** 72:19
106:3
**phonetic**
74:10
**physical**
12:12
**pick** 12:7
**picks** 72:18
**piecing** 23:3
**piggybac...**
93:6
**pinned** 79:21
**Pittsburgh**
19:22,24
20:7 55:12
55:18,20
55:22
70:10,24
71:12
78:19 79:7
79:11
81:10
106:25
**Pittsbur...**
71:21 78:1
**place** 8:21
8:22 9:6
9:16 14:14
30:19
31:11 32:2
42:22
45:21
47:17
48:25

57:15 59:4
78:23
87:13
96:13
101:2
102:13
105:21
106:14
109:15
**placed** 14:25
**places** 24:24
24:25
33:19
36:15 49:7
55:5
**placing**
71:22 82:4
82:16
**Plaines**
11:24 12:9
12:16,20
12:23 13:5
**plaintiff**
70:15 71:9
71:19 72:6
77:13,25
78:7,13
**Plaintiffs**
1:7 3:7
**planet**
105:25
**planning**
106:20,21
**Pleas** 86:6
**please** 10:23
11:17 72:3
105:25
**plenty** 84:8
**point** 10:23
11:1,12
29:18
35:10 46:3
59:11 75:4
81:1 86:18
90:15
91:19
96:17
**police** 51:6
**polite** 74:7
74:7

**politely**
88:24
**political**
26:4 91:7
**Pool** 1:6
55:15
57:21 58:5
58:21,21
59:1,4,12
59:16
79:23 80:7
80:9 81:3
**Pool's** 55:18
57:15,21
**popular** 97:8
**portion** 62:2
104:5
**position**
58:1 84:5
**positions**
58:6
**possibility**
79:10
**possible**
25:9,9
56:11
**possibly**
62:9
**post** 48:20
**power** 27:7
**precisely**
9:8,13
25:18
85:15
**preclude**
82:21
**preference**
97:4
**preliminary**
78:15
**present** 59:1
59:17
**presidency**
18:24 19:2
**pressure**
101:7
**Presumably**
52:17
**presume** 18:8
102:4

pretty 31:11
91:4 93:10
94:5
prevent 83:9
83:19 95:5
prevented
66:5
previous
59:18
60:11
97:12,19
previously
60:14
61:12
84:16
97:10 98:9
primaries
15:6,8
33:11
primarily
90:12
97:18
primary 15:3
33:9 48:20
51:22
64:16,17
prior 15:9
23:8 48:7
58:20 65:2
79:16
private
101:24
privy 95:25
probably
10:12
21:20
24:22
44:18 63:1
63:5
problem
101:12
Procedure
2:5
proceeding
109:11
proceedings
109:7
process 8:7
9:21 25:21
25:22 26:1

produce
73:19
99:25
produces
73:5
producing
100:2
professi...
30:10,12
73:24
74:11
77:13
profiled
101:20
programming
50:20,21
prohibited
1:24
prohibition
83:18
92:13,17
92:25
93:20
prohibit...
85:24
promoter
97:15
properly
67:3
property
55:13,23
101:24
proponent
94:8,13
proponents
69:18
94:12
prorated
73:21
provided
59:1 74:9
88:21
99:17
providing
58:9
provisions
71:21
public 2:7
36:9 109:4
publics

102:24
purely 25:23
28:6 35:12
purposes
76:25
pursuant 2:5
69:10
push 15:14
20:4
put 50:24
76:11
97:10
putting
36:10 60:8
p.m 2:11
103:11
108:7

_____Q_____
qualified
65:2 84:2
qualify 20:6
66:15
67:10
quality
91:21
question
10:24
11:14
12:18
29:22
49:21 52:2
54:5 58:20
64:14 72:3
76:25 77:8
77:24
80:10
82:25 84:5
84:12
85:15,16
86:24
93:14
105:1
107:7
questions
10:15
36:10 89:4
quit 75:22
quite 30:7
quote 66:21

_____R_____
R 3:1 7:1
race 46:19
racially
101:20
Radziewicz
3:10 7:10
72:5,13
Railroad
58:3
Rand 46:24
47:3
range 30:8
rarely 97:24
rate 69:12
69:13
100:12
read 77:7,17
109:9
ready 76:4
reality
56:18
really 23:25
29:17
30:13
32:12
35:11,24
41:14
74:17
84:16
reason 86:9
91:9
reasons
86:11,12
recall 10:9
15:17,22
16:6 17:20
20:15 23:2
24:10
32:12
33:21
36:17 39:8
46:2 49:16
63:24
65:10,10
65:12 73:2
99:2
receiving
90:15,17
recognize

78:12
recognizing
17:7
recollec...
68:7 69:22
record 57:12
76:15
95:12
101:19
109:11
recording
84:13
recruited
88:14
recruiting
70:19
redistri...
50:15
51:10
reduce
103:14
referenda
14:15,23
15:24
25:13 45:3
82:16
referendum
71:22
reflect 91:6
regard 56:13
93:5
Regardless
24:11
register
26:1,5
registra...
25:20,22
25:25 28:6
70:3
registra...
26:3 27:8
28:5
regulations
92:6
relates
43:12
71:22
78:16
relation...
56:23,25

79:22
82:20 83:8
83:16
**relative**
29:9
109:16,18
**relatives**
13:12 31:7
**rely** 104:14
**remaining**
105:20
**remember**
7:17 9:8
9:11 17:5
21:7 22:17
25:7 29:7
31:22 32:1
32:2 35:9
35:19,21
38:9 40:9
41:12,13
45:17 49:2
65:12 66:3
68:9
**remembered**
107:15
**remembering**
63:19 68:1
**remotely**
8:22
**rental** 38:23
**repeat** 10:24
89:25
**rephrase**
11:4 13:21
**reported**
109:8
**reporter** 2:7
10:19
109:24
**represent**
7:10
**reproduc...**
1:24
**Republican**
26:8 33:7
99:15
**Republicans**
26:9,10
46:18

96:10
Republic...
89:20
**require** 63:5
69:3
**required**
96:22
**requirement**
47:16
51:25
56:16
63:15
64:12 66:6
69:16
83:22 95:4
**requirem...**
56:21 85:1
92:11
**requires**
69:17
**residence**
12:23 13:1
14:2
**residency**
83:21
**resident**
64:5
**respect**
91:16
**response**
97:22
**responses**
11:23
**restriction**
92:18
**restrict...**
51:4 93:22
93:25
94:16,18
94:20
95:10
**restrictive**
54:20
**result** 16:24
**returning**
106:2
REVIEWS
77:19
RE-EXAMI...
4:8 107:20

**right** 18:5
20:25
23:16
28:14 39:2
41:9 49:16
51:4 61:3
65:18
71:11 76:6
77:10
80:22
84:23
91:12,17
92:14 95:1
106:22
**road** 70:4
**Rocky** 48:3,4
48:14
51:21
52:14,19
53:9,10,24
54:2,3,14
60:19,20
61:1 64:9
64:14 65:7
67:19,20
68:2,8
80:13
89:24 90:2
98:21 99:1
**Rocky's**
67:19
**role** 48:15
**Ron** 32:17,18
89:18
**room** 79:13
99:17
**Rossi** 3:3,4
4:7 6:4
12:17
28:24 54:7
54:11 71:7
72:2,9
76:22 77:1
83:25
84:11 85:8
85:12 89:4
89:7
104:20,23
107:18
108:4

**rule** 34:21
35:1,20
71:21 78:1
91:24 92:1
92:4,6
93:24
**rules** 2:5
10:14
93:17
**run** 15:7
56:15,19
56:19
65:20
74:22
**running**
41:17 99:4
**rush** 103:25
103:25
104:4,8

———— S ————
**S** 3:1 7:1
**salary** 63:9
**salient**
65:13
**saw** 11:23
68:24 90:8
102:1
**saying** 59:4
**says** 72:19
107:1
**scale** 87:3
**scam** 96:8
**schedule**
105:18
**school** 56:18
**Scott** 74:10
**se** 8:2 25:18
**season** 54:23
**seated** 101:2
**second** 33:1
**Secretary**
96:20
**Section** 3:12
**security**
101:16
102:18,18
**see** 9:9
18:15
47:22 63:1

68:5 81:12
90:10
92:20
**seeing** 41:15
**seeking**
63:10
**seen** 12:16
85:21
**sending**
81:18
**sense** 9:15
11:2 83:1
106:22
**sent** 12:22
81:22,24
82:1
**sentiment**
56:15
**separate**
79:22
99:16
**September**
1:18 2:10
25:3 33:17
**services**
75:24
**set** 27:5
107:10
**shape** 9:20
**short** 28:25
46:2 49:7
51:15
52:23
54:20
57:14
72:15
88:11
**shorter** 24:5
**short-lived**
52:14
**showed** 78:11
**showing**
76:19
**shown** 73:4
**shrug** 10:20
**shrugs** 10:18
**sic** 54:3
**side** 17:9
**sign** 26:1
35:22

36:13 47:1
47:3 56:12
74:5,6
85:5 88:24
95:19 97:3
97:20
102:16
**signature**
15:18
19:11
27:17,20
28:8,15,18
30:4,20
43:16
56:17,21
59:15,23
63:9,10
64:6 68:12
68:20,21
69:6,9
70:2 73:8
73:20,24
74:11 87:7
87:18
88:14
92:12
96:12
99:20
100:2
103:20
**signatures**
7:21,25
8:3,10,23
9:3 10:3,7
10:10
14:14 15:7
15:13 17:2
17:14
18:20,24
19:3,12,15
20:2,7,16
20:18
21:10
22:10,13
22:19
23:10,14
24:14,18
24:21
25:17,23
25:24

