**EXHIBIT 8**

```
          IN THE UNITED STATES DISTRICT COURT
       FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
              CASE NO. 1:16-CV-0074




BENEZET CONSULTING, LLC and
TRENTON POOL                                    PLAINTIFFS


v.


PEDRO A. CORTES and
JONATHAN MARKS                                  DEFENDANTS




              * * * * * * * * * *




    The deposition of MARK GAILEY was taken before

Shannon L. Wheeler, Court Reporter and Notary Public in

and for the State of Kentucky at Large, at An/Dor

Reporting & Video Technologies, Inc., 179 E. Maxwell,

Lexington, Kentucky, on September 30, 2016, commencing at

the approximate hour of 10:30 a.m.  Said deposition was

taken pursuant to Notice, heretofore filed, for any and

all purposes permitted under the Federal Rules of Civil

Procedure.


              * * * * * * * * * *
```

AN/DOR REPORTING & VIDEO TECHNOLOGIES, INC.
SHANNON L. WHEELER, COURT REPORTER

APPEARANCES:




Paul A. Rossi (VIA SPEAKERPHONE)
LAW OFFICE OF PAUL ROSSI, LLC
316 Hill Street
Mountville, PA 17554
COUNSEL FOR PLAINTIFFS




Kenneth L. Joel (VIA SPEAKERPHONE)
Nicole J. Radziewicz
OFFICE OF THE ATTORNEY GENERAL
Litigation Section
15th Floor, Strawberry Square
Harrisburg, PA 17120
COUNSEL FOR DEFENDANTS

I N D E X

WITNESS:  Mark Gailey

EXAMINATION

By Mr. Joel. . . . . . . . . . . . . Page 4 - 50

By Mr. Rossi. . . . . . . . . . . . . .50 - 66

By Mr. Joel. . . . . . . . . . . . . . 66 - 68

By Mr. Rossi. . . . . . . . . . . . . .68 - 70

By Mr. Joel. . . . . . . . . . . . . . . .70

REPORTER'S CERTIFICATE. . . . . . . . . . . . . .71 - 72

* * * * *

```
 1        The witness, MARK GAILEY, after first being duly
 2   sworn, was examined and testified as follows:
 3                       CROSS-EXAMINATION
 4   BY MR. JOEL:
 5        Q    Good morning, Mr. Gailey.  My name is Kenneth
 6             Joel.  I represent the Defendants in this
 7             case along with my colleague, Nicole
 8             Radziewicz.  Have you ever been deposed
 9             before?
10        A    I have not.
11        Q    Let me give you a few rules that will make
12             this go a lot smoother and faster.  First one
13             is, if you could wait until I finish my
14             question, and I will wait until you finish
15             your answer, because it will be easier for
16             the court reporter to take everything down
17             and it will create a cleaner record that we
18             can read down the road.  Is that okay?
19        A    That's good.
20        Q    If you can't hear me at any point, please ask
21             me to repeat the question.  I'll be happy to
22             do so.  Okay?
23        A    Very good.
24        Q    I would ask that you answer verbally all of
25             the questions, yes, no.  Whatever explanation
```

```
 1           you need to give is fine as long as it is the

 2           truth, but stay away from nods, shrugs, the

 3           uh-huhs and huh-uhs because it's harder for

 4           the court reporter to take down and we won't

 5           know what your inflection was when we read

 6           this in the future.  Okay?

 7     A     Okay.

 8     Q     If at any point you don't understand a

 9           question, if you're confused, please just

10           tell me what your confusion is and I will be

11           happy to rephrase it.  Is that okay?

12     A     Yes, sir.

13     Q     Is there any reason, medical or otherwise,

14           that you can't hear me or understand me or

15           answer truthfully today?

16     A     Not that I know of today.

17     Q     So are we in agreement that if you do answer

18           you have heard me, you've understood me, and

19           you've answered truthfully to the best of

20           your ability?

21     A     That will be the assumption I proceed on.

22     Q     Very good.  What's your full name, please,

23           sir?

24     A     I am Mark Gailey.  On birth certificate, Mark

25           Alan Gailey.  A-L-A-N.  And that's
```

1    G-A-I-L-E-Y.

2    Q    Thank you.  And what's your address?

3    A    105 Forest Street, Apartment Number 1.  It's

4         in Berea, B-E-R-E-A, Kentucky 40403.

5    Q    How long have you lived there?

6    A    Three years.

7    Q    Just briefly, can you give me what your

8         educational background is?

9    A    I've graduated in Berea Community School,

10        also a year at Berea College.  I finished up

11        several years doing broadcast as a bachelor

12        of arts degree and finished with that degree

13        at Eastern Kentucky University.  So broadcast

14        communications was my specialty.

15   Q    What year did you get your degree from

16        Eastern Kentucky?

17   A    That would have been the end of '91.

18   Q    Where do you currently work?

19   A    I've worked for myself since age 12.

20   Q    What do you currently do for work?

21   A    I do various services.  Mostly yard work, but

22        also people, pet and home care.  Also

23        political canvassing, costume promotions and

24        some minimal tech advice.

25   Q    Political canvassing, what do you do in

```
 1              relation -- what do you do for that job?
 2      A    Well, that would be the political petitioning
 3           for the most part.  I would have considered
 4           going into other areas like fundraising, but
 5           it's just been a requirement to make sure
 6           that ballot access is available to
 7           alternative candidates.  So that being a
 8           strong need, there has been a mercenary
 9           benefit to allow me some commission to work
10           in the area over many years since 1980.
11      Q    So do I understand you correctly that from
12           1980 to the present you have at least on a
13           part-time basis been out in the field
14           collecting signatures to get candidates on
15           the ballot?
16      A    That is correct.
17      Q    And you said that you work for yourself.  Are
18           you an independent contractors as it relates
19           to political canvassing and signature
20           gathering?
21      A    I am, but I do have a position with the state
22           executive committee of the Libertarian Party.
23      Q    And that state executive committee would be
24           for the Commonwealth of Kentucky?
25      A    Yes.
```

```
 1        Q      From 1980 to the present, as it relates to
 2               your petition -- your signature gathering
 3               efforts, have you ever been employed by
 4               another company or have you always done this
 5               as an independent contractor?
 6        A      Independent contracting has always been the
 7               mode.  Working in that respect there are
 8               different management teams along the
 9               contracting hierarchy, so the question could
10               be answered a couple of ways.  But it's
11               never -- I've never been an employee of any
12               particular firm.
13        Q      When you talk about different management
14               teams, what are you getting at by that?
15        A      Loose associations originally got me into the
16               arrangement, and the payments and the orders
17               or the expectations would be laid out by
18               political committees in some cases, and then
19               through other independent contractors who
20               were in a position of coordinating for the
21               purpose of not allowing too much work to be
22               gathered on this commission basis so that
23               there would be some good management and
24               understanding of the focus and the targeting
25               of how much or how little work there actually
```

```
1              was.

2         Q    When you talk about -- well, let me ask you

3              this:  When you do your signature gathering

4              efforts, are you paid per signature you get?

5         A    Yes, it is a commission basis by signature.

6              The rates vary.  Often a minimal amount will

7              be required on a volunteer basis to justify a

8              reasonable separation of conflict of interest

9              from me being on a state board.

10        Q    What do you mean by that?

11        A    That a lot of folks do volunteer to do the

12             same work the mercenaries are doing.  They

13             don't have the same expertise and quality

14             work in many cases, but people make an effort

15             and so to the degree that I try to be in the

16             volunteer of a small organization, sometimes

17             that is something I try to match.

18        Q    I'm going to go back in time.  I may or may

19             not go all the way back to 1980, we'll see,

20             but for the 2016 election cycle, were you out

21             there collecting signatures for various

22             candidates?

23        A    Yes.  I often work more in the independent

24             and third or alternate party candidacy area,

25             but in this case I was brought in by some
```

1          associates in the winter season which is when

2          the bi-partisans are working on their ballot

3          access for the primaries.

4     Q    Were you brought in by Benezet?

5     A    Yes, that was -- all of my work has been

6          under Benezet until -- for the bipartisan

7          effort all of it was through Benezet, and I

8          believe he was involved in what little bit I

9          did here in Kentucky as well, although it was

10         done through other managers.

11    Q    So let's start with the 2016 election cycle.

12         What was the first petition signature

13         collection efforts that you did?  What state?

