**EXHIBIT 9**

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT

OF PENNSYLVANIA

* * * * * * * *

BENEZET CONSULTING,    *

LLC; and TRENTON POOL,*

    Plaintiffs        *Case No.

    vs.               *1-16-CV-0074

PEDRO A. CORTÉS, in    *

his official capacity *

as the Secretary of    *

the Commonwealth of   *DEPOSITION OF

Pennsylvania; and     *CARL ROMANELLI

JONATHAN MARKS, in his*October 18,

official capacity as  *2016

Commissioner of the    *

Bureau of Commissions,*

Elections and          *

Legislation,           *

    Defendants         *

        * * * * * * * *

Any reproduction of this transcript is

prohibited without authorization by

the certifying agency.

1                     D E P O S I T I O N

2                            O F

3      CARL ROMANELLI, taken on behalf of the

4      Plaintiffs herein, pursuant to the

5      Rules of Civil Procedure, taken before

6      me, the undersigned, Bernadette M.

7      Black, a Court Reporter and Notary

8      Public in and for the Commonwealth of

9      Pennsylvania, at the Crown Plaza-

10     Harrisburg, 23 South Second Street,

11     Harrisburg, Pennsylvania, on Tuesday,

12     October 18, 2016, beginning at

13     1:46 p.m.

14

15

16

17

18

19

20

21

22

23

24

25

3

1               A P P E A R A N C E S

2

3     PAUL ANTHONY ROSSI, ESQUIRE

4     873 East Baltimore Pike

5     Suite 705

6     Kennett Square, PA  19348

7          COUNSEL FOR PLAINTIFFS

8

9     KENNETH JOEL, ESQUIRE

10    NICOLE LYNN ADAMS, ESQUIRE

11    PA Office of Attorney General

12    15th Floor, Strawberry Square

13    Harrisburg, PA  17120

14         COUNSELS FOR DEFENDANTS

15

16

17

18

19

20

21

22

23

24

25

4

1                    I N D E X

2

3    W I T N E S S :  CARL ROMANELLI

4    EXAMINATION

5        By Attorney Rossi              7  -   8 3

6    EXAMINATION

7        By Attorney Joel              8 3  -  1 3 3

8    RE-EXAMINATION

9        By Attorney Rossi           1 3 3  -  1 4 0

10   RE-EXAMINATION

11       By Attorney Joel            1 4 1  -  1 4 3

12   CERTIFICATE                               1 4 4

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1                    EXHIBIT PAGE

2

3                                           PAGE

4    NUMBER    DESCRIPTION        IDENTIFIED

5                   NONE OFFERED

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

1                     O B J E C T I O N   P A G E

2

3    A T T O R N E Y                              P A G E

4    Joel                                    30, 71, 78

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

7

1          P R O C E E D I N G S

2     -----------------------------------------

3     CARL ROMANELLI, HAVING FIRST BEEN DULY

4     SWORN, TESTIFIED AS FOLLOWS:

5     -----------------------------------------

6     EXAMINATION

7     BY ATTORNEY ROSSI:

8     Q.     Good afternoon.

9     A.     Good afternoon.

10    Q.     Can you state your name for the

11    record, please?

12    A.     Yes, Carl Romanelli.

13    Q.     Okay.  Let me go over

14    some ---.  Have you ever been deposed

15    before?

16    A.     Yes, I have been.

17    Q.     Let me go over some foundation

18    rules.  If I ask a question and you

19    don't understand it, stop and ask me

20    to clarify it.  Okay?

21    A.     Okay.

22    Q.     The other answer (sic) is, give

23    verbal answers, yes or no, so that the

24    court reporter can record your answer.

25    A.     Yes.

8

1    Q.    And I assume, then, that if you

2    answer a question you will have

3    understood it; correct?

4    A.    Yes.

5    Q.    Okay.  Is there any reason

6    today ---?  Are you on any medication

7    or any other drug that would prevent

8    you from testifying truthfully?

9    A.    No.

10   Q.    Where do you live?

11   A.    In Wilkes-Barre.  Do you want

12   the full address?

13   Q.    Full address, please.

14   A.    350 South Franklin Street, in

15   Wilkes-Barre, Pennsylvania.

16   Q.    Okay.  What county is that?

17   A.    Luzerne.

18   Q.    Are you a registered voter?

19   A.    Yes, I am.

20   Q.    Are you a registered voter in

21   Luzerne County?

22   A.    Yes, I am, at that address.

23   Q.    What is your ---?  Are you

24   affiliated with a party?

25   A.    Yes.

9

1    Q.    What party are you affiliated
2    with?
3    A.    The Green Party of
4    Pennsylvania.
5    Q.    How long have you been a
6    registered voter?
7    A.    Since I was 18 years of age.
8    So that would be since 1977.
9    Q.    Have you always been a member
10   of ---?  Have you always been
11   registered as a member of the Green
12   Party?
13   A.    No, I have not.
14   Q.    Before you were registered and
15   then with the Green Party, were you
16   registered with a party?
17   A.    Yes.
18   Q.    What party were you registered
19   with?
20   A.    The Democratic Party.
21   Q.    Is that the first party you
22   were registered with?
23   A.    Yes, the only time I ever
24   changed my party affiliation was when
25   I went from being a Democrat to a

10

1    Green in 2000.

2    Q.    2000?

3    A.    Yes.

4    Q.    Going back to when you were a

5    Democrat before 2000, did you hold any

6    party office with the Democrats?

7    A.    I was co-chair of an

8    organization in Luzerne County called

9    the Luzerne County Dissident

10   Democrats.

11   Q.    Sorry.  I'm sorry, was that an

12   official party office?

13   A.    We were an organization that

14   challenged the party establishment on

15   agendas.

16   Q.    Okay.  Were you ever a

17   Republican committeeman for the

18   Democrat Party?

19   A.    No.

20   Q.    Okay.  So you never held any

21   party office, ---

22   A.    No, not that I can recall.

23   Q.    --- when you were a Democrat?

24   A.    Yes.

25   Q.    Did you ever run for public

11

1      office as a Democrat?

2      A.      Yes, I did.

3      Q.      When was that?

4      A.      In the 1981 Luzerne County

5      Democratic Primary I was one of six

6      candidates that ran for Prothonotary.

7      Q.      And what year was this again?

8      A.      1981.

9      Q.      Did you win that office?

10     A.      I did not.

11     Q.      Is that the only time you ran

12     for public office?

13     A.      As a Democrat, yes.  But I ran

14     also for United States Senate in

15     Pennsylvania in 2006 as a Green.

16     Q.      Okay.  But for the Democrat

17     Party, that was the only time you ran

18     for public office, was for

19     Prothonotary in Luzerne County in

20     1981?

21     A.      Correct.

22     Q.      How did you get on the Luzerne

23     County ballot?  Do you recall how you

24     got onto the Luzerne County ballot?

25     A.      Yes, I had petitions, candidate

12

1    petitions, that I actually door

2    knocked with street lists to qualify.

3    Q.     And do you remember what the

4    requirements were for that petition?

5    A.     I believe it was 300 signatures

6    was the minimum number countywide.   It

7    may have been 500.   I don't recall

8    offhand.

9    Q.     To the best of your

10   recollection, was anyone allowed to

11   sign your petition?

12   A.     No, they had to be registered

13   Democrats.   That's why I door knocked

14   with a street list.

15   Q.     Why was a street list helpful?

16   A.     Because it identified in the

17   neighborhood which households had

18   registered Democrats or Republicans or

19   registered voters even.   So that was

20   helpful in identifying where the

21   Democrats were.

22   Q.     So if a house didn't have any

23   Democrats, you wouldn't knock on the

24   door?

25   A.     No.

13

1    Q.    So you went to doors where

2    Democrats were a resident?

3    A.    Right, for a petition.

4    Q.    When you were a Democrat, is

5    that the only time you circulated

6    nominating petitions?

7    A.    Oh, no.  No, I circulated

8    nominating petitions in 1983, for

9    local candidates and county

10   candidates.  In 1984, for Gary Hart

11   for President.  In 1985, for local

12   office.

13        And in 1986 I was working as a

14   consultant for two Democratic State

15   Representative candidates.  Each of

16   them were outside of my district.  So

17   under the rules at the time I couldn't

18   circulate.  But for others that

19   circulated, we made sure that their

20   petitions were notarized and we

21   collected them off of them.  So I

22   acted as a coordinator, not as much a

23   circulator for the State Rep

24   candidates.

25        And then in the winter of '88,

14

1    also circulated for Gary Hart again in

2    Luzerne County, because he needed one

3    more county to qualify for the 1988

4    ballot, because of the distribution

5    laws.  And we successfully got him on

6    the ballot in '88 also.

7    Q.     Okay.  Going back to ---.  You

8    just testified that you were a

9    consultant for two State

10   Representatives running as Democrat?

11   A.     Correct.

12   Q.     Did they win their election?

13   A.     They did not.  They did not,

14   Joe Yeager (phonetic) lost by 12

15   votes.

16   Q.     Sorry to bring that up.

17   A.     That's okay.

18   Q.     The losses stick longer than

19   the wins.  And in that election, the

20   1986 election for State Democrat ---

21   State Representatives, were they

22   outside ---?  They represented areas

23   outside your election district?

24   A.     Outside of my State Rep

25   district, yes.  They ran in the 117th

15

1    and the 119th.  I live in the 121st.

2    Q.    Do you still live in the 121st?

3    A.    Yes.

4    Q.    So it hasn't changed over the

5    years?

6    A.    That has not changed.

7    Q.    Go ahead.

8    A.    Yeah.  No, every address I had

9    in the city was in the 121st.  Just

10   wanted to make sure.

11   Q.    So in 1986 you didn't actually

12   circulate petitions?

13   A.    I did not, no.

14   Q.    Okay.  Were you involved in the

15   management of the circulation of those

16   petitions?

17   A.    Yes, and in checking them.  We

18   would take them to the voter service

19   office and make sure that the people

20   that signed were Democrats, in order

21   to ensure we had enough for our

22   candidate, so ---.

23   Q.    If I recall, the reason why you

24   didn't circulate petitions is because

25   at the time the laws required you to

16

1    be a resident of the election district

2    to circulate ---?

3    A.    Correct.   Correct, I couldn't

4    circulate outside of where I was

5    registered.

6    Q.    When you circulated nominating

7    petitions as a Democrat in 1984, did

8    you circulate with anyone else with

9    you?

10   A.    Likely, yes.   We often worked

11   in teams.

12   Q.    How did that work?

13   A.    Well, we would go out in

14   tandem.   And again, it was a lot of

15   door knocking looking for Democrats or

16   going to Democratic Party functions.

17   You know, it's just finding areas

18   where you might find likely signers

19   and ---.

20   Q.    Well, how did that work?   You

21   had two people circulating?

22   A.    Right.   Well, we liked to go

23   out in teams, because at that time it

24   was an early primary that year.   So

25   you know, the sun went down early and

17

1    so on.  So yeah, making sure that we

2    just didn't leave people hung out

3    themselves in the dark and so on.  And

4    then like if we had to match up that

5    person with a Notary, we would want to

6    do that before it got too late.

7    Q.    Why is that?

8    A.    Well, because it's hard to get

9    Notaries at night.  You know, and

10   sometimes it's hard to get a volunteer

11   back the next day.  Although that's

12   been more of a problem as a Green than

13   as a Democrat.

14   Q.    Let's stick to the Democrat,

15   when you were a Democrat.

16   A.    Okay.

17   Q.    When you circulate nominating

18   petitions for the Democrats, ---

19   A.    Right.

20   Q.    --- either for yourself ---?

21   A.    Right.

22   Q.    First of all --- strike that

23   question.

24         When you circulate nominating

25   petitions for Prothonotary, did

18

1    anybody else circulate petitions for

2    you as well?

3    A.      Yes, there were others that

4    carried my petitions.  Mostly family

5    members.

6    Q.      Were all these people

7    volunteers?

8    A.      Yes.

9    Q.      And were they all members ---?

10   Were they all residents of the

11   election district of Luzerne County?

12   A.      Yes.  Oh, yes.

13   Q.      When they went out, did they

14   team up with anybody, to the best of

15   your recollection?

16   A.      I really don't remember

17   specifically.

18   Q.      Okay.

19   A.      I know for the Prothonotary

20   campaign I rarely did.

21   Q.      Why is that?

22   A.      I was a 22-year-old upstart.

23   And it wasn't until after we qualified

24   for the ballot and I started making

25   the rounds in the circuit that we

19

1   built momentum and volunteers and
2   people started to take me more
3   seriously, so ---.
4   Q.    Why haven't you run for office
5   since, as a ---?  During your time as
6   a Democrat, what caused you not to run
7   again?
8   A.    I was working for the Luzerne
9   County Court.
10  Q.    Okay.
11  A.    And in 1988 the Pennsylvania
12  Supreme Court reversed the last line
13  of the State Ethics Law, and told us
14  that court-appointed personnel are
15  bound by the same restrictions in the
16  judicial canons as a Judge.  And
17  subsequently we were prohibited from
18  that time forward.  So from 1988 until
19  I retired in January of 2001, I seized
20  any partisan political activity ---
21  Q.    Okay.  So you ---?
22  A.    --- during those years.
23  Q.    Partisan activity?
24  A.    Right.  Because of my position
25  with the court.

20

1    Q.    Okay.  I see.  How difficult

2    was it getting people to sign your

3    petitions?

4    A.    It wasn't that hard.  But it's

5    like anything else when you're dealing

6    with the public.  It's a numbers game.

7    You know, sometimes I get like three

8    doors in a row where the people would

9    be happy to sign.  Other times, you

10    know, people didn't want to be

11    bothered or already had a preferred

12    candidate.

13    Or if they have signed for

14    someone else ---.  There were six of

15    us running for Prothonotary, so if

16    they had signed for someone else, then

17    they couldn't sign mine.

18    Q.    Did they indicate that they

19    would've signed?

20    A.    Some did, yes.

21    Q.    And you running for

22    Prothonotary as a Democrat in 1981, it

23    was purely a volunteer situation?

24    A.    Yes.

25    Q.    You didn't pay anybody to

21

1    circulate your petitions, ---

2    A.     Oh, no.

3    Q.     --- did you?

4    A.     No.

5    Q.     Now, in 1986 when you were a

6    consultant, did you participate in the

7    petition drive to get these

8    Representatives on the ballot?

9    A.     I participated only in

10   verifying and reviewing and

11   coordinating --- maybe giving training

12   to volunteers.

