# EXHIBIT A

# PART 2

### Page 74

1  behalf of Rocky De La Fuente during that ---
2  A. Sure.
3  Q. --- time frame.
4  A. Not a problem.
5  Q. Now, did you personally collect signatures for
6  Senator Cruz in any of those states?
7  A. Yeah. Yeah.
8  Q. I can't remember if you listed yourself as a
9  person? Oh, you did.
10 A. Yes.
11 Q. So I don't have to ask that.
12 A. Yeah, I enjoy collecting signatures ---
13 Q. Okay.
14 A. --- for my senator. It's a personal privilege, a
15 way of respecting him. I wish that he was in the
16 debate last night.
17 Q. And you collected --- did you collect for Senator
18 Cruz in all of those states that you listed?
19 A. Yeah, I did.
20 Q. Did you collect for Senator Paul in the two
21 states that you listed?
22 A. I did.
23 Q. Did you collect for Rick Santorum in Indiana?
24 A. I did.
25 Q. Did you collect for Trump in Indiana?

### Page 75

1  A. I did not.
2  Q. Did you collect for Rocky is a Democrat in the
3  four states you listed?
4  A. I did not. Yes. Yes. Yes, I did in every one.
5  Q. And did you collect for Rocky is an Independent
6  in the number of states you listed there?
7  A. I believe. I mean I definitely collected a lot
8  of signatures. I don't know if I actually was on
9  record as collecting any. So when I would train
10 someone, I would go collect their first like 20
11 signatures with them.
12 Q. Uh-huh (yes).
13 A. Teach them how to do it. And I always gave each
14 person I trained a lot of --- I wanted them to make
15 money. So I was trying to help them as much as
16 possible. So I probably collected, you know, 1,000
17 signatures. But I don't know if I actually was on
18 record as collecting any. I'd have to go look
19 through. I'm sure I notarized a page or two. But
20 yes, I did collect signatures.
21 ATTORNEY JOEL:
22 Mark that one next, please.
23     (Defendant's Exhibit 6 marked for
24 identification.)
25 BY ATTORNEY JOEL:

### Page 76

1  Q. Mr. Pool, I'm going to show you what's about to
2  be marked as it looks like Defendant's 6. Thanks.
3  If you take a look at it. I've just got a couple of
4  basic questions about it.
5  A. Okay.
6  Q. Am I correct that this is a nominating petition
7  for Rocky De La Fuente as a Democrat in the
8  Commonwealth of Pennsylvania?
9  A. Yes, sir.
10 Q. So those signatures that are below there are
11 registered voters in the Commonwealth who signed this
12 petition?
13 A. To the best of my knowledge.
14 Q. And it looks like it was notarized and the
15 Affidavit signed by somebody in Pennsylvania?
16 A. Carterstown, yep. Yeah, a Pennsylvania address.
17 Q. Okay.
18 A. And it was notarized in Allegheny County.
19 Q. And this was some stuff that you produced. So am
20 I accurate, this is some of the work that Benezet did?
21 A. Yeah. This is --- any signature gathered for
22 Rocky is a Democrat was done by our company.
23 Q. Nobody else collected for Rocky as a Democrat in
24 the Commonwealth?
25 A. No.

### Page 77

1  Q. Okay.
2  A. I would have gotten it if it was a volunteer or
3  something, you know.
4  Q. Okay.
5  A. Yeah.
6  Q. Let me see that for a second. Do you know
7  whether or not --- do you collect any --- this looks
8  like it's for Rocky De La Fuente. My question is did
9  you collect any signatures for Rocky De La Fuente's
10 delegates?
11 A. No, he didn't want any.
12 Q. He didn't want any?
13 A. No. I thought it was kind of weird, but I didn't
14 say anything. I told him what the purpose of the
15 delegates were and he --- it's hard finding them I
16 mean, it requires a lot of campaign resources and
17 outreach and stuff.
18 Q. So if we talk about --- we'll talk about this
19 election cycle and your signature collections. You,
20 Trenton Pool.
21 A. Okay.
22 Q. For Cruz, you talk about the progression of
23 states. Did you follow that same progression? Did
24 you go from Illinois to Indiana to, what was next,
25 Pennsylvania?

20 (Pages 74 to 77)

Page 78

1  A. Yes, I did. I had to go and like, you know, do
2  some farming in Vermont. And I never went to Rhode
3  Island, but I did have to take a trip to Vermont once
4  or twice. And then I had to go and, you know, go back
5  to Illinois a couple times. We had people in Illinois
6  that were in Indiana that had people in Indiana
7  simultaneously for some period of time.
8  Q. Okay.
9  A. I did a little bit more traveling than gathering.
10 Q. Okay.
11 A. But I was in that same time.
12 Q. And when you were doing the traveling, let's talk
13 about the Cruz campaign first. Through all those
14 states, did you collect signatures or did you manage
15 or whatever it was you were doing at different
16 locations throughout the various states?
17 A. Yeah. I collected signatures in every state I
18 listed.
19 Q. Okay.
20 A. Except for Rhode Island or Delaware.
21 Q. And then within the states or within Illinois,
22 did you collect signatures in different locations
23 within Illinois?
24 A. Uh-huh (yes). Sure.
25 Q. And for Indiana, did you collect signatures in

Page 79

1  different locations in Indiana?
2  A. Of course.
3  Q. And in Vermont, did you collect signatures in
4  different locations in Vermont?
5  A. Not different. I was in pretty much one area.
6  Q. Okay.
7  A. But I did collect signatures.
8  Q. Delaware, did you go to different locations?
9  A. I didn't go to Delaware or Rhode Island.
10 Q. Pennsylvania, you went to different locations?
11 A. Yes.
12 Q. Did you stay in different hotels at these
13 different locations or did you come back to one hotel?
14 A. In Pennsylvania, I stayed in a few cities. I
15 think Harrisburg, Philly and Allegheny.
16 Q. How about in Illinois? Did you stay in different
17 cities?
18 A. Yeah, it was chaotic there. We didn't have the
19 whole state. So it was like, you know, we'd go to one
20 congressional --- it's all done by congressional
21 district there. Kind of like how you guys do it here
22 for the presidential delegates. And we would
23 basically jump to wherever there weren't a bunch of
24 petitioners because everyone just kind of hit the
25 street. My company wasn't the only one doing

Page 80

1  Illinois.
2  Q. And how about in Indiana? Did you stay in
3  different locations?
4  A. Indiana, we had people in every congressional
5  district working simultaneously. And I personally
6  jumped around quite a bit. So yeah.
7  Q. Did the people that Benezet had working in
8  Illinois, did they move around to different locations
9  to collect signatures?
10 A. All the time, yeah.
11 Q. Did they stay in different locations depending on
12 where they were collecting signatures?
13 A. Yes.
14 Q. How about in Indiana? Did they move around to
15 different locations?
16 A. Not generally. We try to keep them all to one
17 area. So I'd give each person a congressional
18 district.
19 Q. Okay.
20 A. Let them get all the money and they make enough
21 money. And, you know, also they get to know the area.
22 It's really chaotic because you're switching up the
23 petition. And Indiana actually doesn't matter but.
24 Well, yeah, you'd have to have --- it's done by
25 congressional district there, too or county there.

Page 81

1  And the counties are part of a congressional district.
2  Meaning you qualify when you get 500 valid signatures
3  in each congressional district. So when they start
4  jumping out of that congressional district, we have to
5  make them do petitions and all that and it gets pretty
6  chaotic. So we keep them in one area to answer your
7  question.
8  Q. How about in Pennsylvania? Did the people you
9  had on the ground in Pennsylvania, did they collect in
10 different locations?
11 A. Not generally.
12 Q. Okay.
13 A. They all try to qualify one district.
14 Q. Okay.
15 A. But we did have some jumping around.
16 Q. And you jumped around?
17 A. I did. I was jumping around, yeah.
18 Q. Rand Paul in Illinois, would it be the same as
19 Cruz in Illinois?
20 A. Yes.
21 Q. We're jumping around?
22 A. Yes.
23 Q. Staying in different locations?
24 A. Yes.
25 Q. Rand Paul in Indiana would be the same as Cruz in

Page 90

1  well, yeah. Sometimes.
2  Q. Why did it depend?
3  A. It just depended on, you know, where we were.
4  They wanted five congressional district delegates
5  originally. And I had enough people to do that. We
6  had some manpower that were in state. And I'd sourced
7  enough people at that point for the Rocky De La
8  Fuente. They came a week after Rocky. So Rocky
9  contracted this within a day or two of the lawsuit.
10 It was like the 27th, 28th, 29th of January.
11 Q. Okay.
12 A. And then we got contracted by the Cruz campaign
13 almost a week after that. So the clock was ticking.
14 You know, I couldn't do the whole state. And also I
15 sourced some Republican people that wanted to work for
16 Rocky. There were outsourced Republicans. So we used
17 some of those people and we tried to get the five
18 districts they wanted. And then we had a couple, I
19 think like one of the districts we had one witness who
20 was ready. He was already going door to door and
21 getting everything. So all we needed was manpower and
22 circulators to help him.
23 Q. Were you able to get the delegates signed up?
24 A. Most of them.
25 Q. For all five districts?

