# EXHIBIT A

# PART 3

Page 206

1  A. All in all about three days.
2  Q. And do you know how many signatures these folks
3  gathered?
4  A. Close to 6,000 a little bit over.
5  Q. And is your understanding that all these
6  signatures were notarized as required by Pennsylvania
7  law?
8  A. I oversaw the notarization. Now did they all do
9  it when I was in the room? I'm assuming they did.
10 Q. So when you oversaw, what did you do?
11 A. I explained to them all to get their Decs filled
12 out accordingly, their declarations. Be ready to go
13 with a notary. We had one notary which was a big pain.
14 And we waited in assembly line fashion to go --- I
15 had them staggered at different times to come show up
16 so that we didn't all show up at 7:00 p.m. I told a
17 group, you know, come at 7:00, you come at 7:20, you
18 come at so and so forth. Try to make it quicker on her
19 and on us, and yeah. The one change that we made on
20 the --- yeah, that's it. We did exactly what we were
21 told to do.
22 Q. And there was one notary that took care of all
23 that? All 6,000 signatures?
24 A. I think there ended up being a couple different
25 notaries being used. I'm not a hundred percent. I

Page 207

1  wasn't really --- that wasn't really my job. I was
2  just making sure she was a notary, that they were
3  notaries.
4  Q. Did it take place --- I understand it's staggered,
5  but was it in one day?
6  A. Yes it was, unfortunately.
7  Q. And did Benezet pay for any of that notarization
8  work?
9  A. No. Well he gave me money to pay for it, but I
10 didn't pay for it.
11 Q. Who gave you money?
12 A. Dave. He was like this is for the notary and just
13 like left it with me. I was like okay.
14 Q. So Tessator ---
15 A. I think he had to go somewhere, I don't know.
16 Q. --- gave you money?
17 A. Yeah.
18 Q. Did he give you cash?
19 A. Yeah. It was a cash notarization deal.
20 Q. How much did he give you?
21 A. I can't remember, man, I didn't count it.
22 Q. Did you turn that over to the notary?
23 A. Yeah, of course. It was her money. I'm sure it
24 wasn't a lot.
25 Q. The guy was paid directly by Tessator.

Page 208

1  A. Exactly.
2  Q. It wasn't paid by Benezet and Benezet getting
3  reimbursed for it?
4  A. No, it wasn't.
5  Q. And what did you --- can you remind me, what did
6  you charge Open Pittsburgh for signature?
7  A. Four bucks.
8  Q. And am I also correct in that the signatures that
9  were gathered --- either when they were gathering or at
10 some point anyway, the intent was not to have somebody
11 sign more than one petition?
12 A. More than one petition?
13 Q. Yes.
14 A. What does that mean? What do you mean? Like
15 duplicating, like sign --- you're holding the petition
16 and then I'm going to go sign his and his and his?
17 Q. Correct.
18 A. Oh yeah, of course. Did that happen? Yeah, I'm
19 sure it did.
20 Q. What did you pay each of your workers for
21 signatures?
22 A. Three bucks. Pretty fair price.
23 Q. The folks who were out collecting signatures on
24 the Open Pittsburgh job, did they work in teams at all
25 or did they all work independently?

Page 209

1  A. They were all independent. I mean they all are
2  independent contractors. So what they did is up to
3  them.
4  Q. And just to make sure, I think you said this
5  yesterday, but since you just mentioned it, I'll
6  confirm it. All the folks who --- that have had
7  deploys on any job since its inception have all been
8  independent contractors?
9  A. 100 percent.
10 Q. Am I correct then that as an independent
11 contractor when they're not doing a job for Benezet,
12 they could do a job for Alex Arsenal corporation?
13 A. Hundred percent, yes.
14 Q. They could do a job for any other number of ---
15 let me finish the question --- signature collecting
16 companies?
17 A. That's right.
18 Q. Or they could go out and just collect on their
19 own, if they were so inclined?
20 A. They could.
21 Q. Let's talk about Benezet's efforts for Rocky De La
22 Fuente as an independent candidate?
23 A. Okay.
24 Q. And yesterday you told me the states you did.
25 A. Okay.

Page 210

1  Q. One of things I want you to try to do is what is
2  the sequencing of those dates?
3  A. So I gave you all of that file. But basically, we
4  started in Pennsylvania ---.
5  Q. And when --- let's do it like this, when did you
6  start in Pennsylvania?
7  A. Late June.
8  Q. When were you contracted by Rocky to start doing
9  the work?
10 A. Mid-June.
11 Q. So you --- Benezet received the contract, entered
12 into the contract with the Rocky De La Fuente campaign
13 in mid-June of 2016?
14 A. Yeah.
15 Q. So then beginning in late June ---?
16 A. We're doing Pennsylvania.
17 Q. Do you know who you deployed to Pennsylvania?
18 A. No. That list is in your discovery.
19 Q. And the list that you provided, does it break it
20 down who was at each state or is it just ---?
21 A. There's no way that I would be able to do that
22 without, you know --- you'd have to wait until after
23 probably the tax season I think. It's pretty ---.
24 Q. Fair enough. So how long --- strike that.
25 Understanding ---.

Page 211

1  A. I have coordinators --- just so you understand
2  what I'm saying. I have coordinators that bring people
3  in. I don't even know half the people that are working
4  there. I'll put one person in charge and then just
5  start sending names. I mean I go through five, six
6  batteries a day just sending people to a state. I'll
7  say call this guy, I don't know if he shows up. I'm
8  just writing checks, that's my job.
9  Q. Who is the coordinator in Pennsylvania?
10 A. I'm basically the coordinator. But I have a
11 coordinator in Philly named Greg Waxman. So the
12 Philadelphia people, 90 percent of them I got off the
13 internet. And then I brought in some pros.
14 Q. When you say brought in off the internet, what do
15 you mean?
16 A. The Craigslist people. The people responding to
17 the Craigslist ads.
18 Q. And is that for witnesses or for circulators or
19 for both?
20 A. For circulators. They're independent. If they're
21 independent, you don't need witnesses.
22 Q. Were they Pennsylvania residents?
23 A. Yeah, most of them. Not all of them, but most of
24 them.
25 Q. So just to make sure I understand you, you put out

Page 212

1  a request on Craigslist for people to come in and
2  circulate in Philadelphia and you had ---?
3  A. We did every city. We did Pittsburgh, Philly and
4  Penn State even, Erie. Wherever we could get the ads
5  and get people interested.
6  Q. All right. So you --- so let's just make this a
7  little more global then. Benezet put out requests on
8  Craigslist in various places throughout the
9  Commonwealth advertising and asking for folks to sign
10 up and become circulators for Rocky De La Fuente as an
11 independent candidate?
12 A. Yeah. We called them campaign workers. We didn't
13 really go into details of what the job was. We just
14 used that as a kind of general, you know, name and then
15 you saw who was interested. I would screen them.
16 Eventually I had Kara start screening them too, just to
17 make sure they weren't crazies, because a lot of them
18 are. And then if they seem like a good match, we are
19 actually going to try to train them and ---.
20 Q. So you got responses, you combed through that.
21 You make a decision on who to engage as an independent
22 contractor, you trained them; correct?
23 A. Uh-huh (yes).
24 Q. Say yes or no.
25 A. Yes, sir.

