# EXHIBIT A

# PART 4

Page 286

1  ticking. You have, by that time, we were on day --- we
2  had ten days. So, 18 signatures a day or 15 signatures
3  every other day is not going to get the 250 valid
4  needed.
5  Q. And you were working for a specific delegate? Or
6  were these signatures for Ted Cruz for president at the
7  state level?
8  A. Ted Cruz for president and his three delegates.
9  Q. And his three delegates.
10 A. All paid for by the campaign.
11 Q. And the Cruz campaign didn't have any witnesses to
12 provide you for that district?
13 A. No, they didn't. Now, I pushed and pried to get
14 as much information as I could for these areas but I
15 just --- when you have all the people running for
16 president, I mean, all the resources are just
17 completely diminished. You've got ten people running
18 for president and it's impossible to find people at the
19 time, and even in the Party, to go and do all this
20 stuff. So I'm sure that she was just as frustrated as
21 I was.
22 Q. Who is she?
23 A. Vonne Andring, the recruit campaign assistant.
24 Q. Oh, Vonne Andring is who was in charge of the Cruz
25 campaign in Pennsylvania?

Page 287

1  A. Yeah. Me and Vonne had many talks about this.
2  Sorry.
3  Q. That's fine. So, she didn't have any witnesses
4  for you and you didn't have --- your advertising
5  efforts only produced Amy Strauss ---
6  A. Yeah.
7  Q. --- and Amy Strauss didn't work out because she
8  had apparent mental issues ---
9  A. Mental issues, yeah.
10 Q. --- and let me bore down on that. When she
11 started talking to herself did that hinder the
12 gathering of signatures?
13 A. Yeah. I mean ---.
14 Q. Now, what was the end result for that
15 congressional district? Did Ted Cruz's delegates make
16 it onto the ballot?
17 A. One of them did.
18 Q. One did?
19 A. I think Deborah Evangelou. Like I said, we had
20 about 15 or 16 signatures in that district for the
21 delegates and Cruz, and when we went to turn in
22 everything, we were all in the annex --- not the annex
23 building, the building across from it. We were all
24 waiting there at the turn-in day. A lady shows up
25 saying that she's 20 shy in that district. And I said,

Page 288

1  what district, what's your name? And I remember that
2  that was --- she was kind of --- I guess it was --- I
3  don't know. God was looking out for us so I pulled the
4  petition, then I actually had exactly about as many as
5  she needed. So we pulled it out and gave it to her,
6  and she went and turned it in.
7  Q. So one of the Cruz delegates in that district got
8  onto the ballot because you had just enough signatures
9  for her to get onto the ballot?
10 A. Yeah.
11 Q. The other two delegates did not get on the ballot,
12 to your knowledge?
13 A. They did not. And we definitely --- I mean, we
14 basically --- that ended up going down to four
15 districts instead of five.
16 Q. So you lost ---?
17 A. I lost money. Yeah, we lost ---.
18 Q. You lost the Cruz district because Amy Strauss
19 could not complete her job as a witness? And you had
20 no other --- hang on. And you had no other witnesses
21 for that district?
22 A. Exactly.
23 Q. So you then had to pull Michael Alexander and Lyra
24 out of that district and then you re-deployed them?
25 A. Yeah. We didn't pull them --- well, we just sent

Page 289

1  them to Philly and I started making calls because the
2  witness operation that we were doing predominantly was
3  focused in Pittsburgh area since I knew Pittsburgh
4  better than Philly for the Rocky campaign, so I started
5  sourcing witnesses for them, for Philadelphia, and we
6  got Kemitt Wilson.
7  Q. Now Kemmitt is the individual you testified
8  earlier about?
9  A. Yeah, the one who tried to get extra --- who got
10 extra money out of me.
11 Q. And he got extra money out of you how?
12 A. By refusing to sign his Decs.
13 Q. And Decs mean the affidavit?
14 A. Yes. Now thankfully we actually got his signature
15 at all, he could have refused completely and then we
16 would have lost all those signatures. So, I mean ---
17 and I am, it means, sucks to say it, I really am put in
18 at his mercy. At that point in time, those signatures
19 become as valuable as Kemmitt says they are.
20 Q. Because Kemmitt is the witness, he is the only one
21 that can affidavit --- he's the only one who can
22 execute the affidavit as a precondition for filing?
23 A. That's the fair market value when a campaign is
24 willing to spend 50 grand to get on the ballot and they
25 need those signatures.

26 (Pages 286 to 289)

Page 290

1  Q. And those signatures were ---?
2  A. It's not fair, it shouldn't be a fair market value
3  but ---.
4  Q. And those signatures that Kemmitt notarized, what
5  petitions were they for?
6  A. Rocky De La Fuente.
7  Q. And that was for ---. I think your testimony
8  before, Rocky didn't actually get delegates, he only
9  was on the top line ballot?
10 A. Yeah. He was ---.
11 Q. Hang on. So Kemmitt was notarizing affidavits for
12 Rocky De La Fuente for Democrat president for the
13 distribution of state-wide delegates?
14 A. Yeah.
15 Q. And those were the signatures that he threatened
16 not to sign unless ---
17 A. Yeah.
18 Q. --- hang on --- unless you provided additional
19 compensation?
20 A. Exactly right.
21 Q. Which eventually you did?
22 A. I did. I had to.
23 Q. Now the witnesses, you said some of them didn't
24 show up sometimes. How often would a witness not show
25 up?

Page 291

1  A. I'd say from the original responses we got, we
2  ended up getting like five people. We built that
3  network up to about ten through, you know, networking,
4  finding friends of friends. But every day, people were
5  not being able to work. Every day I had petitioners
6  who would sit either in our house --- or in a hotel
7  room, not working, because there wasn't an event going
8  on so we could have two boats on one anchor or because
9  they had no witness. Well, because they had no witness
10 and because there was no event going on where they
11 could --- where it made sense to have two petitioners
12 at one street corner with one witness.
13 Q. So every single day you had circulators sitting in
14 a hotel room doing nothing because a witness didn't
15 show up?
16 A. Exactly.
17 Q. And it doesn't make sense to have two people on
18 one anchor, two circulators on one anchor unless it was
19 a high volume?
20 A. It has to be high volume, yeah. Otherwise they
21 are just going to be competing for each other's money
22 and then it creates fights and it's not good.
23 Q. So it's just better to have somebody in a hotel
24 room watching The Price is Right, rather than ---.
25 A. Yeah, exactly. And then they get annoyed and then

Page 292

1  they leave and that happened to a few of the guys.
2  Q. Who got annoyed and left?
3  A. I think Mark Gailey left, Milton Lucan left and
4  Bob Lynch eventually left.
5  Q. Mark Gailey, Lucan and who else?
6  A. Bob Lynch ended up --- Bob Lynch threatened a lot.
7  I think I finally got him in --- I think Milton stayed
8  the whole time actually. So it was Bob Lynch that
9  left. Bob Lynch was just getting fed up.
10 Q. So Lucan stayed even though he was frustrated?
11 A. Yeah. Lucan did stay.
12 Q. But Bob Lynch left Pennsylvania because of the
13 witness problem?
14 A. Yeah.
15 Q. Witnesses not showing up?
16 A. Yeah. And if he didn't, he threatened multiple
17 times and I kept promising him that we'd get more, we'd
18 get more, that kind of thing.
19 Q. And you ---.
20 A. I was playing with him because I really needed ---
21 in the event that I find a witness, I have to have the
22 manpower to go out with them. So I'm hoping and
23 praying every night that we get more people, but it is
24 what it is.
25 Q. And during that time when you had circulators

