# EXHIBIT B

50

1   Q.   Okay.  What individuals or party were you

2   collecting for in Illinois?

3   A.   Only the Libertarian party, ballot access.  And

4   I'm sorry, there were a couple of initiatives that I

5   gathered for in 2014.  And ---

6   Q.   Okay.

7   A.   --- you didn't ask me about them, but you did ask

8   me to say --- you wanted to know where I gathered

9   signatures ---

10  Q.   Yeah.

11  A.   --- and what for, so ---.

12  Q.   So where were those in 2014?

13  A.   And it was also ---.  I think 2012 there was one

14  initiative in Illinois.  It was term limits, and it was

15  a redistricting amendment in Illinois.

16  Q.   That's for 2012?

17  A.   In 2012 there was ---.  I think that there was an

18  initiative that failed to make the ballot, so I deleted

19  it from my memory.  I'm sorry.  I've been trying to

20  learn programming over the last couple of months and

21  trying to delete all the programming knowledge and ---.

22  I mean, I know it sounds absurd for me to say that my

23  brain is full, but I mean I actually am trying to just

24  kind of put the petitioning behind me and be done with

25  it.

51

1    Q.    Are you looking to get out of that work?

2    A.    Yes.

3    Q.    Okay.   Why?

4    A.    Absurd restrictions on my right to free speech,

5    country definitely going down the tubes because of

6    interference with free speech, police harassment

7    continuously, things of that nature.

8    Q.    2014, you just talked briefly about some

9    initiative that you did in Illinois.

10   A.    Map amendments and it's a redistricting initiative

11   and the term limits.

12   Q.    Okay.

13   A.    And all these things I kind of start and stop at

14   various different times.   Some of them I work on for

15   just a very short period of time and others I work

16   longer.   Some I hire petitioners, some I don't.

17   Q.    So around the 2016 election cycle, you told me

18   what you did in Indiana, in Illinois, in North Dakota.

19   We'll come back to Pennsylvania.   What did you do in

20   Connecticut?   Who did you collect for in Connecticut?

21   A.    It was Rocky De La Fuente as a Democrat for the

22   Democratic Primary.

23   Q.    How long were you in Connecticut then?

24   A.    And there were others as well, because there's no

25   exclusive requirement there either.

52

1    Q.   Who else?

2    A.   That's a good question.  Who was it?

3    Libertarians, I believe.  I might be wrong about that.

4    Q.   How long were you in Connecticut for,

5    collectively?

6    A.   Not long, a couple weeks.

7    Q.   Did you collect in Connecticut in different

8    locations?

9    A.   Yes.

10   Q.   And did you stay in different hotels in different

11   locations?

12   A.   Yes.

13   Q.   New Mexico, what were you collecting there for?

14   A.   Rocky De La Fuente and the short-lived Better for

15   America Party.  That was just David French.

16   Q.   Were you ---?

17   A.   Presumably David French, although it was never, I

18   believe, officially declared.

19   Q.   For the Rocky De La Fuente in New Mexico, was that

20   him as a Democrat or as an Independent?

21   A.   An Independent.

22   Q.   How long were you in New Mexico for, collectively?

23   A.   It was a very short period of time.  It could have

24   been five or six days, but I was only working for four

25   days.

64

1  Q.   And do you know what you were collecting for?

2  A.   Jeez, some initiative in Oregon.

3  Q.   Okay.  So in this 2016 campaign, when you worked

4  in Pennsylvania, did you have somebody --- a

5  Pennsylvania resident go with you and witness your

6  signature collections?

7  A.   Yes.

8  Q.   And whether it was for the Ted Cruz delegates or

9  for Rocky De La Fuente, you did obtain signatures for

10  both; correct?

11  A.   That's correct, at different times, due to the

12  nature of the witness requirement.

13  Q.   So let me break that up, because that was not a

14  very good question.  You did get signatures for Rocky

15  De La Fuente?

16  A.   Correct, as a Democrat for the primary.

17  Q.   As a Democrat for the primary you did obtain

18  signatures.  And you obtained signatures even though

19  you had a witness with you; correct?

20  A.   Correct.

21  Q.   And those signatures were notarized, I'm assuming;

22  correct?

23  A.   Correct.

24  Q.   And those signatures, at least to the best of your

25  knowledge, were not people double dipping and signing

65

1   multiple petitions; correct?

