# EXHIBIT C

15

1  A.  The first place that I went to work, it was like a
2  town North of Chicago.  I believe it's called Dearborn,
3  if I'm not mistaken.  It was like in the Dearborn
4  Waukegan area.  That was like around the time when I
5  first, first started.  And then, I tried to work in
6  Gurnee.  That's like further North of Chicago, but not
7  up towards, of course, of the Wisconsin border.  But
8  North of Chicago.
9      Keep in mind, I was going to different locations
10 throughout the day.
11 Q.  What were you doing --- what was the first ---
12 strike that.  Let's ask it this way.
13     The first --- strike it. Let's ask it this way.
14     All of the work you did for Trent Pool, do you
15 understand that it was for his company, Benezet?
16 A.  Yes.
17 Q.  All right.  So all the work that you did for
18 Benezet, was it all collecting signatures?
19 A.  Yes.
20 Q.  Now, this first place you went in Dearborn, what
21 were you collecting for?  Was it a candidate?  Was it a
22 party?  Was it an initiative?  What was it?
23 A.  They were all for candidates representing their
24 own party.  I know one was, I believe --- I'm going to
25 have to look it up on my cell phone because it's been

1   recall because I worked for Connecticut also.  They
2   required witnesses also in Connecticut.  I believe I
3   worked on the Alex Arsenault when I was in Connecticut
4   which I just forgot to tell you.  But somehow, I missed
5   that one.  And I believe that was when I first left
6   Pittsburgh.  Yeah.
7         When I first left Pittsburgh in the wintertime, I
8   went to Connecticut before going back to Los Angeles.
9   That was before going back to Los Angeles.
10  Q.   Who did you collect for ---?  And was that working
11  for Alex Arsenault?
12  A.   I was working for Alex Arsenault also.
13  Q.   And who did you collect signatures for when you
14  were in Connecticut?
15  A.   When I was in Connecticut, I believe it was for
16  Rocky De La Fuente and I believe it was for only Rocky
17  De La Fuente.  And that's just the best that I can
18  recall.
19  Q.   Do you remember how many signatures you collected
20  in Connecticut for Rocky?
21  A.   I want to say 900, but I'm not sure.
22  Q.   How long were you in Connecticut for?
23  A.   I believe I was in Connecticut for like three and
24  a half weeks or so.
25  Q.   Did you move about and go to different locations

54

1   within Connecticut?
2   A.   For the most part, I had only worked in the New
3   Haven area.  I don't recall actually working in
4   Hartford.  I know that I had to go there sometimes but
5   I believe I had only worked in New Haven.
6   Q.   Did you stay in different hotels in the New Haven
7   area?
8   A.   Yes.
9   Q.   So if I understand correctly, you went from
10  Pennsylvania directly to Connecticut and then from
11  Connecticut, directly back out to Los Angeles?
12  A.   Yes.
13  Q.   Thank you.  And it's getting back --- so the
14  notary --- you were able to get the affidavit's
15  notarized, is that correct, when you were in
16  Pennsylvania?
17  A.   Yes.
18  Q.   I think that's all I have.  Mr. Rossi may have
19  some questions for you and that may spark a few more
20  questions from me.  But at this point, I'm finished.
21  Thank you.  I appreciate you calling in.
22  A.   All right.  Thank you.
23  CROSS EXAMINATION
24  BY ATTORNEY ROSSI:
25  Q.   Hey, Mike, this is Paul.  How are you doing?

55

1  A.   Hi.  I'm doing okay.
2  Q.   I guess I should get to say good evening instead
3  of good afternoon.
4  A.   It already is kind of late here, but it's okay.
5  Q.   Okay.  You noted that in several states, when you
6  were working in parking lots, that police would harass
7  you or people would threaten to call the police on you;
8  is that correct?
9  A.   Yes.  They gave me a very hard time.  And in
10 Chicago, there was one cop in particular who just
11 really tried to get under my skin.  But yes, I had a
12 hard time in the parking lots for sure.  That was
13 pretty much in almost every state, though.
14 Q.   Did you have any such incidents in Pennsylvania?
15 A.   I did have a few interactions with the police, but
16 for the most part, in Pennsylvania they were --- I
17 would aim to resolve it.  You know, by just going to
18 another location.  Yeah, it was very hard in
19 Pennsylvania, also because I had to hop around a lot.
20 Q.   So you had to move around from location to
21 location?
22 A.   Yes.  And of course, when that happens, it
23 minimizes the amount of signatures that I can get
24 because I'm wasting time going from one spot to another
25 spot.  I likely had a witness or whatever.  It's not so

