# EXHIBIT D

18

1   A.    North Dakota.

2   Q.    Are you a registered voter in Pennsylvania?

3   A.    I am registered to vote in Pennsylvania, yeah.

4   I'm still on the voter rolls here, yes.

5   Q.    Are you registered as a Democrat or Republican?

6   A.    I registered actually as a Libertarian.  Now, at

7   the time, when we were --- I was registered as a

8   Republican, but I switched it to Libertarian just ---

9   not too long ago.

10  Q.    Did you --- strike that.

11        In 2016, were you an independent contractor for

12  Benezet?

13  A.    Yes.

14  Q.    When did you become an independent contractor for

15  Benezet?

16  A.    I guess it would have been, let's see --- I guess

17  it would have been, I guess in Indiana.  I guess

18  Indiana would have been in January.  It could have

19  been late December, early January.

20  Q.    Did you collect signatures at all as an

21  independent contractor for Benezet in Pennsylvania

22  this past election sign up?

23  A.    Yes.

24  Q.    Who'd you collect for?

25  A.    Ted Cruz.

19

1  Q.    So if I understand correctly, you collected

2  signatures for Ted Cruz, to get his name on the

3  Presidential Primary Ballot, the Republican Primary in

4  Pennsylvania?

5  A.    Yes.

6  Q.    How many signatures did you collect?

7  A.    Oh geez, I don't remember.

8  Q.    Did you go door to door collecting for Ted Cruz?

9  A.    I did.

10  Q.    Did you have a witness with you?

11  A.    Yes.

12  Q.    Why did you have a witness with you if you're a

13  Pennsylvania registered voter?

14  A.    Because there was concern about me not having an

15  in-state license and we didn't have an answer about

16  whether that was going to be an issue or not.  And I

17  didn't think it was going to be an issue, but Trent

18  was afraid that it could come up as an issue if we got

19  challenged.  Because I had talked to a woman named

20  Edee Baggett, who was working the Donald Trump

21  campaign, and I was going to work on the Trump

22  petition at one point.  And I told Edee that I was

23  registered to vote in Pennsylvania, but I did not have

24  a Pennsylvania driver's license.  I told her that I

25  could work with a witness if she wanted me to, and

20

1   then, I don't know, she ended up hiring other people.

2   But then, actually, I did get a call back from

3   somebody that was working with Edee Baggett, offering

4   me to work on the Donald Trump petition.  But by the

5   time they called me back I had already made an

6   agreement with Trent to work on the Ted Cruz petition.

7   And so I had to decline the Donald Trump petition

8   because of the law here, you know, and so, anyway, I -

9   -- and so Trent was afraid that Edee Baggett might

10  make an issue or tell somebody in the Trump campaign

11  that I didn't have a PA driver's license, and so,

12  that's why.

13  Q.    Okay.

14  A.    We didn't know if it would be an issue or not.

15  Q.    How long have you had a North Dakota driver's

16  license?

17  A.    Well I got one in 2012, but I was actually just

18  in North Dakota and I renewed it in North Dakota.

19  Q.    Do you have an address in North Dakota?

20  A.    I had an address that I was staying at.  I was

21  there for several months.

22  Q.    And what made you decide to go door to door for

23  Ted Cruz as opposed to going to an event or something

24  like that?

25  A.    I didn't have any good events to go to and the

21

1  signers have to be registered Republican.   Only

2  registered Republicans can sign.

3  Q.    Did you have some sort of a list that you walked

4  around with to at least identify what houses had

5  registered Republicans in them?

6  A.    Yes.

7  Q.    Who got you that list?

8  A.    My brother got it at the election office.

9  Q.    Does your brother collect signatures for a

10  living?

11  A.    Sometimes.

12  Q.    Is he a Pennsylvania registered voter?

13  A.    Yes, he is.

14  Q.    Do you know any other Pennsylvania registered

15  voters who collect signatures?

16  A.    I do.

17  Q.    How many?

18  A.    Not too many, because Pennsylvania doesn't have

19  petitions very often, so there's not a lot of people

20  who are experienced who've done it in Pennsylvania, so

21  people who, I don't know, maybe who do this type of

22  work on a regular or at least semi-regular basis?

23  Maybe like four.   Four or five, maybe.

24  Q.    Did you collect any signatures for Rocky De La

25  Fuente as a candidate for the Democratic primary in

22

1    Pennsylvania?

2    A.    No.   I did in Indiana but not in Pennsylvania.

3    Q.    Yeah, I'm sorry, I meant in Pennsylvania.   Thank

4    you for clarifying.

