# EXHIBIT E

24

1    Q.    And then you'd move on to the next person?

2    A.    Uh-huh (yes).

3    Q.    And that process kept going?

4    A.    Yes.

5    Q.    Okay.  Can you give me a sense as to how many

6    signatures you got for Cruz?

7    A.    Not very many.  It was very difficult.  We were

8    working with Amy Strauss, our only available witness.

9    And she was ---.  I don't know how to ---.  She was a

10   little crazy.  We would go to the doors and knock on

11   the doors.  And, you know, it's her job to ---.  You

12   know, we would knock on the doors, you know, and say,

13   hey, you're the next listed on the registered

14   Republican voters.  You know, we're here collecting

15   signatures to get Ted Cruz on the ballot in the

16   Republican Primary, could you help us with your

17   autograph real quick?  And whatever --- you know,

18   whatever they said to our original pitch, we just have

19   to --- you know, like a natural salesman, try to battle

20   through the objections.

21        Our witness, though, she was not interested in

22   getting a lot of signatures.  She was not motivated by

23   each signature to get the petition filed.  ·The first

24   sign of rejection, walked away.  Like, you know, it

25   made the job impossible to do.  It was tragic.

25

1   Q.   You did collect some signatures for Cruz; correct?

2   A.   Some.

3   Q.   And as it relates to De La Fuente, did you collect

4   signatures for De La Fuente?

5   A.   Yes.

6   Q.   Were you able to get the signatures for Cruz

7   notarized?

8   A.   Yes.

9   Q.   Were you able to get the signatures for De La

10   Fuente notarized?

11   A.   Yes.  But it was not until at the ---.  So we were

12   working with a witness, Kemitt Wilson, and he was in

13   his 70s.  He was the only guy that we could find to

14   work with ---.  You know, there was only one other

15   person that we knew in the state and it was his cousin.

16   The witness was the cousin of this guy Darrell Bonner

17   (phonetic) that we --- a friend of a friend kind of

18   thing.  And this guy, he had a ---.  He was in his 70s.

19   One day we were out petitioning and, you know,

20   chasing everybody down.  And he got very tired.  And,

21   you know, he would have to take frequent breaks.  And,

22   you know, I was just at the whim of his abilities and

23   it made the job very difficult.

24   Q.   Did you reach out to anybody in the Cruz campaign

25   to ask them to put you in touch with a volunteer?

26

1   A.   Well, the Cruz are Republicans, so ---.

2   Q.   Yeah, I'm going with the Republican one first,

3   then we'll talk about De La Fuente.

4   A.   Oh, I thought we were talking about De La Fuente.

5   Q.   We were, but ---.

6   A.   Oh, well ---.

7   Q.   You had Amy Strauss for the Cruz ones, if I

8   understood you correctly?

9   A.   Correct.

10  Q.   Okay.  Did you reach out to the Cruz campaign to

11  try to get anybody?

12  A.   We reached out to Trent.  He put ads up on

13  Craigslist, I believe.  He tried to find us new

14  witnesses and he couldn't within the district.  I

15  believe the ruling is something like --- correct me if

16  I'm wrong, that the witness has to be from the district

17  --- is that correct?  Where we're gathering the

18  signatures from or we just couldn't find somebody.  It

19  was difficult.

20  Q.   All right.  I'm going to ask you again, because

21  that wasn't my question.  My question was, did you

22  reach out to anybody from the Cruz campaign to try to

23  get help?

24  A.   Oh, no.

25  Q.   Did you reach out to anybody from the De La Fuente

1   campaign to try to get help?

2   A.   No.

3   Q.   Okay.

4   A.   The only contract ---.  You know, the De La Fuente

5   campaign, they're running --- you know, Cruz campaign,

6   they're a big campaign and running, you know, stuff all

7   over the country.  You know, I went to Benezet to try

8   to get help with that, rather than try to reach out to

9   the presidential campaigns.

10  Q.   Okay.  After Pennsylvania, you said you went to

11  Rhode Island to collect signatures?

12  A.   Yes.

13  Q.   And how long were you in Rhode Island for?

14  A.   Oh, a matter of days.  It was a very quick

15  petition.  We were helping them out at the end of their

16  drive.

