## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BENEZET CONSULTING, LLC;** | : | |
| **TRENTON POOL** *and* **CAROL LOVE** | : | |
| | : | **CIVIL ACTION** |
| **PLAINTIFFS,** | : | |
| | : | **No. 1:16-CV-00074** |
| **vs.** | : | **Hon. Yvette Kane** |
| | : | |
| **PEDRO A. CORTÉS,** in his official capacity | : | |
| as the Secretary of the Commonwealth of | : | |
| Pennsylvania; and **JONATHAN MARKS,** | : | |
| in his official capacity as Commissioner, | : | |
| of the Bureau of Commissions, Elections and | : | *Filed Electronically* |
| Legislation | : | |
| | : | |
| **DEFENDANTS.** | : | |

## PLAINTIFFS' REPLY BRIEF IN OPPOSITION TO DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**Paul A. Rossi, Esq.**
*Legal Counsel to Plaintiffs*
**873 East Baltimore Pike**
**Suite #705**
**Kennett Square, PA  19348**
**717.961.8978**
Paul-Rossi@comcast.net

## **TABLE OF CONTENTS**

Cover Page…………………………………………………………….…1

Table of Contents…………………………………………………...……2

Table of Authorities……………………………………………….….…4

Statement of the Motion Presented…………………………………………6

Argument………………………………………………...…………………6

I.     Political Parties Have No First Amendment Right to Exclude
       Non-Members From Offering Election Petitions to Party
       Members to Allow Party Members to Decide if They Want
       To Sign a Nominating Petition to Place A Party Member on
       Their Party's Primary Election Ballot…………………………….……6

II.    All Plaintiffs Have Standing………………………………………….......13

III.   The Circulation of All Election Petitions Implicate
       "Core Political Speech" Afforded the Highest Protections Under
       The First Amendment…………………………………………………16

IV.    Strict Scrutiny Applies to Adjudication of Challenged In-State
       Witness Requirement………………………………………………….....21

V.     Second Circuit Opinion in *Maslow* Does Not Apply to Analysis
       On Restrictions Imposed on Out-of-State Circulators and Does
       Not Displace the Vitality of the Second Circuit's Analysis in
       *Lerman*………………………………………………………..…………28

VI.    Defendants' Denigration of  Plaintiffs Benezet and Pool's
       Entrepreneurial Effort to Carve Out a Living Wage From Their
       Circulation Efforts is Constitutionality Irrelevant…………………….…30

VII.   Defendants' Argument That the "Ends Justifies the Means"
       Is Invalid…………………………………………………………....…32

VIII.  Plaintiffs' First Amendment Challenge to the Sworn Affidavit
       Requirement is Valid……………………………………………………..34

IX.     Plaintiffs' Commerce Clause Claim Against In-State Witness
        Requirement is Valid……………………………………………………..35

X.      The Extensive Record and Argument in Plaintiffs' Brief in
        Support of Plaintiffs' Motion for Summary Judgment is
        Sufficient to Support Grant of Plaintiffs' Motion for
        Summary Judgment Under *Anderson*  Balancing Test……………….…36

Conclusion…………………………………………………………………...36

Certificate of Service…………………………………………………....………38

Exhibits

## TABLE OF AUTHORITIES

*Anderson v. Celebrezze*,
    460 U.S. 780 (1983)……………………………………………….…30

*Ashcroft v. ACLU*,
    542 U.S. 656 (2004)……………………………………………….…25

*Buckley v. American Constitutional Law Foundation*,
    525 U.S. 182 (1999)………………………………………...…..21, 23, 24, 29

*Buckley v. Valeo*,
    424 U.S. 1 (1976)……………………………………………………..19

*Burdick v. Takushi*,
    504 U.S. 428 (1992)…………………………………………………..24

*California Democratic Party v. Jones*,
    530 U.S. 567 (2000)……………………………………………...…..9

*Chandler v. City of Arizona*,
    292 F.3d 1236 (10th Cir. 2002)……………………………………..24

*Citizens in Charge v. Gale*,
    810 F.Supp.2d 916 (D. Neb. 2011)……………………………….20, 23

*Daien v. Ysursa*,
    711 F.Supp.2d 1215 (D. Idaho 2010)………………………………21

*Federal Election Com'n v. Wisconsin Right to Life, Inc.*,
    551 U.S. 449 (2007)……………………………………………...…12

*Green Party of Pennsylvania v. Aichele*,
    89 F.Supp3d 723 (E.D. Pa. 2015)…………………...............…21, 23, 27, 28

*Krislov v. Rednour*,
    226 F.3d 851 (7th Cir. 2000)…………………………….…………..21, 23

*Lerman v. Board of Elections in City of New York*,
    232 F.3d 135 (2d Cir. 2000)…………………………….….…..…28, 29

*Libertarian Party of Virginia v. Judd*,
    718 F.3d 308 (2013)…………………………………………...………*passim*

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)…………………………………………………...………13

*Maslow v. Board of Elections in the City of New York*,
    658 F.3d 291 (2d Cir. 2011)……………………………….......……28, 29

*Meyer v. Grant*,
    486 U.S. 414 (1988)……………………………………………...………*passim*

*Nader v. Blackwell*,
    545 F.3d 459 (6th Cir. 2008)……………………………………......20, 23, 24

*Nader v. Brewer*,
    531 F.3d 1028 (9th Cir. 2008)………………..………............20, 21, 23, 24

*Philadelphia v. New Jersey*,
    437 U.S. 617 (1978)…………………………………………………….…..35

*Rosario v. Rockefeller*,
    410 U.S. 752 (1973)……………………………………………………...……10

*Turner Broad. Sys., Inc. v. FCC*,
    512 U.S. 622 (1994)………………………………………………….…..12

*Wilmoth v. Merrill*,
    3:16-cv-0223 (D. Conn., March 1, 2016, Judge Hall)..……………......…7, 28

*Yes on Term Limits, Inc. v. Savage*,
    550 F.3d 1023 (10th Cir. 2008)………………………………..………24

## STATEMENT OF THE MOTION PRESENTED

Plaintiffs have clearly moved this Honorable Court for summary judgment on plaintiffs' claims alleging that: (1) the challenged in-state witness requirement imposed on the circulation of nominating petitions impairs rights, both facially and as-applied to plaintiffs, guaranteed under the First and Fourteenth Amendments to the United States Constitution and the Commerce Clause of the United States Constitution; and, (2) the notarized affidavit requirement imposed on the execution of each and every page of a nominating petition impairs rights, both facially and as-applied to plaintiffs, guaranteed under the First and Fourteenth Amendments to the United States Constitution.  Plaintiffs are content to take all other claims in the above captioned action to trial.

