**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BENEZET CONSULTING, LLC, <u>et al.</u>,** | : | |
| **Plaintiffs** | : | |
| | : | **No. 1:16-cv-00074** |
| | : | |
| **v.** | : | **(Judge Kane)** |
| | : | |
| **KATHY BOOCKVAR and** | : | |
| **JONATHAN MARKS,[1]** | : | |
| **Defendants** | : | |

<u>**MEMORANDUM**</u>

Before the Court are Plaintiffs' motion for partial summary judgment (Doc. No. 44) and

Defendants' motion for summary judgment (Doc. No. 41).  For the reasons that follow, the Court

will grant in part and deny in part the motions.

**I.      BACKGROUND**

      **A.      Procedural Background**

Plaintiffs Benezet Consulting, LLC ("Benezet") and Trenton Pool ("Pool") initiated the

above-captioned action by filing a complaint against Defendants Pedro A. Cortes ("Cortes"), in

his official capacity as the Secretary of the Commonwealth of Pennsylvania – a position

currently held by Defendant Kathy Boockvar ("Boockvar") – and Jonathan Marks ("Marks"), in

his official capacity as Commissioner for the Bureau of Commissions, Elections and Legislation

(referred to together herein as "Defendants") on January 14, 2016,[2] challenging specific

provisions of Pennsylvania's Election Code (the "Election Code"), in connection with

---

[1] Since the commencement of this action, Kathy Boockvar was appointed Secretary of the
Commonwealth of Pennsylvania, and, accordingly, is substituted as a party pursuant to Federal
Rule of Civil Procedure 25(d).  <u>See</u> Fed. R. Civ. P. 25(d) (providing that the successor of a
public officer "is automatically substituted as a party").

[2] Marks currently serves as the Commonwealth's Deputy Secretary for Elections and
Commissions.

Pennsylvania's primary election for President of the United States.  (Doc. No. 1.)  In their first complaint, Plaintiffs requested, inter alia, a declaratory judgment and emergency permanent injunction "on or before January 25, 2016, enjoining defendants from enforcing the challenged provisions and interpretations" of the Election Code as to Plaintiffs.  (Id. at 36.)  On January 19, 2016, Plaintiffs filed an amended complaint (Doc. No. 3) and motion for a temporary restraining order or emergency preliminary injunction (Doc. No. 4).  The Court denied Plaintiffs' motion for a temporary restraining order on January 27, 2016.  (Doc. No. 21.)  On January 29, 2016, the Court issued an Order deeming Plaintiffs' motion for an emergency preliminary injunction withdrawn and permitting Plaintiffs to file a second amended complaint.  (Doc. No. 24.)  Plaintiffs filed a second amended complaint – the operative pleading in this action – on February 16, 2016 (Doc. No. 25), naming Plaintiff Carol Love ("Love") as an additional plaintiff.

In the second amended complaint, Plaintiffs request declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 and seek to prohibit Pennsylvania state officials from enforcing certain provisions of the Election Code, 25 P.S. §§ 2868 and 2969.  (Id. ¶¶ 1-2.)  Counts I and II allege that the state residency requirement for witnesses of nomination petition circulation under Section 2869 (the "In-State Witness Requirement") violates the First Amendment both facially and as applied to Plaintiffs.  (Id. at 29-32.)  Counts III and IV set forth First Amendment challenges to Section 2869's previous requirement that the affidavit accompanying every nomination petition be notarized (the "Notarization Requirement"), both facially and as applied to Plaintiffs.  (Id. at 32-36.)  Further, Counts V and VI respectively set forth facial and as-applied challenges to Section 2868's prohibition against qualified electors signing more than one nomination petition under the First Amendment.  (Id. at 36-40.)

2

Plaintiffs also assert additional constitutional claims, in the alternative, for alleged violations of the Equal Protection Clause and the Commerce Clause. Specifically, Counts VII, VIII, and IX set forth equal protection challenges to the In-State Witness Requirement, the Notarization Requirement, and the requirement that registered voters enrolled in major political parties may sign only one nomination petition for each office, respectively. (Id. at 40-44.) Count X sets forth an alternative challenge to the In-State Witness Requirement under the Commerce Clause. (Id. at 44-45.)

Upon the completion of discovery, Defendants filed a motion for summary judgment on December 22, 2016. (Doc. No. 41.) On the same date, Plaintiffs filed a motion for summary judgment (Doc. No. 44), as to all of their claims, but for their challenge to Section 2868's prohibition on qualified electors signing more than one nomination petition, on the basis that this claim requires trial testimony and may not be resolved at the summary judgment stage (Doc. No. 45). On August 29, 2018, Defendants filed a motion for leave to file a supplemental brief addressing an opinion issued by the United States Court of Appeals for the Third Circuit in De La Fuente v. Cortes, No. 17-3778, on August 7, 2018 (Doc. No. 64), which this Court granted on September 14, 2018 (Doc. No. 66). Accordingly, Defendants filed a supplemental brief in support of their motion for summary judgment on September 28, 2018 (Doc. No. 67), to which Plaintiffs filed a brief in response on October 12, 2018 (Doc. No. 68). Defendants filed a reply brief on October 26, 2018. (Doc. No. 71.) On December 20, 2019, the Court ordered Plaintiffs to show cause why their challenges to the Notarization Requirement should not be deemed moot in light of recent amendments to the pertinent portion of the Election Code (Doc. No. 72), to which Plaintiffs filed a response on January 6, 2020 (Doc. No. 73). Having been fully briefed, the parties' motions for summary judgment (Doc. Nos. 41, 44) are ripe for disposition.

### B.     Factual Background[3]

In the context of Pennsylvania's primary elections, Section 2868 of the Election Code, 25 P.S. § 2868, provides that qualified electors are prohibited from signing more than one nomination petition for a given office.[4]  Section 2868 reads, in pertinent part, as follows: "Each signer of a nomination petition shall sign but one petition for each office to be filled, and shall declare therein that he is a registered and enrolled member of the party designated in such petition."  See 25 P.S. § 2868.  In addition, Section 2869 of the Election Code articulates two requirements relevant to the instant action.  First, Section 2869 sets forth the In-State Witness Requirement, stating, in pertinent part, that each sheet of a nomination petition "shall have appended thereto the statement of the circulator of each sheet" setting forth that he or she is a qualified elector of the Commonwealth.  See 25 P.S. § 2869.  Section 2869 also previously set forth the Notarization Requirement, which required that the affidavit accompanying each

---

[3] The following facts of record, unless otherwise noted, are derived from the parties' statements of material fact submitted in connection with their respective motions for summary judgment. (Doc. Nos. 42, 46.)  While there are instances in which the parties have disputed the import or materiality of certain facts, the Court deems the facts recited herein to be undisputed in all material respects.  The Court also recognizes that while Defendants filed an answer (Doc. No. 51) to Plaintiffs' statement of material facts (Doc. No. 46), in accordance with Local Rule 56.1, Plaintiffs did not file such a responsive statement with respect to Defendant's statement of material facts.  In light of the undisputed facts and relevant evidence of record, however, Plaintiffs' failure to comply with Local Rule 56.1 is not material to this Court's ultimate resolution of the pending motions.

[4] While the parties occasionally discuss the Election Code provisions at issue using both "petition" and "paper" interchangeably, the Court uses the term "petition" where applicable because the instant case concerns the presidential primary election.  See Constitution Party of Pa. v. Aichele, 757 F.3d 347, 351 n.5 (3d Cir. 2014) (indicating that under Pennsylvania's Election Code, nomination "petitions" are filed in primary elections, while nomination "papers" are applicable to general elections).

nomination petition be notarized.  See id.  Section 2869, however, was amended subsequent to the commencement of this case so as to remove the Notarization Requirement.[5]

Benezet is a Texas limited liability company, of which Pool is the only member, that was formed in 2014 and is involved in the business of gathering signatures for political campaigns. (Doc. No. 46 ¶¶ 1-3.)  Benezet's business specifically deals with "political consulting, ballot access[,] and signature gathering" (id. ¶ 4), and Benezet became involved in gathering signatures in 2006 (id. ¶ 6).  Pool is a registered Republican in the state of Texas (id. ¶ 99), while Love is a registered Republican who resides in Pennsylvania (id. ¶ 83).

Benezet took part in signature-gathering efforts in Pennsylvania as part of the 2016 presidential election.  (Id. ¶¶ 5, 7.)  In doing so, Benezet hired signature gatherers as independent contractors, consistent with its past practice.  (Id. ¶ 7.)  As part of their efforts to gather signatures, "Benezet's circulators . . . move[] around the country as needed to meet individual state deadlines" (id. ¶ 9), and its "contractors are paid on a per signature basis" (id. ¶ 10).