26:19 30:9
33:19 34:1
34:16 36:2
37:23 38:5
38:11 39:9
39:11,16
40:1,25
41:10
42:23 43:3
43:21,24
44:3,12
45:5 46:5
46:15,21
46:25 47:9
49:11,19
49:20,23
50:9 53:1
54:14,18
55:2 58:5
60:2,16,19
64:9,14,18
64:18,21
64:24 65:7
65:19,25
66:8,23
67:3 70:9
70:13,20
70:23
73:11,15
73:16
74:18,20
75:2 78:22
79:18
80:12
81:10
82:23 83:6
86:4,7,13
87:5,10,14
87:17,20
88:2,4,23
92:8,11
96:3,5
99:8 103:8
103:15,18
104:8,9
105:18,22
106:4,9
**signatur...**
61:3
**signed** 20:10

20:11 65:5
66:16 67:5
67:6 95:14
96:13
106:12,13
**signer** 97:8
**signers**
96:12
**significant**
17:9 43:15
49:2
100:20
**signific...**
69:18
**signing**
20:20
64:25 65:3
85:19,24
92:25
93:11
**signs** 102:10
**similar**
101:12
**similarly**
8:12
**simply** 93:17
**single** 94:7
94:7 95:2
**sir** 96:2
**sit** 101:8
**sitting**
102:17
**situation**
100:15,16
101:25
105:12
**situations**
32:1 60:11
**six** 52:24
**slash** 59:12
59:16
**slate** 8:2,4
10:4 16:25
17:1
**slip** 54:12
**small** 28:10
45:16 66:4
91:18
92:11
100:3

**smaller**
27:23 28:5
**smile** 74:8
**smoothly**
10:15
**sole** 83:1,15
83:15
**somebody** 8:7
8:15,18
19:18 64:4
65:5 67:6
96:11
**someplace**
88:2
**somewhat**
10:13
86:24
**sorry** 12:13
12:15
16:18 21:7
27:24 28:1
28:3 29:18
34:17,25
35:19 37:7
37:10,11
37:20 39:1
40:9 41:25
46:11 48:4
48:12 50:4
50:19
54:10
60:21
63:17
68:25
78:10 79:2
90:5 98:2
98:14
104:9,22
**sort** 74:8,21
83:22
88:25
89:23 90:1
**Sot** 18:12
**sounds** 23:6
50:22
65:24 81:4
**South** 39:1,6
39:18,21
39:24 40:1
41:5,21

42:10
43:11
**speaking**
92:23
100:10
**specific**
65:14
**speech** 51:4
51:6
**spend** 21:14
29:19
**spending**
21:9
**split** 62:20
**splitting**
62:3
**spreading**
28:7
**Square** 2:9
3:14
**stack** 97:5
**stacking**
93:6
**stake** 41:15
76:2 90:18
**stances** 90:9
**stand** 63:16
**standard**
67:25
**standing**
102:9,11
**stands** 23:24
**start** 14:22
22:19
24:18
51:13 58:9
65:14 76:6
**started**
46:16 59:8
59:10,12
68:15
**starts** 40:24
**state** 8:2,11
13:19 14:2
14:6 23:18
24:2,12,12
24:16 27:2
27:8 30:19
30:25
31:21

39:12 40:2
40:5 43:4
43:7,9,25
44:3 45:6
45:9 54:21
66:20,24
66:24 67:8
69:10,16
69:21 70:1
70:6,6,6,8
70:8 82:4
82:4,15,15
83:2,17,20
87:5 92:6
93:7 94:14
95:3,3
96:22
97:24
98:13
**stated**
109:15
**states** 1:1
17:22 18:8
18:22 23:4
25:4,11,13
25:14 26:2
26:2,24
27:1 29:5
29:20,25
30:1,16
32:3,11,13
32:16,18
32:20,21
32:23,25
33:22,25
34:3 35:3
35:8,16
55:24
63:11,16
69:4,6,9
69:10,13
70:5 83:22
84:23 85:2
85:23
91:25
92:16 94:2
95:11,11
95:13,15
98:6
**statewide**

16:25 17:1
19:5
**State's**
96:20
**stationary**
100:18
**status** 48:6
83:21
**stay** 10:17
19:24
30:22
31:17 32:2
32:10 34:3
37:21
38:18
39:14 43:6
44:2 45:8
47:12
52:10 53:4
53:19,20
55:5,10
100:18
101:1,5
**stayed** 31:6
31:7 45:11
45:20
53:21
55:25
106:25
**staying**
29:25 40:4
79:13
**Stein** 97:18
**stint** 23:21
**stop** 12:7
51:13
65:14
73:19 74:5
74:6
101:19
106:2
**stopping**
97:18
103:17
**store** 101:22
101:24
**story** 107:23
**straight**
24:6,9
**Strawberry**

2:9 3:14
**street** 3:5
12:14
**stricken**
86:5,8
**strike** 13:25
20:17
49:21
74:18
94:19
99:20
107:4
**strikes**
23:24
**string** 24:23
**struck** 84:15
84:17,21
**stuff** 88:25
**subcontr...**
61:23
**subcontr...**
56:24
**subset** 46:21
**succeed**
105:24
**successful**
7:22
**successf...**
10:2
**sufficient**
20:6
**summer** 9:7,7
44:10,10
**summertime**
33:17 44:9
**supported**
91:5
**supporter**
97:16
**supporters**
97:19
**suppose**
13:21
87:16 88:6
**Supreme**
57:25
**sure** 15:20
18:14
45:18 47:4
58:11,12

63:18 65:4
66:15 67:5
67:25
77:18 78:4
79:21
80:11,16
85:19
**surprised**
56:16 73:6
90:7
**switch** 99:3
**sworn** 7:3
109:12
**sympathetic**
89:19

—   **T**   —
**table** 11:14
**take** 8:21
10:19
11:12,15
18:21 39:5
72:8 87:6
96:16
98:23
**taken** 2:4,5
9:25 49:10
72:15 74:3
88:11
109:14
**takes** 103:18
**talk** 56:22
62:13,14
88:10
102:3
**talked** 36:1
43:11 51:8
106:16
107:22
**talking** 18:6
40:22
44:17
47:24
61:10
91:23
94:11,12
98:4
**taught** 74:4
**technically**
72:20

76:11
92:14
106:18
**Ted** 53:24,24
64:8 67:15
75:16,18
76:8,10
89:18
98:17
**tell** 59:22
81:24
84:10
101:22
**telling**
45:18
107:24
**ten** 104:11
**tend** 41:13
56:10
65:12
89:19
102:13,14
**term** 50:14
51:11 85:7
85:20 93:2
**terminology**
62:21 78:6
85:11
92:23
**terms** 30:3
77:14
**terrible**
21:6
**testified**
7:3 42:21
89:11
92:22 98:8
**testify**
109:13
**testifying**
98:4
**testimony**
90:11
91:25
95:16,18
104:16
**Texas** 57:14
57:25 58:3
58:4
**Thank** 18:5

89:5
that'd 88:7
theory 100:4
thing 11:13
  17:13
  23:24
  57:11
  71:25 74:8
things 30:5
  51:7,13
  65:15
  92:21 97:2
think 9:9,13
  9:18 16:1
  22:14,16
  24:22
  28:13
  29:12,22
  31:11 32:5
  32:20,24
  33:21 34:7
  34:17
  36:17,23
  38:20 41:2
  41:4 42:19
  42:20
  43:15,20
  44:7 45:14
  46:6 49:1
  49:2 50:13
  50:17
  53:15
  56:18
  67:25 68:1
  68:8 69:21
  71:1 75:12
  77:4 81:24
  84:2,4,9
  84:21 85:4
  88:9 89:3
  89:4,11
  93:16 95:7
  96:7 97:1
  97:1 107:1
  107:19
thinking
  68:23 78:8
  106:13
third 33:1
thought

12:15
28:23
59:24
68:24 78:6
80:15
91:10 96:1
106:8
thousands
  96:4,5
  102:23
three 16:1
  20:3 22:15
  23:13 27:7
  29:23 37:1
  48:22
  49:18,24
  67:23,24
  104:9
three-fo...
  63:6
three-month
  49:22
threshold
  90:23
throw 106:9
time 7:17
  9:7 12:7,7
  13:6 20:23
  21:8,14,17
  25:3 29:19
  31:12
  32:17
  38:23
  42:21 44:8
  46:2,19
  49:3,7,8
  51:15
  52:23
  54:20,22
  55:25
  59:25
  61:18
  74:17 79:7
  84:23 87:7
  88:3 91:14
  93:1 95:8
  95:14,23
  96:18 99:7
  103:11,20
  105:19

106:7
109:15
times 7:14
  31:23
  44:20
  51:14
  64:11
  83:14
  88:17
  96:15 99:9
today 84:9
  95:16,18
told 16:2
  41:5 51:17
  60:1
  100:21
  101:19,21
  106:20
tongue 54:12
top 15:14
  100:4
totally
  31:25
  35:19
  66:22 95:1
totals 15:9
track 25:10
traffic
  104:4
train 73:18
training
  73:23,24
  74:9 88:21
transcript
  1:24 109:9
  109:10
travel 9:19
  82:4,15
traveling
  10:9 31:23
Trent 55:15
  57:15,21
  58:21 59:9
  59:10
  72:18 75:7
  75:22,25
  79:4,12,13
  80:9 81:14
  81:25
  106:17