14         Let's start with the state.

15    A    I started out in Illinois, drove to East

16         Peoria and we had a stack of candidates,

17         both -- in Illinois the requirement is only

18         to work in one party as opposed to the rules

19         that are different in other states, and we

20         were allowed to do more than one candidate

21         for president.  We also had some petitions

22         for the actual delegates that would be

23         required in that process, and we also had an

24         additional petition that was setting an

25         initiative on the ballot for Illinois voters

```
 1              relative to gerrymandering.
 2        Q     How long were you in Illinois doing that
 3              collection work?
 4        A     I'm forgetting the specifics because we were
 5              not happy with some of the terms there.  It
 6              was two to three weeks.  It was not quite a
 7              full month and then we transitioned on to
 8              Indiana, the promise that we were given that
 9              we would be working from walking lists.
10              Since we were restricted to work for only one
11              party, that was a practical approach.  And
12              the folks that were coming up with the money
13              did not ever follow through with making those
14              available.
15        Q     And just to circle back, make sure I
16              understand, the work you did in Illinois was
17              that as an independent contractor for
18              Benezet?
19        A     Yes, it was.
20        Q     And you mentioned in Illinois you were
21              restricted to collecting for one party.  Is
22              that because there's something in Illinois
23              law or was that Benezet's requirement?  What
24              was that about?
25        A     Well, Benezet had to follow Illinois law.
```

```
 1              Each state has varying rules, which makes it
 2              very difficult for folks like Benezet to
 3              manage because each state has to be
 4              researched separately and a different set of
 5              rules are used, and so different impediments
 6              have been built into the system that cannot
 7              be approached and reconciled on a national
 8              basis.
 9     Q    So is it your testimony then that in Illinois
10              the Illinois law restricts signature
11              gatherers to collecting for one party or the
12              other as it relates to the primary?
13     A    Well, even beyond the primary, yes.  Yes, and
14              even beyond the primary.  For an example, in
15              2012, I was able to work for three different
16              independent or alternative candidates in
17              Alabama.  That would never be allowed in
18              Illinois.  It would disqualify.
19     Q    So who did you collect for in Illinois then
20              when you were there?
21     A    Principally, I went in to work for Rand Paul
22              and Ted Cruze, and there were also names
23              which I don't remember that would have been
24              delegates for either or one or the other of
25              the candidates.
```

```
1      Q    When you were in Illinois doing that work,

2           did you go to various locations around the

3           state to collect signatures?

4      A    I worked mostly East Peoria.  I made one

5           jaunt across the river into Peoria proper

6           because it's a bigger metropolitan area.  The

7           focus is to find the right neighborhoods, and

8           I probably didn't pick the right density

9           within the party that I was targeting, so I

10          only did that briefly.  I could have taken up

11          different places, but inasmuch as we were

12          looking for targeted lists that were

13          Republicans and that was not forthcoming,

14          that would have governed the prudence of

15          those choices, and so that was part of the

16          reason that I moved on to Indiana.

17     Q    Do you remember how many signatures you were

18          able to get in Illinois?

19     A    I don't.  I've submitted copies of my invoice

20          to the court process that were in a subpoena

21          that were handled by you through the emails

22          and allegedly to be delivered by the 14th of

23          this month.

24     Q    And when you were in Illinois, did you stay

25          at different hotels in different locations or
```

```
 1              did you stay in the same place for the whole

 2              time?

 3      A      I believe that we just stayed at the one

 4              Motel 6 in that town, yes.

 5      Q      After you worked in Illinois did you then go

 6              straight on to Indiana?

 7      A      Yes.

 8      Q      How long were you in Indiana for?

 9      A      Again, I'm not remembering the absolute

10              specifics.  It was more than a month.

11              Probably seemed like five weeks or so.

12      Q      And did I understand you correctly that in

13              Indiana you were also restricted that you

14              could only collect for one party?

15      A      No.  There was an issue about being clear

16              with the folks that are being asked to sign

17              as to whether there was a first-in,

18              first-counted understanding.  My

19              understanding is that you can't tell someone

20              that they can or cannot sign a petition.  The

21              different state rules come in with different

22              procedures and administrative policy as to

23              how those will be counted if the same person

24              ends up signing more than one.

25      Q      And did you collect -- who did you collect
```

```
1              signatures for in Indiana?
2    A    We, again, started with Rand Paul, Ted Cruz,
3         added on the Democrat at the time, Rocky De
4         La Fuente, and so those were my principal
5         bulk of work for that Indiana campaign.
6    Q    Do you remember how many signatures you
7         achieved for any of those folks?
8    A    No, I don't remember specifics because I
9         haven't glanced at them.  They were all paid
10        up.  They were in the invoices that you have
11        received copies of.  I do know that I made
12        good volume in Indiana at either three or
13        three-fifty per signature netting the kind of
14        results -- one weekend in Evansville, I made
15        1,200 at a gun show, and another one in
16        Elkhart, started Friday and made 2,350.
17        These were an anomaly of the kind of money
18        I'd like to bring down throughout the week
19        and throughout the month, but that was the
20        high side of the venture.
21   Q    And you mentioned Evansville and Elkhart.  Am
22        I correct that when you were in Indiana for
23        that five weeks or so you moved around to
24        different parts of the state to collect
25        signatures?
```

1    A    Yes.  We did well targeting gun shows in, for

2         me at least, five communities, and I went to

3         several others as well just to make sure we

4         had good coverage between the different

5         congressional districts.

6    Q    And when you moved around to these different

7         locations over the five weeks did you stay in

8         different hotels?

9    A    Yes.  Yes.  Let's see, sometimes we would --

10        we would get lucky and stay.  It's more

11        comfortable to stay in place, but typically

12        we would have to move on just to -- just for

13        the convenience of the paperwork and

14        submitting the requests for the money to

15        cover them.

16   Q    And was the work in Indiana also done as an

17        independent contractor for Benezet?

18   A    Yes, it was.

19   Q    After Indiana where did you go to collect

20        signatures?

21   A    I made a very brief trip up to Wausau,

22        Wisconsin, and that was the only town that I

23        worked in Wisconsin.

24   Q    And was that trip up to Wisconsin as an

25        independent contractor for Benezet?

```
1    A    Yes, it was.

2    Q    And was that -- and who did you collect for?

3    A    That was strictly for Rocky De La Fuente.

4    Q    And was that for Rocky De La Fuente as a

5         Democrat to get on the Democratic primary in

6         Wisconsin?

7    A    Yes, it was.

8    Q    Do you know how many signatures you got?

9    A    No, not right off-hand.

10   Q    And how long were you in Wisconsin?

11   A    Again, I'm working from memory.  It probably

12        would have been about 10 days.

13   Q    And did you go straight from Indiana to

14        Wisconsin?

15   A    I made one or two trips back to Kentucky,

16        both for holiday events and for the passing

17        of my mother, and so I believe that was a

18        time when I ended up going to Kentucky first

19        just very briefly.

20   Q    And did you stay in the same hotel when you

21        were in Wisconsin or did you move around to

22        different places?

23   A    No, it was the same hotel.

24   Q    Where did you go after Wisconsin?

25   A    We next moved on to Pittsburgh.
```

1    Q    And was that as an independent contractor for

2         Benezet as well?

3    A    Yes, it was.

4    Q    Did you go straight on from Wisconsin to

5         Pittsburgh?

6    A    Again, I think I made a Kentucky trip because

7         it was about the time that my mother was

8         passing.

9    Q    How long were you in Pennsylvania for?

10   A    Again, my memory would say between three and

11        five weeks.  I'm not remembering

12        specifically.  The invoice tracking of that

13        would be clear.

14   Q    And who did you collect signatures for when

15        you were in Pennsylvania this time?