13   Q.     And that training was based on

14   what experience?

15   A.     Based on understanding that

16   there are limitations when you're

17   petitioning that you have to be a

18   resident of the county.  That only

19   Democrats could sign.  So you know,

20   just understanding the dos and don'ts.

21   Q.     Did either of those campaigns

22   hire professional circulators in 1986?

23   A.     No.

24   Q.     When did you become a

25   registered Green Party member?

22

1    A.     The day after election day,

2    2000, November of 2000.

3    Q.     Okay.  Aside from being a

4    registered voter within the Green

5    Party, have you held any party offices

6    for the Green Party?

7    A.     Oh, yes.  Yes, I have.

8    Q.     What are those offices?

9    A.     Okay.  Well, I was chairman of

10   the party in 2012.

11   Q.     2012?

12   A.     Yeah.  From 2007 through 2011 I

13   served on the state Steering

14   Committee.  From 2012 through the

15   present, I serve as co-chair of our

16   Legal Committee.

17   Q.     Before 2007, were you a --- did

18   you hold any office with the Green

19   Party?

20   A.     Yeah, a delegate to --- a State

21   Committee delegate.

22   Q.     And what does a State Committee

23   delegate do?

24   A.     The State Committee is

25   essentially the ruling body of the

23

1    party.  And the Steering Committee is

2    like the Executive Committee of the

3    party.

4    Q.    So is the Steering Committee a

5    smaller subset of the State Committee?

6    A.    Yes, the Steering Committee is

7    a seven-member team.  And yes, they

8    can also be State Committee delegates

9    for their county.  Does a local count

10   or do you just want the state ---?

11   Q.    Offices, yes.

12   A.    From 2001 to the present I've

13   been co-chair of the Luzerne County

14   party.

15   Q.    Okay.  I think we all know the

16   answer to this.  Have you ever run for

17   public office as a Green Party member?

18   A.    Yes, in 2006, for United States

19   Senate.

20   Q.    Okay.  Describe that process of

21   becoming a candidate.

22   A.    Well, I became a candidate by

23   being nominated by our party.

24   Unanimous nomination, I should say.

25   And that year the minimum signature

24

1   requirement for independent or

2   third-party candidates was an historic

3   high at 67,070.  So it was a daunting

4   process.

5   Q.      Now, you said 67,070 signatures

6   on ---?  How did you gather those

7   signatures, for the record?

8   A.      Most of the signatures were

9   gathered by paid circulators.

10   Q.      Who did you hire to circulate

11   your petitions?

12   A.      JSM is the name of the company.

13   They're out of Florida.

14   Q.      Okay.  Just for the record, you

15   circulated nominating papers to get on

16   the 2006 ballot; correct?

17   A.      Yes.

18   Q.      Other than JSM, did anybody

19   else circulate your nominating papers?

20   A.      Oh, yeah, many volunteers.  And

21   outside of JSM, we also offered, in

22   certain areas ---.  Like we hired

23   people individually for the day or the

24   week to circulate, but that was done

25   through the party.

25

1    Q.    So the Green Party hired ---

2    strike that.

3          Did your campaign hire JSM out

4    of Florida?

5    A.    Yes.

6    Q.    To circulate nominating papers?

7    A.    Yes.

8    Q.    In addition to JSM, the Green

9    Party hired individuals to circulate

10   nominating papers on your behalf?

11   A.    The campaign, my campaign

12   hired ---.

13   Q.    Oh, it wasn't the party?

14   Because you testified it was ---.

15   A.    Well, see I raised money that

16   year.  Most of the money that I raised

17   was for the Luzerne County Green

18   Party, which was a registered Federal

19   Committee.  At that time the

20   Pennsylvania Green Party was not

21   registered as a federal party PAC.

22   Q.    Okay.

23   A.    So the Green Party itself

24   didn't have the legal authority to

25   raise more than $5,000 ---

26

1    Q.      Okay.

2    A.      --- at that time.

3    Q.      How many signatures did JSM get

4    for your campaign in 2006?

5    A.      Approximately 40,000.

6    Q.      How many signatures did you

7    file?

8    A.      The raw number we filed was

9    99,802.  After we did a visual review

10   and Xd out any that looked facially

11   invalid, we were left with 94,544;

12   numbers I'll never forget.

13   Q.      So you filed with the Secretary

14   of State's Office, 94,544 signatures?

15   A.      Correct.

16   Q.      Of those 94,000, 40,000 were

17   secured by professional circulators?

18   A.      Yes, yes.

19   Q.      JSM, to be specific?

20   A.      JSM, to be specific, about half

21   of those 90-some thousand.

22   Q.      Okay.  Who learned of JSM?

23   A.      I heard of JSM in 2004.  I want

24   to say it was around the time of

25   Nader's Independent bid.  Because

27

1    Ralph Nader used that company in the

2    southwest in one or two States and one

3    or two states in the northeast.

4    Q.    Did they ever use JSM in

5    Pennsylvania in 2004?

6    A.    He did not, no.

7    Q.    Did you circulate petitions for

8    Nader in 2004?

9    A.    I did.

10   Q.    Did you circulate papers for

11   Nader in 2004?

12   A.    I did.

13   Q.    Okay.  Are you aware of whether

14   or not Nader ---?  Are you personally

15   aware of whether or not Nader hired

16   professionals in 2004 to circulate

17   petitions ---

18   A.    Yes.

19   Q.    --- papers?

20   A.    Yes, he did hire a professional

21   petitioning company out of, I believe,

22   Montgomery County in the southeast.

23   Q.    Oh, so it was Pennsylvania?

24   A.    It was Pennsylvania, yes.

25   Q.    Do you know who that was?

28

1    A.    I don't know the name of the

2    company, but the company run by Darryl

3    Bonner.

4    Q.    Oh, okay.  What was your

5    involvement in the Nader campaign in

6    2004?

7    A.    Mostly a volunteer.  2004 was a

8    politically-awkward year for us,

9    because Nader ---.

10   Q.    When you say us?

11   A.    The Greens.

12   Q.    Okay.

13   A.    Because Nader was running as an

14   Independent.  And we had David Cobb,

15   who was nominated as the Green Party

16   candidate for President that year.  So

17   I was one of the Greens that thought

18   that Ralph Nader was the better choice

19   for our party, and so I circulated for

20   Nader instead of the Green Party

21   candidate in 2004.

22   Q.    Okay.  Did Cobb make it on ---

23   to the best of your recollection?  Did

24   Cobb make it onto the ballot in 2004

25   in Pennsylvania?

29

1    A.     He did.

2    Q.     Did Nader make it onto the

3    Pennsylvania ballot?

4    A.     He did not.

5    Q.     Do you know why he didn't?

6    A.     Nader was challenged and failed

7    to prevail in the challenge, and was

8    subsequently removed from the

9    Pennsylvania ballot.

10   Q.     Did you have any

11   interaction ---?  You testified that

12   you circulated for Nader in 2004?

13   A.     Right.

14   Q.     Yes?

15   A.     Yes.

16   Q.     Did you have any interaction

17   with the paid circulators that year?

18   A.     I didn't have interaction with

19   the paid circulators themselves, no.

20   Q.     Did Cobb hire professional

21   circulators in Pennsylvania, to your

22   recollection?

23   A.     I don't believe so, no.

24   Q.     So in 2004 you circulated

25   petitions for Nader, the Green Party

30

1    --- or excuse me.  Nader hired Darryl

2    Bonner to circulate petitions.  And in

3    2006, you decided to run for Senate;

4    correct?

5    A.    Correct.

6                ATTORNEY JOEL:

7                Object to the form of

8         the question.

9                ATTORNEY ROSSI:

10               Yeah, fair enough.

11               ATTORNEY JOEL:

12               I think he's wrong about

13        who Nader had collecting for

14        him, but that's fine.  If

15        that's his memory, that's fine,

16        but I think he got it wrong.

17               ATTORNEY ROSSI:

18               Okay.

19               ATTORNEY JOEL:

20               The case says who it

21        was.

22               ATTORNEY ROSSI:

23               Okay.

24               ATTORNEY JOEL:

25               But that's fine.  That's

31

1          his memory.

2    BY ATTORNEY ROSSI:

3    Q.     That's your memory, that's all

4    you can testify.

5                  ATTORNEY JOEL:

6                  Yeah.

7                  ATTORNEY ROSSI:

8                  I appreciate that,

9          Counsel.

10    A.     Right.  And let me specify, if

11    I didn't in my initial Answer.  As far

12    as I know, Bonner was only hired to

13    work Southeastern Pennsylvania.  He

14    wasn't hired for the whole state.

15    BY ATTORNEY ROSSI:

16    Q.     So your recollections is that

17    Bonner circulated petitions in the

18    Philadelphia area?

19    A.     Right, Philadelphia and the

20    surrounding areas, yes.  Or a paid

21    circulator.  I thought it was Bonner.

22    Q.     Okay.  So you decided to run

23    for Senate in 2006?

24    A.     Correct.

25    Q.     As a member of the Green Party?

32

1    A.    Correct.

2    Q.    Based on your prior experience,

3    you understand you have to circulate

4    papers to get signatures?

5    A.    Yes.

6    Q.    And you decided to hire a

7    professional circulator?

8    A.    Right.

9    Q.    And that circulator was JSM out

10    of Florida?

11    A.    That's correct.

12    Q.    Why didn't you hire Bonner?

13    A.    There were people who suggested

14    it.  But the paid circulators that did

15    Ralph Nader's work in 2004, I think

16    their work seemed to not be up to par.

17    It looked visually bad and I was

18    concerned that there wasn't enough of

19    a cushion in the southeast for him to

20    qualify.  I didn't think that they did

21    a good job.

22    Q.    When you said visually they

23    didn't look good, the papers from

24    Nader in 2006, what do you mean by

25    that?

33

1   A.    You look at a signature and if

2   it's illegible, it's not good.  Back

3   at that time if the date wasn't filled

4   out properly it's not good.  I was

5   just concerned about the validity

6   rate.  That's what I mean by not

7   looking good.

8   Q.    So in 2004, for Nader, in

9   addition to circulating for him, you

10  had an opportunity to review the

11  pages?

12  A.    I followed that case closely,

13  yes, because of the major challenge

14  and just some of the, you know,

15  interesting things that went with it,

16  that was prior to the SHURE system.

17  So there were hearings like all over

18  the state.

19  Q.    Okay.  But did you participate

20  in those hearings?

21  A.    No.

22  Q.    Did you volunteer to help

23  review the petitions --- the papers?

24  A.    I did review some of the

25  papers, yes.  And I sought ---.

34

1    Q.    In what capacity?

2    A.    Just as a volunteer, and for my

3    own interest in this case.  Because I

4    had never been part of a huge

5    challenge like this before.  No

6    candidates I supported or myself

7    personally ---.  Nader 2004 was an

8    interesting time.  And you know, we

9    were all watching that case very

10   closely.

11   Q.    Okay.  So Nader filed his

12   papers in 2004?

13   A.    Yeah, approximately 55,000.

14   Q.    And he was challenged shortly

15   thereafter?

16   A.    Yes.

17   Q.    So how was it that you came to

18   eyeball the actual petition ---

19   papers?

20   A.    Well, through --- as a

21   volunteer when people were going to

22   court working on the case, they had

23   photocopies of the pages they were

24   working off of.  And I knew some of

25   the people that circulated and, you

35

1  know, talked to them.  So I saw some

2  of the work product, I guess, in the

3  early days of the challenge.

4  Q.    Okay.  Just through conversing

5  with individuals who were involved in

6  the process?

7  A.    And, yeah, there were a lot of

8  Greens that supported Nader and

9  petitioned for him in 2004, besides

10  myself, so ---.

11  Q.    So through that ---?

12  A.    Yeah.

13  Q.    So through those interactions

14  you had occasion to actually review

15  Nader's nominating papers, just ---?

16  A.    Yes.

17  Q.    Okay.  Was it more cursory?

18  Did you ---?

19  A.    Not until later and not so much

20  on the papers themselves as reading

21  the analysis from like Attorney Mark

22  Brown and the court decisions and so

23  on.

24  Q.    So based on that experience, in

25  2006 you decided to hire an

36

1    out-of-state circulator?

2    A.    My concern was in needing so

3    many, I wanted to make sure I had the

4    best possible petitioning company I

5    could get.

6    Q.    Okay.

7    A.    And I felt JSM met that bill.

8    Q.    Do you remember how much they

9    charged per signature?

10   A.    No, I don't.  But the total

11   amount they were paid was about

12   $125,000.

13   Q.    Now, as the candidate you had

14   direct interaction with JSM

15   circulators?

16   A.    Yeah, with the fellow on the

17   ground for them, Mark Jacoby.

18   Q.    Okay.  So Mark Jacoby was JSM's

19   manager of your petition drive in

20   2006?

21   A.    The Pennsylvania petition

22   drive, right, for them.  And they only

23   worked the Philadelphia --- and five

24   or six counties around it also.

25   Q.    Okay.  Why would you only

37

1    circulate in one part of the state?

2    A.      About one-third of

3    Pennsylvania's voters are concentrated

4    in those five or six counties in the

5    southeast.  So for the paid

6    circulators, the professionals we

7    wanted to put them where the

8    population was.  Just the strategic.

9    Q.      So JSM comes in ---.  You hire

10   JSM to circulate your nominating

11   papers in 2006?

12   A.      Right.

13   Q.      Did you sign a contract with

14   them?

15   A.      Actually, no.  We were

16   negotiating ---.  2006 was a strange

17   year.  When I first started inquiring

18   about JSM, and they told me that it

19   would cost like $200,000, it was well

20   beyond anything that I thought I'd

21   ever raise.

22          And when we started raising

23   some money, then I called them back

24   and said, well, you know I have like

25   $40,000, I could hire --- will that

38

1    get anybody into the area and how
2    many ---?  And we started back and
3    forth on that.
4         So I got them into
5    Pennsylvania, got them working.  And
6    you know, I just paid them as they
7    delivered the signatures.  I think it
8    turned out to be about $3 or $4 per
9    signature is the way it worked out.
10   Q.    But there was no contract, it
11   was sort of a mission creed?
12   A.    Right.  Because I couldn't ---
13   wouldn't enter into a contract for
14   $200,000 when I had about $5,000 when
15   I was inquiring, and really thought
16   that it was out of my league, until we
17   were able to raise money about a month
18   or two later.
19   Q.    Okay.  Now, when JSM circulated
20   your papers ---?  They're
21   headquartered outside of the state;
22   correct?
23   A.    Yeah.
24   Q.    And you said Florida?
25   A.    Florida.