Page 91

1  A. No, not all of them.
2  Q. How many of them?
3  A. Whatever Bucks County is, we definitely could not
4  get that done. Our witness there was probably
5  mentally insane. I'm not sure what her problem was,
6  but Michael Alexander who you spoke to I'm sure he
7  could tell you what exactly happened. I mean, she was
8  talking to herself at the door with the ---.
9  Q. Where did you find her as a witness?
10 A. On Craigslist. And then Andy Jacobs and the
11 Masons and a few other people, they basically got the
12 rest of the stuff done. We did three districts to
13 answer your question.
14 Q. Okay.
15 A. Three districts.
16 Q. What happened in the fifth district? You got
17 three. You got the Bucks County district. What
18 happened to the fifth one?
19 A. The Bucks County one. Oh, okay. So the other
20 one was, I think we just, I just told the campaign at
21 that point, after we had the issues with the witnesses
22 and there was an issue with just mobilizing people and
23 getting them to move around, the delegates, Vonne
24 Andring who I think he should have stuff between me
25 and her. She was her campaign person. She provided

Page 92

1  me a list of people's names. I had a list of --- the
2  Rand Paul campaign like reached out to me after that
3  lawsuit. There was like an article written. Some guy
4  gave me a list of every Rand Paul delegate and helper.
5  So I utilized that, tried to find Cruz people. We
6  were told basically to go fly a kite. We exhausted
7  every opportunity we could to go and get witnesses.
8  And unfortunately, we were falling short. And no one
9  wanted to move around. You know, no one has the time
10 and --- the time necessary to go and just travel
11 around with other petitioners to go get signatures.
12 So I told the Cruz campaign I can only do two
13 districts and we ended up getting them in three.
14 Q. Okay.
15 A. So we dropped one of them. I don't know which
16 one it was.
17 Q. Okay.
18 A. It's probably on here though.
19 ATTORNEY JOEL:
20 Mark that one next.
21 (Defendant's Exhibit 8 marked for
22 identification.)
23 BY ATTORNEY JOEL:
24 Q. I'm showing you what's been marked as Defendant's
25 8. Is that what you were talking about? The list

Page 93

1  of ---
2  A. Yes.
3  Q. --- Rand Paul ---
4  A. Yeah, this one.
5  Q. --- delegates ---
6  A. Yes.
7  Q. --- that might be able to help out as witnesses
8  for Cruz?
9  A. Yeah, we did. I e-mailed all these guys and I
10 got the worst e-mail responses back. It's pretty
11 hysterical. Probably not appropriate for Court.
12 Q. Okay.
13 A. But yes, this is what I was talking about.
14 Q. All right.
15 ATTORNEY JOEL:
16 Why don't we take a break? It's about
17 ten of. Give you a chance to get your head together
18 for the next thing.
19 SHORT BREAK TAKEN
20 BY ATTORNEY JOEL:
21 Q. Mr. Pool, one question that came to me over the
22 lunch break was in Pennsylvania when you're getting
23 the notarization requirement, that's done, the
24 signature occurs of the Pennsylvania resident and the
25 notarization happens both after all the signatures

Page 102

1  A. I'll find it.
2  Q. And were you able to collect signatures in
3  Pennsylvania?
4  A. Me personally I did not.
5  Q. Okay.
6  A. I didn't sign off on any affidavits.
7  Q. But the people who you sent out, were they able
8  to collect?
9  A. Oh, yeah.
10 Q. Okay.
11 A. Yeah. We got 1,500 signatures ---
12 Q. Okay.
13 A. --- for the LP and about 4,500 for the Green
14 party.
15 Q. And for the --- staying on the Libertarian party,
16 that was this, it was 2016 ---
17 A. Yes, sir.
18 Q. --- that that happened?
19 A. Yeah.
20 Q. And was there an in-state witness requirement on
21 that collection?
22 A. There wasn't.
23 Q. Was there a notarization requirement on that
24 collection?
25 A. There wasn't.

Page 103

1  Q. Was there a can't sign two permit on that?
2  A. There was not.
3  Q. For the Green party, you said you went to
4  Pennsylvania, Virginia and Georgia. Pennsylvania, did
5  Benezet do that work itself?
6  A. Yes.
7  Q. Who did you deploy there to do that?
8  A. I'm going to give you that list tomorrow.
9  Q. And were those signatures --- did you have the
10 in-state requirement for those signatures?
11 A. Yes. No. No, we did not.
12 Q. Okay.
13 A. No.
14 Q. With the notarization?
15 A. No. We did not have that requirement either.
16 Q. And how about the requirement of two people not
17 being able to sign? Or one person not being able to
18 sign two or more petitions?
19 A. We did not.
20 Q. Virginia, did Benezet do that or did you
21 subcontract?
22 A. Bob Lynch has worked with me a lot. He said he
23 wanted to do it. And it was an Election Day only type
24 of deal. And I subcontracted out technically to allow
25 him to do the whole thing. I think he got 300

Page 104

1  signatures. They wanted 1,000. They were pretty non-
2  plussed with his output. So they ended up basically
3  pulling it and giving it to someone else.
4  Q. How about Georgia? Did you subcontract out or
5  was that Benezet?
6  A. I did subcontract it out, but I did do the work,
7  too. So I subcontracted it to Derrick Lee who had
8  worked with me a lot or worked with Rocky a lot, the
9  cycles. So he was doing Rocky there.
10 Q. Now, when you were collecting for Cruz in
11 Pennsylvania, were you collecting signatures for Cruz
12 and also his delegates? Delegates only? Cruz only?
13 How was that?
14 A. No, the plan was a delegate strategy plan. He
15 wanted to have his delegates on the ballot. So we
16 tried to get them as, you know, the District seemed to
17 want its delegates in there.
18 Q. And the 4,000 signatures you testified about
19 getting, were those for his delegates?
20 A. Oh, yeah. I mean like it's split up, you know.
21 We probably got 1,500 for Cruz and then, you know,
22 2,500 for the delegates.
23 Q. And were you successful in getting these
24 delegates done?
25 A. Yeah, we got some. I think we got about ten on

Page 105

1  there. Between five and ten that my people helped
2  personally fill.
3  Q. Yesterday there was some --- I forget which
4  witness it was frankly. There was some testimony
5  about somebody witnessing. Kemit or something like
6  that.
7  A. Kemit, yes.
8  Q. Kemit. Can you spell that for me?
9  A. It's K-E-M-I-T. Like Kermit without the R.
10 Q. Is that his first name or last name?
11 A. That's his first name.
12 Q. What's the last name?
13 A. His last name is Wilson, I believe.
14 Q. Okay.
15 A. I'll double check that. I think it's in my phone
16 but ---.
17 Q. Am I correct that he was a witness for the Rocky
18 Democratic collection effort?
19 A. He was. Yes, sir; that's correct.
20 Q. How did you find him?
21 A. We found him --- we sourced him through I believe
22 it was Gerald Bundy; he's a friend of Gerald Bundy or,
23 you know, that's exactly how we found him.
24 Q. And was Bundy, was he from Pennsylvania also, if
25 I remember right?