Page 213

1  Q. You then deployed them to these various cities and
2  areas in Pennsylvania?
3  A. I didn't deploy anyone. They were independent
4  contractors so they got the signatures however best -
5  -- you know, I trained them how to get them and told
6  them --- gave them a break down. Went and watched them
7  in the field for 30 minutes or an hour, and if they
8  were doing well, I told them okay, call me when you're
9  --- we'll turn in next week.
10 Q. And a lot of the folks who responded for the
11 Pennsylvania job were Pennsylvania residents?
12 A. A lot of them.
13 Q. Can you give me a sense? Is it 75 percent, 90
14 percent?
15 A. I'd say probably 90.
16 Q. All right.
17 A. They didn't --- the Craigslist people ended up
18 doing, you know, less than ten percent of the work. I
19 mean I spent so much time training and trying to get
20 these people onboard and it was really not even worth
21 my time. I could have spent that same amount of time
22 and opportunity cost of me managing and making money to
23 just being pros. But I was waiting on a verdict from
24 you guys to know how many signatures I had to get.
25 Q. How long were Benezet's folks in Pennsylvania

7 (Pages 210 to 213)

Page 230

1 June 30th, which was New Mexico's deadline?
2 A. Yes.
3 Q. Wisconsin, what's their deadline?
4 A. I can't remember. Sometime in --- I can't find
5 Rich Winger's little form but sometime in July.
6 Q. Did Benezet Consulting have independent
7 contractors in the State of Wisconsin collecting
8 signatures for Rocky De La Fuente as an independent
9 candidate for president from mid-June ---?
10 A. Actually, no, it's in August.
11 Q. Did Benezet Consulting have independent
12 contractors in the State of Wisconsin collecting
13 signatures for Rocky De La Fuente as an independent
14 candidate for president from mid-June through their
15 deadline, mid-August?
16 A. Yes.
17 Q. Virginia, you know their deadline?
18 A. You just did it. I think the 23rd of August.
19 Q. Did Benezet Consulting have independent
20 contractors in the Commonwealth of Virginia collecting
21 signatures for Rocky De La Fuente as an independent
22 candidate for president from mid-June through
23 Virginia's deadline?
24 A. Yes.
25 Q. Alabama, do you know their deadline?

Page 231

1 A. I think it's --- it might be the --- if it's the
2 23rd of July --- of August then Virginia is like a week
3 later. So make Virginia 29th or 30th of August and
4 then make Alabama then 23rd. It's like the second or
5 third week of August.
6 Q. Did Benezet Consulting have independent
7 contractors in the State of Alabama collecting
8 signatures for Rocky De La Fuente as an independent
9 candidate for president from mid-June through Alabama's
10 deadline?
11 A. Yes.
12 Q. The last state that you provided me yesterday was
13 Mississippi, do you know when their deadline is?
14 A. The 9th of September.
15 Q. Did Benezet Consulting have independent
16 contractors in the State of Mississippi collecting
17 signatures for Rocky De La Fuente from mid-June through
18 Mississippi's deadline?
19 A. Yes.
20 Q. Not it appears to me there's significant overlap
21 amongst a lot of these states. They're going on at the
22 same time, is that accurate?
23 A. Yes.
24 Q. So people can't be in two places at the same time;
25 correct?

Page 232

1 A. Yes.
2 Q. So am I correct that when you're talking about
3 deploying and having independent contractors, you have
4 some in, for example Virginia, others in Alabama, still
5 others in Mississippi. When a deadline may end, you'll
6 ship those people to yet another state; is that the way
7 it works?
8 A. Yes.
9 Q. The names that you provided me earlier today, that
10 was for Open Pittsburgh. Are those same people who did
11 all the collecting in all these various states for
12 Benezet?
13 A. Not always.
14 Q. How many people total did you have working on the
15 Rocky signature collection effort?
16 A. Probably total, over like 75. And then when you
17 talk about people under --- other subcontractors,
18 hundreds.
19 Q. Hundreds?
20 A. It's possible, I don't know.
21 Q. The states that we just talked about, did you
22 subcontract those states to anybody else?
23 A. Some of them.
24 Q. Which ones did Benezet subcontract to somebody
25 else?

Page 233

1 A. I mean, technically, all the Northeast stuff is
2 Alex Arsenault.
3 Q. Okay.
4 A. So Massachusetts, Connecticut, New Hampshire,
5 Rhode Island, that's all him.
6 Q. Okay.
7 A. Wyoming, Montana, South Dakota, Washington is all
8 Brent Johnson. And then North Dakota, technically, is
9 Andy Jacobs. But I sent people --- I mean, I sent
10 people to these guys and I'm paying some of them. So,
11 it's kind of a weird arrangement, but some of these
12 guys --- yeah. But anyway, Kentucky is Paulie Frankel.
13 I don't know if I listed Kentucky.
14 Q. No, you didn't.
15 A. Kentucky is on that list too, September 9th. But
16 yes, we had people in between this date. Paulie
17 Frankel ---.
18 Q. So you said, just to make sure everything is
19 clear, Benezet Consulting had independent contractors
20 in the Commonwealth of Kentucky between mid-June, when
21 you got the Rocky contract and Kentucky's deadline for
22 collecting signature?
23 A. Yeah. I know that state because it was the most
24 recent --- we really didn't even start until the 30th
25 of August and it was due the 9th. Yes, we do. We

12 (Pages 230 to 233)

Page 234

1  filed that. That was Paulie Frankel. Alabama I
2  oversaw. Ohio I oversaw. Pennsylvania I oversaw.
3  It's pretty --- Virginia, me and Derek Lee both
4  oversaw. Wisconsin was John Zom and I think that's
5  pretty much it.
6  Q. Okay.
7  A. The people in California, that was Brent Johnson
8  too, mainly.
9  Q. But if I understood your testimony, Benezet sent
10  its independent contractors to collect those.
11  A. Benezet sent their own independent contractors to
12  collect those, yeah. I mean these guys are independent
13  contractors too.
14  Q. Okay.
15  A. Were contracted, but they are.
16  OFF RECORD DISCUSSION
17  BY ATTORNEY JOEL:
18  Q. Of all the 75 --- when you say that you had 75
19  people, those are ones who were independent contractors
20  directly through Benezet?
21  A. Yeah.
22  Q. And then you mentioned hundreds total, is that
23  including the ---?
24  A. The Brent Johnson's, Alex Arsenault, those guys.
25  When you add up all their signatures, their circulator

Page 235

1  pools, it will be over a hundred.
2  Q. So there were 75 that were independently
3  contracted with Benezet. Benezet subcontracted out
4  some of its work to others, for example the New England
5  work to Alex Arsenault, California work to somebody
6  else. And then it's your understanding that those
7  people, in addition to the Benezet assets you put in
8  place, also had their own independent contractors
9  collecting signatures?
10  A. Yes.
11  Q. Got it. And the nature of this business is that
12  the collectors go from state to state. They'll be
13  cranking out in one state, getting signatures, they
14  move around the locations within that state trying to
15  get signatures?
16  A. Yeah. I mean they're independent contractors, so
17  they'll do pretty much --- their mission is to get the
18  signatures and follow the laws to get them. But
19  they'll do whatever it takes and go to events. They'll
20  look up stuff in the newspaper, whatever they have to
21  do.
22  Q. So as an independent contractor, Benezet isn't
23  telling them, you have to be in this location to
24  collect signatures or that location to collect
25  signatures. Benezet leaves that to the independent

Page 236

1  contractor. What Benezet is interested in is getting
2  as many ballot signatures as possible?
3  A. Yes. That's exactly what.
4  Q. And you leave the method to getting those ballot
5  signatures to the independent contractor?
6  A. Yes. With that said, I do provide them a, what I
7  call them a calendar, and I have my assistant Carlie
8  Rose see --- her job was just to calendar the state.
9  She would send them events and they could go to them if
10  they want. They all have each other's numbers,
11  usually. And they'll say I'm going to go to this or
12  I'm going to go to that. Everyone kind of just divvies
13  it up. But I don't do any --- telling anyone what to
14  do.
15  Q. You don't micromanage how they're getting them or
16  where they're going to get the signatures or the hours
17  they worked to get the signatures, or anything like
18  that?
19  A. Not at all.
20  Q. What Benezet does is it says, here's the state,
21  here are the deadlines, here are some events, have at
22  it, go get your signatures?
23  A. That's what we do.
24  Q. As you were discussing those states, you mentioned
25  a number of them --- you didn't necessarily start in