Page 293

1  sitting in hotel rooms because there wasn't a witness,
2  you were actively looking for witnesses through this
3  advertising?
4  A. Every day.
5  Q. So Bob Lynch actually left Pennsylvania?
6  A. He did. That's what I remember
7  Q. Did Mark Gailey leave Pennsylvania?
8  A. Mark Gailey left, he had another reason to leave.
9  But it was definitely compounded with the witness
10 issue.
11 Q. But Lucan threatened, but he stayed?
12 A. Lucan, he's a team player. I told him look man,
13 just --- he basically stayed, but they were all so
14 annoyed. And by this time, moral was so low, it was
15 hard to get anyone really excited about anything. So
16 Milton I got to stay. I paid him to help me out.
17 Basically he was running --- notarized signatures to
18 and from location X and location B. He was helping
19 deliver signatures the night of turn in, stuff like
20 that. I was basically paying him for being on a ---.
21 Q. So you paid him extra money out of your pocket to
22 sort of keep him in Pennsylvania?
23 A. Yeah. He'd be like a courier and have more a
24 managerial role.
25 Q. So you didn't sort of make work for him to make it

Page 298

1  they are in a prone, non-aggressive role, and
2  aggressive meaning you are on someone's property, it's
3  one thing. If you're at a street corner or something,
4  that is neutral ground, that's not --- when you are on
5  someone's property, they become a lot more acquiescent,
6  fearful and it's a lot harder to get those signatures
7  with someone who is not able to roll with the punches.
8  Does that make sense?
9  Q. Yeah, it does. So it's your experience that
10 witnesses only do the witness job because they do not
11 want to engage voters, they just want paid for their
12 time?
13 A. Yeah.
14 Q. And while they may be willing to stick with a
15 person on a street person who initially says no,
16 they're less --- in your experience, they are less
17 likely to stick around when they are on someone
18 property?
19 A. Yeah.
20 Q. Because that's ---.
21 A. Because it's a lot more aggressive than passive.
22 If they're doing it with a passive witness, it's one
23 thing. If they are doing an actual on property, it
24 requires a whole different type of witness and those
25 guys are almost impossible to come by because they are

Page 299

1  probably already making a lot of money in sales. Or
2  doing something that requires an extra, third person.
3  Q. Getting a signature has to be a valid signature;
4  correct?
5  A. Yeah.
6  Q. The goal isn't simply just ink on paper, it's
7  validating on paper. These requirements if they are
8  registered voters of the Party that they sign within a
9  legal time period and that they complete the petition,
10 signature requirements in full; correct?
11 A. Yes.
12 Q. That's the goal; correct?
13 A. Yes.
14 Q. And when you are talking about --- like we're
15 talking now about presidential elections, so these are
16 party nominations, which is the best way to get a valid
17 signature? Is it door to door with a street list or on
18 a corner?
19 A. To get a valid signature?
20 Q. Yeah. To get a valid signature.
21 A. It's going to be --- it depends on who you use.
22 If I have Jake Witmer and Andy Jacobs and Trent Pool's
23 running around and pretty much most of the guys I
24 hired. Michael's got high validity. Milton, you know,
25 Bob, they all have really high validity. So that's why

Page 300

1  we use them. All those guys are great, so that seems
2  awesome. But I mean, when I'm doing a general 10,000,
3  130,000 signature drive, the best way is always going
4  to be going door to door.
5  Q. And why is that?
6  A. Because you know that those people are who they
7  are and that they live at that place. It's so much
8  easier to get a valid signature.
9  Q. And you say you have a street list. Do you know
10 that these people are registered voters?
11 A. Yeah. You're using the voter scrolls, getting
12 them from the Secretary of State's office.
13 Q. So going door to door gives you the certainty that
14 the person who is signing is in fact a registered
15 Republican and that their validity can't be challenged
16 based on their registration status?
17 A. It doesn't mean that they can't be challenged. If
18 they wrote something incorrectly, sometimes they do.
19 But it will knock it off.
20 Q. But it's only on the basis that a registration
21 status that that's a lock.
22 A. Yeah. That's a lock, we know they're a registered
23 voter.
24 Q. As opposed on the street corner, you really don't
25 know if you are being lied to or not by the signing?

Page 301

1  A. Yes, that's true. Some people are also
2  embarrassed to admit that they are not registered
3  voters. Especially in a group of people, getting some
4  elderly people. Yeah, we're all registered; oh sure,
5  we'll help you, honey. And you look them up and not a
6  single one of them is registered. No one wants to
7  admit it.
8  Q. And in those --- so your testimony is that
9  witnesses become more timid for presidential elections
10 where it --- strike that, terrible question.
11   So it's your testimony that while going door to
12 door is the best way to get a valid signature, it is
13 also the most difficult situation for witnesses to
14 stick with you?
15 A. That's true.
16 Q. Let's compare and contrast a little bit, over at
17 Pittsburgh.Org, you brought in 25 people to work
18 OpenPittsburgh.Org's petition drive?
19 A. Uh-huh (yes).
20 Q. And you did not have to use witnesses for that
21 drive; correct?
22 A. That's correct.
23 Q. And your production was how many in three days?
24 A. We had over 6,000.
25 Q. What was your total production for the

Page 302

1 presidential --- 2016 presidential petitions?
2 A. In about 18 days for Rocky, we were able to get
3 4,500 signatures.
4 Q. And what about for Cruz?
5 A. That's with about 10 to 12 petitioners in the
6 state.
7 Q. And what about for Rocky --- I mean what about for
8 Cruz?
9 A. Cruz, we were able to get three congressional
10 districts done.
11 Q. Total?
12 A. So three times 600, 1,800 signatures in about two
13 weeks.
14 Q. So in 18 days you got about --- so in three days,
15 roughly, at OpenPittsburgh.Org you got roughly the same
16 amount of signatures that you got in 18 days of
17 circulation in Pennsylvania for presidential petitions?
18 A. That's a very accurate statement.
19 Q. And that probably was the result of several
20 factors; correct?
21 A. Yeah.
22 Q. One, you were able deploy more people at Open
23 Pittsburgh than in Pennsylvania for the presidential
24 election?
25 A. Yes.