2   A.   Each one had to be qualified by me prior to

3   signing, that's correct.

4   Q.   And by part of that you had to make sure that they

5   hadn't signed somebody else's already?

6   A.   Yes.

7   Q.   Do you know how many signatures you got for Rocky?

8   A.   I don't.  It wasn't a large ---.  It wasn't an

9   exceptionally large number.  Maybe 500 or 600, if I

10  recall, but I don't recall exactly.

11  Q.   Okay.

12  A.   I do recall where I worked.  I tend to remember

13  what I consider to be more the salient facts of the

14  work, rather than, you know, specific start and stop

15  dates and things of that nature.

16  Q.   Okay.

17  A.   The nature of the work, as it were.

18  Q.   All right.  But not the number that you got, the

19  number of signatures?

20  A.   No, not exactly.  I don't run around with that

21  committed to memory.  Andy Jacobs does incidentally.

22  He's excellent with minutiae.

23  Q.   We'll ask him on Friday then.

24  A.   Sounds good.

25  Q.   What about Mr. Cruz?  Did you get signatures from

66

1   Mr. Cruz?

2   A.   Yes, in two different districts.

3   Q.   Do you remember how many you got?

4   A.   A small number in District 14.  I largely was

5   prevented from finishing my work in District 14 due to

6   the witness requirement there.  So that was kind of a

7   hassle.

8   Q.   Okay.  Did you get signatures for Mr. Cruz in

9   District 14?

10   A.   Yes.

11   Q.   Okay.  Did you have a witness with you?

12   A.   Yes.

13   Q.   Were they notarized?

14   A.   Yes.

15   Q.   And did you qualify people to make sure they

16   hadn't signed more than --- another petition already?

17   A.   Yes.

18   Q.   And what other district did you work in for Mr.

19   Cruz?

20   A.   State College.  I believe that's District 5

21   although don't quote me on that, because I'm not

22   totally certain.

23   Q.   Okay.  Did you get signatures from Mr. Cruz in the

24   State College area, in State College?

25   A.   That's correct.

72

1    to me.

2                        ATTORNEY ROSSI:

3                        Can you clarify the question, please, for

4    him?

5                        ATTORNEY RADZIEWICZ:

6                        Maybe explain what the plaintiff is?

7                        ATTORNEY JOEL:

8                        We'll take a break.

9                        ATTORNEY ROSSI:

10                       Yeah.

11                       ATTORNEY JOEL:

12                       Let's go get the Complaint.

13                       ATTORNEY RADZIEWICZ:

14                       Okay.

15   SHORT BREAK TAKEN

16   BY ATTORNEY JOEL:

17   Q.   With your work with Benezet, do you have a

18   contract with them or is it just Trent picks up the

19   phone or e-mails you and says, go here or go there?

20   A.   That would technically be an oral contract, would

21   it not?

22   Q.   Maybe, maybe not.  Do you have a written contract

23   with Benezet to perform work?

24   A.   No.

25   Q.   Okay.  Have you ever had a written contract with

73

1    Benezet to perform work?

2    A.   Not that I can recall.

3    Q.   Okay.

4    A.   He may have shown me one once briefly and I just

5    forgot about it.  So I mean if he produces that then I

6    wouldn't be surprised, but ---.

7    Q.   For this past work that you did in Pennsylvania,

8    how much did you pay per signature?

9    A.   It's difficult to calculate exactly.  I believe it

10   was $3 and then it was a $1.50 override if I could

11   induce the witness to gather their own signatures on

12   his own.

13   Q.   What does that mean?

14   A.   If the witness was willing to gather any

15   signatures, then I was to be paid an additional amount

16   for any signatures that the witness gathered.

17   Q.   Oh, okay.

18   A.   So I would have to train him and get him to

19   produce and explain to him how to stop people and how

20   to not interfere with my signature gathering.  And so

21   that's ---.  It was just kind of prorated out to help

22   defer the cost of having a witness with me.

23   Q.   Okay.  So you mentioned training.  Did you get any

24   training to be able to be a professional signature

25   gatherer?