56

1  bad if she suggests that just go inside the clubs,
2  then.
3      Actually, that's what we did at one point because
4  they have, like, these bars that are open, I guess,
5  like, in the daytime, also. And so this is one of my
6  witnesses, because she's a much older lady. But she
7  told me to just take her advice, and then I did and
8  ironically, it worked for the latter part that I was
9  there in the wintertime.
10     So we would just go from, you know --- inside of
11 clubs, she would talk to the security guard, like,
12 flirt with the security guard. Then we would just have
13 to go inside to collect signatures.
14 Q.  In response to one of Mr. Joel's last questions,
15 where you started talking about Connecticut, you raised
16 the intake witness here in Pennsylvania. And you said
17 that was one of your most aggravating aspects of
18 circulating in Pennsylvania. Can you expound on that,
19 please?
20 A.  I mean, one of those aggravating things number
21 one, they don't really want to --- they want the money
22 of course but they --- a lot of my witnesses, they did
23 not work to work. And it didn't matter about the pay
24 stub they did not want to work. They would hinder my
25 efforts. They would give off negative energy out in

1  the field sometimes and it's my opinion it would turn
2  people away.  And second of all and most importantly,
3  is that if they cannot work, I could not work.  And for
4  me, that was a killer because for me I was never really
5  certain if I could work or not.  Because if they do not
6  show up for work they're not going to work and because
7  they quit work early and I was having a good day then
8  it was my numbers because I can't work anymore 'cause
9  they're leaving.
10 Q.   So you lost signatures because you didn't have a
11 witness available?
12 A.   That happened a few days, yes.
13 Q.   Were there days that you couldn't work because
14 there was no witnesses?
15 A.   There was days that I could not work because there
16 was no witnesses, yes.  Like, I did not have a witness
17 or my witness would cancel and then I could not work.
18 Q.   Wasn't there anybody --- strike that.
19      You circulated in the Pittsburgh area; is that
20 correct?
21 A.   Yes.
22 Q.   Do you know anybody, personally, in Pittsburgh
23 that you could call to be a witness?
24 A.   I mean my closest one, I guess, was Jevron
25 (phonetic).  I know Justin (phonetic).  I had a witness

58

1  named Charles Ostoe (phonetic) at times, Collette
2  (phonetic) of course.  I'm kind of picky so I went to a
3  location day by day.  There were times when they let me
4  down and I was hardly working, you know.  I have their
5  phone numbers.
6              ATTORNEY RADZIEWICZ:
7              Excuse me, Mr. Jennings.
8              ATTORNEY JOEL:
9              Mr. Jennings, can you repeat that and
10 speak up?  You broke up a little bit there.
11 BY ATTORNEY ROSSI:
12 A.   Okay.  Sorry.  I have the phone numbers. Yes.  I
13 have the phone numbers somewhere.  I have Javron's
14 phone number.  He was my witness.  Justin's phone
15 number, he was my witness.  Collette, she was my
16 witness but it ended very badly with her.  Charles
17 (phonetic) was my witness also.  We always had to find
18 more witnesses in case they were to cancel.
19 Q.   And how did you find them?
20 A.   Trent found them for me.
21 Q.   But despite having four or five witnesses
22 available, it's your testimony that you were not able
23 to work as long as you wanted to work?
24 A.   Right.  I was lucky to even get what I got because
25 if I dare say that I want to work later, then they

59

1  could cancel the next day and it happened in the past.
2  You know, I would say well tomorrow can we work? Like,
3  you know what, as a matter of fact, I don't want to
4  work anything tomorrow. And so I was almost to the
5  point where I was scared to ask for more.
6  Q. Can you repeat that? I didn't understand that.
7  You're getting some feedback. You what?
8  A. I was scared to ask for more because in the past,
9  if they work a little bit of hours one day and then I
10 ask them to work more hours the next day, like in a
11 nice, friendly way. Like, you know what? It would be
12 a huge help for me if you could work like 12 hours
13 tomorrow. Then, they would get upset in the past and
14 then they would not work at all the next day, basically
15 because I asked to work more hours.
16 Q. And is it your testimony, you'd like to work 18
17 hours a day if possible?
18 A. Yes.
19             ATTORNEY ROSSI:
20             Okay. I have no further questions.
21 SHORT BREAK TAKEN
22 REDIRECT EXAMINATION
23 BY ATTORNEY JOEL:
24 Q. I think you testified something about some witness
25 who helped you get into a bar. What was her name?