5    A.    Yeah.   No, not in Pennsylvania.   I wanted to but

6    I was unable to because I didn't have a Democrat

7    witness.

8    Q.    Your witness for the Cruz collection, was that

9    one of the Cruz delegates?

10   A.    No, it was my brother.

11   Q.    Oh, I'm sorry, it was your brother.

12   A.    Yeah.

13   Q.    And were you able to collect signatures, I'm

14   assuming?

15   A.    Yes.   For Cruz, but not Rocky.

16   Q.    Right.   And for Cruz, I think you told me you

17   don't remember how many you did, but you did collect

18   some.

19   A.    Yes.

20   Q.    Did you sign the affidavit or did your brother?

21   A.    He signed the affidavits.

22   Q.    And he did have the affidavit notarized?

23   A.    Yes, he did.

24   Q.    What did you do when you were meeting with the

25   people --- strike that.

35

1   A.    So it's inefficient to pay by the hour.

2   Q.    In your experience is --- strike that.

3         So you were paid by Benezet this year, per

4   signature?  Is it your understanding that Benezet was

5   paid by the Cruz campaign per signature?

6   A.    As far as I know.

7   Q.    Are you aware of whether or not, and let's take

8   Benezet and the Cruz campaign, the Cruz campaign said,

9   get as many signatures as you can?  Or was it, we need

10  2,000 to get on the ballot, get us 4,000 to make sure?

11  A.    Um ---.

12  Q.    I believe they set some sort of an upper limit

13  that they gave?

14  A.    They do, but I mean, I don't know what that was.

15  Q.    Okay.

16  A.    That would --- Trent might know that, but I

17  don't.

18  Q.    But, in your experience, the campaigns would set

19  some sort of an upper limit for what they were looking

20  for?

21  A.    Usually.

22  Q.    Because after a certain number it just doesn't

23  matter?

24  A.    Yeah, but I mean I have seen campaigns that will

25  just go for as many as possible, too.

36

1  Q.   But do the majority of campaigns do that?  Or do

2  the majority set some sort of an upper limit?

3  A.   No.  Well, the majority then will set a limit,

4  and they'll try to, they'll try to maybe do a validity

5  check.  It depends on how organized they are and if

6  they're able to somehow get a voter list and check the

7  validity, then they'll be keeping track of what their

8  validity is.  But, then there are other campaigns that

9  are not so organized and don't do that.  And they'll

10 just get as many as possible.

11 Q.   As a professional signature collector, I'm

12 assuming it's your goal to get as many signatures as

13 you can, in the least amount of time it takes?

14 A.   Yeah.

15 Q.   Tell me a little bit about your educational

16 background.

17 A.   I went to high school.  You know, went to college

18 but never graduated.

19 Q.   Did you go to high school here in Camp Hill, or

20 ---?

21 A.   Yes.

22 Q.   When did you re-become a registered voter in

23 Pennsylvania?

24 A.   When did I register?  I think it was 2011.

25 Q.   Is there anything that prevented you from

37

1  renewing your driver's license here in Pennsylvania?

2  A.   Well one issue was I wasn't in the state when my

3  other license expired.  So, I ---.

4  Q.   When your North Dakota license expired?

5  A.   Yeah, no, I had a California license actually.

6  My license was in California and it expired while I

7  was in North Dakota and it was going to cost me too

8  much money to get back to California and I was in

9  North Dakota for a few months, so I just got a North

10 Dakota license.

11 Q.   How about when that just expired and you renewed

12 it.

13 A.   It didn't actually expire.  What happened was, I

14 had a situation that occurred in 2013.  I was driving

15 in the state of South Carolina, and I was involved in

16 a minor car accident.  And the police had falsely

17 reported that I didn't have car insurance, but I

18 didn't know that they had reported this.  And in fact,

19 the insurance actually paid for the accident.  And I

20 was not cited for not having car insurance.  So I was

21 driving around for several months and I forgot about

22 it, and I was pulled over by the police --- this was

23 well after this happened --- in Oklahoma, and they

24 said my license was canceled.  And I didn't know what

25 they were talking about so I told them that I had lost

41

1    A.    Right now he's doing a --- works for a

2    merchandising company.  I mean, sometimes he

3    petitions.