17  Q.   Was that through Benezet?

18  A.   That was through Alex Arsenault.

19  Q.   And I'm sorry, was Vermont through Benezet?

20  A.   Yes.

21  Q.   And Pennsylvania was through Benezet?

22  A.   Yes.

23  Q.   So how long were you in Rhode Island for?

24  A.   A matter of days.

25  Q.   Beginning of the month, end of the month, middle

41

1    they're paying my expenses.

2    Q.   So Benezet covered the expenses, you didn't have

3    to do that?

4    A.   Yes.   I invoice Benezet my expenses, parking,

5    gasoline, rental cars, hotels.

6    Q.   And how about the ---?   Did you have to pay any of

7    the witnesses that were coming along with you or no?

8    A.   That was handled through Trent.

9    Q.   So you had no involvement with that?

10   A.   That's not true also.   We went to go ---.   Okay.

11   So we went to go turn in the signatures, it was the

12   deadline ---.

13   Q.   Which one, Cruz or Rocky?

14   A.   Rocky.

15   Q.   Okay.

16   A.   Yeah, Rocky we were working in Philadelphia.   And

17   we were going to ---.   We had collected all the

18   signatures, myself and Brian Lyra ---.

19   Q.   Do you know how many you had collected?

20   A.   I cannot give you an accurate number now.

21   Q.   Can you give me a range?

22   A.   I don't know.   I really can't, sir.

23   Q.   That's fine.   That's fine.

24   A.   I could tell you we had at least ---.   I don't

25   know, we got maybe --- probably a hundred signatures a

42

1   day for --- at least a hundred signatures a day for a

2   couple of weeks.  I mean, there were many signatures,

3   at least a thousand.  At least a thousand, not a lot

4   more.

5   Q.   And we're talking about for De La Fuente?

6   A.   For De La Fuente.

7   Q.   Okay.

8   A.   That myself and Brian Lyra personally collected.

9   And yeah, and so ---.

10  Q.   And that was with having the Pennsylvania witness

11  with you?

12  A.   The witness was with us, yes.  He followed us

13  around.  He sat down while we petitioned in the

14  corridors of the subways.  There's a strip mall inside

15  of the --- I think it's what, City Center it is, in

16  Philadelphia that we were in the corridors.  And he was

17  just sitting there.  And the end, our witness had ---.

18  He had stopped us.  He was trying to collect more money

19  than he was owed on ---.  He said that he wasn't going

20  to get the signatures notarized unless we paid him much

21  more than what the contract was for.

22  Q.   Who was that?  Who's the witness?

23  A.   Kemitt Wilson.  He extorted us and extorted the

24  campaign at the end of the drive.

25  Q.   Did you have to sign it?

43

1    A.   Yes.   Yes, he and Trent came upon an agreement and

2    we had to get them notarized.   He held us over a

3    barrel.

4    Q.   So if I understand you correctly, you had, at

5    least for De La Fuente, collected, you believe, over a

6    thousand signatures ---

7    A.   Yes.

8    Q.   --- with the Pennsylvania witness; correct?

9    A.   Yes.

10   Q.   And the affidavit was signed and it was notarized;

11   correct?

12   A.   Yes.

13   Q.   And it was turned in?

14   A.   Correct.

15   Q.   Okay.   How about with Cruz?   Can you give me any

16   sense as to how many signatures you got in Pennsylvania

17   for Cruz?

18   A.   It was less than 500.   It was very difficult.   The

19   woman, Ms. Strauss, she was --- she would not do the

20   job.   She didn't work out.   We tried to find another

21   witness and failed.

22   Q.   And by not do the job, do you mean what you

23   testified before that, you know, if somebody said

24   no, ---

25   A.   Yeah, she just ---.

44

1  Q.   --- she wouldn't give them the hard sell to try to

2  get ---?

3  A.   Not at all.  Not just not give them the hard sell,

4  she would just walk away.  Oh, okay.  She was that

5  crazy.  I don't know if she was on like prescription

6  medication or, you know, I don't know where we found

7  this lady, but she was terrible.

8  Q.   Who put you in touch with the lady?  Was it Trent?

9  A.   Trent had recruited her.

10  Q.   And you have no knowledge of whether she was on

11  prescription medication, you're just speculating?

12  A.   I'm just speculating, yeah.  I don't know.  She

13  was nuts.