## ARGUMENT

**I.      Political Parties Have No First Amendment Right to Exclude Non-Members From Offering Election Petitions to Party Members to Allow Party Members to Decide if They Want to Sign a Nominating Petition to Place A Party Member on Their Party's Primary Election Ballot.**

Plaintiffs are placing this part of their reply at the top of the brief because, the Court's adjudication of this issue is as important as the challenged provisions made part of plaintiffs' motion for summary judgment.  Defendants argue that because political parties have a First Amendment right to restrict the **_selection_** of their nominees to their party members that the parties also have the First Amendment right to say who may or may not hold the clipboard of offer an

election petition to a party member to permit the party member to decide for himself/herself whether to sign the petition to place a party member on their party's primary election ballot, which, in turn directly permits the party membership to decide who will be their party's nominee.  Def. Br. in Opposition at pp. 13-15.  Defendants argument is pure folklore which is the product of sloppy (intentional or unintentional) treatment of precedential material and which has never been ratified by the United States Supreme Court, or any other court beyond *Maslow* – a Second Circuit case not binding on this court, and which was not followed by the United States District Court for the District of Connecticut when it first entered a temporary restraining order on March 1, 2016, enjoining Connecticut's in-state witness requirement for the circulation of Republican and Democrat nominating petitions and then accepting a stipulated judgment permanently enjoining Connecticut's enforcement of the in-state witness requirement for Republican and Democratic presidential candidates.  *See*, *Wilmoth v. Merrill*, 3:16-cv-0223 (D. Conn., March 1, 2016, Judge Hall)[1] Attached hereto as Exhibit K.

Yes, political parties have the right under the First Amendment to exclude non-members from the ***selection*** of their party nominees.  Plaintiffs and plaintiffs'

---

[1] After the grant of the TRO by Judge Hall, defendants eventually agreed to a stipulated judgment whereby the State of Connecticut agreed to cease enforcement of the in-state witness requirement of election petitions for presidential candidates of major political parties.

legal counsel will be the first to challenge any change in Pennsylvania election law which would move the Commonwealth to an "open" primary election format that would allow independents and/or Democrats to vote in the GOP primary or even permitting non-party members to sign nominating petitions to place candidates on the party primary election ballots.

As this Court, in particular, is well aware, the only operative signature on a nominating petition is the signature of the registered Republican for GOP candidate petitions and the registered Democrat for Democratic party candidates. The First Amendment right of political parties to limit the **_selection_** of their party nominee to party members is, at the election petition stage, fully protected by limiting valid nominating petition signatures to registered party members.  The party affiliation of the person holding the clipboard, or offering the nominating paper to a party member is entirely irrelevant to the operative decision of a registered party member who must decide whether or not they want a particular party member to be placed on their primary election ballot to permit their party's membership to decide if they want that party member to be their party's nominee. A million unregistered circulators, whether in-state residents or out-of-state residents cannot get a single candidate on a primary election ballot unless the requisite number of registered and enrolled party members independently decide to actually sign the nominating petitions offered to them by the million unregistered

circulators.  If Martians were offering the clipboards for party members, the fact that Martians were the beings holding the clipboard does not implicate any form of party raiding because at all times registered and enrolled party members retain the sole power and legal authority to provide all of the operative signatures necessary to place a member of their party of their party's primary election ballot.

The cases cited by defendants never extend the First Amendment rights of political patties to be able to exclude non-party members from engaging in interactive political speech with their members.  The First Amendment does not empower either the Commonwealth or the Republican or the Democratic parties to cloister off their members from non-member political speech.  The precedents merely state that the ***selection*** of party nominees by party members is protected under the First Amendment.  In *California Democratic Party v. Jones*, 530 U.S. 567, 574-75 (2000), the Supreme Court stated that: "in no area is the political association's right to exclude more important than in the process of selecting its nominee." *Id*.  The Supreme Court has never sought to extend the right of political parties to exclude non-member political speech of the sort implicated by petition circulation.

To the extent that placing a candidate on a party primary election ballot is part of the selection process, and plaintiffs agree that it is, the selection is made by the registered party members deciding to sign or not sign the nominating petition –

not the person holding the clipboard while the party member signs or refuses to sign.

Defendants incorrectly denominate the alleged right of a political party to exclude non-party members from engaging in interactive political speech with party members as a state interest against "party raiding." Def. Br. in Opposition at p. 15. Contrary to defendants' argument, a state's interest against "party raiding" as explained by the United States Supreme Court, only implicates the state's right to place a reasonable deadline on the ability of members of one party to switch to another political party. *See Rosario v. Rockefeller*, 410 U.S. 752 (1973). The Supreme Court has never articulated any rational that would permit this Court to characterize a citizen of another state presenting an election nomination petition to an enrolled party member of Pennsylvania to give them the opportunity to allow that enrolled party member to decide for his or herself as to whether (or not) he or she wanted to support a candidate within their party to be placed on their party's primary election ballot as an example of "party raiding" sufficient to prohibit out-of-state circulators through the boot-strapping of an in-state enrolled party registration requirement. The only operative signatures on an election nomination petition is that of the enrolled party member – not the person who presented the petition to them on a clipboard.

Furthermore, as applied to the plaintiff Pool, even if this Court adopts defendants' grossly expanded definition of "party raiding," plaintiff Pool is a member of the Texas Republican Party and so the circulation of nominating petitions for GOP candidates by plaintiff Pool renders defendants' party raiding argument even more remote from legal reality.  As the Pennsylvania Republican Party is just a local organ of the Republican National Committee, as a Texas Republican, plaintiff Pool cannot be characterized as attempting to "raid" his own party.  Therefore, as applied to plaintiff Pool, raising the alleged state interest in preventing "party raiding" is simply not applicable to this case.

If this were not the case, it would seem that Hillary Clinton, who is a New York Democrat was herself engaged in a form of "party raiding" of the Pennsylvania Democratic Party when she sought to have her name placed on the 2016 primary election ballot – an act far more intimate to a party's First Amendment rights than plaintiff Pool's mere circulation of a nominating petition. "Party raiding" has never been employed to cloister state political parties from political speech uttered by unaffiliated citizens.