## 1. Facts as Stated in Support of Plaintiffs' Motion for Summary Judgment

### a. Benezet Consulting and Signature-Gathering

In 2016, Benezet entered into a contract to gather signatures for Ted Cruz in his candidacy for the Republican nomination, Rocky De La Fuente in his candidacy for both the Democratic nomination and as an independent candidate, and Donald Trump as a Republican candidate.  (Id. ¶ 5.)  Under such contracts, "Benezet's circulators [are] moved around the

---

[5] Specifically, Section 2869 was amended, in part, such that the "affidavit" requirement was removed from the statute.  See 25 P. 2019 Pa. Legis. Serv. Act 2019-77 (S.B. 421) (Purdon's) (striking the term "affidavit" from the text of Section 2869 and, instead, stating that "[e]ach sheet shall have appended thereto the statement of the circulator of each sheet, setting forth, subject to the penalties of 18 Pa. C.S. § 4904 (relating to unsworn falsification to authorities)" that he or she meets the other criteria set forth in Section 2869).

country as needed to meet individual state deadlines" while its contractors are paid weekly "based on work/signatures actually produced." (Id. ¶¶ 9-10.) Further, "Benezet always hired signature [gatherers] as independent contractors."[6] (Id. ¶ 7.) During the 2016 presidential election season, Benezet was "paid by Cruz in Pennsylvania on a per signature basis" and "by De La Fuente . . . [on] a per signature basis," and under this arrangement, "[t]he more signatures that Benezet collect[ed], the more money that Benezet earn[ed]."[7] (Id. ¶ 12.)

### b. Benezet's Signature-Gathering and the Challenged Election Code Provisions: In-State Witness Requirement

According to Benezet, the In-State Witness Requirement requires it "to charge higher rates per signature than in other states," as Pool "had to pay witnesses to work with his professional circulators in Pennsylvania." (Doc. No. 46 at ¶¶ 15-16.)[8] The requirement posed additional problems for its signature-gathering efforts during the election because of issues relating to the work performance of certain witnesses, as well as their availability. Specifically, the alleged behavior of one witness in Bucks County, Pennsylvania deterred certain voters from signing a petition for Ted Cruz.[9] (Id. ¶ 26.) Further, Benezet experienced difficulty in "find[ing] enough witnesses to circulate nomination petitions" in three out of five congressional districts

---

[6] Specifically, Plaintiffs name multiple individuals who were hired by Benezet "as independent contractors to collect signatures for election petitions in Pennsylvania" (id. ¶ 7), including both Pennsylvania residents and residents of other states (id. ¶ 8).

[7] In total, "Benezet collected 4,000 signatures for Cruz in [four] Congressional districts" and "about 5,000 signatures for De La Fuente as a Democrat and 12,000 signatures for De La Fuente as an Independent." (Id. ¶ 18) (citations omitted). On behalf of Benezet, Pool also collected signatures for other presidential primary candidates in states outside of Pennsylvania. (Id. ¶ 13.)

[8] During the 2016 presidential primary election, all of the petitions circulated by Benezet for Cruz and De La Fuente "were witnessed and executed by a Pennsylvania resident with a sworn affidavit." (Id. ¶ 19.)

[9] According to Pool, despite using Internet advertisements to obtain in-state witnesses, when Benezet contacted the witnesses about working with them, "they would 'flake out.'" (Id. ¶¶ 28, 47.) In addition, Benezet found obtaining witnesses through email advertisements to be difficult because recipients of the emails would often view the advertisements as illegitimate. (Id. ¶ 28.)

(id. ¶ 27), and "[t]he lack of Pennsylvania in-state witnesses caused Cruz delegates [not to] make it onto the 2016 primary election ballot" (id. ¶ 26).  Additionally, Benezet experienced issues with a particular Pennsylvania in-state witness who "extorted additional money from Pool after the signatures had been gathered" and "threaten[ed] not to execute the affidavit unless he was paid more money," an occurrence that, in Pool's assessment, happens frequently.  (Id. ¶¶ 30-31.)  Moreover, Pool claims that certain circulators do not "want to work with witnesses."  (Id. ¶ 33.)  According to Pool, while some witnesses "would also get signatures," they did so "at a lower rate than the professional circulators," and there were instances in which witnesses were unreliable in arriving at work.[10]  (Id. ¶ 39.)  Benezet allegedly "would have brought in more circulators for the 2016 presidential nominating petitions" were it not for the In-State Witness Requirement.[11]  (Id. ¶ 45.)

### c.  Benezet's Signature-Gathering and the Challenged Election Code Provisions: Notarization Requirement

Benezet states that in order to comply with the Notarization Requirement, it must bear several costs.  According to Pool, "notarizations costs at least $5.00 per acknowledgement," and the "[n]otarization costs for the petitions Benezet collected for Cruz was $1,500 to $1,600 for

---

[10] Citing Pool's deposition testimony, Benezet states that professional circulators use certain techniques to obtain more signatures in a given time period, and that professional circulators often refer to in-state witnesses as "anchors" due to a belief that "a witness cannot keep an eye on multiple signings like a trained circulator, so the professional circulator must cut back on the number of petitions that are being signed at once."  (Id. ¶¶ 42-44.)

[11] In support of this position, Benezet states, inter alia, that it "brought in more circulators for OpenPittsburgh.Org than for the presidential petitions because the OpenPittsburgh.Org circulators could start circulating right away because they did not have to wait for an in-state witness" (Id. ¶ 45), and that "[w]ithout the in-state witness requirement, Benezet collected 6,000 signatures in 3 days for OpenPittsburgh.Org," while it collected "only 6,300 signatures for De La Fuente as a Democrat and Cruz as a Republican over 18 days during the 2016 Pennsylvania nominating petition drives[,] which required the use of in-state witnesses" (Id. ¶ 49).  Further, each day of the nominating petition drive in Pennsylvania, "Benezet had at least [one] circulator sitting in a hotel room, not working, because he did not have a Pennsylvania in-state witness with whom he could work."  (Id. ¶ 48.)

delegates in three or four congressional districts."  (Doc. No. 46 ¶ 51.)  Further, Pool testified

that obtaining a notary at certain times is difficult, stating that "[f]inding a notary after 5:00 p.m.

'is almost impossible'" and in order to get petitions notarized on a daily basis, petitioners had to

stop early and lose valuable time to gather more signatures[,] but not notarizing every day risks

losing signatures if the in-state witness does not show up to execute the petitions at a later date."

(Id. ¶ 52.)  Pool also testified that, in states permitting circulators to work without sworn

affidavits, circulators "are able to circulate for longer periods of time" than circulators in states

that do have such a requirement.  (Id.)  In addition, Benezet asserts that the text of the affidavit

required in Pennsylvania has been confusing to some witnesses.  (Id. ¶ 53.)[12]  In the general

context of Benezet and Pool's involvement in Pennsylvania's primary election process, "Pool is

willing to sign an affidavit, or any other paper, placing himself within and consenting to the

jurisdiction of Pennsylvania judicial officials with respect to any investigative or judicial

procedure seeking to investigate and prosecute violations of Pennsylvania election law."  (Doc.

No. 25 ¶ 21.)

### 2.    Facts as Stated in Support of Defendant's Motion for Summary Judgment

According to Defendants, the challenged provisions "do not prevent anybody from

coming into Pennsylvania and handing out leaflets for candidates, [] from talking to people on

the street about candidates, or from carrying signs about candidates or issues" during the primary

election season.  (Doc. No. 42 ¶ 17.)  Further, various witnesses testified that in previous

presidential elections, signature collectors were able to obtain "a significant amount of

---

[12] As it relates to Section 2868's prohibition on qualified electors signing more than one
nomination petition, Plaintiffs state that while they "have secured a significant amount of
testimony on the severe impairment that the restriction . . . imposes on [their] rights guaranteed
under the First and Fourteenth Amendments, additional testimony is required to show the depth
of the severity of the restriction."  (Doc. No. 45 at 34.)

signatures" in Pennsylvania while adhering to the in-state witness and notarization requirements. (Id. ¶ 18-36.)

Additionally, pursuant to the arrangement under which Benezet is paid per signature, "Benezet prices the per signature rate such that it will make a profit." (Id. ¶ 47.) Moreover, as independent contractors, those working as signature collectors "are free to collect signatures for Benezet[,] any other signature collection company[,] for candidates[,] or issues on their own[,]" and "by whatever method [they] may choose." (Id. ¶¶ 51, 53.) Because the signature gatherers "are paid on a per signature basis . . . they are driven to get as many signatures as possible in the shortest time as possible so as to maximize earnings." (Id. ¶ 55.) According to the testimony of one signature gatherer, "the time spent with any potential signor is 'very quick, like in a matter of seconds' and if there is a hint that there will be no signature, that collector will just move on and talk no further."[13] (Id. ¶ 57.)

During the 2016 election cycle, "Benezet collected about 4,000 signatures for . . . Cruz in Pennsylvania," and "the affidavits of circulator[s] on the nomination petitions for . . . Cruz were signed by Pennsylvania residents and were notarized." (Id. ¶¶ 69-70.) Further, "the collectors made sure that those who signed had not signed for another Republican candidate for President of the United States." (Id. ¶ 70.) Benezet collected approximately 5,000 signatures for De La Fuente in Pennsylvania while complying with similar restrictions.[14] (Id. ¶ 74.) In addition, Defendants stated that Benezet would be profitable in 2016 and that, "[i]n fact, Benezet [would] likely make more money off of its efforts in Pennsylvania than anywhere else." (Id. ¶ 83.)