TRENTON 1:6
Trent's 59:6
  106:16
true 109:10
Trump 83:6
truth 45:18
  109:13,13
  109:14
truthfully
  11:9
try 25:10
  58:4 69:16
  87:23
trying 31:24
  50:19,21
  50:23 68:7
  87:9 96:8
  101:5,6
tubes 51:5
turn 74:18
  77:6
turned 74:20
  75:2
turning 30:4
  75:5 77:6
  77:6,6
turns 95:9
  105:21
Tuscaloosa
  31:14,18
two 9:17
  24:25
  31:16
  40:12 47:8
  54:18
  57:14,23
  66:2 98:20
  99:2
  103:14
two-year
  18:3
types 89:20
typical
  97:22
Typically
  88:18 93:5

U

uh-huh 10:18
  18:2 33:10

36:3 37:18
41:8 42:11
42:25 68:6
77:9
uh-uh 10:18
ultimately
  10:3 15:5
uncertain
  58:20
undersigned
  2:6
understand
  10:22 11:1
  21:24 69:8
  77:24 81:3
  81:18
understa...
  11:4
understa...
  49:24
  84:10
  93:14
  102:20
understands
  94:7,8
understood
  11:9 94:6
unfamiliar
  78:5
unfortun...
  35:7
UNITED 1:1
universe
  93:25
universi...
  22:7
university
  30:14
unpack 7:24
unwittingly
  102:8
use 10:14
usually
  10:14
  16:25 30:9
  70:7 97:4
  98:12

V

valid 7:21

| | | | | |
|---|---|---|---|---|
| 16:23 | 97:1 | 87:4 97:6 | 42:21,24 | 18:7,9 |
| 19:10 | **vs** 1:8 | 109:19 | 43:21 | 25:16 |
| **value** 87:3 | | **ways** 94:25 | 44:13 | 28:10 30:5 |
| **variations** | **W** | **weather** | **wind** 77:23 | 31:13,20 |
| 98:2 | **wait** 104:15 | 54:25 | 81:18 | 33:23 38:1 |
| **various** | **waited** 105:4 | **website** 90:9 | **window** 54:19 | 38:21 44:6 |
| 39:11,14 | **Walmart** | **week** 9:17 | 54:20,22 | 45:13,23 |
| 43:3,6,25 | 101:8 | 24:5 | **winter** 28:12 | 48:7 51:1 |
| 44:2 47:9 | **want** 10:16 | **weeks** 9:17 | 80:8,12 | 51:14,15 |
| 47:12 | 11:4 36:11 | 20:3,3 | **wintertime** | 53:1 54:6 |
| 51:14 55:2 | 37:14 | 21:4,20,20 | 15:14,15 | 57:10 |
| 71:20 | 45:18 | 22:15 | 33:4 | 58:10,25 |
| 86:13 | 47:25 | 23:13,22 | **wintery** | 59:8 61:12 |
| 94:20 98:6 | 56:13,15 | 24:3,22,25 | 54:25 | 62:3,11 |
| **variously** | 56:19,22 | 39:25 | **Witmer** 1:17 | 65:14,17 |
| 74:16 | 60:23,25 | 48:22 52:6 | 2:4 4:3 | 66:5,18 |
| **verbally** | 62:20 | **went** 22:1,2 | 7:3,8 | 68:20 71:4 |
| 10:16 | 74:16 76:5 | 22:12,20 | 11:18 | 71:6 72:17 |
| **vernacular** | 77:7 80:15 | 22:25 23:1 | 88:13 | 72:23 73:1 |
| 92:4 93:24 | 92:15 | 23:12 29:6 | 109:8 | 73:7 79:5 |
| **versa** 98:18 | 94:13 | 42:22 49:6 | **witness** 4:3 | 79:11 80:4 |
| **vice** 98:18 | 95:22 96:3 | 57:14 58:4 | 19:19 | 80:7,9 |
| **videocon...** | 96:5,9 | 67:13 | 20:19 64:5 | 82:7,8 |
| 8:25 9:22 | 97:23 | 80:22 | 64:12,19 | 83:3 90:12 |
| **view** 56:18 | 100:18 | 105:10 | 66:6,11 | 95:8,17 |
| 94:2 | 102:11 | **West** 32:22 | 67:1 73:11 | 97:12 |
| **viewpoint** | 103:14 | 33:15 | 73:14,16 | 99:10 |
| 91:7 | **wanted** 35:4 | 34:10 | 73:22 76:4 | 107:2,10 |
| **viewpoints** | 36:8,13 | **western** 26:2 | 77:19 | **worked** 16:7 |
| 91:13 | 47:1 50:8 | 84:23 | 98:12,15 | 17:22 |
| **violates** | 81:16 | **we'll** 16:11 | 98:16,17 | 18:19 |
| 92:14 | 91:24 | 36:11 39:6 | 98:21 99:7 | 23:13 25:6 |
| **violation** | 97:18 | 47:25 48:1 | 99:11 | 25:11,12 |
| 20:13 | 100:15,17 | 51:19 | 100:11,18 | 25:14 |
| **Virginia** | 100:18,22 | 57:19 | 101:13 | 26:14 |
| 32:22 | 101:1 | 62:14 | 102:7,19 | 32:23 |
| 33:16 | **wasn't** 20:4 | 65:23 72:8 | 102:20 | 59:19,21 |
| 34:10 | 25:23 | **we're** 27:24 | 105:10,14 | 59:23 |
| **visiting** | 49:18,23 | 27:25 28:1 | 106:5 | 60:15 61:1 |
| 13:20 | 65:8,8 | 41:6 43:13 | 109:12 | 62:8,9,22 |
| **volunteer** | 97:13,14 | 95:7 | **witnesses** | 63:2,2,7 |
| 26:25 | 97:15 | **whichever** | 98:20 99:2 | 63:23 64:3 |
| 27:10 | 100:20 | 23:17 | 99:3,19,21 | 65:12 |
| 67:13 | **way** 9:20 | **widely** 94:5 | 99:23 | 71:24 78:7 |
| 90:15 | 24:11 31:1 | 104:12 | 106:1 | **working** 26:8 |
| **vote** 26:1 | 31:25 | **willing** | **witness's** | 31:18 |
| **voter** 95:2 | 39:19,20 | 73:14 | 105:18 | 52:24 56:6 |
| **voters** 92:25 | 71:19 | **Wills** 41:12 | **wording** 78:6 | 58:9,11,18 |
| 94:22 | 74:19 79:3 | 41:17 42:1 | **work** 8:11 | 59:10,12 |
| 95:18 97:1 | 79:3 80:11 | 42:8,16,19 | 15:3 18:3 | 60:5,5 |

75:22 76:6
77:23 80:1
81:5 82:1
82:22 83:9
83:10,10
86:17
105:21
107:14
**works** 28:6
100:5
**worries** 28:2
90:8
**worth** 106:2
**wouldn't**
73:6 83:3
106:11
**wound** 106:8
**write** 92:15
92:16
**written**
72:22,25
92:18
**wrong** 52:3
**Wyoming** 8:22
8:23 37:3
40:7,11
41:6,9,14
42:12,15
42:20,23
43:4,7,9
43:12,18
43:19,24
44:5,12,17
44:19,22
44:23,24
107:11

---
**X**
---
**X** 4:1

---
**Y**
---
**yeah** 12:15
17:10,16
22:14
23:19
25:21
27:23
28:21 32:9
34:17
36:11 39:4

40:3 41:8
41:20,25
42:7,14,17
44:11,20
45:12
47:25
49:14
50:10
54:12 68:4
68:19
72:10
77:20 81:6
82:8 89:23
90:6 93:2
93:16,21
94:4 98:19
98:24,24
104:5,21
107:1
108:1
**year** 17:8
19:13
20:24
28:15
29:21 44:8
57:11
**years** 14:21
16:7 18:6
68:17
69:25
91:22
**York** 18:16
22:24 23:1
23:5,17,20
23:22 24:6
24:9,17
25:5 30:18

---
**$**
---
**$1.50** 73:10
**$3** 73:10
**$934** 76:3
81:8

---
**0**
---
**03** 17:4
**06** 27:25
28:1

---
**1**
---

**1:16-CV-...**
1:8
**10th** 90:9
**10:00** 30:4
**104** 6:5
**107** 4:7,9
**108** 4:9
**109** 4:10
**11** 104:15
105:4
**11:00** 105:6
**13th** 2:9
**1319** 12:19
**14** 66:4,5,9
75:16 76:7
98:20
106:4
**15** 46:20
**15th** 3:13
**16** 77:11,11
**17120-0001**
3:15
**17554** 3:6

---
**2**
---
**2,000** 15:13
**2:00** 104:11
**2:02** 2:11
**20** 56:4
**2000** 14:17
**2002** 14:17
14:22,24
15:19,21
16:2,3,14
17:4,5
74:1 90:14
**2003** 15:22
16:3,17
17:7,8,10
17:19 18:1
18:9 25:22
25:23
**2004** 17:21
17:22,25
19:3 20:24
23:4 25:6
25:15
29:24
30:17 31:2
31:10 32:3

90:14
**2005** 13:3,6
25:16,16
25:18
26:14
27:24
58:22,23
59:1
**2006** 26:19
27:14,17
27:22
28:16,19
28:20 29:4
29:21 32:6
84:24
**2007** 28:8
33:6 68:19
68:19
**2008** 28:14
32:16,23
33:7,20
36:5
**2009** 34:15
36:1,15
37:7,9,15
90:21 91:9
91:9
**2010** 36:18
37:10,11
38:4 63:23
**2011** 36:20
37:3 38:24
39:3 40:20
40:22 41:1
41:4,25
42:5,7,8
42:15,20
42:23 58:7
59:8,9,10
59:13,17
68:11
107:12
**2012** 40:19
40:21,23
41:7 42:6
42:9 43:11
50:13,16
50:17
**2013** 42:8,15
42:19