16   A    We principally started with Rocky De La

17        Fuente Democratic primary campaign.  There

18        was a little bit of work that we were hoping

19        for that didn't get assigned quickly in the

20        Republican primaries for the Rand Paul and

21        Ted Cruz again.  I ended up -- by that time,

22        Rand Paul had dropped out.  Ted Cruz was

23        required, along with delegates, to support

24        his documentation, and so I worked directly

25        under one of those delegates.

```
1    Q    So did you collect signatures for the Ted
2         Cruz campaign?
3    A    Yes.
4    Q    And did you collect them for Ted Cruz or for
5         Ted Cruz's delegates?
6    A    Both.
7    Q    Can you give me any estimate as to how many
8         signatures you collected for Rocky De La
9         Fuente as the Democratic candidate for
10        president?
11   A    No, it's not -- not given to my memory.
12   Q    Can you give me any estimate as to how many
13        signatures you collected for Ted Cruz as a
14        Republican candidate for president in
15        Pennsylvania?
16   A    Since the walking lists and the orders to go
17        in that direction were late and slow, it was
18        certainly less than a hundred on each.
19   Q    So less than a hundred for Cruz and less than
20        a hundred for his delegates?
21   A    I think so, as I remember.
22   Q    And when you say that was because getting the
23        walking list was slow, explain to me what you
24        mean.
25   A    Well, the folks that finance are in charge
```

```
 1            and they can, as political organizations,

 2            they have access to the full voting lists at

 3            a paid rate.  I'm not sure of the process,

 4            but we count on them getting those, and then

 5            working through the database and the sorting

 6            and reporting from those lists to something

 7            that is a little easier to walk with.  We

 8            couldn't walk with the entire voters list of

 9            the state.

10       Q    So do I understand you correctly that either

11            the campaign or somebody is in charge of

12            getting these voting lists, culling them down

13            and putting them into more digestible amounts

14            where you as a signature collector then takes

15            so you know where the Republican houses are

16            so you can knock on those doors and get the

17            signatures more easily?

18       A    Yes, that's exactly right.

19       Q    And as it related to Cruz, you didn't get

20            those as quickly as you had hoped and that

21            hindered your ability to get signatures?

22       A    Right.  The assignments to go ahead in that

23            direction were filtered through Benezet and

24            we could only wait for the money and the

25            orders to come through.
```

```
1      Q     You mentioned that you were in Pittsburgh.

2            Did you go to different locations around

3            Pennsylvania or were you only in Pittsburgh?

4      A     Pittsburgh is pretty big.  I did travel

5            throughout Pittsburgh.  In 2012, I was

6            centered in the south county below it,

7            Washington, but in 2016, no, I did

8            primarily -- I did all my work in Pittsburgh

9            region.

10     Q     And did you stay at different locations

11           around the Pittsburgh region, different

12           hotels or just one?

13     A     Yes, I was back and forth in several hotels.

14           They were quite expensive.

15     Q     Where did you go from Pennsylvania to collect

16           signatures?

17     A     I gave up at that point and returned home to

18           Berea, Kentucky.  It was coming up on the

19           season where there were other states beyond

20           Pennsylvania that I could have made myself

21           available, but I have a primary objective of

22           yard work, and so I had to start building my

23           lawn mowing contracts.

24     Q     Is your primary employment yard services?

25     A     The bulk of it for the last couple of years
```

```
 1              has been yard services, yes.
 2        Q     And then if I understand you correctly,
 3              during these winter months you'll do this
 4              signature gathering because presumably
 5              there's no yard work to do in the winter; is
 6              that the idea?
 7        A     Right.  Well, a diversification of many
 8              aspects, and that is two that fit together
 9              well.
10        Q     Did you go out on any other signature
11              collecting efforts in the 2016 election cycle
12              after Pennsylvania?
13        A     I was recruited for both more work, I think
14              with Benezet in Pennsylvania, with another
15              associate in Alabama.  I did not choose to
16              take those on.  I was able to get a small
17              amount of signatures in Kentucky along with
18              the effort that was paid there.  That was
19              associated with Benezet as he brought in some
20              of his contacts.  I was actually paid
21              directly by the party that I'm on the
22              executive committee with.
23        Q     Do you know when you collected in Kentucky?
24        A     Oh, let's see.  I had the opportunity for
25              some time, so I only worked in the very last
```

```
 1          month before the turn-in date, which was

 2          several weeks ago.  Worked less than really

 3          about a month at the most.

 4     Q    Other than that small effort in Kentucky, did

 5          you collect signatures on behalf of any other

 6          candidate, party, initiative, anything like

 7          that in the 2016 cycle?

 8     A    No.  That would cover everything for 2016.

 9     Q    When you were in Pennsylvania collecting for

10          Rocky De La Fuente and Ted Cruz and Ted

11          Cruz's delegate, did you have the signatures

12          that you collected notarized?

13     A    I worked cooperatively with the notarization

14          process, but the witness requirement of both

15          jurisdiction and party affiliation had to be

16          fulfilled by an additional witness.  In the

17          Republican primary it was the actual delegate

18          who provided me the list and the criteria and

19          traveled with me much of the time.  That was

20          a difference in -- from the Rocky De La

21          Fuente, who I'm not sure had a full delegate

22          listing yet, and so we worked with witnesses

23          that we had to arrive at on an hourly basis.

24     Q    Let's unpack that a little bit.  As it

25          relates to Cruz, did I understand you
```

```
 1              correctly that your witness was a Cruz

 2              delegate?

 3       A      That's correct.  That's the basis on which I

 4              worked in 2012 and in 2016.

 5       Q      And you collected signatures for Cruz and for

 6              his delegates, correct?

 7       A      Yes.

 8       Q      And then did the delegates sign the affidavit

 9              of circulator?

10       A      I'm sure they did or the work would not have

11              been turned in.

12       Q      And that affidavit of circulator signed by

13              the Cruz delegate was notarized to your

14              knowledge?

15       A      Yes.

16       Q      And to your knowledge, did you -- when you

17              were getting signatures did you ask if people

18              had signed another petition already or how

19              did you deal with the requirement in

20              Pennsylvania that you can only sign one

21              petition for the primary candidate?

22       A      I'm not sure that that is the reading of the

23              law.  My understanding was that they had to

24              fulfill both the jurisdiction and the party

25              affiliation.  That's the basis upon I went.
```

```
1              I guess it gets confused in rhetoric with

2              approaching more candidates more broadly

3              adding the independent and alternatives.  So

4              going from state to state you have to re-look

5              at the rules.  They're all different.  So

6              since I don't live there, I had not committed

7              those to memory.

8        Q     With the Rocky collection efforts in

9              Pennsylvania, did you also have a witness

10             come around with you to collect?

11       A     Yes.  We hired folks from various places that

12             we could find.  I did not have any contacts

13             in Pittsburgh myself that were willing or

14             able to put the time forward.

15       Q     So did you therefore not collect any

16             signatures for Rocky?  I thought you said you

17             did.

18       A     No, I did, but we had to arrive at witnesses

19             through hiring them and Benezet took care of

20             that.

21       Q     Oh, okay.  I understand.  So the witnesses

22             were provided to you by Benezet --

23       A     Yes.

24       Q     -- for Rocky De La Fuente, whereas for the

25             Cruz campaign the delegate acted as your
```

```
 1              witness?
 2       A     Right, but it was still in coordination with
 3              the Benezet management.
 4       Q     Very good.  And for the Rocky De La Fuente,
 5              am I correct that that witness signed the
 6              affidavit?
 7       A     Yes.  I had to make sure and step them
 8              through that process because they generally
 9              did not have any basis or expertise of
10              understanding or competency in the area.
11       Q     And were those affidavits signed by the
12              witnesses notarized to your knowledge?
13       A     Yes.  We would make sure and get them
14              notarized because our payment was dependent
15              upon the notarization.
16       Q     Now, as it relates to the Rocky De La Fuente
17              collection effort, did you go door to door on
18              that?  Did you go to big events?  What was
19              your practice?
20       A     We went on the streets to events or just busy
21              street traffic, commercial traffic.
22       Q     How about Cruz or the Cruz delegates, did you
23              do the same or did you go door to door?
24       A     No, we finally did door to door with the Cruz
25              because we were given some registered voter
```

```
 1              lists from the Republican party.
 2      Q      In your experience as a signature gatherer,
 3              if you have those walking lists, knowing who
 4              are going to be your targeted Republicans,
 5              does that make it easier to collect
 6              signatures than just being out in traffic?
 7      A      It generally does because you have to filter
 8              so many things beyond just someone's interest
 9              in signing, and the party affiliation and the
10              local jurisdiction sometimes is very minor.
11              If you've got delegates, they can't be across
12              certain borders.
13      Q      Did you do any signature collecting in 2015?
14      A      I don't recall that I did.  If I did, it
15              would have been not through Benezet and it
16              would have been a Republican race here -- I
17              mean a governor's race here in Kentucky, but
18              it would have been so brief that it wouldn't
19              have amounted to much.
20      Q      How about in 2014, did you do any signature
21              collecting?
22      A      I think I did a very small amount, probably
23              was not paid, but it was for a senatorial
24              candidate.
25      Q      Was that also in Kentucky?
```

```
 1      A    Yes, Kentucky.  The Libertarians challenge

 2           against Mitch McConnell.

 3      Q    How about 2013, did you do any signature

 4           collections?

 5      A    No.

 6      Q    How about 2012?

 7      A    Yes, I worked in -- not through Benezet, but

 8           I worked the campaign just south of

 9           Pittsburgh in Washington County.  Also I did

10           a little bit in Altoona, Pennsylvania.  And

11           again, these were Republican presidential

12           candidate Rand Paul -- or Ron Paul and the

13           delegates that would follow up in support of

14           them.

15      Q    Let me just make sure I understand.  So in

16           2012, you collected signatures in

17           Pennsylvania, in Washington, Pennsylvania,

18           and around Altoona, Pennsylvania, for the

19           primary for Republican Rand Paul and for his

20           delegate; is that correct?

21      A    I think that's right, but it's -- it's a --

22           I'm forgetting which year Rand started and

23           whether it was his father.  It could have

24           been his father.  I believe it was Ron Paul,

25           not Rand.
```

1  Q   Did I -- I meant to say Ron Paul.  I'm sorry.

2  A   Yes.  Thank you.

3  Q   Thank you for correcting me.  How long were

4      you in Pennsylvania that time?