39

1    Q.    Okay.  Did they bring people

2    out of state into Pennsylvania to

3    circulate?

4    A.    Well, they may have brought a

5    team of their own.  Yeah, I know Mark

6    Jacoby was the guy that was

7    coordinating.  And whether he had his

8    own people or had Pennsylvanians, he

9    had to train them.  When he had his

10   own people in, if they weren't from

11   Pennsylvania, they had to be paired up

12   with a Pennsylvanian, because of the

13   way the law was at that time.

14   Q.    And did you provide the

15   Pennsylvanians for him?

16   A.    Some of them.

17   Q.    Okay.

18   A.    Not all.

19   Q.    To the best of your

20   recollection, how did he go about

21   finding Pennsylvania witnesses?

22   A.    College campuses is where they

23   looked for hiring a lot of

24   Pennsylvania witnesses or circulators

25   themselves, that the company would

40

1    hire and put on the streets and, you

2    know, they pay the individuals,

3    that ---.

4    Q.    How long did it take to get the

5    witnesses for their circulators?

6    A.    It took at least ten days to

7    two weeks, as I recall, from when I

8    met with Jacoby and he told me how ---

9    you know, they were going to train

10   these people until they actually were

11   on the streets and reporting numbers

12   to us.  So almost two weeks.

13   Q.    During the 2006 election, were

14   there situations where witnesses ---

15   well, strike that.

16         Were there any problems that

17   arose during the petition drive in

18   2006?

19   A.    There's always problems that

20   arise, yeah.  You'd get difficulty in

21   people not showing up.  You'd get

22   people who were out on the street and

23   you think that they were working for

24   you.  Then when you have your

25   rendezvous point to collect the

41

1   signatures and bring them to the
2   Notary, the people don't come back.
3   Q.     What people are you referring
4   to?
5   A.     The volunteers, the
6   Pennsylvanians.  The paid circulators,
7   they come back, because until they
8   have their papers notarized and
9   verified, they don't get paid.  But
10  volunteers could sometimes be
11  problematic, for a number of reasons.
12  Q.     And these are the volunteers
13  that JSM hired to go with their
14  circulators?
15  A.     Not hired, these are folks that
16  we'd send to them or that they'd round
17  up to work with their team, yeah.
18  Q.     Oh, so some of the witnesses
19  were unpaid?
20  A.     Yes.  Yes.  Because a lot of
21  them ---.  Like if we had Greens in
22  the Philadelphia area and they teamed
23  up with the petitioners, that was
24  great.  Because they were familiar
25  with our issues, the volunteers were.

42

1    And the professionals were, you know,

2    not real chatty about the issues, but

3    more focused on getting the job done.

4    Q.    Okay.

5    A.    Because it was such a

6    monumental task and it was getting

7    late in the season.

8    Q.    Okay.  About what time of year

9    did you hire JSM?

10   A.    About May or June, probably

11   May.  But it took until June until we

12   saw anything from them.

13   Q.    And to the best of your

14   recollection, when were you required

15   to file your papers in 2006?

16   A.    August 1st, I believe.  I don't

17   think there was any holiday or weekend

18   that got in the way.

19   Q.    Okay.

20   A.    I'm certain there wasn't.

21   Q.    So to your knowledge, when JSM

22   out-of-state circulators were

23   circulating for your campaign, they

24   always used Pennsylvania witnesses?

25   A.    Yes, they had to.

43

1    Q.    And to the best of your

2    knowledge, did the Pennsylvania

3    witnesses execute the affidavit on the

4    papers?

5    A.    Yes.

6    Q.    Okay.  And you just testified

7    that it was your practice to have that

8    done the same day?

9    A.    Yes.

10   Q.    Your campaign instructed

11   circulators or JSM instructed

12   circulators to notarize the

13   paper --- all their work product of

14   the day, the same day?

15   A.    Yeah.  You want to get these

16   daily when you're out in big teams.

17   Otherwise you're going to lose a lot

18   of signatures, because people just

19   won't come back.  Or if they didn't do

20   a good job and they're not going to

21   make what they targeted money-wise,

22   they won't come back.

23   Q.    Okay.

24   A.    So it makes more sense to do

25   that daily.

44

1    Q.    And so about what time of day
2    did your --- based on your
3    recollection did the circulators
4    notarize their affidavits?
5    A.    It was often done after 5:00 or
6    6:00 p.m., ---
7    Q.    Okay.
8    A.    --- sometimes later.  Whenever
9    it was done later, though, that
10   usually required paying additional
11   expenses to the Notary.  Because they
12   were coming out of their office at a
13   time they normally wouldn't, so ---.
14   And we tried to negotiate a flat fee
15   with the Notary or an hourly rate as
16   opposed to a per-page rate, when we
17   came in with that volume.
18   Q.    And why is that?
19   A.    Because $5 a page, with the
20   number of pages we have, even with
21   some money around would be very
22   cost-prohibitive.
23   Q.    Were there ever times in 2006
24   that you wanted to circulate papers
25   at a time of day when --- strike that.

45

1          In 2006 did you limit the
2    circulation of your papers based on
3    when you thought you could get
4    Notaries?
5    A.     Yeah, I guess.  I don't know if
6    limit is the right word, because we
7    never wanted to limit anyone if they
8    were going to be productive.  But you
9    had to conform to certain time
10   patterns in order to assure that
11   so ---.  Yeah, I guess you could call
12   that a limitation.
13   Q.     That was my question.  I'm not
14   trying to testify.  Would you consider
15   it a limitation?
16   A.     Well, yeah, of course.  I mean,
17   the whole Notary process just creates
18   limitations.  Because again, for a
19   Notary to do his or her job the right
20   way they need the actual circulator
21   there.  So if you don't match those
22   two up, the papers don't mean a thing.
23   Q.     Did you ever consider having
24   members of your campaign become
25   Notaries?

46

1    A.     We've actually had a few

2    Notaries in the Green Party.  I think

3    Christine Plunkett is still a Notary,

4    in the Harrisburg area.  And Diane

5    White was one of our Notaries.  And we

6    had a person in York, at least in

7    2004.  I don't know if that person was

8    still there in '06.  And one in

9    Williamsport ---.

10   Q.     And these are all members of

11   the Green Party, who are Notaries, to

12   the best of your recollection ---

13   A.     Yes.

14   Q.     --- in 2006?

15   A.     Yes.

16   Q.     Okay.  Why not just use these

17   people to notarize your papers?

18   A.     We did.  Like Diane White

19   notarized a lot of the Harrisburg

20   circulators' papers.  And Christine,

21   when we had Notary parties, would do

22   so.  But like Christine can't help us

23   in Philadelphia, unless we took the

24   expense of actually putting her there.

25   Which makes more sense to find a

47

1    Notary in Philadelphia to pay.

2    Q.    What's a Notary ---?  You just

3    mentioned a Notary Party.  For the

4    record, what is a Notary ---?

5    A.    Oh, a Notary party is when

6    you've had your team in the field and

7    then at the end of a day or the end of

8    a week you have everybody come in for

9    refreshments and getting together.

10   And you know, the Notary is seated

11   there and one by one the people go up

12   and get their papers notarized

13   and ---.  You know, just a way of

14   getting everybody together with the

15   Notary, and trying to give them

16   incentive.

17   Q.    You testified that 2006 the

18   policy was to get it done the same

19   day?

20   A.    Yes, wherever possible, and in

21   bulk, yes.

22   Q.    Why not just use Notary parties

23   to do that at the end?

24   A.    Well, because when you have

25   paid circulators getting, you know, a

48

1    few thousand signatures a day, to wait

2    for a party and then have tens of

3    thousands, it just doesn't make sense.

4    Q.     Okay.

5    A.     You run the risk of losing too

6    many.

7    Q.     Who paid for the notarizations

8    in 2006?

9    A.     It was paid for by the campaign

10   and our party.

11   Q.     Did individuals ever pay to

12   notarize their own papers?

13   A.     They may have from time to time

14   and would be reimbursed then.

15   Q.     So if a volunteer notarized a

16   paper, the campaign would reimburse

17   that person for the ---

18   A.     Yes.

19   Q.     --- Notaries?

20   A.     Yes.

21   Q.     Was the individual compensated

22   for any other ---?  And I'm talking

23   about the volunteers now.  Typically

24   nominating papers in 2006, did your

25   campaign reimburse them for any other

49

1    expenses?

2    A.       Nothing beyond maybe a sandwich

3    or a drink from time to time.  But no,

4    if they weren't specifically hired as

5    a paid circulator by the petition

6    company or by the party campaign, then

7    they were volunteers and we would only

8    reimburse any expense that they would

9    put upfront.

10   Q.       In 2004, going back a little

11   bit ---.  Just to clean up Nader's

12   campaign.  Where did you circulate

13   nominating papers for him?

14   A.       Luzerne County mostly.

15   Q.       At that time was the law ---?

16   At that time ---?  Based on your

17   recollection, at that time, did the

18   law still limit you to your election

19   district to circulate papers?

20   A.       Good question.  Technically no,

21   because of the Morrill case.  Mike

22   Morrill was a Green Party candidate

23   for Governor in 2002.  We won the fact

24   that you don't have to be in that

25   district to ---.  But Pennsylvania was

50

1    still enforcing that for some

2    candidates.  I don't believe they were

3    forcing it on federal candidates,

4    though.

5    Q.    But nevertheless, you

6    circulated in Luzerne County?

7    A.    Luzerne and Lackawanna.  Very

8    close to home I stayed in 2004 for

9    Nader.

10   Q.    Did the Nader campaign

11   compensate you at all for those ---?

12   A.    No.  And I never sought any.

13   Q.    Did you notarize his papers?

14   A.    Oh, yeah.

15   Q.    Did you pay for the

16   notarizations?

17   A.    I did, yeah.

18   Q.    And were you reimbursed from

19   the Nader campaign?

20   A.    No, I didn't ---.

21   Q.    Getting back to 2006.  Did JSM

22   manage the circulation of the papers

23   for your campaign?  It's a bit of

24   a --- strike the question.

25        Who handled the daily work

51

1   required to circulate papers for your

2   campaign in 2006?

3   A.     Well, again, anything that JSM

4   was doing, their personnel would be in

5   charge of that.  But myself and

6   Gennaro (phonetic), Pelano (phonetic)

7   and a couple of other volunteers were

8   overseeing what was coming in from

9   other areas.

10  Q.     Did JSM report to you of any

11  problems that they were encountering

12  in 2006?

13  A.     Yeah, yeah.  I mean, I remember

14  inquiring about why I hadn't gotten an

15  update in two days.  And Mark

16  explained that he had to train some

17  new people, because the folks he had

18  working with him can't do it anymore

19  or at least some of them.

20  Q.     Who couldn't work?

21  A.     The Pennsylvanians ---.

22  Q.     Okay.

23  A.     He had to get new

24  Pennsylvanians.

25  Q.     To witness?

52

1    A.     In some cases, yeah.

2    Q.     But his out-of-state

3    circulators stayed in state for the

4    entire time period, based on your

5    recollection?

6    A.     Based on my recollection his

7    core team stayed with him.

8    Q.     So the only issues that were

9    brought to your attention were with

10   respect to Pennsylvania witnesses?

11   A.     Well, yeah, because you can't

12   circulate without them.

13   Q.     And during that time period you

14   tried to help him get Pennsylvania

15   either Green Party members or other

16   volunteers?

17   A.     Correct.

18   Q.     Okay.  In 2006, did you pay the

19   witnesses to work with the

20   circulators?

21   A.     We didn't.  I'd imagine JSM

22   did.

23   Q.     So you're not sure?

24   A.     I can't say with any certainty

25   from firsthand knowledge.  But expect

53

1    that they did, because without paying

2    them I don't think they would've

3    gotten the numbers they needed.

4    Q.      Were there papers that JSM had

5    in their possession that they never

6    filed?

7    A.      That I wouldn't know about.

8    But I do know that I had papers in my

9    possession that I never filed.

10   Q.      For your own campaign?

11   A.      For my own campaign, because of

12   this doggone Notary thing.  Back home

13   in Luzerne County one of my most

14   ambitious volunteers was this fellow

15   named Jim Spak.  We go back many

16   years.

17   Q.      Can you spell the name?

18   A.      Yes, S-P-A-K.  Spak.  He

19   pronounces it Spock.

20   Q.      Okay.

21   A.      Okay.  And in 2012, for

22   example, Jim and I were circulating at

23   the Farmers Market in Wilkes-Barre.  I

24   got about four signatures, but in the

25   same time Jim got about 17, 20

54

1  signatures and was doing really well.

2        And then as it's getting around

3  August and I'm collecting from local

4  people, I have everybody's signatures

5  but Jim.  And I called him up and

6  said, you know, Jim, I didn't get your

7  papers, could you run them down and

8  leave them at my house?  And he said

9  no.  He said, I can't afford to get

10  them notarized.

11        Now, this was getting close to

12  the date.  I said well ---.  I tried

13  to find a Notary that would do it for

14  free for him.  But I ended up leaving

15  whatever signatures he had on the

16  table.  And I watched him get at least

17  20 that one day.

18        And in 2006 when he worked for

19  us, he got us like 200 or 300.  And

20  that's because we brought him directly

21  to the Notary on a regular basis, to

22  make sure that that's done.  But you

23  get that with certain volunteers, that

24  just won't spring for a penny out of

25  their pocket, even if they'll get

55

1    reimbursed later.

2    Q.      Did you offer to reimburse

3    Spak?

4    A.      Uh-huh (yes).  Spak is

5    disabled ---

6    Q.      Oh.

7    A.      --- and lives on his Social

8    Security.  Because the year that he

9    got paid we had to provide copies of

10   the information to his caseworker on

11   this.  So I believe him when he says

12   he really couldn't spend the money at

13   the time.

14          You know, again it's somebody

15   that's close to you.  You think that

16   everything's going to be okay and then

17   you get these curve balls, you know?

18   Q.      Why didn't you have a Notary

19   party?

20   A.      What's that?

21   Q.      Why didn't you just have a

22   Notary party in 2006 in Luzerne

23   County?

24   A.      We had them in 2006.  It was

25   2012 when Jim didn't turn in ---.

56

1    Q.    Oh, I'm sorry.  Okay.  I'm

2    sorry.

3    A.    In 2006 we had Notary parties

4    and gatherings and associations.

5    Q.    So Jim Spak didn't turn his

6    work product in in 2012?