27 (Pages 102 to 105)

Sargent's Court Reporting Services, Inc.
(814)-536-8909

```
                                                    Page 106
 1    A. Yes, he's from Philly.
 2    Q. Now, there was some discussion --- well, now let
 3    me ask you this. Did you have a written contract with
 4    Mr. Wilson to be a witness?
 5    A. No, I did not.
 6    Q. Did you have any paperwork back and forth with
 7    him setting up the relationship with him?
 8    A. I had a contract, a verbal contract with Gerald
 9    who worked for me, you know, a lot. And Gerald's the
10    one who sourced Kemit. And he told Kemit exactly what
11    me and Gerald had agreed to for all witnesses in this
12    state.
13    Q. Okay. What was that?
14    A. $10 per hour. And it's written in our contract.
15    I'm getting into my cost that I billed the campaign.
16    Q. I'm sorry, say that again?
17    A. I'm giving them literally the cost that was
18    billed to the campaign.
19    Q. Okay.
20    A. So Rocky's campaign is paying me $10 an hour.
21    I'm giving it directly to the witness who's following
22    around my people and helping.
23    Q. Okay.
24    A. Okay.
25    Q. And it sounds like there was a dispute over
```

```
                                                    Page 107
 1    payment with Mr. Wilson. What's your understanding of
 2    that?
 3    A. Well, I was there so I understand it to be the
 4    guy basically tried to change the deal after the fact
 5    and refused to notarize the signatures we needed to
 6    get him on the ballot. I mean, you're talking about
 7    700 signatures or so. Basically we wouldn't have
 8    qualified Rocky if there was a challenge or anything
 9    without paying this guy the extra money he asked for.
10    Q. So why did he think he was deserving of more
11    money?
12    A. It happens a lot. Just people get greedy and
13    they realize how important their role is in the
14    process. And they start asking for more.
15    Q. What was his basis for saying it? Did he say he
16    worked more hours? I mean, if there's an hourly rate,
17    how did he come up with that I'm owed this?
18    A. He just said that that's what he thinks it's
19    worth.
20    Q. Did you ever consider paying any of your
21    witnesses a per signature fee?
22    A. I wanted to actually. I didn't. And I told
23    Shawn that. I said I think that, you know, if we
24    charged $1 per signature rate, it'll come out to be,
25    you know, probably the same price. And it actually
```

```
                                                    Page 108
 1    ended up being less the way Shawn proposed it; the $10
 2    per hour. You know, I want to make sure that they're
 3    all there also. I could see people saying yeah, I'll
 4    just go get them and I'll sign off on them. I don't
 5    want anything like that to happen. So I think the per
 6    hour thing maybe is better. You know, these guys are
 7    all independent contractors. They're just going to do
 8    what they do anyway. But I wanted to make sure that
 9    the plan was in place to make sure the best business
10    practices were followed.
11    Q. Okay.
12    A. And I thought that the hourly rate, after talking
13    to Shawn, might have been the smarter strategy.
14    Q. And why is that?
15    A. For those reasons; making sure the person
16    actually shows up to the job and not trying to pull
17    some, you know, shoddy --- I don't know, doing
18    something that's not correct.
19    Q. So were you actually there on the collecting with
20    Mr. Wilson?
21    A. No, I was not there.
22    Q. Okay.
23    A. I was there at the turn in to get his stuff
24    notarized.
25    Q. Oh, okay.
```

```
                                                    Page 109
 1    A. To write him his check.
 2    Q. Did you end up resolving that with him?
 3    A. I did.
 4    Q. What did you end up giving him?
 5    A. I gave him a few hundred dollars extra. We
 6    settled about half.
 7    Q. Okay.
 8    A. By the end of it, he probably got $300 or $400
 9    extra.
10    Q. Since Benezet has been up and running in 2014,
11    has it been profitable?
12    A. In 2014, no. But it has been this year.
13    Q. So 2016 you'll be profitable?
14    A. Yeah, I'll be profitable this year.
15    Q. 2015, you didn't do any work?
16    A. Didn't do any work under Benezet.
17    Q. And 2014, you just started out?
18    A. Yeah. We're baby.
19    Q. Okay.
20    ATTORNEY JOEL:
21    Can you mark that one, please? Okay.
22    I'm not sure if that's supposed to go with something
23    else or what. That's the way it came to us sort of
24    after another e-mail.
25    (Defendant's Exhibit 12 marked for
```

Page 110

1  identification.)
2  BY ATTORNEY JOEL:
3  Q. So can you just tell me what that is?
4  A. This is the amendment for Rocky De La Fuente's
5  contract. I think number ten in there. This would be
6  the amendment for number ten.
7  Q. So if it's not number ten, whatever the contract
8  we just looked at for Rocky De La Fuente, this is the
9  amendment?
10 A. Sure. Yeah.
11 Q. That added all those states?
12 A. Yeah. And I believe the contract was for Ohio.
13 So then we said okay, well this is now going to amend
14 the Ohio agreement and then add all these other
15 states.
16 Q. Okay.
17 A. And then this was, after this everything became a
18 verbal basically because we were just moving too
19 crazy.
20 Q. And was this for him as an Independent?
21 A. Yeah.
22 Q. Correct? Okay. What do you mean when you say
23 you're moving too crazy?
24 A. Well, I mean like we're just, you know, I didn't
25 have time to go and sit with my contract lawyer and go

Page 111

1  and like read the by stuff and then get his signature
2  because, you know, by this time we're halfway through
3  the cycle. Deadlines are looming. You know, we're
4  just, we're literally just become a nomadic band of
5  petition gatherers and throw them into the next state.
6  Make sure we see what we can get on the ballot.
7  Q. This nomadic existence that you and your people
8  had, did that --- when did it start?
9  A. It started basically after Pennsylvania.
10 Q. So after the Pennsylvania Democratic deadline?
11 A. No, after the Pennsylvania Independent deadline
12 we became pretty chaotically moving about trying to
13 get stuff done.
14 Q. Okay. And was that August?
15 A. Yeah. I think it was August 1st deadline.
16 Q. August 1st. Okay. So from August 1st through
17 when were you and your folks nomadic?
18 A. Pretty much until about two weeks ago.
19 Q. And describe what you mean by nomadic?
20 A. We're just like, you know, I went from
21 Pennsylvania into Ohio. We had eight days to get it
22 done. Then we got contracted. We got the
23 Constitution party. Actually, they contracted us
24 there, too. I didn't tell you that. That's another
25 amendment. Darrell Castle. You know, so we had eight

Page 112

1  days to go get the 10,000 signatures or so we needed.
2  And, you know, get it done. And then after that we're
3  like okay, great. And then we get called to come to
4  Pittsburgh. So we all move to Pittsburgh. Okay,
5  great. Go get that done. You know, what else do got?
6  Alabama, Virginia, Kentucky, you know, Georgia. Some
7  of the people came in from working for Alex in
8  Connecticut and Massachusetts. So people just kind of
9  running all over.
10 Q. Okay.
11 A. That's what I meant.
12 Q. And after the primary in Pennsylvania, did you
13 guys continue collecting signatures in other
14 locations?
15 A. After the primary in Pennsylvania we're pretty
16 much done. After the primary date or after the
17 Pennsylvania primary collection window?
18 Q. After the collection window.
19 A. After the collection window, I think we still did
20 a couple things but I can't recall.
21 Q. Okay.
22 A. I don't know what we --- I think actually we were
23 done. We're done. I remember we're done.
24 Q. Is that because there was --- I mean, were there
25 other ---.

Page 113

1  A. There's no ---.
2  Q. Were there other drives to do?
3  A. After that, the only thing really left is Rhode
4  Island delegates. And the Rhode Island delegates need
5  like 1,000 signatures between the two congressional
6  districts. It's pretty easy. At that point everyone
7  --- all the Republican Party people are helping anyone
8  but Trump. So they need to spend money on this.
9  Q. And how about for the Independents? When do
10 those start up?
11 A. The Independents start up ---.
12 Q. What was the earliest startup date?
13 A. Actually, some of them started right around then.
14 Q. Oh, okay.
15 A. So I could have actually theoretically began
16 circulating at the same time. I could have started
17 circulating for the Libertarians probably at the same
18 time that we had turned in for Ted Cruz. I believe
19 that I could have gone straight into doing that.
20 Q. Okay.
21 A. I'll look at the timeline and see.
22 Q. If you had a contract?
23 A. Yeah, if I had a contract. Yeah.
24 Q. So there's work to be done in various states for
25 other, for Libertarians, Greens, Constitution, ballot

Page 118

1  Q. Okay. How about in 2015? Anything that Trenton
2  Pool did to collect signatures in 2015?
3  A. Actually, sorry. 2014 was the Equal Rights
4  Ordinance. So we ended up doing that in like July.
5  Q. Okay. That was in Texas also?
6  A. Yes.
7  Q. Okay.
8  A. In Houston.
9  Q. Okay. Anything else in 2014?
10 A. I think that's it.
11 Q. All right. How about 2015?
12 A. 2015, the very end about I think like the late,
13 late, late, late, it was probably like right at the
14 --- it was November, December. I can't remember. I
15 got to go look at the timeline. But I consider that
16 all in this fiscal year because we really didn't do
17 billing or any of that. It was like we got contracted
18 technically in that year. But all the work was done
19 in the '16 cycle.
20 Q. So in 2015, I just want to make sure I
21 understand, Trenton Pool didn't collect signatures in
22 2015?
23 A. That's correct.
24 Q. In 2016, has Trenton Pool collected signatures
25 other than for your work with Benezet?