Page 237

1  June, you started later. Can you tell me in each state
2  how many weeks you had Benezet folks deployed?
3  A. Yeah. I mean in most of them I can. Now in the
4  states I subcontracted, I don't know. But the ones I
5  did, yeah. I could have more than 10 days, probably,
6  in any state other than Pennsylvania. Is that an easy
7  answer?
8  Q. Yep. That's fine. And after that 10 days, you
9  moved on? Your independent contractors moved on to
10  someplace else?
11  A. Yep.
12  Q. And you may have had independent contractors in
13  different states at the same times, recognizing that
14  people can't be in two places. But, if I'm a collector
15  and Mr. Alexander is a collector, we could each be in a
16  separate state. If my deadline ends, you could then
17  say, alright, go over Mr. Alexander's state and try to
18  pick up some signatures?
19  A. Yes.
20  Q. Is that how it worked this past year?
21  A. It --- off and on. Some people would flake out
22  and just stop petitioning after one state and others
23  would go home, or call me on the next state and say can
24  we put them back in. But yeah, I would tell them where
25  the next state was going to be and where we needed

Page 238

1  people and it was their job to figures out if they
2  wanted to go or not, and let us know.
3  Q. When Benezet was collecting for Rocky De La Fuente
4  as a Democrat in Pennsylvania, how many weeks were you
5  guys on the ground here collecting those signatures, or
6  days?
7  A. I got the contract a few days after the lawsuit.
8  The lawsuit was the first day of the signature
9  collection window. It's a three-week window. So I
10 probably had a little bit over two weeks.
11 Q. And when you were doing the Cruz work in the
12 Commonwealth of Pennsylvania, how much time was Benezet
13 on the ground here in the Commonwealth doing that?
14 A. Probably had two weeks. Just under two weeks.
15 Q. Has Jake Witmer ever had any ownership interest in
16 Benezet?
17 A. No.
18 ATTORNEY JOEL:
19 I've got my call in about 10 minutes, so
20 this would be a good time to break. I'm just about
21 done with him. I know you probably have some questions
22 though, and I may have some follow-up. But I'm just
23 about done with him. Let's take a break.
24 SHORT BREAK TAKEN
25 BY ATTORNEY JOEL:

Page 239

1  Q. I took a couple of minutes to look through the
2  flash drive that you provided; you would agree that
3  there is a lot of documents on it?
4  A. Oh yeah. I tried to give you all everything.
5  Q. We do appreciate that. Unfortunately, we are not
6  in a position to look through everything to ask you
7  about it today.
8  A. That's fine.
9  Q. A couple things I asked about that I pulled and
10 I've got some more general questions and then we'll
11 have to figure out how ---
12 A. We can do a phone call or ---.
13 Q. --- we move forward if there's certain issues with
14 documents. Is that agreeable?
15 A. Perfect. Yep.
16 ATTORNEY ROSSI:
17 First of all, if there's any issue with
18 actually viewing the document, let me know the document
19 and I can get the hard copy from you, if necessary.
20 A. I can put them in pdf, so that should be doable.
21 ATTORNEY ROSSI:
22 So we can get those to you in a timely
23 fashion. I don't think you have the capacity to print
24 out 1,500 emails.
25 A. No. I might need to start traveling with a

Page 240

1  scanner/copier.
2  ATTORNEY ROSSI:
3  Also I think were amenable to a follow-up
4  telephonic deposition with respect to specifically with
5  his production.
6  ATTORNEY JOEL:
7  Okay.
8  ATTORNEY ROSSI:
9  And we'll be --- whatever the time frame
10 is, well ---. In October, were obviously not going to
11 make it October. And our staff discovery ends October
12 31st.
13 A. Okay.
14 ATTORNEY ROSSI:
15 I'm also amenable to extending that if
16 necessary, if Judge Kane lets us.
17 ATTORNEY JOEL:
18 Okay.
19 ATTORNEY ROSSI:
20 Any reasonable amount of time. October
21 --- your schedule is like what in October?
22 A. I think --- we were going to try to take a trip,
23 but I mean --- you guys just let me know. I'm supposed
24 to go to Vegas the 30th, so I kind of have to be there
25 for that.

Page 241

1  ATTORNEY ROSSI:
2  You have to be there for Vegas?
3  A. I don't know if I'm going to go or not, I'm
4  supposed to be in the wedding, so we'll worry about
5  that later.
6  BY ATTORNEY JOEL:
7  Q. Let me ask just a few general questions about what
8  you provided today.
9  A. Sure.
10 Q. Now you provided us with a flash drive; correct?
11 A. Yeah.
12 Q. And that contained however many documents it
13 contains?
14 A. Yeah. 1,500 plus whatever the attachments are.
15 1,500 emails plus attachments. Probably over a couple
16 thousand.
17 Q. Are all of those documents Benezet documents,
18 meaning they were in the care, custody and control of
19 Benezet?
20 A. They should be, yeah. I mean it's all from this
21 summer, so.
22 Q. And it's all from Benzet's efforts as at signature
23 collection for the 2016 election?
24 A. Yeah.
25 Q. And the 2016 presidential election?

Page 242

1  A. Yes.
2  Q. And documents that are in there, for example,
3  emails by you were created by you; correct?
4  A. Or someone sent to me.
5  Q. That's my next question. But when you sent an
6  email, you actually typed it out and created the email?
7  A. Yeah. I should have.
8  Q. And when you received an email, it shows it going
9  to you?
10 A. It should have been; yeah.
11 Q. And you would have received those?
12 A. Yeah.
13 Q. I saw some other documents in there, for example,
14 some lists that show how many signatures various folks
15 collected. Those would have been compiled either by
16 Benezet or by you, or by somebody at Benezet's
17 direction or your direction?
18 A. Yeah. Probably a coordinator or yeah ---.
19 Q. And those lists, things like that, are part of
20 Benezet's business documents?
21 A. Yeah. Those are proprietary so ---.
22 Q. And they are created by Benezet or by your
23 designee and kept by Benezet in the ordinary course of
24 Benezet's business?
25 A. Yeah.

Page 243

1  Q. To your knowledge, are all the documents in there
2  accurate and true?
3  A. Yeah. I haven't really looked at every single one
4  but I'm sure they are.
5  Q. And to your knowledge, are they all authentic?
6  Meaning they haven't been tampered with or anything
7  like that?
8  A. No.
9  Q. And they are whatever the purport to be, whether
10 it's an email, whether it's a list, whether it's a W-9,
11 we can look at it and whatever that shows, that's what
12 it is.
13 A. That's what it is, yeah.
14 Q. We may have some follow-up questions as we go
15 through it and I appreciate your willingness to
16 participate by telephone on that. Thank you.
17 A. Yep.
18 Q. A couple things that we did print out.
19 ATTORNEY JOEL:
20 Can you mark that one next, please?
21 (Deposition Exhibit 18 marked for
22 identification.)
23 BY ATTORNEY JOEL:
24 Q. I'm showing you what's been marked as Defendant's
25 18. It was an Excel spreadsheet so that's kind of the

Page 244

1  way it printed. So I think it would be side to side to
2  side, but I think that is a list of people living in
3  the Commonwealth who you used or could use or were
4  planning to use, you tell me ---
5  A. Yeah.
6  Q. --- to be witnesses or circulators; is that
7  accurate?
8  A. Yeah. These are just people that we were
9  compiling a list of. You know, trying to keep some
10 sort of method to the madness that people are saying it
11 would be one or the other.
12 Q. So it would circulate the whole way then?
13 A. Witness --- yeah, that have some interest.
14 Q. Do you know how you go these names? Is this in
15 response ---?
16 A. Yeah. These are all the Craigslist and through
17 the grapevine, friends of friends, people's neighbors,
18 stuff like that. This is from Rocky, from the summer.
19 Q. Thank you. SO that was in connection with the
20 effort to collect signatures in Pennsylvania for Rocky
21 De La Fuente?
22 A. Yes.
23 Q. I've got a sting of emails here, and I'm going to
24 show them to you. You can look at all of them if you
25 want. I've just got a couple of questions about, so