Page 303

1 Q. And that is a direct result of you not having
2 enough witnesses for Pennsylvania president?
3 A. Yeah. Once they throughout the out of state
4 circulator requirement and if they would have given us
5 the emergency relief we would have gotten the state ---
6 I probably would have gotten Cruz on every --- every
7 district as many delegates as you wanted. We would
8 have collected all 35,000 signatures that he needed.
9 Q. So you're talking now about Cruz for president?
10 A. Cruz for president.
11 Q. You could have deployed more professional
12 circulators for him had I been able to get the
13 emergency relief?
14 A. Exactly. And he probably would have had more
15 delegates elected and might have had more chances of
16 doing better at the convention.
17 Q. So this is all my fault? Okay.
18 A. But also, Rocky's petition would have gone a lot
19 smoother. There was a lot of hiccups in that. That
20 collection effort ---.
21 Q. Let me ask you a question, Rocky, Democrat, 2016.
22 Describe that petition drive.
23 A. It was just a rollercoaster, man. It was constant
24 gardening, constant making sure --- I mean I've never
25 spent more time trying to get these witnesses to show

Page 304

1 up and do the job that they've been hired to do.
2 Q. So your prior testimony that every single a
3 witness didn't show up --- that wasn't just Ted Cruz,
4 that was ---.
5 A. No, Ted Cruz ---.
6 Q. Hang on, let me ask my question. That was for Ted
7 Cruz and for Rocky. When you said somebody didn't
8 show, you were talking about Cruz and Rocky?
9 A. Talking about mainly --- just Rocky. Cruz's
10 people --- we had Cruz done. They were always limited
11 to just the witness or the delegates doing the
12 petitioning.
13 Q. So it was the Rocky delegates, it was the Rocky
14 witnesses which were the bigger problem?
15 A. They never showed up, yes.
16 SHORT BREAK TAKEN
17 BY ATTORNEY ROSSI:
18 Q. In case I didn't ask this question before, you
19 found Amy Strauss through Craigslist; correct?
20 A. She was a Craigslist person.
21 Q. Let's clean up the record a little bit. Your
22 earlier testimony was that you were the only person
23 that Rocky used in Pennsylvania for Democrat, 2016?
24 A. Yeah. Shawn and then Shawn hired me.
25 Q. So Shawn had the exclusive contract in

Page 305

1 Pennsylvania?
2 A. That's correct.
3 Q. And you were a subcontractor of Shawn Wilmar
4 (phonetic).
5 A. I think he had hired someone to do it before me
6 but that guy --- I never got any signatures from him.
7 Q. And let me remind you not to --- because I had a
8 discussion with the court reporter. Wait for my
9 question to be asked and then answer, I will try not to
10 talk over you because I have the same problem.
11 A. Okay. Sorry.
12 Q. How many signatures --- if I want to be on
13 Pennsylvania's ballot for president of the United
14 States, even though I would lose. If I wanted to have
15 every delegate and every alternate slot filled in every
16 congressional district, and be on the statewide ballot,
17 what is the minimum number of signatures would that
18 require?
19 ATTORNEY JOEL:
20 Can you read that back, I got lost in the
21 middle of it?
22 ATTORNEY ROSSI:
23 I can rephrase the question if you'd
24 like.
25 BY ATTORNEY ROSSI:

Page 306

1   Q. Strike that, let me start over. Rocky De La
2   Fuente, strike that.
3   Ted Cruz was running for president of the United
4   States in 2016 for the Republican nomination for
5   president. If he had --- how many signatures would it
6   take to place every delegate and every alternate
7   delegate slot available to him in Pennsylvania as well
8   as be on the state's top line for president?
9   ATTORNEY JOEL:
10  Object to the form of the question.
11  A. I agree.
12  BY ATTORNEY ROSSI:
13  Q. How many signatures does it take to get on --- how
14  many signatures would it take to have a full slate of
15  delegates, alternate delegates and to appear on
16  Pennsylvania's ballot for president of the United
17  States?
18  ATTORNEY JOEL:
19  Same objection.
20  BY ATTORNEY ROSSI:
21  Q. Let's break this down then. What is the minimum
22  number of signatures it takes to become a delegate, to
23  appear as a delegate in Pennsylvania?
24  A. 250.
25  Q. In your experience, how many raw signatures does

Page 307

1   it usually take to be comfortable that you have enough
2   ballot signatures?
3   A. Going door to door you can do it less, but most
4   campaigns don't do it for less than 400?
5   Q. 400?
6   A. Trump was buying 450.
7   Q. So each delegate requires 450?
8   A. Something like that.
9   Q. Yes?
10  A. Yes.
11  Q. How many delegates are in each congressional
12  district?
13  A. Three delegates, three alternates, so six.
14  Q. And were talking about the Republican
15  presidential?
16  A. Republican presidential. It's the same as
17  Democrat though.
18  Q. So to get a full slate of delegates and alternates
19  in each congressional district requires 450 times six?
20  A. Yeah. I'd say about 2,000 to 2,400, somewhere
21  around here.
22  Q. My math comes to 2,000.
23  A. Yeah. At the high end I think you are looking
24  about 2,700 to 3,000.
25  Q. Is it your testimony that 400 to 450 gets you on

Page 308

1   the ballot?
2   A. Yeah. I'd say that would be pretty good.
3   Q. So anything more than 450 is surplus?
4   A. Yeah.
5   Q. Anything less than 400, you really risk not being
6   on the ballot.
7   A. Yeah. Depending on how you do it. If you're
8   going door to door, obviously you're going to come away
9   with less signatures.
10  Q. Going door to door, what is the recommended number
11  of signatures you get?
12  A. Cruz campaign wanted me to go to 275 and I thought
13  that was kind of crazy. I was concerned for their
14  sake.
15  Q. So 275 times 6 is?
16  A. Fifteen (15) ---.
17  Q. 1,650. So Cruz thought that 650 (sic) signatures
18  per congressional district would get him a full slate
19  of Republican delegates and Republican alternates on
20  the ballot?
21  ATTORNEY JOEL:
22  Object to the form.
23  A. Yes.
24  BY ATTORNEY ROSSI:
25  Q. Let me rephrase that. Is it your testimony, Ted

Page 309

1   Cruz contracted for 1,650 signatures per congressional
2   district?
3   A. No, they contracted me --- the only wanted me to
4   do the delegates.
5   Q. So 825? But a candidate came to you and wanted
6   you to circulate petitions for three delegates and
7   three alternates in a congressional district, you would
8   recommend to a campaign that they pay for how many
9   signatures?
10  A. 1,875.
11  Q. And that's what Ron Paul did in 2012?
12  A. Mitt Romney, all those campaigns did that.
13  Q. And that's if you go door to door?
14  A. Well, you're not going to do 400 door to door.
15  You're going to get about 325 max door to door. 325
16  per delegate. But still you're looking at 1,800 raw
17  signatures, per CD. Multiple that by 18. You're
18  looking at well over 20,000, I would say probably about
19  35,000 signatures per presidential campaign that need
20  to be gathered in the three-week period.
21  Q. So it's your testimony that in order for a
22  presidential candidate to have a full slate of
23  delegates and alternates as well as appear on the
24  Pennsylvania ballots requires about 35,000 signatures?
25  ATTORNEY JOEL:

Sargent's Court Reporting Services, Inc.
(814)-536-8909

Page 310

1 Objection to form.
2 BY ATTORNEY ROSSI:
3 Q. How many signatures does a presidential candidate
4 need in Pennsylvania to have a full slate of delegates
5 and alternates in a presidential election --- primary
6 election?
7 A. 35,000 and probably up to 40,000. I wouldn't be
8 surprised if Hilary Clinton or somebody really popular
9 like that got more than that.
10 Q. Now in addition to those signatures, in order to
11 appear on the state's top line as the presidential
12 preference primary, where their names actually appear
13 untethered to delegates; how many signatures does that
14 require?
15 ATTORNEY JOEL:
16 Object to form.
17 BY ATTORNEY ROSSI:
18 Q. How many signatures does it take for a
19 presidential candidate to appear on Pennsylvania's
20 presidential primary ballot?
21 A. 2,000 ballot but you'll always double that like we
22 did for Rocky to turn in 4,800 or something, I can't
23 remember what it was. When I said 35,000 to 40,000
24 that includes that number. So that's 4,000 for them
25 and pretty much, the bare minimum about 300 per