74

1   A.   In 2002, yes.

2   Q.   What did you get?

3   A.   I was taken to a location in Lansing, Michigan for

4   one day of petitioning on a college campus and taught

5   how to get people to stop and sign the petition, how to

6   get the maximum number of people to stop and sign a

7   petition, how to be very polite, exceptionally polite,

8   smile, make eye contact, that sort of thing.

9   Q.   Okay.  Who provided the training?

10  A.   Scott Coolhouse (phonetic).

11  Q.   Is he a professional signature gatherer as well or

12  what's his business?

13  A.   Yes.

14  Q.   Okay.

15  A.   He may call himself a campaign consultant

16  variously.  I don't want to label what he's done with

17  himself since that time.  I don't really know.

18  Q.   When you turn the signatures at --- strike that.

19       Let me again ask it this way.  When is it that you

20  get paid?  Is it when the signatures are turned in?  Is

21  it after some sort of an objection or challenge period

22  is run?  When do you get paid?

23  A.   It entirely depends on the campaign.

24  Q.   Okay.  How about this last go-around of

25  Pennsylvania?

75

1   A.   I was paid within one month of completing.  It was

2   after signatures have been turned in.  And I don't know

3   whether the campaigns had accessed the ballot at that

4   point or not.

5   Q.   Okay.  So then within about a month of you turning

6   them in you were paid?  Did I hear that correctly?

7   A.   Yes.  I had a payment dispute with Trent, though,

8   so ---.

9   Q.   What was that over?

10  A.   I believe that I was not completely paid for one

11  of the districts.

12  Q.   Why do you think you were not completely paid?

13  A.   He claimed that he did not owe me money, my

14  calculations were something different.

15  Q.   Okay.  Was that based on a per-signature ---?

16  A.   For District 14, for Ted Cruz.

17  Q.   Okay.

18  A.   Where Ted Cruz failed to access the ballot.

19  Where his delegates failed to access the ballot.

20  Q.   Did you end up getting paid for that?

21  A.   I was either paid for that or I was paid for what

22  I did in Atlanta.  And then I quit working for Trent

23  over that dispute.

24  Q.   So you're no longer doing collection services for

25  Benezet or for Trent?

76

1   A.   Correct.

2   Q.   How much money was at stake?

3   A.   $934.  And that district was the district where

4   for the first day there was no witness ready to go and

5   I had to --- you know, I want to be able to get into

6   that district and start working right away.  I need to

7   make money on this job.  So that was District 14 for

8   Ted Cruz.

9   Q.   Okay.

10  A.   Or Ted Cruz's delegates, as it were.  Because

11  technically the candidate doesn't get put on the

12  ballot, the delegates do, so ---.

13            ATTORNEY JOEL:

14            Okay.  Why don't you mark that?

15  OFF RECORD DISCUSSION

16            (Defendant's Exhibit 3 marked for

17            identification.)

18            ATTORNEY JOEL:

19            I'm showing you what's been marked as

20  Defendant's 3.  There may be an amended complaint after

21  that, but ---.

22            ATTORNEY ROSSI:

23            There is.

24            ATTORNEY JOEL:

25            Okay.  For purposes of this question, ---

77

1               ATTORNEY ROSSI:

2               Absolutely.

3               ATTORNEY JOEL:

4               --- I think this will be fine.

5      BY ATTORNEY JOEL:

6      Q.   Turn.  Keep turning.  Keep turning.  Keep turning.

7      I mean, you can read where you want, but I've just got

8      a question.

9      A.   Uh-huh (yes).

10     Q.   Keep going.  Oh, that might be it.  All right.

11     Paragraph 16.  Nope.  There you go.  Paragraph 16, at

12     the bottom of that page, it mentions you being a

13     professional circulator for the plaintiff in that case.

14     Does that help you at all in terms of know anything

15     about that OpenPittsburgh case and your constitutional

16     challenges in it?

17     A.   I'd have to read it fully.

18     Q.   Sure.

19     WITNESS REVIEWS DOCUMENT

20     A.   Yeah.  Okay.  I knew of the initiative ---

21     BY ATTORNEY JOEL:

22     Q.   Okay.

23     A.   --- to an extent.  I didn't wind up working on it.

24     Q.   I understand that, too.  My question was, though,

25     do you know that you're a plaintiff in this lawsuit

93

1   at a time?