4    Q.    Have you, in Pennsylvania, petitioned --- strike

5    that.

6          All the experience you have petitioning and

7    signature gathering in Pennsylvania has been at the

8    presidential level?

9    A.    Yeah.  I mean I guess, technically, on like the

10   Libertarian Party petition, they generally will have a

11   slate of candidates on the same petition, or the ---

12   you know, same thing with the Green Party petition.

13   So, there's --- you know, they'll have other

14   candidates on there besides president.

15   Q.    I understand, thank you.  Mr. Rossi may have some

16   questions for you, but I think that's all I have.

17   A.    Okay.

18   Q.    That may spur some more for me, but that's it

19   right now.

20                    ATTORNEY ROSSI:

21                    It always does.

22   EXAMINATION

23   BY ATTORNEY ROSSI:

24   Q.    You testified that you did not circulate for

25   Rocky De La Fuente for Democrat?

42

```
1   A.    Not in Pennsylvania.   I did in Indiana, though.
2   Q.    And why did you not circulate for Rocky De La
3   Fuente?
4   A.    Because I couldn't find a Democrat witness.
5   Q.    Did you reach out to anybody to ---?
6   A.    I tried to find a Democrat witness.
7   Q.    Let me ask my question first, then answer my
8   questions.
9   A.    Sure.
10  Q.    Let's ask that again.   Strike that question.
11        Did you reach out to anyone to find a witness?
12  A.    To Trent.
13  Q.    And what was Trent's reply?
14  A.    He did try to find a witness for me and was
15  unsuccessful.
16  Q.    How long were you in Pennsylvania during the
17  circulation of petitions?   About how long were you in
18  Pennsylvania?
19  A.    For the whole three-week period.
20  Q.    And that's the period of time that petitions are
21  allowed to be circulated?
22  A.    For the major party primaries, yes.
23  Q.    You testified that you were circulating for Ted
24  Cruz as well?
25  A.    Yes.
```

43

1 Q.   I 'm assuming, because you wanted to circulate

2 for Rocky De La Fuente, there were days that you were

3 not circulating for Ted Cruz?

4 A.   Yeah.  Well here's what happened.  We were in

5 Indiana and we were doing Rand Paul and Ted Cruz.  And

6 then I briefly worked Donald Trump and I briefly

7 worked Rocky De La Fuente in Indiana, and I was doing

8 them all at the same time.  So I was doing Ted Cruz

9 --- I was doing Rand Paul and Ted Cruz the whole time.

10 And then I briefly worked Donald Trump along with Ted

11 Cruz and Rand Paul.  And then I briefly worked Rocky

12 De La Fuente along with Ted Cruz and Rand Paul ---

13 this is in Indiana.

14     And then we came into Pennsylvania and we were

15 coming in to work Rand Paul.  We thought we were going

16 to do Rand Paul.  That's what I wanted to do.  I

17 wanted to work Rand Paul.  And the Rand Paul campaign

18 was not sure what they were going to do in

19 Pennsylvania because they were basically --- Rand Paul

20 wanted to see how he did in the Iowa Caucus to see

21 whether he was going to continue.  So he was waiting

22 for the Iowa Caucus vote, and so they were kind of

23 stalling us on to whether or not they were going to

24 hire us or not.

25     And so now Trent had put out a feeler with the

44

1    Ted Cruz people, but we didn't have any deal with Ted

2    Cruz either.  And I had talked to Edee Baggett about

3    working Donald Trump.  So basically I came into

4    Pennsylvania without any deal, but just thinking that

5    I was going to get one.  And so I came in to

6    Pennsylvania and I ended up sitting out of work for

7    the first --- I think it was week and a half.  I had

8    no work because we didn't --- the Rand Paul thing was

9    stalling and then they ended up coming in like fifth

10   place in the Iowa Caucus so he decided to drop out.

11   And then, now, the other guys --- I mean Trent went to

12   Pittsburgh and then we had some other guys that were

13   in Philadelphia.  And I went to Central Pennsylvania

14   because this is where my family's at.  And so they got

15   the Rocky De La Fuente petition pretty early on in the

16   process.  And apparently it was easier to find

17   Democrat witnesses in Pittsburgh and Philadelphia

18   because those are more heavily Democrat areas and

19   they're more densely populated.