14  Q.   Okay.  So you were managing in New Hampshire?

15  A.   Uh-huh (yes).

16  Q.   When you were managing in New Hampshire, were you

17  staying in New Hampshire to do that work or did you

18  commute back and forth?

19  A.   Commute back and forth.

20  Q.   Okay.  For the whole time?

21  A.   Yes.

22  Q.   All right.  Where did you go after New Hampshire

23  to manage?

24  A.   After New Hampshire wrapped up, I was

25  notified ---.  This is still ongoing in Connecticut.  I

75

1   A.   Yeah.   I sometimes tried to befriend people and,

2   you know, crash at their houses, if I can.

3   Q.   Okay.

4   A.   But I prefer to stay ---.   Unless if I really know

5   the person very well, I'll prefer to stay at a hotel.

6   Q.   Okay.

7   A.   Or if I'm, you know, short on money, you know,

8   I'll stay at the hotel --- or the campaign will put me

9   up in a hotel or, you know.   In Oregon I was introduced

10  to a roommate and I lived up there with him for a few

11  months.

12  Q.   Okay.

13  A.   But generally speaking when I'm traveling I'm

14  either --- you know, I'm staying in hotels for the most

15  part.   It's the very expense of doing this type of

16  business, living on the road.

17  Q.   Okay.   Your work with Alex, has his business ever

18  collected signatures in the Commonwealth of

19  Pennsylvania, that you're aware of?

20  A.   No, I don't think so.

21  Q.   So your work in Pennsylvania has only been through

22  Benezet?

23  A.   And Andy Jacobs.

24  Q.   And Andy Jacobs.   Sorry, I forgot about him.

25  Thank you.

76

1    A.   Yeah.   Other than those two people, I've not

2    worked in Pennsylvania.

3    Q.   Okay.   Were you part of any signature collection

4    efforts for a ballot question that's going on --- out

5    now?   It's going on at Pittsburgh this year, for

6    OpenPittsburgh?

7    A.   No.

8              ATTORNEY JOEL:

9              Can we take two minutes?   I'm think I'm

10   just about done.

11   SHORT BREAK TAKEN

12             ATTORNEY JOEL:

13             I believe I'm done, pending any follow-up

14   to you.

15   EXAMINATION

16   BY ATTORNEY ROSSI:

17   Q.   Mr. Alexander, beyond Andy Jacobs, do you know

18   anybody in Pennsylvania well enough to ask them to be a

19   witness?

20   A.   No.

21   Q.   Okay.

22   A.   Actually, I do.   I have a friend who lives like 45

23   miles --- 45 minutes east of Harrisburg.   Actually I

24   did try to recruit her and her friends, and asked her

25   if she had any friends that could witness for us.   And

77

1   she was not registered to vote nor did she express any

2   interest in registering to vote.  I told her that we

3   could pay her, the money was lucrative and she still

4   didn't have any time for us.

5   Q.   Okay.

6   A.   She was busy with her own career.

7   Q.   Sure.  When you arrived in Pennsylvania ---?

8   Let's take the Cruz campaign signatures first.

9   A.   Uh-huh (yes).

10  Q.   Am I correct that the 8th District of Pennsylvania

11  is the western district of Pennsylvania?

12  A.   What's that?

13  Q.   Am I correct that the 8th District of Pennsylvania

14  is in the western district of Pennsylvania?

15  A.   No.  It's in the eastern part of Pennsylvania.

16  Q.   Oh, I'm sorry.

17  A.   Yeah.

18  Q.   Okay.

19  A.   We stayed in Willistown I believe it was.

20  Q.   Oh, okay.

21  A.   Yeah.  New Hope, PA.  Yeah, it was right around

22  the area we were at.  We stayed for a few days.

23  Q.   So you were in the eastern part of the state,

24  then, for the entire time in Pennsylvania?

25  A.   Uh-huh (yes).

78

1  Q.   Okay.

2  A.   Honestly I don't remember the district number off

3  the top of my head.

4  Q.   Well, you testified you were circulating for Cruz

5  in the 8th Congressional District in ---.

6  A.   It was in ---.  I do not know which --- what the

7  numbered district was.  It was the same district as

8  Feasterville.

9  Q.   Okay.  Well you testified today, am I not correct,

10  that Ted Cruz was the 8th Congressional District?