Furthermore, defendants have failed to produce any evidence that either the Pennsylvania Republican or Democrat parties have ever articulated a desire to prohibit non-members from circulating their petitions.  Both the Republican and Democratic parties are required to file their by-laws with defendant Marks.

Neither set of by-laws assert any party desire to prohibit non-party members from circulating their nominating petitions.

Under strict scrutiny analysis, the government has the burden to prove that the challenged law is constitutional. *Federal Election Com'n v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 450-51 (2007). To withstand strict scrutiny, the government must prove that the law is necessary to achieve a compelling governmental interest and to meet this burden of proof, the government "must do something more than merely posit the existence of the disease sought to be cured." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 644 (1994). In other words, the government must factually prove the existence of the evil and that the asserted interest is necessary and narrowly tailored to remedy the evil. Here, defendants have completely failed to offer any evidence that circulation of nomination petitions by unenrolled or enrolled members of the same political party from other states is "party raiding" or how the enrolled party requirement for circulators is narrowly tailored to prevent an evil proven to actually exist.

Furthermore the notion that petition circulators must be registered voters of the same political party as the members signing the petition flies in the face of the Supreme Court's ruling that it is unconstitutional to require petition circulators to be registered voters – at all.

II.   __All Plaintiffs Have Standing__.

Standing to maintain the instant action requires three elements to be present: (1) the plaintiffs are required to have suffered an injury in fact; which (2) must be causally connected to the complained-of conduct undertaken by defendants; and (3) will likely be redressed if plaintiffs prevail. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). All plaintiffs' have suffered injury in fact. Plaintiffs Benezet and Pool have suffered both economic loss/harm ((a)decreased signature production; (b) the expense of advertising to find in-state witnesses; (c) the costs of paying for idle circulators sitting in hotel rooms for entire days because plaintiff Pool could not, despite every effort, locate willing in-state witnesses willing to work with every out-of-state circulator brought into Pennsylvania to circulate nominating petitions; (d) lost Trump contract as a direct result of plaintiffs' search for in-state witnesses in the Pittsburgh area; (e) the costs of executing the sworn affidavits for the Cruz campaign) and direct harm to free speech rights ((a)lost opportunity to interact with Pennsylvania voters in the circulation of nominating petitions for lack of an in-state witness; (b) lost signatures because circulation hours had to be cut short because either there was no in-state witness or the in-state witness was not willing to work as many hours as the out-of-state circulator or the out-of-state circulator had to stop circulating nominating petitions at the "peak" time of day to collect signatures because virtually none of the 80,000 notaries in

Pennsylvania work past 5:00 p.m.; (c) the out-of-state circulator must stop to get the day's work executed out of fear that the in-state witness will disappear into the ether; and (d) the imposition of inefficient signature collection methods necessary to accommodate less mobile or motivated in-state witnesses).  *See*, Pl. Exhibit A, Pool Dep. at 22:7-12;  23:2-11;  39:1-14;  37:3-10;  41:5-12;  54:18-21:  90:24-91:13;  91:16-93-13;  105:3-109:9;  107:10-14;  130:2-6;  130:21-132:7;  131:13-132:7;  145:2-23;  176:16-179:6;  212:6-213:23;  244:23-246:23;  246:6-23;  249:17-252:2;  267:7-19;  268:25-271:16;  270:24-271:9;  274:1-276:15;  281:1-284:2;  285:4-25;  287:3-288:22;  289:7-294:10;  315:7-321:21;  324:7-20;  *See*, Pl. Exhibit B, Witmer Dep. at 65:25-66:7;  73:9-22;  75:1-76:8;  94:11-95:10;  98:4-99:20;  101:11-102:18;  102:19-104:12;  *See*, Pl. Exhibit C, Jennings Dep. at 56:14-57:12;  57:13-17;  58:21-59:18;  58:21-59:18;  *See*, Pl. Exhibit D, Jacobs Dep. at 42:1-15;  59:15-60:5;  *See*, Pl. Exhibit E, Alexander Dep. at  78:23-79:7;  24:5-25;  25:9-26-24;  42:12-24;  81:2-13;  81:23-83:13;  83:9-20.  Plaintiff Love suffered an injury in fact because she was deprived of the opportunity to sign a nominating petition for Cruz because there was no in-state witness available to execute her nominating petition in Lancaster County.  *See*, Pl. Exhibit A, Pool Dep. at 154:7-16; Pl. Exhibit F, Love Dep. at 24:1-18.  Love testified that she has signed Republican nominating petitions in the past when offered to sign.  *See*, Pl. Exhibit F, Love Dep. at 24:19-25:11.

14

All of the aforementioned injury-in-fact is directly caused by the challenged in-state witness and/or sworn affidavit requirements.  The requested injunctive and declaratory relief will provide plaintiffs complete prospective equitable relief such that none of the experienced injuries will occur in the future.  Accordingly, plaintiffs have standing to maintain all of the claims upon which plaintiffs request summary judgment.

Plaintiffs' brief in opposition to defendants' motion for summary judgment more extensively addresses the standing objections raised by defendants in support of their motion for summary judgment.   Plaintiffs will mostly rest on their argument in favor of standing found in plaintiffs' brief in opposition.  However, plaintiffs' will point out that plaintiffs' Benezet and Pool have standing as the challenged statutes directly targets and regulates their political speech in the circulation of nominating petitions for political party candidates in Pennsylvania. As the Fourth Circuit explained in *Libertarian Party of Virginia v. Judd*, 718 F.3d 308 (2013), in holding that a circulator-plaintiff Daryl Bonner who was not even able to circulate election petitions in Virginia owing to an injured knee during the immediate past circulation period:

> "[I]f the witness residency requirement is at least in part responsible for
> frustrating Bonner's attempt to fully assert his First Amendment rights in
> Virginia, the causation element of *Lujan* is satisfied, and he can attempt
> to hold the Board accountable notwithstanding the presence of another
> proximate cause.  In that vein, it is well to remember that Bonner's claim
> is not that the requirement has precluded him, as a nonresident of

Virginia, from circulating nominating petitions at all, but that he may only do so when accompanied by a resident witness.

Whereas a knee ailment like the one afflicting Bonner would have disabled any circulator or witness without regard to residency, the law of which Bonner complains targets him and others of his ilk with laser precision; consequently, Bonner's legal disability relates more closely to his asserted injury than does his physical infirmity. Moreover, Bonner's medical condition is ephemeral and, presumably, will have sufficiently improved by 2016, but if the witness residency requirement then remains on the books, he will yet be prohibited from circulating petitions unencumbered.