---

[13] Defendants describe the interaction between signature gatherers and signors as very simple, pointing to testimony indicating that "the job of a signature collector [is] 'just like any sales job that [one has] ever heard of.'" (Doc. No. 42 at ¶ 59.)

[14] Defendants also note Benezet's role in collecting signatures for Jill Stein's candidacy in 2016 and state that "[o]verall, about 22,700 signatures were collected and filed on behalf of Jill Stein." (Id. ¶¶ 88-89.)

As to the Notarization Requirement, Defendants refer to the presence of "some 80,000 notaries" in Pennsylvania, and note that there is a prohibition on notaries "charg[ing] more than $5.00 for their notary fee." (Id. ¶¶ 91-92.) Further, notaries across the Commonwealth may be found on a public website managed by the Commonwealth (id. ¶ 93), and the Commonwealth screens prospective notaries before granting them a notary license (id. ¶ 94). Additionally, with regard to the prohibition on signing multiple petitions, Defendants state that "Love testified that she does not recall ever being approached to sign a petition to get a Republican or Democratic candidate on the primary ballot for President" (id. ¶ 96), and that "Love does not recall who she voted for in the 2016 Republican primary; nor does she recall whether she voted or not in several past Presidential elections" (id. ¶ 97).

## II. LEGAL STANDARD

### A. Summary Judgment

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is material if it might affect the outcome of the suit under the applicable law, and it is genuine only if there is a sufficient evidentiary basis for allowing a reasonable factfinder to return a verdict for the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). At summary judgment, the inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law. See id. at 251-52. In making this determination, a court must "consider all evidence in the light most favorable to the party opposing the motion." See A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. See Conoshenti v. Pub. Serv. Elec. & Gas. Co., 364 F.3d 135, 145-46 (3d Cir. 2007). Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." See Berckeley Inv. Grp. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is warranted. See Celotex, 477 US. at 322. With respect to the sufficiency of the evidence that the non-moving party must provide, a court should grant a motion for summary judgment when the non-movant's evidence is merely colorable, conclusory, or speculative. See Anderson, 477 U.S. at 249-50. There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts. See id. at 252; see also Matsushita Elec. Indus. Co. v. Mem'l Hosp., 192 F. 3d 378, 387 (3d Cir. 1999).

The standard applicable to a motion for summary judgment "is no different where there are cross-motions for summary judgment." See Lawrence v. City of Phila., 527 F.3d 299, 310 (3d Cir. 2008). As explained by the United States Court of Appeals for the Third Circuit:

> Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one if rejected the other is necessarily justified or that the losing party waives judicial consideration and determination [of] whether genuine issues of material fact exist.

Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968) (citing F.A.R. Liquidating Corp. v. Brownell, 209 F.2d 375, 380 (3d Cir. 1954)).

Thus, a district court presented with cross-motions for summary judgment is instructed to evaluate the motions separately, "and view the evidence presented for each motion in the light most favorable to the nonmoving party." See Borrell v. Bloomsburg Univ., 63 F. Supp. 3d 418, 433 (M.D. Pa. 2014) (citations omitted). "[E]ach movant must demonstrate that no genuine issue of material fact exists; if both parties fail to carry their respective burdens, the [C]ourt must deny [both] motions." Quarles v. Palakovich, 736 F. Supp. 2d 941, 946 (M.D. Pa. 2010) (citing Facenda v. N.F.L. Films, Inc., 542 F.3d 1007, 1023 (3d Cir. 2008)). "The standard for addressing cross-motions for summary judgment remains the same as if there were only one motion filed." Beneficial Mut. Sav. Bank v. Stewart Title Guar. Co., 36 F. Supp. 3d 537, 544 (E.D. Pa. 2014) (citing Lawrence v. City of Phila., 527 F.3d at 310). "When both parties move for summary judgment, '[t]he [C]ourt must rule on each party's motion on an individual separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." Auto-Owners Ins. Co. v. Stevens & Ricci, Inc., 835 F.3d 388, 402 (3d Cir. 2016) (first alteration in original) (quoting 10A Charles Alan Wright, et al., Federal Practice & Procedure § 2720 (3d ed. 2016)).

### B.     Facial Versus As-Applied Constitutional Challenges

"A party asserting a facial challenge 'must establish that no set of circumstances exists under which [an act] would be valid.'" Heffner v. Murphy, 745 F.3d 56, 65 (3d Cir. 2014) (quoting United States v. Mitchell, 652 F.3d 387, 405 (3d Cir. 2011)). "This is a particularly demanding standard and is the 'most difficult challenge to mount successfully.'" Id. (quoting United States v. Salerno, 481 U.S. 739, 745 (1987)). "By contrast, '[a]n as-applied attack . . . does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right.'"

Id. (alterations in original) (quoting United States v. Marcavage, 609 F.3d 264, 273 (3d Cir. 2010)). The United States Supreme Court "typically disfavor[s] facial challenges" because "[t]hey 'often rest on speculation,' can lead courts unnecessarily to anticipate constitutional questions or formulate broad constitutional rules, and may prevent governmental officers from implementing laws 'in a manner consistent with the Constitution.'" See John Doe No. 1 v. Reed, 561 U.S. 186, 230 (2010) (quoting Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449 (2008)). "If a litigant decides to bring both types of challenge, a court's ruling on one might affect the other." Knick v. Twp. of Scott, 862 F.3d 310, 321 (3d Cir. 2017) (citing Heffner, 745 F.3d at 65 n.7), vacated in part, 139 S.Ct. 2162 (2019). "But if a litigant loses an as-applied challenge because the [C]ourt rules as a matter of law that the statute or ordinance was constitutionally applied to her, it follows a fortiori that the law is not unconstitutional in all applications." Id. at 321 (citing Dickerson v. Napolitano, 604 F.3d 732, 741 (2d Cir. 2010)).

## III. DISCUSSION

### A. Subject Matter Jurisdiction over Plaintiffs' Claims

The Court observes that in support of their motion for summary judgment (Doc. No. 44), Defendants assert that this Court lacks subject matter jurisdiction over Plaintiffs' claims primarily on the basis that Plaintiffs' claims are rendered moot by the conclusion of the 2016 presidential election (Doc. No. 43 at 20).[15] Because Defendants challenge the Court's subject matter jurisdiction, the Court addresses this issue as a threshold matter.

#### 1. Applicable Legal Standard

---

[15] Defendants also assert that "[f]or the same reasons, [Plaintiffs'] claim is not ripe." (Doc. No. 43 at 24 n.7) (citing Presbytery of N.J. of Orthodox Presbyterian Church v. Florio, 40 F.3d 1454, 1462 (3d Cir. 1994)).

The federal judicial power extends only to the adjudication of live cases or controversies. See Common Cause of Pa. v. Pennsylvania, 558 F.3d 249, 257-58 (3d Cir. 2009) (citing U.S. Const. art. III, § 2). The requirement as to live cases and controversies "is satisfied only where a plaintiff has standing." See id. at 258 (citing Sprint Commc'n Co. v. APCC Servs., Inc., 554 U.S. 269 (2008)). For a plaintiff to have Article III standing, three elements must be present: (1) "the plaintiff must have suffered a 'concrete,' 'particularized' injury-in-fact, which must be 'actual or imminent,' not conjectural or hypothetical'"; (2) "that injury must be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the [C]ourt'"; and (3) "the plaintiff must establish that a favorable decision likely would redress the injury." See Toll Bros., Inc. v. Twp. of Readington, 555 F.3d 131, 138 (3d Cir. 2009) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992)). "While all three of these elements are constitutionally mandated, the injury-in-fact element is often determinative." Id. (citing Teva Pharm. USA, Inc. v. Novartis Pharm. Corp., 482 F.3d 1330, 1337 (Fed. Cir. 2007)). Further, "[t]hat harm 'must affect the plaintiff in a personal and individual way.'" Id. (quoting Lujan, 504 U.S. at 560 n.1).

Even if the injury-in-fact requirement is satisfied, a case may nonetheless be non-justiciable if it is deemed moot. A case is moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." See U.S. Parole Comm'n v. Geraghty, 445 U.S. 388, 396 (1980) (citing Powell v. McCormack, 395 U.S. 486, 496 (1969)). There is, however, a recognized exception to the mootness doctrine in instances where the challenged conduct is "capable of repetition yet evading review." See N.J. Tpk. Auth. v. Jersey Cent. Power & Light, 772 F.2d 25, 31 (3d Cir. 1985) (citing Neb. Press Ass'n v. Stuart, 427 U.S. 539, 546 (1976)). This exception applies when: "(1) the challenged action was in its duration too

short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party would be subjected to the same action again." <u>See</u> <u>id.</u> (quoting <u>Murphy v. Hunt</u>, 455 U.S. 478, 481 (1982)).