43:13,14
43:16 58:7
**2014** 7:16,23
8:4 9:5
42:21
43:17,18
44:10 50:5
50:12 51:8
**2015** 46:4,10
46:12,16
61:8,11,12
**2016** 1:18
2:10 46:7
46:11,14
47:20
49:10
51:17
53:22
60:18 61:7
61:9,10,18
62:6 64:3
**21-day** 54:19
54:22
**26** 1:18 2:10
**27th** 9:10,11
9:14 21:3
21:4

---
**3**
---
**3** 5:6 76:16
76:20
**3:00** 104:11
**30** 103:10
104:9
**300** 30:13,15
**316** 3:5

---
**4**
---
**4:11** 108:7
**40** 103:10
**400** 30:13

---
**5**
---
**5** 66:20
98:21,22
99:1
105:22,23
107:23
**5:00** 103:11
**500** 65:9

**6**
**60** 104:8
**600** 65:9
**60018** 12:20
**6402** 11:22

**7**
**7** 4:5
**7:00** 30:4
**76** 5:6

**8**
**8th** 78:16,22
  79:17
**80** 56:3
**84** 6:4
**85** 6:4
**89** 4:5,7

**9**
**9th** 90:9
**9/26/16**
  109:8
**99.9** 47:5
**99504** 11:22

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **OPENPITTSBURGH.ORG and JAKE WITMER** | : | |
| | : | **CIVIL ACTION** |
| **Plaintiffs,** | : | |
| | : | **No_____** |
| **v.** | : | |
| | : | |
| **MARK WOLOSIK; in his official capacity as Manager of the Allegheny County Division of Elections; JOHN P. DEFAZIO, in his official capacity as a Member of the Allegheny County Board of Elections; RICH FITZGERALD, In his official capacity as a Member of the Allegheny Board of Elections; SAMUEL DEMARCO III, in his official capacity as a Member of the Allegheny County Board of Elections; and KATHLEEN KANE, in her official capacity as the Attorney General of the Commonwealth of Pennsylvania** | : : : : : : : : : : : : : | |
| | : | *Filed Electronically* |
| **Defendants.** | : | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      Plaintiffs, OPENPITTSBURGH.ORG and JAKE WITMER, by and

through their undersigned legal counsel, file this civil action for prospective

equitable relief against defendants, MARK WOLOSIK, in his official capacity as

Manager of the Allegheny County Division of Elections, JOHN P. DEFAZIO, in

his official capacity as a Member and President of the Allegheny County Board of

Elections, RICH FITZGERALD, in his official capacity as a Member of the

1



Allegheny County Board of Elections, SAMUEL DEMARCO III, in his official

capacity as a Member of the Allegheny County Board of Elections, and

KATHLEEN KANE, in her official capacity as the Attorney General of the

Commonwealth of Pennsylvania, requesting temporary and permanent injunctions

and declaratory relief prohibiting defendants from enforcing 53 Pa.C.S.A. §

2943(a) of the Pennsylvania Home Rule & Optional Plan Law to the extent it

incorporates 25 P.S. § 2869 of the Pennsylvania Election Code on the circulation,

signing, filing and adjudication of petitions to place a referendum question on the

2016 Pittsburgh general election ballot to the extent that 25 P.S. § 2869: (a)

prohibits unregistered Pennsylvania voters from freely circulating referendum

petitions under 53 Pa.C.S.A. § 2943(a); (b) prohibits non-Pennsylvanians from

freely circulating referendum petitions under 53 Pa.C.S.A. § 2943(a); (c) requires

plaintiffs to notarize each and every page of referendum petitions circulated and

filed under 53 Pa.C.S.A. § 2943(a); and (d) prohibits unregistered electors from

validly signing referendum petitions under 53 Pa.C.S.A. § 2943(a) in clear

violation of rights guaranteed to plaintiffs under the First and Fourteenth

Amendments to the United States Constitution and/or state statutory law.

## NATURE OF THE COMPLAINT

2.     This is an action to enforce rights guaranteed to plaintiffs under the

First and Fourteenth Amendments to the United States Constitution,  as well as a

2

pendent state law claim arising under the Constitution of Pennsylvania, the Home

Rule & Optional Plan Law and the Pennsylvania Election Code.

3. The United States Supreme Court has established that the collection

of signatures on referendum petitions is core political speech afforded the highest

level of protection under the First and Fourteenth Amendments to the United

States Constitution. *Meyer v. Grant , 486 U.S. 414, 422 (1988)*. Restrictions that

place a severe burden on core-political speech are subject to strict-scrutiny.

4. This is a civil rights action brought pursuant to 42 U.S.C. § 1983,

seeking prospective equitable relief enjoining enforcement and declaring that

certain of the combined requirements of 53 Pa.C.S.A. § 2943(a) and 25 P.S. §

2869 impairs clearly established rights guaranteed to plaintiffs under the First and

Fourteenth Amendments to the United States Constitution and a pendent state law

claim challenging defendants interpretation and enforcement of state statutory

law.

5. Plaintiffs ask this Court for an immediate emergency temporary

restraining order, and preliminary and permanent injunctions enjoining defendants

from rejecting any referendum petition authorized to be circulated under 53

Pa.C.S.A. § 2943(a) where the referendum petition's "Affidavit of Qualified

Elector" has been executed by: (a) an unregistered qualified elector of the

Commonwealth of Pennsylvania; or (b) a resident of another state willing to

3

consent to the jurisdiction of the Commonwealth of Pennsylvania for purposes of any investigation related to the circulation, signing and filing of referendum petitions all in violation of rights guaranteed to plaintiffs under the First and Fourteenth Amendments to the United States Constitution.

6. Plaintiffs also ask this court to declare unconstitutional those provisions of 53 Pa.C.S.A. § 2943(a) and 25 P.S. § 2869 authorizing defendants to reject any referendum petition authorized to be circulated under 53 Pa.C.S.A. § 2943(a) where the referendum petition's "Affidavit of Qualified Elector" has been executed by: (a) an unregistered qualified elector of the Commonwealth of Pennsylvania; or (b) a resident of another state willing to consent to the jurisdiction of the Commonwealth of Pennsylvania for purposes of any investigation related to the circulation, signing and filing of referendum petitions in violation of rights guaranteed to plaintiffs under the First and Fourteenth Amendments to the United States Constitution.

7. Plaintiffs ask this Court for an immediate emergency temporary restraining order, and preliminary and permanent injunctions enjoining defendants from requiring, as a condition precedent to filing, that each circulator notarize each and every "Affidavit of Qualified Elector" for each page of the referendum petition circulated by the circulator as authorized under 53 Pa.C.S.A. § 2943(a) and pursuant to provisions of 25 P.S. § 2869 of the Pennsylvania Election Code

4

in violation of rights guaranteed to plaintiffs under the First and Fourteenth Amendments to the United States Constitution.

8.    Plaintiffs also ask this court to declare unconstitutional those provisions of 53 Pa.C.S.A. § 2943(a) and 25 P.S. § 2869 requiring, as a condition precedent to filing with defendants, that each circulator notarize each and every "Affidavit of Qualified Elector" for each page of a referendum petitions circulated by the circulator as authorized under 53 Pa.C.S.A. § 2943(a) and pursuant to provisions of 25 P.S. § 2869 of the Pennsylvania Election Code in violation of rights guaranteed to plaintiffs under the First and Fourteenth Amendments to the United States Constitution.

9.    Plaintiffs also ask this Court for an immediate emergency temporary restraining order, and preliminary and permanent injunctions enjoining defendants from requiring signers of referendum petitions authorized under 53 Pa.C.S.A. § 2943(a) and pursuant to provisions of 25 P.S. § 2869 of the Pennsylvania Election Code to be registered electors of the Commonwealth of Pennsylvania and permit unregistered electors to validly sign plaintiffs' referendum petitions.

10.    All of plaintiffs' allegations are based upon their good faith information and belief after a reasonable investigation of the facts involved in this action.

## JURISDICTION

11.     Jurisdiction lies in this Court under 28 U.S.C. § 1331, providing that district courts shall have original jurisdiction of all civil actions arising under the Constitution of the United States.

12.     Moreover, jurisdiction lies under 42 U.S.C. § 1983 and 28 U.S.C. § 1343(a), the jurisdictional counterpart of 42 U.S.C. § 1983 as Plaintiffs allege violation of rights guaranteed to them under the First Amendment, as applied to the states by the Fourteenth Amendment to the United States Constitution.

13.     Jurisdiction of this court to adjudicate pendent state law claims in this action arise under 28 U.S.C. §1367(a), is authorized by Fed.R.Civ.P. 18(a) and is mandatory under the doctrine of supplemental jurisdiction as set forth in *United Mine Workers v. Gibbs*, 383 U.S. 715 (1966). The pendent state law claims in this action arise out of a common nucleus of operative facts as the federal questions in this complaint and the state law claims form part of the same case or controversy.

## VENUE

14.     Venue is proper in the United States District Court for the Western District of Pennsylvania under 28 U.S.C. § 1391 as plaintiff Open Pittsburgh.Org is a resident of the district and defendants exercise their authority in the Western District of Pennsylvania, maintain offices within this district and all of the operative acts or omissions have or will occur in this district.

6

## PARTIES

15.    Plaintiff OpenPittsburgh.Org is an unincorporated grass-roots

political organization seeking to place a referendum on the 2016 Pittsburgh

general election ballot seeking to amend the Pittsburgh City Charter to demand

greater governmental transparency and accountability by asking the following

voter the following referendum question:

> "Shall Pittsburgh's Charter be amended to delete Article 6: Community
> Advisory Boards (voided, Dec. 31, 2000) and substitute **Article 6: Open
> Government,** providing greater public disclosure; requiring public
> information, notices, and meetings be Internet accessible; setting applicable
> standards; creating a selectable notification process; and establishing an
> open membership Citizen Advisory Panel to which pending legislative and
> administrative actions must be explained and through which citizens can
> develop and provide information and comment before final approval?"