5  A   It was about a month.

6  Q   And did you move around to different

7      locations in Pennsylvania?  I presume so.

8  A   Well, I had walking lists, and so it was more

9      convenient, but yes, I worked throughout

10     Pittsburgh and Altoona.  I mean, not

11     Pittsburgh, Washington proper.  I believe the

12     town and the county are the same name.  But

13     around Washington, Pennsylvania, and Altoona.

14     So we had walking lists and it was easier to

15     stay in one motel at that point for each

16     town.

17 Q   So did you stay in one hotel the entire month

18     you were in Pennsylvania or did you move

19     around?

20 A   No, one hotel per town, so it would have been

21     two.

22 Q   Can you give me any estimate as to how many

23     signatures you collected for either Ron Paul

24     or his delegate?

25 A   No.  It's not something that is trivia that I

```
 1              remember.  It paid well enough to stay there

 2              for a month and to pay for the hotels.

 3        Q     Did you work through another company for that

 4              or did you work directly for the campaign?

 5        A     I believe I was working directly for either

 6              the campaign or political action committees.

 7              I was brought into the industry after first

 8              being introduced to it in 1980s by a friend,

 9              Andy Jacobs, who is also an associate of

10              Trenton Pool of Benezet, and so some of the

11              payments were coordinated with folks like

12              Andy Jacobs.

13        Q     And in 2012, doing the work collecting

14              signatures for Ron Paul and his delegate,

15              since you had the walking lists, am I correct

16              that you primarily went door to door?

17        A     That's correct.

18        Q     And am I correct that you had a witness with

19              you for that collection?

20        A     I was working under the agency of the

21              delegate.

22        Q     So you had a Ron Paul delegate as your

23              witness walking with you, correct?

24        A     In most cases, yes.

25        Q     Did that Ron Paul delegate sign the affidavit
```

```
1              of circulator?

2    A    Yes.

3    Q    And was that notarized to your knowledge?

4    A    Yes, absolutely.

5    Q    Did you do any other collection in 2012?

6    A    Yes.  I moved on to Alabama where I worked

7              for three separate third party or independent

8              candidates.  I think we covered Green,

9              Constitution and Libertarian Party there.  I

10             could gather signatures from any individual

11             for all three if they chose.

12   Q    And did you go straight from Pennsylvania to

13             Alabama?

14   A    No.  It would have been a separate season.

15   Q    So after Pennsylvania did you go back to

16             Kentucky?  Is that what happened?

17   A    Yes.

18   Q    And then at some point you went from Kentucky

19             down to Alabama to collect signatures?

20   A    Correct, and then more in Kentucky as well.

21   Q    How long were you in Alabama for?

22   A    I believe that would have been a short run,

23             maybe three weeks.

24   Q    And did you go to different parts of the

25             state to collect signatures?
```

1    A    No.  I worked in Huntsville and then drove at

2         the end near the deadline to the capital to

3         help collate all the various documents for a

4         last minute turn in.

5    Q    When you were doing your collection in

6         Huntsville, did you stay in one hotel or did

7         you move around?

8    A    I may have moved for convenience or

9         preference, but it was generally one

10        location.

11   Q    And then what did you collect for in Kentucky

12        in 2012?

13   A    That would have been just for the Libertarian

14        candidate.

15   Q    For president?

16   A    For president, and that would be Gary

17        Johnson.

18   Q    The Alabama collection for the

19        Green/Constitutional/Libertarian, was that

20        also for president?

21   A    All three for president.

22   Q    Did you just stay at your home in Kentucky or

23        did you move around?

24   A    Right.  I live in central Kentucky, in the

25        Bluegrass region, so it was convenient not to

```
 1              have to get motels.
 2       Q     Can you remember how many signatures you got
 3              in Alabama for either the Green,
 4              Constitutional or Libertarian?
 5       A     I do not.  It went smoothly.  There's always
 6              challenges, but it paid well and I don't
 7              remember the specific numbers.
 8       Q     How about in 2011, did you collect any
 9              signatures?
10       A     No.
11       Q     2010?
12       A     No.
13       Q     2009?
14       A     Not that I recall.
15       Q     2008?
16       A     I'm running a blank.  It would have been a
17              minimal amount in Kentucky.
18       Q     Do you remember what it was for?  Was it for
19              the presidential race or something else in
20              2008?
21       A     It would have been presidential and perhaps
22              an additional congressional candidate.
23       Q     And both of those were at Kentucky?
24       A     Yes.
25       Q     Your efforts were in Kentucky?
```

```
1       A    Yes.

2       Q    How about 2007?

3       A    Nothing.

4       Q    2006?

5       A    No.

6       Q    2005?

7       A    No.

8       Q    2004?

9       A    It's hard to remember that far back.  I

10           believe there may have been some work for a

11           congressional race in Pennsylvania at which I

12           did go to Pittsburgh, but I'm not remembering

13           the year.  It was between 2002 and 2004.

14      Q    How about 2003?

15      A    No.

16      Q    So if I understand your testimony correctly,

17           in either 2002 or 2004, you think you did a

18           congressional collection effort in

19           Pennsylvania?

20      A    Yes.

21      Q    How long were you in Pennsylvania for that

22           collection effort?

23      A    I think three or four weeks.

24      Q    Do you remember what candidate it was for?

25      A    No.  The name escapes me.  It was a
```

```
 1              Libertarian candidate.

 2      Q    And did you actually collect signatures?

 3      A    Yes.

 4      Q    And you said you were in Pittsburgh.  Did you

 5           stay in the same hotel or did you move around

 6           at all?

 7      A    Housing is miserable in Pittsburgh.  We

 8           probably found multiple locations and moved

 9           around just outside of the city limits.

10      Q    And did you have a witness accompany you for

11           those signature collections?

12      A    As I recall, I believe that's what happened.

13      Q    And did you have -- and were those -- did the

14           witness sign the affidavit of the circulator?

15      A    I think they did.

16      Q    And was it notarized to your knowledge?

17      A    Yes.

18      Q    How about 2001, any efforts there?

19      A    No.

20      Q    2000?

21      A    I'm not remembering any.  I probably worked

22           on a Kentucky campaign, though.

23      Q    So that we don't have to go year by year back

24           to 1980, let me ask a little more generally.

25           Before 2000, can you remember any time that
```

```
 1              you collected signatures?  We'll just hone in

 2              on it that way.

 3        A     Well, my first opportunity was in 1980.  The

 4              first chance that the Libertarians had to

 5              getting coverage in 50 state ballots was only

 6              because of the money brought forward by the

 7              vice presidential candidate being one of the

 8              Koch brothers, David Koch, and I worked five

 9              weeks or almost five weeks in Atlanta,

10              Georgia, canvassing for 5,000 signatures.

11              Probably stopped about 13 and a half thousand

12              people to do so.

13        Q     Other than what you testified about, have you

14              had any other experience collecting

15              signatures in the Commonwealth of

16              Pennsylvania?

17        A     No.

18        Q     When you're out collecting signatures, let's

19              take 2016 for example, and whether it's for

20              Rocky as the Democrat in Pennsylvania or Cruz

21              as the Republican in Pennsylvania or his

22              delegate, are you -- do you have any

23              information or knowledge as it relates to

24              what the campaign is looking for in terms of

25              signatures?  And let me explain that a little
```

```
 1            bit so you know where I'm going.  If, for
 2            example, there's 2,000 signatures that are
 3            needed, do you have any information on
 4            whether or not the campaign is saying, go out
 5            and get me 10,000 or are they saying, you
 6            know, get me three or 4,000 or get me 2,000?
 7            Do you have any information on that?
 8       A    We always, with a typical approach, shoot for
 9            50 percent more than is required because
10            there are problems inevitable along the way
11            of verification and validation.  They
12            absolutely have to fit the criteria of both
13            party affiliation and jurisdiction and be up
14            to date in registration, and so all of those
15            questions are asked in theory.  Sometimes
16            people get in a hurry or you ask people that
17            you thought had already heard it asked to
18            another person, but those things are
19            requisite for good quality work that I'm
20            graded on by a percentage rate, and in some
21            places actually don't pay me unless each one
22            of those shows up and is verified as
23            registered.
24       Q    So when you -- let's say in 2016 when you
25            were working as an independent contractor for
```

```
 1              Benezet, I can't remember if I asked you this
 2              or not, but did you have a written contract
 3              or was it oral?
 4    A         We looked at a written contract.  It never
 5              got facilitated in signing both ends, so we
 6              had an oral agreement.
 7    Q         Did you have any terms of that in terms of
 8              that you had to have a certain validity rate
 9              to be able to get paid?
10    A         I'm forgetting.  Generally, those are brought
11              into the clauses at levels of two-thirds, and
12              so it's something that I'm expectant to
13              fulfill at any rate, whether it's stated or
14              not.
15    Q         And when you were engaged by Benezet to go
16              out and collect signatures, were you given
17              this is how many you need to get, recognizing
18              that typically you want to get 50 percent
19              more than is required for whatever race
20              you're talking about?
21    A         Well, those standards are set and shared, but
22              not for the individual petition or signature
23              gatherer.  We work as teams and we have to
24              keep checking base to see where we are,
25              but -- so as a community within the process
```