7    A.    In 2012, for Jill Stein.

8    Q.    Okay.  But 2006, were there any

9    nominating papers that you're aware of

10   that did not get turned in?

11   A.    Yeah, or we didn't submit them

12   because they weren't notarized.  I

13   would say a good 5,000 signatures.

14   Q.    Were not notarized?

15   A.    Were not turned in because

16   either the person didn't get them to

17   us or they weren't notarized and we

18   didn't have that person to match up

19   with a Notary.

20   Q.    If they weren't filed, how did

21   you come in possession of these

22   papers?

23   A.    People would drop them off at

24   the doorway, mail them to the parties'

25   Post Office box.  But they're mailed

57

1    with the affidavit filled out but not

2    notarized.  People thinking they could

3    just send them in and we'll have

4    somebody notarize them, not

5    understanding how that works.

6    Q.    So most of these papers that

7    weren't filed were circulated by

8    volunteers?

9    A.    Yes.

10   Q.    Okay.

11   A.    Yes.

12   Q.    And they didn't understand the

13   Notary --- strike that.

14         The volunteer-circulated papers

15   that weren't filed didn't follow the

16   rules required to execute ---?  Is

17   that your testimony?

18   A.    That's my testimony, yes.

19   Q.    Did you ever ---?  At the time

20   when you got these papers, did you try

21   to contact the circulator and explain

22   what they needed to do?

23   A.    Sometimes we did.  Sometimes it

24   was so late it was just impossible.

25   And again, in 2006 we're talking about

58

1    massive volume trying to manage the
2    company over here.  Which was
3    stressing me out because, you know, I
4    was always behind on my payments, just
5    trying to make sure I keep them and
6    got any work product from them.  And
7    then from volunteers or paid people in
8    other areas of the state, it was a big
9    job.
10            So you know, after a full day
11   on the road, then I get home and it's
12   two days before the deadline and I've
13   got 200 signatures somebody left but
14   aren't notarized.  So yeah, I tried to
15   get it done or leave them home.  And
16   you know, tell my son, look, if this
17   guy calls back, tell him ---.
18   Q.    Did you have a campaign staff
19   in 2006?
20   A.    Well, not a paid staff for
21   sure.  I had some core volunteers that
22   worked with us.
23   Q.    Did you have any paid staff,
24   other than JSM?
25   A.    No.

59

1    Q.      Okay.

2    A.      Well, we hired some people who

3    would normally volunteer for us, and

4    people in neighborhoods to work for us

5    like at $10 an hour or a dollar or two

6    per signature.

7    Q.      To do what?

8    A.      To collect signatures.

9    Q.      But at the campaign level you

10   didn't have any paid staff?

11   A.      No, I didn't have a paid

12   manager or coordinators or --- no.

13   Q.      Outside of 2004 and 2006 ---?

14   By the way, if you want to take a

15   break at any time, let us know.

16   A.      Yeah, can I take a break?

17             ATTORNEY ROSSI:

18             Ten-minute break?  Okay.

19        All right.

20   SHORT BREAK TAKEN

21   OFF RECORD DISCUSSION

22             ATTORNEY ROSSI:

23             All right.  Back on the

24        record.

25   BY ATTORNEY ROSSI:

60

1    Q.    All right.  So did JSM bring

2    any problems to your attention in

3    2006?

4    A.    Yeah.  Yeah, of course.  You

5    know, they sometimes had difficulty in

6    finding enough Pennsylvanians.

7    Q.    Okay.

8    A.    Other times getting them to be

9    dependable.  And again, there was a

10   little more panic that year because it

11   was getting late and it was such a

12   daunting number that we were striving

13   for.

14   Q.    After 2006, we'll move forward

15   a little bit, have you circulated

16   nominating papers for the Green Party

17   in Pennsylvania?

18   A.    Oh, yes I have.  In 2008, for

19   our statewide team and for our

20   Presidential candidate, who was former

21   Congresswoman Cynthia McKinney.  In

22   2010, for Mel Packer, who was running

23   for U.S. Senate.  I believe we had

24   some other down-ballot candidates that

25   year, too.

61

1          And in 2012, for Jill Stein.

2     And in 2014 for our gubernatorial

3     team.  And this year, 2016, I was the

4     Pennsylvania ballot coordinator for

5     the Stein campaign.

6     Q.     Was that a paid position?

7     A.     Yes.

8     Q.     How did you get that job?

9     A.     I applied for it as an

10    independent contractor and was hired

11    or awarded the work.

12    Q.     When did that run through?

13    What were the dates that you were an

14    independent contractor for the Jill

15    Stein campaign?

16    A.     April 22nd through August 8th.

17    Q.     What was your experience in

18    2016 with circulating nominating

19    papers?

20    A.     Well, our experience is that we

21    got on the ballot, number one.  Number

22    two, we found that this was great

23    because of winning on the in-state

24    witness.  The Stein campaign hired

25    the --- Trent Pool's company, to do

62

1    Pennsylvania.  And Trent's team, since
2    they didn't have to train and pair up
3    with Pennsylvanians, he was able to
4    use his team members from day one.  He
5    was able to hit the ground running.
6    Q.    As the coordinator for the
7    Stein campaign in Pennsylvania, did
8    you work --- did Trent Pool report
9    record to you?
10   A.    He reported to me, yes.
11   Although his contract was done
12   directly through the campaign.
13   Q.    Okay.
14   A.    I had no control over that.
15   But the field operations, yes, I was
16   the person he'd have to report to.
17   Q.    When he finished up a paper,
18   did he turn them over to you, ---
19   A.    Yeah.
20   Q.    --- to the campaign?
21   A.    To me.
22   Q.    Okay.  So you were able ---?
23   You collected all of the nominating
24   papers for Jill Stein's campaign for
25   President in Pennsylvania in 2016?

63

1    A.      Yes.

2    Q.      Are you the person that filed

3    these nominating papers with the

4    Secretary of State's Office?

5    A.      I am.

6    Q.      Okay.  When did you do that?

7    A.      On August 1st.

8    Q.      How many signatures did you

9    file?

10   A.      22,713.

11   Q.      I think we all know the answer

12   to this question, but just to get it

13   on the record.  Were your nominating

14   papers challenged by any party?

15   A.      No.

16   Q.      When Trent Pool was circulating

17   nominating papers, did he also

18   circulate papers for other candidates

19   at the same time?

20   A.      He did.

21   Q.      Were you personally aware of

22   that occurring?

23   A.      Yes, yes.

24   Q.      Did you circulate any

25   nominating papers in 2016, yourself?

64

1  A.      I did.

2  Q.      Where did you do that?

3  A.      Wherever I was ---

4  Q.      Fair enough.

5  A.      --- in Pennsylvania.  Yeah, I

6  circulated mostly in the east,

7  but ---.

8  Q.      Did you do that on your own?

9  A.      Yeah.

10  Q.      Did you ever circulate

11  nominating papers with anyone else in

12  2016?

13  A.      Yeah, I guess.  For example,

14  when I was in York, I was circulating

15  for the Green Party, put my clipboard

16  down for a minute to have a cigarette.

17  And Ed and Denise, two people who were

18  working for Trent, came up to me and

19  asked me if I wanted to sign the Green

20  Party's petition.  Because I guess

21  they saw my Green Party pen.

22          I said, I can't, I already

23  have.  And you know, we got to talking

24  and I ended up signing for the

25  Constitution and --- you know, for

65

1    Rocky and the Libertarians that same
2    day.
3    Q.    You mentioned the names Ed and
4    Denise, do you know their last names?
5    A.    I do, but I'm not bringing it
6    forward right now.
7    Q.    Did they indicate to you who
8    they were working for?
9    A.    Oh, yes.
10   Q.    And who were they working for?
11   A.    They were working for Trent.
12   Q.    Would that be Ed and Denise
13   Mason?
14   A.    Mason.  That's the name, yeah.
15   Q.    So they were circulating down
16   in your county?
17   A.    Yes.
18   Q.    And you ran into them by
19   happenstance?
20   A.    Happenstance.  I was there
21   because I spoke at a school that day.
22   Q.    Okay.
23   A.    And I was going to have lunch
24   in York.  I figured I'd take my
25   clipboard over to that marketplace

66

1    that they have there and work.

2    Q.      So in 2016, you signed for more

3    than one President ---

4    A.      I did.

5    Q.      --- candidate?  Other than the

6    Greens, Rocky and the Libertarians,

7    did you sign any other nominating

8    papers?

9    A.      I think I may have even signed

10   the Constitution party's petition

11   somewhere along the way.

12   Q.      But not at the same time you

13   met Ed and Denise?

14   A.      No, I only signed two of the

15   three that they had that day.  And I

16   don't believe it was Constitution

17   party.  It was Rocky and the

18   Libertarians.

19   Q.      Why would you sign more than

20   one nominating paper?

21   A.      Well, because we're allowed to

22   now.

23   Q.      Okay.

24   A.      I think candidates deserve to

25   be on the ballot if they're seriously

67

1    carrying an agenda.  Though I disagree

2    with a lot of things that the

3    Libertarians or the Constitution Party

4    believe in philosophically, I believe

5    in their right to be on the ballot.

6    Q.    When you circulated --- strike

7    that.

8         Did you circulate nominating

9    papers in 2016 yourself?

10   A.    Nominating papers, yes.

11   Q.    Okay.  Who did you circulate

12   for in 2016?

13   A.    Well, Jill Stein was at the top

14   of the ticket.  But we have down-

15   ballot candidates, too.  So I helped

16   Jay Sweeney, who's running for State

17   Representative in the 100 --- the new

18   117th District.

19   Q.    Did you circulate nominating

20   papers for candidates from other

21   parties?

22   A.    I didn't circulate for other

23   parties, no.

24   Q.    In 2016 you were the

25   Pennsylvania coordinator for Jill

68

1    Stein's campaign?

2    A.      Correct.

3    Q.      Were you allowed to circulate

4    for other parties, ---

5    A.      No.

6    Q.      --- as a coordinator?

7    A.      No.

8    Q.      Were you expressly prohibited

9    in doing so?

10   A.      Between confidentiality and

11   other provisions in the contract, I

12   didn't want to in any way do something

13   outside of what I was hired for.

14   Q.      Okay.  Makes sense.

15   A.      Yeah, I mean, I wasn't getting

16   paid a whole lot of money from the

17   Stein campaign.  And Trent did offer

18   me work carrying other petitions, but

19   I refused, ---

20   Q.      Okay.

21   A.      --- because of my loyalty to

22   the task at hand.

23   Q.      Outside of the situation when

24   you ran into Ed and Denise Mason, did

25   you witness the circulating nominating

69

1    papers at any other point in time in
2    Pennsylvania in 2016?
3    A.    Yes.  I mean, I've seen lots of
4    that kind of activity.
5    Q.    I'm talking about this
6    election, 2016?
7    A.    Yeah.
8    Q.    What was the occasion where you
9    were witnessing the circulation of
10   nominating papers?
11   A.    Well, just that day with the
12   Masons.
13   Q.    Aside from the Masons, were
14   there other situations where you
15   witnessed Jill Stein's papers being
16   circulated?
17   A.    Yes.  Yes, at festivals, in
18   different cities.  Not as
19   happenstance, usually it was more, you
20   know, I knew I was going to be in
21   Philadelphia, and I knew I was going
22   to be doing things related to the
23   campaign or the drive.
24   Q.    So when you knew papers were
25   going to be circulated, do you

70

1    participate because it was your job?

2    A.    Because it was my job.  And

3    yeah, sometimes if you have newer

4    people, it just helps to give them a

5    little motivational talk.  And you

6    know, make sure the volunteer

7    coordinator's giving them good

8    information, take a look at ---.

9    Q.    Did you ever witness Trent's

10   circulators in action?

11   A.    Yeah.

12   Q.    Were you happy with their work

13   product?

14   A.    I was.

15   Q.    Why?

16   A.    Well, as I was going to say

17   before ---.  Like that day with the

18   Masons, I ended up having a nice

19   conversation with them for a good half

20   hour while they were circulating their

21   papers and in between.  And I liked

22   the way that when someone was signing,

23   they were looking over the shoulder

24   and saying, okay, this is where your

25   signature goes, this is where you

71

1   print your name.  They would ask

2   where, do you live as the first thing,

3   to make sure they had the proper

4   county.

5        In some of the rural areas you

6   might have an address that is P.O. Box

7   X in Dalton, but you're actually

8   residing at, you know, Falls Township

9   or something like that.  So I was very

10   impressed, too, with the Masons

11   explaining that, when somebody said

12   they were from a rural area.  And say,

13   well, please sign like where you

14   actually live, not just your P.O. Box.

15        Like they were kind of aware of

16   that.  So they were paying attention

17   to detail and I liked that.

18   Q.     Trent the other professional

19   circulators that Jill Stein's campaign

20   hired, did they conduct themselves in

21   a similar matter or did it vary?

22             ATTORNEY JOEL:

23             Objection to the fact

24         that he actually saw anybody

25         else.

72

1          ATTORNEY ROSSI:

2          I'm sorry?

3          ATTORNEY JOEL:

4          I don't think he said he

5     saw anybody else.  He's talking

6     about the Masons, not that he

7     saw anybody ---.

8  BY ATTORNEY ROSSI:

9  Q.     Setting aside your interactions

10 with the Masons, did you witness any

11 other --- strike that.

12          Aside from the Masons, did you

13 have an occasion to witness other

14 professional circulators hired by

15 Trent in action in Pennsylvania?

16 A.     I saw some of his people, yeah,

17 working in Pittsburgh, when I was out

18 there.

19 Q.     Did you have a chance to review

20 their work product?

21 A.     Not so much their field work,

22 beyond my observation.  But yeah, I

23 reviewed all of the work product

24 before it was submitted.

25 Q.     Trent's circulators in

73

1    Pittsburgh, did you have ---?  Were

2    you happy with how they conducted

3    themselves?

4    A.    Yes.  Yes, I was.

5    Q.    In what manner?

6    A.    Again, the same attention to

7    detail.  I mean, I guess it's more of

8    a personal thing.  Sometimes they led

9    with the Libertarian petition before

10   ours.  So I was a little nervous, like

11   well, make sure that you get one for

12   ours, too.  But they did.

13   Q.    To the best of your knowledge,

14   they were circulating for more than

15   one ---?

16   A.    They were circulating for more

17   than one also.  They had at least two

18   clipboards at that time.

19   Q.    Was the Jill Stein campaign

20   okay with the people ---?  Her

21   campaign were paying circulators ---.

22   Was she okay with them circulating

23   more than one nominating paper?