Page 119

1  A. No, I was doing this under the Benezet name
2  there. We also did an Uber lift. We helped recall a
3  city councilor as an advisory role to source
4  petitioners. I forgot to mention that, too. That's
5  one thing we did in 2016 while we were doing all this
6  other stuff.
7  Q. Did that involve signature collecting?
8  A. Yeah, it did.
9  Q. Okay. Where was that?
10 A. That was in Austin. It was a recall of Ann
11 Kitchen. We sourced about 10 or 20 of the petitioners
12 that they used to gather the 5,600, 6,000 signatures
13 in the District.
14 Q. Was that Benezet?
15 A. That was probably, I can't remember. I think
16 they wrote the check to Benezet. But it could have
17 been my name on it. So I would just say either one.
18 Q. Okay.
19 A. You can say it's under me. That's fine.
20 Q. So anything else in 2016 where Trenton Pool was
21 out collecting signatures other than for Benezet?
22 A. No, that's pretty much it.
23 Q. So now let's go back before the formation of
24 Benezet in 2014. When did you first begin doing work
25 as a signature collector?

Page 120

1  A. I started a long time ago with Jake. We were in
2  Oregon.
3  Q. Can you give me a year?
4  A. I think it was 2006. I don't really recall. I
5  believe it was whatever --- it must have been 2006
6  because that was the Libertarian National Convention
7  of Oregon where we were.
8  Q. And what did you do in 2006 as it related to
9  collecting signatures?
10 A. We worked for a petition company called Americans
11 for Limited Government. It was run by, you know, some
12 co-financed organization. I didn't know anything
13 about gathering signatures other than it was kind of
14 an interesting thing to me. And Jake was already
15 there doing it. And I was supposed to meet up with
16 this guy Jake because he was going to pay half of gas
17 to drive from Oregon to Alaska where we both needed to
18 go. So he asked me if I wanted to work. I remember
19 we made, I made like $3,000 or $4,000 in a few days.
20 So I thought it was pretty cool.
21 Q. Okay.
22 A. I was in college.
23 Q. I never asked you about your educational
24 background. Tell me about that.
25 A. I went to school growing up in high school and

Page 121

1  then went to Baylor for a semester. Didn't like it.
2  So I transferred to Alaska. They had given me part of
3  the --- they have like a private fund dividend that
4  they give people that go to all the schools. And so
5  it was super cheap and I had made like a 1,400 SAT,
6  1,300-something SAT. So they gave me a scholarship to
7  Baylor. And then I went to Alaska and they gave me a
8  good deal. And then I transferred to SMU because I
9  mean there's not much money in being a park ranger,
10 you know.
11 Q. What was your degree in?
12 A. My degree was in business and geology. A little
13 bit different.
14 Q. And when did you get your degree?
15 A. I got my degree in 2010.
16 Q. So 2006 was your first signature gathering for
17 money?
18 A. Yeah. That was the first time I ever did it.
19 Q. And that was for Americans for Limited Government
20 in Oregon?
21 A. Yes.
22 Q. What time of year was that?
23 A. It was in the summer, early summer.
24 Q. Did you do any other signature collecting in
25 2006?

## Page 130

1  reimbursed.
2  Q. With the Benezet work for this year that Benezet
3  has done in Pennsylvania, did the notary --- I'm
4  sorry. Did the witness fee get passed on to whoever
5  the client was?
6  A. No, not for Cruz.
7  Q. Not for Cruz?
8  A. For Rocky, it's in the contract that we ---
9  Q. Okay.
10 A. --- would pass that on.
11 Q. So for the Rocky witness fee, when Rocky was
12 running as a Democrat in Pennsylvania, that $10 an
13 hour was passed through to the Rocky campaign?
14 A. It was passed to subcontractor.
15 Q. Oh. Passed through to ---
16 A. His contractor.
17 Q. --- Shawn?
18 A. Yeah. Yeah.
19 Q. Okay.
20 A. A deal, yeah.
21 Q. And for the Cruz, did you quote a price that
22 would incorporate what that was going to cost you?
23 That witness fee?
24 A. Yeah. I mean I did some arithmetic and figured,
25 you know, I had a pretty good idea what it would be

## Page 131

1  considering the other stuff. But when I did Cruz's
2  --- like I told you before, when I did the Cruz bid, I
3  was, I assumed that I was only going to do the
4  districts that I had the people to do. So I was going
5  to use people. I wasn't going to go source witnesses
6  and everyone was circulated was going to be the
7  witness. Now, that didn't actually work out that way.
8  But that's pretty much what we had anticipated. So
9  the $7, $6.50 that I quoted him should have been able
10 to absorb some of it. But it's probably not, you
11 know, I'm probably lower than what anyone else would
12 have charged them.
13 Q. And did I understand you correctly that when you
14 bid the Cruz work, you were, it was your thought that
15 you were going to do a limited amount of districts,
16 ones where you already had witnesses online to help?
17 A. Exactly.
18 Q. Okay. That was the plan?
19 A. That was the plan, yeah.
20 Q. Okay.
21 A. Yeah.
22 Q. And that didn't work?
23 A. No, we had to move some of the guys around. So
24 we took like, you know, once someone moved, they'd
25 finished the district, we had to move them somewhere

## Page 132

1  else to help go clean up. But yeah, I mean we were
2  able to get about three of the five we had originally
3  contracted for. And as I mentioned before, part of
4  that was because the witness and district date who,
5  you know, she spoke well and seemed really awesome and
6  nice, she ended up being however you want to say it.
7  I think pretty crazy.
8  Q. Getting back to 2012 when you were doing it just
9  on your own or working for Andy Jacobs or somebody
10 else, you mentioned Pennsylvania and you mentioned
11 North Dakota. Any place else you collected signatures
12 for?
13 A. Not that I remember.
14 Q. And the collection in Pennsylvania was for Ron
15 Paul to get on the Republican primary ballot for
16 President, I assume?
17 A. Yeah, that is true.
18 Q. And the work you did in North Dakota for the
19 Libertarian party, was that to get them on the general
20 election ballot ---
21 A. Yeah.
22 Q. --- for President?
23 A. Yes, it was. And we also did the Constitution
24 Party there. And a third party, it was kind of odd at
25 the time. It was brand-new. It was called Americans

## Page 133

1  Elect. And that was all for Mike Arno.
2  Q. And both of those, the Constitution party and
3  that American Select or Elect?
4  A. Elect.
5  Q. Elect?
6  A. Yeah.
7  Q. American Elect party, was that also to get that
8  party on the general election ballot for president?
9  A. Yes, sir.
10 Q. Did you do any work in 2012 signature gathering
11 that wasn't associated with a presidential bid?
12 A. I don't believe so.
13 Q. So we talked about Pennsylvania and North Dakota.
14 Any other states did you go to in 2012 to collect
15 signatures?
16 A. I don't think so.
17 Q. How about 2013? Trenton Pool as an individual?
18 A. Just the stuff for the Supreme Court candidates.
19 Q. And is that what you talked about before that may
20 have bled ---
21 A. Yes.
22 Q. --- into 2014?
23 A. Yes. Well, the signatures are due in December of
24 that month. But the primary's not until a few months
25 later. So we roll into the campaign.