Page 245

1  you can take a look. And that's Defendant's Exhibit
2  19. That looks to me to be email chains back and forth
3  between you and that Amy Strauss who was a witness?
4  (Deposition Exhibit 19 marked for
5  identification.)
6  A. Yeah, this is ---.
7  BY ATTORNEY JOEL:
8  Q. And she was a witness that you brought in for the
9  --- was that for Rocky as a Democrat?
10 A. No, this was on the Cruz campaign.
11 Q. Oh, okay.
12 A. She was supposed to do the District.
13 Q. That's right. So Amy Strauss was a Pennsylvania
14 resident that you were using as a witness and a signer
15 of the affidavit for the Cruz, Republican signature
16 drive?
17 A. Yes.
18 Q. You can keep looking at it if you want, but I have
19 a couple of questions.
20 A. Sure.
21 Q. And it's a string so there's a lot of copy to pay,
22 things with bills on it, but I think this will --- this
23 is what I'm interested in. On February 12, 2016, Ms.
24 Strauss sends to you, that's your name; correct,
25 Trenton Pool?

Page 246

1  A. Uh-huh (yes).
2  Q. Yes or no?
3  A. Yes, it is.
4  Q. And is that your email address next to it?
5  A. It is.
6  Q. And Ms. Strauss is --- comment is, hi, just
7  waiting to pay --- for pay from two days and 14
8  petitions that I got notarized, thanks. Do you see
9  that?
10 A. Yeah.
11 Q. So is that your understanding that she helped out
12 for two days and they got 14 petitions signed for Cruz
13 for president?
14 A. Yeah. And that's minor --- it's not very good at
15 all, and that's why we stopped.
16 Q. Do you know how many names were on those 14
17 petitions?
18 A. What she meant is 14 signatures.
19 Q. Well how do you know what she meant?
20 A. Because I remember that's exactly how many we had.
21 We had like 14 to 18 in that district. They spent
22 probably 20 hours hitting over 100 homes. She started
23 talking to herself at everyone's door.
24 Q. Okay. And who did you have --- was it Michael
25 Alexander that you had working that and Brian Lyra?

Page 247

1  A. Brian Lyra and Michael were kind of like a team.
2  One would drive the other one would go with him. That
3  was my understanding. They always teamed up. They
4  were like best friends.
5  Q. And Michael and Brian had --- they were
6  independent contractors for you for a while?
7  A. Not for a while. I actually started using them
8  just this year. That's really --- I mean this year is
9  really the year of my business being a business. But
10 they have, yeah. They've been pretty ---.
11 Q. They are good signature collectors?
12 A. They are. They are very good.
13 ATTORNEY JOEL:
14 I think that's all I have at this point.
15 I'm sure your attorney has some questions, which may
16 prompt some more questions ---.
17 A. I'm sure it will.
18 ATTORNEY JOEL:
19 I'm good right now. Thank you.
20 OFF RECORD DISCUSSION
21 EXAMINATION
22 BY ATTORNEY ROSSI:
23 Q. Let's start with --- we talked a lot about, and
24 this really created a fair and comprehensive records to
25 where your petitioners were, who they were and a pretty

Page 248

1  good timeline with respect to where all your
2  petitioners work and how they work. Let's get into the
3  issue of, how do you go about collecting a signature?
4  What is --- from a professional circulator standpoint,
5  how do you go about in the most effective manner to get
6  a signature?
7  A. Well first it starts with preparation. So you
8  need to make sure you have the materials.
9  Q. What materials do you need?
10 A. So I would have a --- I kind of do this all the
11 time. I'll go get a bunch of boards cutout from FedEx.
12 I don't use clipboards. I tell my guys not to use them
13 either, they're heavier. We go get foam boards and we
14 basically cut them out just a little bit slightly
15 bigger than the piece of paper were circulating. It's
16 a nominating paper, a nominating petition, whatever the
17 size of that is. And we use binder clips because you
18 can carry about ten of these boards and it weighs about
19 the same as two clip boards. I try to give everyone a
20 couple boards; you know, I'll give them like four so
21 they can get four people signing at once.
22 Q. So you don't actually use clipboards?
23 A. No. I use foam boards. We make them in house.
24 It's basically a foam board, you know, one of those
25 sheets --- a sheet of foam. It's cut down into to

Page 249

1  about six or seven boards and that way the circulators
2  are not carrying around a bunch of heavy stuff all day.
3  They get less tired but also they can get more people
4  signing at once, it's a lot lighter. We'll use that
5  instead.
6  Q. What do you mean getting more than one person
7  signing at once?
8  A. So when you're doing a big event or a busy street
9  corner, imagine downtown Philadelphia, you'll have a
10 bunch of people coming by.
11 Q. Yeah.
12 A. So you know, you're not just getting one person to
13 sign, you want --- I mean I've had 12, 15 people
14 signing at once. Now I wouldn't do that with a
15 witness. In the anchor, I would do it with myself
16 but ---.
17 Q. You mentioned anchor, what's an anchor?
18 A. A witness is an anchor. Any person that's
19 basically has to --- you're basically anchored to them,
20 so they're --- a witness, we call it an anchor, but
21 it's really ---. If you're petitioning on a street
22 corner with 15 boards out, the chances are --- I can do
23 it, Jake Witmer could do it, Michael Alexander could do
24 it, but a witness who just started the process wouldn't
25 probably be able to keep up. I don't think that they

Page 250

1  would be able to sign off on the Decs.
2  Q. And a dec means what?
3  A. The declaration.
4  Q. Okay, dec is short for ---.
5  A. I would be concerned that they wouldn't be able to
6  follow everything that is going on. So I wouldn't do
7  more than probably five boards with a rookie.
8  Q. So outside Pennsylvania, in a state that doesn't
9  have a witness restriction, is it your testimony that a
10 professional circulator can have more than ten boards
11 running at once?
12 A. Yeah. I think Jake usually carries around 12.
13 Q. That's ---.
14 A. I've seen him have every one of those boards out.
15 Q. So how does he --- how do you engage 12 people at
16 once? I mean what's the mechanism for getting a crowd
17 of people signing?
18 A. Imagine going to a Penn State game and there's 20
19 people sitting around and you say, hey, would you mind
20 signing our petition to help a presidential candidate
21 on the ballot, if you're doing Rocky for instance
22 because anyone can sign up. And they say --- well you
23 ask them first if they are registered Pennsylvania
24 voters. If they say yes, you mind helping out? Tell
25 them who is he, what he's about. If they say yes, get

Page 251

1  the pen and the board.
2  Just kind of work the --- get them all to sign,
3  give them all the pen and the board. Make sure they
4  know a little bit, answer their questions. Guide them.
5  Explain them all. Sign, print, address or street
6  number/address or house I think. And then --- the
7  petition is weird, I think it's street number, then
8  street, then I think it's city actually. And the
9  date's afterwards. Usually the date's at the front.
10 But you would basically just guide them through that
11 and tell each one how to do it and gather it up.
12 If you are working an event, it's the same thing.
13 Some petitioners, I've seen, will make a Post-it note
14 and actually put it on the petition if they're only
15 doing one and not flipping. They'll sometimes put a
16 Post-it note, instructing sign here, print here so
17 everyone can kind of follow it. They'll see it with
18 like a Post-it note.
19 But yeah, basically it's kind of --- and when you
20 get a big event like that going on, you'll have a chain
21 reaction going. When people are coming by, you have go
22 to into the crowd, work them. Sometimes they'll run
23 away and you have to be persistently kind of after
24 them. It is a kind of --- being as persistent as being
25 able to bounce back kind of quickly. You have to be