Page 311

1 congressional district gets you about 35,000 raw
2 signatures.
3 Q. So the 35,000 signatures that you are saying is
4 required includes all delegates, all alternates and the
5 states presidential preference primary?
6 A. Yes. With not much ---.
7 ATTORNEY JOEL:
8 Object to form. You can answer.
9 BY ATTORNEY ROSSI:
10 Q. You can answer the question.
11 A. And that doesn't give you much cushion because you
12 are only going to have 50 signature cushion for the
13 delegates. So that's giving 300 signatures per
14 delegate alternate, which is 1,800. Divide that by 18
15 and you're looking about 30-something thousand there.
16 Add the 4,000 for the presidential candidate. So
17 that's what most campaigns are coming to Pennsylvania
18 ready to buy. So it's a very expensive endeavor
19 getting all those signatures.
20 Q. Now breaking that down, how many signatures can
21 you get --- if a nominating petition is filled with
22 signatures, how many signatures does a nominating
23 petition contain in Pennsylvania?
24 A. Can I look at an exhibit? I think ---.
25 Q. That is in the exhibit. What exhibit is ---?

Page 312

1 A. It's like 5, 6 or 7, I can't remember.
2 Q. I'm showing you Defense Exhibit 6.
3 A. So we have 30 lines on Defense Exhibit 6. So the
4 nominating papers we circulated for Rocky this
5 summer ---.
6 Q. We're talking about petitions right now.
7 A. Okay, we're talking about petitions, so 30.
8 Thirty (30) lines ---.
9 Q. Thirty (30). And this petition is generated by
10 whom?
11 A. The Secretary of State.
12 Q. And how do you generate that petition?
13 A. You go online. I found this out in the lawsuit,
14 it's actually a pretty cool system that they have. You
15 type in all your information and it kind of produces it
16 for you, which is pretty ---. It's helpful for a
17 candidate to have that.
18 Q. And to your knowledge, you are required to use
19 this petition? The format provided by the Secretary of
20 State.
21 A. Yeah. You definitely are.
22 Q. So the maximum number of signatures any petition
23 page can contain is 30 signatures in Pennsylvania?
24 A. Yes. For this year, that's all I can testify to.
25 Q. How often is a petition page fully utilized?

Page 313

1 A. This one right here --- I mean this one went to
2 22. They're not all --- very rarely. When the
3 candidate is doing it himself you'll see that it's more
4 filled out. When you have pros doing it themselves,
5 it's more filled out. But, you know, you're never
6 going to have --- it will be probably, I'd say, you'll
7 have about 90 percent of the pages filled out. On the
8 low end --- it's cringing, I cringe so many times when
9 I have to pay a $5 notarization for one signature on
10 the page. But you have to do what you have to do.
11 Q. Let me ask you that, if you have a petition ---
12 nominating petition with one signature on it, will you
13 bother to have it notarized and filed?
14 A. That's a hard question. Sometimes we don't, we
15 just throw them away.
16 Q. Do you notify the signor that their signature is
17 not being used?
18 A. No, I don't think you do. I think we just --- I
19 think the way we've done it, is we'll file them
20 un-notarized or just try to stick them in and say hey,
21 you know --- and they won't count them. But then
22 they'll get thrown away. You don't want to
23 disenfranchise the butter, but I don't want to pay five
24 bucks when I don't need to.
25 Q. When you file nominating petitions, you file them

32 (Pages 310 to 313)

Page 314

1  with Secretary of State's office for statewide
2  counties?
3  A. Yep.
4  Q. And so the Secretary of State's office goes
5  through the petitions; correct?
6  A. Yes.
7  Q. And they will strike any petition's signature that
8  is not valid on its face?
9  A. Yes.
10 Q. Okay. And do they do the same thing for the
11 petition themselves?
12 A. Yeah.
13 Q. So if something's not notarized, they throw ---
14 they whole petition is thrown out; correct?
15 A. Yes. And that's your experience?
16 Q. Yeah, the example we had from one of the exhibits
17 about the --- I guess there was a facially --- facial
18 error with the affidavit or the execution, so they
19 threw them out en masse, in bulk. And you have
20 personally yourself on occasion actually filed
21 petitions with the Secretary of State's office? Have
22 you?
23 A. Yeah.
24 Q. So you know this process from personal experience?
25 A. Yeah.

Page 315

1  Q. So based on the math, 35,000 signatures, if that's
2  the minimum number, divided by 30 is 1,160 petitions.
3  Okay. So based on your number --- and we're going to
4  have Secretary of State's office testify to this at
5  some point.
6  A. Okay.
7  Q. As to what the actual numbers are, minimum numbers
8  of petitions that need to be filed and signatures need
9  to be filed for each delegate, for each alternate, how
10 many there are in the state and how many they need or
11 so. We're not going to go over --- we're simply
12 relying on your testimony. This is just for
13 informational purposes. If it's 35,000 divided by 30,
14 in a best case scenario, my math comes to 1,160
15 nominating petitions that need to be filed for a
16 presidential candidate. And then what is your
17 experience --- how much does it cost you to get a
18 petition notarized in Pennsylvania?
19 A. Never less than $5 and sometimes more when you add
20 in all the, you know --- there's a lot of issues with
21 the notaries you get online, they always charge you
22 more than that because ---.
23 Q. Are there situations where you can get it for
24 free?
25 A. No. I mean, in Pennsylvania, no. I've maybe

Page 316

1  gotten a few, but things are pretty strict about this.
2  You know, Pennsylvania is the worst state in the
3  nation, hands down. I mean, I've never been to a state
4  --- candidates expect to come here with $5,000 or
5  $6,000 as a backdoor filing fee, prepare to paid their
6  petitions. Cruz's campaign gave me $1,000 for three
7  districts and we ended up going to $1,500, $1,600. I
8  mean it's insanity.
9  Q. $1,500 or $1,600 ---.
10 A. I'd have to look at the actual invoice, but we had
11 over $1,000 in notarizations.
12 Q. Okay. You had $1,000 in notarization fee for how
13 many congressional districts?
14 A. Four, three or four. However many.
15 Q. And you actually spent that money?
16 A. Yeah.
17 Q. On the affidavit?
18 A. Oh, yeah.
19 Q. Three or four congressional districts?
20 A. Three or four, yeah. And that's only three
21 delegates in each one.
22 Q. Did he bother with alternates?
23 A. No, he didn't. Okay. So he came pretty late in
24 the game. So they were just --- I asked him, you know,
25 finding these guys --- they didn't even have like a

Page 317

1  delegate recruitment plan. So they were kind of a
2  little disorganized and they weren't prepared for all
3  that. But some candidates are, you know.
4  Q. So is it your testimony that you can sometimes get
5  free notarizations?
6  A. Never in my experience. I may have gotten a few
7  free notarizations from a bank, but my bank is Wells
8  Fargo. It's impossible to find a Wells Fargo in
9  Pittsburgh. You can't find a Chase in Pittsburgh. You
10 can't find any bank other than the ones they have
11 there. I think someone said there's 80,000 notaries in
12 Pennsylvania. I googled so many times 24/7 notary,
13 there's like one or two ads that pop up. And then none
14 of them will ever work past certain hours. My
15 petitioners are working late. It's crazy, you know.
16 Getting a notary after 5:00 p.m. is almost impossible.
17 And when you find one --- we found one guy who's
18 willing to do it, but his kids go to bed at a certain
19 time. My petitioners don't get done until late. It
20 was problematic. And for me, I want the petitions
21 notarized every day, because I don't want --- things
22 that happened where they don't show up or someone not
23 showing to notarizing the petitions on the last day.
24 So I want them notarized and turned in to me. And
25 also, that's when my petitioners want to do it too,