2   A.   Yeah.  I've never heard the term double

3   dipping ---

4   Q.   Well, that's fair.

5   A.   --- with regard to the ---.  Typically a

6   petitioner would say like piggybacking or stacking

7   petitions, like can that be done in a certain state, if

8   they're ascribing a job to another petitioner.  And

9   that would be the nature of that.

10  Q.   Okay.  But as Mr. Joel used it, it was pretty

11  clear he was discussing signing more than one nominee

12  petition per paper?

13  A.   Correct.

14  Q.   Is that your understanding of his question?  And

15  your answer to it?

16  A.   Yeah, I think so.

17  Q.   But exclusionary rules, your definition is simply

18  a much broader --- that double dipping would be one

19  component of exclusionary ---?

20  A.   A prohibition on double dipping as he calls it?

21  Q.   Yeah.  Would be equivalent to other ballot acts,

22  restrictions?

23  A.   Yes.

24  Q.   So an exclusionary rule, in your vernacular, is

25  the universe about access restrictions?

94

1    A.   Yes.

2    Q.   And in your view some states are better at

3    allowing ballot access than others?

4    A.   Yeah.  Not just in my opinion.  But I mean that's

5    like a pretty demonstrable fact.  I mean, that's widely

6    known and understood in the petition industry.  Every

7    single petitioner understands that, every single

8    proponent understands that.  Everybody knows that

9    that's the case.

10   Q.   Okay.

11   A.   And, in fact, if you're talking with certain

12   proponents or certain petitioners and you're talking

13   with a proponent about, do they want to get on the

14   ballot in a certain state, they may say no or they may

15   say yes based on the difficulty and the number of

16   restrictions.  You know, because every instruction

17   increases the cost of a petition to all involved.

18   Q.   Okay.  And restrictions limits your ability, in

19   your experience, to access and to --- strike that.

20        These various ballet access restrictions, in your

21   estimation and in your experience, limits your ability

22   to interact with voters?

23   A.   Yes.

24   Q.   Okay.  Let me ---.

25   A.   And frequently and in many different ways.  All

95

1   right?  Because they could totally limit my ability to

2   interact with a single voter by keeping me out of the

3   state.  And that I could be kept out of the state

4   because the requirement is so onerous that I can't make

5   good money complying with it or it could prevent the

6   entire attempt about access from even happening.  And

7   so someone would say, well, we think we're going to

8   have work for you, you know, at such and such a time

9   and then it turns out that we don't because of these

10   restrictions.

11   Q.   In those states ---?  Are there states that

12   allow ---?  Just to get it on the record, have you

13   circulated petitions in states which allow more than

14   one petitioner paper to be signed at a time?

15   A.   Yes, that's the case with most states ---

16   Q.   Okay.  And it's your testimony today ---?

17   A.   --- that I work in.

18   Q    It's your testimony today that many voters like to

19   sign more than one paper?

20   A.   Yes.

21   Q.   Okay.  Have they ever explained to you why they

22   want to?

23   A.   All the time, yes.

24   Q.   And give us some of those explanations that you've

25   been privy to.

96

1   A.   Okay.   I thought they were already on the ballot.

2   No, sir, we have to go out and gather petition

3   signatures if you want candidates on the ballot.   Or

4   no, ma'am, we have to go out and gather thousands and

5   thousands of petition signatures if you want a choice

6   on the ballot.   And then a lot of them will express

7   incredulity that that's the case and they think I'm

8   trying to scam them or something.   And so I'd have to

9   explain to them that no, in fact, if you want any

10   Republicans or any Democrats on the ballot, you have to

11   --- for those candidates somebody in your district,

12   some number of signature signers in your district in

13   the past have, in fact, signed petitions to place these

14   candidates on the ballot.

15       And then a lot of the times they'll say, well,

16   okay.   Or let me take a look at it as long as I don't

17   have to give any personal information.   At which point

18   in time if they do have to give personal information,

19   then I have to explain to them, you know, well, it just

20   goes to, you know, either the Secretary of State's

21   Office or to whoever the election authority is in that

22   state.   And then, in fact, it is required for them to

23   access the ballot.

24       And there are other ---.   There are many other

25   exclamations.   It's not just that objection or

97

1  that ---.  What do the voters think?  The voters think

2  all different kinds of things.  And they might say,

3  well, you know, can I sign for such and such a

4  candidate?  Usually the candidate of their preference.