20        Now I could have gone to Philadelphia or

21   Pittsburgh and it would have probably been --- I

22   would've probably had an easier time finding a witness

23   there, but I wanted to work in Central Pennsylvania

24   because it's, you know, where my family's at and

25   everything.  And so I don't get to see them, you know,

45

1   that often.  And so, also, we kept thinking that

2   another one of these deals was going to come through.

3   And so I didn't want to drive all the way off to

4   Pittsburgh or Philadelphia and then have like a day or

5   two later, one of these other deals comes through.

6   Or, Trent was also trying to find me a witness around

7   here.  And so I thought that maybe a witness here was

8   going to materialize and then one never did.  So

9   basically I ended up wasting about the first half of

10  the circulating period not even working at all.

11  A.    So you came into Pennsylvania without contract,

12  but the first one that came available for you to work

13  was Rocky De La Fuente?

14  A.    Yes.

15  Q.    And you could not --- and because you didn't have

16  a witness you were not able to work his petitions?

17  A.    Yes.

18  Q.    And then at some point --- and you said, about a

19  week and a half you were not working?

20  A.    Yes.  And then --- and then the Ted Cruz thing

21  materialized.

22  Q.    Benezet Consulting got the Ted Cruz contract?

23  A.    Yes.

24  Q.    And did you circulate for delegates and Ted Cruz?

25  A.    And Ted Cruz, yes.

50

BY ATTORNEY ROSSI:

Q.    In Indiana, who did you circulate for?

A.    I did Rand Paul and Ted Cruz most of the time.  I mean actually, almost the whole time I was there I was doing those two.  But then I did briefly work Rand Paul, Ted Cruz and Donald Trump.  And then I also briefly worked Rand Paul, Ted Cruz and Rocky De La Fuente.  And then actually, at the end, I ended up getting a few signatures for Ben Carson and Rick Santorum.  You know, Trent kind of talked me into it. I didn't really want to do it but I did it anyway.

Q.    Let's break that --- and you're talking about Indiana?

A.    Indiana, yes.

Q.    Let's explore that.  In Indiana, there's a party registration requirement in order to sign a petition, to the best of your knowledge?

A.    No, there is not.

Q.    So a Republican can sign a Democrat petition?

A.    In Indiana they don't register by party.  In Indiana, it's one of the states they don't register by party.  They're all registered basically as --- there's several states --- I think there's probably 20-some-odd states that don't have partisan voter registration.  They're all registered independent, and

51

1   then at the polls they say, you know, they go vote in

2   the primaries and they say, I would like a Democrat

3   ballot or I would like a Republican ballot.

4   Q.   Okay.  I did not know that.  So then in Indiana,

5   somebody could vote --- somebody could sign for a Ron

6   Paul and a Rocky petition ---?

7   A.   Rand.  Rand.

8   Q.   I'm sorry.  Rand Paul and a Rocky petition at the

9   same time?

10   A.   Yes.

11   Q.   Would you agree that their political viewpoints

12   are --- would you consider their political viewpoints

13   to be fairly disparate?

14                    ATTORNEY JOEL:

15                    Objection.

16   A.   Yeah.

17   BY ATTORNEY ROSSI:

18   Q.   Let me ask you this, did people sign for both Ron

19   Paul and for Rocky --- Rand Paul and Rocky?

20   A.   Yes, I had some.  There was a lower flip rate.  I

21   call it the flip rate.  I mean, like, in other words,

22   my flip rate was really high when I was doing Ted Cruz

23   and Rand Paul.  I don't know what the percent was but

24   I had a large percent sign.  And I did have those

25   people that were only for Rand and they would only

52

1   sign that one.  And I had some people that would only

2   sign Cruz.  But I'm saying, when I was doing the

3   Republicans, I had a higher percentage of people sign

4   them all than when I was doing the Republicans and

5   Rocky.  But I still did have some people who signed

6   Rocky and all of them.  Some people would sign Rocky

7   and Rand and not sign Cruz.  And you know, vice ---

8   you know what I mean?

9   Q.   And by flip rate, what do you mean by that?

10  A.   The percent of people that signed them all, or

11  what percent of people signed all the petitions.

12  Q.   Now when you're working in Pennsylvania with a

13  witness, has it always been your brother?

14  A.   Yeah.

15  Q.   So there's no issue with respect to getting your

16  brother to notarize and affidavit for you?

17  A.   Not as much.  I mean sometimes he complains about

18  it, but you know.