11  A.   Was it?  I do not ---.  Can you show me a district

12  map?

13  Q.   No.  I don't have a district map.  I was going off

14  your testimony.

15  A.   I believe it was the 8th.  I'm not sure.

16  Q.   Okay.  Yeah.  You testified New Hope, District 8,

17  for Cruz.

18  A.   Okay.  Yes, that is the eastern part of the state.

19  Q.   All right.  So you didn't have any witnesses?  You

20  didn't have any personal contacts to actually ask

21  somebody to witness with you?

22  A.   No.

23  Q.   At any time while you were in Pennsylvania, were

24  you not --- was there any period of time you were not

25  able to circulate petitions for lack of a witness?

79

1   A.   During the off hours of our witnesses.   Our
2   witnesses had other things that they had to do.   Amy,
3   she had --- I forget what it was.   But, yes, I had to
4   go around the personal schedules of the witnesses that
5   we worked with and their abilities.
6   Q.   When you do have a witness, ---
7   A.   Yes.
8   Q.   --- what is the process of hooking up with them,
9   for lack of better terminology?
10  A.   Call them up and say, hey, we're going to be here
11  at such and such time.
12  Q.   Are they always there on time?
13  A.   For the most part.
14  Q.   Okay.   But there are situations where they are not
15  there on time, you have to wait for them?
16  A.   I'm trying to remember.   I do not recall.
17  Q.   Do you personally know of any people who are
18  authorized to do notaries in Pennsylvania?   Do you know
19  of anyone personally?
20  A.   I have no personal contacts with notaries.
21  Q.   How do you find a notary public in Pennsylvania?
22  When you got your signatures and you're ready to have
23  them notarized, how do you go about finding a notary?
24  A.   Most banks have notaries.   I have a Citizen's Bank
25  account in Pennsylvania --- well, out of Massachusetts

80

1  but they are in Pennsylvania.  Only a small handful of

2  them actually have notaries.  So I'd, you know, call up

3  the banks and see if they could, you know, access a

4  notary.

5  Q.  Okay.

6  A.  Well, some of them when we brought a larger amount

7  of signatures and stuff --- they could only notarize

8  bank documents.  Some of the banks have their own

9  policies about the notarization of the signatures

10  versus bank documents.

11  Q.  When you actually do find a notary and you

12  notarize the petitions, who pays for the notary fee?

13  A.  I would assume Benezet ---

14  Q.  Okay.

15  A.  --- or the candidate.

16  Q.  But at the point of sale, do you ---?

17  A.  Yeah, I would have to pay for it.

18  Q.  And then you get reimbursed for the notaries?

19  A.  Correct.

20  Q.  So when you --- in Pennsylvania you can't execute

21  the affidavit; correct?

22  A.  No.

23  Q.  Okay.

24  A.  No, it has to be ---.

25  Q.  Who is the person that executes the affidavit?

81

1   A.   The witness.

2   Q.   And the witness has to be available to go to the

3   notary?   In addition to his or her normal tasks of

4   witnessing the petitions, ---

5   A.   Uh-huh (yes).

6   Q.   --- they have to then also go with you to the

7   notary that you find who is open and available?

8   A.   Correct.

9   Q.   Okay.   So once the notaries ---?   Once you no

10  longer have a notary available for that day, what do

11  you do?   Are you able to go out and get more signatures

12  or ---?

13  A.   No.

14  Q.   Is there a situation ---?   Have you ever had a

15  situation where you want out and got signatures after

16  the closing hours for notaries and were not able to

17  notarize them on the subsequent day?

18  A.   When we did the ---.   Yeah.   With Amy we had to

19  wait until the next day to notarize the signatures.

20  With Kemitt we held all the signatures until the end.

21  Q.   Kemitt.   Who is Kemitt?

22  A.   The witness in Philadelphia.

23  Q.   Okay.   And Kemitt is the one that ---.   So let's

24  go down to the --- Kemitt witnessed for you in

25  Philadelphia for ---

82

1   A.    Uh-huh (yes).

2   Q.    --- Rocky De La Fuente?

3   A.    Correct.

4   Q.    And did you say he was 70 years old?

5   A.    Yes.

6   Q.    And you were essentially getting signatures for

7   Rocky in subway tunnels?

8   A.    For the majority of the signatures, yeah.

9   Q.    Is that because of the inclement weather?

10  A.    Yes.  It was very cool that weekend.

11  Q.    Yeah.  I believe it probably was.

12  A.    It was extremely cold.

13  Q.    So most people would be using the subway tunnels,

14  so that's where ---?