*Libertarian Party of Virginia*, 718 F.3d at 316. Accordingly, all plaintiffs have standing to maintain the instant motion for summary judgment.

## III.   The Circulation of All Election Petitions Implicate "Core Political Speech" Afforded the Highest Protections Under the First Amendment.

Defendants' effort to delegitimize the circulation of election petitions as "core political speech" afforded the highest protections under First Amendment jurisprudence is riddled with analytical holes and without merit. In order to prevail, defendants are required to concoct some argument, no matter how attenuated, to render the work of every previous federal court on this issue a nullity.

In sum, defendants argue that because some of the testimony in this case indicates that some of the communication between out-of-state circulators and prospective signers is of such brevity that all speech and conduct uttered by circulators in the course of circulating nominating petitions in Pennsylvania is

16

negated from the ranks "core political speech" afforded protection under the First Amendment. Defendants seem to argue that only a certain quality or length of speech is worthy of First Amendment protection, and that the Commonwealth of Pennsylvania is entitled to establish that brief encounters between an out-of-state circulator (or any circulator for that matter) of an election petition and voters does not constitute political speech protected under the First Amendment. Def. Br. in Opposition at pp. 3, 19-20.

As an initial matter, defendants are cherry-picking testimony which seems to show only brief interactions between the circulator and the voter. Defendants omit from their argument the fact that there is also testimony of extended discussion between the circulator and the prospective signer. Jacob Witmer testified that he often has to explain to the voter how candidates get on the ballot and when they learn that signatures are required they will ask to sign petitions for more than one candidate to promote choice on the ballot. *See*, Exhibit B, Witmer Dep. at 94:18-97:25. Accordingly, the full record does not support defendants' attempt to characterize circulator speech as nothing more than a Neanderthal utterance, and therefore, defendants' argument that circulator speech is not "core political speech" is factually baseless. Witmer's testimony, beyond showing that extended discussion is often necessary to get a prospective voter to sign a nominating petition, also exemplifies the broader nature of the content of the political speech

of circulators to advocate for the need for ballot choice and the education of voters

as to how candidates get on the Commonwealth's primary election ballot.

Furthermore, the testimony of Michael Alexander demonstrates his willingness to

"battle through objections" to get a signature, providing further evidence that

defendants' effort to characterize all speech by petition circulators as too brief to

warrant First Amendment protection is betrayed by the full record in this case.

*See*, Exhibit E, Alexander Dep. at 24:5-25.

Defendants rely on the testimony given in *Meyer v. Grant*, 486 U.S. 414

(1988), which involved the circulation of referendum petitions and which showed

some extended discussion between the circulator and the prospective signer of the

petition.  Defendants then make the First Amendment killing leap that because the

*Meyer* Court had a record which involved some detailed speech that, therefore,

only detailed political discourse was entitled to the mantle of "core political

speech."   The Supreme Court has never issued an opinion limiting the First

Amendment to lofty political engagements of speech, and defendants fail to cite a

single case in support of their argument that only extended political discussion is

entitled to the mantle of "core political speech."

Furthermore, every federal court that has adjudicated the constitutionality of

state requirements that only in-state circulators or witnesses may circulate or

execute an election petition for candidates where the out-of-state challenger to the

restriction has agreed to consent to the jurisdiction of the state for the purpose of

any investigation and/or prosecution of allegations of election petition fraud have

determined that the restrictions imposed a severe restriction on "core political

speech" subject to exacting scrutiny.  In *Buckley v. Valeo*, 424 U.S. 1 (1976), the

Supreme Court held that "legislative restrictions on advocacy of the election or

defeat of political candidates are wholly at odds with the guarantees of the First

Amendment."  *Buckley*, 424 U.S. at 50.  In *Libertarian Party of Virginia v. Judd*,

718 F.3d 308, the Fourth Circuit employing strict scrutiny analysis in striking as

unconstitutional Virginia's in-state witness restriction for election petitions for

minor political party candidates noted that a unanimous Supreme Court determined

in *Meyer v. Grant* that petitions "of necessity involve[] both the expression of a

desire for political change and a discussion of the merits of the proposed change."

*Libertarian Party of Virginia*, 718 F.3d 308 (2013) quoting  *Meyer v. Grant*, 486

U.S. 414, 421 (1988).  The Fourth Circuit stated as part of its standing analysis

that:

> "Mindful of the Court's analysis in *Meyer*, we observe that those circulating nominating petitions need not succeed in convincing potential signatories that the candidate will prevail, but the circulators 'will at least have to persuade them that [the candidate] is…deserving of the public scrutiny and debate that would attend…consideration by the whole electorate."  Almost invariably, this will 'involve an explanation of the nature of the proposal,' e.g., the candidates political views or the party's platform, 'and why its advocates support' them.  Taking as true the uncontested averments of the plaintiffs, we cannot help but agree that the witness residency requirement inevitably 'limits the number of voices

who will convey [the] message and hours they can speak and, therefore, limits the size of the audience they can reach.' It is therefore immaterial that the LPVA can, in spite of the witness residency requirement, circulate its petitions to enough of the electorate to permit the collection of 10,000 signatures, if it is also true that, absent the requirement, the petition circulators could approach and attempt to persuade an even larger audience. An encumbrance thus alleged, whose presence is properly evidenced on summary judgment, constitutes an injury in fact for standing purposes."

*Libertarian Party of Virginia*, 718 F.3d at 314-15 (2013) *quoting Meyer*, 486 U.S. at 421 (1986). Witmer's and Alexander's testimony cited above, clearly demonstrate out-of-state circulators engaging in extended discussion to persuade the prospective voter to support ballot access for the subject candidate. Furthermore, the testimony shows that the in-state witness restriction is the direct and proximate cause of the loss of political speech.