### 2.    Arguments of the Parties

Defendants argue that Plaintiffs' constitutional challenges are not justiciable because while "Benezet and Pool brought this case so that they could more profitably collect signatures" during the April 2016 primary election in Pennsylvania and "Love later joined [the instant litigation] because she claims that she wants to sign a nomination petition for more than one Republican seeking access to the Pennsylvania primary ballot" (Doc. No. 43 at 13), "[t]he 2016 Pennsylvania primary is over" (<u>id.</u>). Defendants also state that "2016 was the first presidential work that Benezet did and Pool admitted that his 2016 work was on behalf of Benezet and that his individual signature collection work before that focused primarily on local races in Texas." (<u>Id.</u>) Further, Defendants state that "as for Love, she admitted that she has never signed a nomination petition for any candidate seeking to become President and she has never even been approached to sign a nomination petition for any candidate seeking to become President." (<u>Id.</u> at 13-14.) According to Defendants, "[t]here is no live controversy with respect to any claim to collect signatures for the 2016 Pennsylvania primary because the primary is over" and, "[e]ven assuming the Court could entertain those claims, it could afford no cognizable relief in terms of undoing that election." (<u>Id.</u> at 14.) Further, Defendants maintain that Plaintiffs also lack standing with respect to their requests for a declaratory judgment, as well as their ability to pursue other injunctive relief. (<u>Id.</u>) To that end, Defendants argue that "[b]eyond allegations regarding the 2016 general election, Plaintiffs [have] failed to factually demonstrate any threat of injury that is actual and imminent." (<u>Id.</u> at 15.)

In opposition, Plaintiffs assert that they have standing to assert the instant constitutional challenges. Specifically, Plaintiffs maintain that "Pool and Benezet suffered direct . . . harm as a result of the [I]n-[S]tate [W]itness [Requirement] because they were restricted to circulate only in those areas in Pennsylvania where they could find in-state witnesses with whom they could circulate." (Doc. No. 53 at 11.) For example, Plaintiffs state that they could not complete certain nomination petitions in different areas of Pennsylvania because they could not locate in-state witnesses for those areas who would perform work of an acceptable quality. (Id. at 11-12.) Plaintiffs contend that these asserted economic injuries have been deemed sufficient to establish standing, and that "the inability to freely engage in protected political speech through the circulation of nomination petitions as a direct and proximate result of the challenged provisions is an independent[,] concrete harm [to] [P]laintiffs' First Amendment rights." (Id. at 13.)

Additionally, Plaintiffs argue that their claims have not been rendered moot as a result of the conclusion of the 2016 presidential election because the instant litigation falls within the scope of the recognized exception for mootness in cases where conduct is capable of repetition but evading review. (Id. at 16.) To that end, Plaintiffs state that "[e]very decision rendered by the federal courts invalidating the in-state witness restriction where the circulator was willing to consent to the subject state's jurisdiction was issued after the deadline to file the petition had passed, and no mootness claim was ever entertained []or upheld by those [c]ourts." (Id. at 17.) In sum, Plaintiffs assert that "election law cases are the classic fit for the 'capable of repetition yet evading review' exception to the doctrine of mootness."[16] (Id. at 18.)

---

[16] Plaintiffs state that "there is no way for [D]efendants to deduce from the depositions [taken in this case], or [P]laintiffs to represent, that [P]laintiffs will not have future contracts." (Doc. No. 53 at 18.) Defendants state, though, that by asserting their claims are capable of repetition but evading review, Plaintiffs "concede that, as for the 2016 election cycle, their claims are moot because the relief they seek cannot be provided for this past election cycle." (Doc. No. 55 at 11.)

### 3.    Whether This Court Has Subject Matter Jurisdiction Over Plaintiffs' Claims

Upon consideration of the parties' arguments and the relevant authorities, the Court concludes that it has subject matter jurisdiction over Plaintiffs' claims and Plaintiffs' claims are justiciable, as Plaintiffs' claims are neither moot nor unripe, and Plaintiffs have standing to pursue their claims.  As an initial matter, the Court recognizes that the exception to mootness in instances where conduct is capable of repetition but evading review "readily applies to most election cases."  See De La Fuente v. Cortes, 261 F. Supp. 3d 543, 549 (M.D. Pa. 2017), aff'd, 751 F. App'x 269 (3d Cir. 2018).  The fact that the 2016 election has concluded, therefore, does not render Plaintiffs' claims moot, for Plaintiffs' "grievances arise when Pennsylvania's election laws impede" their desired involvement in the primary process.  See id.  Accordingly, "it is reasonable to expect" that Plaintiffs intend to participate in the 2020 primary process in such a way as to invoke application of the challenged provisions, which is sufficient to negate any finding of mootness and establish that Plaintiffs' claims are ripe for review.  See Merle v. United States, 351 F.3d 92, 95 (3d Cir. 2003) (finding that a plaintiff's claim was not moot where it was "reasonable to expect that [the plaintiff] will wish to run for election to the House of Representatives either in 2004 or at some future date" (citing Int'l Org. of Masters, Mates & Pilots v. Brown, 498 U.S. 466, 473 (1991))); see also Morrill v. Weaver, 224 F. Supp. 2d 882, 891 (E.D. Pa. 2002) ("Our abiding interest in the constitutionality of the elections process . . . cannot be regulated by adjudging every case unripe before the election or moot after

---

Further, Defendants assert that, as they pertain to the 2020 presidential election, Plaintiffs' constitutional challenges are unripe because "Pool admitted that he has no contracts in place for 2017 and Love admitted that she had never signed – or been approached to sign – a nomination petition for a candidate seeking access to the Pennsylvania Republican primary ballot for President," and that "[i]t is plain speculation that 'someday' Plaintiffs may be asked to gather signatures in the Commonwealth . . . or that 'someday' Love may be approached by an out-of-state collector to sign a nomination petition."  (Id. at 12.)

the election." (citing <u>Meyer v. Grant</u>, 486 U.S. 414, 425 (1988))).  Lastly, the Court rejects any

argument from Defendants that Plaintiffs lack standing, as Plaintiffs presumably intend to

"engage in the political process[,]" which is unquestionably "affected with constitutional

interests[,]" and, additionally, by operation of the Election Code, "there is a credible threat" that

Plaintiffs' election-related conduct would be impacted by the Election Code in the context of the

2020 primary election in the same manner it was during the 2016 primary election.  <u>See</u> <u>Cortes</u>,

261 F. Supp. 3d at 550 (concluding that the plaintiff "pled sufficient facts to establish Article III

standing").  Accordingly, the Court concludes that it has subject matter jurisdiction over

Plaintiffs' claims.[17]

### B.    Plaintiffs' First Amendment Claims

#### 1.    Challenge to Section 2869's Requirement of Witnesses for Nomination Petition Circulation (Counts I and II)

In Count I of the second amended complaint, Plaintiffs assert a facial challenge to the In-

State Witness Requirement under the First Amendment of the United States Constitution (Doc.

No. 25 at 29), while Count II sets forth an as-applied challenge to the In-State Witness

Requirement under the First Amendment (<u>id.</u> at 30-31).

##### a.    Applicable Legal Standard

Laws potentially compromising constitutional rights are subject to varying levels of

scrutiny.  Under strict scrutiny review, the Government is required "to prove that [a] restriction

furthers a compelling interest and is narrowly tailored to achieve that interest."  <u>See</u> <u>Ariz. Free</u>

<u>Enter. Club's Freedom Club PAC v. Bennett</u>, 564 U.S. 721, 734 (2011) (quoting <u>Citizens United</u>

---

[17] As explained <u>infra</u>, however, the Court concludes that Plaintiffs' challenges to the Notarization Requirement have been rendered moot as a result of changes to the Election Code.  Accordingly, the Court will consider the question of mootness as to the Notarization Requirement separately from the other questions pertaining to subject matter jurisdiction that the parties have specifically raised in their briefing.

v. Fed. Election Comm'n, 558 U.S. 310, 340 (2010)).  In applying strict scrutiny to a challenged restriction, the Court "presume[s] the law is invalid, and the government bears the burden of rebutting that presumption."  See United States v. Marzzarella, 614 F.3d 85, 99 (3d Cir. 2010) (citing United States v. Playboy Entm't Grp., 529 U.S. 803, 817 (2000)).  In contrast, rational basis review mandates "that the action be rationally related to a legitimate government objective."  See Tenafly Eruv Ass'n v. Borough of Tenafly, 309 F.3d 144, 165 n.24 (3d Cir. 2002).