OpenPittsburgh.Org is currently circulating referendum petitions authorized to be

circulated by Pennsylvania's Home Rule & Optional Plan Law to place the above

referenced referendum question on Pittsburgh's 2016 general election ballot.

Plaintiff OpenPittsburgh.Org is using volunteer and paid circulators to secure the

required number of valid signatures  Plaintiff OpenPittsburg.Org is headquartered

at 304 Ross Street, STE 702, Pittsburgh, Pennsylvania.  David Terence Tressitor is

Chairman of OpenPittsburgh.Org and resides at 240 Chesterfield Road,

Pittsburgh, Pennsylvania.

16.    Plaintiff Jake Witmer is a professional circulator of election and

referendum petitions and frequently works on election projects in the

Commonwealth of Pennsylvania.  Because of the Commonwealth's prohibition on non-Pennsylvania residents from freely circulating referendum petitions and prohibits non-Pennsylvania residents or unregistered Pennsylvania residents from executing the "Affidavit of Circulator" made part of each referendum petition, plaintiff is not able to freely circulate referendum petitions for plaintiff OpenPittsburgh.Org, but would like to do so.  Furthermore, plaintiff Witmer works for Benezet Consulting, LLC (hereinafter sometimes "Benezet") which is an out-of-state professional election and referendum circulation firm who placed a formal bid to circulate plaintiff OpenPittsburgh.Org's referendum petitions in July 2016, but was forced to charge an amount which included fees needed to pay Pennsylvania registered voters to tag along with Benezet's out-of-state professional circulators, as a direct and proximate result of the statutes challenged in this action, which caused Benezet's bid to be too expensive for plaintiff OpenPittsburgh.Org who had to decline Benezet's bid, which directly resulted in an economic loss to plaintiff Witmer because plaintiff Witmer is not able to circulate OpenPittsburgh.Org's  referendum petitions as a professional circulator.  Plaintiff Witmer is a resident and registered voter of Alaska.  Plaintiff Witmer's resides at 6402 Hampton Drive, Anchorage, Alaska, 99504.

17.    Defendant Mark Wolosik, is made a defendant to this action in his official capacity as the Manager of the Allegheny County Division of Elections.

8

As the manager of the Allegheny County Division of Elections, defendant Wolosik is charged with enforcement of the statutory provisions challenged in this action. Specifically, defendant Wolosik is the official responsible to enforce the challenged statutory provisions by either accepting or rejecting plaintiffs' referendum petitions as provided by law. Defendant Wolosik is charged with rejecting any referendum petition where the "Affidavit of Circulator" is not executed by a registered Pennsylvania voter, or is not properly notarized. Defendant Wolosik is also ultimately responsible for enforcing the unlawful interpretation that the challenged statutes mandate that only registered Pennsylvania qualified electors may lawfully record their signatures on plaintiffs' referendum petitions. Defendant Wolosik's business address is 542 Forbes Avenue, Room 604, Pittsburgh, Pennsylvania, 15219.

18. Defendant John P. DeFazio is made a defendant to this action in his official capacity as a Member and President of the Allegheny County Board of Elections charged with enforcing the statutes challenged in this action and the superior of defendant Wolosik. Defendant DeFazio's business address is 542 Forbes Avenue, Room 604, Pittsburgh, Pennsylvania, 15219.

19. Defendant Rich Fitzgerald is made a defendant to this action in his official capacity as a Member of the Allegheny County Board of Elections charged with enforcing the statutes challenged in this action and a Member of the

9

Board charged with oversight of defendant Wolosik.  Defendant Fitzgerald's

business address is 542 Forbes Avenue, Room 604, Pittsburgh, Pennsylvania,

15219.

     20.    Defendant Samuel Demarco III is made a defendant to this action in

his official capacity as a Member of the Allegheny County Board of Elections

charged with enforcing the statutes challenged in this action and a Member of the

Board charged with oversight of defendant Wolosik.  Defendant Demarco's

business address is 542 Forbes Avenue, Room 604, Pittsburgh, Pennsylvania,

15219.

     21.    Defendant Kathleen Kane is made a defendant to this action in her

official capacity as the Attorney General of the Commonwealth of Pennsylvania

who is charged with the criminal and civil enforcement and defense of the statutes

challenged in this action.  Defendant Kane's business address in this district is 564

Forbes Avenue #6, Pittsburgh, PA  15219.

## FACTS

     22.    The Pennsylvania Home Rule & Optional Plan Law authorizes

citizens resident in municipalities operating under the Law to place certain

binding referendum questions amending the municipal charter on the ballot to be

decided by the voters at the next election.  Pittsburgh operates under a Charter

authorized under this law.

23.     OpenPittsburgh.Org is circulating referendum petitions to place a

referendum question on the 2016 Pittsburgh general election ballot to amend the

Pittsburgh Charter.

24.     53 Pa.C.S.A. § 2943(a) provides that:

"A petition containing a proposal for referendum on the question of
amending a home rule charter or an optional plan of government signed by
electors comprising 10% of the number of electors voting for the office of
Governor in the last gubernatorial general election in the municipality or an
ordinance of the municipal governing body proposing amendment of a home
rule charter or an optional plan shall be filed with the election officials not
later than the 13th Tuesday prior to the next primary, municipal or general
election. The petition and the proceedings therein shall be in the manner and
subject to the provisions of the election laws which relate to the signing,
filing and adjudication of nomination petitions insofar as such provisions are
applicable, except that no referendum petition shall be signed or circulated
prior to the 20th Tuesday before the election nor later than the 13th Tuesday
before the election. The name and address of the person filing the petition
shall be clearly stated on the petition."

25.     Plaintiff OpenPittsburgh.Org needs 7,582 valid signatures of electors

to place their proposed referendum question on the 2016 Pittsburgh general

election ballot.

26.     The 7.582 valid signatures that plaintiff OpenPittsburgh.Org needs to

place their proposed referendum question on the 2016 Pittsburgh general election

ballot is 2,582 more valid signatures than statewide political bodies such as the

Green, Libertarian and Constitution parties need to place their Presidential and

Vice-Presidential candidates on the Commonwealth's general election ballot.

11

27.    The circulation, signing, filing and adjudication of referendum petitions petitions are, in relevant part, governed by 25 P.S. § 2869's provisions governing partisan nomination petitions which provides that:

> "Said nomination petition may be on one or more sheets, and different sheets must be used for signers resident in different counties.  If more than one sheet is used, they shall be bound together when offered for filing if they are intended to constitute one petition, and each sheet shall be numbered consecutively beginning with number one, at the foot of each page….Each sheet shall have appended thereto the affidavit of the circulator of each sheet, setting forth – (a) that he or she is a qualified elector duly registered and enrolled as a member of the designated party of the State, or of the political district, as the case may be, referred to in said petition, unless said petition relates to the nomination of a candidate for a court of common pleas, for the Philadelphia Municipal Court or for the Traffic Court of Philadelphia or for justice of the peace, in which even the circulator need not be a duly registered and enrolled member of the designated party; (b) his residence, giving city, borough or township, with street number, if any; (c) that the signers thereto signed with full knowledge of the contents of the petition; (d) that their respective residences are correctly stated therein; (e) that they all reside in the county named in the affidavit; (f) that each signed on the date set opposite his name; and (g) that, to the best of affiant's knowledge and belief, the signers are qualified electors and duly registered and enrolled members of the designated party of the State, or of the political district, as the case may be."

28.    As a result of the combined effect of, 53 Pa.C.S.A. § 2943(a) and 25 P.S. § 2869 the referendum petitions circulated by plaintiff OpenPittsburgh.Org may not be freely circulated by either: (1) unregistered Pennsylvania citizens; or, (2) out-of-state residents, regardless of their registration status, because only registered voters of Pennsylvania may execute the "Affidavit of Qualified Elector" made part of each and every sheet of the referendum petition.

29.    In combination, 53 Pa.C.S.A. § 2943(a) and 25 P.S. § 2869 require

unregistered Pennsylvania residents and out-of-state circulators to team up with

registered Pennsylvania voters who must tag along and "witness" the signatures

recorded on the referendum petitions so that the registered Pennsylvania voters

can lawfully execute the "Affidavit of Qualified Elector" made part of each and

every page of the referendum petition.

30.    Defendants are authorized to strike and refuse the filing any

referendum petition when the "Affidavit of Qualified Elector" is executed by

anyone who is not a registered elector of the Commonwealth of Pennsylvania.

The registered voter requirement and the out-of-state circulator restriction imposes

an unconstitutional impairment of plaintiffs' right to free speech, petition and

association as guaranteed by the First and Fourteenth Amendments to the United

States Constitution.

31.    The registered voter requirement and the out-of-state circulator

restriction imposed by 25 P.S. § 2869 imposes a severe burden on speech and is

not narrowly tailored to effectuate a compelling state interest.  As explained by the

overwhelming majority of federal district and circuit courts of appeals, any

alleged compelling governmental interest advanced by statutes identical to 25 P.S.

§ 2869 is more narrowly and fully advanced – without the need to impair any First

Amendment guarantees – by requiring affiants to submit to the Commonwealth's

jurisdiction for the purpose of any subsequent investigation, prosecution and adjudication of alleged election petition fraud.

32.    There is no regulatory interest advanced by the registered voter requirement and the out-of-state circulator restriction imposed by 25 P.S. § 2869 sufficient to justify the severe impairment of plaintiffs' speech, petition and association protected under the First and Fourteenth Amendments to the United States Constitution.