1          of the mercenary work, we do have to stay in

2          touch and make sure that we are not over

3          target but also not under target, and so

4          those communications happen verbally and on

5          phone throughout the process on a regular

6          basis.  I don't know that --

7     Q    I'm sorry.  Go ahead.

8     A    I'm reflecting on the concept of whether my

9          quality of work had been checked, and I don't

10         know that Benezet checked the quality of

11         work.  I came in with high ratings from the

12         Kentucky Libertarian Party of at least lower

13         80 percent quality rates, and I received the

14         same kind of acknowledgment from the 30 units

15         of Trump I turned in, which I wasn't working

16         much on the Trump campaign, but a little of

17         that happened as well, and I believe that was

18         in Indiana.

19    Q    Did you collect signatures for Trump in

20         Indiana?

21    A    Yeah, just -- I got 30 just so I could get to

22         know one of these other middle managers.

23    Q    So with regards to what you just said, let me

24         make sure I understand it.  When you said

25         you're working in teams with the others, do

```
 1            you mean working in teams in terms of calling

 2            and coordinating efforts with the other folks

 3            collecting signatures on behalf of Benezet in

 4            Pennsylvania?

 5       A    That's correct, and/or anyone else.  If a

 6            candidate has a target, multiple independent

 7            individual contractors are engaged, and so

 8            everyone has to keep tabs on the workload,

 9            where it is and that it's not under or over.

10       Q    And I'm presuming that when you talk about

11            making sure that it's not over, the

12            candidate, if they're looking to get -- let's

13            take Pennsylvania where there's 2,000

14            signatures to get on the presidential

15            primary.  Given your testimony about the

16            typical wanting to get 50 percent over that,

17            let's say 3,000 then.  Am I correct that in

18            your experience the campaign is not going to

19            be too happy and is not going to want to pay

20            for 10,000 signatures if they only really

21            needed to get 3,000 to get on the ballot?  Is

22            that what you mean by making sure you're not

23            over?

24       A    Right, that's correct.  It's all a budgetary

25            issue.
```

```
 1    Q    Let me ask it this way:  When you're out
 2         there collecting door to door for the Cruz
 3         campaign, let's say in Pennsylvania, either
 4         for Mr. Cruz or his delegates, what's your
 5         process?  You go up to a house, you knock on
 6         the door.  Take me through sort of what
 7         you're saying and how long that takes and all
 8         that sort of stuff.
 9    A    Well, we start studying the lists and break
10         it down by neighborhood, find areas that are
11         easiest to walk or work with someone in
12         tandem that's driving with to follow along,
13         but we locate the house numbers, have to make
14         notes as to whether they had signed or were
15         not available to even talk to so we know
16         where to go back, picking the densest areas
17         for convenience and practicality.
18    Q    So you study the list, you get a game plan of
19         where you want to hit that would be easiest
20         for you, and by that I mean -- I'm assuming
21         you mean that it's going to yield the most
22         valid signatures in the quickest amount of
23         time for you?
24    A    Well, the validity of the signatures would
25         not be in question in most cases because
```

1        we're working from the list.  That alleviates

2        that level of the verification.  It's just

3        finding the people at home.  Odd things

4        happen where someone might be on the list and

5        their child also is in the house but isn't on

6        the list.  I had a -- just an odd case where

7        the fellow would sign, but wouldn't even let

8        me talk to the fellow that was on the list

9        because he thought I was just going to get

10       into an argument or a, you know, an hour

11       debate or discussion.

12    Q   And is the idea with studying these lists and

13       then game planning where you're going to go

14       to maximize in terms of getting the most

15       signatures in the least amount of time?

16    A   That's correct.

17    Q   Is that your game plan?

18    A   That's correct.  Just work the most

19       productive lists and be able to make notes

20       that are clear enough that if I need to go

21       back because of when people are home and not,

22       that that works in a good fluid manner.