24   A.    I imagine they must have

25   been.

74

1    Q.    But you don't know for a fact?

2    A.    I'm only speculating.

3    Q.    As Jill Stein's coordinator in

4    Pennsylvania, were you given any

5    instructions from the Stein campaign

6    with respect to whether or not her

7    paid circulators could circulate for

8    more than one candidate?

9    A.    We had a conversation.  When I

10   saw we, I say myself and the national

11   ballot-access coordinator, Rick Lass.

12   So I told Rick that I knew that Trent

13   was circulating for the Libertarians

14   as well.  This Rocky project came in

15   later.

16   Q.    Okay.

17   A.    But at this time I knew that

18   Trent was also circulating for the

19   Libertarians.  And Rick understood

20   that Trent was doing that.

21         And the idea was that for both

22   the Libertarians and the Greens, the

23   overall cost is less if you have one

24   person circulating two.  So I'm

25   confident the campaign was aware of

75

1    that from the beginning.

2    Q.    Were there any nominating

3    papers in 2016 that were delivered to

4    you that you didn't file?

5    A.    There were some, but far less

6    than other years.

7    Q.    Why?

8    A.    The only reason we didn't file

9    anything this year is the person who

10    turned it in maybe neglected to fill

11    out an affidavit on every page.  So

12    that would be a page we couldn't use;

13    or people who got them to us late.

14    Q.    After the filing deadline?

15    A.    After the filing deadline.  But

16    we got ---.  May I add something?

17    Q.    Sure.

18    A.    We did get a lot more papers

19    late from individual volunteers.  And

20    I know at least in the case of Blyden

21    Potts, one of our volunteers ---.

22    Because he called my cellphone and

23    said, I know the filing deadline is

24    coming up, he said tomorrow, but I

25    didn't get these papers notarized.

76

1    And I said, Blyden, you don't have to

2    get them notarized anymore.

3           He didn't realize there was

4    that change in the law.  Then he

5    looked at the paper and saw that.  So

6    he was able to run those up from

7    Cumberland County.  In a traditional

8    year, we'd have lost his.

9    Q.     Oh, okay.  In past election

10   cycles, prior to the change of the

11   law, were there petitions that were

12   not --- papers that were not filed?

13   A.     Yes.  As I testified earlier,

14   if we couldn't get them notarized or

15   match the Notary and the circulator,

16   we lost that work product.

17   Q.     Are there specific reasons why

18   somebody wouldn't have a paper

19   notarized?

20   A.     Well, you know ---.

21   Q.     To your knowledge.

22   A.     Yeah, I guess cost,

23   convenience.

24   Q.     Okay.

25   A.     But I wouldn't be able to

77

1    definitively say why.

2    Q.     How many signatures were

3    usually on the nominating paper?

4    A.     Usually about 30, 32.

5    Q.     Were there situations where

6    there would be nominating papers with

7    less than 30 signatures?

8    A.     There were.  We actually

9    had ---.  Ratio-wise, compared to what

10   our goal was for the state, we

11   actually had a lot of papers with one

12   or two or three signatures on that

13   were included in our filing package

14   this year, because of the fact that

15   those --- they didn't have to be

16   notarized.

17          You'd often lose straggling

18   papers like that.  Like, for example,

19   somebody gets 200 signatures out of

20   Philadelphia.  But then they meet two

21   people from Butler County and one from

22   Armstrong or something.  So if they

23   were getting them notarized

24   themselves, they would do the full or

25   close to full pages and ignore those

78

1    smaller pages for not wanting to put

2    the money upfront, plain and simple.

3    Q.     And your understanding of law

4    is that signatures have to be on

5    nominating papers of the same county?

6    A.     Right.

7    Q.     So your understanding is

8    somebody's working Philadelphia, most

9    of the signatures are going to come

10   from Philadelphia County?

11                   ATTORNEY JOEL:

12                   Objection.

13   A.     Yeah, you can't tell.

14   BY ATTORNEY ROSSI:

15   Q.     So the circulators had ---.  If

16   somebody from Philadelphia is

17   circulating papers and they come

18   across a Lancaster County voter, what

19   is the process to get that Lancaster

20   County signature recorded?

21   A.     Well, you just need a separate

22   page with Lancaster County indicated

23   in the top line and that page is for

24   Lancaster County signers.

25   Q.     And it's your experience that

79

1    some of those smaller petition papers

2    would not get notarized?

3    A.     Yes.

4    Q.     And how do you know that?  Did

5    you have conversations with these

6    individuals why they didn't notarize?

7    A.     Well, you know, I said, how

8    come everything is from one county?

9    And you know, they would say, well, I

10   had two from X county, but since there

11   were only two on the page, I didn't

12   think it was worth it to us or to you.

13   Q.     Would it have been worth it to

14   you?

15   A.     Look, every signature counts.

16   So yes, it would've been worth it,

17   expensive or not.

18   Q.     In 2016, were there --- strike

19   that.

20          As Jill Stein's coordinator in

21   Pennsylvania in 2016, you testified

22   one of your jobs was to manage the

23   professional circulators; correct?

24   A.     Or at least ---.  Yeah.

25   Q.     And so you collected their work

80

1    product?

2    A.      Yeah.

3    Q.      Did you have conversations with

4    Trent Pool during the circulation

5    period?

6    A.      Oh, yeah.

7    Q.      Were there any problems that

8    crept up during that circulation in

9    2016?

10   A.      Not anything that I would call

11   glaring.

12   Q.      Okay.  The 2016 circulation

13   drive, was it easier than in 2006?

14   A.      Oh, yeah.  Yeah, in volume, and

15   the fact that it was so much more

16   efficient.  It was a lot easier to,

17   you know, have people turn in

18   signatures when we didn't have to go

19   through the extra step of Notary

20   parties.

21   Q.      How much time ---?  Back in

22   2006, when you were notarizing papers,

23   how much time did you have to spend to

24   get a paper notarized?

25   A.      Well, you know, what does it

81

1    take, 30 seconds, for a paper to get

2    notarized, so ---.  Is that what

3    you're asking or ---?

4    Q.    I mean, it's a question.  You

5    answer with your answer.  In 2006,

6    were any of your papers rejected

7    because the Notary did not properly

8    execute the affidavit?

9    A.    No.

10   Q.    So they were all properly

11   notarized ---

12   A.    Yes.

13   Q.    --- in 2006?  In 2006, in your

14   campaign, did you come across any

15   fraud by circulators?

16   A.    No.

17   Q.    Okay.

18   A.    Let me clarify that.  There

19   were many pages that were turned in by

20   people that we didn't submit because

21   they looked like they were blatantly

22   forged or fabricated in some way.  So

23   I mean, what we did with those people

24   is pay them for their time, fire them.

25   But we shredded those petitions, so

82

1   they wouldn't come into our package.

2   Because you could tell from looking at

3   it that those people didn't do this

4   the right way.  It was all in the same

5   hand and ---.

6   Q.     Okay.  So you believe it was

7   actual fraud, rather than somebody's

8   sloppy work?

9   A.     That was my perception.  And

10  it's been my experience that when

11  you're hiring people to do this,

12  there will be a small percentage of

13  folks who are not ethical and just try

14  to submit something for payment.  Or

15  you know, there could be other

16  motivations, but that would be pure

17  speculation.

18  Q.     In 2006 the petition pages that

19  you shredded, were they circulated by

20  Pennsylvania residents ---

21  A.     Yes.

22  Q.     --- or out-of-state residents?

23  A.     No, they were Pennsylvanians.

24  Q.     In 2006?

25  A.     I didn't have this issue with

83

1    the signatures that I got from the

2    paid circulators, in '06 or, no.  But

3    people that we hired on our own, when

4    you're hiring people off of the

5    streets or Philadelphia or Harrisburg

6    or somewhere, you're going to get

7    people that try to scam you.

8         And you have to do your due

9    diligence, because that could reflect

10   very poorly on a candidate if papers

11   like that get through.  And I've been

12   adamant my whole career about that

13   kind of thing.

14   Q.    We all know the answer to this

15   question, but just for the record,

16   did you get on the ballot in 2006?

17   A.    I did not.

18                   ATTORNEY ROSSI:

19             Okay.  I'm done.  I may

20        have some follow-up questions

21        but right now I'm done.

22   EXAMINATION

23   BY ATTORNEY JOEL:

24   Q.    My name's Kenneth Joel.  I'm

25   here with my colleague Nicole Lynn

84

1    Adams and we represent the Defendants

2    in this case.  What's your educational

3    background?

4    A.    I have a college degree from

5    Wilkes College, a few graduate credits

6    from Penn State, in the Administration

7    of Justice.  High school was Coughlin

8    in Wilkes-Barre.  And two

9    certifications in mediation and

10   advanced mediation from Marywood.

11   Q.    I want to go back.  I think

12   your first ---.  1981, that was the

13   first time you ran for anything?

14   A.    Yes, sir.

15   Q.    Okay.  And that was Luzerne

16   County Prothonotary?

17   A.    That's correct.

18   Q.    And am I correct that ---?  I'm

19   sorry.  You ran as a Democrat;

20   correct?

21   A.    Correct.

22   Q.    So you had to gather signatures

23   on nominating petitions to get

24   yourself on the primary ballot;

25   correct?

85

1    A.      Correct.

2    Q.      And you did collect enough

3    signatures to get yourself on the

4    ballot; correct?

5    A.      Yes, sir.

6    Q.      And those signatures you

7    collected were all notarized; correct?

8    A.      They were.

9    Q.      Were they also ---?  At least

10   to the best of your recollection and

11   ability, only one person signed?  And

12   by that I mean they didn't sign for

13   you and another candidate?  You were

14   aware of that?

15   A.      Yes, that would be one of the

16   things that I ask, if they signed for

17   any other candidate.

18   Q.      Okay.

19   A.      For that office.

20   Q.      For that office?

21   A.      Yes, sir.

22   Q.      Now, I'm going to go through

23   each office.  But to the best of your

24   memory, the signatures that you turned

25   in were unique to your petition?

86

1    A.       Yes, yes.  Yes.

2    Q.       And they were all notarized?

3    A.       Yes.

4    Q.       And do you remember how many

5    you got?  I think you said between 300

6    and 500?

7    A.       That was the minimum.  I think

8    we submitted about 900 signatures that

9    year.

10   Q.       You said you were collecting

11   and also I think you said family

12   members were collecting.  Am I correct

13   that you or your family members signed

14   the affidavit of circulation?

15   A.       Yes.

16   Q.       I just want to fill in a date

17   here.  Now you've been a member of the

18   Green Party from 2000 to the present.

19   And I assume by that you left the

20   Democratic Party in 2000.  When did

21   you first become a member of the

22   Democratic Party?

23   A.       When I registered to vote, when

24   I was 18 years of age.

25   Q.       So 19 ---?

87

1   A.      1977.

2   Q.      And you were a member of the

3   Democratic Party from 1977 all the way

4   through 2000?

5   A.      Through Election Day 2000, yes.

6   Q.      Now, the next one I wrote down

7   was that you circulated for local

8   candidates in 1983; is that correct?

9   A.      In 1983, yeah.

10  Q.      And was that ---?  That was for

11  Democratic candidates?

12  A.      A Democratic candidate for

13  County Commissioner, yeah.

14  Q.      And the county was Luzerne?

15  A.      Luzerne, yes.

16  Q.      Did you just circulate on

17  behalf of one candidate?

18  A.      Yes.

19  Q.      Do you remember how many

20  signatures that candidate needed to

21  get to get on the ballot?

22  A.      It was a county-wide office, so

23  the same 300 to 500.

24  Q.      Do you remember how many

25  signatures you gathered?

88

1    A.        No.

2    Q.        Do you remember whether or not

3    that local candidate then made it onto

4    the Democratic primary ballot?

5    A.        Yes.   Yes, he did.

6    Q.        And am I correct that since you

7    were already --- since you were the

8    Democratic Party, at least at that

9    point in time, you signed the

10   affidavit of circulation, for the

11   signatures to be collected?

12   A.        Yes.

13   Q.        And you had them notarized?

14   A.        Yes.

15   Q.        And you made sure, to the best

16   of your ability, that people were only

17   signing your person's nominating

18   petition as supposed to signing yours

19   and somebody else's?

20   A.        Well, that was Commissioner,

21   so they could sign up to two for that

22   office.

23   Q.        Okay.   So you made sure that

24   they didn't sign ---?

25   A.        They didn't sign any more, yes,

89

1    sir.

2    Q.    The next time I have written

3    down her that you circulated was 1984

4    for Gary Hart, for President; is that

5    correct?

6    A.    That's correct.

7    Q.    And where did you circulate?

8    A.    In Luzerne County.

9    Q.    Do you know, back in 1984, was

10   it the same as 2000, signatures

11   required to get on the ballot in

12   Pennsylvania?

13   A.    I don't remember what it was.

14   Our goal was at least a hundred valid

15   signatures, so that Luzerne County

16   counted for the distribution.

17   Q.    Okay.

18   A.    Okay.  The state campaign

19   pretty much handled the petitioning,

20   but wanted to make sure that the

21   county coordinators were getting

22   enough, because of the distribution

23   concerns.

24   Q.    Did you actually collect

25   signatures for Gary Hart running for

90

1    President?

2    A.    Yes.

3    Q.    You got some signatures?

4    A.    Yes.

5    Q.    Okay.

6    A.    Yes.

7    Q.    Do you know how many you got?

8    A.    No, I don't, but I know it

9    wasn't a lot.

10   Q.    Was it enough to get him on the

11   ballot for distribution purposes?

12   A.    Oh, yes.  Yes, he qualified.

13   And there were a lot of far more

14   prolific volunteers than I was.  And

15   that's still the case until today, by

16   the way.

17   Q.    The signatures you collected,

18   am I correct that since you were a

19   Democrat in 1984 in Pennsylvania, did

20   you sign the affidavit of circulation?

21   A.    Yes.

22   Q.    And am I correct that whatever

23   signatures you gathered you had

24   notarized?

25   A.    Yes.

91

1    Q.    And am I correct that to the

2    best of your ability, did you try to

3    make sure that you weren't get any

4    signatures from a person who had

5    signed somebody else's?

6    A.    Yes.  Again, by asking.

7    Q.    Right.

8    A.    That's the only thing I did.

9    Q.    The next one I have written

10   down is 1985 you circulated for ---.

11   I wrote down local office.  What

12   office was it?

13   A.    Lou Miscoto (phonetic) for

14   Prothonotary.

15   Q.    And was that circulation done

16   in Luzerne County also?