Page 134

1  Q. Okay.
2  A. So we're still helping and doing stuff.
3  Q. And that Supreme Court candidate, that was your
4  father again?
5  A. Yes. But I was helping two others, I mean I did
6  their signature gathering. I made it pretty clear I
7  wasn't going to help dad's campaign. I didn't think
8  it was appropriate. And, you know, it's hard to get
9  along with your dad. You know, seeing him getting
10 torn up. It kind of feels, you know, you just want to
11 stay away from it. So Jake did most of that.
12 Q. Okay.
13 A. I went and helped Robert Talton mainly. He's a
14 friend of mine. He was running for Supreme Court. So
15 I kind of, you know, I was his little helper. And
16 then they're doing, you know, I think we helped a few
17 other people. I can't remember who. I don't know.
18 Q. Was that all in Texas though, that work in 2013?
19 A. Yeah.
20 Q. Did you do any other signature collection other
21 than for that Supreme Court work in Texas in 2013?
22 A. No.
23 Q. And 2014 we already talked about. Do you do, for
24 any of the folks who you subcontract with --- strike
25 that. That's a bad one.

Page 135

1  For any of the individuals who you contract with,
2  that Benezet contracts with to go out and collect the
3  signatures, whether it's Witmer or Jacobs or any of
4  those folks, do you do any sort of a background check
5  on them?
6  A. No.
7  Q. Okay.
8  A. I mean, no.
9  Q. Your complement of signature gatherers that
10 Benezet uses, how did you find them all?
11 A. We find them from all over.
12 Q. Explain that to me.
13 A. It's word of mouth. People being sourced by
14 other, you know, signature gathering companies,
15 friends of friends, you know, people who have done it
16 before. There's really not like that big of a barrier
17 of entries. So anyone can become one in a sense. So
18 we can also train them, which we did over the summer.
19 We've trained a lot of people. And, you know, try to
20 give everyone a chance.
21 Q. I noticed that a few of your folks at least are
22 from Pennsylvania.
23 A. Uh-huh (yes).
24 Q. Jacobs, Mason, Mason and Bundy.
25 A. Uh-huh (yes).

Page 136

1  Q. You have to say yes or no, please.
2  A. Yes, sir. They are.
3  Q. Did you ever --- did you or Benezet ever ask them
4  to try to find more witnesses in Pennsylvania?
5  A. I think we did. I mean that's how I got a hold
6  of Kemit was through Gerald Bundy.
7  Q. Okay.
8  A. So I told him what the deal, what the offer was
9  and he sourced Kemit. And he, you know, I don't think
10 he found any. I don't know what he did. I didn't
11 think he --- they didn't do anything.
12 Q. How many people ---?
13 ATTORNEY ROSSI:
14 Can you speak up for the ---?
15 A. Yeah. Ed and Denise, they didn't do any --- I
16 didn't ask him to help source them out.
17 BY ATTORNEY JOEL:
18 Q. You didn't ask him to do what?
19 A. I didn't ask him to help source anyone.
20 Q. And by that you mean to help find witnesses?
21 A. To help find, yeah, more registered ---
22 Q. Okay.
23 A. --- Republican or Democratic voters.
24 Q. Is Jacobs a registered voter?
25 A. I believe so.

Page 137

1  Q. Republican or Democrat?
2  A. I'm not sure.
3  Q. How about Mason, Ed?
4  A. He's a diehard Republican.
5  Q. Okay. How about Denise Mason?
6  A. Republican.
7  Q. And how about Gerald Bundy? Democrat, I'm
8  assuming?
9  A. I don't know. I think he is.
10 Q. Let me ask you this. Jacobs is a Pennsylvania
11 resident; correct?
12 A. I believe so.
13 Q. So Jacobs could have signed the affidavit. Why
14 did Jacobs need a witness?
15 A. Jacobs need a witness?
16 Q. Or did he?
17 A. I don't know if he did. Where did he work? Did
18 he work in --- I think he did sign the affidavit.
19 Q. Okay.
20 A. Yeah.
21 Q. And what about Mason? The Mason's? Did they
22 work for you in Pennsylvania?
23 A. Yeah.
24 Q. I thought they did.
25 A. They did.

35 (Pages 134 to 137)

Sargent's Court Reporting Services, Inc.
(814)-536-8909

Page 142

1  A. Oh, okay. I don't believe so.
2  Q. What about any of the people who you have
3  deployed to Pennsylvania? To your knowledge have any
4  of them ever been stopped, arrested, told to stop
5  gathering signatures, told that they're not allowed to
6  speak about their political views, candidates,
7  anything like that?
8  A. So can you just clarify what you mean by asked to
9  stop? Like by an officer of the law?
10 Q. Yeah.
11 A. Okay.
12 Q. Yeah.
13 A. I'm sure, yeah. I mean I haven't personally, but
14 I've had incidents all over the country where people
15 have been asked to stop.
16 Q. I'm asking in Pennsylvania.
17 A. I got asked to stop by a lot of people that
18 weren't officers of the law.
19 Q. No. All right.
20 A. So I mean it's like ---.
21 Q. To your knowledge, the time that you've been in
22 Pennsylvania collecting signatures, ---
23 A. Uh-huh (yes).
24 Q. --- has any Pennsylvania law enforcement officer
25 prohibited you from interacting with the people who

Page 143

1  you're trying to convince to sign petitions?
2  A. Me, no. Independent contractors, I would have to
3  go back and ask.
4  Q. Okay. To your knowledge has that happened ---
5  A. I believe ---.
6  Q. --- as you're sitting here today?
7  A. I believe to Michael Jennings it happened
8  somewhere.
9  Q. In Pennsylvania or elsewhere?
10 A. In Pennsylvania, yeah.
11 Q. Okay. What do you know about that?
12 A. I don't know much. I'd have to go look at my
13 notes and see what happened. But people get asked to
14 stop all the time. Were they on private property?
15 Possibly. I don't know how it happened.
16 Q. And just to be clear, I want to make sure.
17 Stopped by like a Pennsylvania State Police Officer?
18 A. Yes, it's possible.
19 Q. Do you know that for a fact or are you saying
20 maybe?
21 A. I don't know about Michael, but I'm sure it's
22 possible, yeah.
23 Q. Okay.
24 A. People have been asked to stop.
25 Q. All right. Well, I'll ask Michael when we meet

Page 144

1  with him. That's fine.
2  A. Jake, could've happened to him, I don't know who
3  was asked to stop what, you know. So I mean I'd have
4  to go and ask every single person.
5  Q. Okay.
6  A. And when I say that, just to clarify, you know,
7  signatures are gathered from all different aspects.
8  You can go, some people gather them on private
9  property. Some people gather them at public events.
10 Some people go door-to-door. So there's a whole walk
11 of different modes of modalities of getting these
12 things onto the paper.
13 Q. Okay.
14 A. And so if they've been --- if they're at a
15 private, you know, Walmart for instance getting
16 signatures, odds are they probably got asked to stop.
17 Q. Okay.
18 A. You know?
19 Q. All right.
20 A. Does that make sense?
21 Q. Yeah. No, I understand what you're saying.
22 A. Okay.
23 Q. And that does help clarify what you said.
24 A. Okay.
25 Q. Thank you.

Page 145

1  A. Okay.
2  Q. You understand the nature of this lawsuit to be
3  challenging the restriction, the necessity to have an
4  in-state witness with you; correct?
5  A. Yes.
6  Q. The notarization requirement; correct?
7  A. The notarization requirement, yes.
8  Q. And the fact that a voter in Pennsylvania can
9  only sign one petition?
10 A. Yes.
11 Q. Do any of those provisions stop you from coming
12 in to Pennsylvania and campaigning or advocating on
13 behalf of any candidate of your choice?
14 A. Campaigning or advocating can be defined as
15 petitioning, too. I mean so under that question I
16 would say yes. If I can't do everything that needs to
17 be done to make sure that candidate is most successful
18 and petitioning's included then, yeah. I would say
19 yes.
20 Q. Okay.
21 A. Without spending money out of my own pocket and
22 without being harmed by not being able to practice my
23 personal right to petition the government.
24 Q. So is it your belief that the provisions you've
25 challenged ban you from coming into Pennsylvania and

37 (Pages 142 to 145)

Page 146

1  handing out leaflets for a candidate?
2  A. They don't ban me from that, no.
3  Q. Do they ban you from coming in to Pennsylvania
4  and talking to people on the street about the
5  candidate of your choice?
6  A. No, they do not.
7  Q. Do they ban you from coming in to Pennsylvania
8  and carrying signs around with the candidate of your
9  choice?
10 A. No, they don't.
11 Q. For the issue of your choice, or the ballot
12 initiative of your choice, anything like that?
13 A. No.
14 Q. All right. Let's look at this a little bit. I'm
15 going to pass this back and forth because this is the
16 only copy I have.
17 A. No problem.
18 Q. Ron Yoachum. Yoachum?
19 A. Ron Yoachum.
20 Q. And I'm just a little bit confused when you say
21 circulated and/or witnesses. Was he a circulator for
22 you in Pennsylvania?
23 A. Yeah, I believe he actually was. He collected a
24 few signatures.
25 Q. Okay.