Page 252

1  able to take a --- go with the flow, take a hit and
2  bounce back.
3  Q. You talk about dynamic --- so this is a dynamic
4  ---. Going after people ---. If I'm a professional
5  circulator, do I stand on the corner and wait for the
6  persons to come to me and just remain static or do I
7  move --- am I working through a crowd like a salmon
8  through a river?
9  A. Both.
10 Q. Am I moving through the crowd?
11 A. Both, yes. You can. It depends on your location.
12 Some locations --- after your materials, location is
13 the second most important thing. I mean you want to
14 have a good --- you want to have high pedestrian filled
15 traffic. Imagine Harrisburg, y'all have like events
16 and stuff out in the park, stuff like that. You want
17 to make sure what works better. Maybe on like a
18 Saturday during game day on Front Street. Think about
19 where the most people are going be on any given day or
20 an event.
21     So you want to find these --- but then an event,
22 like a good example is the Pittsburgh Pickle Bird
23 festival. There's 10,000 people on the 9th Street
24 Bridge. You want to be going through the crowd,
25 getting as many signatures as possible, working as many

Page 253

1  boards as possible. And we were able to do that this
2  summer with the Rocky campaign because we didn't have
3  anchors behind us preventing us from not being able to
4  work that area.
5      Now, when you are working like the presidential
6  primary stuff, it's completely different. You're not
7  going to be going in the crowds. You're not going to
8  be engaging voters. You're going to be sitting where
9  the anchor is that you don't leave there, the general
10 area so that you can watch and monitor to make sure
11 that you are doing ---.
12 Q. So again, when you talk about anchor, you're
13 talking about a witness?
14 A. The witness is the anchor.
15 Q. The witness is the anchor. So when you don't have
16 an anchor, you can actively move through a crowd,
17 negotiate a crowd and ---?
18 A. Your volume will increase.
19 Q. Your volume will increase?
20 A. Tremendously.
21 Q. Is it your testimony because you are able to
22 engage more people in that manner?
23 A. Yes.
24 Q. The movement of the circulator through the crowd,
25 they can hit more people rather than staying in a

Page 254

1  static location?
2  A. Yeah. And I mean, it really depends on the crowd
3  too. If there's a crowd that is static, then I'm going
4  to need and navigate through it and start asking
5  people. If the crowd is moving and ambulatory, then
6  I'm going to be walking back and forth in probably a
7  30-foot radius diameter. But I'm not going to be
8  sitting at the street corner, ever. I'm always ---
9  were constantly moving. You're never --- you know, if
10 you're at a street corner, like in downtown Philly and
11 it's been pretty high steady foot traffic and there's
12 no events going on. That's one thing that might pan
13 out.
14 But it's not --- the ideal situation is to be as
15 flexible and mobile as possible and be able to ---.
16 When I'm petitioning, I'll easily run back and forth
17 across streets. I can, you know --- I'll chase people
18 down the street if they seem interested. A lot of
19 people don't want to stop to sign but if you'll walk
20 with them, they'll sign. I've done that a lot of
21 times. I'll say hey man, I'm at your mercy, wherever
22 you're taking me, we'll go. Just if you mind helping
23 us out, we're trying to put another candidate on the
24 ballot, that kind of thing.
25 Q. And if you have an anchor, the anchor has to

Page 255

1  follow you?
2  A. The anchor will follow you, yeah.
3  Q. If the anchor is not willing to follow you, you
4  can't engage the voter in that?
5  A. You wouldn't get those signatures.
6  Q. If you have an anchor --- the instate witness ---
7  again I like the term anchor because it's a --- I
8  didn't know you could --- I never envisioned them an
9  anchor but ---.
10 A. They're definitely an anchor.
11 Q. I just want to be clear, whenever I say an anchor,
12 I'm referring to the instate witness, just to be clear
13 for the record. But the instate witness --- strike
14 that.
15 When you're operating with an instate witness, are
16 you able to work as many boards as you would like?
17 A. No.
18 Q. And state for the record, why is that?
19 A. Like I said, I would be cautious to work more
20 boards than the person is comfortable with. And I'm
21 not trying to sound arrogant, I consider myself to be
22 intelligent and smart. I'm very ADD. I have a lot of
23 things going on at once, I can multitask. I could have
24 probably 15 people signing, I feel like, if I was able
25 to control the discourse and make sure that I'm able to

Page 256

1  handle it. I probably wouldn't do that often, but I've
2  done it multiple times. Jake can do it.
3  A witness coming on, the first couple days if
4  they're green, they're not going to --- I wouldn't be
5  more comfortable than having four boards. Just so you
6  get the process down. And then as they move on and on
7  and get better. It requires --- petitioning --- a lot
8  of people think that it's, you know, anyone can do it.
9  There is no barrier entry, but it does require people
10 skills, emotional intelligence, being able to read
11 people. You're not going to go up to some guy that's
12 drunk and carrying a gun and looks like he's about to
13 go off on someone. You've got to be able to have very
14 high awareness of people and read situations pretty
15 well. Especially when you are working in cities that
16 you've never been to before. Because of that we try to
17 --- I try not to overwhelm a witness coming in, just
18 because I'm concerned.
19 And I know that it is a concern, because I've had
20 witnesses not feel comfortable signing off on stuff in
21 the past. I think that they --- we had one situation
22 where, I can't remember what happened, but it was
23 basically, they didn't --- I think it might have been
24 with Jake or someone, I can't remember. But basically
25 they didn't want to do the --- I think having --- if

Page 257

1  you're doing too many things at once, it can overwhelm
2  someone who is new.
3  Q. Your instruction to a witness --- what is your
4  instruction to a witness? What is it that they have to
5  witness?
6  A. They need to witness the signature being gathered.
7  Q. So your instruction to the witness is that they
8  have to keep an eye on every signature which is being
9  recorded on a petition?
10 A. That's my understanding, yeah.
11 Q. And is it your testimony that if you have too many
12 boards running, they don't feel like they can keep
13 their eye on the signatures?
14 A. I would be cautious to say that they could, yeah.
15 Q. And you, as the one who is ultimately responsible
16 for everything that is turned in for Benezet, are
17 mindful of that legal requirement?
18 A. Yeah. I mean they're the ones signing the dec,
19 and they read the dec and when we do the training with
20 the petition --- with the witnesses, I go through every
21 part of the petition with them. So we break it down,
22 part A, part B, part C, part D, part E. I have the
23 witnesses read the parts that they are going to be
24 declaring and also the beginning, end and all that.
25 Then they'll ask questions, there's substitution,

Page 258

1  electors, everything is on the petition. They'll
2  actually go through and ask questions about it and we
3  cover it, like I'm giving them a mini ten-minute
4  education on what the components of the petition are.
5  Then I explain to them the dec and we go through it
6  line by line in plain English and define each and every
7  part of it so they know what it is. So I make sure
8  that they're comfortable, because we need to retain
9  these guys.
10  I need the attrition rate to be high, I can't have
11  them not show up the next day, which happens every day.
12  Not having a witness show up and then one of my
13  petitioners is just burning money sitting in a hotel
14  room. So we try to make it as easy for them and
15  bearable for them so that they're comfortable with it,
16  so there's no issue that arises so that we can get the
17  job done.
18  Q. So in addition to your concern about the legal
19  requirement that they keep an eye on every signature
20  that's being gathered, you also limit the number of
21  boards which are being circulated by your professionals
22  so that your witnesses are not overwhelmed so that they
23  come the next day; is that your testimony?
24  A. Yeah. I don't --- I really --- and I believe that
25  we didn't have an issue with this because no one really