Page 318

1  because then they get paid. So I'll give them a check
2  or money or whatever I have to do to make sure that the
3  signatures are compensated for. It's best business
4  practice to have all of that paperwork and stuff done
5  on each night so I don't have to wait around or run the
6  risk of not getting it notarized on the last day.
7  Q. Okay. You said you found somebody who would
8  notarize after 5:00 in Pittsburgh?
9  A. Yeah, Jay Risner (phonetic) was his name. We have
10 a bunch of receipts from him. He was a pretty cool guy
11 in Squirrel Hill.
12 Q. Okay. How much did he charge per affidavit?
13 A. He charges $5, which was typical. And he was
14 working for --- I can't remember his employer's name.
15 He was charging us $5 and then he was also charging a
16 service fee. You know, how many miles he had to drive,
17 what's the inconvenience, what time.
18 Q. Jay Risner. Okay. Did he have a physical
19 location you could go to to have your petitions
20 notarized?
21 A. He had a house, but like I said, he had a daughter
22 and when she's in bed, you know, you can't be there
23 after a certain time. It was like 8:00 or 9:00. And
24 he was getting angry, too, that we were coming in.
25 Because I would send five or six guys there at 8:00, or

Page 319

1  the cutoff, and then he's there doing the notarization.
2  He started getting annoyed with us.
3  Q. So the process of notarization takes a certain
4  amount of time to conduct?
5  A. The longest time ever. I mean you're circulating
6  --- you're signing off on every page that is
7  circulated. If you have ten pages, it could take a
8  minute, two minutes per page. They also have paperwork
9  on their end, I don't know what it is in Pennsylvania.
10 But notaries have certain requirements that they have
11 to follow and the petitioner --- everything's got to be
12 done according to the laws of the notarization.
13 License is required, the guy probably has to put it in
14 his book or something along those lines. They've got
15 to make sure the stamp is done, everything is done
16 correctly and then they --- hopefully they don't mess
17 up. Because if they mess up and the signatures are
18 invalid, the whole process is a waste of everyone's
19 time.
20 Q. Now this Jay Risner, would he ever come out ---
21 strike that.
22 In your experience, were there any notaries that
23 actually come to you to do the notarization?
24 A. He was the one we found after calling everyone.
25 Q. And when he came to you to notarize, it was still

Page 320

1  just $5 a notary?
2  A. No. It was always more than $5 a notary. That
3  was what he charged per stamp. But then he had a fee
4  associated with mileage, a fee associated with his time
5  and a fee associated with the service provided.
6  Q. And what were those fees?
7  A. I think it ended up being a $40 extra charge.
8  Q. $40 per travel to somebody to notarize?
9  A. I think so. Something along those lines, I'd have
10 to look.
11 Q. What was the utility having the notary come to you
12 out in the field?
13 A. Well it doesn't slow down the petitioners. If
14 they have to drive Pennsylvania, you guys got all the
15 crazy hills. There's roads in Pittsburgh that are not
16 done to a grid system. So anyone from out of state or
17 a petitioner coming around and trying to move around
18 there, even with their witnesses it's kind of hard to.
19 I'd say it probably takes them about 30 to 45 minutes
20 to move from the petition location to the guy's house
21 and then you have to give them another 30 minutes or so
22 just to get their stuff, their paperwork process with
23 him. So you're talking about probably an hour to an
24 hour and half of down time per petitioner group or per
25 petitioner team just to get the stuff done.

Page 321

1  Q. And you want this done daily so that you don't
2  lose witnesses ---
3  A. Oh definitely.
4  Q. --- who are the people who have to execute?
5  A. In our experience, the witnesses weren't showing
6  up so it was even more risky to not have them notarized
7  each and every day. When we started having petitioner
8  issues, or witness issues not showing up, I started
9  thinking well, that's not good and we need make sure
10 it's per day so it doesn't mitigate against anything
11 happening to the signatures we've already gathered. So
12 we started doing it every day, especially towards the
13 last week of the drive.
14 Q. And so when you found Jay Risner and you realized
15 that he would come out to you, you utilized that
16 service?
17 A. Yep. We definitely did.
18 Q. And is it your testimony --- so saving time
19 traveling to a notary after hours allowed you to
20 collect more signatures?
21 A. Yes.
22 Q. In states where there are not notaries, are you
23 able to circulate for longer periods of time?
24 A. 100 percent, so yeah.
25 Q. So let me clarify my question. In states that

34 (Pages 318 to 321)

Page 322

don't have a notarization requirement, are you able to circulate petitions per day for a longer period of time?
A. Yes. You're much more productive in states without a notarization requirement.
Q. In addition to the expense, there is an efficiency issue with respect to the notarization in your estimation?
A. Yes. There definitely is.
Q. And so when you found Jay Risner, was it worth the $40 for him to come out because you could get --- you make enough money to compensate you for the extra service fee on signatures?
A. Yes. Jay Risner was mainly for the Rocky stuff. The other guys found theirs in different areas for Cruz. I'm not sure --- they all --- one guy said it was over $1,000. But Jay Risner was convenient because he was the only person who answered their phone in Pittsburgh. But he wasn't the best because he wouldn't leave his house. So we had to go to him regardless. He would leave his house before 5:00 p.m., after 5:00 p.m. his daughter is with him, he wouldn't leave his house. We had to go to his house. It became kind of --- I mean what do you do. You need a notarization late at night, none of my guys have any of the banks in

Page 323

Pittsburgh. You're pretty much at a loss for getting a notarization for free.
Q. So Jay Risner's mobile service was before five o'clock?
A. Basically.
Q. After five o'clock you had to go to his house.
A. Yep.
Q. Would he notarize documents at 1:00 a.m.?
A. No, he would not.
Q. What was the cutoff?
A. Pretty much about 9:00. And the other thing is too, the petitioning window that envelope of time for the best production and output for a petitioner is 5:00 to about 9:00 when people are off work, at the store, going to get groceries or whatever. That's when you want your guys working. You don't want them going and trying to meet Jay Risner --- it really starts about 3:30.
Q. The peak production period is --- what is the prime time for signature gatherers in Pennsylvania?
A. It's in the morning from 6:00 a.m. to about 9:00. Work from your breakfast location, work from your store, work from the gym and then it's 4:30 to about 9:30.
Q. How difficult is it to find a notary after 5:00?