5  And if that candidate is in the stack of petitions that

6  I have, then I say, yes, and by the way ---.

7       I would say --- very, like almost every petition

8  signer in North Dakota, Gary Johnson was popular and I

9  was explaining to them that he was already on the

10  ballot.  You know, we put him on previously in the

11  election cycle or the Libertarians had ballot access

12  because of our previous work in the election cycle.

13  I had to make it clear to them that I wasn't just a

14  partisan Libertarian or that I wasn't just a partisan,

15  a Constitution promoter, that I wasn't just a partisan

16  Green Party supporter.

17       And I would say that one-third of the people

18  primarily were stopping because they wanted Jill Stein

19  on the ballot and they were previous Bernie supporters.

20  And when I said can you sign for these other

21  candidates?  They would say, of course, of course,

22  would be the typical response.  So that leads me to

23  believe that they want multiple choices on the ballot

24  and only rarely would they expressly state that, but I

25  got many of courses throughout the day.

98

1   Q.   And now ---.

2   A.   And other variations of that.   Sorry.   I didn't

3   mean to ---.

4   Q.   No.   You were testifying, I was talking over you.

5   I apologize.   Now, during this deposition Mr. Joel

6   asked you in all these various states that you

7   petitioned in, whether or not you circulated different

8   locations.   Now in Pennsylvania you testified that you

9   circulated different locations previously, I believe?

10  A.   Yes.

11  Q.   And when you --- when you moved from one location

12  to another, does the in-state witness usually follow

13  you around to different parts of the state?

14  A.   They have to.   Oh, no, no.   I'm sorry.   There

15  would be a different witness in each congressional

16  district and a different witness for each candidate, of

17  course.   Because a Democrat can't witness for Ted Cruz

18  and vice versa.

19  Q.   Yeah.   Okay.

20  A.   So I had two witnesses at least in District 14 and

21  I had a witness in District 5 and I didn't do Rocky in

22  District 5.

23  Q.   Okay.   Does it take additional ---?   Are you done?

24  A.   Yeah.   Yeah.

25  Q.   Okay.

99

1   A.    I did actually do Rocky in District 5, now that I

2   recall.   So I had two witnesses in both.

3   Q.    Okay.   When you switch witnesses, does that impede

4   your ability to get up and running in the new district?

5   A.    Yes.

6   Q.    Why?

7   A.    Every time that a witness is called to a petition

8   location, that impedes the gathering of signatures.

9   Like each and every day they're late a lot of times.

10  They say that they can't work that day, got to find a

11  different witness, whatever is, so ---.   And if they

12  have to follow you to a different district because you

13  don't have like a Democrat in one district and you've

14  got the Democrat to go with you or you've got to get

15  the Republican to go with you, then that also will of

16  course be a huge obstacle.   And of course a separate

17  hotel room in some cases would have to be provided for,

18  for that.   So that increases the cost of the campaign.

19  Q.    Now in your experience are witnesses paid per

20  signature or how --- are?   Strike that.

21       In your experience how are witnesses paid in

22  Pennsylvania?

23  A.    Almost everywhere witnesses are paid hourly.

24  Q.    Okay.

25  A.    Because they won't go out and produce.

100

1   Q.   Okay.

2   A.   If they are producing per signature, it's

3   commonplace to pay them some additional small amount on

4   top of what they're paid hourly.  So that it in theory

5   works out to what the, you know, circulator is being

6   paid.

7   Q.   Okay.

8   A.   Although that's never the case, ---

9   Q.   Okay.

10  A.   --- generally speaking.

11  Q.   Have you ever had a witness that ---?

12  A.   Match my hourly rate?

13  Q.   Yes.

14  A.   No.

15  Q.   Has there ever been a situation where you wanted

16  to move, like ---?  Has there ever been a situation in

17  Pennsylvania where you wanted to move around and the

18  witness would not want to --- wanted to stay stationary

19  or ---?

20  A.   Yes.  However, that wasn't a significant

21  obstacle, because they were told, then, to listen to me

22  and to go where I wanted to go, in Pennsylvania.  But

23  in Connecticut it was a big obstacle.

24  Q.   Okay.  How so?

25  A.   There was a guy who was handicapped and couldn't

101

1  move around very well, so he just only wanted to stay

2  seated in one place.