19  Q.   But nevertheless, he doesn't disappear?

20  A.   No.  I know that's happened with other people

21  though.  I almost had it happen to me in another state

22  one time.

23  Q.   Explain that.

24  A.   I had a witness who --- I was in Maine doing an

25  initiative and I had to work with a witness, and the

53

1  witness disappeared on me and then kind of re-

2  appeared, and kind of developed an attitude and he

3  wasn't going to do it.  And somebody else who was

4  working on the campaign basically had to yell at him

5  and sort of badger him into doing it.

6  Q.   And presumably because, and back to Pennsylvania,

7  presumably because your brother is your witness, you

8  can execute the petitions at your leisure?

9  A.   Well, I guess it's more reliable than relying on

10 somebody who's, you know, just some random person that

11 I don't really know as well.

12 Q.   Because you circulated with your brother, you

13 don't have to stop in the middle of the day to find a

14 notary?

15 A.   Well it depends on when they have the notary

16 scheduled.  I mean it's varied, because it's not like

17 you can get notaries 24 hours a day.  So it depends on

18 who's doing the notarization, where they're being

19 notarized.  So it depends upon a variety of factors.

20 Q.   In what circumstance would you be --- you

21 testified that the maximum number of boards that

22 you've run was 16?

23 A.   Uh-huh (yes).

24 Q.   Do you remember a specific instance when you ran

25 16 boards at once?

54

1  A.    Yeah, I was in Massachusetts.

2  Q.    And why, in that situation, were you able to run

3  16 boards?

4  A.    Because there were --- they have to separate

5  petitions by the towns.  Like every town has to be on

6  a separate page and there's 359 cities and towns in

7  Massachusetts.  And then also I had multiple petitions

8  and in Massachusetts they have what's known as open

9  access, which means you can legally go set up anywhere

10 the public has access, including storefronts.  And you

11 can have a table.  And so I had a table set up with 16

12 clipboards on it.

13 Q.    Okay.

14 A.    And sit in front of stores.

15 Q.    So in that context, you're not physically holding

16 16 boards?

17 A.    No.  But there have been, I mean, there's been

18 occasions where I'm holding six or eight boards.

19 Q.    Okay.  So you can manipulate six to eight boards?

20 A.    Yeah.

21 Q.    And so in other states where you can't set up

22 tables, you could --- your testimony is you generally

23 run three to six?

24 A.    Yeah.  Usually three would be if I was going door

25 to door, usually if I'm out at public venues I usually

55

1    carry six.

2    Q.    Why do you want six boards?

3    A.    So I can have groups of people stop, signing at

4    the same time.

5    Q.    When you're circulating in a crowd do you remain

6    static or do you move through the crowd?

7    A.    Usually walk around.

8    Q.    Why do you do that instead of remaining static?

9    A.    Because you can usually get more signatures

10   walking around.  I mean it depends upon the way the

11   venue's set up, but you need to have the versatility

12   to be able to walk around, you know, so it helps to

13   have the versatility.  Because sometimes the people

14   don't come to you.  Sometimes you've got to go to the

15   people.  Every situation is different, though.

16   Q.    Sure.  So as you're sitting here today, you don't

17   know --- you're not clear in your mind as to whether

18   or not you are qualified to execute an affidavit of

19   circulation?

20   A.    Yeah.  I mean I'm not 100 percent sure.  I know

21   that I've been told different things by different

22   people, so --- and then, you know, there's other

23   states where I know that people have had a driver's

24   license from a different state, but they registered to

25   vote in the state they were in and were able to sign

56

1  off on declarations.  Now there is other states that

2  don't even have declarations on petitions.  Some

3  states have declarations but the declarations do not

4  have to be notarized.  And then some states have

5  declarations that don't have to be notarized and you

6  don't have to be a state resident.  So most states you

7  don't have to be a state resident to petition there,

8  and there's been lawsuits over this in multiple

9  states.

10 Q.   Have you ever been --- strike that.

11      To the best of your knowledge, has there been any

12 allegation lodged against you with respect to petition

13 fraud?

14 A.   The only one I'm aware of is the one in Illinois

15 in 2014.  But I was --- you know, I prevailed and they

16 were false allegations.

17 Q.   And what were the allegations?

18 A.   I think they were basically accusing us of

19 everything they could, to try to get the petition

20 disqualified.  So they basically accused everybody who

21 worked on the petition drive of engaging in multiple

22 fraudulent acts.