15  A.    There was a mall underneath ---

16  Q.    Yeah.

17  A.    --- the city center.

18  Q.    Yeah.  And Kemitt would sit and just watch?

19  A.    Yes, he would sit and watch, while Brian and I

20  stood and collected the signatures.  He would watch the

21  both of us.

22  Q.    Were you able to move around in that situation?

23  A.    No, not really.  You had to be within ---.  You

24  know, to satisfy the witness requirement, I mean, we

25  couldn't walk away from Kemitt.  If he went to --- you

83

1    know, say go to the bathroom or something, you know, I

2    couldn't bring my petitions with me and petition, not

3    without Kemitt, the witness.

4    Q.   So were there situations where he had to go to the

5    bathroom and you had to stop petitioning?

6    A.   Absolutely.

7    Q.   Okay.

8    A.   Many times.  He was an old man.

9    Q.   Right.  So are there situations where you like to

10   be mobile and go with the crowd and ---?

11   A.   Absolutely.  Absolutely.  And Kemitt stopped my

12   ability to do that.

13   Q.   Okay.

14   A.   There were many situations, you know ---.  One day

15   we got one of our biggest days where we got lots of

16   signatures.  We petitioned for about 11 hours and we

17   got hundreds of signatures that day.  And the next day

18   Kemitt couldn't --- you know, he couldn't stand up all

19   day.  You know, he's an old guy.  He had to take a lot

20   of breaks and sit down.  And, you know ---.  Right.

21   Q.   Okay.  Do you know people in the Philadelphia area

22   that would be willing to be witnesses if you reached

23   out?

24   A.   No, not at all.

25   Q.   Okay.

84

1   A.   We tried.

2   Q.   Rocky didn't have any formal campaign structure in

3   Pennsylvania, did he?

4   A.   No.

5   Q.   Was there an office that you could call, you

6   know, ---

7   A.   No.

8   Q.   --- in Philadelphia?

9   A.   No.

10  Q.   Did Cruz have an office in Pennsylvania that you

11  could call, that you were aware of?

12  A.   Not that I was aware of, no.

13  Q.   Now this Kemitt guy, your witness in

14  Philadelphia, ---

15  A.   Uh-huh (yes).

16  Q.   --- you testified that when it came time to

17  notarize, he initially refused?

18  A.   Yeah.

19  Q.   And how was that issue resolved?

20  BRIEF INTERRUPTION

21              ATTORNEY JOEL:

22              Sorry.  Can we go off the record?  It's

23  the next witness.  I should take his call.  Forgive me.

24  OFF RECORD DISCUSSION

88

1   Q.   So you can go half a mile away, you can roam?

2   A.   Yeah.   Sometimes we use walkie-talkies.

3   Q.   Oh, do you really?

4   A.   Yeah.

5   Q.   I didn't know they still had those.   All right.

6   Fair enough.

7   A.   Well, we use them for, you know, skiing.   So, you

8   know, they're very handy in the professional field as

9   well.

10   Q.   Okay.   All right.   Now are there situations where

11   voters want to sign more than one paper?

12   A.   Oh, absolutely.   Yeah, there is.

13   Q.   How does that come about?   Like if somebody's

14   committed to a candidate, why would they sign --- why

15   would they ---?

16   A.   Well, because competition ---.

17                ATTORNEY JOEL:

18                Objection.   I'd just object to the form.

19   I don't know how he could know what somebody's

20   intention is in signing.

21                ATTORNEY ROSSI:

22                That's a valid objection.   It's okay.

23   BY ATTORNEY ROSSI:

24   Q.   In your experience people were willing to sign

25   more than one election candidate?

89

1   A.   I've petition for multiple candidates before and

2   they've signed different candidates.

3   Q.   So is it the normal practice outside Pennsylvania,

4   in your experience, to circulate more than one petition

5   at a time?