Critically, defendants' argument further lacks any discussion as to how out-of-state circulator speech in Pennsylvania is any different from the political speech, in kind or quality, of circulators in any of the jurisdictions where the in-state witness restriction was held unconstitutional by federal courts as part of the circulation of candidate election petitions in all those states. *See Citizens in Charge v. Gale*, 810 F.Supp.2d 916 (D. Neb. 2011) (invalidating state residency requirement for circulators of candidacy and ballot initiative petitions); *Nader v. Blackwell*, 545 F.3d 459 (6th Cir. 2008) (invalidating state residency requirement for circulators of presidential candidacy petitions); *Nader v. Brewer*, 531 F.3d

1028 (9th Cir. 2008) (same); *Daien v. Ysursa*, 711 F.Supp.2d 1215 (D. Idaho 2010) (same); *Krislov v. Rednour*, 226 F.3d 851 (7th Cir. 2000) (invalidating residency requirement for circulators of petition for congressional candidacy petitions); *Libertarian Party of Virginia v. Judd*, 718 F.3d 308 (4th Cir. 2013) (invalidating state residency requirement for circulators of candidacy petitions), *aff'g* 881 F.Supp.2d 719 (E.D. Va. 2012) *cert. denied*, 571 U.S. \_\_\_\_, 134 S. Ct. 681 (Dec. 2, 2013); *Green Party of Pennsylvania v. Aichele*, 89 F.Supp3d 723 (E.D. Pa. 2015). Defendants provide no evidence that the record in this case demonstrates that out-of-state circulators engage in a different kind of speech in Pennsylvania for political party candidates than that engaged in by circulators in Virginia, Idaho, Nebraska, Ohio, or even Pennsylvania for political body candidates, where the in-state witness requirement was struck as unconstitutional by federal courts. Accordingly, plaintiffs and out-of-state circulators of political party nominating petitions in Pennsylvania are engaged in "core political speech" subject to the highest protections afforded under the First Amendment to the United States Constitution.

## IV.   Strict Scrutiny Applies to Adjudication of Challenged  In-State Witness Requirement.

In evaluating ballot access cases, courts must "be vigilant . . . to guard against undue hindrances to political conversations and the exchange of ideas." *Buckley v. American Constitutional Law Foundation*, 525 U.S. 182, 192 (1999).

The Supreme Court has twice considered statutes that restrict who may circulate election petitions in support of ballot access, and has twice invalidated the restriction.   In *Meyer v. Grant*, 486 U.S. 414 (1988), the Court struck down Colorado's prohibition on paid petition circulators.  Holding that the restriction was "a limitation on political expression subject to exacting scrutiny" the Court reasoned that the state had failed to justify the burden on advocates' free speech rights.  *Meyer*, 486 U.S. at 420.  In *Buckley*, the Court invalidated a requirement that petition circulators be registered voters of the state, holding that the "requirement cuts down the number of message carriers in the ballot-access arena without impelling cause." *Buckley*, 525 U.S. at 197.[2]

Although *Buckley* expressly reserved the question of whether residency requirements like the one at issue in this action would be unconstitutional, *Buckley*, 525 U.S. at 197, every federal court, but one (the first one), to consider the issue has expressly relied on *Buckley* and *Meyer* to hold such requirements unconstitutional in the context of both ballot initiative and candidacy petitions.

---

[2] The Supreme Court's invalidation of a registered voter requirement for petition circulators because the "requirement cuts down the number of message carriers in the ballot-access arena without impelling cause" destroys defendants' argument that the Commonwealth of Pennsylvania can limit nominating petition circulators to registered party members, because party registration can only be accomplished in Pennsylvania through the voter registration process.  If a voter registration requirement for petition circulators is unconstitutional, then there is no constitutional right for the Commonwealth or political parties to require party membership for circulators that can only be accomplished through voter registration.

Furthermore, <u>every</u> court has held such in-state circulator restrictions unconstitutional where out-of-state circulators have expressly been willing to consent to the subject state's jurisdiction for the purpose of investigation and prosecution of alleged election petition fraud. *See Citizens in Charge v. Gale*, 810 F.Supp.2d 916 (D. Neb. 2011) (invalidating state residency requirement for circulators of candidacy and ballot initiative petitions); *Nader v. Blackwell*, 545 F.3d 459 (6th Cir. 2008) (invalidating state residency requirement for circulators of presidential candidacy petitions); *Nader v. Brewer*, 531 F.3d 1028 (9th Cir. 2008) (same); *Daien v. Ysursa*, 711 F.Supp.2d 1215 (D. Idaho 2010) (same); *Krislov v. Rednour*, 226 F.3d 851 (7th Cir. 2000) (invalidating residency requirement for circulators of petition for congressional candidacy petitions); *Libertarian Party of Virginia v. Judd*, 718 F.3d 308 (4th Cir. 2013) (invalidating state residency requirement for circulators of candidacy petitions), *aff'g* 881 F.Supp.2d 719 (E.D. Va. 2012) *cert. denied*, 571 U.S. ____, 134 S. Ct. 681 (Dec. 2, 2013); *Green Party of Pennsylvania v. Aichele*, 89 F.Supp3d 723 (E.D. Pa. 2015).

The Fourth Circuit Court of Appeals in *Libertarian Party of Virginia*, relied upon by the Judge Dalzell in striking Pennsylvania's cognate in-state witness requirement for the circulation of nominating papers for independent and political body candidates, explained:

> As the law has developed following the Supreme Court's decisions in *Meyer v. Grant*, 486 U.S. 414 (1988), and *Buckley v. American*

> *Constitutional Law Foundation*, 525 U.S. 182 (1999), a consensus has
> emerged that petitioning restrictions like the one at issue here are subject
> to strict scrutiny analysis. *See, Yes on Term Limits, Inc. v. Savage*, 550
> F.3d 1023 (10th Cir. 2008) (applying strict scrutiny to overturn Oklahoma
> prohibition on nonresident circulators of initiative petitions); *Nader v.
> Blackwell*, 545 F.3d 459 (6th Cir. 2008) (declaring unconstitutional, as
> failing strict scrutiny, Ohio ban on nonresidents circulating nominating
> petitions) *Nader v. Brewer*, 531 F.3d 1028 (9th Cir. 2008) (invalidating,
> pursuant to strict scrutiny analysis, Arizona deadline and residency
> provisions relating to  nominating petitions and circulator-witnesses).
> The Ninth Circuit in *Brewer* recited the general rule that "the severity of
> the burden the election law imposes on the plaintiff's rights dictates the
> level of scrutiny applied by the court." *Nader v. Brewer*, 531 F.3d at
> 1034 (citing *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)).  Hence, "an
> election regulation that imposes a severe burden is subject to strict
> scrutiny and will be upheld only if it is narrowly tailored to serve a
> compelling state interest." *Brewer*, 531 F.3d at 1035.  The triumvirate of
> 2008 decisions in *Savage*, *Blackwell*, and *Brewer* demonstrate a general
> agreement among our sister circuits that residency restrictions bearing on
> petition circulators and witnesses burden First Amendment rights in a
> sufficiently severe fashion to merit the closest examination.