In the context of election-related constitutional challenges, "[s]tates allowing ballot initiatives have considerable leeway to protect the integrity and reliability of the initiative process, as they have with respect to election processes generally."  See Buckley v. Am. Constitutional Law Found., Inc., 525 U.S. 182, 191-92 (1999) (citing Biddulph v. Mortham, 89 F.3d 1491, 1494 (11th Cir. 1996)).  "[A]t the same time, the First Amendment requires vigilance 'to guard against undue hindrances to political conversations and the exchange of ideas.'" Initiative & Referendum Inst. v. Jaeger, 241 F.3d 614, 616 (8th Cir. 2001) (quoting Buckley, 525 U.S. at 192).  Accordingly, "[i]n reviewing a First Amendment challenge to a state's election law, the Supreme Court has emphasized that '[n]o bright line separates permissible election-related regulation from unconstitutional infringements on First Amendment freedoms.'" Wilmoth v. Sec'y of N.J., 731 F. App'x 97, 101-02 (3d Cir. 2018) (quoting Timmons v. Twin Cities Area New Party, 520 U.S. 351, 359 (1997)).  "Instead, under what has come to be known as the Anderson-Burdick balancing test, 'the rigorousness of [a court's] inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens' the plaintiff's First Amendment rights."  Id. at 102 (quoting Burdick v. Takushi, 504 U.S. 428, 434

(1992)).  As explained by the United States Court of Appeals for the Third Circuit, a court must

weigh various factors in making such an inquiry, including:

> (1) the "character and magnitude" of the alleged constitutional injury; (2) "the precise interests put forward by the [s]tate as justifications for the burden imposed by its rule[;]" and (3) "the extent to which those interests make it necessary to burden the plaintiff's rights."

Id. (alteration in original) (quoting Anderson v. Celebrezze, 460 U.S. 780, 789 (1983)).

The above analysis comports with "the general rule that 'the severity of the burden the

election law imposes on the plaintiff's rights dictates the level of scrutiny applied by the

[C]ourt.'"  See Libertarian Party of Va. v. Judd, 718 F.3d 308, 317 (4th Cir. 2013) (quoting

Nader v. Brewer, 531 F.3d 1028, 1034 (9th Cir. 2008)).  "[A] consensus has emerged[,]"

however, "that laws imposing residency restrictions upon circulators of nomination petitions 'are

subject to strict scrutiny analysis.'"  See Wilmoth, 731 F. App'x at 102 (quoting Judd, 718 F.3d

at 316-17).  Accordingly, should a court apply strict scrutiny to a state's residency restriction, the

state bears the burden of demonstrating that the restriction is narrowly tailored to serve a

compelling interest.

A state's interest in preventing fraud in elections has been deemed a compelling interest.

See, e.g., Lerman v. Bd. of Elections in City of New York, 232 F.3d 135, 149 (2d Cir. 2000)

(stating that "ensuring integrity and preventing fraud in the electoral process" are

"unquestionably compelling" (citing Krislov v. Rednour, 226 F.3d 851, 859 (7th Cir. 2000)));

see also Judd, 718 F.3d at 317 (acknowledging previous decisions recognizing a compelling

interest on the part of a state in preventing election fraud).  As to whether a challenged restriction

is narrowly tailored to advance this interest, "[f]ederal courts have generally looked with favor

on requiring petition circulators to agree to submit to jurisdiction for purposes of subpoena

enforcement" and, in doing so, "have viewed such a system to be a more narrowly tailored

means than a residency requirement to achieve the same result." See Brewer, 531 F.3d at 1037 (noting decisions in which courts acknowledged submission to a state's jurisdiction as a more narrowly tailored measure in preventing fraud). A court's determination as to whether a state residency restriction satisfies strict scrutiny "necessarily requires recourse to an evidentiary record." See Wilmoth, 731 F. App'x at 105 (reversing district court's dismissal of complaint and remanding for further proceedings).

### b. Arguments of the Parties

Defendants argue that Plaintiffs' challenge to the In-State Witness Requirement is meritless because the requirement imposes no constitutionally-significant burden on Plaintiffs and the Commonwealth has a compelling interest in enforcing the requirement. As to the former point, Defendants state that "it is undisputed that the provisions at issue do not ban Plaintiffs from advocating or even collecting signatures in Pennsylvania," which is evidenced by Plaintiffs' ability to collect signatures for Republican and Democratic candidates in the 2016 election. (Doc. No. 43 at 30.) Defendants further assert that the evidence of record "demonstrates that Plaintiffs are primarily engaging in a form of commercial speech and that political speech is, if anything, only incidental to their goal of collecting as many signatures as quickly as possible because they are paid by the signature." (Id. at 30-31) (stating that "Plaintiffs, and their independent contractors, equate procuring a signature to making a 'sale'"). Defendants also note that "out of all the states in which Benezet conducted business in 2016, Pennsylvania was the most profitable" and state that "even with the witness requirement in place, Benezet successfully performed work for its clients, gathering significant numbers of signatures." (Id. at 32.)

As to their argument that the Commonwealth has a compelling interest behind the In-State Witness Requirement, Defendants contend that the requirement falls within the scope of Pennsylvania's "compelling interest in ensuring an orderly election process[,] including the primary process."  (Id. at 34) (describing the Commonwealth's procedure for reviewing challenged petitions).  According to Defendants, "[t]he fully developed record amply demonstrates the compelling need for the [In-State Witness Requirement]" (id.), because circulators travel frequently and live throughout the country, thus demonstrating the "risk in relying on the circulators' unverified guarantees that they will submit to the Court's jurisdiction on a moment's notice" (id. at 35).  Defendants further argue that "[t]he Commonwealth's well-established interests are advanced to the least extent necessary, as there is nothing close to a ban on out-of-state circulators, and because, at best, Plaintiffs are only minimally burdened by the requirement."  (Id. at 37) (citing Libertarian Party of Ky. v. Grimes, 835 F.3d 570, 574 (6th Cir. 2016)).  To that end, Defendants state that because the In-State Witness Requirement does not "sharply limit[]" Plaintiffs' rights, the Commonwealth "need only demonstrate that, at a minimum, it has a rational basis for the rule, or, at best, that the Commonwealth's interests in the rule are 'sufficiently weighty.'"  (Id.)  Defendants also argue that "even assuming that Court would apply [] strict scrutiny[], the Commonwealth's interests still pass constitutional muster" because "[t]here is no less restrictive means to both permit out-of-state circulating, and to protect the Commonwealth's interests in ensuring that circulators are accountable so that the primary ballot can be finalized as soon as possible."  (Id.)

In opposition, Plaintiffs first argue that strict scrutiny is applicable to this Court's examination of the In-State Witness Requirement because "[e]very federal court [that] has ruled on an in-state witness requirement where the circulator is willing to consent to the jurisdiction of

the subject state" has applied such a standard of review.  (Doc. No. 53 at 26); see also Doc. No. 45 at 10-11 (describing certain case law as demonstrative of "a consensus . . . that petitioning restrictions like the one at issue here are subject to strict scrutiny analysis").  According to Plaintiffs, this Court should ultimately apply strict scrutiny because, as recognized by the Second Circuit Court of Appeals in Lerman v. Board of Elections in the City of New York, strict scrutiny applies "to the review of restrictions placed on the circulation of nomination papers." (Doc. No. 45 at 12.)

According to Plaintiffs, the In-State Witness Requirement fails strict scrutiny review because "[w]hile the Commonwealth might have an interest in making sure individuals who circulate election petitions are available for any investigation and/or prosecutorial action[,]" in the case at bar, Pool "has expressly agreed to consent to the jurisdiction of the Commonwealth" for purposes of any such investigation and, accordingly, the Commonwealth cannot articulate a compelling interest sufficient for this requirement to survive strict scrutiny.  (Id. at 16.)  In support of this assertion, Plaintiffs state that even though "Buckley expressly reserved the question of whether residency requirements like the one at issue in this action would be unconstitutional . . . every court, but one, to consider the issue has . . . [held] such requirements unconstitutional in the context of both ballot initiative and candidacy petitions" and that, additionally, "every court has held such requirements unconstitutional when imposed on out-of-state residents who have expressly been willing to consent to [a] state's jurisdiction for purposes of investigati[ng] . . . election petition fraud."  (Id. at 17.)  Plaintiffs maintain that, in light of the above, the In-State Witness Requirement places an impermissibly severe burden on their First

Amendment Rights "without being narrowly tailored to serve a compelling governmental interest." (Id. at 18.)[18]

        **c.**       **Whether Summary Judgment is Proper as to Counts I and II of Plaintiffs' Second Amended Complaint**

The Court concludes that Defendants are entitled to summary judgment as to Count I of the second amended complaint (Plaintiffs' facial challenge to the In-State Witness Requirement), while Pool and Benezet are entitled to summary judgment as to Count II of the second amended complaint (their as-applied challenge to the In-State Witness Requirement). The Court notes, as an initial matter, that with respect to each of the claims asserted in the second amended complaint, Plaintiffs do not specify which of them is asserting each constitutional challenge included therein. In light of Plaintiffs' briefing on these claims, however, and considering that the subject requirement pertains to circulators or those involved in circulation who are located outside Pennsylvania, the Court considers Plaintiffs' First Amendment challenges to the In-State Witness Requirement as applying only to Pool and Benezet, and not to Love.