33.    The registered voter requirement and the out-of-state circulator restriction imposed by 25 P.S. § 2869 in the circulation of referendum petitions limited circulator's ability to advance and spread the message of plaintiff OpenPittsburgh.Org by limiting plaintiff OpenPittsburgh.Org to use registered Pennsylvania voters and forgo unregistered Pennsylvania voters and out-of-state circulators, including professional out-of-state election petition circulators, because the time and effort required to "marry" unregistered and/or out-of-state circulators to an Pennsylvania registered voter expends valuable time and resources that OpenPittsburgh.Org must dedicate to

34.    The requirement that plaintiff OpenPittsburgh.Org must "marry" a registered Pennsylvania voter with volunteer and/or paid circulators who are not registered Pennsylvania voters and/or out-of-state residents directly impairs plaintiff OpenPittsburgh.Org ability to secure the number of signatures required to

place their proposed referendum question on the 2016 Pittsburgh general election ballot.

35.    The requirement that plaintiff OpenPittsburgh.Org must "marry" a registered Pennsylvania voter with volunteer and/or paid circulators who are not registered Pennsylvania voters and/or out-of-state residents increases the amount of time it takes to secure the number of signatures required to place their proposed referendum question on the 2016 Pittsburgh general election ballot.

36.    The requirement that plaintiff OpenPittsburgh.Org must "marry" a registered Pennsylvania voter with volunteer and/or paid circulators who are not registered Pennsylvania voters and/or out-of-state residents increases the costs to plaintiff OpenPittsburgh.Org to secure the number of signatures required to place their proposed referendum question on the 2016 Pittsburgh general election ballot because the inefficiency in circulating a single referendum petition with 2 people lengthens the time it will take plaintiffs to secure the necessary signature, thereby increasing the number of signatures that OpenPittsburgh.Org must pay to professional circulators (increasing the time it takes to gather the necessary signatures increases the amount of time professional circulators have to gather more signatures that OpenPittsburgh.Org must pay to the professional circulators).

37.    The requirement that circulators must be registered Pennsylvania voters means that any unregistered Pennsylvania resident who wishes to circulate

plaintiff OpenPittsburgh.Org's referendum petition must be accompanied by a

Pennsylvania registered voter willing to follow the unregistered circulator around

while he/she circulates the petition.

38.    Plaintiff OpenPittsburgh.Org has unregistered Pennsylvania residents

who are willing but cannot circulate plaintiff's referendum petition for the sole

reason that they, while qualified to register to vote in Pennsylvania, are not

registered to vote in the Commonwealth of Pennsylvania.

39.    The requirement that circulators must be registered Pennsylvania

voters means that any out-of-state circulators who wish to circulate plaintiff

OpenPittsburgh.Org's referendum petition must be accompanied by a

Pennsylvania registered voter willing to follow the unregistered circulator around

while he/she circulates the petition, and limited to the time and place of the

Pennsylvania registered voter's choosing.

40.    Plaintiff Witmer is an out-of-state professional circulator who is

willing to circulate plaintiff OpenPittsburgh.Org's referendum petition but is not

able to do so without being accompanied by a Pennsylvania registered voter,

limiting the amount of time that he would be able to circulate the referendum

petition.

41.    Plaintiff Witmer, as a condition precedent to the right to circulate

referendum petitions in the Commonwealth of Pennsylvania, is expressly willing

to execute any document necessary to submit himself to the jurisdiction of the Commonwealth of Pennsylvania for any investigation or adjudicatory proceeding that may arise as a result of his circulation of referendum petitions in the Commonwealth.

42.     Because of the additional cost of paying registered Pennsylvania voters to accompany professional circulators out-of-state as a direct and proximate result of  53 Pa.C.S.A. § 2943(a) and 25 P.S. § 2869, out-of-state professional circulators are not price competitive with in-state circulators in bidding for the right to circulate referendum petitions, limiting the pool of available professional circulators to plaintiff OpenPittsburgh.Org.

43.     Evidence of past election petition signature drives shows that in-state professional circulators attain a substantially lower validity rate than out-of-state professional circulators thereby imposing increased costs on OpenPittsburgh.Org through the need to collect and pay for the additional signatures needed to make-up for the substantially lower validity rate of in-state professional circulators.

44.     Limiting the pool of professional circulators to in-state professionals creates a monopoly for Pennsylvania professional circulators, thereby decreasing the ability of plaintiff OpenPittsburgh.Org to negotiate favorable contract terms, with the effect of dramatically increasing the cost of referendum petition signature drives.

45.     As a direct and proximate result of 53 Pa.C.S.A. § 2943(a) and 25

P.S. § 2869 plaintiff OpenPittsburgh.Org was not able to hire Benezet, plaintiff

Witmer's out-of-state professional circulator firm, thereby depriving plaintiff

Witmer's of both the economic opportunity and the ability to associate with the

voters of Pennsylvania to advance the political agenda of plaintiff

OpenPittsburgh.Org by circulating OpenPittsburgh.Org's referendum petitions.

46.     In combination, 53 Pa.C.S.A. § 2943(a) and 25 P.S. § 2869 places a

severe burden on the First Amendment speech of OpenPittsburgh.Org by making

it more difficult for it to disseminate its political views, choose the most effective

way of conveying its message, to associate in a meaningful way with prospective

circulators of its referendum petition for the purpose of eliciting political change,

to gain access to the general election ballot, and to utilize the public endorsement

of circulators which can be implicit in a circulator's efforts to gather signatures on

OpenPittsburgh.Org's behalf.

47.     The combined requirement of 53 Pa.C.S.A. § 2943(a) and 25 P.S. §

2869 that each and every "Affidavit of Circulator" made part of each and every

nomination petition page, be notarized imposes a severe economic and logistical

burden on plaintiff OpenPittsburgh.Org.

48.     Notarizations in Pennsylvania typically cost $5.00 per

acknowledgement imposing upon plaintiff OpenPittsburgh.Org a substantial

economic cost to notarize the 12,000 to 15,000 signatures typically required to make sure they collect and file the required number of 7,582 valid signatures to secure access to the 2016 Pittsburgh general election ballot.

49.     The notarization requirement for each page of the referendum petition adds an additional step, including the time to locate and travel to a notary public, which decreases the amount of time a circulator has to gather valid signatures, communicate the message of political change espoused by plaintiff OpenPittsburgh.Org, and associate with the residents and voters of Pittsburgh – all in the context of the compressed time period allowed by the Home Rule & Optional Plan Law to gather signatures.

50.     The significant costs imposed by the notarization requirement has caused plaintiff to design referendum petitions of larger size, to reduce the number of notarizations required; which leads to an extended time period that the petitions are in the field exposed to the elements and the wear and tear of prolonged handling by circulators which tends to degrade the readability of the signatures recorded on the referendum petitions, which in turn, leads to a larger number of invalidated signatures impairing otherwise valid core political speech.

51.     Plaintiff's effort to reduce the number of notarizations by placing as many signatures as possible on each petition page has also resulted in a reduction of the space allowed for each signatures, thereby making it more difficult for

voters to legibly record their information on the referendum petitions, resulting in a likely increase in the number of signatures ruled invalid by defendants and/or challenged by potential challengers as illegible.

52.     In *Green Party of Pennsylvania v. Aichele*, the United States District Court for the Eastern District of Pennsylvania ruled a cognate notarization requirement for petition papers (circulated by political bodies) unconstitutional.

53.     The notarization requirement of the "Affidavit of Qualified Elector" is a ministerial requirement which places a severe restriction on core political speech that is not narrowly tailored to advance a compelling governmental interest.

54.     53 Pa.C.S.A § 2943(a) provides in relevant part that: "A petition containing a proposal for referendum on the question of amending a home rule charter or an optional plan of government signed by ***electors*** comprising 10% of the number of ***electors voting*** for the office of Governor in the last gubernatorial general election in the municipality….shall be filed with the election officials not later than the 13th Tuesday prior to the next primary, municipal or general election.   53 Pa.C.S.A. § 2943(a) further provides that: "The petition and the proceedings therein shall be in the manner and subject to the provisions of the election laws which relate to the signing, filing and adjudication of nomination petitions ***insofar as such provisions are applicable***."

20

55. In *In re the Nomination Petition of Vodvarka*, 126 MD 2016, 37 MAP 2016 (Pa. April 19, 2016) the Supreme Court of Pennsylvania unanimously admitted, in a 6-0 decision, that it had previously "erroneously confused electors who were **qualified** to vote with electors who were **registered** to vote....Pursuant to Article VII, Section 1 of the Pennsylvania Constitution..., a person is qualified to vote if they meet the three constitutional qualifications (age, citizenship and residency) in subsections 1, 2 and 3....A qualified elector may register to vote by satisfying legislatively-enacted voter registration requirements...." *Id.* at Opinion, note #10, pp. 13-14.

56. While 25 P.S. § 2869 imposes the requirement that electors who sign partisan nomination petition must be "registered and enrolled members of the designated party of the State" such a "registered and enrolled" requirement is not applicable under Section 2943(a) of the Pennsylvania Home Rule & Optional Plan Law which only mandates that plaintiff OpenPittsburgh.Org's referendum petition be signed by ***electors*** comprising 10% of those who voted in Pittsburgh for Governor in 2014. The "registered and enrolled" requirement of 25 P.S. § 2869 relates to a partisan primary election (protecting the First Amendment rights of political parties to ensure only their party members select the party's standard-bearer), a referendum is a non-partisan election such that the "registered and enrolled" provisions of 25 P.S. § 2869 are not applicable and are, therefore,

21

expressly excluded by the "***insofar as such provisions are applicable*** clause of 53
Pa.C.S.A. § 2943(a).