23    Q   So when you get to a door and knock, let's

24       say somebody answers.  What's the normal

25       conversation that you go through with them to

```
 1              get them to sign?

 2    A    Well, I would represent myself as having

 3          gotten the list from the party and ask them

 4          if they were, in fact, still registered to

 5          the best of their knowledge and would they

 6          sign to get these Republican candidates on

 7          the ballot for the primary.

 8    Q    How long does that usually take between the

 9          time you knock on the door or -- well,

10          between the time that somebody answers the

11          door and you either get a signature or you

12          walk away because they're not going to sign?

13    A    Well, if they're clearly not interested, many

14          folks just don't have time for it anymore,

15          it's under two minutes.  Some will require

16          between 10 and 20 minutes depending on how

17          many people are in the house that might need

18          also -- could also be solicited at that

19          point.  They may have friends or neighbors,

20          they may have a party going on, and so --

21    Q    But if it's just one person, one registered

22          Republican at this house, you knock on the

23          door and that person answers.

24    A    Yeah, it's ten minutes.

25    Q    Ten minutes even for just one person?
```

```
 1     A     Well, five to ten minutes.  If they are on
 2           board already they'll sign quickly and not
 3           hold you up, but people don't understand the
 4           process, so many of them require a lot of
 5           explanation as to why I'm doing what I'm
 6           doing, how it works, what parts of it don't
 7           work.
 8     Q     What do you mean by that?
 9     A     Well, just explaining that the requirement of
10           keeping your registration up.  Folks that may
11           want to sign, but they're not qualified
12           because they're in another party.
13     Q     When you were going door to door in
14           Pennsylvania this past season, this 2016
15           season, can you give me a sense as to the
16           percentage of homes that had somebody in them
17           that answered the door and your ability to
18           get the signature on it?  Was it 50 percent,
19           was it 75 percent, was it 10 percent?  What
20           could you tell me about that?
21     A     I would guess 20 to 40 percent.
22     Q     So 20 to 40 percent of the people who
23           answered the door you get their signature?
24     A     Yes.
25     Q     Do you have any belief as to why the number
```

```
 1              was 20 to 40 percent as opposed to either 10

 2              percent or as opposed to 90 percent?

 3      A       Well, particularly in this year there's an

 4              increase in the disenfranchisement that is

 5              voiced and displayed by anyone and everyone

 6              asked to participate.  They don't want to

 7              have anything to do with politics anymore.

 8              People are fed up.

 9      Q       Any other reasons or is that your belief as

10              to why there was a 20 to 40 percent success

11              rate?

12      A       Well, there's certainly people that are in

13              another candidate's camp who would have

14              reason not to sign, and so there are some who

15              have already drawn their lines and are not

16              willing to help the ones that are paying me

17              at the time.

18      Q       Any other reason that you attribute that to

19              or is that it?

20      A       That's it.  That covers it.

21      Q       When you were collecting back in Pennsylvania

22              in 2012, I think you said it was for Ron Paul

23              and his delegate, correct?

24      A       Yes.

25      Q       Did you use the same door-to-door technique
```

```
 1            as you did in 2016 for Senator Cruz?
 2     A      Yes.  We'd have to locate the witness and
 3            then travel in the snow and find the best
 4            locations that offered a density for
 5            productive means.
 6     Q      Back in 2012, when you were walking door to
 7            door collecting for Ron Paul and his
 8            delegates here in Pennsylvania, was your
 9            success rate in getting signatures any better
10            or worse than the 20 to 40 percent you
11            testified to for this year?
12     A      It seemed to be more productive, yes, in
13            2012.
14     Q      Can you give me a sense as to what that
15            percentage would be?  Would it be 40 to 60,
16            60 to 80?
17     A      Oh, I expect it's still probably more than
18            the 20.  Maybe 30 to 40.  Still not more than
19            40.
20     Q      In 2016, when you were collecting for Rocky
21            De La Fuente, I think you testified that that
22            was -- that collection -- you didn't have
23            walking lists for that, correct?
24     A      Correct.
25     Q      And you were out just on streets and public
```

```
 1            areas trying to collect signatures; is that
 2            correct?
 3    A       Yes.
 4    Q       Can you give me any sense as to what your
 5            success rate was there in terms of people who
 6            you stopped and you got a signature from?
 7    A       I would guess maybe one in ten as a
 8            broad-approach look.  Like I say, that
 9            compares to Atlanta in 1980; I'd say one out
10            of five that were questioned would sign.
11    Q       What do you attribute the one in ten 2016
12            Rocky success rate to, if you have any
13            opinion on that?
14    A       Well, again, it's a waning number.  It's a
15            waning productivity because more and more
16            people just want to have nothing to do with
17            it.
18    Q       Any other reason that you attribute that to
19            or is it the political -- I don't know what
20            the right word is -- yeah, landscape?
21    A       The landscape is changing, so that is
22            primary, but folks not being interested,
23            folks having already signed.  When you have a
24            glut of petitioners in a neighborhood, then
25            each petitioner starts stepping on one
```

```
 1              another in terms of the local crowd of the

 2              minute.

 3      Q       When you were collecting for Rocky De La

 4              Fuente as a Democrat in Pennsylvania, can you

 5              give me the names of any of the folks who

 6              were your witnesses?

 7      A       It's not on the tip of my tongue, any of

 8              them.  They typically would come from halfway

 9              houses, and I think one was Justin.  The

10              director of the house -- I can't even

11              remember his first name -- he went out a day

12              or so.  But yeah, Justin, but I don't

13              remember last names.

14      Q       When you were going door to door in

15              Pennsylvania in 2016 for Cruz and his

16              delegates, how many boards did you have ready

17              for signing?  Did you just have one, did you

18              go two?  How many did you have?

19      A       I carry at least two or three, which isn't

20              necessary for a house call, but it's handy if

21              there's a couple that doesn't want to wait.

22      Q       And how about when you were out on the street

23              doing for Rocky De La Fuente?  Same, two to

24              three boards, or did you have more?

25      A       I prefer two or three.
```

```
 1    Q    So regardless of the situation, you prefer to

 2         handle two or three.  Why is that?

 3    A    Again, two is essential to keep a couple

 4         happy so they can sign together and not one

 5         wait on the other.  I'm not sure how much ire

 6         that would cause if I didn't do that, but

 7         just to keep things pleasant for the industry

 8         it's a nice -- it's a nice thing to offer.  I

 9         know a lot of folks who carry five and six

10         boards and it's just -- it's not convenient.

11         My hand starts to cramp and sweat, falls off.

12         Of course, in the winter it might not, but in

13         the summer your body sweats and drips on the

14         boards.  So there's several things that just

15         make it complicated the more you get.

16         MR. JOEL:  I believe that's all the questions

17         I have.  I'm going to ask if we can take a

18         couple of minutes because I need to hit the

19         restroom and then we'll come back.  I'm just

20         going to leave you on the phone --

21         THE WITNESS:  Very good.

22         MR. JOEL:  -- because I'm afraid if I hit a

23         button to put you on hold or something I'm

24         going to disconnect everybody.  Okay?

25         THE WITNESS:  So I get cross-examined here in
```

```
 1              a bit?
 2              MR. JOEL:  Yeah.  I'm sure Mr. Rossi will
 3              have some questions for you.  I may have some
 4              follow up after he's done, but let's take a
 5              five-minute break.
 6              (OFF THE RECORD)
 7              MR. JOEL:  I have no further questions at
 8              this point.  Thank you, Mr. Gailey.
 9              THE WITNESS:  Thank you, Ken.
10                          DIRECT EXAMINATION
11   BY MR. ROSSI:
12        Q    Good morning, Mark.  This is Paul Rossi.  I'm
13              actually your attorney in this matter.
14        A    Yes.
15        Q    Not that we've ever met.  I'll go through a
16              couple of questions with you.  Most recently,
17              just in some of your most recent testimony
18              today, you indicated that in this election
19              cycle that you ran into people who had
20              already signed nominating petitions; is that
21              correct?
22        A    That's correct.
23        Q    Had they not signed a petition before, would
24              they -- did they indicate to you that they
25              would be willing to sign your petition?
```

```
 1      A    Well, it's a complicated question.  There are

 2            several reasons that they would have signed

 3            another one.  One would be that they have the

 4            same target candidate and so it would be

 5            useless to sign again.  In other cases, a

 6            different candidate altogether may have been

 7            the one they signed for and I may have time

 8            to clarify that and try to get their

 9            signature still.  Or in a busy street,

10            they've already moved on and I don't have a

11            chance.  I just start -- I just keep on

12            filtering through the crowd.

13      Q    And what do you mean by that?  You mean when

14            you're working on a street?

15      A    Right, when folks are coming through.  It

16            could be somebody on my own team that has

17            already asked them or it could be someone

18            from a competing team.

19      Q    For those who said they signed for some other

20            candidate, did they indicate that they would

21            be willing to sign for you if they were

22            allowed?

23      A    In some cases, yes.

24      Q    I want to talk about your witnesses for your

25            circulation nominating petitions for Rocky De
```

1              La Fuente when he was running as a Democrat.

2              Where exactly did your witnesses come from?

3        A     If I had known someone that had time, I would

4              have preferred to work with a friend.  I

5              didn't have contacts that had time to be

6              involved and many of them had conflicting

7              interests.  For example, pushing Bernie

8              Sanders was a very popular one among my

9              friends that were there.  So Trenton Pool

10             with Benezet would work through various

11             levels of putting postings on bulletin

12             boards, posting on CraigsList and then just

13             generally soliciting through other means, by

14             word of mouth, and typically what was most

15             available was folks that had time, for

16             example, at a halfway house.  We could secure

17             the understanding that they were qualified

18             because we could check their voter

19             registration, and that would have to be

20             verified because the halfway house may be

21             temporary, but they would need to be there

22             long enough to establish their credentials.

23       Q     What was your experience with the witnesses

24             that you worked with for Rocky De La Fuente

25             when he was running for Democrat?

```
 1     A     It was -- it was difficult to find folks, so

 2           sometimes there were delays.  When we did

 3           find folks that would work, sometimes it was

 4           difficult.  They would expect extra ferrying

 5           to errands that they would need to have done,

 6           and some of that was reasonable, some of it

 7           was not.  We would have difficulties with

 8           them in terms of trust.  I think I lost as

 9           much as a full sheet of signatures.  I forget

10           how many was on the sheet -- ten to thirty,

11           typically -- and I felt like there was a good

12           chance that it might have been robbed by the

13           witness because at some point they come to

14           the understanding that they're needed both on

15           the hourly basis to serve as the witness, but

16           that they could also have some options in

17           circulating some of the sheets themselves,

18           which there was no reason why they couldn't

19           other than their, you know, quality of work

20           and their understanding of the requirements.

21     Q     You just testified that you lost a full sheet

22           of signatures of about, how many, 20 to 30

23           signatures?

24     A     Yeah, it probably was about 30, sheets of 30,

25           I think.
```

```
 1      Q    And you believe the witness took it and lost

 2           it or just took it and --

 3      A    Oh, I can't -- I cannot blame them directly

 4           from any firsthand knowledge, but I am so

 5           careful with my work that it just was very

 6           disturbing and confusing that I would lose a

 7           sheet of work because of the money it

 8           represents.  And since they had been

 9           involved -- I think Justin, particularly, was

10           the one I was working with at the time and

11           had been offered to be able to turn in

12           signatures on his own, that's just like --

13           it's like an asset.  If it disappears out of

14           my hands and he can turn it in, he would get

15           rates for that work, and since there is no

16           tracking of me because I'm not allowed to be

17           the one that signs off in front of the

18           notary, then there's not a good way to track

19           the difference between who produces what

20           work.

21      Q    So your testimony is that you believe that

22           the signatures were turned in by one of your

23           witnesses rather than -- in other words, they

24           took credit for the signatures rather than

25           you?
```

```
 1      A    I believe that's the most likely scenario as

 2           to explain the missing sheet.

 3      Q    Do you know for a fact that that sheet was

 4           turned in?

 5      A    No, because I wouldn't have had a record

 6           with, you know, what the names were.  I

 7           didn't know any of those people personally

 8           and would have not had a good way to

 9           recognize it unless I had made special

10           notations.

11      Q    Were the witnesses that you worked with for

12           Rocky De La Fuente, did they show up on time

13           at all times?

14      A    No.  It was very problematic getting in touch

15           with them, getting the day started, finding

16           the best combination of moving forward within

17           that context.  They didn't even have a lot of

18           good advice on the busiest neighborhoods or

19           the busiest locations, which I would have

20           hoped they could at least do that, but they

21           may not, you know, traverse the city in a

22           complete fashion to know those kinds of

23           ideas.  A petitioner begins to -- with

24           experience begins to pull together categories

25           and have, you know, first spot looks.  In
```

1       each city they have to reexamine that process

2       to be the most productive, and so certainly

3       somebody in a halfway house has not been

4       tasked at considering any of those things.