17   A.    It was, yes.

18   Q.    And was that the same 300 to

19   500 signatures needed?

20   A.    Yes.

21   Q.    Was that candidate successful

22   on getting on the Democratic primary

23   ballot for Prothonotary?

24   A.    He was.

25   Q.    And the signatures that you

92

1    collected, am I correct that as a

2    Pennsylvania Democratic, you signed

3    the affidavit of circulation?

4    A.    Yeah.

5    Q.    And am I correct that your

6    signatures that you gathered you had

7    notarized?

8    A.    Yes.

9    Q.    And am I correct ---?  Oh, all

10   right.  Did you try to make sure that

11   only person signed or was this one of

12   those county offices that two people

13   could sign it?

14   A.    No, this was one where you

15   could only sign for one candidate.

16   Q.    Okay.

17   A.    Yeah, we made sure they didn't

18   sign for the incumbent before.

19   Q.    1986, I have you written down

20   as being a coordinator, consultant for

21   state office ---.

22   A.    Two State Rep candidates.

23   Q.    Okay.

24   A.    In the 117th and the 119th.

25   The 117th candidate, Stephanie Wychock

93

1   (phonetic) actually made it to the

2   general election ballot, because there

3   was no Democratic opposition in that

4   primary.  And Joe Yeager, in the 119th

5   District, lost that election, but made

6   it to the primary ballot.

7   Q.     Okay.  So both of those

8   individuals for whom you were

9   coordinating, made it to their

10  respective primary ballot for the

11  Democrats?

12  A.     Correct.

13  Q.     And did you collect signatures

14  for them?

15  A.     No, just coordinated.

16  Q.     As part of your coordination,

17  did you ensure that all signatures

18  were notarized before they were

19  submitted?

20  A.     Yes.

21  Q.     Am I correct that the

22  signatures that you received and

23  submitted had been notarized?

24  A.     Yes.

25  Q.     And the people actually

94

1  collecting the signatures, were they

2  Pennsylvania-registered Democrats, to

3  your recollection?

4  A.    Yes.

5  Q.    So would I be correct that

6  those individuals signed the affidavit

7  of circulator?

8  A.    You'd be correct, yes.

9  Q.    And the next one I have written

10  down in 1988, circulating for Gary

11  Hart when he ran for President.  Do

12  you remember how many signatures he

13  got?

14  A.    Yeah, I remember we got 85 that

15  day out of the courthouse area during

16  a snowstorm in February.

17  Q.    And was your effort for Mr.

18  Hart similar to your previous effort

19  for Mr. Hart, that you were trying to

20  get him signatures, so that there

21  would be some distribution that he'd

22  be on the ballot or ---?

23  A.    1988 was that odd year where

24  because of the Donna Rice scandal

25  Hart's campaign was kind of derailed.

95

1    So it wasn't as organized, but the die

2    hards on the ground, you know, we

3    decided to try to get him on the

4    Pennsylvania ballot.  So Luzerne

5    County did end up being the 10th and I

6    think it was Kim Stevens and I who

7    actually drove to Harrisburg in the

8    snowstorm to file those papers that

9    year.

10   Q.     Is it your recollection, did

11   Mr. Hart get on the primary ballot in

12   Pennsylvania?

13   A.     He did.

14   Q.     He did?

15   A.     He did, yes.

16   Q.     And as a registered Democrat in

17   Pennsylvania in 1988, am I correct

18   that you signed the affidavit of the

19   circulator?

20   A.     Yes.

21   Q.     And am I correct that your

22   affidavits were properly notarized?

23   A.     That's correct.

24   Q.     And am I correct that you

25   certainly at least asked to try to

96

1    have people signing your petition who

2    hadn't also signed a petition for one

3    of the other candidates running for

4    President that year?

5    A.    Yes.

6    Q.    I then have a gap from 1988

7    until I think you actually ran for

8    Senate in 2006.  And I understand that

9    was because you were working for the

10   judicial branch in Luzerne County?

11   A.    Yeah.  No, the gap was between

12   1988 and 2001.  It was in January of

13   2001 when I retired ---

14   Q.    Okay.

15   A.    --- from the courts and became

16   active in politics again.

17   Q.    Did you do any ---?  Did you

18   run for any office between 2001 and

19   when you ran for Senate in 2006?

20   A.    No.

21   Q.    Okay.  Did you collect

22   signatures on behalf of any other

23   candidate between 2001 and when you

24   ran for Senate in 2006?

25   A.    Yes.

97

1    Q.     Okay.  Let's talk about those.

2    You talked about them before and I

3    didn't write them down, so ---.

4    A.     Okay.

5    Q.     Let me ask this.  I'm sorry.

6    After 1988, did you do any

7    signature-gathering activities on

8    behalf of candidates, yourself or

9    others?

10   A.     No, sir.

11   Q.     The next time you started back

12   up with that was 2001?

13   A.     2002.  Oh, no, 2001 we actually

14   petitioned locally to change the city

15   charter, ---

16   Q.     Okay.

17   A.     --- put a charter question on

18   the ballot.  So I circulated on that

19   issue.

20   Q.     Were you able to sign ---?  Was

21   there an affidavit of circulator

22   involved with that?

23   A.     Yes.

24   Q.     And did you sign that, ---

25   A.     Yes.

98

1    Q.     --- as a Pennsylvania resident?

2    A.     Yes.

3    Q.     And was there a Notary

4    requirement back in 2001, ---

5    A.     There was.

6    Q.     --- for that sort of petition?

7    A.     Yes, sir.

8    Q.     And did you have all of your

9    stuff notarized properly?

10   A.     Yes, sir.

11   Q.     Was there a ---?  Did you ---?

12   Go ahead.

13   A.     Also in 2001, now that I think

14   about it, I circulated petitions to be

15   a candidate for the Luzerne County

16   Study Commission, looking at

17   establishing Home rule in Luzerne

18   County.  And on the day that I had to

19   submit my signatures, the lawyer's

20   office that I was going to use to have

21   them notarized was closed early that

22   day.

23          So I went to the courthouse and

24   found a Notary there to notarize my

25   papers, but the delay actually caused

99

1    me to be 30 seconds late in filing,

2    and subsequently they weren't

3    accepted.  So yeah, I was actually 30

4    seconds late, but I did intend to run

5    for the Study Commission position in

6    2001.  I apologize, Attorney Rossi,

7    for forgetting about that one.

8                    ATTORNEY ROSSI:

9                    No problem.

10   BY ATTORNEY JOEL:

11   Q.    Getting back to the petition

12   for the city charter.  Did that

13   question get on the ballot?

14   A.    It did.

15   Q.    Do you know how many signatures

16   you either needed to get it on the

17   ballot or how many you collected?

18   A.    I think we collected about 800.

19   Q.    Any other signature-gathering

20   activities moving forward from

21   2001 ---?  And let's stop at your

22   Senate one, because I've got some

23   specific questions about that.

24   A.    Okay.  Yeah, 2002 for Mike

25   Morrill for Governor, the Green Party

100

1      petitions.  2004 for Nader.  And I

2      guess that's it in --- prior to '06.

3      Q.     Okay.  So the 2002 effort, were

4      you able to sign the affidavit of

5      circulator for the Green Party's ---?

6      A.     Yes.

7      Q.     And were you able to get those

8      notarized?

9      A.     Yes.

10     Q.     And were you able to make sure

11     that somebody who signed your petition

12     hadn't signed for somebody else?

13     A.     Yes.

14     Q.     And did Mr. Morrill make

15     the ---?  Was that the general

16     election ballot, I'm assuming?

17     A.     Yes, yes.

18     Q.     General election ballot.

19     A.     He made the ballot, yep.

20     Q.     And Nader in 2004, I'm assuming

21     that was for President?

22     A.     Yes.

23     Q      And did you ---?  And you

24     collected signatures for Mr. Nader;

25     correct?

101

1    A.      Yeah.

2    Q.      And were you able to sign the

3    affidavit of circulation for that?

4    A.      Yes.

5    Q.      Did you have those affidavits

6    notarized?

7    A.      Yes.

8    Q.      And did you, to the best of

9    your ability, ask folks who you were

10   asking to sign, to ensure that they

11   hadn't previously signed somebody

12   else's ---?

13   A.      For any other third-party

14   candidate, yes.

15   Q.      And did Mr. Nader make it on

16   the '04 ballot?

17   A.      He did not.  He lost in

18   challenge.

19   Q.      Okay.

20   A.      He had enough signatures.

21   Q.      That's probably a better way to

22   ask it.  So he had enough signatures

23   to get on the ballot, but as you

24   understand it, there was a subsequent

25   challenge to his signatures in his

102

1     candidacy?

2     A.      Correct.

3     Q.      And through the court process

4     it was determined that he didn't have

5     enough ---

6     A.      That he didn't have enough.

7     Q.      --- or for some other reason he

8     was off?

9     A.      Right.

10    Q.      Let's turn to your Senate one.

11    I just want to make sure.  So you

12    had ---.  Your campaign for U.S.

13    Senate in 2006, you were able to

14    gather a raw total of 99,802

15    signatures?

16    A.      Correct.

17    Q.      And under the law at that time,

18    did --- the affidavit of circulator

19    needed to be signed by a Pennsylvania

20    voter; correct?

21    A.      Circulator, yes.

22    Q.      Okay.  And those affidavits

23    needed to be notarized at that time;

24    correct?

25    A.      Correct.

103

1    Q.    And did those affidavits ---

2    strike that.

3          Did the signatures also have to

4    be --- those folks couldn't have

5    signed a nominating paper for another

6    third-party candidate for Senate?

7    A.    Yes, I believe that restriction

8    still applied.

9    Q.    And then if I understood your

10   testimony correctly, the campaign

11   looked through various signatures and

12   then decided --- made the decision to

13   submit 94,544 of those signatures?

14   A.    The total number on the several

15   thousand pages we submitted, came to

16   99,802.  And then what we did is from

17   that final package, looking at

18   individual's signatures that may have

19   been problematic, redlined them out,

20   which is what gave us that reduced

21   number.

22   Q.    Okay.  But that was a decision

23   that you ---?

24   A.    The campaign made, yes.

25   Q.    That wasn't, for example, when

104

1    you dropped them off at the Secretary

2    of State's Office, the Secretary of

3    State going through and saying, that's

4    bad, that's bad, that's ---?

5    A.      Correct, yeah.  This was the

6    campaign's decision, not the

7    Commonwealth.

8    Q.      Okay.  And I think you said

9    about half of those signatures were

10   collected by JSM?

11   A.      Yes.  About half, maybe a

12   little more, a little less.  But yeah,

13   approximately ---.

14   Q.      All right.  And the signatures

15   that you turned in, the 94,544, was

16   above the threshold of 67,070 that was

17   needed for you to get your name on the

18   ballot?

19   A.      Yes, sir.

20   Q.      But then as I understand it,

21   there was an objection process after

22   that; correct?

23   A.      Yes, sir.

24   Q.      Who objected?  Was it one of

25   the other major candidates or who

105

1    objected?

2    A.     It was four individuals on

3    behalf of the Democratic Party, I

4    guess.  Let's see, Daniel Landers

5    (phonetic), William Caroselli

6    (phonetic).  And then there were two

7    others.  There were four challengers

8    altogether.

9    Q.     Okay.  And these were

10   nomination papers.  So this is your

11   attempt to get right on the general

12   election ballot in November?

13   A.     Yes, sir.

14   Q.     Because the Green Party

15   candidate didn't have a primary, ---

16   A.     Correct.

17   Q.     --- in Pennsylvania at least?

18   A.     That's correct, yes, sir.

19   Q.     Who's the Democratic that won

20   then?

21   A.     Bob Casey.

22   Q.     What's your recollection of how

23   long that objection process took?

24   A.     It took until October 1st or

25   2nd before there was any kind of

106

1    ruling saying that I would not appear

2    on the ballot.  And then through

3    various appeals, of course, different

4    aspects of that case, that went on for

5    years, appealing the fees that were

6    imposed and so on.

7    Q.    So the Decision on October 1 or

8    2, was that Decision by Commonwealth

9    Court or is that the Supreme Court?

10   A.    That's the Commonwealth Court.

11   Q.    What went on in that objection

12   process?  For example, did you have to

13   go into court and testify?  Did you

14   bring people in to testify?  What was

15   the process on it?

16   A.    Well, the process immediately

17   we received a court order requiring

18   nine Green Party members as well as

19   nine Democratic members to be in

20   Harrisburg from 9:00 to 4:00, Monday

21   through Friday, until review of the

22   petitions were completed.

23   Q.    Okay.  And how long did that

24   review take?

25   A.    Five weeks.

107

1    Q.     What happened next, after the
2    review?
3    A.     After the review ---.  To make
4    a long story very short, we were
5    removed from the ballot on the
6    contention that there were not enough
7    valid signatures.
8    Q.     What number of signatures were
9    deemed to be invalid of the 94,000 and
10   change that you submitted?
11   A.     I don't recall.
12   Q.     Was it more than half?  Was it
13   less than half?
14   A.     I don't recall.  I mean, the
15   bottom line is they bounced me from
16   the ballot.  And it was
17   practically ---.  I do know that there
18   were global challenges made by the
19   challengers.  By a global challenge,
20   meaning either challenging the
21   circulator or challenging the Notary.
22          Total that amounted to about
23   40,000 signatures that were challenged
24   on that basis alone.  We prevailed in
25   both of those areas.  None of those

108

1  were stricken.  But we did have

2  line-by-line challenge.  That's what

3  most of the review over that five

4  weeks was, was the line-by-line

5  challenge.

6          And then after we had won on

7  certain challenge provisions,

8  sometime in early September the

9  Democrats were then allowed to amend

10  their challenge, to go after those or

11  other signatures on different

12  technicalities.

13  Q.      Okay.

14  A.      So I mean there were a series

15  of hearings and proceedings beyond the

16  line-by-line challenge.  We also had

17  two questions certified to the Supreme

18  Court on whether a signer had to be an

19  elector, and asking the question of

20  when is an election not an election?

21  Because in 2015 there were judicial

22  retentions in which one Judge lost,

23  one Judge was not retained.

24          And if that had been the

25  standard, our minimum number of

109

1    signatures would've been 15,000

2    instead of 67,000.  So we were in

3    court on other aspects ---

4    Q.    Okay.

5    A.    --- besides that ---.

6    Q.    You mentioned hearings.  Were

7    there actually hearings taking place

8    in court, where people showed up and

9    argued and gave testimony and that

10   sort of stuff?