Page 147

1  A. Maybe ten.
2  Q. For who?
3  A. Twenty (20). He was working Cruz. He was a
4  Republican.
5  Q. So since he's a Pennsylvania resident, he
6  wouldn't have needed a separate witness ---
7  A. He would not.
8  Q. --- to collect?
9  A. He would not. Well, he could have, but I didn't
10 --- he was doing is own little thing. I gave him the
11 walk list. I believe that's the guy I gave a walk
12 list to, gave him an account. And he was just going
13 door-to-door and doing it that way. And I tried to
14 pair him up with someone probably and he probably told
15 me to go fly a kite to be honest. I can't remember.
16 Some of these guys don't want to work with anyone and
17 it's hard to ---.
18 Q. I mean, he didn't need anybody to collect in
19 Pennsylvania because he could sign the affidavit?
20 A. I believe that Ron Yoachum is a registered
21 Republican?
22 Q. Okay. Rick Churra?
23 A. Rich Churra is a registered Republican, too.
24 Q. And was he a circulator for you?
25 A. He was a circulator and witness.

Page 148

1  Q. Okay.
2  A. And a delegate.
3  Q. Delegate for Cruz?
4  A. For Cruz.
5  Q. So he circulated signature petitions on behalf of
6  Benezet?
7  A. Originally for himself. So he was one of those
8  guys that the campaign said hey, this guy's already
9  doing work. Go get him.
10 Q. Okay.
11 A. And so I said okay. And we were originally going
12 to use him to travel to other districts. But none of
13 the other delegates in that district could spin. He
14 was a full-time, he basically gave up his job for a
15 month to go and do this. So he was actually probably
16 one of the better, he was our best asset provided to
17 us by the Cruz campaign.
18 Q. And did you find him by contacting the Cruz
19 campaign?
20 A. Yeah. I mean we were in communication daily.
21 Q. Okay.
22 A. Vonne Andring who I believe might be in this
23 list, too.
24 Q. Yeah.
25 A. If she's not, she's in the discovery I'll send

Page 149

1  you with all the email. But she gave us him and a
2  couple other people.
3  Q. And did you contact them for --- did you contact
4  the Cruz campaign to try to get registered Republicans
5  who might help with this witness or collect or do
6  anything like that?
7  A. Exactly. We wanted help getting signatures or
8  volunteers. Originally when I talked to the Cruz
9  campaign about all this stuff, you know, back when we
10 were in Indiana, I told them how difficult
11 Pennsylvania was. And I said, you know, you guys are
12 going to need help there. It's not an easy state.
13 It's the most difficult state. It really is. And I
14 said if y'all want delegates, you know, you guys are
15 going to. He said no, no. We've got $20,000 and 200
16 volunteers. He's like you guys are going to get blown
17 away. And I said I'll bet you $500 you call me within
18 a week. And he did.
19 Q. Okay.
20 A. So that's when we --- and then we had two weeks
21 to do it instead of three. So we just kind of
22 scrambled and hit our heads against the wall. And
23 figured out who could spend this amount of time, who
24 could get paid for their activism, and who was able to
25 go out and help us. And they provided probably two or

38 (Pages 146 to 149)

Page 154

1 know, there's probably 50 names.
2 ATTORNEY ROSSI:
3 You can take care of that after you get
4 the download then; right?
5 A. Sure. Yeah, that's right.
6 BY ATTORNEY JOEL:
7 Q. Have you had any discussions with Carol Love
8 about this case?
9 A. No, not really. I know that she was one of the
10 witnesses. She was going to be a signature. She was
11 a Proponent of signing for multiple, multiple
12 signatures.
13 Q. Okay.
14 A. Or candidates, sorry. Republican candidates. As
15 are many voters, you know. A lot of people ask why
16 they can only sign for one. And they get kind of mad.
17 Q. Number 17, Justin Freyermuth; his involvement?
18 A. He was a Democrat witness.
19 ATTORNEY ROSSI:
20 Sorry, what's that name?
21 A. Justin Freyermuth was a Democrat witness
22 circulator for Rocky.
23 BY ATTORNEY JOEL:
24 Q. Was he one who you contracted via Benezet or is
25 he just one of these local witnesses that you found to

Page 155

1 go along?
2 A. What you mean contracted? I mean they were all
3 technically contracted via Benezet; right?
4 Q. Okay.
5 A. If they're working for us and getting paid by us.
6 Q. Okay.
7 A. Yeah. So this guy ---.
8 Q. Oh, that's true. So even all your Pennsylvania
9 witnesses were working for Benezet?
10 A. Technically, yeah.
11 Q. Okay.
12 A. Yeah. So they're all independent contractors.
13 But they're all working for Benezet or getting a
14 paycheck from Benezet at this time, in 2016.
15 Q. For whatever effort they provide?
16 A. For whatever, yeah.
17 Q. And for Rocky, it was $10 an hour that was passed
18 through to the Rocky campaign?
19 A. For Rocky, yeah. Some of them got paid cash like
20 Kemit and Justin probably got some cash, too. But
21 they were all getting paid. Now, some of them
22 actually ended up liking the signature gathering
23 portion, too. Like Justin ended up, he was one of our
24 best witnesses or most reliable. I wouldn't say best.
25 But he actually liked collecting the signatures. So

Page 156

1 he would go and he would be holding the boards getting
2 signatures. And when Bob or whoever is working with
3 him can't get them all, you know, because they're
4 spilling over and everything, he would start gathering
5 them, too. And he would end up --- and so I'd pay him
6 per signature on his signatures.
7 Q. So some of your --- how many others in addition
8 to Freyermuth, did that?
9 A. Pretty much all of them. All of them.
10 Q. Okay.
11 A. I would say the majority of the people that are
12 witnessing. Kemit didn't do it. I don't know why.
13 Maybe Michael just didn't tell him to do it. But they
14 guys that were working for me, you know. They see how
15 easy and how good it is. And they all kind of say
16 well, you know, I can do that, too. Why don't we make
17 a little extra money?
18 Q. Okay. So the witnesses were not only witnessing
19 the folks, well, Andy Jacobs is from Pennsylvania, but
20 the Jake Witmers of the world, but were also
21 collecting their own signatures is what you're saying?
22 A. Yeah.
23 Q. Okay.
24 A. I mean they're carrier circulators. That's what
25 they are.

Page 157

1 Q. What's that mean?
2 A. They're circulating, carrying the petition and
3 witnessing the circulation effort. So they're there
4 basically --- they're not there to take away
5 signatures from a primary like professional
6 circulator. But they're there to make sure that, you
7 know, they're aided in every way. Like if you're at a
8 busy location, it's impossible to stop them all. You
9 can't catch them all, right. So you've got to like,
10 you know ---. And so these guys are there to help and
11 make sure, in the most beneficent way possible, that
12 these guys succeed, and we get our clients on the
13 ballot, and make sure that we do it all legally and
14 lawfully. And Justin Freyermuth was one of the better
15 ones. He would come home. Him and Jake went to that
16 library in downtown Pittsburgh. And I think they got
17 like, I'm thinking like 200-something signatures a
18 day.
19 Q. Okay.
20 A. And Justin was getting about 50. So that's
21 pretty good.
22 Q. So the witnesses would catch the overflow?
23 A. Overflow, yeah.
24 Q. So if they weren't there to collect those
25 signatures, those signatures would be gone. They

40 (Pages 154 to 157)