Page 259

1  carried more than four boards in Pittsburgh. I think
2  that everyone kind of knew that, you know, the
3  witnesses were just going to sit around. Like Jake,
4  he's normally up there with eight or ten boards. But
5  he had --- he was working with four, I think. And I
6  --- definitely, everything is slowed down. Production,
7  completely but also the professionals out there,
8  they're going to pull back what their average --- what
9  their daily production without a witness or anchor
10  would be is drastically decreased. Does that make
11  sense?
12  Q. Yeah, it does. Now --- you testified that you
13  circulated nominating petitions in Pennsylvania in the
14  winter --- during January, February of 2016?
15  A. Uh-huh (yes).
16  Q. And then you also circulated nominating papers,
17  strike that.
18  Nominating papers in Pennsylvania during the
19  summer of 2016 for Rocky De La Fuente?
20  A. And the Libertarians and the Greens.
21  Q. And Libertarians and Green Party?
22  A. Uh-huh (yes).
23  Q. And you also circulated for OpenPittsburgh.Org?
24  A. Yep.
25  Q. So during this string --- let's take the mechanics

Page 260

1  of circulating for Mr. Cruz for president. So in 2016,
2  the only time that you used in state witnesses was
3  during the circulation of petitions, nominating
4  petitions for Republican and Democrat?
5  A. Yes. For the nominating petition.
6  Q. So on average for the out of state --- for the
7  professional circulators that came into Pennsylvania,
8  did they --- strike that.
9  Were there any circulators, any of your
10  professional circulators for both the petitions, the
11  papers and the referendum petitions, all three?
12  A. In other words, I think Michael was there. I
13  think Ben Mason was there. I think --- Andy didn't do
14  it all. There's got to be more than them.
15  Q. What about Gerald Bundy?
16  ATTORNEY JOEL:
17  Joe Bundy?
18  BY ATTORNEY ROSSI:
19  Q. Gerald Bundy?
20  A. Yeah.
21  Q. Their production ---.
22  A. Pretty much everyone from Pennsylvania was ---.
23  Q Let's talk about their production levels. During
24  the presidential primary nominating petitions, did ---
25  the number of signatures that Michael received, that

Page 261

1  Michael obtained during the presidential primary were
2  the same that he got during the nominating paper on a
3  daily basis?
4  A. I would say no. I mean ---. So somedays he
5  couldn't even work.
6  Q. Did their production go up or down from petitions
7  to papers?
8  A. Completely down, I mean he was able to work. We
9  didn't have witnesses every ---. The witnesses that he
10  had sometimes wouldn't even show up. If you gave him
11  --- was able to do a thousand signatures over a couple
12  weeks in Pennsylvania.
13  Q. For who?
14  A. For Rocky.
15  Q. For Rocky, but not for Cruz?
16  A. No. He didn't do Cruz, he did Rocky
17  Q. He did Rocky, Democrat?
18  A. Yes.
19  Q. So Michael Alexander worked Rocky, Democrat and
20  Rocky, independent?
21  A. Rocky, Democrat, Rocky, independent.
22  Q. And did he work on the Pittsburgh.org case?
23  A. I can't remember. I'd have to look. I think he's
24  on that list.
25  Q. Do you have that list?

Page 262

1  A. I'd have to look, I'm not a hundred percent
2  certain. I think he is. Yes, he is on there.
3  Q. So take Michael Alexander. He circulated for
4  Rocky, Democrat?
5  A. Michael Jennings.
6  Q. I'm sorry?
7  ATTORNEY JOEL:
8  He's talking about Michael Alexander.
9  A. We're talking about Michael Jennings.
10 BY ATTORNEY ROSSI:
11 Q. I'm talking about Michael Alexander.
12 A. Oh okay.
13 Q. Did he circulate for Rocky, Democrat?
14 A. Yes, he did.
15 Q. Did Michael Alexander circulate for Rocky,
16 independent?
17 A. No.
18 Q. Did Michael Alexander work on OpenPittsburgh.Org?
19 A. No, he did not.
20 Q. So let's talk about Michael Jennings. He
21 circulated for Rocky, Democrat?
22 A. Yes.
23 Q. He circulated for Rocky, independent?
24 A. Yes.
25 Q. And he circulated for OpenPittsburgh.Org?

Page 263

1  A. Yes, he did.
2  Q. Let's take Michael Jennings as a --- to see how he
3  did.
4  A. Okay.
5  Q. And I understand that these are going to be
6  estimates and to the extent that we can get detailed
7  numbers submitted and we --- let's do that. But right
8  now --- I understand that you were getting ---. So
9  Michael Jennings, Rocky, Democrat, what did he do on
10 average per day?
11 A. I'd have to go look, but it was probably --- the
12 days that he was able to work, he was probably getting
13 close to 75 to 100 a day.
14 Q. And would it be your expectation that he would not
15 --- at all times he worked with a witness?
16 A. A hundred percent.
17 Q. For Rocky, Democrat. Is it your understanding
18 that he would limit the number of boards that he was
19 running?
20 A. Mike is a not a really good example because he is
21 not --- and I'm not saying this in any way, he's just
22 not very smart. He's got --- didn't come from that
23 good of a family or home or whatever. He doesn't like
24 to stack, he's not like a normal petitioner. I
25 wouldn't use him as a good example. He doesn't stack,

Page 264

1  he doesn't do a lot of things.
2  Q. Who of your circulators that worked in
3  Pennsylvania for all three drives?
4  A. I think he's actually the only one to be honest,
5  unfortunately. So he's not a good example though. If
6  you compare like Jake Witmer across the board, he would
7  do --- Jake would probably do 250 a day with a
8  witness ---.
9  ATTORNEY JOEL:
10 Let me just object. I think this is
11 hypothetical.
12 A. It is hypothetical.
13 ATTORNEY JOEL:
14 Okay, fine. I just wanted to clarify
15 that.
16 ATTORNEY JOEL:
17 Okay.
18 BY ATTORNEY ROSSI:
19 Q. Well they just need experience. Jake Witmer with
20 the witness.
21 A. He was crushing them downtown at the downtown
22 Pittsburgh library. He was getting 250 a day.
23 Q. With a witness?
24 A. Without a witness, he probably would have gotten
25 400.

Page 265

1  Q. Are there situations where he has circulated
2  petitions without a witness where he actually got 400 a
3  day.
4  A. I've seen him get 500, 600.
5  Q. Without a witness?
6  A. In the Chicago subways, of course. He's one of
7  the best petitioners when he wants to be. He's not
8  always on fire. He needs management.
9  Q. Now, based on your testimony, you brought in about
10 25 to 30 people?
11 A. Twenty-five (25), yeah.
12 Q. Twenty-five (25) to 30 for OpenPittsburgh.Org?
13 A. Uh-huh (yes).
14 Q. Why didn't you have those kind of numbers for the
15 Pennsylvania presidential circulation?
16 A. We brought in about half as many people for
17 Pittsburgh for the presidential petition, so that was
18 number one. But number two, these people don't have
19 anchors. These people are having to circulate as soon
20 as they hit the ground. They are able to start
21 collecting immediately. They don't have to wait and
22 they're not limited by when person X, who's a
23 registered Democrat or Republican voter says they are
24 looking to work with him.
25 Q. Are you saying that --- is it your testimony that

Page 266

1  you were limited in the number of people, professional
2  circulators you could bring in from out of state
3  because you didn't have enough witnesses?
4  A. A hundred percent.
5  Q. Had it not been for the witness requirement, you
6  could have brought in more professional circulators
7  into Pennsylvania?
8  A. Yes.
9  Q. And you didn't because you didn't have witnesses?
10 A. A hundred percent.
11 Q. Now you say you did advertising on Craigslist?
12 A. Yeah.
13 Q. How many witnesses did you actually use from your
14 advertisements from Craigslist in Pennsylvania in 2016?
15 A. We got about probably ten responses.
16 Q. Total?
17 A. Yeah.
18 Q. And of those ten ---?
19 A. We had a job in Pittsburgh, so we just did
20 Pittsburgh on Rocky.
21 Q. I think it was your testimony that 2016
22 presidential primary, you circulated for Rocky,
23 Democrat and Ted Cruz, Republican; correct?
24 A. Uh-huh (yes).
25 Q. Refresh my recollection as to, are there other