Page 324

A. After 5:00 it's pretty darn hard. You're going to have to use one of the services that I mentioned, like a Jay Risner.
Q. Are there mobile services everywhere in Pennsylvania?
A. No.
Q. How many after hour notaries did you use in Pennsylvania?
A. Just that guy. We called multiple people. And we really started getting kind of worried. I was trying to find libertarian friendly people, all people that I could network with just to find someone who is willing to be at our beck and call. It was getting to be kind of --- I was worried that the guy was getting kind of mad with people showing up randomly. I would text my people, this is the guy, this is the number, this is where you go by 9:00. They would show up at 11:00. He got pretty furious at us. And rightfully so, but my guys they're not thinking like that guy is. They're just going and showing up to get this stuff notarized.
Q. So at some point in time Jay was --- you began to overwhelm him?
A. Yeah. We overwhelmed him. He was pretty flexible with us and he did end up --- I think he ended up staying on with us through the drive but I'd basically

Page 325

be pretty nice to the guy.
Q. You ultimately were able to get everything notarized; correct?
A. Yes.
Q. But at a cost of signatures?
A. Oh they cost. They cost us signatures and they cost financially.
Q. Let's talk about the notary. I'm going to refer you to Defendant's Exhibit 6. Can you read the affidavit circulator into the record, please?
A. I do swear or affirm that I am a qualified elector of the Commonwealth, duly registered and enrolled as a member of the political party designated in this nominated petition. That my residence is as set forth below; that the signers of the foregoing petition sign the same with the full knowledge of the contents thereof. That their respective residences are correctly stated therein. That each sign on the date set opposite his or her name. That to the best of my knowledge and belief the signers are qualified electors, duly registered and enrolled members of the political party and of the political district designated in the petition. And that they are residents of the county specified in number one below. Number one is Allegheny --- or county petition signers.

Page 326

1  Q. That affidavit --- your testimony is that when you
2  get a --- in Pennsylvania the witness, the in-state
3  witness has to execute the affidavit; correct?
4  A. Yes.
5  Q. And your prior testimony is that you advertised
6  and found witnesses in Pennsylvania; correct?
7  A. Yes.
8  Q. And you trained them on how to execute the
9  affidavit?
10 A. Yeah. We would read through the complete
11 petition, the different components of and then --- well
12 this one --- obviously not he nominating paper mailing
13 because there's five parts to it, A, B, C, D, E. This
14 would have basically make sure that the add-on was
15 reading that with us and go through it and say.
16 Q. So to the best of your knowledge, you trained each
17 witness as to what they were swearing to?
18 A. Yeah. We would have them read it and we would go
19 through it line by line and they would say, okay. And
20 then the understanding of why they are doing what their
21 job is.
22 Q. Based on your experience in Pennsylvania, were any
23 witnesses confused as so what it was they were
24 executing?
25 A. Yeah. I think most of them were. I think all

Page 327

1  witnesses were kind of like --- you know, the language
2  isn't --- for a person off the street, it's not very
3  colloquially or in laymen's terms. But ones we go
4  through it line by line and make sure that they're
5  understood, it becomes a little bit more --- it is an
6  opaque --- I would say that this it's a very opaque
7  statement. I'm a qualified elector of the
8  Commonwealth. In their eyes, I could be a qualified
9  elector. Who knows what --- they're not lawyers and
10 going and looking up what a qualified elector is.
11 Q. Did you ever have any situation where a
12 circulator, an out-of-state circulator executed the
13 affidavit?
14 A. I think Michael Jennings might have executed some,
15 and I talked to you about this last time. I'm not sure
16 but we had --- when we went through all these
17 processes, everyone knew except Michael and maybe two
18 other guys who had never done it before in
19 Pennsylvania, but they've been around enough. So
20 Michael, I think, was the only one who was confused
21 originally. I think he executed the first day at the
22 notary some signatures and I asked Michael, why are you
23 executing? I love Michael to death, but he's not the
24 sharpest tool in the shed. I said were paying John or
25 whoever it was as witness, is going around with you,

Page 328

1  why are you executing the document? The whole purpose
2  of him is to do that while you go and petition. And it
3  became clear. People are confused, I would be confused
4  if I had never done it before. He was from LA;
5  California doesn't have notarizations. It's a beast
6  unto its own.
7  Q. Was this the first time that Michael Jennings was
8  in a state where he couldn't execute the petition?
9  A. Yeah. This was his first time.
10 Q. So he wasn't clear what the role of the witness
11 was?
12 A. Yeah.
13 Q. And he wasn't clear that he couldn't execute the
14 affidavit at first?
15 A. Yeah. We talked to him and figured it out but it
16 was king of a --- on top of that some of the witnesses
17 were kind of questioning what their --- they didn't
18 understand. I would read it with them and explain it
19 to them and we're moving quick, but when they got to
20 actual notarization, they were like oh yeah, okay.
21 I've got to --- and they were slow moving. It doesn't
22 resonate with people until they actually get it done
23 and do it and then they're like okay, that makes sense.
24 Q. So you would have trouble the first time around
25 with people as they learned how to do it?

Page 329

1  A. Yeah. Exactly.
2  Q. Witnesses and circulators?
3  A. Yes, witnesses and circulators.
4  Q. When you discovered Michael was executing these
5  affidavits, you instructed him not to; correct?
6  A. Yeah. We instructed him not to. I can't remember
7  if we turned them in or not.
8  Q. Did you file and of these? Did you personally
9  file any of these petitions?
10 A. No. I didn't file Rocky. We did with Cruz, but
11 I'm pretty sure we didn't file them. I can't remember.
12 Q. Did you have any witnesses that improperly
13 executed the affidavit?
14 A. I very likely.
15 Q. But you don't know?
16 A. I have no clue. I just know when I was given the
17 pages after they had been executed, I would make sure
18 just to read --- to make sure to the best business
19 practices I can that the stamp on the notary commission
20 wasn't expired, things like that. I would say okay,
21 everything looks good and put it in our pile. But I
22 didn't go through it with a fine tooth comb and make
23 sure everything ---- you know if I say Michael James
24 name on it, that's when I was like oh, you know, this
25 is not happening. So we would --- we would at least

36 (Pages 326 to 329)

---

Page 330

1. solve the problem.
2. Q. Did you review these petitions on a daily basis as they came into you?
3. A. Yes, semi-daily.
4. Q. So you discovered Michael's error early on?
5. A. Yeah. Within the first few days.
6. Q. How did he react when he was told that he couldn't execute the affidavit.
7. A. I don't know if he even understood what was going on --- like I said the guy is awesome but he's not the smartest person. He started to understand more --- you know it's kind of a different beast, Pennsylvania versus California so I gave him the benefit of the doubt. But we just made sure everything --- he reacted kind of like, what, what's going on, why are we doing that? He understood eventually. It's pretty self-explanatory. It's not hard to ---.
8. Q. You testified yesterday that Freyermuth, was he a witness?
9. A. Freyermuth?
10. Q. Yeah. Freyermuth (corrects pronunciation). I'm sorry.
11. A. Yes.
12. Q. Freyermuth was one of your witnesses?
13. A. Yeah. He was a better witness than most, when he

Page 331

showed up.
Q. So he did not show up on certain days?
A. A lot, yeah. He was infrequently --- we met him through a --- he was in a like a sober living facility, so his boss was one of the other guys. And basically he would go on intermittent binges.
Q. I don't know what that --- what's a sober living facility?
A. He was basically having issues with his sobriety.
Q. Oh, okay. Was he in active treatment for alcoholism?
A. I believe so.
Q. But you don't know?
A. I didn't get too much into his personal life. We prayed together and I told him that I was thinking about him. I felt bad for the guy. He seems like a really good kid.
Q. So you deployed him into the field?
A. Yeah, we did. Definitely.
Q. And who was he teamed up with?
A. I think he was teamed up with pretty much everyone at some given time. Everyone wanted to use him because when he would show up, he was probably the easiest going person.
Q. Was he a Cruz witness or was he a Rocky witness?