3  Q.  Okay.

4  A.  And, you know, also generally objecting to --- you

5  know, he was also trying to get me to allow him to stay

6  at home and just lie.  You know, like trying to

7  pressure me there.  So I said, no, no, you have to come

8  out and sit in Walmart or wherever it was that I had

9  permission at that date.

10  Q.  Okay.

11  A.  And in Pennsylvania there is one additional

12  similar case where there was a problem where I was

13  petitioning and the witness got me kicked out of the

14  location.  So just him being there ---

15  Q.  How so?

16  A.  --- attracted security onto himself and myself,

17  insisting that we leave.  And they didn't leave, I'm

18  certain, because of me, because they approached him,

19  told him to stop loitering.  And just for the record he

20  may have been racially profiled, African American.  And

21  so he was told that he can't be loitering in front of

22  the store.  And they said, and tell your buddy, you

23  know, to leave, too, you know.

24  Q.  Okay.  So this was a store or private property

25  kind of situation where ---?

102

1   A.   And I saw them looking over at me, then, ---

2   Q.   Okay.

3   A.   --- when they came to talk to him.  And so I

4   presume that they would not have even known that I was

5   around there if he had not been asked to leave.  And so

6   then we had to get a new location, which that is

7   actually a very commonplace occurrence, where a witness

8   will unwittingly cause a petitioner to --- he has to

9   leave a location because they're standing around and

10  there are no loitering signs around.  And so they don't

11  want some guy standing there all day, you know, ---

12  Q.   Okay.

13  A.   --- in the same place anyway.  They tend to not

14  move around very much.  Like they tend to not be doing

15  what I'm doing, which is going around asking people to

16  sign, which looks like a more natural action,

17  apparently, to people who may be sitting in front of a

18  security camera or security monitor.

19  Q.   Now, in Pennsylvania the witness --- it's your

20  understanding that the witness has to execute the

21  affidavit to circulate; correct?

22  A.   Correct.

23  Q.   Now, there are hundreds of thousands of notary

24  publics in Pennsylvania, you're aware of that?

25  A.   I was not aware of that, because I only know of

103

1  one of them who would agree to meet late at night.

2  Q.   Okay.  So late at night, why would you meet with a

3  notary late at night?

4  A.   That's when I'm done petitioning for the day.

5  Q.   Okay.

6  A.   There were some people who interrupted their

7  petitioning day to go drive to a bank, get petition

8  signatures notarized and then drive back to a location.

9  Which if you consider it may be that the bank is even

10  30 or 40 minutes away and you've got to be there by

11  5:00 p.m. by the time the bank closes, that's ---.

12  Q.   Okay.

13  A.   And interruption of my day that I did not care to

14  do myself.  I did not want to reduce by one or two

15  hours the amount of signatures that I was gathering in

16  the middle of the day.

17  Q.   So stopping to get papers notarized limits your

18  ability to get signatures?  You know, it takes ---

19  A.   Yes.

20  Q.   --- time away from your signature gathering?

21  A.   Yes.  In the middle of the day.  And there are

22  peak hours and nonpeak hours during the day.

23  Q.   What are those peak hours in general, in your

24  experience?

25  A.   Morning rush hour, evening rush hour.

104

1   Q.   Okay.

2   A.   And lunchtime.

3   Q.   So if you leave to get papers notarized around

4   four o'clock, you may miss a rush hour traffic?

5   A.   Yeah.  Or even a portion of it ---

6   Q.   Okay.

7   A.   --- would be detrimental to my day, because I may

8   get 60 signatures an hour during rush hour, whereas

9   I'll get three --- or, I'm sorry, 30 signatures, you

10  know, about half of that in a non-rush hour.  Or even

11  like ten per hour in like between 2:00 and 3:00, you

12  know.  So whether it's widely like that ---.

13  Q.   You mentioned this one notary.  So you had only

14  like one notary that you could rely on whereby you

15  could wait until 11 o'clock at night to get petitions

16  notarized.  Is that what your testimony is?

17              ATTORNEY JOEL:

18              Objection.

19  A.   One per each.

20              ATTORNEY ROSSI:

21              Yeah.

22  A.   I'm sorry.

23              ATTORNEY ROSSI:

24              No, no.  He's allowed to object.  It's

25  okay.  It was an appropriate objection.  It was a long,