23 Q.   And this is the signature challenge that you

24 testified to earlier?

25 A.   Yeah.  Illinois, 2014, Libertarian Party.

57

1  Q.    So these were allegations made as part of a

2  signature challenge?

3  A.    Yes.

4  Q.    To the best of your knowledge, have you ever been

5  investigated by law enforcement with respect to any

6  kind of petition fraud?

7  A.    No.

8  Q.    Would you ever commit petition fraud?

9  A.    No.

10  Q.    Do you know people who do commit petition fraud?

11  A.    I mean, I've met a lot of people over the years.

12  I don't know who's committed fraud and who hasn't.  I

13  mean I've heard various stories, you know, and

14  everything.  But, you know, it's hard for me to say.

15  You know, there's probably people out there who've

16  done it.  But, you know, I've met lots of people.  I

17  don't know who all's done what.

18  Q.    Fair enough.  You said that you collected 5,000

19  signatures for the Libertarian Party in 2008?

20  A.    I believe so, yeah.

21  Q.    Now over what span of time did you collect those

22  signatures?

23  A.    This was over several weeks.  I mean I don't

24  remember --- it was several weeks, though.  I was, you

25  know, at some high volume locations.

58

1  Q.   And your brother was your witness for those?

2  A.   Yeah.

3  Q.   Are there any candidates that you would never

4  circulate a petition for?

5  A.   Generally, some of the big main-screen

6  politicians, you know.  Hillary Clinton I wouldn't do.

7  I wouldn't do like, Jeb Bush or something I wouldn't

8  do.  I mean, you know --- so.

9  Q.   Sure.

10  A.   I really didn't want to do Rick Santorum but

11  Trent kind of pushed me into it.

12  Q.   Okay.

13  A.   I mean I only worked it for a few days.

14  Q.   Have there been states that you worked --- other

15  than Pennsylvania, have there been states where you've

16  worked petitions where you did have to have a witness

17  with you?

18  A.   A few places, yeah.

19  Q.   What states?

20  A.   Maine.  I'm trying to think where else.  Maine

21  --- oh, in California there used to be a requirement

22  in some of the cities and counties that you had to be

23  a resident of X city or X county to circulate a local

24  petition there.  Now there was not for the state, or

25  at least in the time that I've been petitioning in

59

1   California, which goes back to 2001.  But there were

2   some cities that had that.  And that was actually

3   struck down in a court case in 2007 in San Clemente.

4   So now in California you don't have to be a resident

5   anywhere to circulate any city or county petitions,

6   but I did work a few before that happened.

7   Q.    But before 2007, okay.  That was my next

8   question.  Before 2007, had you worked some of those

9   cities and towns?

10  A.    Yes.

11  Q.    And were you allowed to actually carry boards?

12  A.    Yes.

13  Q.    But you had a city witness with you?

14  A.    Yes.

15  Q.    Were there any issues with those witnesses at

16  that time?

17  A.    Yes.

18  Q.    Can you please describe?

19  A.    Witnesses flaking out, like not showing up.

20  Wanting to leave early.  Just being annoying.  You

21  know, sometimes repelling people from signing, you

22  know.  So I was glad when the witness --- I've

23  actually avoided some petition drives because of the

24  witness requirement.  Like I was going to go to

25  Michigan in 2012 and I decided not to go because I

60

1  know what a pain it is to work with witnesses.  Now

2  there was a court case a year or two after 2012 where

3  the witness requirement was thrown out of Michigan,

4  but I declined the Michigan job because I didn't want

5  to have to deal with witnesses.

6  Q.    That's all I have.  Thank you.

7  EXAMINATION

8  BY ATTORNEY JOEL:

9  Q.    A few follow ups.  Before showing up to your

10  deposition, did you talk to anybody about your

11  deposition testimony today?

12  A.    I guess I talked to Mr. Rossi just in the lobby,

13  briefly, but ---.

14  Q.    Anybody else?

15  A.    No.

16  Q.    Not Trenton Pool or anyone else?

17  A.    I did not talk to Trent today.

18  Q.    Did you talk to him at any point prior to this as

19  it relates to your deposition?

20  A.    I talked to him yesterday.

21  Q.    What did you talk about?

22  A.    I think he just talked about some of the things

23  that were going on with the case and stuff like that.

24  Q.    Did he tell you the type of questions that I was

25  going to be asking?