6   A.   Yeah.  I mean, we worked in Alabama in 2012.  We

7   were petitioning for Johnson, Stein and Goode.

8   Q.   Uh-huh (yes).

9   A.   And, you know, most people signed all three,

10  because they thought that ---.  Most of the people that

11  signed the petition had expressed that they felt that

12  we needed to have more choices.

13  Q.   Have you worked for ---?  In Pennsylvania, in

14  2016, have you worked for any of the minor party

15  candidates in Pennsylvania in the 2016 election cycle?

16  A.   Rocky ran as a Democrat when I helped him get on

17  the ballot in Pennsylvania and Cruz was a Republican.

18  Q.   So you did not circulate nominating papers in

19  Pennsylvania this election cycle?  Let me clarify,

20  nomination, nominee petitions are for Republicans and

21  Democrats running ---

22  A.   Okay.

23  Q.   --- in the spring.  Nominating papers are for

24  everyone else to get on the general election ballot.

25  A.   Like Gary Johnson from ---.

90

1   Q.   Right.   Did you circulate any nominating papers
2   in ---?
3   A.   No.
4   Q.   When you were circulating petitions in 2016 in
5   Pennsylvania, for either Cruz or Rocky, did any voters
6   ask to --- to sign for more than one candidate?
7   A.   Yeah.   A lot of the people wanted to sign
8   petitions for Bernie and Clinton.
9   Q.   Okay.
10  A.   They said, why do you only have Rocky?   I said,
11  well, I think anyone deserves to be on the ballot.
12  This is America.
13  Q.   Yeah.   Going to the 2012 Ron Paul campaign, you
14  said you actually ---.   Back to 2012.
15  A.   Correct.
16  Q.   Okay.   You circulated nominating petitions for Ron
17  Paul in Pennsylvania?
18  A.   Uh-huh (yes).
19  Q.   Okay.   Correct?
20  A.   Correct.
21  Q.   And your witnesses were the delegates themselves?
22  A.   Yes.
23  Q.   Okay.   Did you find the delegates motivated to
24  help out in getting signatures?
25  A.   Yeah.

91

1   Q.   Did they cause any problems in that circumstance?

2   A.   No.

3   Q.   Okay.

4   A.   It was a very different experience in 2012.

5   Q.   Now, you said --- you mentioned that you know one

6   in Pennsylvania other than Andy Jacobs?

7   A.   Uh-huh (yes).

8   Q.   That you know of a man by the name of Darrell

9   Bonner?

10  A.   Yes.

11  Q.   And he is a resident of Pennsylvania, is he?

12  A.   I believe so.

13  Q.   What experience have you had with his efforts?

14  A.   Shoddy workmanship.  I've seen him on various

15  occasions hire --- you know, have people circulate

16  petitions who produced less than genuine work, bad

17  validity.  I've heard he's got very bad validity

18  before.  I wouldn't want to work with him because of

19  that.

20  Q.   In your experience has your validity rate been

21  pretty high?

22  A.   Yeah.  Very high.

23  Q.   What's considered a high validity rate in this

24  state?

25  A.   About 80, 90 percent.

92

1   Q.   Ninety (90) percent?

2   A.   Yeah.  On some cases.  I mean, you know, it

3   depends on if you work --- if you collect signatures

4   inside the Post Office or, you know, where voters tend

5   to go.  We tend to have better signature validation

6   rates than say just the subway or, you know, just a

7   large crowd, you know, or an event or something.

8   Q.   All right.

9   A.   Or the DMV is also a great place to petition.  A

10  lot of people register to vote after they get their

11  cars registered or whatever.

12  Q.   Is it your experience that you're able to get more

13  signatures in states without a witness requirement ---

14  A.   Absolutely.

15  Q.   --- in Pennsylvania?

16  A.   Well, I have the freedom to work whenever I want.

17  Q.   Okay.  And how late do you usually work?

18  A.   I have worked as late as 4:00 in the morning?

19  Q.   How do you do that?

20  A.   There was one case where we were petitioning for

21  marijuana legalization.  And I set up a table outside

22  of a liquor store in Boston, and a very busy corner in

23  Boston.  There's a lot of club scene around there and

24  they were out there late in the morning.  And, you

25  know, they signed in droves.