*Libertarian Party of Virginia*, 718 F.3d 308, 316-17 (4th Cir. 2013).  Defendants

argue that the state's interest in policing against election petition fraud implicates a

sufficient state interest to save the challenged in-state witness requirement.  In the

instant action, plaintiffs' have agreed that they are willing to submit to the

Commonwealth's jurisdiction as a condition precedent to freely circulating election

petitions in Pennsylvania without the in-state witness requirement.  As the Fourth

Circuit's decision in *Libertarian Party of Virginia* explains:

> The plaintiffs counter that the Commonwealth could compel
> nonresidents, as a condition of witnessing signatures on nominating
> petitions, to enter into a binding legal agreement with the Commonwealth
> to comply with any civil or criminal subpoena that may issue.  Indeed,

"[f]ederal courts have generally looked with favor on requiring petition circulators to agree to submit to jurisdiction for purposes of subpoena enforcement, and the courts have viewed such a system to be a more narrowly tailored means than a residency requirement to achieve the same result." *Brewer*, 531 F.3d at 1037 (citing, inter alia, *Chandler v. City of Arizona*, 292 F.3d 1236, 1242-44 (10th Cir. 2002); *Krislov*, 226 F.3d at 866 n. 7. More recently in *Savage*, the Tenth Circuit reiterated that "requiring non-residents to sign agreements providing their contact information and swearing to return in the event of a protest is a more narrowly tailored option." 550 F.3d at 1030.

According to the Board, ostensible consent to the extraterritorial reach of the Commonwealth's subpoena power does not guarantee the requisite access, because nonresident witnesses must yet be located and retrieved, perhaps by extradition or rendition. There are few guarantees in life, however, and it is hardly an iron-clad proposition that a similarly situated resident witness will be amenable to service and comply with a lawfully issued subpoena.

Simply states, the Board has produced no concrete evidence of persuasive force explaining why the plaintiffs' proposed solution, manifestly less restrictive of their First Amendment rights, would be unworkable or impracticable. *See*, *Ashcroft v. ACLU*, 542 U.S. 656 (2004) ("[T]he burden is on the Government to prove that the proposed alternatives will not be as effectual as the challenged statute). Surely nonresidents with a stake in having the signatures they have witnessed duly counted and credited – whether that stake be political, financial, or otherwise – will possess the same incentive as their resident counterparts to appear at the Commonwealth's request and answer any questions concerning the petitioning process.

Having fallen short of adducing the quantum of proof necessary to place into issue the relative effectiveness of the plaintiffs' proposed alternative to the patently burdensome witness residency requirement, the Board cannot prevail. Given the facts developed below and viewed in the proper light, we have scant choice but to conclude, as the district court did, that the requirement fails strict scrutiny and is unconstitutional.

*Libertarian Party of Virginia*, 718 F.3d at 318-19 (2013).  Accordingly, defendants' various arguments that the in-state witness requirement is narrowly tailored to advance a compelling state interest to police fraud and ensuring that circulators attend court hearings in the event of a challenge to their petitions are without merit. *See*, Def. Br. in Opposition at p. 41.

Defendants merely make conclusory statements in support of their argument, without producing any evidence, that an out-of-state witness subject to the police powers of the Commonwealth is less likely than an in-state resident to comply with the Commonwealth's orders and/or judicial process.  *Id*.  In fact, the evidence in this case demonstrates that the witnesses in this case (including those non-party witnesses who had not previously consented to the jurisdiction of the Commonwealth by joining as parties to this action) did, in fact, comply with the Commonwealth's subpoena to produce documents and submit to sworn depositions (most of them traveling to Pennsylvania).

Defendants offer no evidence that any out-of-state circulator has ever avoided their legal obligation attached to the circulation of election petitions.  Amusingly, defendants complain that Jake Witmer, who is a plaintiff in the OpenPittsburgh.Org litigation pending in the United States District Court for the Western District of Pennsylvania, did not show up for the emergency hearing held in August in Pittsburgh "because he was circulating in North Dakota."  *See*, Def.

Br.in Opposition at p. 41. The problem with defendants' argument is that I, Paul A. Rossi, who is the legal counsel for plaintiffs in OpenPittsburgh.Org, never asked or sought to have Jake Witmer attend the emergency hearing.  In fact, the second of two witnesses that I had at the hearing did not get to fully testify at that hearing because Judge Hornak did not, at the end of the day, want to hear any additional testimony.  Accordingly, defendants have no evidence that where circulators have consented to the jurisdiction of the Commonwealth of Pennsylvania that the Commonwealth retains any state interest sufficient to overcome the impairment of plaintiffs' First Amendment rights under either a strict scrutiny analysis or the *Anderson* balancing test.

Furthermore, defendant Marks testified that since the ruling in *Green Party of Pennsylvania*, there have been no known instances or allegations of circulator fraud in Pennsylvania.  *See attached*, Ex. #2, Marks' Depo. at pp. 27-30.  In fact, as noted by the Tenth Circuit in *Savage*, "requiring non-residents to sign agreements providing their contact information and swearing to return in the event of a protest is a more narrowly tailored option."  *Savage*, 550 F.3d at 1030.  Under the *Green Party of Pennsylvania* rules, out-of-state circulators are required to provide their contact information to the Commonwealth allowing for proper service of any subpoena – information which is not currently available where a straw in-state witness is the only party required to provide their contact

information.  Accordingly, defendants have failed to offer any evidence that the in-state witness requirement is narrowly tailored to advance a compelling governmental interest.

**V.    Second Circuit Opinion in *Maslow* Does Not Apply to Analysis on Restrictions Imposed on Out-of-State Circulators and Does Not Displace the Vitality of the Second Circuit's Analysis in *Lerman*.**

Defendants allot a significant amount of their brief in opposition to plaintiffs' motion for summary judgment attempting to displace the Second Circuit's decision in *Lerman v. Board of Elections in City of New York*, 232 F.3d 135 (2d Cir. 2000).  First, *Lerman* is just one of a line of cases which extend the analysis and holding of the Supreme Court's decisions in *Buckley v. Am. Constitutional Law Found. Inc.*, 525 U.S. 182 (1999) and *Meyer* to the circulation of candidate election petitions.  Plaintiffs clearly do not rely solely on *Lerman*.  In fact, given that Judge Dalzell in *Green Party of Pennsylvania* relied heavily on the Fourth Circuit's more recent decision in *Libertarian Party of Virginia*, articulating a nearly identical analysis found in *Lerman* and other cited cases, plaintiffs contend that the decision in *Libertarian Party of Virginia* provides the best analysis (aside from *Green Party of Pennsylvania*) as to the proper constitutional adjudication of Pennsylvania's in-state witness requirement for political party candidates.