First, while the parties offer differing viewpoints as to the appropriate standard of review that should govern this Court's analysis of the In-State Witness Requirement, the United States Court of Appeals for the Third Circuit has explicitly stated that such a restriction is subject to strict scrutiny review. See Wilmoth, 731 F. App'x at 102 (describing relevant case law in support of the proposition that "'a consensus has emerged' that laws imposing residency restrictions upon circulators of nomination petitions 'are subject to strict scrutiny'" (quoting Judd, 718 F.3d at 316-17)). Moreover, although Wilmoth is a non-precedential opinion and, as

---

[18] Plaintiffs also argue that even if the Court does not evaluate the In-State Witness Requirement under strict scrutiny, the requirement is also unconstitutional under the Anderson balancing test applicable to ballot access cases. According to Plaintiffs, the requirement places an impermissible burden on candidates and circulators, as well as voters and potential voters, so as to fail the Anderson analysis, as well. (Doc. No. 45 at 18.)

such, is not binding on this Court, the Court finds that <u>Wilmoth</u> is consistent with other courts'

conclusions that the act of circulating petitions generally constitutes core political speech, thus

warranting the use of strict scrutiny.  <u>See, e.g.</u>, <u>Judd</u>, 718 F.3d at 314 (discussing restrictions on

petition circulation and stating that such restrictions implicate "core political speech" because

"petitions 'of necessity involve[] both the expression of a desire for political change and a

discussion of the merits of the proposed changed'" (alteration in original) (quoting <u>Grant</u>, 486

U.S. at 421)); <u>Goodall v. Williams</u>, 324 F. Supp. 3d 1184, 1196 (D. Colo. 2018) (collecting

authority in support of the proposition that petition circulation is core political speech).

In addition, the Court disagrees with Defendants' assertions that Pool and Benezet's

interest in Pennsylvania's primary election is tantamount to "party raiding" (Doc. No. 67 at 8-9),

which the Third Circuit identified as carrying with it an unprotected interest in the primary

process when it upheld the Commonwealth's requirement that an elector circulating a

nominating petition for a party primary must be a registered member of the same party in <u>De La</u>

<u>Fuente v. Cortes</u>.  <u>See</u> <u>De La Fuente v. Cortes</u>, 751 F. App'x 269, 274 (3d Cir. 2018) (concluding

that the Commonwealth's requirement was constitutional because the plaintiffs had no

cognizable right to associate with a party to which they did not belong).  Noting that "the

associational 'interest' in selecting the candidate of a group to which one does not

belong . . . falls far short of a constitutional right," the Court of Appeals reasoned that the

challenged restriction was constitutional in light of a state's legitimate interest in preventing

party raiding.  <u>See</u> <u>id.</u> (quoting <u>Cal. Democratic Party v. Jones</u>, 530 U.S. 567, 575 n.5 (2000)).  In

this case, however, Pool is a registered member of the Republican Party (Doc. No. 46 ¶ 99),

which removes the instant case from the ambit of <u>De La Fuente</u> and places it in the context of a

restriction on core political speech in light of the authority described <u>supra</u>, as it pertains to

Pool's involvement in circulation on behalf of Republican candidates.[19]  Having found that the

circulation activity at issue is core political speech, the Court must evaluate the In-State Witness

Requirement using strict scrutiny.  See Wilmoth, 741 F. App'x at 102.  Accordingly, the Court

must determine whether the requirement is narrowly tailored to further a compelling state

interest on the part of the Commonwealth.  See, e.g., Buckley, 525 U.S. at 206 (describing strict

scrutiny review in the context of election-related restrictions).

In the case at bar, the Commonwealth's stated interests behind the In-State Witness

Requirement are preventing fraud and ensuring the integrity of the election process.  (Doc. No.

52 at 45) (describing the Commonwealth's interest in "the orderly and fair process of resolving

challenges and objections to nomination petitions and the prevention of fraud").  As noted supra,

a state's interest in preventing fraud in the context of elections has been deemed compelling.

See, e.g., Lerman, 232 F.3d at 149 (citing Krislov v. Rednour, 226 F.3d at 859) (describing

interests in "ensuring integrity and preventing fraud in the electoral process" as "unquestionably

compelling").  The Court, therefore, accepts Defendants' argument that there is a compelling

interest underlying the In-State Witness Requirement and, accordingly, turns to the question of

whether the In-State Witness Requirement is narrowly tailored to advance this interest.

Upon review of the parties' arguments, the relevant evidence of record, and the

applicable law, the Court finds that the In-State Witness Requirement is not narrowly tailored to

advance the Commonwealth's interest in preventing fraud and maintaining the integrity of the

election process, as applied to Benezet and Pool in the context of the Republican primary

---

[19] The Court finds that "party raiding" is inapplicable to the case at bar only insofar as Pool is
circulating on behalf of Republican candidates.  As it pertains to any circulation by Pool on
behalf of candidates from other parties, however, the Court finds that De La Fuente governs the
instant case because, as noted supra, the Court of Appeals indicated therein that one does not
have a constitutional right to associate with a party to which he does not belong.  See De La
Fuente, 751 F. App'x at 274.

election. It bears noting that Pool "has expressly agreed to consent to the jurisdiction of the Commonwealth . . . for any investigation and/or prosecutorial action related to the circulation of election petitions in the Commonwealth" (Doc. No. 45 at 16), especially in light of the case law in which "[f]ederal courts have generally looked with favor on requiring petition circulators to agree to submit to jurisdiction for purposes of subpoena enforcement, and . . . have viewed such a system to be a more narrowly tailored means than a residency requirement to achieve the same result." See Brewer, 531 F.3d at 1037 (citing Chandler v. City of Arvada, Colo., 282 F.3d 1236, 1242-44 (10th Cir. 2002)). Moreover, in Wilmoth, the Court of Appeals specifically noted that "[s]ubmitting to a state's jurisdiction for purposes of subpoena enforcement . . . has been accepted as a less restrictive means of achieving the [] goal" of preventing election fraud. See Wilmoth, 731 F. App'x at 104 (citing Chandler, 292 F.3d at 1244). The Court is mindful of this instruction in the case at bar. The relevant evidence of record does not demonstrate that Benezet and Pool's submission to the Commonwealth's jurisdiction would be ineffective for purposes of maintaining the integrity of the election process in the Commonwealth. Here, the Commonwealth's existing measures for safeguarding against voter fraud may be applied with equal force to Benezet and Pool as it would in regard to Pennsylvania residents because Benezet and Pool presumably "will possess the same incentive as their resident counterparts to appear at the Commonwealth's request and answer any questions concerning the petitioning process." See Judd, 718 F.3d at 318.[20] In light of the fact that the Commonwealth has in place an existing remedy for potential voter fraud that is less offensive to Plaintiffs' First Amendment rights, the Court finds that Defendants have not met their burden, for purposes of strict scrutiny, of

---

[20] The Court observes that, in order to further its interest of preventing election fraud, the Commonwealth is not prohibited from requiring Benezet and Pool to submit to the jurisdiction of the Commonwealth with respect to their activities that are implicated by the In-State Witness Requirement.

demonstrating that Benezet and Pool's submission to the jurisdiction of the Commonwealth does not advance the Commonwealth's compelling interest in maintaining the integrity of the election process. Accordingly, the In-State Witness Requirement, as applied to Benezet and Pool with respect to Republican candidates, does not pass strict scrutiny and, as a result, violates the First Amendment.[21]

In light of the above conclusion, the Court turns to the question of the appropriate remedy to be fashioned, and, in turn, addresses the fact that Plaintiffs have asserted both facial and as-applied challenges to the In-State Witness Requirement. Despite Plaintiffs' inclusion of facial challenges in the second amended complaint, however, Plaintiffs' briefing appears to contemplate only an as-applied challenge, for the arguments asserted therein ultimately concern the constitutionality of the Election Code as it applies to Plaintiffs. (Docs. 45 at 9-29, 53 at 27-35.) Even if the Court were to consider Plaintiffs' filings as having pursued a facial challenge to the In-State Witness Requirement, though, for Plaintiffs to be successful in this regard, they "must establish that no set of circumstances exists under which [the requirement] would be valid." See Heffner v. Murphy, 745 F.3d 56, 65 (3d Cir. 2014) (quoting United States v. Mitchell, 652 F.3d 387, 405 (3d Cir. 2011)). Upon review of the relevant evidence of record, undisputed facts, the parties' arguments, and the governing law, the Court is unconvinced that Plaintiffs have satisfied this "particularly demanding standard." Id. (citing United States v. Salerno, 481 U.S. 739, 745 (1987)). The Court concludes, therefore, that Defendants are entitled to summary judgment as to Count I of the second amended complaint, which asserts a facial

---

[21] Due to the Court's conclusion herein that Plaintiffs are entitled to summary judgment on Count II of their complaint, the Court need not reach the merits of Plaintiffs' alternative challenges to the In-State Witness Requirement under the Equal Protection Clause of the Fourteenth Amendment or the Commerce Clause. Accordingly, the Court will dismiss Counts VII and X of the second amended complaint as moot.