57.    Because the "registered and enrolled" requirement for signers of
partisan nomination petitions is not applicable to a non-partisan referendum
elections, and because 53 Pa.C.S.A. § 2943(a) merely provides that signers of
plaintiff OpenPittsburgh.Org's referendum petition be "electors" without any
additional limiting qualifications, and because the Pennsylvania Supreme Court
has recently clarified that "electors" need only meet the State Constitution
requirements of age, citizenship and residency, defendants cannot lawfully require
signers of plaintiff OpenPittsburgh.Org's referendum petitions to be registered
qualified electors.

58.    Plaintiffs have no other adequate remedy at law.

## FEDERAL CONSTITUTIONAL CLAIMS

### COUNT I – FACIAL CHALLENGE
**(The Voter Registration Requirement for Circulators of Referendum
Petitions under 53 Pa.C.S.A. § 2943(a) and 25 P.S. §2869 is a Facial
Impairment of Rights Guaranteed to Plaintiffs under the First and
Fourteenth Amendments to the United States Constitution)**

59.    Plaintiffs reassert each preceding allegation as if set forth fully
herein.

60.    The circulation of referendum petitions as defined by 53 Pa.C.S.A. §
2943(a) and 25 P.S. §2869 is core political speech protected by the First
Amendment to the United States Constitution.

61.    The voter registration requirement imposed on those who execute the
"Affidavit of Qualified Elector" of referendum petitions contained in 53 Pa.
C.S.A. § 2943(a) of the Pennsylvania Home Rule & Optional Plan Law and 25
P.S. § 2869 of the Pennsylvania Election Code places a severe burden on core
political speech and is subject to strict scrutiny.

62.    The voter registration requirement imposed on those who execute the
"Affidavit of Qualified Elector" of referendum petitions is not narrowly tailored to
advance a compelling governmental interest.

63.    Alternatively, because no state regulatory interests justify the voter
registration requirement imposed on those who execute the "Affidavit of Qualified
Elector" of referendum petition, the voter registration requirement violates the
First Amendment to the United States Constitution, as incorporated to the States
by the Fourteenth Amendment to the United States Constitution .

64.    Defendants are state actors charged with enforcement of 53 Pa.
C.S.A. § 2943(a) and 25 P.S. § 2869 against plaintiffs.

65.    Defendants, pursuant to the Pennsylvania Home Rule & Optional
Plan Law and the Pennsylvania Election Code, are required to reject any

referendum petition sought to be filed by plaintiffs if it contains material errors or defects apparent on the face thereof, or on the face of the appended or accompanying affidavits; or if it contains material alterations made after signing without the consent of the signers; or it does not contain a sufficient number of signatures as required by law.

66.    Accordingly, defendants enforcement of 53 Pa.C.S.A. § 2943(a) and 25 P.S. § 2869 is the direct and proximate cause of the impairment of rights guaranteed to plaintiffs under the First Amendment to the United States Constitution of the United States for which plaintiffs request relief.

## COUNT II – AS APPLIED CHALLENGE
**(The Voter Registration Requirement for Circulators As Applied to the Circulation of Referendum Petitions under 53 Pa.C.S.A. § 2943(a) and 25 P.S. §2869 is an Impairment of Rights Guaranteed to Plaintiffs under the First and Fourteenth Amendments to the United States Constitution)**

67.    Plaintiffs reassert each preceding allegation as if set forth fully herein.

68.    The circulation of referendum petitions as defined by 53 Pa.C.S.A. § 2943(a) and 25 P.S. §2869 is core political speech protected by the First Amendment to the United States Constitution.

69.    The voter registration requirement imposed on those who execute the "Affidavit of Qualified Elector" as applied to the circulation of referendum petitions contained in 53 Pa. C.S.A. § 2943(a) of the Pennsylvania Home Rule &

Optional Plan Law and 25 P.S. § 2869 of the Pennsylvania Election Code places a

severe burden on core political speech and is subject to strict scrutiny.

70.    The voter registration requirement imposed on those who execute the

"Affidavit of Qualified Elector" as applied to the circulation of referendum

petitions is not narrowly tailored to advance a compelling governmental interest.

71.    Alternatively, because no state regulatory interests justify the voter

registration requirement imposed on those who execute the "Affidavit of Qualified

Elector" of referendum petition, the voter registration requirement as applied to

the circulation of referendum petitions violates the First Amendment to the United

States Constitution, as incorporated to the States by the Fourteenth Amendment to

the United States Constitution .

72.    Defendants are state actors charged with enforcement of 53 Pa.

C.S.A. § 2943(a) and 25 P.S. § 2869 against plaintiffs.

73.    Defendants, pursuant to the Pennsylvania Home Rule & Optional

Plan Law and the Pennsylvania Election Code, are required to reject any

referendum petition sought to be filed by plaintiffs if it contains material errors or

defects apparent on the face thereof, or on the face of the appended or

accompanying affidavits; or if it contains material alterations made after signing

without the consent of the signers; or it does not contain a sufficient number of

signatures as required by law.

74.     Accordingly, defendants enforcement of 53 Pa.C.S.A. § 2943(a) and

25 P.S. § 2869 is the direct and proximate cause of the impairment of rights

guaranteed to plaintiffs under the First Amendment to the United States

Constitution of the United States for which plaintiffs request relief.

## COUNT III – FACIAL CHALLENGE
## (The Restriction on Out-of-State Circulators of Referendum Petitions under 53 Pa.C.S.A. § 2943(a) and 25 P.S. §2869 is a Facial Impairment of Rights Guaranteed to Plaintiffs under the First and Fourteenth Amendments to the United States Constitution)

75.     Plaintiffs reassert each preceding allegation as if set forth fully

herein.

76.     The circulation of referendum petitions as defined by 53 Pa.C.S.A. §

2943(a) and 25 P.S. §2869 is core political speech protected by the First

Amendment to the United States Constitution.

77.     The prohibition on out-of-state circulators executing the "Affidavit of

Qualified Elector" of referendum petitions, for circulators willing to submit to the

jurisdiction of the Commonwealth of Pennsylvania , contained in 53 Pa. C.S.A. §

2943(a) of the Pennsylvania Home Rule & Optional Plan Law and 25 P.S. § 2869

of the Pennsylvania Election Code places a severe burden on core political speech

and is subject to strict scrutiny.

78.     The prohibition on out-of-state circulators executing the "Affidavit of

Qualified Elector" of referendum petitions, for circulators willing to submit to the

26

jurisdiction of the Commonwealth of Pennsylvania , is not narrowly tailored to advance a compelling governmental interest.

79.     Alternatively, because no state regulatory interests justify the prohibition on out-of-state circulators executing the "Affidavit of Qualified Elector" of referendum petitions, for circulators willing to submit to the jurisdiction of the Commonwealth of Pennsylvania, the out-of-state circulator ban violates the First Amendment to the United States Constitution, as incorporated to the States by the Fourteenth Amendment to the United States Constitution .

80.     Defendants are state actors charged with enforcement of 53 Pa. C.S.A. § 2943(a) and 25 P.S. § 2869 against plaintiffs.

81.     Defendants, pursuant to the Pennsylvania Home Rule & Optional Plan Law and the Pennsylvania Election Code, are required to reject any referendum petition sought to be filed by plaintiffs if it contains material errors or defects apparent on the face thereof, or on the face of the appended or accompanying affidavits; or if it contains material alterations made after signing without the consent of the signers; or it does not contain a sufficient number of signatures as required by law.

82.     Accordingly, defendants enforcement of the out-of-state circulator ban contained in 53 Pa.C.S.A. § 2943(a) and 25 P.S. § 2869 is the direct and proximate cause of the impairment of rights guaranteed to plaintiffs under the

First Amendment to the United States Constitution of the United States for which

plaintiffs request relief.

### COUNT IV – AS APPLIED CHALLENGE
### (The Restriction on Out-of-State Circulators As Applied to Referendum Petitions under 53 Pa.C.S.A. § 2943(a) and 25 P.S. §2869 is a Facial Impairment of Rights Guaranteed to Plaintiffs under the First and Fourteenth Amendments to the United States Constitution)

83.    Plaintiffs reassert each preceding allegation as if set forth fully

herein.

84.    The circulation of referendum petitions as defined by 53 Pa.C.S.A. §

2943(a) and 25 P.S. §2869 is core political speech protected by the First

Amendment to the United States Constitution.

85.    The prohibition on out-of-state circulators, as applied to the

execution of the "Affidavit of Qualified Elector" of referendum petitions, for

circulators willing to submit to the jurisdiction of the Commonwealth of

Pennsylvania , contained in 53 Pa. C.S.A. § 2943(a) of the Pennsylvania Home

Rule & Optional Plan Law and 25 P.S. § 2869 of the Pennsylvania Election Code

places a severe burden on core political speech and is subject to strict scrutiny.

86.    The prohibition on out-of-state circulators, as applied to the

execution of the "Affidavit of Qualified Elector" of referendum petitions, for

circulators willing to submit to the jurisdiction of the Commonwealth of

Pennsylvania , is not narrowly tailored to advance a compelling governmental interest.

87.     Alternatively, because no state regulatory interests justify the prohibition on out-of-state circulators, as applied to the execution of the "Affidavit of Qualified Elector" of referendum petitions, for circulators willing to submit to the jurisdiction of the Commonwealth of Pennsylvania, the out-of-state circulator ban violates the First Amendment to the United States Constitution, as incorporated to the States by the Fourteenth Amendment to the United States Constitution .

88.     Defendants are state actors charged with enforcement of 53 Pa. C.S.A. § 2943(a) and 25 P.S. § 2869 against plaintiffs.