5    Q    And you testified earlier that before you

6       actually went -- you testified earlier that

7       you essentially -- before you actually went

8       and got signatures you did sort of a game

9       plan; is that correct?

10    A    Well, you always look at a game plan, but in

11       the context when I said that it was the house

12       to house with the walking list, and the Rocky

13       De La Fuente we did not have walking lists.

14       He didn't have a management team or had not

15       bought the Pennsylvania list, and so we were

16       strictly left to, you know, managing the

17       crowdest, the most dense pedestrian traffic

18       that was allowable.  Also that was

19       constrained by issues that even though in the

20       federal first district we're allowed to do

21       Walmart and Kroger's parking lots, but those

22       battles have not been won in any other

23       federal district even though the arguments

24       would be the same.

25    Q    So for Rocky De La Fuente, you did not go

```
 1              door to door?

 2    A    No.  No.

 3    Q    And so you were constrained to working crowds

 4         in various locations to gather signatures?

 5    A    That's correct.

 6    Q    And it's your testimony that the witnesses

 7         didn't add any value with respect to picking

 8         the place that you would circulate at?

 9    A    Generally, that was correct.  They may have a

10         good idea --

11         MR. JOEL:  OBJECTION.

12    Q    Strike that.  Let me rephrase.  Is it your

13         testimony -- strike that.  Did the witnesses

14         assist in selecting your circulation spots?

15    A    They had no voluntary information from the

16         outset.

17    Q    Now, you just testified that, I believe, that

18         the witnesses wanted you to run them around

19         for errands?

20    A    That's correct.  Things like job interviews

21         would be the one that I remember

22         specifically.  I heard some other grumblings

23         from other petitioners, but that was the one

24         that I recall, that these people are in

25         transition and have some extra side needs,
```

```
 1              and so to cooperate with them we would have

 2              to facilitate some of that.

 3      Q       So in order to get the witness you had to

 4              take them on errands?

 5      A       On occasion they would be distracting from

 6              the main priority.

 7      Q       And when you were running them to a job

 8              interview you were not able to circulate?

 9      A       That's correct.

10      Q       In your experience, what is the prime time to

11              gather signatures?

12      A       Any crowded pedestrian event or venue.  Bus

13              stops were good.  Events, sometime less good

14              because people are racing a deadline to get

15              into a movie or a game.  I tend to not choose

16              to go inside the venues like a game.

17              Sometimes you get thrown off and lose the

18              money you've paid for the ticket and

19              sometimes you don't.

20      Q       In your experience, is there a time of day

21              where you gather more signatures than other

22              times of day?

23      A       The only focus that I have in picking my best

24              times would be when folks are not at bars and

25              not sober.  You can get good -- you can get a
```