11   A.    There was at least one hearing

12   where there were witnesses, which was

13   during the appeal process.  That I

14   could remember.  Most of it were

15   hearings with the attorneys briefing

16   or arguing in front of the court.

17   Excuse me, may I take a quick bathroom

18   break?

19                   ATTORNEY JOEL:

20                   Sure.

21   SHORT BREAK TAKEN

22   BY ATTORNEY JOEL:

23   Q.    Mr. Romanelli, going back to

24   the 2006 signature collections that

25   JSM did for you.  I think I asked

110

1    this, but I just want to make sure.

2    Am I correct that those signatures

3    needed a Pennsylvania resident to sign

4    the affidavit of circulator?

5    A.    Yes.

6    Q.    And I think you talked about

7    some global challenges, 40,000 were

8    challenged by the basis of the Notary

9    or the affidavit?

10   A.    Either the circulator or yes,

11   the Notary.

12   Q.    And I think you said that your

13   side was victorious on all of those

14   challenges?

15   A.    Right. None of the global

16   challenges were upheld. And the

17   petition to move on them was withdrawn

18   by the other side, rather than the

19   Judge making the ruling on it.

20   Q.    Okay. And were some of those

21   challenges to the signatures that JSM

22   had gotten for you?

23   A.    I guess it was a combination of

24   both.

25   Q.    And then were some of the

111

1    line-by-line strikings, were those

2    ones that JSM collected for you, and

3    also ones that you had volunteers or

4    what's your ---?

5    A.    A combination of both.  Most of

6    what was challenged was in the

7    Philadelphia area.  But we had a lot

8    of volunteers working that area as

9    well.

10   Q.    So we have the 2006 Senate

11   campaign.  Am I correct that your next

12   circulating efforts were in 2008?

13   A.    Yes.

14   Q.    Okay.  And that was for a woman

15   by the name of Cynthia McKinney?

16   A.    Correct.

17   Q.    And was she running for

18   President?

19   A.    Yes, she was.

20   Q.    On which party or ---?

21   A.    Green Party.

22   Q.    And did you actually circulate

23   and collect signatures for Ms.

24   McKinney?

25   A.    I did.

112

1    Q.    And as a Pennsylvania resident,

2    did you actually sign the affidavit of

3    circulation?

4    A.    I did.

5    Q.    And did you have those

6    affidavits notarized?

7    A.    I did not.

8    Q.    Why not?

9    A.    Because we did not have enough

10   signatures with a cushion to meet that

11   year's obligation and file a number

12   that would stand up.  So since we

13   didn't file --- since we weren't

14   filing, I didn't pay for the Notary.

15   Q.    Okay.  So if I understand you

16   correctly, you gathered signatures.

17   I'm assuming you and others did for

18   Ms. McKinney?

19   A.    Yes.

20   Q.    And you didn't hit whatever you

21   felt was a sufficient number to, at

22   the end of the day, get her over the

23   threshold for what she needed to get

24   on the ballot?

25   A.    Right.  And please, let me

113

1    specify for anyone who wouldn't know.

2    Because of the fees imposed on myself

3    in 2006 and Nader in 2004, by 2008,

4    third parties, unless they had

5    something that was rock solid in their

6    filing, weren't going to put

7    themselves in that kind of possible

8    jeopardy.

9    Q.    Okay.  And what you're

10   referring to there is the way the law

11   in Pennsylvania used to be at that

12   point in time, was that ---.  If your

13   petitions were challenged and

14   successfully challenged, you, as the

15   proponent of the signatures, would

16   have to pay the other side's fees and

17   costs?

18   A.    Yes, but I don't want to agree

19   to that with as Pennsylvania law had

20   it.  Because it's not really clear

21   that that was necessarily part of the

22   provision.  It had never been done

23   before.

24   Q.    Okay.  All right.  I understand

25   what you're saying.  I understand what

114

1    you're saying.  But in '04 and '06,
2    whether it was in the election or by
3    some other mechanism, ---
4    A.     Right.
5    Q.     --- the folks, Nader in '04,
6    and you in '06, the proponents of
7    signatures got levied fees and costs
8    from the objector, ---
9    A.     Yes, sir.
10   Q.     --- the objectors had incurred?
11   A.     That's correct.
12   Q.     Okay.  And what you're saying
13   is because of those two situations,
14   it's your opinion that at least in
15   2008, the decision by the McKinney
16   folks was that unless we're absolutely
17   sure we're going to be okay on that,
18   we're not going to risk it, because we
19   don't want to pay the money?
20   A.     Correct.
21   Q.     Okay.  I just wanted to make
22   sure.  I thought you understood what I
23   was saying.  I wanted to make sure you
24   understood.
25   A.     Yes, sir, I understand.

115

1    Q.    What was the number that year

2    for McKinney, do you remember?

3    A.    Yeah, I believe the minimum

4    number was in the area of 24,000.

5    Q.    Do you know how many McKinney

6    folks collected?

7    A.    I think we were looking at like

8    26,000 or something.  We were just a

9    thousand or 2,000 over the minimum.

10    Q.    Okay.  So you were able to

11    collect signatures, having to sign the

12    affidavit of circulator?  And you were

13    able to collect signatures of folks

14    who at least told you that they only

15    signed one set of nominating papers?

16    A.    That's correct.

17    Q.    But because you didn't have

18    enough of a buffer, you didn't go to

19    the final step and get them notarized

20    because you weren't going to submit

21    them?

22    A.    Correct.

23    Q.    And the decision not to submit

24    them was the fear you might lose in a

25    challenge and get levied for fees and

116

1   costs ---?

2   A.      That's correct.

3   Q.      Fair enough.  2010, ---.

4   BRIEF INTERRUPTION

5   BY ATTORNEY JOEL:

6   Q.      Was that also a Green Party?

7   A.      Yes.

8   Q.      And do you know what the number

9   was to get Mr. Packer on the ---?  Did

10  you get him on the General election

11  ballot?

12  A.      Yes, it was like 20,500.

13  Q.      Did you actually collect

14  signatures for Mr. Packer?

15  A.      I did.

16  Q.      And did you sign the affidavit

17  of circulator, since you're a

18  Pennsylvania ---?

19  A.      Yes, sir.

20  Q.      And did you get those

21  notarized?

22  A.      Yes.

23  Q.      When you were collecting, did

24  you ask, and at least try to the best

25  of your ability, to make sure that

117

1    somebody hadn't already signed

2    somebody else's nomination papers?

3    A.      Correct.

4    Q.      How many signatures did Mr.

5    Packer end up --- well, strike that.

6            Did Mr. Packer actually submit

7    his nomination papers with signatures

8    to the state?

9    A.      He did.

10   Q.      How many did he have?

11   A.      It was about 22,000.

12   Q.      Was there any challenge to

13   that?

14   A.      There was the threat of a

15   challenge.  An attorney on behalf of

16   the Democratic challenger --- Mike

17   Sestak was the challenger himself on

18   Packer's petitions.  His attorney

19   threatened Mel with the possibility of

20   fees if he didn't prevail.  So Mel

21   withdrew his filing.

22   Q.      That withdrawal was because Ms.

23   Sestak's attorney threatened to go

24   after fees, if ---?

25   A.      Right.  And with such a minimal

118

1    cushion, you knew the candidate was
2    vulnerable.
3    Q.    2012 is the next one I have
4    written down.  It was Jill Stein for
5    President?
6    A.    Yes.
7    Q.    And did you collect signatures
8    for Ms. Stein?
9    A.    I did.
10   Q.    That was for the Green Party
11   I'm assuming also?
12   A.    Yes, sir.  And I was chair of
13   the party that year, so ---.
14   Q.    Did you, as a collector of
15   signatures, sign the affidavit of
16   circulator?
17   A.    Yes, sir.
18   Q.    And did you have it notarized?
19   A.    Yes, sir.
20   Q.    And did you try to make sure
21   that to the best of your ability that
22   you didn't have somebody who had
23   signed for somebody else already?
24   A.    Yes.  Yes, I think we were
25   still very careful about that in 2012.

119

1    Q.    And jumping back to 2008, did

2    Ms. McKinney hire any professional

3    circulators or was it all done by

4    volunteers?

5    A.    It was all done by volunteers.

6    Q.    And by Pennsylvania volunteers?

7    A.    Yeah.

8    Q.    For Mr. Packer Senate's run in

9    2010, was that all done by

10   Pennsylvania volunteers or was there

11   professional ---?

12   A.    No, that was all Pennsylvania

13   volunteers.

14   Q.    And 2012, Jill Stein, was that

15   done by Pennsylvania volunteers or was

16   there a professional outfit engaged?

17   A.    There wasn't a professional

18   outfit engaged.  Most was gathered by

19   volunteers.  But we were still short

20   in early July on our goal for Jill,

21   and the Stein campaign was able to

22   provide some money to this task.  And

23   we hired the people from the

24   Kensington section of Philadelphia to

25   work for us, so ---.

120

1    Q.    Go ahead, I'm sorry.

2    A.    The Vice-Presidential candidate

3    with Ms. Stein that year was Cheri

4    Honkala, from the Kensington section

5    of Philadelphia.

6    Q.    Okay.

7    A.    Which is why the poorer

8    sections of Philadelphia is where most

9    of the hiring was done in 2012.

10   Q.    Do you know, what was the

11   number of signatures needed for Ms.

12   Stein in 2012?

13   A.    Yeah, it was a little short of

14   20,000, like 19,007, 19,008.

15              ATTORNEY ROSSI:

16              It's 20,600, '12.

17   A.    Oh, 20,600 in 2012?  Okay.

18              ATTORNEY ROSSI:

19              I only know that because

20        I defended the Libertarians,

21        so ---.

22   A.    Oh, that's right.  Thank you.

23   BY ATTORNEY JOEL:

24   Q.    How many signatures were

25   collected for Ms. Stein?

121

1  A.      About 27,000.

2  Q.      Were those submitted to the

3  State?

4  A.      Yes.

5  Q.      Was there a challenge?

6  A.      No.

7  Q.      So Ms. Stein was on the general

8  election ballot for President of the

9  United States in 2012?

10  A.      She was.

11  Q.      Okay.  The next one I have

12  written down is 2014.  What was that

13  for?

14  A.      Paul Glover and Wendy Lynne

15  Lee, for Governor and Lieutenant

16  Governor.

17  Q.      Did that seem higher --- a

18  professional signature circulator?

19  A.      It did not.

20  Q.      Did you collect signatures on

21  behalf of that team?

22  A.      Yes.

23  Q.      And I'm assuming that was the

24  Green Party ---?

25  A.      Yes.

122

1    Q.     And as a Pennsylvania resident,

2    did you sign the affidavit of

3    circulator?

4    A.     Yes.

5    Q.     And did you get those

6    signatures notarized?

7    A.     Yes.

8    Q.     When you were collecting, did

9    you try your best to make sure that

10   somebody hadn't signed on behalf of

11   somebody else?

12   A.     I probably did.

13   Q.     Okay.  How many signatures were

14   needed for that gubernatorial team in

15   2014 to get on the general election

16   ballow?

17   A.     I don't recall.  It was close

18   to the 20,000 mark.

19   Q.     And do you remember how many

20   signatures were submitted?

21   A.     I don't believe any were ever

22   submitted.  We knew we were short.

23   Q.     Okay.  So you didn't even get

24   to the threshold?

25   A.     We didn't even ---.  Well, we

123

1    may have gotten to the threshold, but
2    barely over it, so it wasn't worth
3    filing.
4    Q.    And am I correct the decision
5    was made not to file, because it
6    wasn't a big enough buffer you
7    were ---?  And the campaign at least
8    was fearful of getting levied with
9    fees and cost on the back end?
10   A.    By 2014 we were somewhat
11   concerned about fees, but more
12   concerned about just the pragmatic,
13   not having a buffer to work with.
14   That it just wasn't smart.  There had
15   already been some action in the courts
16   --- in the federal courts because of
17   other lawsuits.  Even though we hadn't
18   had a decision yet, by 2014, we
19   weren't as fearful in the past two
20   years as we were in the years between
21   2004 and 2013, regarding fees.
22   Q.    But I'm assuming in a sense you
23   had --- over the threshold, you were
24   at least somewhat fearful or else why
25   not just pull the trigger and submit

124

1    them and see what happens?

2    A.      Right, right.  Yeah.

3    Q.      The next one I have is 2016.

4    That's this year.  Did you collect

5    signatures?

6    A.      I did.

7    Q.      And I'm assuming that was for

8    Jill Stein for President?

9    A.      Jill Stein and our down-ballot

10   candidates Jay Sweeney for Auditor

11   General and Kristin Combs for

12   Treasurer.

13   Q.      When did you start collecting

14   for the Green Party candidates?

15   A.      I guess in March.

16   Q.      And for the ones that you

17   collected, did you personally go out

18   and collect signatures?

19   A.      I did.

20   Q.      And did you sign the affidavit

21   of circulation?

22   A.      Yes.

23   Q.      And did you get those notarized

24   or ---?

25   A.      No.

125

1    Q.    The decision came down that you

2    didn't have to get them notarized?

3    A.    Right.  The decision came down

4    in 2015.

5    Q.    Okay.

6    A.    So this was the first election

7    that we used --- that we didn't have

8    to use the Notaries.

9    Q.    Okay.  And is it the first

10   election that you didn't --- that you

11   could have out-of-state circulators,

12   and then just sign the statement as

13   opposed to the affidavit?

14   A.    Yes.

15   Q.    And was this the first election

16   where you can have folks sign on more

17   than one paper?

18   A.    Yes.

19   Q.    How many did you collect for

20   --- let's say for Jill Stein?

21   A.    Like me, myself or ---?

22   Q.    Let's start with you and then

23   let's go overall.

24   A.    I collect a few hundred myself.

25   Q.    Okay.

126

1    A.    Overall, we filed about 22,000

2    signatures, 22,700.

3    Q.    Do you know what the number

4    was, at least at the time of filing?

5    A.    Yes, at the time of filing the

6    requirement was 21,775.

7    Q.    Okay.  And between '14 and

8    2016, had there been some other court

9    Decision on the issue of fees and

10   costs on the campaign or the person

11   --- as the proponent of the

12   signatures?

13   A.    Rephrase that ---?

14   Q.    Let me get it at this way.

15   It's my understanding that there's a

16   decision out there that you can't

17   impose those costs on the other side.

18   If you know that's the case, you can

19   tell me that.  That's fine.

20   A.    Yeah, I'm not sure that that is

21   necessarily the case.