Page 174

1  collecting signatures for?
2  A. Those were ---.
3  Q. On behalf of?
4  A. Yes. There's probably some --- I know one
5  delegate from that district did end up getting
6  entered. I think it was Evangelou. And she was
7  actually pretty excited because we only ended up
8  getting 25 signatures or so for her before I had to
9  pull the plug. And that's exactly the number she
10 needed. So it was just, you know, I guess someone's
11 looking out for us. Because she came to the turn-in
12 the final day and she said I need 25 signatures more.
13 And I pulled them out and I said this is yours. So it
14 was kind of funny. At least I didn't throw them away.
15 Q. How about this last page talking about CD14,
16 Richard Finn? What's that one about?
17 A. So these are the two for congressional district
18 14, Richard Finn, Andy Maul, and then they had some
19 other person who came in late and then they pulled
20 him. Actually, Ron Yoachum wanted to be a delegate,
21 too. He asked me, but at the time we had like a week
22 left. And I said, you know, we're getting like 40 a
23 day, 50 a day, 30 a day or something. It was really
24 slow moving. And, you know, I couldn't --- it was not
25 going to happen basically. So we have two delegates

Page 175

1  there.
2  ATTORNEY JOEL:
3  All right. Can we take a couple minute
4  break?
5  ATTORNEY ROSSI:
6  No problem.
7  SHORT BREAK TAKEN
8  (Defendant's Exhibit 15 marked for
9  identification.)
10 BY ATTORNEY JOEL:
11 Q. Mr. Pool, marked and put in front of you
12 Defendant's 15. Can you take a look at that? My
13 suspicion is it's identical to the Interrogatories
14 that you verified on behalf of Benezet. But could you
15 confirm that for me and confirm that it is your
16 signature at the very end?
17 A. I believe it's the same. I don't see anything.
18 It's the same, pretty much the same names that were
19 involved in the challenge. There's some, obviously
20 stuff that needs to be changed on page 18 that we
21 talked about on the other one. And then there's
22 probably some stuff on page 19 as well that we talked
23 about on the other one. And then Paul's signature and
24 my signature.
25 Q. Okay.

Page 176

1  OFF RECORD DISCUSSION
2  BY ATTORNEY JOEL:
3  Q. Mr. Pool, Defendant's 15, you identified that
4  that is your signature again; correct?
5  A. Yes, that's my signature.
6  Q. And whatever discussions or changes or
7  information you provided with regards to the
8  Interrogatories that were signed on behalf of Benezet
9  also apply to this; correct?
10 A. Yes, sir.
11 Q. I'm showing you what's been marked as Defendant's
12 16.
13 (Defendant's Exhibit 16 marked for
14 identification.)
15 BY ATTORNEY JOEL:
16 Q. Can you tell me what that is, please?
17 A. This is the ad for --- this is an ad that we
18 posted on Craigslist.
19 Q. Is that to get witnesses for the Rocky signature
20 collection?
21 A. Yeah. No, it's not. This is for the
22 Republicans.
23 Q. Oh, okay. So that's for Cruz?
24 A. Yeah.
25 Q. Okay.

Page 177

1  A. Yeah. This is probably after we ended up losing
2  what's her name? The witness who was speaking to
3  herself and was crazy, making voters not want to sign
4  the petitions at the door.
5  Q. I don't know what the right word is but how many
6  hits or responses did you get to your ads for
7  witnesses in Pennsylvania?
8  A. Not many. Not many.
9  Q. Can you estimate?
10 A. Make an estimate? Probably, you know, I would
11 say per ad placement, we'd probably get one email a
12 day and we'd put it up pretty much in every major city
13 every day. So we'd probably get one person out of all
14 four markets to say yeah, I'm interested. And then
15 when I'd touch base with them, they'd say, you know,
16 they wouldn't answer. They'd flake out.
17 Q. Okay. What other efforts did you make to find
18 witnesses for Pennsylvania?
19 A. I should have sent you guys something in
20 discovery, but I made like a flyer. We put it in all
21 the shops in Allegheny County. Bulletin boards,
22 especially like the same thing, same type script, more
23 generalized for both parties on the field. Do you
24 have a copy of that? Have y'all seen that? It's in
25 discovery that I'll send you all tonight or get you

Page 178

1 all for tomorrow. And I had like the bottom serrated
2 so they could like rip off my number. You haven't
3 seen it? Do you have it?
4 ATTORNEY ROSSI:
5 I don't know how to print this out
6 though.
7 A. Okay.
8 ATTORNEY ROSSI:
9 Let me see if I have it.
10 A. Yeah. Well, we can get it to y'all. I did
11 things like that. Networking was the best, you know.
12 Asking people who are already on board to go and ask
13 other people because people don't believe that they're
14 going to get --- I mean, everyone thinks you're a
15 Nigerian prince, something crazy. So it's kind of
16 hard to convince people you're legitimate.
17 BY ATTORNEY JOEL:
18 Q. Did you use your Pennsylvania collectors as a
19 source of trying to get more witnesses?
20 A. Yeah, sure. We asked everyone.
21 Q. Okay.
22 A. I mean I was pretty thorough in pretty much
23 taking any lead I had.
24 Q. And you got with the campaigns, at least the Cruz
25 campaign?

Page 179

1 A. Yeah, Cruz campaign was a lot more helpful than
2 Rocky's. Rocky, I didn't even talk to Rocky until,
3 you know, this June. So I didn't really know him.
4 And we pretty much realized from the get, when we
5 signed the contract that there wasn't going to be any
6 campaign resource help. But yeah.
7 Q. All right. I am almost at a good stopping point.
8 Why don't we go back and try to figure out what your
9 homework is for tonight?
10 A. Can I write this down, Paul, or do you want to
11 write it down?
12 ATTORNEY ROSSI:
13 You write it down.
14 A. Okay.
15 BY ATTORNEY JOEL:
16 Q. I've been taking some notes along the way, but
17 let's just have a ---.
18 ATTORNEY ROSSI:
19 First of all, first of all, the getting
20 the download tonight. He's going to use my computer,
21 which is faster than the hotel's computer ---
22 ATTORNEY JOEL:
23 Okay.
24 ATTORNEY ROSSI:
25 --- to do the downloads. If that fails,

Page 180

1 I'm going to ask your girlfriend to maybe break down.
2 Is that possible?
3 A. Oh, yeah. Yes.
4 ATTORNEY ROSSI:
5 Get it in smaller amounts?
6 A. Right now it's 633 megabytes. So there's a lot
7 of stuff for you.
8 ATTORNEY ROSSI:
9 I think as I explained to you, they want
10 all the invoices that you have with contracts.
11 A. I mean anything that I have regarding any of this
12 stuff should be, it will be in.
13 ATTORNEY ROSSI:
14 We're intending to give you is --- we're
15 downloading it on to flash drives.
16 ATTORNEY JOEL:
17 Okay.
18 A. I'll give you guys one of these tomorrow and then
19 I'll make paper copies. Y'all have them pre-print in
20 here, I'm sure.
21 ATTORNEY ROSSI:
22 And if there's any follow-up,
23 communicate any documents that aren't opening up and I
24 will try to get, I will get the hard copy for you that
25 way. So that's the first thing --- from my

Page 181

1 standpoint, that's the most important thing from my
2 standpoint ---
3 A. Got it.
4 ATTORNEY ROSSI:
5 --- to be accomplished.
6 BY ATTORNEY JOEL:
7 Q. The other thing that I had down was the list of
8 people who worked for you for Benezet on the general
9 election. I guess it would be probably the general
10 election Rocky.
11 A. Okay.
12 Q. Isn't it, who had that?
13 A. Yeah. And that'll cover --- and do you want
14 every state?
15 Q. Uh-huh (yes).
16 A. Broken down by state?
17 Q. What I want is you gave me a list of the states
18 that you worked.
19 A. Yeah.
20 Q. So what I want is all the people who worked in
21 those. And I'll probably drill down and try to figure
22 out who worked where.
23 A. Yeah.
24 Q. So think of that.
25 A. That might be pretty hard.