Page 267

1  candidates that you worked for in Pennsylvania in 2016
2  for the presidential primary election?
3  A. No.
4  Q. So were just talking about Rocky, Democrat and
5  Cruz, Republican?
6  A. Uh-huh (yes).
7  Q. How many witnesses were you able to recruit in
8  Pennsylvania for Rocky, Democrat?
9  A. Probably about --- me personally spending two
10 weeks doing it, I probably got five good people. Now
11 people like Mike were able to procure some of their
12 own. Some of them started trying to network and do
13 their own thing. All my petitioners are told when they
14 are out with another petitioner coming by who is
15 interested in a job is a perspective lead. The goal is
16 to have --- each petitioner needs five to six
17 witnesses. Because none of these guys do show up on
18 time, they are all flaky, they're not dependable and
19 they won't ---.
20 Q. For Republican Cruz in 2016, how many Republican
21 witnesses were you able to recruit in Pennsylvania?
22 A. I think I got two. And the campaign helped us get
23 the other ones. And then we had a couple people who
24 were already registered, like Rick Chera, who is a
25 delegate. Well I guess you can't bring him up --- like

Page 268

1  a Ron who I got through the grapevine, a couple other
2  guys like Andy.
3  Q. If I remember your testimony is that --- and prior
4  testimony frankly, some of the Cruz delegates actually
5  went along with the circulators, so they serve his or
6  her own witnesses.
7  A. I think it was mainly Andy and Rick and then there
8  was one guy, Ron, who wanted to be a Cruz delegate and
9  didn't because we just didn't have time.
10 Q. In totally, your testimony is that we you able to
11 get --- you actually put into the field seven witnesses
12 for both Rocky, Democrat and Cruz. Just you, Benezet
13 Consulting recruiting efforts, when you came into
14 Pennsylvania in February?
15 A. Yeah. I got more than that total.
16 Q. Five for Rocky and two for Cruz?
17 A. Yeah.
18 Q. That's all you were able to find?
19 A. Well I got more than that in total, but that's how
20 many actually --- because a few more responded. I had
21 probably 12 people total respond to my stuff. We were
22 putting up ads every day, but the probably is that they
23 would flake out and not show up. I was spending too
24 much time trying to get them to show up again.
25 Q. For 2016 presidential in Pennsylvania, for both

Page 269

1  Rocky, Democrat and Cruz, Republican what methods did
2  you use to recruit witnesses?
3  A. We used Craigslist.
4  Q. Any other methods?
5  A. I showed you the little flyer. I don't know if
6  you've given it to them yet, but I sent that to you. I
7  don't have any more copies of it. It's the one that
8  had the little edge cut out. I put those at all the
9  little stores that had bulletin boards. People would
10 call me form that.
11 Q. So you used stop lists to advertise?
12 A. Strip --- yeah. Bulletin boards, stuff like that.
13 And then we would --- word of mouth, but also people
14 that were already to become a witness, we would ask
15 them if they knew anyone that was interested, that kind
16 of thing.
17 Q. And networking?
18 A. Networking, yeah.
19 Q. So you used --- let me ask the question. So you
20 used Craigslist, people that you already knew in
21 Pennsylvania ---
22 A. Uh-huh (yes).
23 Q. --- people that your circulators knew?
24 A. Uh-huh (yes).
25 Q. Say yes.

Page 270

1  A. Yes.
2  Q. Word of mouth?
3  A. Yep.
4  Q. And any other method? Though the campaign --- did
5  you call any campaigns?
6  A. I didn't talk to Rocky's campaign. Sean taught me
7  how to do the Craigslist and the --- he set me up with
8  an Indeed account too. So he was able to find a few
9  people that way.
10 Q. What is an Indeed account?
11 A. Indeed.com. It's basically like a --- looking for
12 people to hire.
13 Q. So it's another form of Craigslist?
14 A. Yeah. Another Craigslist.
15 Q. So generally internet advertising you used?
16 A. Yeah.
17 Q. And in total, how many witnesses did that yield
18 for Rocky, Democrat and Ted Cruz, Republican in
19 Pennsylvania. In total how many witnesses were you
20 able to generate through those advertising mechanisms?
21 A. Probably about 15.
22 Q. Fifteen (15)?
23 A. Yeah.
24 Q. Now these 15 witnesses were then deployed into the
25 field with your professional circulators; yes?

Page 271

1  A. That was the idea. But no one got out.
2  Q. What happened?
3  A. About one --- three-fourths of them crapped out or
4  don't show up or flake out, or say they'll show up and
5  don't, and waste a whole day of petitioning or waste
6  the day. So then I have to pair up that petitioner who
7  misses the appointment that were going to train the
8  witness with another anchor who is already working with
9  another petitioner.
10 Q. So let's bore this down. How many of these 15
11 people, how many actually showed up at some point? All
12 15?
13 A. Probably four.
14 Q. You say you recruited 15 people, witnesses through
15 this advertising method; correct?
16 A. Leads. Fifteen (15) leads.
17 Q. Oh 15 leads. These are not --- so you got 15
18 total leads from all your advertising efforts in
19 Pennsylvania for 2016 presidential nominating petitions
20 for rocky and Cruz?
21 A. Uh-huh (yes).
22 Q. You had 15 leads?
23 A. Uh-huh (yes).
24 Q. And of those 15 leads, how many actually showed up
25 in physical form at some point in time?

Page 272

1  A. Less than five for Rocky.
2  Q. What about for Cruz?
3  A. The Cruz campaign were the ones who provided us
4  with those witnesses.
5  Q. So you got most of your witnesses for the Rocky,
6  Democrat petition drive came from the internet and word
7  of mouth and networking advertising?
8  A. Yep.
9  Q. Yes?
10 A. All of them.
11 Q. Ted Cruz's campaign, however, provided their
12 witnesses to you?
13 A. Yeah.
14 Q. And some of those included the delegates
15 themselves that wanted to get on the ballot because
16 they wanted to go to the Republican national
17 convention?
18 A. That's right.
19 Q. Do you know the number of total witnesses you had
20 deployed for Cruz's campaign?
21 A. I didn't have any because they were all registered
22 Pennsylvania voters.
23 Q. Fair enough. So where a delegate served as his
24 own witness, you don't know how many you actually had
25 in the field?

Page 273

1  A. Or like Andy --- Andy is a registered Republican.
2  Q. So he doesn't need a witness; correct?
3  A. I think --- I can't remember what happened, but I
4  think he did use --- I think him and Rick teamed up.
5  His brother also is registered Republican. Then you
6  have his --- Ed Mason, Denise Mason, they are
7  registered Republicans. Amy Strauss, that is one
8  person I did source who is a Republican off of
9  Craigslist for Cruz. She was out in Philly. Michael
10 Alexander and Brian Lyra were coming that way, we
11 paired them up immediately and had them do the district
12 that the Cruz campaign wanted out there until she
13 was ---.
14 Q. Is that the Bucks County district?
15 A. Yeah.
16 Q. You know the district number for it?
17 A. I think it's 18 or 8, or something like that. Do
18 you all know?
19 Q. It may be 18. But the congressional district for
20 Cruz in Bucks County is where you had Amy Strauss
21 deployed?
22 A. Yeah.
23 Q. Now of these witnesses, you had 15 leads, 5 showed
24 up for Rocky, did you have any problems with them once
25 they actually showed up, once they were trained and

22 (Pages 270 to 273)