Page 332

A. Rocky witness.
Q. So you would team him up with Rocky circulators?
A. Yeah.
Q. Did this occur in the Philadelphia area?
A. No, it was all in Pittsburgh.
Q. So when he didn't show up, what did your professional circulators do?
A. It pretty much happened every other couple days. We would have to, like I said earlier, we would put the two boats on one anchor if there was an event. Otherwise, they would sit in a hotel and watch the Price is Right.
Q. Now you testified that he, along with some other witnesses would actually pick up a clipboard or a foam board and do some circulation for you?
A. Justin would. He was probably the only one that actually would.
Q. Justin?
A. Yeah. They all would hold the board but none of them would collect it. Justin Freyermuth.
Q. Oh, Justin Freyermuth.
A. Yeah. He would collect signatures. I tried to encourage all of them, give a little hand and help the coordinator out. They were all going to get a commission based on every signature they got for their

Page 333

help or they'd get paid hourly. So they'd pick up a few extra signatures. I'd offer them an extra dollar a signature, that kind of thing.
So, none of them knew how much the circulators were getting, which is important because once you tell them that, they start trying to be like Kennett and making more money. But Justin was willing to help. Even if you got a certain amount of signatures each day, he wanted to be a Jake or he wanted to be a traveling professional circulator.
Q. I think your testimony was that Justin Freyermuth would get about 30 signatures a day?
A. He'd get sometimes 50.
Q. Depending on how he felt when he showed up?
A. When he showed up, yeah.
Q. And when the circulators were operating in environments where they didn't have to have a witness, would they get more than that 50 signatures per day?
A. Oh, yeah. I mean Jake was getting --- at downtown public library in Pittsburgh, he was doing 250 a day with Justin or Charles or whoever was witnessing. And when he was with one of these guys, he'd get 250 a day. Michael was getting 100 plus.
Q. And what was with a witness?
A. Yeah.

Page 334

1  Q. Without a witness, what did the circulators
2  generate?
3  ATTORNEY JOEL:
4  Object to form.
5  A. Jake would do --- do I need to answer that?
6  BY ATTORNEY ROSSI:
7  Q. Let me rephrase it. You just testified that he
8  would receive --- when he circulated with a witness,
9  250 was who?
10 A. Jake.
11 Q. Jake, we've got 250 with a witness?
12 A. Yeah.
13 Q. Hang on. Who would get 100 plus with a witness?
14 A. Michael Jennings.
15 Q. Michael Jenkins?
16 A. Michael Jennings is good for around 100 a day.
17 Q. With a witness?
18 A. Yeah.
19 Q. Without a witness, what does Jake generate?
20 ATTORNEY JOEL:
21 Object to form.
22 BY ATTORNEY ROSSI:
23 Q. Based on your direct observation ---.
24 ATTORNEY JOEL:
25 Same objection. How can he know what

Page 335

1  would Jake would have gotten in Pennsylvania without a
2  witness when Jake wasn't allowed without a witness?
3  ATTORNEY ROSSI:
4  In other states ---.
5  ATTORNEY JOEL:
6  Who cares what he got in another state.
7  BY ATTORNEY ROSSI:
8  Q. In other states when there is no witness in
9  another state, what was his daily production?
10 A. Like I said, he's gotten --- I've seen him get 500
11 in the Chicago subways in one day.
12 Q. And does Illinois require a witness?
13 A. No. And it has probably the same traffic as
14 downtown Pittsburgh library.
15 ATTORNEY JOEL:
16 Objection.
17 BY ATTORNEY ROSSI:
18 Q. Jennings, in Pennsylvania with a witness, he
19 generated 10 a day? Yes?
20 A. Around there. I'd probably say 75 is more
21 accurate for him.
22 Q. 75 to 100 a day?
23 A. Yeah.
24 Q. Outside of Pennsylvania without a witness, what
25 did he generate?

Page 336

1  A. He'll do 120 to 140 if he works all day.
2  Q. Are there any professional circulators, based on
3  your experience, that generate more signatures with a
4  witness than without a witness?
5  A. No.
6  Q. Are there any, based on your personal experience,
7  either in Pennsylvania or out of Pennsylvania where a
8  professional circulator with a witness who carried a
9  clipboard generated more signatures as a circulator
10 without a witness?
11 A. Never.
12 Q. Were you in Pittsburgh when David Tessator
13 notarized the petitions for the first deadline?
14 A. (Indicates no).
15 Q. You did not witness that?
16 A. No, we weren't.
17 Q. When you were in ---?
18 ATTORNEY JOEL:
19 Hold on. We can go off for a second.
20 OFF RECORD DISCUSSION
21 BY ATTORNEY ROSSI:
22 Q. Let me ask the question. The only notarizations
23 that you witnessed with respect to the
24 OpenPittsburgh.Org petition was when there were no
25 witness restrictions?

Page 337

1  A. That's correct.
2  Q. It was during your four-day period that you were
3  in the states, that's the only thing you witnessed?
4  A. Yeah.
5  Q. How did they do the notarizations? I mean, did
6  you have --- and I'm talking about for the
7  OpenPittsburgh.Org referendum petition when you were
8  there.
9  A. Uh-huh (yes).
10 Q. When you were there, there was no witness
11 requirement; correct?
12 A. When we were there, there was no witness
13 requirement.
14 Q. So did you still have the petitions notarized
15 every day?
16 A. No, unfortunately.
17 Q. Unfortunately. Did you recommend that they were
18 notarized every day?
19 A. Of course.
20 Q. And Dave Tessator rejected that?
21 A. Yeah.
22 Q. So the notarizations --- I think your prior
23 testimony is that they had --- they were notarized all
24 in one day, but they were stacked?
25 A. Well, let's put it this way. I'm sorry. Can I go

38 (Pages 334 to 337)

Page 354

1  Q. Fair enough. Very clever. So enough of that.
2  But ultimately, when you're told to leave a store
3  parking lot, if you don't, you risk, in your
4  experience, ---
5  A. Being there.
6  Q. --- them calling the police?
7  A. Definitely.
8  Q. And that's the limit of being --- of police power
9  being used against you with respect to stopping you
10 from circulating; correct?
11 A. Yeah, on private --- now, it's not isolated to
12 private property. A lot of people don't understand
13 public property or access rights. And this summer, for
14 instance, we had a guy call the cops on us at a street
15 festival. And what I found was --- you know, I talk to
16 the cops all the time, explain the situation. If I'm
17 there, I like to be able to intervene for petitioners.
18 I think Michael Jennings and Brian Miller and a couple
19 other guys were getting kicked out of a location that
20 was in the middle --- it was Picklesburgh Street
21 Festival. Anyway, I went and told the cop exactly what
22 we were doing, and he told the little guy that was
23 telling on us that basically we're practicing our First
24 Amendment rights, and he's going to be damned if he's
25 going to stop us. And that was pretty cool.