Defendants' reliance on *Maslow v. Board of Elections in the City of New York*, 658 F.3d 291 (2d Cir. 2011), is misplaced and is distinguishable to cases

adjudicating out-of-state circulator restrictions as was no bar when Judge Hall of the United States District Court for the District of Connecticut (a district court within the Second Circuit), applying strict scrutiny analysis, granted an out-of-state circulator a temporary restraining order in 2016 enjoining enforcement of Connecticut's in-state witness requirement for major political party presidential nominating petitions. *See*, *Wilmoth v. Merrill*, 3:16-cv-0223 (D. Conn., March 1, 2016, Judge Hall)[3] Attached hereto as Pl. Exhibit K.

The Second Circuit's decision in *Maslow v. Board of Elections in City of New York*, 658 F.3d 291 (2011), is distinguishable in important ways from the instant case and does not control and it does not displace the Second Circuit's decision in <u>Lerman</u>. The Second Circuit's decision in *Maslow* did not implicate First Amendment analysis with respect to out-of-state circulators. *Maslow's* analysis is limited by the facts to an analysis of exclusions at the local level, and not on the national level when considering in-state circulator requirements in connection with enrolled party requirements. Accordingly, the ratio of excluded "voices" to non-excluded "voices" is not so stark at the local level as it is when the entire nation is considered as required under in-state circulator and enrolled party restriction under the analysis required under *Buckley* and *Lerman*. The sheer size

---

[3] After the grant of the TRO by Judge Hall, defendants eventually agreed to a stipulated judgment whereby the State of Connecticut agreed to cease enforcement of the in-state witness requirement of election petitions for presidential candidates of major political parties.

of the pool of excluded core political speech implicated by Pennsylvania's in-state

circulator requirement and the proper First Amendment analysis when considering

out-of-state circulator restrictions was not addressed by the *Maslow* Court.

Furthermore, in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), the United

States Supreme Court made clear that:

> [I]n the context of a Presidential election, state-imposed restrictions
> implicate a uniquely important national interest.  For the President and
> the Vice President of the United States are the only elected officials
> who represent all the voters in the Nation.  Moreover, the impact of
> the votes cast in each State is affected by the votes cast for the various
> candidates in other States.  Thus, in a Presidential election, a State's
> enforcement of more stringent ballot access requirements…has an
> impact beyond its own borders.  Similarly, the State has a less
> important interest in regulating Presidential elections than state-wide
> or local elections, because the outcome of the former will be largely
> determined by voters beyond the State's boundaries….The pervasive
> national interest in the selection of candidates for national office, and
> this national interest is greater than any interest of an individual State.

*Anderson* at 794-795.  The decision in *Maslow*, implicating only rules governing

local elections, was not decided under the same factual circumstances.

**VI.  Defendants' Denigration of Plainitffs Benezet and Pool's
Entrepreneurial Effort to Carve Out a Living Wage from Their
Circulation Efforts is Constitutionally Irrelevant.**

Perhaps the most obnoxious and constitutionally irrelevant aspect of

defendants' brief in opposition to plaintiffs' motion for summary judgment is

defendants' constant effort to belittle the efforts of out-of-state circulators who

need to eat, pay bills and make a living in tandem with their desire to advance their

firmly held desire to promote ballot access and the democratic process for as many candidates as possible. *See e.g.*, Def. Br. in Opposition at pp. 17-20, 27, 29, 34. Engaged in the full-time pursuit of the ballot access cause requires that they be compensated for their efforts. All legal counsel in this case as well as your Honor and the Clerk reading this brief receive substantial economic remuneration for a job fully protected under the First Amendment to the United States Constitution.

Defendants intentionally seek to twist plaintiff Pool's words describing his skill set and ability to quickly find a way to comfortably communicate with a stranger to get them to sign a petition as "just like any sales job you've ever heard of" to try to characterize plaintiff Pool as engaged in some sort of conduct unworthy of the protections of this Court or of the First Amendment to the United States Constitution. Such actual cherry-picking of the record by defendants is at worst wholly irrelevant to any valid argument to deny plaintiffs' pending motion for summary judgment. Defendants' briefing on this point is unworthy of the Commonwealth's Office of Attorney General. Defendants' legal counsel's obligation to defend a statute which has been virtually universally struck as unconstitutional, does not give them license to launch irrelevant and gratuitous personal attacks on the livelihood of hardworking individuals dedicated to the expansion of voter choice and democratic participation.

Furthermore, the testimony from some witnesses that they will work for any candidate who is willing to pay for their work evinces, as much as anything, the willingness and desire of circulators to work, whenever economically feasible, to expand voter choice and does not advance defendants' underling effort to paint petition circulators as mere economic whores untethered to any desire to advance any political speech.  Def. Br. in Opposition at pp. 18-19.

The Supreme Court's decision in *Meyer* establishing a constitutional right under the First Amendment to the United States Constitution for circulators to be paid for the work that they produce, renders constitutionality meritless all of defendants' bitching that plaintiffs Benezet and Pool's profit component to their circulation efforts.  The very thing that defendants seek to argue as diminishing plaintiffs' First Amendment claims is itself an exercise of a protected right under the First Amendment.  *Meyer*, 486 U.S. at 427-28.

## VII.  **Defendants' Argument That the "Ends Justifies the Means" Is Invalid.**

Defendants argue throughout their brief in opposition that because candidates routinely get on the ballot and because other avenues of political expression are available to plaintiffs – so who cares if the circulator requirements impose a burden, just do something else if you don't like the rules – that the Court should just pass-over the challenged restrictions as meaningless impairments when

viewed from a macro First Amendment standpoint.  In *Meyer*, the Supreme Court

explained that:

> That appellees remain free to employ other means to disseminate their
> ideas does not take their speech through petition circulators outside the
> bounds of First Amendment protection….The First Amendment protects
> appellees' right not only to advocate their cause but also to select what
> they believe to be the most effective means for so doing.