challenge under the First Amendment, while Plaintiffs are entitled to summary judgment as to Count II of the second amended complaint, which sets forth an as-applied challenge under the First Amendment. Accordingly, the Court deems the Pennsylvania Election Code's In-State Witness Requirement unconstitutional as applied to Benezet and Pool, and Defendants will be enjoined from enforcing this requirement as to Benezet and Pool in the context of the 2020 Republican primary election for President of the United States.[22]

### 2. Challenge to the Notarization Requirement (Counts III and IV)

In Count III of the second amended complaint, Plaintiffs assert a facial challenge to the Notarization Requirement under the First Amendment (Doc. No. 25 at 32), while asserting an as-applied challenge to the Notarization Requirement under the First Amendment in Count IV of the second amended complaint (id. at 34). The Court observes, however, that subsequent to the commencement of this action, Section 2869 was amended, in part, such that the "affidavit" requirement was removed from this provision. See 25 P. 2019 Pa. Legis. Serv. Act 2019-77 (S.B. 421) (Purdon's) (striking the term "affidavit" from the text of Section 2869 and, instead, stating that "[e]ach sheet shall have appended thereto the statement of the circulator of each sheet, setting forth, subject to the penalties of 18 Pa. C.S. § 4904 (relating to unsworn falsification to authorities)" that he or she meets the other criteria set forth in Section 2869). Moreover, in responding to the Court's December 20, 2019 Order to show cause as to this issue, Plaintiffs state that "[t]he recent amendments to the Pennsylvania Election Code dropping the

---

[22] In granting such relief, the Court is guided by the proposition that "the remedy for an as-applied challenge would be to bar its enforcement against a particular plaintiff alone under narrow circumstances." See Green Party of Pa. v. Aichele, 103 F. Supp. 3d 681, 689 (E.D. Pa. 2015) (citing CMR D.N. Corp. v. City of Phila., 703 F.3d 612, 624 (3d Cir. 2013)). Additionally, the Court recognizes the general instruction that "district courts granting injunctions" should do so in a manner that is "no broader than necessary to provide full relief to the aggrieved plaintiff." See Belitskus v. Pizzingrilli, 343 F.3d 632, 650-51 (3d Cir. 2003) (quoting McLendon v. Cont'l Can Co., 908 F.2d 1171, 1182 (3d Cir. 1990)).

[N]otarization [R]equirement for the execution of nomination petitions renders Plaintiffs' claims challenging the constitutionality of the former [N]otarization [R]equirement moot." (Doc. No. 73 at 2.) Accordingly, the Court will dismiss Plaintiffs' challenges to the Notarization Requirement set forth at Counts III and IV of the second amended complaint, as well as their alternative challenge to the Notarization Requirement under the Equal Protection Clause set forth at Count VIII of the second amended complaint, as moot.

### 3. Challenge to the Prohibition on Qualified Electors Signing More than One Nomination Petition (Counts V and VI)

Through Count V of the second amended complaint, Plaintiffs assert a facial challenge under the First Amendment to Section 2868's prohibition on qualified electors signing more than one nomination petition (Doc. No. 25 at 36), while Count VI sets forth an as-applied challenge to this provision under the First Amendment (id. at 38).

### a. Applicable Legal Standard

Pursuant to the Anderson-Burdick framework for analyzing the constitutionality of ballot access cases, courts have held "that the right to ballot access . . . may be limited in accord with appropriate state interests, and that limitations imposed in furtherance of such interests need not be the most narrowly drawn as long as they are nondiscriminatory and reasonable in light of the relevant burdens." See Rogers v. Corbett, 468 F.3d 188, 194 (3d Cir. 2006). Such recognized interests include "avoiding ballot clutter and ensuring viable candidates." See id. Similarly, "[s]tates may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." See Timmons, 520 U.S. at 358 (citing Burdick, 504 U.S. at 433). "When deciding whether a state election law violates First and Fourteenth Amendment associational rights," a court must "weigh the 'character and magnitude' of the burden the [s]tate's rule imposes on those rights against the interests the [s]tate contends

justify that burden, and consider the extent to which the [s]tate's concerns make the burden unnecessary." See id. (citing Burdick, 504 U.S. at 434). Accordingly, while "[r]egulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest[,] [l]esser burdens, however, trigger less exacting review, and a [s]tate's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'" See id. (citing Burdick, 504 U.S. at 434).

### b. Arguments of the Parties

Defendants assert that Plaintiffs' challenge to the Election Code's prohibition on qualified electors signing more than one nomination petition lacks merit because the provision does not impose a burden, and it furthers legitimate interests on the part of the Commonwealth. With regard to any burden imposed by this requirement, Defendants state that "Love does not recall ever being approached to sign a petition to get a Republican or Democratic candidate on the primary ballot for President"; "who she voted for in the 2016 Republican primary"; or "whether or who she voted for in the several past Presidential elections." (Doc. No. 43 at 43.) According to Defendants, "absent such facts, her speculation does not rise to a burden." (Id.) As it pertains to the Commonwealth's interest behind the subject provision, Defendants state that Love "is not constitutionally entitled to pursue a goal of getting as many candidates on the ballot as possible[,]" and that the statutory provision at issue furthers the Commonwealth's "strong interest in preventing voter confusion, avoiding ballot clutter, and ensuring viable candidates by limiting ballot access." (Id. at 44) (quoting Storer v. Brown, 415 U.S. 724, 733 (1974)). According to Defendants, because "Love has not demonstrated any injury greater than the desire of increasing the number of names on the ballot, the rational basis standard should be applied to

this requirement, particularly in light of the extent of the Commonwealth's interests." (Id. at 44-45.)[23]

Plaintiffs, however, state that their challenge to the Election Code's prohibition on signing more than one nomination petition is inappropriate for resolution at the summary judgment stage because additional testimony at trial is required. (Doc. No. 45 at 34.) Averring that "additional testimony is required to show the depth of the severity of the restriction" on Plaintiffs' constitutional rights, "Plaintiffs intend to reserve litigation on the merits of this claim for trial." (Id.) This statement appears to constitute the extent of Plaintiffs' arguments as to this claim, but for the arguments Plaintiffs raise in their brief in opposition to Defendants' motion for summary judgment (Doc. No. 44), wherein Plaintiffs state primarily that "Love's constitutional right to sign more than one nomination petition . . . is not contingent [on] her doing so in the past" (id. at 44).

### c. Whether Summary Judgment is Proper as to Counts V and VI of Plaintiffs' Second Amended Complaint

In light of the relevant evidence of record, the parties' briefing, and the relevant legal standards, the Court concludes that Defendants are entitled to summary judgment as to Counts V and VI of Plaintiffs' second amended complaint. The Court first acknowledges that as it pertains to the subject statutory provision, Plaintiffs' litigation of the instant claims indicates that Plaintiffs, in effect, are challenging this provision only as it applies to Love. (Doc. No. 53 at 44.) The Court, therefore, examines Plaintiffs' challenges to this requirement accordingly. While Plaintiffs maintain that these claims may not be resolved at the summary judgment stage because their disposition requires the development of a trial record (Doc. No. 45 at 34-35), Plaintiffs have

_____

[23] Defendants also argue that under either rational basis review or strict scrutiny, the requirement is constitutional when the Commonwealth's asserted interest is weighed against Plaintiffs' alleged constitutional injury. (Doc. No. 43 at 45-46.)

failed to demonstrate that, in light of the evidence of record currently before the Court, as well as the relevant law, Defendants are not entitled to judgment as a matter of law as to these claims. The relevant evidence of record – including Love's testimony – does not demonstrate a sufficiently severe burden in order for heightened scrutiny to apply.[24]  Notably, Love testified that she does not recall signing a nomination petition for a presidential candidate (Doc. No. 42-13 at 19:19-22), and while she may hope to do so in the future, the Court agrees with Defendants that, based on the facts present before the Court, Love's "speculation does not rise to a burden" (Doc. No. 43 at 43).  Having considered this lack of a constitutionally-significant burden, the Court is unpersuaded by Plaintiffs' challenge to the subject requirement, which the Court considers to fall within the ambit of the Commonwealth's interests in "avoiding ballot clutter and ensuring viable candidates[,]" both of which "have long been recognized as valid ones."  See Rogers, 468 F.3d at 194-95 (citing Jenness v. Fortson, 403 U.S. 431, 442 (1971)).  Accordingly, the Court will grant Defendants' motion for summary judgment as to Counts V and VI of Plaintiffs' second amended complaint.

> **C.    Plaintiffs' Alternative Challenge Under the Equal Protection Clause (Count IX)[25]**

_____

[24] The Court notes that Defendants' briefing on the appropriate legal standard for the disposition of these claims is unclear, for Defendants appear to argue that either strict scrutiny or rational basis review would apply, and that the challenged provision would pass muster under either standard.  (Doc. No. 45 at 52.)  Because Plaintiffs argue that their challenge to this requirement may not be resolved at the summary judgment stage, Plaintiffs do not address this question.  (Doc. No. 45 at 34-35.)  The Court finds, though, that the Anderson-Burdick framework sets forth the appropriate standard for the Court's analysis herein.  See, e.g., Green Party, 89 F. Supp. 3d at 746 (analyzing prohibition on signing more than one nomination petition, as applied to minor parties, using the Anderson-Burdick standard).