89.     Defendants, pursuant to the Pennsylvania Home Rule & Optional Plan Law and the Pennsylvania Election Code, are required to reject any referendum petition sought to be filed by plaintiffs if it contains material errors or defects apparent on the face thereof, or on the face of the appended or accompanying affidavits; or if it contains material alterations made after signing without the consent of the signers; or it does not contain a sufficient number of signatures as required by law.

90.     Accordingly, defendants enforcement of the out-of-state circulator ban contained in 53 Pa.C.S.A. § 2943(a) and 25 P.S. § 2869 as applied to the

circulation of referendum petitions is the direct and proximate cause of the impairment of rights guaranteed to plaintiffs under the First Amendment to the United States Constitution of the United States for which plaintiffs request relief.

## COUNT V – FACIAL CHALLENGE
**(Defendants' Enforcement of 53 Pa.C.S.A. § 2943(a) and 25 P.S. §2869 Requiring Plaintiffs to Notarize Every Page of the Referendum Petition is a Facial Impairment of Rights Guaranteed to Plaintiffs under the First and Fourteenth Amendments to the United States Constitution)**

91.     Plaintiffs reassert each preceding allegation as if set forth fully herein.

92.     The circulation of referendum petitions as defined by 53 Pa.C.S.A. § 2943(a) of the Pennsylvania Home Rule & Optional Plan Law and 25 P.S. § 2869 of the Pennsylvania Election Code is core political speech protected by the First Amendment to the United States Constitution.

93.     Signatures recorded on referendum petitions as defined by 53 Pa.C.S.A. § 2943(a) of the Pennsylvania Home Rule & Optional Plan Law and 25 P.S. § 2869 of the Pennsylvania Election Code is core political speech protected by the First Amendment to the United States Constitution.

94.     Defendants' enforcement of 53 Pa.C.S.A. § 2943(a)  and 25 P.S. § 2869 requiring witnesses of referendum petition circulation to secure a sworn affidavit from a notary public for each page of a referendum petition places a severe burden on core political speech and is subject to strict scrutiny.

95.     Because defendants' enforcement of 53 Pa.C.S.A. § 2943(a) and 25

P.S. § 2869 requiring witnesses of referendum petition circulation to secure a

sworn affidavit from a notary public for each page of a referendum petition is not

narrowly tailored to further a compelling governmental interest, the provision

facially violates the First Amendment to the United States Constitution, as

incorporated to the States by the Fourteenth Amendment to the United States

Constitution.

96.     Alternatively, because no state regulatory interests justify defendants'

enforcement of the affidavit requirement of 53 Pa.C.S.A. § 2943(a) and 25 P.S. §

2869, defendants' enforcement of the provision violates the First Amendment to

the United States Constitution, as incorporated to the States by the Fourteenth

Amendment to the United States Constitution.

97.     Defendants are state actors charged with enforcement of 53 Pa.C.S.A.

§ 2943(a) and 25 P.S. § 2869 against plaintiffs.

98.     Defendants, pursuant to 25 P.S. § 2936 of the Pennsylvania Election

Code, are required to reject any nomination paper sought to be filed by plaintiffs if

it contains material errors or defects apparent on the face thereof, or on the face of

the appended or accompanying affidavits; or if it contains material alterations

made after signing without the consent of the signers; or it does not contain a

sufficient number of signatures as required by law.

31

99.     Accordingly, defendants enforcement of the affidavit requirement of

53 Pa.C.S.A. § 2943(a)  and 25 P.S. § 2869 is the direct and proximate cause of

the impairment of rights guaranteed to plaintiffs under the First Amendment to the

United States Constitution of the United States for which plaintiffs request relief.

## COUNT VI – AS APPLIED CHALLENGE
### (Defendants' Enforcement of 53 Pa.C.S.A. § 2943(a) and 25 P.S. §2869 As Applied to the Requirement that Plaintiffs Notarize Every Page of the Referendum Petition is an Impairment of Rights Guaranteed to Plaintiffs under the First and Fourteenth Amendments to the United States Constitution)

100.    Plaintiffs reassert each preceding allegation as if set forth fully

herein.

101.    The circulation of referendum petitions as defined by 53 Pa.C.S.A. §

2943(a) of the Pennsylvania Home Rule & Optional Plan Law and 25 P.S. § 2869

of the Pennsylvania Election Code is core political speech protected by the First

Amendment to the United States Constitution.

102.    Signatures recorded on referendum petitions as defined by 53

Pa.C.S.A. § 2943(a) of the Pennsylvania Home Rule & Optional Plan Law and 25

P.S. § 2869 of the Pennsylvania Election Code is core political speech protected

by the First Amendment to the United States Constitution.

103.    Defendants' enforcement of 53 Pa.C.S.A. § 2943(a)  and 25 P.S. §

2869, as applied to the requirement that witnesses of referendum petition

circulation secure a sworn affidavit from a notary public for every page of a

referendum petition places a severe burden on core political speech and is subject

to strict scrutiny.

104.  Because defendants' enforcement of 53 Pa.C.S.A. § 2943(a) and 25

P.S. § 2869 as applied to the requirement that witnesses of referendum petition

circulation secure a sworn affidavit from a notary public for every page of a

referendum petition is not narrowly tailored to further a compelling governmental

interest, the provision facially violates the First Amendment to the United States

Constitution, as incorporated to the States by the Fourteenth Amendment to the

United States Constitution.

105.  Alternatively, because no state regulatory interests justify defendants'

enforcement of the affidavit requirement of 53 Pa.C.S.A. § 2943(a) and 25 P.S. §

2869 as applied to referendum petitions, defendants' enforcement of the provision

violates the First Amendment to the United States Constitution, as incorporated to

the States by the Fourteenth Amendment to the United States Constitution.

106.  Defendants are state actors charged with enforcement of 53 Pa.C.S.A.

§ 2943(a) and 25 P.S. § 2869 against plaintiffs.

107.  Defendants, pursuant to 25 P.S. § 2936 of the Pennsylvania Election

Code, are required to reject any nomination paper sought to be filed by plaintiffs if

it contains material errors or defects apparent on the face thereof, or on the face of

the appended or accompanying affidavits; or if it contains material alterations

33

made after signing without the consent of the signers; or it does not contain a

sufficient number of signatures as required by law.

108.    Accordingly, defendants enforcement of the affidavit requirement of

53 Pa.C.S.A. § 2943(a)  and 25 P.S. § 2869 as applied to referendum petitions is

the direct and proximate cause of the impairment of rights guaranteed to plaintiffs

under the First Amendment to the United States Constitution of the United States

for which plaintiffs request relief.

## PENDENT STATE LAW CLAIM

### COUNT VII
**(Defendants Lack Statutory Authority to Prohibit Unregistered Electors
from Validly Signing Plaintiff OpenPittsburgh.Org's Referendum Petition)**

109.    Plaintiffs reassert each preceding allegation as if set forth fully
herein.

110.    The Supreme Court of Pennsylvania recently defined an "elector" as

a resident and citizen of the Commonwealth of Pennsylvania who has attained the

age of 18.

111.    Referendums are non-partisan elections.

112.    53 Pa.C.S.A. § 2943(a)  requires that plaintiff OpenPittsburgh.Org

collect valid signatures from 7,582 Pittsburgh electors.

113.    53 Pa.C.S.A. § 2943(a) further provides that the signing, filing and

adjudication of non-partisan referendum petitions are subject to the provisions of

the election laws governing partisan nomination petitions only "***insofar as such provisions are applicable***."

114.   Accordingly, defendants lack statutory authority to require that only registered electors may validly sign plaintiff OpenPittsburgh.Org's referendum petitions.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

a.   Enter declaratory judgment against all challenged provisions of 53 Pa.C.S.A. § 2943(a)  and 25 P.S. § 2869  as detailed in Counts I through VI above,  or any combination thereof;

b.   Enter an emergency temporary restraining order, on or before August 1, 2016, enjoining defendants from enforcing the challenged provisions and interpretations of 53 Pa.C.S.A. § 2943(a)  and 25 P.S. § 2869 as detailed in Counts I through VI above, or any combination thereof, against all plaintiffs now and in the future;

c.   Permanently enjoin defendants from enforcing the challenged provisions of 53 Pa.C.S.A (a) and 25 P.S. § 2869 for referendum petitions now and in the future;

d.   Enter an emergency temporary restraining order, on or before August 1, 2016, enjoining defendants from striking otherwise valid

signatures of unregistered electors from plaintiffs' referendum petitions as detailed in Count VII against all plaintiffs now and in the future;

e.      Permanently enjoin defendants from striking otherwise valid signatures from referendum petitions of unregistered electors as detailed in Count VII against all plaintiffs now and in the future;

f.      Award plaintiffs the cost of this action together with their reasonable attorneys' fees and expenses pursuant to 42 U.S.C. § 1988; and,

g.      Retain jurisdiction of this action and grant plaintiffs such other relief which may in the determination of this Honorable Court to be necessary and proper.

Dated:  July 21, 2016                    Respectfully submitted,

                                          /s/ *Lawrence M. Otter*
                                         LAWRENCE M. OTTER, ESQUIRE
                                         **ATTORNEY FOR PLAINTIFFS**
                                         PA ATTORNEY ID #31383
                                         P.O. Box 575
                                         Silverdale, PA  18962
                                         267-261-2948
                                         Email:  larryotter@hotmail.com


                                          /s/*Paul A. Rossi*
                                         PAUL A. ROSSI, ESQUIRE
                                         PA ATTORNEY ID # 84947

**OF COUNSEL TO PLAINTIFFS**
IMPG Advocates, Inc.
873 East Baltimore Pike
Suite #705
Kennett Square, PA  19348
717.961.8978
Email:  Paul-Rossi@comcast.net