|    |   |                                                                  |
|----|---|------------------------------------------------------------------|
| 1  |   | number of signatures in that scenario, but                       |
| 2  |   | they become less legible and therefore harder                    |
| 3  |   | to verify and validate.  But time of day is                      |
| 4  |   | irrelevant if you can find the crowd.                            |
| 5  | Q | In 2016, for the nominating petitions, the                      |
| 6  |   | affidavit circulator had to be executed by                      |
| 7  |   | your witness, correct?                                            |
| 8  | A | That's my understanding, that it's a title                       |
| 9  |   | and that you had to fulfill both jurisdiction                   |
| 10 |   | and party affiliation to serve in that title                    |
| 11 |   | even though that generally in most of the                       |
| 12 |   | states is my job description and my                             |
| 13 |   | expertise.                                                        |
| 14 | Q | So in most states you are able to execute the                   |
| 15 |   | petition that you circulate?                                     |
| 16 | A | That's correct, and in a sense that I am                         |
| 17 |   | respected to the level that I can sign off on                   |
| 18 |   | my work and be treated as competent, whereas                    |
| 19 |   | in Pennsylvania that does not seem to be the                    |
| 20 |   | case.                                                            |
| 21 | Q | Have there ever been any allegations, to your                   |
| 22 |   | knowledge, leveled against you with respect                     |
| 23 |   | to the veracity of your circulation efforts?                    |
| 24 | A | Not that I know of.                                             |
| 25 | Q | Have you ever been charged with election                        |

```
 1              petition fraud?
 2     A    Absolutely not.  To continue making the money
 3              you have to have quality work, and we've
 4              seen -- I've seen over, you know, many
 5              campaigns the problems where there is not
 6              quality or veracity or accountability.  Folks
 7              come in with anything from listings all in
 8              the same handwriting straight out of a phone
 9              book or every Disney character you can think
10              of.
11     Q    Do you have personal knowledge of that?
12     A    Not that I would say personal knowledge.  The
13              experience goes back many -- you know, all
14              the way to 1980 where I've watched managers
15              have to get a handle on the issue, and
16              certainly they can't continue on the basis
17              where they don't have a handle on it.
18     Q    How many hours a day do you like to circulate
19              petitions?
20     A    That would be rated only relative to trying
21              to save up and sleep, make good use of rain
22              and bad weather periods, but to be very
23              productive when it's available.  Certain
24              crowd events will wax and wane.  Campus time
25              with students, students tend to be more
```

```
 1           friendly or are more willing to be compliant

 2           in the requests than a general population.

 3    Q      No, I'm asking you, you yourself, when you're

 4           planning your day, given -- how many hours a

 5           day do you like to work, number of hours?

 6    A      Number of hours?  Six to eight would be

 7           great.  If you're in a good, dense place the

 8           money will -- in your own processing of

 9           what's practical just to go out and stick it

10           out and do big numbers.  Big numbers is the

11           name of the game for quality commission pay,

12           and so it's a combination of not wearing

13           yourself out and getting out in front of the

14           biggest crowds when you can.  There's

15           oftentimes when there are just no crowds and

16           that starts to wear a person down and he has

17           to pick and choose and be a little more

18           practical about the sleep that it takes to go

19           out and do it in a healthy manner.  But

20           there's no set rule.

21    Q      Were you able -- go ahead.

22    A      There's no set rules in that.  It's really a

23           balancing act.  It's a juggling of all those

24           concepts.

25    Q      You mentioned that the witnesses in
```

```
 1              Pennsylvania for Rocky De La Fuente didn't

 2              show up and then also you had to run errands

 3              with them.  Were you able to work the number

 4              of hours that you wanted to work?

 5     A   No, certainly not when it was heavily reliant

 6              on finding that witness, making them

 7              available to the schedule.  It was

 8              problematic.  A lot of waiting.

 9     Q   Were there any days that you were not able to

10              work?

11     A   There were a few.  I would be patient, but,

12              you know, keep pressuring to get the

13              witnesses, and we did the best we could.

14     Q   Let me ask you a question, and this -- it's

15              in the realm of I'm more curious, but to get

16              it on the record, do people object to

17              providing any specific piece of data required

18              on the nominating petition in Pennsylvania?

19     A   There may likely be one in a hundred that

20              starts to sign and then scratches it out,

21              decides that they didn't want to give their

22              address or their birthday.

23     Q   Well, birthday -- if I'm correct, birthday is

24              not on the Pennsylvania nominating petition,

25              correct?
```

```
 1     A    Oh, okay.  It all merges together with the

 2          many, many states I've worked in.  Each state

 3          has different rules, yes.

 4     Q    I understand that and I appreciate that.

 5     A    Some used to require Social Security, but --

 6          I know Kentucky used to and then they decided

 7          that that was an option between the birthday,

 8          so people don't like to give that certainly.

 9     Q    Do people object to printing out their

10          address?

11     A    Most don't.  One in a hundred might.

12     Q    Now, when you -- did you take -- when you're

13          getting your petitions executed, did you

14          travel with the witness to the notary public?

15     A    I did not travel with them in every case.  In

16          many cases, to expedite assurance that I

17          would get paid, I would set that up and go

18          along with.  We had extra fees that were

19          given to notaries just for coming out, and

20          the director of this halfway house knew

21          someone in a distant neighborhood who did not

22          have the extra cost but we had to meet their

23          office hours.  So depending on the

24          flexibility of the notary, that would all be

25          varied, and if I did not go with the witness
```

```
 1          to see that it happened and secure the papers
 2          that were due me regarding commission
 3          payment, we would typically have Trent or
 4          someone else in his team to do that.  So he
 5          was ultimately taking responsibility, but me
 6          knowing I had to get paid would certainly
 7          facilitate every bit that I could.
 8     Q    Going back to the situation where you had to
 9          drive the witness to a job interview, were
10          you compensated for your gas in transporting
11          the witness?
12     A    No.  It was just considered a trade-off for
13          the cooperative partnership.
14     Q    Is it your understanding that if you did not
15          take the witness to his job interview he
16          would not have shown up?
17     A    It would be very likely that he would have to
18          find other means to get to the job interview
19          since what he was doing was very short term.
20          That also kind of paints the quality of his
21          work and his competency and lack of
22          understanding in the whole process, which
23          really, the bottom line, it skewed the
24          hierarchy of the agency because here's an
25          hourly person that really doesn't know and
```

```
 1          have much investment of his own process that

 2          is signing off on work and above me who is

 3          the one that, you know, for my own work and

 4          my own pay know that I have to do the most

 5          accurate and most competent capacity of work.

 6     Q    I don't understand that answer.  Forgive me.

 7          Are you saying that -- can you break that

 8          down?

 9     A    Well, what I'd like to say in addendum to

10          that question, this is about -- the problem

11          here is the hierarchy of authority as it's

12          brought from the agency.  The secretary of

13          state and the candidate both are asking me to

14          do something --

15     Q    Yes.

16     A    -- and to do it effectively, to do it

17          honestly and accurately.  They've put someone

18          in line of authority above me, between them

19          and me, who has no dog in the fight, has no

20          investment, has no accountability, has no

21          answerability.

22     Q    And the person placed above you between the

23          person hiring you to do a good job is this

24          witness?

25     A    This witness that typically in a difficult
```

```
1              labor market is just someone from a halfway
2              house.
3              MR. ROSSI:  I think that's all my questions.
4              MR. JOEL:  I've got a couple of follow-ups,
5              Mr. Gailey.
6              THE WITNESS:  Yes.
7                      RECROSS-EXAMINATION
8    BY MR. JOEL:
9         Q    You were talking about going out and
10             collecting signatures for Rocky De La Fuente
11             in Pennsylvania as a Democrat.  As the
12             petitioner, you could have opted to go door
13             to door, correct?  There's nothing stopping
14             you from doing that.
15        A    That's correct.  I would have gone to many,
16             many doors where people were not registered
17             or were registered the wrong way, and so that
18             would have slowed me down more than double,
19             probably almost five times as much.  I would
20             be probably 20 percent as efficient.
21        Q    But that was a decision that you as the
22             professional circulator, you made that
23             decision?
24        A    That's right.  Short of having a Democrat
25             list or a more full list.
```

```
 1    Q    And you talked about -- when you were talking
 2         about people who have signed other petitions
 3         or may or may not want to sign your petition,
 4         let's say Cruz as a Democrat -- or Cruz as a
 5         Republican, I thought you testified earlier
 6         that it also could be the case that one of
 7         the people you were asking to sign was set in
 8         their ways and adamant about their candidate,
 9         and as a result wouldn't want to help the
10         candidate you were circulating for; is that
11         accurate?
12    A    That's accurate.  When I approach and am
13         filtering in a crowd or even door to door, I
14         meet every kind of nuance and situation of
15         their different backgrounds, and so that's
16         just one of many.
17    Q    And that would have happened whether it was
18         the Cruz collection or the Rocky De La Fuente
19         collection as a Democrat, correct?
20    A    Well, not to the same degree if I'm working
21         from a list that is committed to a party
22         list.
23    Q    I understand.  I understand that.  I mean in
24         terms of you coming across somebody who has
25         already signed for Hillary Clinton, that
```

```
 1              person may say, I've got my candidate, I'm
 2              not signing -- even if I were allowed to sign
 3              I'm not going to sign your petition for
 4              Rocky, correct?
 5      A    That's correct.
 6      Q    And the same thing could be true when you're
 7              circulating for Trump.  You could have
 8              somebody saying, I've already signed for
 9              Donald Trump, there's no way in God's green
10              earth I'm signing for Ted Cruz even if I'm
11              allowed to do it, correct?
12      A    Yes.
13              MR. ROSSI:  OBJECTION.  That calls for
14              speculation.  You can answer the question.
15      Q    In your experience, do people get dug into
16              their candidate and they refuse to sign for
17              other people even if they're allowed to?
18      A    Absolutely.  That's one of the aspects of the
19              broader population.  There are folks in that
20              category.
21              MR. JOEL:  That's all I have.  I thank you
22              for your time.
23              MR. ROSSI:  I have a follow-up on that.
24                        REDIRECT EXAMINATION
25    BY MR. ROSSI:
```

```
 1       Q     You testified earlier that there were some
 2             people who indicated to you they would sign,
 3             but since they did sign you could not take
 4             their signature.
 5       A     Well, that's relative to the different states
 6             rules and there's a broad --
 7       Q     I'm talking about Pennsylvania.
 8       A     Right.
 9       Q     When you were collecting for Rocky De La
10             Fuente, is it your testimony people
11             expressed -- people had said they signed --
12             they would sign but they had already signed?
13       A     That is correct, and for most of the
14             population they have no idea what the rules
15             are, so much of the time is spent analyzing
16             and breaking that down to make sure people
17             understand what they need to.
18       Q     In other states in which you circulated are
19             people willing to sign more than one nominee
20             or one election petition?
21       A     Some are; some are not.  Many are glad to
22             have as many candidates as they can, and in
23             many states where they're restricted they're
24             very frustrated at not being able to broaden
25             the field more than just the one candidate.
```

```
 1      Q    And you're testifying to that because they've

 2           expressed that to you directly?

 3      A    Absolutely.

 4           MR. ROSSI:  That's all I have.

 5                   FURTHER RECROSS-EXAMINATION

 6  BY MR. JOEL:

 7      Q    Mr. Gailey, there are still others who have

 8           expressed to you directly, I'm not signing

 9           that petition even if I could because I don't

10           want that person to get on the ballot?

11      A    Yeah, there are some like that.

12      Q    And that's in Pennsylvania and other places?

13      A    Oh, absolutely everywhere.

14           MR. JOEL:  Okay.  Thanks.

15           THE WITNESS:  Thank you folks.

16           MR. ROSSI:  Do you want to read and sign

17           this, Mr. Gailey?  You have that opportunity.

18           THE WITNESS:  I don't know that I need to.

19           I'd be glad to if you would prefer that.

20           MR. ROSSI:  It doesn't matter to me.  It's

21           completely your option.

22           THE WITNESS:  No, I don't feel the need to.

23                   * * * * * * * * *

24      THEREUPON, the deposition of MARK GAILEY was

25  concluded.
```

1   STATE OF KENTUCKY      )
                           )
2   COUNTY OF JESSAMINE    )

3

4

5        I, SHANNON L. WHEELER, the undersigned Notary Public

6   in and for the State of Kentucky at Large, certify that

7   MARK GAILEY, the aforesaid deponent, was by me first

8   duly sworn to testify to the truth, the whole truth and

9   nothing but the truth in the case of BENEZET CONSULTING,

10  LLC, and TRENTON POOL, Plaintiffs, v. PEDRO CORTES and

11  JONATHAN MARKS, Defendants, Case No. 1:16-CV-0074, now

12  pending in the United States District Court for the

13  Middle District of Pennsylvania.

14

15       That the foregoing deposition was taken down in

16  stenograph by me and afterwards reduced to computer

17  transcription under my direction, and the typewritten

18  transcript is a true record of the testimony given by said

19  witness.

20

21       That the Plaintiffs were represented by their

22  counsel, Paul Rossi, telephonically at the taking of said

23  deposition; that the Defendants were represented by their

24  counsel telephonically, Kenneth L. Joel and Nicole J.

25  Radziewicz; that there were no other appearances.

 1      That said deposition was taken on behalf of the

 2  Defendants pursuant to Notice and pursuant to the Federal

 3  Rules of Civil Procedure for the District Courts of the

 4  United States.

 5

 6

 7      I do further certify that I am a disinterested person

 8  in the cause of action heretofore stated.

 9

10

11

12

13

14

15

16

17  My commission expires:  March 23, 2018.

18  IN TESTIMONY WHEREOF, I have hereunto set my

19  Hand and seal of office on this the 17th day of

20  November, 2016.

21

22

23                        _____

24                        SHANNON LYNN WHEELER,
                          NOTARY PUBLIC, STATE-AT-LARGE
25                        NOTARY ID 415547