22   Q.    Okay.

23   A.    Okay.  It might still be there

24   in some form or another.

25   Q.    Okay.  What's your

127

1    understanding about the ability to get

2    costs from the other side --- fees

3    from the other side at this point?

4    Strike that.

5           At the point that you filed the

6    papers for Ms. Stein?

7    A.    Well, ---.

8    Q.    At that time frame ---?

9    A.    Yes, yes.  Because when we

10   filed, it was based on the court order

11   from Judge Stengel.  That specifically

12   said that in the event of a challenge,

13   each side would pay its own costs, ---

14   Q.    Okay.

15   A.    --- its own litigation costs.

16   Q.    So that's what I was getting

17   at.  That was your understanding at

18   the time you submitted the 22,000 and

19   change?  That was then going to be the

20   rule, each side would pay its own

21   costs?

22   A.    Right.  In combination with a

23   much lower threshold of 5,000.

24   Q.    When did that come about?

25   A.    The last week or the next to

128

1    the last week of July.  I believe it
2    was around July 20-something when that
3    finally came down.  Very close to the
4    deadline.
5    Q.    So you submitted all 22,000
6    anyway --- even though the number at
7    the time of your filing was only
8    5,000?
9    A.    At the time of the filing,
10   yeah.  The minimum number was 5,000
11   but we submitted everything that we
12   had.
13   Q.    Was there any challenge to Ms.
14   Stein's signatures?
15   A.    There was not.
16   Q.    How about the other folks, from
17   whom you collected this year, the
18   down-ballot folks?
19   A.    None of those candidates were
20   challenged.
21   Q.    Okay.  What was the signature
22   requirement on those?
23   A.    2,500 for the row offices, with
24   at least five counties with a hundred
25   or more signatures.  So there was a

129

1    distribution aspect to it.  And our

2    State Rep candidates, I think they

3    needed 300 signatures ---.  Whatever

4    Republicans and Democrats need,

5    that's all that our State Rep

6    candidates needed in the three

7    districts that they're running.  That

8    would be 60, 64 and 117.

9    Q.    How many did you submit for the

10   down-ballot races, how many

11   signatures?

12   A.    For the statewide ---?

13   Q.    Any or all of them that you can

14   remember?

15   A.    Okay.  Well, the statewide

16   candidates, it would've been the same

17   number of signatures as the

18   Presidential.

19   Q.    Okay.

20   A.    Okay.  And I don't know, there

21   were several hundred --- needing a

22   thousand --- for each of the State Rep

23   candidates.  I'm not quite sure.

24   Q.    And were there any challenges

25   to any of those down-ballot ---?  I

130

1    can't remember if I asked that?

2    A.    There were no challenges to any

3    of our candidates this year.

4    Q.    And did the collection for the

5    Green Party this year ---?  I think

6    you talked about this, did that engage

7    a professional signature

8    circulator ---?

9    A.    It did.

10   Q.    Do you know when they ---?  Did

11   they start in March also or when did

12   they start?

13   A.    No, no.  I would guess that it

14   was in late April or early May, when

15   Trent Pool's company finally had a

16   contract.

17   Q.    Did you have any information

18   that you can give me how many

19   signatures, campaign ---?  How many

20   signatures were collected for any of

21   those Green Party folks, from March

22   until Benezet started as supposed to

23   from when Benezet started until after,

24   until the filing?

25   A.    Yeah, yeah.  I would say that

131

1    prior to the paid circulators coming

2    in, we had maybe 3,000, 5,000

3    signatures.  We didn't have a lot.

4    Q.    And that period was from ---?

5    When in March did you start

6    collecting?

7    A.    We were eligible to start

8    collecting early, but it had to be

9    after mid-March before anybody really

10   started.

11   Q.    And then you say that Benezet

12   started collecting in late April or

13   early May.  Can you narrow that down

14   at all for me?

15   A.    No, I'm guessing it was May,

16   because it was around the time the

17   Penguins were in the last stages of

18   the playoffs.  Because a month later

19   after they won, I directed Trent to

20   take his team to the parade in

21   Pittsburgh.  And he got a few hundred

22   signatures that day, so ---.

23   Q.    Did your volunteers continue to

24   collect signatures throughout the

25   entire period, all the way up through

132

1       August 1?

2       A.      Yes.

3       Q.      For the ones that were

4       collected --- strike that.

5               You have collected signatures

6       for yourself and for others for over

7       30 years now; is that accurate?

8       A.      That's accurate, yes, sir.

9       Q.      Would it be a fair statement

10      that if somebody hasn't signed your

11      petition, there could be a whole host

12      of reasons why they decided not to do

13      so?

14      A.      Sure.

15      Q.      Anything from not supporting

16      your candidate to supporting another

17      candidate, to I just don't feel like

18      it today.  And anything like ---?

19      A.      Sure.

20      Q.      Would it be based on whatever

21      that individual's decision is at that

22      time?

23      A.      That's correct.

24      Q.      We're just about done.

25      A.      Okay.

133

1    Q.      We were just talking about ---

2    A.      Yes, sir.

3    Q.      --- other reasons why somebody

4    might not want to sign.  It could be

5    that they're just rushed that day?

6    A.      Look ---.

7    Q.      It could be ---?

8    A.      A bunch of reasons, yeah.

9    Q.      Okay.  Could be an infinite

10   number of reasons?

11   A.      Correct.

12   Q.      Just depends on what that

13   person wants to do?

14   A.      That's correct.

15   Q.      And by that person, I mean the

16   person who you're trying to get a

17   signature from?

18   A.      Yes, sir.

19              ATTORNEY JOEL:

20              That's all.  Thanks, I

21       appreciate it.

22   RE-EXAMINATION

23   BY ATTORNEY ROSSI:

24   Q.      A couple follow-up questions.

25   You testified that prior to Trent

134

1    coming on board in 2016, your
2    volunteers got about 3,000 signatures?
3    A.    Yes.
4    Q.    Approximately?
5    A.    Approximately.
6    Q.    Throughout the entire process,
7    about how many signatures did the
8    volunteers get?
9    A.    Maybe about 6,000, 7,000.
10   Q.    Okay.  And you testified
11   earlier that you got about 22,700
12   signatures for Jill Stein?
13   A.    About 21,700, actually.
14   Q.    Okay, 21,000 ---?
15   A.    Yes, just below the 22,000.
16   Q.    So the rest were collected by
17   your hired professional circulator?
18   A.    Yeah.  Or again, sometimes we
19   hired ---.  Like there were some
20   people who were working for Trent, but
21   then they decided to submit theirs as
22   a separate independent contractor.  So
23   I guess they still got the same amount
24   of money.  But the campaign paid them
25   instead of Trent paying them.  So we

135

1    had a couple of other paid folks, but
2    it was smaller scale.
3    Q.     So is it your testimony --- and
4    it probably is --- your testimony that
5    some of Trent's people took up
6    signatures directly to the Stein
7    campaign?
8    A.     One of his did.
9    Q.     Do you know who that person
10   was?  If you don't, that's fine.
11   A.     I can't remember his name.  I
12   remember his e-mail address.  But ---.
13   Q.     Okay.  What's the e-mail
14   address?
15   A.     Thatpetitionguy@yahoo.
16   Q.     Okay.
17   A.     What happened was, he was
18   working for Trent, and then when Trent
19   tried to collect the signatures, the
20   guy wasn't calling him back.  And
21   apparently this person who went rogue
22   on Trent got ahold of our national
23   ballot director said, I could get
24   petitions but I'd rather do it on my
25   own.  So we took care of that.

136

1          And then in some cities you
2     might have a small --- ten people who
3     each go out and get 40 signatures and,
4     you know, might have made $80 apiece
5     or something.
6     Q.     So about how many signatures
7     did Trent's circulators provide to the
8     Stein campaign in 2016?
9     A.     At least maybe 10,000.
10    Q.     Okay.  Going back to Cynthia
11    McKinney's 2008 campaign.  Your
12    testimony is that ultimately they
13    didn't want to file because it wasn't
14    a big enough buffer and they were
15    worried about the fee issue?
16    A.     Right.  Yes, sir.
17    Q.     And because of that, you didn't
18    get the --- you didn't execute the
19    petition papers with a Notary?
20    A.     On mine.
21    Q.     Oh, just yours?
22    A.     On mine, yes.  The attorney
23    asked me about mine.  I'm sure others
24    got their papers notarized.
25    Q.     Okay.  So they ---?

137

1   A.      Not all of us, but some did.

2   Q.      Do you know that to be a fact

3   or is that speculation?

4   A.      No, I know for a fact that

5   there were a handful of people who had

6   their papers notarized as they went

7   along month to month.  So there were

8   notarized papers there.

9   Q.      So there were people in 2008

10  who notarized their petitions and they

11  were not --- excuse me, notarize the

12  papers and they were not turned in?

13  A.      Correct.

14  Q.      Okay.  Do you know if they paid

15  to have those papers notarized?

16  A.      That I can't say for sure one

17  way or another.

18  Q.      Do you know if the McKinney

19  campaign had any kind of operation to

20  process to notarize those papers?

21  A.      I don't know for sure, no.  I

22  really believe any of the logistics

23  were handled by the state party, not

24  the campaign.

25  Q.      Oh.  So McKinney didn't have a

138

1    campaign apparatus in the state?

2    A.    She didn't, no.  Not like Jill

3    Stein, she had nowhere near the funds

4    for the organization that the Stein

5    campaign has.

6    Q.    So each state party was

7    responsible for getting the national

8    candidate on the ballot, is that your

9    understanding?

10   A.    Yeah, at least for

11   Pennsylvania.

12   Q.    Okay.  All right.

13   A.    You might have an event state

14   like California, where there might be

15   --- where the resources were actually

16   spent.

17   Q.    When people refuse to sign

18   nominating papers, do they ever say

19   why they're not going to?

20   A.    Sure.  I mean, we've had people

21   actually accuse us of doing something

22   wrong by trying to have them signed.

23   And they're saying, well, every time

24   people sign for the Green Party, you

25   guys are in court.  But they don't

139

1    understand what this challenge system

2    means.  And so you've had people that

3    were afraid, who think they're in the

4    know politically.

5         We've also had people that just

6    don't like us.  And you know, you have

7    other people who don't want to be

8    bothered.  Some people you'll ask

9    them, they'll steer right through you

10   and won't answer.

11        We've had people say, yeah,

12   sure.  In 2006, I experienced that and

13   the person started signing his name

14   and when he got to the end of his

15   signature, put this big flourish that

16   ended up making almost a G Clef on my

17   page, and then he handed the paper

18   back and took off.  So that eliminated

19   a whole page, you know.

20        I'd like to think that was

21   either ill mood or some sort of true

22   believer candidate that --- who we

23   might challenge.  So you're out

24   dealing with the people, you never

25   know.

140

1    Q.     Okay.  Prior to 2016, when you

2    were allowed to get signatures from

3    electors who had signed other papers,

4    were there --- did any voter indicate

5    his desire to sign more than one

6    paper?

7    A.     Yes.

8    Q.     Okay.  Did they say why ---

9    based on ---?  Do you recall why?

10   A.     Most of the people who wanted

11   to sign more than one was simply for

12   choice.

13   Q.     Okay.

14   A.     You know, people like

15   candidates to be on the ballot and

16   then hear what those candidates are

17   about.  Though a lot of our rifles in

18   the bigger parties aren't very fond of

19   us, there's a certain curiosity in

20   part of the population about what

21   Greens and Libertarians are.  So they

22   like when we're on the ballot and they

23   could find out a little bit about us.

24                 ATTORNEY ROSSI:

25                 Okay.  I'm done.

141

1          Thanks.

2     RE-EXAMINATION

3     BY ATTORNEY JOEL:

4     Q.     You mentioned somebody who was

5     collecting this time around I think

6     for the Stein campaign.  Was that one

7     of Benezet's professional collectors?

8     A.     It was somebody --- a

9     Pennsylvanian, that he wanted to be on

10    his team to help.  And the guy said he

11    would.  And then he went and was

12    petitioning like in New York or New

13    Jersey --- this other person not

14    Trent.

15          And then when he came back he

16    didn't want to talk to Trent.  He had

17    already worked out his own deal, which

18    amounted to the same amount of money.

19    But I remember I had to have him fill

20    out W-9s and have a contract sent to

21    him before we could finalize things,

22    so I know that that individual didn't

23    get paid until like late August.

24    Q.     Was it Andy Jacobs?

25    A.     It was Andy, yeah.

1   Q.   I just want to make sure I

2   covered this.  For the 2008

3   collections that you did for Ms.

4   McKinney, am I correct that there was

5   no out-of-state professional

6   circulators involved in that

7   collection of ---?

8   A.   That's correct.

9   Q.   For the 2010 Mel Packer

10   collection effort, am I correct that

11   there was no out-of-state professional

12   signature collection efforts for that?

13   A.   Correct.

14   Q.   For the 2012 Jill Stein

15   collection effort, am I correct that

16   there was no professional out-of-state

17   signature collection effort?

18   A.   That's correct.

19   Q.   2014 gubernatorial team, am I

20   correct that there was no professional

21   out-of-state signature collection?

22   A.   That is correct.

23   Q.   But in 2016 with Jill Stein in

24   the down ballot, there was?

25   A.   Yes.

143

1                    ATTORNEY ROSSI:

2                    That is it.

3             *   *   *   *   *   *   *   *

4        DEPOSITION CONCLUDED AT 4:40 P.M.

5             *   *   *   *   *   *   *   *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

144

1    COMMONWEALTH OF PENNSYLVANIA  )

2    COUNTY OF BEDFORD             )

3                   CERTIFICATE

4            I, Bernadette M. Black, a Notary

5    Public in and for the Commonwealth of

6    Pennsylvania, do hereby certify:

7            That the witness whose testimony

8    appears in the foregoing deposition, was duly

9    sworn by me on said date, and that the

10   transcribed deposition of said witness is a

11   true record of the testimony given by said

12   witness;

13           That the proceeding is herein recorded

14   fully and accurately;

15           That I am neither attorney nor counsel

16   for, nor related to any of the parties to the

17   action in which these depositions were taken,

18   and further that I am not a relative of any

19   attorney or counsel employed by the parties

20   hereto, or financially interested in this

21   action.

22   COMMONWEALTH OF PENNSYLVANIA          _Bernadette M. Black_
            Notarial Seal
23   Bernadette M. Black, Notary Public    _____
        Everett Boro, Bedford County
24   My Commission Expires Jan. 17, 2017    Bernadette M. Black,
     MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

25                                         Court Reporter