Page 198

1  to be Trenton Pool just helping out?
2  A. I'll be going up there just as a petitioner.
3  Q. So just you as a petitioner, Trenton Pool?
4  A. Yeah. I'll be one of like 30 people. Back at the
5  bottom of the totem pole. They have an in-state
6  witness requirement. Imagine that.
7  Q. They do?
8  A. Yes, they do. I'm going to be challenging it.
9  It's one of the 30 states --- 20 states.
10 ATTORNEY ROSSI:
11 Twenty (20).
12 A. No, it's more than that. I have a list.
13 BY ATTORNEY JOEL:
14 Q. Well let's talk about that. How many states, to
15 your understanding, have an instate witness
16 requirement?
17 A. In state. It depends because they switch up.
18 Like some states, like Vermont has no --- or no, you
19 mean instate circularly requirement?
20 Q. Yes.
21 A. There's like four or five.
22 Q. Do you know which ones they are?
23 A. New York, Maine, you guys and I don't know,
24 there's one more out there.
25 ATTORNEY ROSSI:

Page 199

1  New Jersey.
2  A. There's New Jersey and Delaware; right?
3  ATTORNEY ROSSI:
4  No, not Delaware. I'm not testifying.
5  A. It is new Jersey. I know it is New Jersey.
6  That's the fourth.
7  BY ATTORNEY JOEL:
8  Q. Okay.
9  A. And there's probably one more.
10 ATTORNEY JOEL:
11 There's some work in that Missouri at
12 some level has an instate registration and many states
13 apply ---.
14 A. South Dakota.
15 ATTORNEY ROSSI:
16 Yeah. South Dakota does, absolutely.
17 ATTORNEY JOEL:
18 Okay.
19 ATTORNEY ROSSI:
20 Many states also apply the instate
21 registration sometimes to the --- to the referendum
22 petitions but not to election petitions.
23 A. Yeah.
24 ATTORNEY ROSSI:
25 The referendum petitions, I don't think

Page 200

1  there is a possible list because some states allow
2  referendum petitions at the local level and they have a
3  rule, so they just pop up as they come along. That's a
4  pretty --- more difficult list to possibly get.
5  A. And if you get to like Texas, they actually have
6  cities that require you to be an in state city voter
7  --- or an in city voter, which is unconstitutional too.
8  But they don't ---.
9  BY ATTORNEY JOEL:
10 Q. So certain Texas cities also have an in city
11 requirement?
12 A. They have an in city requirement, yeah. It's
13 ridiculous.
14 Q. And the states you just listed, New York, Maine,
15 Pennsylvania, New Jersey and South Dakota have in state
16 witness requirements for candidates ---
17 A. That's correct.
18 Q. --- to collect signatures for candidates?
19 A. Oh for candidates? I've never circulated for a
20 candidate in Maine but I know the other four do, yeah.
21 Q. Okay.
22 ATTORNEY ROSSI:
23 I think the Maine restriction is limited
24 to referendum, not election petitions.
25 BY ATTORNEY JOEL:

Page 201

1  Q. So when you're talking about instate, New York,
2  Maine, Pennsylvania, New Jersey and South Dakota have
3  instate circulator requirements for everything? With
4  the exception that Maine, to your understanding, is not
5  for candidates, just for referendums?
6  A. I'm almost positive that's what it is.
7  Q. You started talking about notaries. What states
8  are you aware of that have notary requirements?
9  A. I think all except for what's on this list, which
10 is about 33. Now when I say that, every state is
11 different. Like Vermont, the independents need a
12 notarization, but the major parties don't.
13 Q. Okay.
14 A. Yeah.
15 Q. Vermont?
16 A. Vermont, yeah. So some states do that. Like if
17 I'm circulating a referendum in Arkansas, I have a
18 notarization. But if I'm circulating an election
19 petition, I don't. Same with New Mexico.
20 Q. So what list do you have there?
21 A. You want me to read it?
22 Q. Yeah.
23 A. These are the states that don't have a
24 notarization.
25 Q. At all? For any signature collecting activity?

4 (Pages 198 to 201)

## Page 202

1  A. No. Just for presidential.
2  Q. For presidential, okay. So the list you are about
3  to read are states that do not have a notarization
4  requirement for presidential signature gathering?
5  A. That's right.
6  Q. Okay. Go ahead.
7  A. New Mexico, Arkansas, Iowa, Indiana, Tennessee.
8  New Mexico --- I can give you a copy.
9  Q. We're going to mark it afterwards.
10 A. New Mexico, Arkansas, Iowa, Indiana, Tennessee,
11 Massachusetts, Rhode Island actually does. New
12 Hampshire, Utah, Mississippi, Alabama, Florida,
13 Minnesota, Wisconsin, North Dakota, California and
14 Washington State, and then there's also Alaska. And I
15 know there's probably another five to ten.
16 Q. That have no notarization requirement for any
17 collection?
18 A. For presidential ---.
19 Q. For presidential, I'm sorry. And the other states
20 that you didn't mention have presidential signature
21 gathering having notarization requirements; to your
22 understanding?
23 A. I can't speak to everyone. But I know that a
24 majority of them are.
25 ATTORNEY JOEL:

## Page 203

1  Can we mark that as whatever the next one
2  is?
3  (Deposition Exhibit 17 marked for
4  identification).
5  ATTORNEY ROSSI:
6  Trent, did you cross off the ---?
7  BY ATTORNEY JOEL:
8  Q. So everything that remains on that list are states
9  at the presidential level that do not have notarization
10 requirements; is that correct?
11 A. Yeah. But there's probably, like I said, five to
12 ten more states
13 Q. Okay. I see the exhibit list.
14 A. There's probably five to ten more states that
15 don't. That's just a list that I was able to put
16 through my brain last night. I didn't get everyone.
17 And we definitely didn't circulate in every state this
18 summer either, so.
19 Q. So I want to talk about Open Pittsburgh a little
20 bit.
21 A. Okay.
22 Q. Who did you deploy to Open Pittsburgh to collect
23 those signatures?
24 A. I have a list of 25 right here.
25 Q. Go ahead and read them please.

## Page 204

1  A. Angela Dixon, Burt Amos ---.
2  Q. Read slowly please so I can write them down.
3  A. Burt Amos, A-M-O-S.
4  Q. And is it B-E-R-T or B-U-R-T?
5  A. B-U-R-T. Bob Baskin, B-A-S-K-I-N.
6  Q. Denise Mason?
7  A. Ed Mason, Elizabeth Hastings, George Harper, H-A-
8  R-P-E-R, Gerald Bundy, Gersena, G-E-R-S-E-N-A, Guiton,
9  G-U-I-T-O-N, Gregory Waxman, Jasmine Walton, Jeffery
10 King, Jimmy Clark, Joe Jackson, Ken McKnight, Malcom
11 Newman, Michael Jennings, Mildred Almeida, A-L-M-E-I-D-
12 A, Nadaziah, N-A-D-Z-I-A-H, Varner, V-A-R-N-E-R, Sarah
13 Butler, Kathy Adams was supposed to be on that list
14 too. Shaun Sachs.
15 Q. Can you spell that?
16 A. S-H-A-U-N S-A-C-H-S.
17 Q. S-A-C-H-S.
18 A. Yeah. Sheri Smith, Tenisha Greer, Timothy Hale,
19 Victor Bernard-Childres and Walt Stuart.
20 Q. What are the states of residence of all those
21 folks?
22 A. I wouldn't even know that.
23 Q. Do you know any of them?
24 A. Yeah, a few.
25 Q. We know the Masons are both from Pennsylvania.

## Page 205

1  A. Yeah, Gerald Bundy too.
2  Q. And we know Gerald Bundy is from Pennsylvania.
3  A. Greg Waxman is Pennsylvania. He was the --- Greg
4  Waxman, Michael Jennings, I don't know where he's from,
5  Sweden. Tim Hale is Ohio. Sheri Smith is his better
6  half.
7  Q. So she's from Ohio also?
8  A. Yeah. I'm assuming. And then --- Tenisha Greer,
9  Sarah Butler, Elizabeth Hastings, Jimmy Clark are all
10 Ohio.
11 Q. Okay. So Ohio, Tenisha Greer, Ohio. Sarah
12 Butler, Ohio. And who is the other one? Christina?
13 A. No. It was Elizabeth Hastings and Jimmy Clark and
14 Joe Jackson. And the rest are just, you know, through
15 the grapevine people that just came in.
16 Q. For how many days did you collect signatures as
17 --- strike that.
18 Did you collect signatures in Pennsylvania, north
19 of Pittsburgh?
20 A. Me?
21 Q. Yes.
22 A. No, I did now.
23 Q. How many days were these folks deployed in
24 Pennsylvania to collect signatures for the Open
25 Pittsburgh initiative?