Page 274

once they were deployed into the field? Did you have any issues with these witnesses?
A. Yeah. I mean a lot of them don't like the job so they'll quit. A lot of them like the job and they think it's easy work and it's great but they're not dependable.
Q. What do you mean by not being dependable?
A. Well they don't treat it --- we'll tell them, like they'll come in after the day is over and I'll say hey, how did it go? Did it work out? And they'll say yeah, I'm doing great. See you tomorrow right? Give them a time, tell them when to show up and then they don't show up.
Q. And when a witness doesn't show up, what does --- and the witness is there to witness the job of the professional circulator; yes?
A. Yes.
Q. And when a witness doesn't show up, what do you do with the circulator who was going to be anchored to the witness?
A. We have different things. One, they'll sit in the hotel room. Two, if there's a busy enough traffic area, maybe a Saturday in Pittsburgh you can go down to the strip district and there's the whole market day scene. We'll have many one or two people pair up with

Page 275

one witness. So we'll have one anchor with two boats. So basically what they'll do is stand on opposite corners and make sure that the witness' attention is gathered every time the signature is being signed. So if you have a signer, you say John or whoever it is, got a signer and look them in the eyes and make sure everything is being ---.
Q. Now in that circumstance where you have to marry an anchor witness to two boats, is that what you call a circulator that are anchored to a witness?
A. Two boats, yeah. Well that's my analogy.
Q. So that makes the witness a boat anchor?
A. It is a boat anchor; yeah.
Q. You have these two circulators anchored to a witness.
A. Yes.
Q. Are they able to operate in their normal fashion ---. Your prior testimony was that that's the way to get signatures is to navigate through a crowd and to be mobile, be ambulatory; correct?
A. That's exactly right.
Q. So if a witness has to eyeball two circulators, does that place a limit on the range of motion for the circulator?
A. Yeah. I mean they're not leaving that street

Page 276

corner. And that's --- it doesn't happen all the time because it's not a comfortable situation for any of them. But sometimes, if the guy is just sitting in a hotel room and it's a busy enough street location, I'm pretty sure like Bob Lynch and Michael might have done it once or twice with one of the guys. They're not leaving the damn street corner.
Q. And is it your testimony that that reduces production?
A. 100 percent. If that situation arises, they're not going to be productive.
Q. So you're losing signatures because of the witness?
A. Definitely. They're lucky to be getting any signatures that day, is the way I'm looking at it.
Q. Now, since we're talking about witnesses, you --- this came up earlier, and I think Mr. Joel was interested in --- maybe not. Andy Jacobs is a Pennsylvania resident; correct?
A. Yes.
Q. He's a registered voter? He's a registered Republican, actually?
A. Registered --- I think he is. I'd have to ask him. I know he's a registered voter, though.
Q. And he's one of your better circulators; correct?

Page 277

A. Yeah, he's really good. He's been circulating for 10 or 15 years.
Q. And he's in Pennsylvania, and you used him in --- for Ted Cruz, 2016 president, in Pennsylvania?
A. He worked on --- I think he might have done some Trump or something. I don't know what all he did, but he worked for me for Cruz.
Q. But he didn't witness his own petitions; correct?
A. I don't believe he did.
Q. Why is that?
A. I think there was a worry that Edee was going to challenge his out-of-state driver's license. That's what he told me.
Q. I know who Edee is, but for the record, who is Edee?
A. She is the one who was doing Trump's campaign.
Q. What's her full name?
A. Edee Baggett.
Q. So ---?
COURT REPORTER:
Baggett?
A. Baggett.
ATTORNEY ROSSI:
Baggett.
A. B-A-G-G-E-T-T, Baggett.

Sargent's Court Reporting Services, Inc.
(814)-536-8909

Page 282

1 the time I was hoping that Andy Maul would be a
2 witness, although he actually told me that he would
3 never circulate a Trump petition and I respected that.
4 I didn't know that he wasn't going to be, but I hadn't
5 found that out until after I talked to the local
6 Republican Party, and then she'd already pulled the
7 contract, so.
8 Q. She pulled the contract from who? You or ---?
9 A. From me.
10 Q. So you were fired for what?
11 A. Fired within a day of getting the packet. So I
12 went to go pick up all the petitions, had everything
13 ready, met with them, got a map of the district, got
14 everything good, even had a list of the district and
15 then go home, get everything ready, I was going to
16 start circulating actually the next day, and the
17 contract got pulled. I got an e-mail.
18 Q. And what was the reason she gave you for firing
19 you?
20 A. The e-mail that I sent to the Allegheny Republican
21 Party.
22 Q. And what did you ask for?
23 A. I asked for interested Republican registered
24 voters who were interested in helping on candidates'
25 campaigns. I said candidates plural, because I didn't

Page 283

1 want to give all my cards away. And then when they
2 asked what candidate I said, well right now it's for
3 the Trump campaign but it's very likely we'll have
4 other campaigns as well. And, I said, if we get
5 rejected at the door with a Trump petition, it's always
6 possible that the person who comes with us could have
7 in their back pocket the person that they support's
8 petition and try to qualify that candidate instead.
9 And I was completely fine with that. I thought that
10 that sounded pretty reasonable. Because that way we're
11 not wasting the door knock. And they didn't like that.
12 Q. Who didn't like that?
13 A. Edee didn't like me contacting the Party at all.
14 Q. Why didn't she like that?
15 A. She said, basically, don't trust any of the
16 Republican Party.
17 Q. So the Trump campaign fired you because you
18 contacted the political party for a witness?
19 A. Yes. And I guess I found out later that most of
20 the people there supported Marco Rubio, so that made
21 sense in hindsight. And you know, there's so many ---
22 there's a spectrum of Republicans, right? Not everyone
23 just because you're republican means you like Trump or
24 Marco Rubio or Ted Cruz or Rand Paul. You know,
25 you've got these little subsets and groups inside the

Page 284

1 Party. And then after the primary it's everyone versus
2 the other side.
3 Q. Amy Strauss. Where did you find Amy Strauss?
4 A. Craigslist.
5 Q. And Amy Strauss was a circulator, or what ---?
6 A. She was a circulator. I mean a witness, and
7 originally that was the whole ---.
8 Q. So she was a witness?
9 A. She was a witness.
10 Q. She didn't do any circulations?
11 A. She didn't do any circulation, to my knowledge.
12 Now, I'll double check after reading that e-mail. I'm
13 not very sure --- I'm not 100 percent. I just want to
14 make sure that that's clear, but she was hired to be a
15 witness.
16 Q. And you deployed her --- how did you deploy her?
17 A. She was teamed up with Michael Alexander and Brian
18 Lyra, who came in from Massachusetts.
19 Q. So she was their anchor?
20 A. She was their anchor.
21 Q. And they worked on what petition drive?
22 A. They worked on the Ted Cruz petition drive for the
23 first two days, and then we had to transition them and
24 pivot them out of Ted Cruz for lack of a decent witness
25 in that district.

Page 285

1 Q. Well, you said you had a witness. You had Amy
2 Strauss.
3 A. We had Amy Strauss.
4 Q. What happened with Amy Strauss?
5 A. She seemed great. I liked her. She seemed really
6 gung-ho and fired up on the phone. And then after the
7 first day I talked to Brian and Michael about it and
8 they said that she was insane. And I said, what does
9 that mean? And he goes, well, once we get to the door,
10 she starts talking to herself. And I said, but she
11 seemed so natural and normal on the phone, you know,
12 are you serious? And he goes, very. I was like, so,
13 on a scale of 1 to 10, how bad is it? And they said,
14 it's like a 15, man. So we gave it another day just to
15 see where they were at, and they produced 14
16 signatures, or whatever it was.
17 Q. So two professional circulators generated 14
18 signatures in two days? Three days?
19 A. Yeah, I believe that was the chain of events that
20 led me to pulling --- and I had to have an honest
21 conversation with the Cruz campaign about getting that
22 district done. They didn't have any people in the
23 district that could help us, didn't have any witnesses
24 they could source. I was running ads down in Philly
25 for that area. It just wasn't --- and the clock's