Page 355

1  Q. Good. Good. In your experience, what is the
2  validity rate of your circulators, your professional
3  circulators?
4  A. You know, always over 70 percent. High sometimes.
5  It depends on the state, too. But you know, like Andy
6  or Jake, they're usually in the 80s plus.
7  Q. When you say Andy and Jake, Andy who?
8  A. Andy Jacobs, Jake Witmer. Milton Lucan is high.
9  I'm high. Bob Lynch. All these guys that we had for
10 Rocky De La Fuente, you know, because that was the
11 third state we had done and we were just doing Rocky as
12 a Democrat then. Those are all the core group of ---
13 you know, those had been putting the Libertarian Party
14 on the ballot for 30 years in every state in the
15 country, so you know, those guys have been --- they're
16 awesome.
17 Q. Early on in your testimony you clearly gravitated
18 to Libertarian candidates.
19 A. Uh-huh (yes).
20 Q. Let me ask you, now you've branched out. You do
21 more than Libertarian candidates now.
22 A. Of course, yeah.
23 Q. If you had to choose between a Libertarian and a
24 Green Party candidate, who would you check?
25 A. The Libertarian.

Page 356

1  Q. And what if the Libertarian --- what if the Green
2  Party candidate was going to pay you more money and you
3  could only do one?
4  A. Well, you know, money is not the only thing in the
5  world. I believe in Libertarianism. I made that clear
6  in my testimony. I probably wouldn't be doing this if
7  I wasn't a Libertarian. I believe strongly in the
8  message and liberty, so yeah, I would work for them
9  over the Green, even if it was more money.
10 Q. But if you can do them all, you would do them all?
11 A. How much more money? I'm just kidding.
12 Q. If you could do them all, you will do them?
13 A. Definitely.
14 Q. But you have limited resources sometimes; correct?
15 A. Everyone does, yeah.
16 Q. And if the Libertarians ask you to circulate and
17 you could only --- you only had enough to do one
18 petition drive and you had to choose between a
19 Libertarian candidate and others, you would choose the
20 Libertarians?
21 A. Of course.
22 Q. And there are some candidates you won't circulate
23 for; correct?
24 A. Yeah.
25 Q. Under any circumstances?

Page 357

1  A. Yeah. I wouldn't circulate for Hillary. My guys
2  circulate for Trump. I don't really care for him, you
3  know. Hitler, Stalin, those types.
4  Q. I mean, seriously.
5  A. I wouldn't circulate for Bernie Sanders. I
6  wouldn't circulate for Hillary. I wouldn't circulate
7  for a lot of candidates probably.
8  Q. So ---.
9  A. I'm very selective. I don't just go with
10 everyone.
11 Q. Who you're willing to circulate for is cabined by
12 your political beliefs?
13 A. Yeah, it definitely has a lot to do with it.
14 Q. But as part of your exercise, you're willing to
15 make a profit?
16 A. Sure.
17 Q. Based on your circulation efforts this year, ---
18 A. Yep.
19 Q. --- did you make more or less money in
20 Pennsylvania relative to other states?
21 A. In Pennsylvania, did I make more or less money
22 relative to the other states? Well, I had three ---
23 four contracts in Pennsylvania. So assuming the
24 Libertarian Party doesn't stiff me and I did get paid
25 --- I mean, I probably made a little bit more here.

Page 358

1  But I mean it's really relative to what you're talking
2  about. Here, in general, did I make --- did I have
3  more contracts in Pennsylvania than anywhere else, yes,
4  I did.
5  Q. On a daily basis --- strike that.
6  Did the requirement --- did the in-state witness
7  requirement reduce your profits in Pennsylvania?
8  A. Oh, okay. We're talking about the witness ---
9  we're talking about the Democratic ---?
10 Q. Yes.
11 A. Okay. Sorry. So I need to clarify that. If
12 we're talking about the Democratic primary, did that
13 reduce my profits, well, on a daily basis, yes, because
14 the job was spread out over a lot more days. So I was
15 only able to get a certain amount of signatures each
16 day, you know. If we eliminated that, I would have
17 gotten the job done and been able to focus completely
18 on Cruz and probably knocked out more districts.
19 Q. And when you say eliminated that, eliminated what?
20 A. What? If we eliminate the in-state circulator
21 requirement, then, you know, I get Rocky done in three
22 days and I can move on to the other ones, start helping
23 Trump in all the districts. I could have probably
24 gotten ten times as much money and work done.
25 Q. So the number of signatures you get today in a

Page 359

1  day, without doing the state --- without --- excuse me.
2  I'm getting tongue-tied. I apologize. Strike that.
3  So the number of signatures you could get per day
4  would be closer to what you did for OpenPittsburgh.Org?
5  A. Sure. At least half of that per day. I mean, I
6  used to do half of that per day with our manpower. And
7  you know, Rocky might have needed about 4,000 to 5,000
8  signatures. I could have gotten that done in two or
9  three days with the guys I have in the state.
10 Q. Let me ask you something. Why not --- how long
11 does it take to train somebody to become proficient at
12 being at circulator?
13 A. I mean, I was training people in a day here in
14 Pittsburgh, but --- or in Pennsylvania, the cycle, over
15 the summer. However, to be --- the definition of
16 proficient is pretty variable. I mean, if you wanted
17 to be a circulator, I could train you in a day. If you
18 want to be a good circulator, you know, it can take
19 years, really. I mean, some of these guys, they learn
20 new tricks every other day.
21 Q. So it's a trial and error kind of training?
22 A. Yeah. You know, anyone can do it and start off
23 and make some money, but not everyone's going to make,
24 you know, enough money to live off of.
25 Q. So to become a Jake Witmer takes several years?

Page 360

1  A. Yeah. And I think Jake --- you know, Jake and
2  Andy and those guys --- like Jake's really good, you
3  know. And if he could work every day at his full
4  capacity, he'd probably be making a few hundred
5  thousand dollars a year. Petitioning's not --- it's a
6  seasonal job, too, and not everyone wants to do it, you
7  know, full time. I trained a couple all right guys
8  that seem to be semi-decent in Pennsylvania from the
9  Craigslist. It's just not something that --- it's not
10 very common.
11 ATTORNEY ROSSI:
12 I'm done.
13 ATTORNEY JOEL:
14 I've got more.
15 ATTORNEY ROSSI:
16 I know you do.
17 ATTORNEY JOEL:
18 Do you need a break?
19   A. You all want to go through?
20 ATTORNEY ROSSI:
21 I'm okay to go if you guys want to go.
22   A. Yeah, that's fine, because ---.
23 RE-EXAMINATION
24 BY ATTORNEY JOEL:
25 Q. I want to make sure I understand a few things.

Page 361

1  With the Cruz campaign in Pennsylvania, did Cruz only
2  contract with you to collect signatures for delegates?
3  A. No, he contracted for both.
4  Q. Because I thought you said yesterday that you
5  collected signatures for him as a candidate and also
6  for his delegates; is that correct?
7  A. Yes.
8  Q. Am I correct that you were not the only business
9  or collection outfit in the Commonwealth collecting for
10 Cruz?
11 A. I don't know the answer to that question. I
12 believe I was, but I'm not a hundred percent.
13 Q. So do you think you were the only ones who
14 collected for Cruz to get him on the ballot?
15 A. I think we were, yeah. Yeah, Dave probably would
16 have mentioned something. I don't know, though. I
17 couldn't answer that question. I'll find out.
18 Q. Did you get Cruz enough signatures to get him on
19 the ballot?
20 A. We supplemented them, supplemented.
21 Q. What does that mean?
22 A. Well, we were only in charge of a few
23 congressional districts, so they had volunteers getting
24 a lot of stuff, too.
25 Q. So maybe my question was a bad one then. So for