*Meyer*, 486 U.S. at 424.  And the Fourth Circuit explained in *Libertarian Party of*

*Virginia*, that:

> Although the LPVA has yet to fail in its quadrennial quest to gather
> sufficient signatures in Virginia on behalf of its party's presidential
> candidate, the Board's exclusive focus on those past successes ignores
> the means by which that end has been, and is, achieved…we observe that
> circulating nominating petitions…will 'involve an explanation of the
> nature of the proposal'…'and why its advocates support' them.  Taking
> as true the uncontested averments of the plaintiffs, we cannot help but
> agree that the witness residency requirement inevitably 'limits the
> number of voices who wil convey [the] message and hours they can
> speak and, therefore, limits the size of the audience they can reach."
>
> It is therefore immaterial that the LPVA can, in spite of the witness
> requirement, circulate its petitions to enough of the electorate to permit
> the collection of 10,000 signatures, if it is also true, absent the
> requirement, the petition circulators could approach and attempt to
> persuade an even larger audience.  An encumbrance thus alleged, whose
> presence is properly evidenced on summary judgment, constitutes an
> injury in fact.

*Id*. at 314-15.  And, indeed, the record his overflowing that the challenged in-state

and affidavit requirements impair the ability of plaintiffs to reach as large of an

audience that they would otherwise be able to reach and both of the challenged

restrictions limit the number of hours that out-of-state circulators can be work.  *See*

*e.g.*, Exhibit A, Pool Dep. at 54:18-21;   90:24-91:13;   176:16-177:4;   244:23-246:23;  285:4-16;  287:3-288:22.

## VIII.  Plaintiffs' First Amendment Challenge to the Sworn Affidavit Requirement is Valid.

Defendants' argument that the "notarization requirement does not impact the interaction between signature collector and potential signor at all" is flatly rejected by the record established in this action.  Def. Br. in Opposition at p. 43.  Testimony is clear that out-of-state circulators are required to stop in the middle of the best part of the day for collecting signatures to herd the in-state witness to a notary to execute the signatures gathered during the day.  *See*, Exhibit B, Witmer Dep. at 102:19 - 104:12.  This requirement , therefore, clearly imposes an impairment between the ability of circulators to interact with potential signors.  Furthermore, assuming $5.00 per notarization (and not taking into account all of the surplus signatures that must be notarized to guard against possible invalid signatures), the sheer costs of notarization impose an absolute limit on the number of signatures that a circulator can get, because he/she is limited to the number of signatures that he/she can afford to notarize.  Therefore, the notarization requirement imposes a direct impairment on First Amendment speech.

Defendants' further argument that because Jill Stein notarized more signatures under the in-state witness rules in force in 2012 than her presidential campaign collected in 2016 under the post-*Green Party of Pennsylvania* is some

form of evidence that the sworn affidavit rules do not impose any First

Amendment harm, intentionally ignores, to the point of unethical argument, that

the sole reason that Jill Stein notarized fewer signatures in 2016 than in 2012 was

that Judge Stengel lowered the number of signatures that political body presidential

candidates are required to file to 5,000 in 2016 from the 20,601 that were required

in 2012.  Def. Br. in Opposition at pp. 43-44.

## IX.   Plaintiffs' Commerce Clause Claim Against In-State Witness Requirement is Valid.

Application of plaintiffs' dormant Commerce Clause argument is a case of

first impression.  First Amendment law is clearly sufficient to strike the in-state

witness restriction as unconstitutional.  No previous plaintiff or Court has had to

resort to an analysis of the impermissible interstate discrimination implicated by

forcing out-of-state professional circulators to charge a higher contract price for

their work than in-state professional circulators.  Where a state law directly targets

out-of-state vendors imposing higher costs on their services than in-state

professionals, a clear *per se* violation of the Commerce Clause is established.  The

seminal case of *Philadelphia v. New Jersey*, 437 U.S. 617 (1978) is clear that the

in-state witness restriction implicates a violation of the Commerce Clause of the

United States Constitution.

**X.    The Extensive Record and Argument in Plaintiffs' Brief in Support of Plaintiffs' Motion for Summary Judgment is Sufficient to Support Grant of Plaintiffs' Motion for Summary Judgment Under *Anderson* Balancing Test.**

The argument and record as set forth in plaintiffs' brief in support of plaintiffs' instant motion for summary judgment is conclusive that plaintiffs' ought to prevail on their motion even under an *Anderson* balancing test analysis. Plaintiffs' argument and the record developed in plaintiffs' brief in support is sufficiently extensive, and defendants brief in opposition directly countered elsewhere in this reply, that no further amplification is required by plaintiffs in this reply brief.

## CONCLUSION

Accordingly, defendants' brief in opposition to plaintiffs' motion for summary judgment offers no valid argument that the law and record when viewed in its proper light is sufficient for this Court to deny plaintiffs' pending motion for summary judgment that the in-state witness and sworn affidavit requirements are unconstitutional under the First and Fourteenth Amendments to the United States Constitution.

Respectfully submitted,

Dated:  January 26, 2017                    ____/s/ *Paul A. Rossi, Esq*_____
                                            Paul A. Rossi, Esq.
                                            Attorney I.D. #84947
                                            *Counsel to Plaintiffs*
                                            IMPG Advocates, Inc.

873 East Baltimore Pike, Suite #705
Kennett Square, PA  19348
Direct: 717.961.8978

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BENEZET CONSULTING, LLC;** | : | |
| **TRENTON POOL *and* CAROL LOVE** | : | |
| | : | **CIVIL ACTION** |
| **PLAINTIFFS,** | : | |
| | : | **No. 1:16-CV-00074** |
| **vs.** | : | **Hon. Yvette Kane** |
| | : | |
| **PEDRO A. CORTÉS,  in his official capacity** | : | |
| **as the Secretary of the Commonwealth of** | : | |
| **Pennsylvania; and JONATHAN MARKS,** | : | |
| **in his official capacity as Commissioner,** | : | |
| **of the Bureau of Commissions, Elections and** | : | |
| **Legislation** | : | *Filed Electronically* |
| | : | |
| **DEFENDANTS.** | : | |

## CERTIFICATE OF SERVICE

I, Paul A. Rossi, attorney for plaintiffs, hereby certify that on January 26, 2017, I personally caused to be served on opposing counsel a true and correct copy of the foregoing document on opposing counsel through the Court's ECF system.

Dated:  January 26, 2017          ____/s/ *Paul A. Rossi, Esq*_____
                                                      Paul A. Rossi, Esq.