[25] In light of the Court's disposition as to Plaintiffs' First Amendment challenge to the In-State Witness Requirement, the Court need not address Plaintiffs' alternative challenge to the In-State Witness Requirement under the Equal Protection Clause, as asserted in Count VII of the second amended complaint.  Additionally, given the Court's conclusion that Plaintiffs' challenges to the Notarization Requirement are moot, the Court need not address Plaintiffs' alternative challenge

In Count IX of the second amended complaint, Plaintiffs allege, in the alternative, that Section 2868's prohibition on qualified electors signing more than one nomination petition violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution on the basis that "Defendants, pursuant to a federal injunction and declaration that the [subject requirements are] unconstitutional, as applied to the Pennsylvania Green and Libertarian parties in the circulation of nomination papers, have abandoned enforcement of the . . . requirement[s]" as to the Pennsylvania Green and Libertarian Parties. (Doc. No. 25 at 40-44.)[26]  Plaintiffs are referring to the Commonwealth's lack of enforcement of the subject provision as to the Pennsylvania Green Party and Libertarian Party, both of which are minor parties, resulting from the decision rendered by the United States District Court for the Eastern District of Pennsylvania in Green Party of Pennsylvania v. Aichele, 89 F. Supp. 3d 723 (E.D. Pa. 2015), wherein the district court invalidated the provision as applied to those parties. (Doc. No. 25 at 7-8.)  Plaintiffs, "who are members of a major political party and/or who circulate election petitions for major political party candidates[,]" allege that they "remain subject to" the relevant provision of the Election Code and, consequently, "Defendants' different treatment of, and

---

to this provision under the Equal Protection Clause, as asserted in Count VIII of the second amended complaint.

[26] In this regard, Plaintiffs refer to the decision rendered by the United States District Court for the Eastern District of Pennsylvania in Green Party of Pennsylvania v. Aichele, 89 F. Supp. 3d 723 (E.D. Pa. 2015), which was issued in March of 2015. (Doc. No. 25 at 7.)  As noted by Plaintiffs in their second amended complaint, in Green Party, the district court held that in the context of nomination papers, the In-State Witness Requirement, Notarization Requirement, and prohibition on signing more than one nomination paper were unconstitutional "as applied to the Pennsylvania Green and Libertarian Parties[,]" and in doing so, "enjoin[ed] enforcement [of those portions of the Election Code] as to those minor political parties and bodies." (Id. at 8.) Further, Plaintiffs state that "[D]efendants['] subsequent abandonment of these requirements for all nomination papers renders [D]efendants['] continued enforcement of [the requirements]" unconstitutional under the Fourteenth Amendment. (Id.)

imposition of different requirements upon, [P]laintiffs . . . constitutes a violation of [P]laintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment."  (Id. at 41.)

### 1.  Applicable Legal Standard

"[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process."  Belitskus, 343 F.3d at 642 (internal quotation marks omitted) (quoting Burdick, 504 U.S. at 433).  "Nevertheless, a state's power to regulate elections 'must be exercised in a manner consistent with the Equal Protection Clause of the Fourteenth Amendment.'"  Id. at 642-43 (quoting Bullock v. Carter, 405 U.S. 134, 141 (1972)).  "Ballot access is recognized as an important aspect of voting rights."  Rogers v. Corbett, 468 F.3d 188, 194 (3d Cir. 2006) (citing Bullock, 405 U.S. at 143).  Following Anderson, however, "the right to ballot access . . . may be limited in accord with appropriate state interests, and [] limitations imposed in furtherance of such interests need not be the most narrowly drawn as long as they are nondiscriminatory and reasonable in light of the relevant burdens."  Id. (citing Anderson, 460 U.S. at 788).  "Anderson sets out the proper method for balancing . . . equal protection concerns and the burdens that the challenged law creates on these protections as weighed against the proffered state interests."  Id. at 194.  Accordingly, a court must "consider what burden is placed on the rights [that] [the] plaintiffs seek to assert and then [] balance that burden against the precise interests identified by the [S]tate and the extent to which these interests require that [the] plaintiffs' rights be burdened."  See id.  "Only after weighting these factors can [a court] decide whether the challenged statute is constitutional."  Id. (citing Anderson, 460 U.S. at 789).

### 2.  Arguments of the Parties

Plaintiffs maintain that they request only that the Court "impose the same rules on the circulation of nomination petitions that have already been imposed . . . on the circulation of nomination papers in <u>Green Party</u>[,]" which they do not characterize as binding on this Court. (Doc. No. 53 at 19.) Although Plaintiffs admit that the decision is not binding, they argue that the decision and the relief granted concurrently therewith led to "an inequality in the circulation of nomination petitions for political party candidates" that "implicate[s] equal protection concerns." (<u>Id.</u> at 19-20.) Plaintiffs add that "while the legislature did not directly create the inequality between the circulation of nomination petitions and papers, they directly did create the current state of inequality by imposing a set of unconstitutional laws on both petitions and papers, such that the current inequality between the circulation of petitions and papers was foreseeable when one or the other were inevitably challenged." (<u>Id.</u> at 20.) According to Plaintiffs, while "Republican and Democratic party candidates and those who circulate their nomination petitions need to collect a fewer number of signatures" because "their voter registration numbers and past election results [establish] a significant level of support[,]" these parties do not differ from minor parties beyond "[t]he methods used to show 'substantial support.'" (<u>Id.</u> at 21.) Plaintiffs posit, therefore, that the challenged requirement "as applied to Republican and Democratic party candidates and circulators has no basis for any distinction and implicates" the Equal Protection Clause of the Fourteenth Amendment. (<u>Id.</u> at 21-22.)

Defendants reject Plaintiffs' equal protection claims generally on the basis that "even assuming that a judicial decision equates to a legislative enactment that can be used for an equal protection claim," Plaintiffs "are not similarly situated to the Green Party of Pennsylvania or the Libertarian Party of Pennsylvania." (Doc. No. 43 at 26.) Further, Defendants state that "even if [Plaintiffs] could assert the constitutional rights of others, the fact is that the major parties are not

the same as the Green Party or the Libertarian Party" in that the two types of parties must comply with multiple different requirements as part of the primary process. (Id.) According to Defendants, because Plaintiffs ignore "material differences between the Green Party and the Republican Party and/or the Democratic Party and the Libertarian Party," their equal protection challenge is meritless. (Id. at 26-27.)

### 3. Whether Summary Judgment is Proper as to Count IX of Plaintiffs' Second Amended Complaint

Having considered the parties' arguments, applicable law, and the relevant evidence of record, the Court finds that summary judgment in favor of Defendants is warranted as to Count IX of Plaintiffs' second amended complaint, as Defendants are entitled to summary judgment on Plaintiffs' equal protection challenge to the Commonwealth's prohibition on signing more than one nomination petition.[27] It bears noting that in the briefing addressing their alternative equal protection claims, Plaintiffs do not specify which of them is actually asserting the subject challenge. (Doc. No. 53 at 19-25.) The Court, therefore, considers these claims in a fashion similar to the manner in which it resolved Plaintiffs' other claims and, therefore, addresses the challenge to the prohibition on signing more than one nomination petition as it applies to Love.

The Court concludes that Defendants are entitled to judgment as a matter of law on this claim. The crux of Plaintiffs' equal protection argument is that the previous invalidation of this requirement as it applied to the parties in the Green Party case – and the Commonwealth's refraining from applying the challenged rule to those parties as a result of the decision in Green

_____

[27] As noted supra, because the Court has concluded that Benezet and Pool are entitled to summary judgment on their First Amendment challenge to the In-State Witness Requirement, the Court does not address their alternative challenge to the In-State Witness Requirement under the Equal Protection Clause. Additionally, in light of the Court's conclusion that Plaintiffs' challenges to the Notarization Requirement are moot, the Court considers Plaintiffs' equal protection challenge only with respect to Count IX of the second amended complaint.

Party, while still enforcing it as to Plaintiffs – violates the Equal Protection Clause.  (Id. at 19.)

Plaintiffs have provided no authority, and the Court is unable to locate any, directly supporting

the proposition that the Commonwealth's enforcement of this prohibition post-Green Party

implicates equal protection concerns for Plaintiffs.  Absent such authority, or any instruction

from the United States Court of Appeals directing a contrary result, the Court agrees with

Defendants that because "Plaintiffs are not the major political parties . . . and are not candidates

seeking access to the Democratic or Republican primary ballot for the office of President[,]" the

"invalidation of other provisions of the Election Code in Green Party has no applicability to this

litigation."  (Doc. No. 43 at 25.)  Accordingly, the Court will grant Defendants' motion for

summary judgment as to Count IX of the second amended complaint.

IV.     **CONCLUSION**

        For the foregoing reasons, the Court will grant in part and deny in part Defendants'

motion for summary judgment (Doc. No. 41) and grant in part and deny in part Plaintiffs' motion

for partial summary judgment (Doc. No. 44).  An appropriate Order follows.